## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **CLIFFORD BAILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **3:06- CV-00979-MHT** |
| | ) | **Removed from the Circuit Court** |
| **MERCK & COMPANY, INC.,** | ) | **of Randolph County, Alabama** |
| **et al.,** | ) | **CV-06-145** |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' EMERGENCY MOTION TO REMAND
## AND FOR EXPEDITED HEARING

Now come the Plaintiffs and move that this Court remand this civil action to the Circuit Court of Randolph County, Alabama from whence it was improvidently removed, without jurisdiction, and in support of this Motion, the Plaintiffs show the Court as follows:

There is no Federal jurisdiction in this case in that there is a lack of complete diversity. The Defendants weakly contend that the sales representative Defendants, who are in many cases Alabama residents, are fraudulently joined. In fact, the sales representative Defendants are proper parties and should not be dismissed. Emergency treatment is needed because Merck has notified the MDL Panel, in order to have an automatic "Conditional Transfer

Order" issued, before this Court can consider Remand.  A two year sojourn to the distant MDL is sought by Defendants before a ruling on this obviously valid motion to remand.

The Plaintiffs show the Court that the same subject presented herein has been recently, and thoroughly, studied by Judge Hopkins of the U.S. District Court for the Northern District of Alabama in a pharmaceutical case where the sales representative Defendants were the local parties.  Attached is a copy of Judge Hopkins' well-reasoned and recent Memorandum Opinion in the case of *Tracy v. Eli Lilly & Co., et al.,*  2:06-CV-00536-VEH (Attached hereto, included in **Exhibit A**).  As this decision shows, there are several bases upon which remand is mandated.  As here, a mass of evidence was presented by the Plaintiffs, in stark contrast to that in the *Legg v.  Wyeth* case, heavily relied on by defendants.  Also different claims were made in *Legg* than those here or in *Tracy*.  As here, there is ample reason to believe that a bonafide dispute will exist on the facts as to the conduct of the sales representatives.  Also, Judge Hopkins points out that in her case, AEMLD was raised as against the sales representatives.  It was not was raised in *Legg*.  AEMLD is raised in the case at bar – we claim that these defendants are liable to these plaintiffs under the AEMLD as Judge Hopkins found was plausible in *Tracy*.

Judge Hopkins discusses the *Legg v.  Wyeth* case in her Memorandum

Opinion, calling it "the jewel of Defendants' contentions" of fraudulent joinder. Obviously, *Legg* can not be construed to mean that all Pharmaceutical sales representatives are simply immune from liability under all circumstances, as *Tracy* points out. Instead, it is clear that this is a very different case. Judge Hopkins follows her own ruling in *Slatton v. Merck,* 05-VEH-1056-S ( a Vioxx case), also attached with opinions such as this Court's remand orders in *Crittenden v. Wyeth,* 03-T-920-N, *Brunson  v. Wyeth,* 03-T-1167-S, *Reeder v. Wyeth,* 04-T-066-N, *Brogden v. Wyeth,* 04-T- 068 -S, *Chestnut v. Wyeth,* 04-T-0295, *Ballard v. Wyeth,* 04-T-1251-S, *Allen v. Wyeth,* 04-T-0238 and *Blair v. Wyeth,* 03-T-1251-S (attached as part of **Exhibit A**). These decisions properly remanded pharmaceutical cases because of non-fraudulent claims against  sales representatives like those in the case at bar.

*Legg* was a case about a sanction against the drug company for removing a case. The holding of the case, therefore, was only such as would be necessary to say that a sanction was improper for the removal. Of course, the case stayed remanded. In *Legg*, the affidavits of the sales representatives were not even controverted. Instead, the District Judge had followed the older Eleventh Circuit holdings that the matter should be determined by the allegations of the pleadings.

Here, we have filed a substantial quantity of evidentiary material showing that there is very substantial evidence that Merck sales representatives were heavily involved, acted, and had personal incentive, with regard to a wide spread fraud on the medical community and the physicians prescribing to people like

these Plaintiffs.  Of course, even the Defendants in the case at bar do not argue that the Court ought to conduct a full trial of the matter before determining a motion to remand.  The Court is, under the law, to remand if there is "even a possibility" that the Plaintiffs may be able to state a claim against the resident Defendants.  Here, their own call notes show that these sales representatives carried the Vioxx false message to the relevant doctors –  accompanied even by cash honorariums and trips to the Chateau Elan Resort for a "Consumer Focus Group" on Vioxx! (**Exhibit S**) The sales representatives also advocated Vioxx (now withdrawn from the market) over Celebrex (still safe enough even now to be on the market) and did what they called "damage control" after the doctors met with the Pfizer representatives (selling Celebrex by claiming risks of Vioxx). (**also in Exhibit S**) (Here, the sales representatives were responding to Merck directives as to how to mislead the doctors as in Merck's, *Bulletin for Vioxx: New Obstacle Response,* May 1, 2000, attached hereto as **Exhibit P**). This bulletin told the sales force how to respond to a competitor's argument that "Vioxx has an increased incidence of heart attacks compared to Celebrex." (Merck, *Bulletin for Vioxx)* and **Exhibit F** the Merck internal document showing how sales representatives were trained to deceive about this subject of Vioxx dangers.   These facts against the sales representatives will be discussed more below.

As was stated by one court, that possibility needed to be greater than the possibility that a meteor might strike the Plaintiffs' house tonight.  But in the present circumstance, we have a majority of Alabama Federal District Judges

remanding cases like this. Surely, a majority of U.S. District Judges having a positive opinion on the subject constitutes a greater possibility than a meteor striking. The possibility that sales representatives may have liability under the AEMLD is such that several different U.S. District Judges have found that possibility reasonable. Should another Alabama Judge find that those Judges were so far off the mark as to have missed the point to such a high degree as being less than a meteor strike? We think not. It is certainly a point that was well analyzed in Judge Hopkins' attached opinion in *Tracy*.              It should be noted at the outset that the sales representative Defendants in this case do not deny that they were the ones who detailed (sold)Vioxx to East Alabama doctors. Second, they do not argue in their affidavits that the information given by them to East Alabama doctors about Vioxx was even true (it is widely known now that much false information was disseminated through sales representatives to prescribing doctors). They admit that there was other "information I used in speaking with physicians about Vioxx" besides the FDA approved material. See each form Declaration at ¶4, Exhibit F to Notice of Removal. Some of the sales representatives go to the extent of denying that they were personal participants in the "dodge ball" seminar or program but they don't deny having received the underlying message– suppress, conceal, and falsify information about Vioxx risks of cardiovascular problems. The fact that some of them missed one of the notorious programs does not dispose of any material factual dispute.

The Plaintiffs move this Honorable Court to immediately remand this action

to the Circuit Court of Randolph County, Alabama, and to expedite any hearing of that motion.  There is no federal subject matter jurisdiction in this case.  Federal judges in this district, and elsewhere in Alabama, have repeatedly held that the selling in-state pharmaceutical sales representatives are not fraudulently joined. Not surprisingly, Merck has failed to refer this Court to this body of authority, nor has Merck attempted to distinguish any of those opinions.

## I.    Introduction

In removing this action to federal court, Merck employs the same tactics that were successful in promoting and selling Vioxx - misinformation and half-truths.  First, Merck argues the decisions of distant courts located as justification for its fraudulent joinder argument, yet totally ignores the large volume of cases in this district, and other districts in this state, which squarely rejects Merck's position.

Moreover, Merck's marketing of Vioxx  has, to say the least, been under attack.  Within the last year months, documents have been provided in the public domain which offer a rare glimpse into the bowels of a pharmaceutical company's marketing program.  Indeed, only a few weeks ago, on May 5, 2005, the U.S. House of Representatives Committee on Government Reform released a memorandum entitled "The Marketing of Vioxx to Physicians."  (Attached hereto as **Exhibit B**) This report will be discussed subsequently in greater detail, but suffice it to say that the report is damning of the methods employed by Merck to vigorously promote Vioxx to prescribing doctors despite the known

cardiovascular risks associated with the drug. This report confirms what was already known: the sales representatives for Merck were not mere lackeys. This force of 3,000 people, including the defendants herein, was a well-trained, organized, and aggressive group. Most importantly, it was a group armed with the knowledge of the risks associated with Vioxx and tediously trained to misinform, misinterpret, dodge, and obfuscate those risks.

It is somewhat surprising that Merck claims with a straight face that its sales representatives are unquestionably innocent of the charges levied against them, as a matter of law. A mountain of evidence already in the public domain – and as alleged in the Complaint and attached hereto in pertinent part – proves otherwise. The declarations Merck submits with its Notice of Removal do not even bother to address that evidence, which is a telling defect. "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997) (emphasis added).

Although one or more resident Defendants moved to dismiss subsequent to the removal for judgment in his or her favor on the Plaintiffs' claims, those dispositive motions must be ignored by this Court for purposes of this motion to remand, again for the reason given by controlling precedent. "[D]istrict courts must exercise extraordinary care to avoid jumbling up motions for remand and motions for summary judgment that come before them . . . Applying these

principles to this case, we conclude that the district court – given the record before it – should have remanded the case to state court and should have never addressed the motion for summary judgment." *Crowe*, 113 F.3d at 1542.

At bottom, Merck's removal simply plows old ground which has already been tilled many times by various federal judges in this state.  Defense filings subsequent to the removal – all made no doubt at Merck's behest and to serve its interest – do no more than distract from that fact.  *Compare Tomlin v. Merck*, Case No. 04-14335, Slip op. at pp. 2 & 4-5, Feb. 22, 2005, U.S. District Court, S.D. Fla. (finding that Merck's filings "only serve to obscure the real issue before this Court of whether Merck should have removed this case based on fraudulent joinder in light of the prior remands in factually similar cases") (denying Merck's motion to stay, granting remand, and allowing plaintiff to seek "costs and expenses incurred as a result of Merck's removal").  (*Tomlin* is attached hereto at **Exhibit E**, which includes two other Florida federal court decisions.)  This case is due to be remanded to the Circuit Court of Randolph County, Alabama.

## II.  Under 11th Circuit Law, Merck Has Not Demonstrated by "Clear and Convincing Evidence" That There is "No Possibility" That Plaintiff Can State a Valid Cause of Action Against the Sales Representative Defendants.

When a defendant seeks to invoke federal diversity jurisdiction under a theory of fraudulent joinder in the Eleventh Circuit, "[T]he burden . . . is on defendant to show that ***the allegations of the complaint state no possible cause of action***" against each resident (*i.e.*, non-diverse) defendant.  *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1562 (11th Cir. 1989) (emphasis added).  "If there is

even a *possibility* that a state court would find that the complaint states a cause of action against any one of the resident defendants, the Federal court *must find* that the joinder was proper and remand the case to state court." *Coker v. Amoco Oil*, 709 F.2d 1440, 1441 (11th Cir. 1983) (emphasis added).

Where the plaintiff states even a colorable claim against a resident defendant, joinder is proper and the case should be remanded to state court. *Pacheco DePerez v. A T & T Co.*, 139 F.3d 1368, 1380 (11th Cir. 1998).

In defeating a fraudulent joinder argument, a plaintiff need not prove that he has a winning case against the resident defendant. *Triggs v. John Crump Toyota*, 154 F.3d 1284 (11th Cir. 1998). In fact, in defeating a fraudulent joinder argument, a plaintiff need not show that he could survive on a motion for summary judgment or a motion to dismiss filed by the in-state defendant. *See Crowe*, 113 F.3d at 1542; *see also Tillman v. R.J. Reynolds*, 253 F.3d 1302 (11th Cir. 2001) ("the plaintiff need not have a winning case against the allegedly fraudulently joined defendant, he need only have a possibility of stating a valid cause of action in order for joinder to be legitimate").

In *Pacheco*, the Court observed that "in a fraudulent joinder inquiry, 'federal courts are not to weigh the merits of a plaintiff's claims beyond determining whether it is an arguable one under state law.'" *Pacheco*, 139 F.3d 1381 (quoting *Crowe*, 113 F.3d at 1538).  Specifically, when making this inquiry, "the district court must evaluate the factual allegations in a light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in

favor of the plaintiff." *Crowe*, 113 F.3d at 1538.

Thus, on a motion to remand, the plaintiff's burden is light. The Eleventh Circuit holds that ". . . after drawing all reasonable inferences from the record in plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be 'a reasonable basis for predicting that the state law might impose liability on the facts involved.'" *Crowe*, *ante*. Furthermore, for two reasons, district courts should not confuse a motion for remand with one for summary judgment, or with a motion to dismiss.  First, the substantive requirements for the two are different, and second, the movant for remand (this Plaintiff) benefits from those differences.  *See e.g, Crowe*, 113 F.3d at 1542.  That was exactly the holding of Judges Hopkins and Acker of the Northern District Court in favor a plaintiff who brought a Vioxx suit against Merck and its resident sales representatives.  Those decisions, in which Judges Hopkins and Acker granted the plaintiff's motion for remand – *Slatton v. Merck* and *Hales v. Merck*, – is **Exhibits A** and **C** to this motion.

Merck cites *Crowe* to support its unfounded contention that "there is no reasonable basis for predicting that Plaintiffs could prevail on any of these claims."  (Merck Notice of Removal, pp. 6-7, ¶ 18, referring to claims against resident sales representatives).  A close reading of *Crowe* – and of *Slatton* and *Hales, ante*, the case in which that same unfounded contention of Merck was met and denied – reveals that *Crowe* is not helpful in any way to Merck. In *Crowe*, the defendant who alleged fraudulent joinder submitted an affidavit, along with some

other co-defendants. Defendants claimed that these affidavits should be controlling and that the fraudulently joined defendant must be dismissed. **In ruling that the Plaintiff's motion to remand should have been granted** by the trial court, the Eleventh Circuit held as follows:

> . . . over and over again, we stress that 'the trial court must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits.' [citations omitted]. In considering a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law. '***If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court.***' (emphasis added)

113 F.3d at 1538.

Federal courts, in deciding an issue of fraudulent joinder, are not to delve into the merits of a claim. Again, we cite *Crowe*:

> In the remand context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims. Although we have said that district courts may look beyond the face of the complaint, ***we emphasize that the district court is to stop short of adjudicating the merits of cases that do not appear readily to be frivolous or fraudulent.*** (emphasis added)

113 F.3d at 1542.

The question is simple: does a possible cause of action exist under Alabama law against the sales representative Defendants?  The question has been answered "Yes" in an undistinguishable case in this district that the Defendants did not even attempt to distinguish.  *Hales* (**Exhibit C**, attached hereto).  Accordingly, unless a conflict is to arise within this district, the case is due to be remanded.

**III.  The Plaintiff Has Pled Causes of Action Against the Resident Defendants Which Require Remand.**

The Complaint is replete with allegations against the sales representative Defendants which are dispositive of Merck's fraudulent joinder argument. The sales representatives were trained to deflect questions concerning the safety of Vioxx, and to obscure and hide the risks of the drug from the doctors they promoted it to.  In each such instance, and for each resident Defendant (*i.e.*, each sales representative), the Plaintiff alleges that this misconduct was directed to the Plaintiff's prescribing physician.  (Complaint ¶¶ 44, 46, 105-108, 110-116, 119, 121-134)

Plaintiffs allege that "Despite knowledge in its clinical trials and post-marketing reports, as well as studies and information relating to cardiovascular-related adverse health effects, Defendant promoted and marketed Vioxx® as safe and effective for persons such as Plaintiff. " (Complaint, ¶ 113) The promotion was carried out by the Defendant sales representatives.

Plaintiffs  allege that the Defendant sales representatives "...negligently, recklessly, intentionally and fraudulently made material representations that Vioxx was safe and effective. The sales representative defendants represented Vioxx as safe so that the general consuming public, including Plaintiffs and their physicians, would rely upon said representations when purchasing the product. The sales representative defendants also suppressed the cardiovascular risks from prescribing physicians, and consumers such as the Plaintiffs, even though they had knowledge of the risks." (Complaint, ¶ 121)

12

The Complaint spells out that "Merck trained its sales representatives, through programs such as the "Vioxx Obstacle Dodgeball Program," the "Obstacle Response Guide for Vioxx" and "Top Ten Obstacle Handlers" to misstate, conceal, and misrepresent the truly dangerous nature of Vioxx to prescribing physicians." (Complaint, ¶ 122)  Indeed, ..."These programs were specifically designed and promulgated by Merck to mislead prescribing physicians about the safety of Vioxx," (Complaint, ¶ 123), and. . . "These programs were specifically designed and promulgated by Merck to mislead prescribing physicians about the life threatening side effects, including myocardial infarction and stroke, of Vioxx." (Complaint, ¶ 124)

Further, Plaintiffs allege: "These programs were utilized by sales representative defendants to 'dodge' relevant safety questions by physicians to who promoted and or sold Vioxx.  Indeed, these programs provide specific responses and representations that are to be made by Merck sales representatives to physicians  during the sales calls or in response to physician questions.  These Merck mandated responses misrepresented the safety of Vioxx." (Complaint, ¶ 126)

The Obstacle Dodge Ball Program was most specific in instructing sales representatives how to respond. Take the following example: "The safety questions to be "dodged" by sales representatives, including the sales representative defendants include, inter alia, questions such as, "I am concerned about the cardiovascular effects of Vioxx," and "The competition has been in my

office telling me that the incidence of heart attacks is greater with Vioxx than with Celebrex." (Complaint, ¶ 127)

Again, the programs by which Merck trained its sales representatives, including these sales representative Defendants, showed the level of knowledge imputed to the sales representatives and illustrate what was provided to the representatives in order to perpetuate the sales of Vioxx: "Additional sales representative guidelines provide specific answers to physician questions/obstacles (such as those noted above) that were to be recited by sales representatives, including the sales representative defendants. The top three "obstacles" listed on the sales guidelines are physician safety questions involving Vioxx related "Cardiovascular Events." Sales representative, including the sales representative defendants, are thereafter provided with specific misrepresentations to make to the concerned physicians about the safety of Vioxx. For example, bulletins from Merck to its sales representatives state, "in response to recent published reports about Vioxx on May 1, 2000, we provided you with an approved verbal response to use to address customers' questions around the incidence rate of MI's [myocardial infarctions] on patients taking Vioxx . . . " (Bulletin for Vioxx: New PIRs Relative to Vioxx GI Outcomes Research Study.) Sales representatives, including the sales representative defendants, were therefore required to misrepresent that Vioxx does not increase the rate of myocardial infarctions when compared with NSAID's. This misrepresentation is false and inaccurate, yet was intentionally, knowingly, recklessly, wantonly and/or

negligently made to treating physicians, including each Plaintiffs' prescribing physicians, by the individually named sales representatives." (Complaint, ¶ 128)

Lastly, Plaintiffs allege in detail the nature of the fraud, both in the form of misrepresentation and suppression, committed by the sales representative Defendants and upon which Plaintiffs' prescribing physicians relied. **First**, " Merck and the individually named sales representatives further misrepresented the safety of Vioxx to prescribing physicians by providing written literature to the doctors that contained false statements about Vioxx's safety. Such literature would be forwarded to the physician who posed questions/obstacles to the sales representatives after the sales representatives had concluded their meeting with the physician, entitled "In Response To Your Questions" (follow-up literature that misrepresents Vioxx's cardiovascular safety) and "In Response To Your Questions: Cardiovascular System", which also misrepresents the risks associated with Vioxx." (Complaint ¶ 130) **Second**, " Sales representatives, including the sales representative defendants, were also ordered to send follow-up letters to physicians with whom they met who had posed questions/obstacles. These letters would downplay the cardiovascular risks associated with Vioxx, even though the defendants were well aware that the risks existed." (Complaint ¶ 131) **And, finally**, the Complaint alleges that ". . . Plaintiffs and their prescribing physicians reasonably relied, to their detriment, upon the false oral and written misrepresentations of Merck, and the sales representative defendants, concerning the safety of Vioxx and the absence of adverse cardiovascular events in users.

Such reasonable reliance induced each Plaintiff's treating physician to prescribe his Vioxx and further induced the Plaintiffs to utilize the dangerous drug Vioxx. As a direct and proximate result of Plaintiff's usage of Vioxx, they were injured as described herein." (Complaint ¶ 133)

These facts, as noted in the complaint, set forth specific allegations regarding activities of Merck and its sales representative Defendants.

> ### a.    Under Alabama law, it is a "certainty" that a cause of action exists against the sales representative Defendants.

If a "possibility" exists under Alabama law that a cause of action may be maintained against the sales representative Defendants, then Merck's contrivance of fraudulent joinder must fail. Merck's argument of fraudulent joinder is eviscerated by Alabama law. Whether the Plaintiff has a cause of action under Alabama law against the sales representative Defendants can be resolved in the *affirmative* with *absolute certainty*.

Alabama has long recognized the rule of law that a plaintiff may support a claim for fraud against a third party if he can show loss or injury resulting from such fraud. *Thomas v. Halstead*, 605 So.2d 1181 (Ala. 1992).    In Alabama, it is not always necessary to prove that a misrepresentation was made directly to the person who claims to have been injured.  *Sims v. Tigrett*, 229 Ala. 486, 491, 158 So. 326 (1934).

While generally a stranger to a transaction has no right of action for fraud, an exception to this general rule exists if a third person is injured by the deceit. In such a circumstance, he may recover against the one who made possible the

damages by practicing the deceit in the first place. *National State Ins. Co. v. Jones*, 393 So.2d 1361 (Ala. 1980) (holding that a niece had standing to sue for fraud even though the representation had been made to her deceased aunt).

In Alabama, in order to maintain an actionable fraud claim, it is not necessary that the misrepresentation be made directly to the person who claims to have been injured. Indeed, in *Sims*, the Alabama court stated:

> But we may observe that if defendant caused the representations to be made, and the public were intended to be thereby induced to act upon them, and plaintiff was in the class of those so contemplated, the action for deceit against defendant may be maintained by plaintiff, though defendant did not sell the bonds to plaintiff, but sold them to another, and he to plaintiff, both in reliance on the truth of the representations.

*King v. Livingston Mfg. Co.*, 180 Ala. 118, 126, 60 So. 143.

Recent authority by the Alabama Supreme Court likewise supports this settled rule of law. *See Seward v. Dickerson*, 844 So.2d 1207 (Ala. 2002) (where a third party fraudulent misrepresentation is alleged, statements to persons other than the plaintiff will support the fraud allegations when there is sufficient evidence of an intent on the part of the speaker to communicate to the third party in such a way as to induce the plaintiff to act). Moreover, in the case of *Delta Health Group, Inc. v. Stafford*, 2003 WL 22977449 (Dec. 19, 2003), the Alabama Supreme Court, in an opinion penned by Justice Stewart, again confirmed that a cause of action for fraud may be maintained by one who relied on the representation, even though the representation may have been made to another:

> We agree with *Stafford* that in certain limited circumstances not relevant here, a plaintiff may properly state a fraud claim even though

the defendant makes a false representation to a third party rather than to the plaintiff. However, we do not read *Thomas* as excusing a plaintiff from the requirement of establishing his reliance upon the misrepresentation. *Thomas* appears to contemplate that the plaintiff, in fact, has relied on the defendant's misrepresentation, even though the misrepresentation was made to another party.

*Delta Health Group, Inc.* p.10.

Indeed, in *Delta Health Group*, the plaintiff did not allege that *he* relied on the false representation made by the third party, so the Alabama Supreme Court had no choice but to reverse the jury verdict entered in favor of the plaintiff. Of course, in the instant case, the Complaint is replete with allegations of reliance by the Plaintiff.

It is beyond any doubt that Alabama recognizes a cause of action against a third party for fraud. Alabama has allowed such causes of action for over 100 years and has affirmed such causes of action as recently as December, 2003 in the *Delta Health Group* case.

Plaintiff was prescribed a drug for her arthritis affliction which caused a stroke. Plaintiff has alleged in the Complaint that the Defendant sales representatives made fraudulent representations concerning the safety of the drug, and likewise concealed information from her physician that was material, and should have been disclosed (Complaint, Counts I, II, III, IV, V, VI, and VII). Clearly, the Plaintiff is in the class of individuals that the sales representatives sought to induce into buying Vioxx. Any representations made about the safety or efficacy of the drug were communicated by the sales representative to be passed on to the patient, or in the case of concealment, to be withheld from the patient. As

the Complaint clearly alleges, the Plaintiff's physician, relied on the information, or misinformation, provided by the sales representatives and advised the Plaintiff accordingly.

Moreover, it matters not whether the sales representative defendants were acting within the line and scope of their employment with Merck at the time the fraud occurred. In Alabama, regardless of whether a person is acting within the line and scope, he or she is personally liable for the torts committed. *Galactic Employer Services, Inc. v. McDorman*, 2003 WL 21569815 (Ala. Civ. App. 2003); *Ex parte McInnis*, 827 So.2d 795 (Ala. 2001); *Sunshine Investments, Inc. v. Brooks*, 642 So.2d 408 (Ala. 1994).

Alabama law could not be any clearer. A cause of action exists against the sales representative Defendants. This easily meets the Eleventh Circuit standard. Merck's efforts to remove cases clearly grounded under Alabama state law have failed for one simple reason: **there is at least a possibility under Alabama law that a cause of action exists against the sales rep defendant as stated in the complaint. This is all that is required to defeat an allegation of fraudulent joinder under the law in the Eleventh Circuit.**

**b.     Federal Courts in Alabama have consistently held that a possible cause of action exists under Alabama law against pharmaceutical sales representatives**.

Merck invokes two non-jurisdictional decisions (Notice of Removal, p.6, ¶ 18) as ostensible authority for its assertion that the sales representative Defendants are fraudulently joined. It cites *In re Rezulin Products Liability Litigation*, 133 F.

Supp. 2d 272, 287 (S.D. N.Y. 2001) ("*Rezulin I*"), and *In re Baycol Products Litigation*, MDL 1431, Order dated March 26, 2004. It also cites Judge Propst's decision in *Fowler v. Pharmacia & Upjohn*, CV-04-PT-712-M, June 24, 2004. Merck's reliance on these decisions is specious. The decisions are patently distinguishable and inapposite.

Removal was upheld in *Rezulin I*, according to the court that issued it, because the Alabama Plaintiffs who sought a remand "did not specifically mention a nondiverse physician or sales representative Defendant except in the caption and then sought to lump this defendant in with the manufacturing defendants for liability purposes. *In re Rezulin Products Liability Litigation*, 2002 WL 548750, at *2 (S.D.N.Y April 12, 2003) (order disposing of certain remand motions) ("*Rezulin II*"), attached hereto as **Exhibit D**. *Accord Barragan v. Warner-Lambert Company*, 216 F.Supp.2d 627, 633 (W.D. Tex 2002) (quoting *Rezulin II* to describe basis of *Rezulin I* decision). Plaintiffs' allegations, in clearest contrast to the complaints at issue in *Rezulin I*, are made thoroughly and in detail against the nondiverse Defendants (*i.e.*, the sales representatives), and thus her complaint is untouched by the extremely limited basis and rationale of *Rezulin I*.

Likewise, in the *In re Baycol Products Litigation* decision that Merck cites, the court (the federal district court for Minnesota) found deficiencies in pleading not present here. Slip op. at 5-9. Equally important, *In re Baycol Products Litigation* is inapposite because it was decided under a non-jurisdictional

standard. *Id.* at 3 (quoting *Wiles v. Capitol Indemnity Corporation*, 280 F.3d 868 (8th Cir. 2001)). That standard is a test of law and fact, *id.*, in contrast to the controlling Eleventh Circuit standard (which is *Crowe*). That difference, which appears more favorable to a defendant who removes than the Eleventh Circuit standard, may explain why Judge Propst, in *Fowler v. Pharmacia & Upjohn* (cited by Merck and attached to the Notice of Removal), recognized that *In re Baycol Products Litigation* may wrongly "exclude claims against even active, knowledgeable sales representatives," including (or specifically) "failure to warn or suppression claims." *Fowler*, slip op. at 30-31. The sales representatives sued here by Plaintiffs were (according to the Complaint and the facts admitted) knowledgeable of the risks of Vioxx and active in obscuring and suppressing awareness of those risks. *Fowler* is unhelpful to Merck for that reason. The sales representatives were also active promoters of the drug and earned money from the success of that promotion (again according to the Complaint and the attached documents).

In contrast to Merck's preferred, non-jurisdictional authorities, numerous federal judges in Alabama who considered Motions to Remand in this litigation, ruled that sales representatives were not fraudulently joined. Merck, which certainly is aware of this large body of precedent, ignored same in its Notice of Removal.

It also ignored the decision of Judges Hopkins and Acker in *Slatton* and

*Hales*, which placed it on notice that a remand would be in order.  Suffice it to say that federal courts in Alabama have a long history of removals based on ultimately discredited assertions of fraudulent joinder of pharmaceutical sales representatives, and those courts have repeatedly rejected such as a basis for federal diversity jurisdiction.

Previously discussed was a partial list of decisions by federal judges in Alabama, applying Eleventh Circuit law, who held that pharmaceutical sales representatives were not fraudulently joined. The claims asserted against the sales representatives in this case are virtually the same as those asserted against the sales representatives in the decisions referenced herein.   Those district judges would have to be found to be "irrational" by a court to refuse remand in the case at bar.

**c.      Federal Courts in Florida in recent Vioxx litigation have recently held that a possible cause of action exists against pharmaceutical sales representatives**.

In Florida, three federal judges have remanded cases to state courts in the Vioxx litigation, denying in the process similarly unfounded assertions of fraudulent joinder and  diversity jurisdiction. *White v. Merck & Co, Inc, et al.*, No. 05-243 (M.D. Fla.); *Kozic v. Merck & Co, Inc.*, No. 04-324 (M.D. Fla.); *Tomlin, et al. v. Merck & Co., et al.*, No. 04-14335 (S.D. Fla.) (all of which are attached hereto as **Exhibit E**).  In each of these three cases, all of which are specific to the Vioxx litigation and similarly involve claims against Merck and its resident sales

representatives, the courts held for purposes of remand that the plaintiffs had asserted causes of action against the sales representatives.

> **d.    Merck's arguments concerning the sufficiency of the claims stated in the original Complaint, are unavailing.**

In its notice, Merck goes to great lengths to criticize the sufficiency of the claims against the sales representatives which were stated in the Complaint, but inaccurately so.

i.    Merck asserts that the sales representative are fraudulently joined claiming that Plaintiffs failed to make anything other than vague assertions regarding the sales representatives. But this the Complaint is full of any specific allegations regarding what the individual defendants named in this case are alleged to have done. As noted herein, and in the Complaint, numerous specific allegations have been laid out, that show clear and direct actions on the part of the Defendants.

ii.    Merck argues that "Counts I and II do not state a viable claim for relief against them because the sales representatives are not "sellers' as required under the AEMLD." (Notice of Removal, p. 13, ¶ 29). Merck ignores numerous holdings like Judge Hopkins' *Tracy* decision. Even if the sales representatives did not participate in the design, manufacture, or testing of the product at issue, they did participate, and indeed, were the primary distribution mechanism of the product by promoting and distributing thousands upon thousands of samples of Vioxx to Physicians throughout the

State of Alabama. These samples reached thousands of persons in the State

of Alabama. The sales representatives were the key link between the

Plaintiff's prescribing physician and Merck.    The sales representatives

admit that there was other "information I used in speaking with physicians

about Vioxx" and this is selling pure and simple.  See form Declarations

each at ¶4, Exhibit F to Notice of Removal.  What else do sales

representatives do besides sell?

iii.    Further, as stated in the Complaint, an aggressive marketing campaign was

made to Physicians and directly to consumers through advertising.

(Complaint, ¶ 17, 119) The sales force was a further extension of this

concerted push to promote their product. Further, as Judge Acker noted in

*Hales*, the "Alabama Supreme Court has never addressed whether an

individual employee of a defendant designer and manufacturer of a

prescription drug, who has responsibility for marketing and selling the drug

on behalf of his employer, can be held liable on a claim arising under

AEMLD, and accordingly, the court has never rejected individual liability

against intermediary sellers."

iv.    Merck argues that Counts VI and VII fail to state a cause of action against

the sales representatives because the sales representatives have never met

the Plaintiff and have made no representations to him or the general public

with regards to Vioxx. (Notice of Removal, ¶ 25) As noted herein, a claim

for fraud has been clearly established against third party representatives.
Indeed, in each of the declarations of sales representative defendants
Sparkman, Lovett, Bartlett, Mitcham, Delk, Houston, and Hodges-Melton
(attached as Exhibit F to Merck's brief), each notes in paragraph three that
the knowledge they had was provided to each by their employer. As has
been noted in the Complaint and herein, such information was fraudulent
and this was provided to the Physician to induce him to prescribe Vioxx to
his patients, including the Plaintiff.

v.   Defendants also claim that "Plaintiffs' fraud and fraudulent
misrepresentation counts (Count IX) are deficient because Plaintiffs have
not specifically alleged that the Employee Defendants, independently from
Merck, made a misrepresentation directly to the Plaintiffs or their
prescribing physicians." Judge Hopkins dispelled that argument in *Tracy*,
quoting two Middle District cases:

vi.   "In Alabama, the general rule is that officers or employees of a
corporation are liable for torts in which they have personally
participated, irrespective of whether they were acting in a corporate
capacity. Ex parte *Charles Bell Pontiac-Buick-Cadillac-GMC, Inc*., 496
So.2d 774, 775 (Ala.1986) (citing *Candy H. v. Redemption Ranch, Inc.,*
563 F.Supp. 505, 513 (M.D.Ala.1983)); see also *Chandler v. Hunter*,
340 So.2d 818, 822 (Ala.Civ.App.1976). Obviously, to the extent R.J.

Reynolds allegedly violated the AEMLD, it acted through its employees;
the company does not employ ghosts. [Plaintiff] should be allowed to
pursue these individual defendants, and, if, after discovery, it should
turn out that he has named the wrong persons, he should be allowed to
make substitutions."

*Seaborn v. R.J. Reynolds Tobacco Co.*, 1996 WL 943621, *8 (M.D. Ala. 1996).

And:

"The same language can be applied here: Defendants Philip Morris and
Brown & Williamson clearly do not employ ghosts. That is, the court
finds that some of the moving Defendants' employees are likely to hold
some superior knowledge regarding the nature of cigarettes. The court
finds that it is therefore conceivable that Plaintiff's AEMLD claims ...
may be viable [against the individual nondiverse defendants]."

*Clay v. Brown & Williamson Tobacco Corp.*, 77 F.Supp.2d 1220, 1224 (M.D. Ala.
1999).

Judge Hopkins then said: "A similar situation to those present in Seaborn and Clay
exists in the instant case. Green admits to being an Eli Lilly employee engaged to
promote Zyprexa to physicians, including Tracy's prescribing physician.
Therefore, she is liable for torts in which she personally participated. Also, if Eli
Lilly violated the AEMLD, it acted through Green in this case, and Tracy should
be allowed to pursue Green as an individual defendant, considering Green's
possible superior knowledge of the risks associated with Zyprexa and her

representation to Tracy's prescribing physician that the drug was safe." *Tracy*, at page 18.

vii.    Additionally, although all of the resident sales representatives who are Defendants have been served or have appeared in this case, declarations are not submitted by some.  (Notice of Removal, p. 2, ¶ 3, & Exhibit F)  The allegations against those resident Defendants stand individually unrefuted, erasing any possibility of diversity jurisdiction for the reason given by controlling precedent.

While Merck is suggesting to this Court it will prevail on the claims asserted against the sales representative Defendants, by doing so, Merck is "embarking upon a safari in search of a judgment on the merits", which, according to *Crowe* and other Eleventh Circuit authority, is not allowed. As *Crowe* and its progeny (*Tracey, Slatton* and *Hales,* included) teach, when deciding a question of fraudulent joinder, the "district court is to stop short of adjudicating the merits of cases that do not appear readily to be frivolous or fraudulent."  *Crowe,* 113 F. 3d, at 1542.

While we don't think they will, it is possible that the defendants may ultimately prevail on the claims asserted against the sales representative Defendants.  The defendants may have valid defenses to these claims.  The defendants may be able to prove that the Plaintiff's physician did not rely on any suppression or misrepresentation made by these gentlemen.  In the end, before a

jury (which DEFENDANTS demanded), the sales representatives may vindicate themselves of the allegations. However, whether Merck and/or the sales representatives will prevail on these claims is immaterial to this Court's ruling here. The standard set forth by the Eleventh Circuit to determine fraudulent joinder is clear.  If a *possibility* exists that the Complaint states a cause of action against the sales representative Defendants under Alabama law, then this case must be remanded.

## IV.    Merck's Internal Documents Confirm that Sales Representatives Were Trained to Mislead and Conceal Cardiovascular Risks from Physicians.

Merck has alleged that federal jurisdiction exists in this case because its sales representatives were fraudulently joined. Nothing could be further from the truth. The undisputed evidence leads to the inescapable conclusion that Merck knew of cardiovascular risks, at the latest, in 2000, and that Merck trained its sales representatives to intentionally mislead physicians who posed questions concerning cardiovascular side effects.

In early 1999, Merck started an 8,000 person trial referred to as the Vioxx Gastrointestinal Outcomes Research Study (VIGOR).  This trial compared Vioxx with naproxen, and excluded from the group, people who had cardiovascular problems within a year of the sample.

In March, 2000, less than one year after the FDA approved Vioxx, the results of the VIGOR trial indicated that Vioxx caused *four times* as many heart

attacks as Naproxen.  The results of the VIGOR trial caught the attention of the FDA and many in the medical community, but Merck attempted to neutralize the results of the trial by claiming that Vioxx looked bad in comparison to naproxen because naproxen was "cardio protective," a position which credible epidemiologists would deem untenable.

In any event, following the VIGOR trial, Merck scrambled in an attempt to address concerns from prescribing physicians which would inevitably follow the results of the VIGOR trial. Merck made a conscious decision to train its sales representatives to mislead, misrepresent, conceal, and "dodge" questions from physicians about the cardiovascular risks associated with Vioxx.

Attached hereto as **Exhibit F** is a Merck internal document revealing the despicable manner in which Merck trained its sales force after the results of the VIGOR trial were announced.  This document in entitled "Dodgeball Vioxx."  The document lists various "obstacles" which the sales rep is trained to overcome. These "obstacles" are nothing more than the anticipated questions of prescribing physicians. This court will recall from the diet drug litigation, that physicians heavily rely on sales representatives who are supposed to furnish accurate information regarding the properties of the drugs they detail. Physicians rely on this information in their treatment of patients.

This document is revealing because it confirms Merck's scheme to obfuscate as much as possible the issue of cardiovascular risks associated with

Vioxx. Indeed, in the document, it notes the following:

> "The competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than with Celebrex."

The training manual also includes "obstacle four" which states as follows:

> "I am concerned about the cardiovascular effects of Vioxx?"

At the end of these training materials, the Merck sales representative is provided instructions on how to answer each and every question, or "obstacle" contained therein. The Merck sales representatives are instructed to "DODGE!"

On November 9, 2004, the United States Committee on Government Reform requested that Merck provide the Committee with a range of documents related to Vioxx® in preparation for the May 5, 2005 hearing on FDA and Vioxx® (in a letter from Chairman Tom Davis to Merck Chief Executive Officer Ray Gilmartin dated November 9, 2004)

A Memorandum was prepared by Rep. Henry A. Waxman to the Democratic Members of the Government Reform Committee concerning the marketing of Vioxx® to Physicians, dated May 5, 2005. Over 20,000 pages of Merck documents were reviewed evidencing that the company used its sales force to counter the concerns of safety of Vioxx. A copy of this Memorandum is attached hereto as **Exhibit B**.

This Memorandum and Executive Summary shed further light on the distressing tactics of Merck. Nothing was left to the imagination of the sales force marketing this drug. The Executive Summary stated:

"The documents indicate that Merck instructed these representatives to show physicians a pamphlet indicating that Vioxx might be 8 to 11 times safer than other anti-inflammatory drugs, prohibited the representatives from discussing contrary studies (including those financed by Merck) that showed increased risks from Vioxx, and launched special marketing programs - named Project Xxceleration and Project Offense - to overcome the cardiovascular obstacle increased sales."

(Waxman Memorandum to Democratic Members of the Government Reform Committee, May 5, 2005, p.3)

Indeed, the 3,000 person sales force Merck used to promote Vioxx® was very well trained. The Merck training manual (Merck, *Professional Presence,* undated, attached hereto as **Exhibit G**), promoted that "gaining access and building relationships... are key to providing you the opportunity to influence your customers' behavior". Another manual, (Merck, *Selling Skills for Hospital Representatives & HIV Specialists,* undated, attached hereto as **Exhibit H** ), instructed them on how to close the deal. The materials and manuals provided the sales force was extensive, and nothing was left uncovered; other topics included selling skills (*Selling Skills* attached as **Exhibit H**) *;* using and reading nonverbal techniques ( Merck, *Captivating the Consumer,* June, 2001, attached hereto as **Exhibit I**); assessing the personality of doctors in order to determine what type of information would be most convincing to them (Merck, *Champion Selling: Milestone Leader's Guide,* January, 2002, attached hereto as **Exhibit J** ); refocusing conversations from non-business subjects to business subjects (Merck, *Planning, Conducting & Following up Successful HEL Programs,* 1999, attached as **Exhibit K**); and, detailing how to give handshakes and greetings and how to eat

31

when dining with physicians (Merck, *Professional Presence,* undated, attached as **Exhibit G**). These examples show how determined Merck was to focus the tactics of its sales force on pushing Vioxx on all Physicians.

Merck provided its sales force with detailed instructions on a range of sensitive subjects specific to the marketing of its drugs, including Vioxx®. They were provided with specifics on individual doctors' prescribing habits and were to use this data to increase their prescribing of Merck drugs. This data was purchased from outside sources that tracked pharmacy prescriptions (Merck, *Data Sources,* May, 2003). Further, Merck could compile monthly reports on overall sales and market share for each sales representative's territory, and the representatives were instructed that their bonuses were to be based on overall sales figures (Merck*, Basic Training Participant Guide*, January, 2002, attached hereto as **Exhibit L**). The sales representatives were instructed on how to approach getting hospitals to add Merck drugs onto their fomularies, thereby making it more likely that their products would be used (Merck, *Hospital Strategy Simulation: Roleplayers Guide*, September, 2000, attached as **Exhibit M**). Additionally, Merck also instructed its sales force on the use of speaker programs and educational events to enhance the sale of its products. The sales force knew which speakers would speak favorably about Merck's products and whether they were influential among their peers (Merck, *Specialty Foundations Participant Self-Study Workbook: Specialty Representative Advocate Development*, May, 2001, attached hereto as **Exhibit N**).

The Waxman Memorandum reviewed the series of studies and news reports,

discussed previously, in depth. Throughout the Merck documents a common theme emerged; the reassurance of physicians about the safety of Vioxx by providing highly questionable and misleading information about cardiovascular risks.

a.      After the VIGOR Trial showed a five-fold increase in the risk of heart attacks for patients on Vioxx, Merck instructed its sales force to show doctors a pamphlet suggesting that Vioxx was 8 to 11 times safer than other anti-inflammatory drugs, using studies that were not appropriate for an analysis of cardiovascular safety. The sales force was issued a "new resource" "to ensure that you are well prepared to respond to questions about he cardiovascular effects of Vioxx". This was the "Cardiovascular Card". (Merck, *Bulletin for Vioxx: NEW RESOURCE: Cardiovascular Card*, April 28, 2000, attached hereto as **Exhibit O**) The data on this card had little or no scientific validity.

b.      On May 1, 2000, Merck provided a bulletin to "all field personnel with responsibility for Vioxx". (Merck, *Bulletin for Vioxx: New Obstacle Response,* May 1, 2000, attached hereto as **Exhibit P**) This bulletin told the sales force how to respond to a competitor's argument that "Vioxx has an increased incidence of heart attacks compared to Celebrex." (Merck, *Bulletin for Vioxx)* This involved using the "Cardiovascular Card".

c.      As a result of the February 2001 meeting of the FDA Arthritis Advisory Committee, the Committee voted that doctors should be informed of the data from the VIGOR study. The next day, Merck sent another bulletin to "all field personnel with responsibility for Vioxx.", instructing them to "stay focused on the

EFFICACY messages for VIOXX". (Merck, *Bulletin for Vioxx: FDA Arthritis Advisory Committee Meeting for Vioxx*, February 9, 2001, attached hereto as **Exhibit Q**) The bulletin stated:

> DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE...OR THE RESULTS OF THE...VIGOR STUDY

Sales force staff were given detailed steps to take when physicians asked about these topics.

d.    After the August 22, 2001 study published in the *Journal of the American Medical Association (*D. Mukherjee, S. Nissen, E. Topol*, Risk of Cardiovascular Events Associated with Selective Cox-2  Inhibitors,* Journal of the American Medical Association, 954-9, August 22-29, 2001) which raised serious concerns about the safety of Vioxx and other drugs in the same class, Merck urged its sales force to show confidence in Vioxx's cardiovascular safety and to use the Cardiovascular Card. In light of this study, Merck Executive Jo Jerman left a voice mail for all the company's field representatives, urging them to :"Stay focused. Stay focused with your efficacy and GI risk awareness messages and stay focused with your confidence in cardiovascular safety and overall safety of Vioxx" (Merck, *MVX for Vioxx, Field Sales - USHH, Jo Jerman, August 21, 2001 "JAMA article" FINAL (approx 4 minutes),* August 21, 2001, attached hereto as **Exhibit R***).* Instead of moderating its sales approach, Merck launched a new marketing strategy, Project Offense. This strategy focused on efficacy. If "obstacles" appeared when discussing physicians, the sales force was to "quickly and effectively address

all physician obstacles and return to the core message for Vioxx." (Merck, *Project Offense Meeting Agenda & Content: Representative Meetings,* 2001).

Accordingly, the sales representative defendants are liable to the Plaintiff for the claims stated herein, and are not fraudulently joined in an attempt to defeat removal to federal court.

It is clear from these materials that Merck and its sales force engaged in a scheme to defraud prescribing physicians, with the intent that patients not be told about the cardiovascular risks associated with Vioxx.  Merck trained its sales force to "dodge" life-saving questions from physicians. The sales force, including the individual Defendants in this case, knowingly concealed and misrepresented the cardiovascular risks of Vioxx from prescribing physicians.   Far from being fraudulently joined, the sales representatives who participated in this scheme are liable for numerous common law causes of action in Alabama.  These sales representatives were not duped by Merck. They willingly participated in this sordid scheme.

Merck's claim of fraudulent joinder should be rejected forthwith, and this action is due to be remanded to state court.

**V.    Plaintiffs Request Emergency Consideration of their Remand Motion.**

Plaintiffs request that their Motion to Remand be heard on an emergency and expedited basis due to the fact that they have been damaged by the use of Vioxx, and  are entitled not heir timely day in the court which has jurisdiction, which is the Circuit County of Randolph County, Alabama. Plaintiffs respectfully request that

all remand motions relating to the interpretation of state law be addressed by the

District Court in the district where the action was removed. Lastly, due to the clear

absence of federal jurisdiction, as evidenced by the arguments herein, and other

decisions granting similar remand motions, the matter should be disposed of on an

expedited basis.

Wherefore the Plaintiffs respectfully move that the Court remand this civil

action to the Circuit Court of Randolph County, Alabama, from which it was

improvidently removed without jurisdiction.

/S/ James S.  Hubbard
Attorney for Plaintiffs


/S/ Thomas J.  Knight
Attorney for Plaintiffs

HUBBARD & KNIGHT
1125 Noble Street
Anniston, Alabama 36202
(256) 237-9586

<u>Certificate of Service</u>

I hereby certify that on November 20, 2006, I electronically filed the
forgoing with the Clerk of Court using the CM/EMF system which will send
notification of such filing to the following:

Robert C. "Mike" Brock
F. Chadwick Morriss
Ben C. Wilson
Richard B. Garrett
Attorneys for Defendant
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
Post Office Box 270
Montgomery, Alabama 36101-0270

/S/ Thomas J.  Knight
Attorney for Plaintiffs

FILED

2006 Apr-25  PM 02:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| PATRICIA TRACY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 2:06-CV-00536-VEH** |
| | ) | |
| ELI LILLY AND COMPANY, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Pending before the court is Plaintiff's Emergency Motion to Remand (doc. 13). This motion has been briefed extensively and is ripe for review.  A hearing has not been requested on the instant motion, and the court is satisfied that a decision can be reached based on the papers submitted by the parties.  For the reasons stated herein, the Motion to Remand is due to be **GRANTED**.

## Procedural History

Plaintiff Patricia Tracy commenced this action in the Circuit Court of Jefferson County, Alabama, on February 14, 2006, by filing a Complaint against Defendants Eli Lilly and Company, Richard Leventry, and Mary V. Green.  Eli Lilly is an Indiana corporation.  Richard Leventry, a district manager for Eli Lilly, and Mary V. Green,

1

a sales representative for Eli Lilly, are both alleged to be citizens of Alabama. Tracy is a citizen of Alabama. The Complaint asserts claims for violation of the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), failure to warn, breach of warranty of merchantability, negligence and fraud against all defendants as well as a claim for negligent training and supervision against Eli Lilly.

Defendants removed this action to the United States District Court for the Northern District of Alabama on March 20, 2006. The basis for removal is that complete diversity among the parties to this action exists due to Leventry and Green having been fraudulently joined. Simultaneously with filing the Notice of Removal, Defendants also filed a Motion to Stay this action pending transfer of this case to a MDL proceeding that has been established in the Eastern District of New York.[1] Tracy filed an Emergency Motion to Remand on March 30, 2006.

### **Facts**[2]

Tracy was prescribed the drug Zyprexa by Dr. Wolfman Glaser on or about

---

[1] Defendants invite the court to stay this case without reaching a decision on the motion to remand so that the instant motion may be decided by the MDL once the case is transferred. Such a course of action would be improper in that the parties are entitled to a determination of this court's jurisdiction as soon as is practicable. Additionally, the facts which establish (or fail to establish) fraudulent joinder are likely to be unique to this case.

[2] As it must, the court will decide all disputed issues of fact in favor of the plaintiff; however, where an affidavit is undisputed by the plaintiff, the court will give weight to the sworn statement over unsupported allegations in the Complaint. *See Legg v. Wyeth*, 428 F.3d 1317, 1323 (11th Cir. 2005).

April, 2003, and continued taking the drug under physician supervised care until about August, 2005. In January, 2005, Tracy was diagnosed with borderline diabetes. Following further tests, she was diagnosed as a Type II diabetic in April, 2005. Tracy alleges that her diabetes is the proximate and legal result of the ingestion of Zyprexa, and that her life expectancy has been shortened as a consequence of her diabetic condition.

Zyprexa, a product of Eli Lilly, was initially approved for the treatment of schizophrenia in October, 1996, and was subsequently approved for the short-term management of acute manic episodes associated with bipolar disorder in March, 2000.

In 1998, the worldwide pharmacology and epidemiology department at Eli Lilly began receiving adverse event reports revealing excessive weight gain as well as reports for diabetes mellitus, ketoacidosis, and increased incidents of hyperglycemia in patients who were taking Zyprexa. These reports are consistent with reports provided to Eli Lilly prior to the launch of the drug which warned against a risk of significant weight gain and Type II diabetes. During clinical trials, Eli Lilly denied that any patient using Zyprexa developed diabetes due to weight gain associated with ingesting the drug. Eli Lilly continued to market and sell the drug despite additional reports that its use was associated with instances of weight gain

3

and diabetes.

In April, 2002, the Japanese Ministry of Health required Eli Lilly to revise the Zyprexa label to include warnings that the drug has been linked to cases of weight gain and diabetes.  Eli Lilly did not update the label for Zyprexa distributed to the American market until July, 2003, when the FDA placed Eli Lilly on notice that the label on Zyprexa must be updated with information on the metabolic disorders, including diabetes, that were linked to the drug.  By this time, Eli Lilly was aware of the risk of diabetes associated with Zyprexa; however, Eli Lilly did not update the drug's label to include a warning of the risk until March, 2004.

The sales force for Eli Lilly were trained to avoid or, in the alternative, to give protracted answers to questions from physicians regarding the risk of diabetes associated with Zyprexa.  In addition, Eli Lilly employed the services of at least one physician to assist sales personnel at trade shows in an effort to minimize inquiring physicians' concerns about the risk of diabetes associated with the drug.

Eli Lilly's sales representatives were not instructed to conduct any independent medical research, including review of scientific articles not provided to them by Eli Lilly, as to any of the risks or benefits associated with Zyprexa, and were limited to discussing issues approved during their sales training.  In many cases, the sales representatives were instructed by Eli Lilly to refer physicians, as the ultimate

4

decision maker to prescribe the drug, to the written information provided by Eli Lilly regarding Zyprexa.

Leventry, through an affidavit dated March 14, 2006, admits that he is a district manager for Eli Lilly; however, he denies being responsible for training the sales staff who promoted Zyprexa, supervising the sales force or any other person responsible for promoting Zyprexa, supervising anyone who called on Tracy's prescribing physician, and having any involvement in the manufacture or development of Zyprexa, the preparation of package inserts, or otherwise participating in the promotion of Zyprexa.

Green, through two affidavits dated March 14, 2006, and April 6, 2006, admits being a sales representative for Eli Lilly responsible for promoting Zyprexa to psychiatrists, including Tracy's prescribing physician, beginning prior to and extending throughout the duration of Tracy's prescribed use of Zyprexa. Her knowledge of the drug was derived exclusively from materials and education provided by Eli Lilly. At no point did she conduct any independent research on Zyprexa.

Green states that she did not represent Zyprexa to have efficacy for any uses other than those approved by the FDA. However, Green was trained to promote the drug with the tale of a fictitious individual known as "Donna" who was a single

mother suffering from anxiety and irritability issues. Donna was created to enhance profits for Eli Lilly for promoting Zyprexa for off-label uses. Anxiety, in any form, is not an approved ailment for which Zyprexa is a treatment.

Green represents that she had not seen any of the documents accompanying Tracy's Motion to Remand, that those documents were not a part of her training, nor did she use those documents when she called on Tracy's physician.

Green denies any knowledge of any risks associated with Zyprexa other than those provided in the FDA approved package insert accompanying the drug, and she denies that Eli Lilly trained her to mislead or withhold information from physicians or that she mislead or withheld information from physicians regarding the risks associated with Zyprexa.

Tracy has produced documents generated by Eli Lilly and used for the purpose of training its sales force. These documents acknowledge a risk of weight gain and diabetes associated with Zyprexa and instruct sales representatives on methods designed to minimize any physicians' concerns regarding the link between the drug and these risks. Green, as a sales representative for Eli Lilly responsible for promoting Zyprexa, would have access to these materials.[3]

---

[3]A genuine issue of disputed of fact exists regarding Green's knowledge and training as to the risks of weight gain and diabetes associated with ingesting Zyprexa. Green flatly denies having ever seen any of the documents offered by Tracy, and she additionally denies that Eli Lilly

Green represented, to Tracy's prescribing physician, that Zyprexa was safe and effective. That representation led, in part, to Dr. Glaser's prescribing Zyprexa to Tracy.

## **Standard of Review**

"Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity." *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998). Under Eleventh Circuit precedent, joinder is fraudulent in three situations: (1) when there is no possibility that the plaintiff can prove a cause of action against the resident defendant; (2) when there is outright fraud in the plaintiff's pleading of jurisdictional issue; and (3) when a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant.[4] *Id. See also Coker v. Amoco Oil Co.*,

---

trained her to mislead or withhold information from physicians about risks associated with Zyprexa. Tracy has produced documents that were used by Lilly to train its sales force on how to address or avoid questions about Zyprexa and diabetes. The fact that these documents predate Green's employment is of no consequence. The court rejects Defendants' contention that *Legg* stands for the proposition that Green's affidavit trumps all allegations made and supporting documents provided by Tracy. Such a reading of *Legg* would allow nondiverse defendants to satisfy their burden on a motion to remand solely by executing affidavits that deny the allegations in a plaintiff's complaint. Tracy has effectively disputed Green's affidavit. For purposes of this motion, the court must decide these disputed issues of fact in favor of the plaintiff.

[4]In the present case, Defendants assert that only the first type of fraudulent joinder is applicable; accordingly, the court will offer no analysis as to the second and third situations under which a fraudulent joinder can occur.

709 F.2d 1433, 1440 (11th Cir. 1983), *superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533 (11th Cir. 1993); *Tapscott v. MS Dealer Service Corp.*; 77 F.3d 1353, 1360 (11th Cir. 1996), *overruled as conflicting with prior panel decision on other grounds by Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000). If any of these situations are present, the nondiverse defendant has been fraudulently joined and its citizenship should be ignored for purposes of determining jurisdiction. *Id.*

"In evaluating a motion to remand, the removing party bears the burden of demonstrating federal jurisdiction." *Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1373 (11th Cir. 1998). "The determination of whether a resident defendant has been fraudulently joined must be based upon the plaintiff's pleadings at the time of removal, supplemented by the parties." *Id.* at 1380. "While the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed. R. Civ. P. 56(b) ... the jurisdictional inquiry must not subsume substantive determination." *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997) (internal citations and marks omitted). A district court must resolve all questions of fact in favor of the plaintiff; however there must be some dispute of fact before the court can resolve that fact in the plaintiff's favor. *Legg v. Wyeth*, 428 F.3d 1317, 1323 (11th Cir. 2005). When a defendant's affidavits

8

are not disputed by the plaintiff, the court "cannot then resolve the facts in the [plaintiff's] favor based solely on the unsupported allegations in the Plaintiff's complaint." *Id.*

A federal court must be certain of its jurisdiction before "embarking upon a safari in search of a judgment on the merits." *Crowe*, 113 F.3d at 1538. A "district court's authority to look into the ultimate merits of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims." *Crowe*, 113 F.3d at 1542.

<u>Discussion</u>

## I.  Tracy has not asserted facts that could be construed to give rise to a possible cause of action against Leventry

Tracy does not dispute that Leventry was not responsible for training the sales staff who promoted Zyprexa, supervising the sales force or any other person responsible for promoting Zyprexa, supervising anyone who called on Tracy's prescribing physician, and does not dispute that Leventry had no involvement in the manufacture or development of Zyprexa, the preparation of package inserts, or otherwise participated in the promotion of Zyprexa. In an attempt to defuse the disputed facts as they apply to Leventry, Tracy asserts that the veracity of the declarations contained in Leventry's affidavit is a matter to be navigated during

9

discovery, and that the court need not concern itself with Leventry's representations. Contrary to Tracy's position, the court is obligated to make factual determinations where there is obvious dispute.

Under the precedent articulated in *Legg*, the court must resolve all factual disputes in favor of Tracy; however, because Leventry's declaration conflicts with Tracy's assertions contained within her complaint, and because Tracy does not dispute or adequately rebut the statements contained in Leventry's affidavit, the court is obligated to accept Leventry's affidavit as fact for the purpose of deciding the instant motion. *See Legg*, 428 F.3d at 1323. Accordingly, Tracy cannot maintain a cognizable claim against Leventry, the court concludes that Leventry has been fraudulently joined in this action, and his citizenship will be ignored for the purpose of establishing diversity jurisdiction in this case. *See Triggs*, 154 F.3d at 1287.

## II.     Tracy can maintain a possible cause of action against Green

Tracy's arguments as to the improper removal of this case are based solely on the claims asserted against Green. The issue before the court is whether a possible claim for violation of the AEMLD, fraud, or negligence might be maintained against Green in state court. A possibility of success as to any of the aforementioned claims will lead to a determination that Green is not fraudulently joined in this action, that complete diversity does not exist among the parties, and that this action is due to be

10

remanded.

It is undisputed that Green transmitted information to Tracy's prescribing physician regarding Zyprexa. Tracy directs the court to numerous internal Eli Lilly documents that demonstrate Eli Lilly's knowledge that Zyprexa was linked to reports of weight gain and diabetes. Knowledge of those risks, to some degree, was imparted to sales representatives through documents that outline plans, created and executed by Eli Lilly, to craft sales materials and jargon designed specifically for the purpose of minimizing, by virtue of Green's solicitations, physicians' concerns, including those of Tracy's prescribing physician, about the link between Zyprexa and weight gain or diabetes.

**A.     Tracy can possibly maintain a claim for violation of the AEMLD against Green**[5]

The AEMLD establishes a cause of action against "a manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence as a matter of law." *Castrell v. Altec Industries, Inc.*, 335 So.2d 128, 132 (Ala. 1976). In order to establish liability under the AEMLD, Tracy must prove:

---

[5]Because Tracy could possibly maintain a claim against Green for violation of the AEMLD, the court will not offer analysis as to the possibility of the remaining claims of fraud and negligence asserted against Green.

11

> [She] suffered injury or damages to [herself] or [her] property by one
> who sold a product in a defective condition unreasonably dangerous to
> the plaintiff as the ultimate user or consumer, if (a) the seller was
> engaged in the business of selling such a product, and (b) it was
> expected to, and did, reach the user or consumer without substantial
> change in the condition in which it was sold.

*Key v. Maytag Corp.*, 671 So.2d 96, 101 (Ala. Civ. App. 1995); *quoting Atkins v.*
*American Motors Corp.,* 335 So.2d 134 (Ala.1976).

Tracy asserts that, as a seller of Zyprexa, Green faces possible liability under
the AEMLD. Defendants argue that Green is not a "seller" as defined under the
AEMLD; thus, she cannot be held liable for a violation of the statue.

The sole issue addressed in the parties briefs is whether Green is a "seller"
under the AEMLD or a representative of the seller.[6] The Alabama Supreme Court has
not yet addressed the question of whether a sales representative is a "seller" exposed
to possible liability under the AEMLD or, conversely, a representative for the "seller"
who would be shielded from liability.

Tracy contends that because Alabama courts have never addressed the issue at
hand and due to the lack of a clear mandate by Alabama courts on the issue, an

---

[6]Due to Defendants' burden to demonstrate the propriety of removal, and given that the
additional elements necessary to establish liability under the AEMLD are not addressed in any of
Defendants' papers, the court finds that Defendants concede the possibility that an Alabama state
court could find that Zyprexa is "a product not reasonably safe when applied to its intended use
in the usual and customary manner."

Alabama court might determine Green to be a "seller" under the AEMLD. The bright-line rule to which Tracy clings is that a "seller who markets a product not reasonably safe when applied to its intended use in the usual and customary manner" is exposed to liability under the AEMLD "[a]s long as there is a causal relationship between the defendant's conduct and the defective product." *Casrell v. Altec Industries, Inc.*, 335 So.2d 128, 132 (Ala. 1976).[7] The parties have not cited, and this court is unaware, of the existence of any published opinion from an Alabama court addressing liability under the AEMLD of a product sales representative who is employed by the manufacturer of the product. However, there are persuasive cases that distinguish between a sales representative and a "seller." The court agrees with Defendants that these cases indicate that a sales representative is not a "seller" as defined under the AEMLD in certain instances; however, none of those situations exist in the case at hand. While numerous persuasive decisions exist supporting both sides of this argument, the court is persuaded that a pharmaceutical representative, under the specific facts and allegations in this case, is a "seller" for purposes of the AEMLD.

Defendants direct the court to the case of *In re Rezulin Products Liability*

---

[7]*Casrell*, along with *Atkins v. American Motors Corp.*, 335 So.2d 134 (Ala. 1976), are cited by the parties as the cases defining the scope of the AEMLD. Neither case addresses a distinction between a "seller" or a "representative of the seller."

*Litigation*, 133 F.Supp.2d 272, 288 (S.D.N.Y. 2001), in which the court considered Alabama law and opined that holding a pharmaceutical sales representative liable under the AEMLD would contravene the doctrine's purpose and scope.  The court observed, "[t]he AEMLD is founded on broader moral notions of consumer protection and on economic and social grounds, placing the burden to compensate for loss incurred by defective products on the one best able to prevent the distribution of these products."  *Id.* at 287 (quoting *Atkins v. American Motor Corp.*, 335 So.2d 134, 139 (Ala. 1976)) (internal marks omitted).  The court found that there was "no reasonable basis for supposing that [an Alabama court] would impose liability on the sales representative" due to the representative's status as merely an agent of the manufacturer/seller and, as a corporate employee, the sales representative was not "the best one able to prevent sales of defective drugs."  *Id.* at 288 (internal marks omitted).

The facts of *In re Rezulin* are distinguishable from the present case in that the AEMLD was inapplicable to the *Rezulin* defendant pharmaceutical sales representative, in part, due to an "absence of any alleged connection between the sales representative and Plaintiff ... [which is] fatal to all of the claims against the sales representative."  *In re Rezulin*, 133 F.Supp.2d at 287.  Green admits  that she called upon Tracy's prescribing physician for the purpose of promoting Zyprexa before and

continuing throughout the time Tracy was undergoing treatment with the drug. There is a clear link between the sales representative and the plaintiff in this case that simply was not present in *In re Rezulin,* thereby providing an important distinction between the two cases.

Applying the holding in *In re Rezulin*, a district court in *Bloodsworth v. Smith & Nephew*, 2005 WL 3470337, *6 (M.D. Ala. 2005) held that a sales representative who sold a replacement hip that later proved defective "is not deemed a 'seller' within the meaning of the AEMLD."[8]  While the *Bloodsworth* court relied heavily on *In re Rezulin*, the court noted an unpublished opinion by the Multi-District Litigation Court in *In re Baycol Products Liability Litigation*, M.D.L. No. 1431, *4-*7 (D.Minn. March 26, 2004), holding that "the purpose of the AEMLD did not support a claim against a sales agent who had no authority to compel or prevent the distribution of particular products." *Id.* (internal marks omitted).

In the instant case, Green compelled the distribution of Zyprexa to Tracy by virtue of promoting the drug to Tracy's prescribing physician while ensuring the safety of the drug. There is no indication in *Bloodsworth* that the sales representative made any assertions as to the safety of the artificial hip that caused injury to the

---

[8]The court notes that district court decisions, including decisions of this district, are not binding on this court.

plaintiff in that case. On the other hand, Green represented that Zyprexa was a safe form of treatment, thereby opening herself up to potential liability given that Zyprexa, at the time Green made the representation, had been linked to the risks of weight gain and diabetes. This distinguishing factor separates the case at bar from the holding in *Bloodsworth*.

The jewel of Defendants' contention that Green has been fraudulently joined in this action is *Legg v. Wyeth*, 428 F.3d 1317, 1320 (11th Cir. 2005). In *Legg*, the court, in dicta, quotes *Anderson v. Am. Home Prods. Corp.*, 220 F.Supp.2d 414, 425 (E.D. Pa. 2002), for the general proposition that joinder of individual sales representatives in a lawsuit against a diet drug manufacturer can "only be characterized as a sham, at the unfair expense  not only of [Defendants] but of many individuals and small enterprises that are being unfairly dragged into court simply to prevent the adjudication of lawsuits against [Defendants], the real target, in a federal forum." However, as Tracy points out, *Legg* did not hold that all sales representatives in pharmaceutical cases are fraudulently joined. The individual sales representatives who were determined to be fraudulently joined in *Legg* were so found due to Legg's insufficient response or rebuttal to affidavits, executed by the defendants in that case, that were contrary to Legg's allegations in the complaint. The *Legg* defendants' uncontroverted testimony establishing a lack of knowledge in that case is

16

distinguishable from the instant case where Green's affidavit, purporting to establish her lack of knowledge as to the risks associated with Zyprexa, has been adequately challenged by the Plaintiff. In addition, the court in *Legg* was not called upon to interpret the definition of "seller" under the AEMLD. This court does not read the holding in *Legg* to mean that all nondiverse sales representatives are per se fraudulently joined in actions involving pharmaceutical companies.

There are persuasive cases in which a district court has found potential liability under the AEMLD for an individual corporate employee, including sales representatives employed by a manufacturer. Two such cases, involving the possible validity of AEMLD claims against individual, nondiverse defendants in products liability actions held that:

> In Alabama, the general rule is that officers or employees of a corporation are liable for torts in which they have personally participated, irrespective of whether they were acting in a corporate capacity. *Ex parte Charles Bell Pontiac-Buick-Cadillac-GMC, Inc.,* 496 So.2d 774, 775 (Ala.1986) (citing *Candy H. v. Redemption Ranch, Inc.,* 563 F.Supp. 505, 513 (M.D.Ala.1983)); *see also Chandler v. Hunter,* 340 So.2d 818, 822 (Ala.Civ.App.1976). Obviously, to the extent R.J. Reynolds allegedly violated the AEMLD, it acted through its employees; the company does not employ ghosts. [Plaintiff] should be allowed to pursue these individual defendants, and, if, after discovery, it should turn out that he has named the wrong persons, he should be allowed to make substitutions.

*Seaborn v. R.J. Reynolds Tobacco Co.,* 1996 WL 943621, *8 (M.D. Ala. 1996).

17

> The same language can be applied here: Defendants Philip Morris and Brown & Williamson clearly do not employ ghosts. That is, the court finds that some of the moving Defendants' employees are likely to hold some superior knowledge regarding the nature of cigarettes. The court finds that it is therefore conceivable that Plaintiff's AEMLD claims ... may be viable [against the individual nondiverse defendants].

*Clay v. Brown & Williamson Tobacco Corp.*, 77 F.Supp.2d 1220, 1224 (M.D. Ala. 1999).

A similar situation to those present in *Seaborn* and *Clay* exists in the instant case. Green admits to being an Eli Lilly employee engaged to promote Zyprexa to physicians, including Tracy's prescribing physician. Therefore, she is liable for torts in which she personally participated. Also, if Eli Lilly violated the AEMLD, it acted through Green in this case, and Tracy should be allowed to pursue Green as an individual defendant, considering Green's possible superior knowledge of the risks associated with Zyprexa and her representation to Tracy's prescribing physician that the drug was safe.

Eli Lilly's position, that its sales representatives are never "sellers" within the definition of the AEMLD, is untenable when examined from the perspective that such a holding would shield all nondiverse pharmaceutical sales representatives from any liability under the doctrine. Such a holding would be contrary to the purpose and scope of the AEMLD by allowing Green, an individual who potentially had

18

knowledge of the risks of weight gain and diabetes associated with Zyprexa, who promoted the drug as being safe to Tracy's prescribing physician, and who was in a position to prevent the defective product from reaching Tracy, to escape all liability under the doctrine.

Accordingly, the court holds that Green is a "seller" under the AEMLD and is therefore subject to liability. On a motion to remand, a court must determine whether there is no possibility that the plaintiff can prove a cause of action against the resident defendant. Due to Green's status as a "seller," and due to Defendants' apparent concession of the additional elements of an AEMLD claim against Green, a state court could possibly find a valid AEMLD claim against Green.

## Conclusion

The court finds that joinder of the nondiverse party, Mary V. Green, is not fraudulent. Complete diversity among the parties as required by 28 U.S.C.A. § 1332 does not exist. Consequently, this court lacks subject matter jurisdiction over this action, and this case is due to be remanded to the Circuit Court of Jefferson County, Alabama. Accordingly, Tracy's Emergency Motion to Remand is due to be **GRANTED**.

A Final Order will be entered consistent with this Memorandum Opinion.

19

**DONE** this 25th day of April, 2006.

VIRGINIA EMERSON HOPKINS
United States District Judge

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DALE SLATTON, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **vs.** | )    **Civil Action No. 05-VEH-1056-S** |
| | ) |
| **MERCK & CO., INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

### Memorandum Opinion

Presently before the Court are Plaintiffs' Emergency Motions to Remand and for Expedited Hearing (Doc. #13) and Motion for Hearing (Doc. #27) and Defendants' Motion to Stay (Doc. 10). Upon due consideration, and for the reasons that follow, Plaintiff's Motion to Remand will be **GRANTED** (Doc. #13), Plaintiff's Motion for Expedited Hearing (Doc. #13) will be **DENIED**, Plaintiff's Motion for Hearing (Doc. #27) will be **DENIED**, and Defendants' Motion to Stay (Doc. 10) will be **DENIED**.

On April 18, 2005, the Plaintiffs, Dale Slatton and Gary Albright, filed their Complaint against the Defendants in the Circuit Court of Jefferson County, Alabama. Defendant Merck & Company, Inc. ("Merck") removed the action to this Court on May 20, 2005. Only Merck, and not all of the Defendants, joined in the removal, despite the requirements of 28 U.S.C. 1441(b). Merck asserts that because the

individual Defendants were fraudulently joined, their consent to the removal was not necessary. Merck also asserts that this court has original jurisdiction over this case under 28 U.S.C. § 1332 based on the diversity of citizenship of the parties. 28 U.S.C. § 1332 does confer jurisdiction on the Federal District Courts in cases between citizens of different states when the amount in controversy exceeds $75,000.00, exclusive of interest and costs. *See Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998).

The Plaintiff does not dispute that the jurisdictional amount is met. The court will therefore turn to the question of diversity. "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377 (1994). For removal to be proper, the court must have subject-matter jurisdiction in the case. "Only state-court actions that originally could have been filed in federal court may be removed to federal court by the Defendant." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). In addition, the removal statute must be strictly construed against removal, and any doubts should be resolved in favor of remand. *See Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994). In reviewing a Motion to Remand, the burden is on the party who sought removal to demonstrate that federal jurisdiction exists. *Friedman v. New York Life Ins. Co.,* --- F.3d ----, 2005 WL

1324593 (11th Cir. 2005);  *Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir.2001).

The Plaintiff argues that the case should be remanded because Robert Wall, Gary Harlan, Angela Finch, Matthew King, Patricia Aiken, and Sonya Coley ("individual Defendants") did not join in the removal and because complete diversity does not exist. Plaintiff asserts that the inclusion of the individual Defendants in the originally filed complaint destroyed complete diversity. Plaintiff and each of the individual Defendants are citizens of Alabama. As noted above, Merck asserts that the individual Defendants were fraudulently joined to avoid diversity.

"A party fraudulently joined to defeat removal need not join in a removal petition, and is disregarded in determining diversity of citizenship." *Polyplastics, Inc. v. Transconex, Inc.,* 713 F.2d 875, 877 (C.A.Puerto Rico,1983) (citing 1A J. Moore, Moore's Federal Practice ¶¶ 0.161 [1.-1] at nn. 23 & 25, 0.161[2], 0.168[3.-2-2]). The determination of the issue of fraudulent joinder will thus determine whether the joinder of the individual Defendants in the removal was necessary.

*Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553 (11th Cir. 1989) sets forth the test to be applied when it is alleged that a non-diverse party is fraudulently joined.

> The test for determining whether or not a defendant has been fraudulently joined is twofold:  (1) look to see whether there is no possibility the plaintiff can establish any cause of action

3

> against the resident defendant; and (2) look to see whether
> plaintiff has fraudulently pled jurisdictional facts in order to
> bring the resident defendant into state court.

*Cabalceta*, 883 F.2d at 1561.

This is indeed a difficult burden for the removing party to meet. The height of the bar is raised further by the fact that "[i]n addressing the issue of fraudulent joinder, the district court should resolve all questions of fact and controlling law in favor of the plaintiff. . . ." *Id.* at 1561.

Defendant does not contend that the Plaintiff fraudulently pled jurisdictional facts in his complaint but instead relies on the first prong of the test described in *Cabalceta*. Therefore, the question presented to this court is whether the Defendant has carried the burden of proving that "there is no possibility the plaintiff can establish any cause of action against the resident defendant[?]" "[T]he question is whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved." *Crowe v. Coleman*, 113 F.3d 1536, 1540 (11th Cir. 1997). "For a Plaintiff to present an arguable claim against an in-state defendant and, therefore, to require a case removed to federal court to be remanded to state court, the plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state defendant." *Crowe,* 113 F.3d at 1541.

4

The Eleventh Circuit has gone as far as to require that "[d]oubts as to whether removal of an action is permissible should be resolved against removal." *Key Bank U.S.A., N.A. v. First Union Nat'l Bank of Florida*, 234 B.R. 827, 829 (M.D. Fla. 1999) (citing *Roe v. O'Donohue*, 38 F.3d 298, 303 (7th Cir. 1994)).

In Count VI, the Plaintiff asserts a claim for Fraud-Misrepresentation against the individual (Alabama-resident) Defendants.  Under Alabama law, "[t]he elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Ex parte Michelin N. Am., Inc.*, 795 So. 2d 674, 678-79, (Ala. 2001).

In Count VI the Plaintiff alleges:

1.    that Defendants "fraudulently made material misrepresentations that Vioxx . . . was safe and effective.  Defendants represented Vioxx as safe so that the general consuming public, including each Plaintiff, would rely upon said representations when purchasing said product;" *Complaint*, at 21.

2.    that these representations were made so that Plaintiff and the general public would rely on these representations and take the drug; *Id.*

3.    that "[individual] Defendants made representations to each Plaintiff's prescribing physician that Vioxx was safe and effective, and did not cause

5

cardiovascular risks. [That] these representations were false, and were made intentionally and/or recklessly, but with knowledge of their falsity. The prescribing physician relied upon these representations and prescribed Vioxx to the Plaintiff, proximately resulting in [injury]." *Id.*

At least with regard to Count VI, Plaintiff has not asserted "obviously fraudulent or frivolous claims" against the individual Defendants and thus their joinder is not fraudulent. The court is of the opinion that it does not have diversity jurisdiction.

As to the issue of whether this Court should defer to the transferee Court to decide the remand issue, the court is persuaded by the logic of *Morales v. American Home Products Corp.*, 214 F. Supp. 2d 723 (S.D. Texas 2002), where the Eastern District Court wrote:

> It is abundantly clear that a conditional transfer order by the MDL panel does not affect or suspend any pretrial proceedings in this Court. This Court has sometimes deferred to the MDL court when presented with an issue likely to be common among all other cases throughout the nation. Here, however, the key question is whether Defendant Circle K has been fraudulently joined. This issue is controlled by the law of the Fifth Circuit Court of Appeals and ultimately the laws of Texas, as applied to the pleadings in this case. There is no reason to ask a federal court in Washington to make that decision.

*Morales v. American Home Products Corp.*, 214 F.Supp.2d 723, 725 (S.D.Tex.,2002). Similarly, the key issue being decided by this Court is whether the

6

individual Defendants have been fraudulently joined.  This is a question of Eleventh

Circuit and Alabama law, best decided by a federal Court sitting in Alabama.

This case will be **REMANDED** to the Circuit Court of Jefferson County,

Alabama.  A separate order will be entered.

**DONE** this 21st  day of July, 2005.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge

7

FILED
2005 Jul-21  AM 09:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DALE SLATTON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-VEH-1056-S** |
| | ) | |
| **MERCK & CO., INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

Presently before the Court are Plaintiffs' Emergency Motions to Remand and for Expedited Hearing (Doc. #13) and Motion for Hearing (Doc. #27), and Defendants' Motion to Stay (Doc. 10).  For the reasons stated in the Memorandum of Opinion filed contemporaneously herewith, it is hereby **ORDERED, ADJUDGED**, and **DECREED**, as follows:

1.  The Plaintiff's Motion to Remand is **GRANTED** (Doc. #13);

2.  The Plaintiff's Motion for Expedited Hearing (Doc. #13) is **DENIED**;

3.  The Plaintiff's Motion for Hearing (Doc. #27) is **DENIED**; and

4.  Defendants' Motion to Stay (Doc. 10) is **DENIED**.

5.  This case is hereby **REMANDED** to the Circuit Court of Jefferson County, Alabama.

**DONE** and **ORDERED** this 21st day of July, 2005.

VIRGINIA EMERSON HOPKINS
United States District Judge

FILED
2005 May 28 PM 04:07
U.S. DISTRICT COURT
N.D. OF ALABAMA
2005 Feb 00 OF ALABAMA
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | CIVIL ACTION NO. 02-RRA-2710-S |
| | ) | |
| MERCK & COMPANY, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

The motion to remand is **GRANTED**, and this case is ORDERED remanded to the state court from which it was removed. The Clerk shall effect the remand after ten (10) days.[1]

DONE this day 10th of February, 2005.

*Robert R. Armstrong*
ROBERT R. ARMSTRONG, JR.
UNITED STATES MAGISTRATE JUDGE

---

[1]The parties are directed to Rule 72(b), *Federal Rules of Civil Procedure*, and the General Order of Referrals of Civil Matters to United States Magistrate Judges at paragraph 5.

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

03 JUN 26  PM 3: 58

U.S. DISTRICT COURT
N.D. OF ALABAMA

LAVAUGHN HALES,              )
                            )
        Plaintiff,          )
                            )        CIVIL ACTION NO.
v.                          )
                            )        03-AR-1028-M
MERCK & CO., INC., et al.,  )
                            )
        Defendants.         )        ENTERED
                            )        JUN 2 6 2003
                            )

ORDER OF REMAND

In accordance with the accompanying memorandum opinion, plaintiff's motion to remand is GRANTED upon the court's finding pursuant to 28 U.S.C. § 1447(c) that it lacks subject matter jurisdiction. Accordingly, the above-entitled action is REMANDED to the Circuit Court of Dekalb County, Alabama from which it was improvidently removed. The Clerk is DIRECTED to effectuate this order.

The parties shall bear their own respective costs in this court.

DONE this 26th day of June, 2003.

_William M. Acker_

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

LAVAUGHN HALES,                    )
                                   )
          Plaintiff,               )
                                   )
v.                                 )        CV 03-AR-1028-M
                                   )
MERCK & CO., INC., et al.          )
                                   )
          Defendant.               )

## MEMORANDUM OPINION

Before the court is a motion to dismiss filed by Hal

Henderson ("Henderson")[1], Steve Santos ("Santos")[2], and Matthew

King ("King")[3] and a motion to remand to the Circuit Court of

DeKalb County, Alabama filed by plaintiff, Lavaughn Hales

("Hales"). Hales brought this products liability case against

defendant, Merck & Co., Inc. ("Merck"), and its agents Henderson,

Santos, King, and Patricia Aiken ("Aiken")[4], alleging that she

---

[1]Henderson is a district sales manager for Merck, and a resident
of Cobb County, Georgia.

[2]Santos is a district sales manager for Merck and a resident of
Montgomery County, Alabama.

[3]King is a sales representative for Merck, and a resident of
Jefferson County, Alabama.

[4]Aiken is a sales representative for Merck, and a resident of
Jefferson County, Alabama. Aiken had not yet been served when
the case was removed to this court.

1

suffered a heart attack after taking the prescription drug Vioxx, manufactured and marketed by Merck.

### Facts

Hales filed suit in the state court on March 24, 2003. Her complaint contained five counts charging various defendants with 1)designing, manufacturing, and/or selling a defective product and failing to warn; 2)negligence; 3)breach of express warranty; 4)breach of implied warranty; 5)negligent, reckless, intentional and fraudulent misrepresentation and suppression. Three of the individual non-diverse defendants were served on April 3, 2003. Merck, Henderson, Santos, and King are all represented by the same counsel. On May 5, 2003, Merck, Santos, Henderson, and King filed their notice of removal and answer in this court alleging diversity jurisdiction based on plaintiff's alleged fraudulent joinder of the four non-diverse individual defendants. The court deemed the affirmative defense of fraudulent joinder a motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6), and included Aiken because a dismissal of the action against Aiken is as necessary to this court's diversity jurisdiction as a dismissal of the action against the three non-diverse individuals who have filed appearances. Oral argument was heard at the court's regular motion docket on June 20, 2003.

2

The dispositive jurisdictional question is whether Hales can assert **any** valid cause of action against a non-diverse sales representative/manager under Alabama's substantive law or under a legitimate prospect for a change in Alabama law. This court in *Barnes v. American Honda Motor Co.*, 02-AR-1664-J, stated a court's duty in evaluating a motion to remand a diversity removal challenged on fraudulent joinder grounds as follows: "If there is a *possibility* that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder is proper and remand the case to the state court." *Whitlock v. Jackson Nat'l Life Ins.*, 32 F. Supp. 2d 1286, 1289 (M.D. Ala. 1998)(emphasis supplied). In the present action Hales argues that she has a valid AEMLD claim against the sales representatives/managers for supplying and/or for failing to warn and/or inadequately warning and/or failing to instruct her treating physician of the dangers of Vioxx. Henderson, Santos, and King argue that no cause of action has been stated nor can be stated against the sales representatives/managers because only the manufacturer is liable as a "seller" of a defective product under AEMLD, and all other claims are subsumed or merged into the AEMLD claim. Hales argues to the contrary that the Alabama

3

Supreme Court has never addressed whether an individual employee

of a defendant designer and manufacturer of a prescription drug,

who has responsibility for marketing and selling the drug on

behalf of his employer, can be held liable on a claim arising

under AEMLD, and accordingly the court has never rejected

individual liability against intermediary "sellers."

Furthermore, Hales points out that under Alabama law a

person is liable for his intentional torts.  Hales asserts that a

cause of action exists against Henderson, King, Santos, and Aiken

for the intentional tort of fraudulent misrepresentation and

suppression of material information regarding the safety and

efficacy of Vioxx, and the participation in an aggressive

marketing campaign that fraudulently misrepresented the product

to treating physicians.  Hales also contends that a cause of

action for negligence and breach of warranty exists against the

individual sales representatives because they had a duty to warn

her treating physician of the dangers of Vioxx.

Hales cites three decisions by federal courts in Alabama

that have remanded in cases similar to the instant action:

Roughton v. Warner-Lambert Co., 01-D-865-N (De Ment, J.)(court

remanded for a second time a products liability case brought in

state court against the defendant Warner-Lambert, Co. as the

4

manufacturer and its sales representatives/territory manager, an Alabama citizen. The case was originally remanded after Judge Myron H. Thompson found that defendants had not met their burden of showing either fraudulent joinder or fraudulent misjoinder); *Pace v. Davis a division of Warner-Lambert*, 00-J-3046 (Johnson, J.)(court remanded a products liability case against a drug manufacturer and the non-diverse treating physician); *McCaffery v. Warner-Lambert Co.*, 00-PT-2848-M (Propst J.) (court remanded in case brought against drug manufacturer and treating physician).

Henderson, Santos and King cite *Tillman v. R.J. Reynolds Tobacco*, 253 F.3d 1302 (11th Cir. 2001) in support of their position that claims asserted against a retailer merge into an AEMLD claim against the manufacturer. But in *Tillman*, the Eleventh Circuit certified the following question to the Alabama Supreme Court: "Whether there is any potential cause of action under any theory against any retail defendants including those that employ pharmacists who sell cigarettes for claims brought under the Alabama Extended Manufactures Liability Doctrine, or premised on negligence wantonness, or civil conspiracy under Alabama law." The question has not been answered. A similar question was certified in *Spain v. Brown & Williamson Tobacco*

5

Corp., 230 F.3d 1300 (11th Cir. 2000). It too, has not been answered.

This court unashamedly quotes itself: "[T]his court cannot substitute its uncertain judgment of what the Alabama law ought to be, or to predict what it someday will be, when this court's jurisdiction is premised on 28 U.S.C. §§ 1441 and 1332. The court must give a plaintiff the benefit of all doubt on questions of Alabama law when deciding upon subject matter jurisdiction that depends upon the state of the state of the law." *Barnes*, at 3.

Henderson, Santos, and King argue alternatively that even if there is a viable cause of action against intermediary sellers under AEMLD, there is no cause of action against these four sales representatives/managers because three of them have presented affidavits stating that they have never visited Dr. Cornelius B. Thomas, Hales' treating physician, and accordingly there is no causation. The court notes, without finding it unduly significant, that there is no such affidavit for Aiken. The court disagrees. If the court were to consider the affidavits of Henderson, Santos, and King it would have to convert the motion to dismiss under Rule 12(b)(6) to one under Rule 56 and find as a matter of law that no genuine issue of material fact existed.

6

This would require the court do what it explicitly said it could not do in *Barnes*, adjudicate the claims against the defendants on their merits before finding that the court has subject matter jurisdiction. *Barnes*, at 3-4.

### Conclusions

Because the defendants must prove by clear and convincing evidence that no cause of action exists, and because the question of whether a cause of action exists against an intermediary supplier under AEMLD is uncertain, plaintiff's motion to remand is due to be granted, and defendants' motions to dismiss are due to be denied. A separate order will be entered.

DONE this _26th_ day of June, 2003.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

03 OCT 20  PM 3: 45

U.S. DISTRICT COURT
N.D. OF ALABAMA

PAMELA FLOYD, STACIE H. RICHARDS, and )
ANN RUTLEDGE,                          )
                                       )
                    Plaintiffs,        )
                                       )
vs.                                    )        Civil Action Number
                                       )        03-C-2564-M
WYETH, a corporation; STACY STUBBLEFIELD, )
an individual; MICHAEL T. SULLIVAN, an  )
individual; and BETSY R. WEAVER, an individual, )
                                       )     **ENTERED**
                    Defendants.        )
                                       )        OCT 2 0 2003

## REMAND ORDER

Because the removing Defendant has failed to carry its heavy burden of proof of fraudulent

joinder, and the attendant lack of complete diversity of the parties, this case is hereby REMANDED

to the Circuit Court of Marshall County, Alabama, from whence it was improvidently removed.

The costs of this action are hereby taxed against the removing Defendant.

Done this _____ day of October, 2003.

_____
Chief United States District Judge
U.W. Clemon



FILED

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE NOV 21 2003

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

SHARON C. CRITTENDEN,       )
et al.,                     )
                            )
        Plaintiffs,         )
                            )
    v.                      )       CIVIL ACTION NO.
                            )       03-T-920-N
WYETH, a corporation,       )
et al.,                     )
                            )
        Defendants.         )

ORDER

This lawsuit, which was removed from state to federal court based on diversity-of-citizenship jurisdiction, 28 U.S.C.A. §§ 1332, 1441, is now before the court on plaintiffs' motion to remand.  The court agrees with plaintiffs that this case should be remanded to state court.  First, there has not been <u>fraudulent joinder</u> of any resident defendant (that is, plaintiffs have colorable claims against such a defendant), <u>see</u> <u>Coker v. Amoco Oil Co.</u>, 709 F.2d 1433, 1440 (11th Cir. 1983); <u>Cabalceta v. Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989).

EOD    11/21/03

20

Second, there has not been <u>fraudulent misjoinder</u> of any resident defendant (that is, plaintiffs have reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), <u>see</u> <u>Tapscott v. MS Dealer Service Corp.</u>, 77 F.3d 1353, 1360 (11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiffs' motions to remand, filed on September 30 and October 15, 2003 (doc. nos. 9, 13, and 14), are granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Covington County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 21st day of November, 2003.

MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

STEPHANIE TERRELL, et al.,        ]
                                   ]
        Plaintiffs,                ]
                                   ]
v.                                 ]        CV-03-BE-2876-S
                                   ]
WYETH, et al.,                     ]
                                   ]
        Defendants.                ]
                                   ]
                                   ]
                                   ]
                                   ]
                                   ]

**ENTERED**
DEC 1 2 2003

## MEMORANDUM OPINION AND ORDER REMANDING CASE TO STATE COURT

The case comes before the court on Plaintiff's Motion to Remand (Doc. 10). Having

reviewed the pleadings and briefs of counsel, the court is not persuaded that the plaintiffs failed

to state a viable claim against the non-diverse defendant, or that the non-diverse defendant was

fraudulently joined, and, therefore, the court is not persuaded that the case was properly removed

for the reasons stated below.

The defendants removed this case to federal court on October 23, 2003 from the Circuit

Court of Jefferson County, Alabama. Although the complaint purports to state claims against

corporate defendants who admittedly are not Alabama residents, it also names as a defendant

Pam Parker, admittedly a resident of Alabama, whose presence precludes removal under 28

U.S.C. § 1441. Defendants argue, however, that Ms. Parker is fraudulently joined.

The standard for successfully removing a case from state to federal court is a high one, and the burden rests heavily upon the removing party to establish that federal jurisdiction exists. See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989); Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983). This burden is especially high when the defendants allege fraudulent joinder as the basis for subject matter jurisdiction. See Pacheo de Perez v. AT&T Company, 139 F.3d 1368, 1381 (11th Cir. 1983). In making the fraudulent joinder determination, a district court "must evaluate factual allegations in the light most favorable to the plaintiff and resolve any uncertainties about the applicable law in plaintiff's favor." Pacheco de Perez, 139 F.3d at 1380.

To establish fraudulent joinder, the removing party must show either (a) that the plaintiff would have no possibility to establish a cause of action against non-diverse defendants in state court, or (b) that the plaintiff's pleading of jurisdictional facts have been made fraudelently. Cabelcata, 883 F.2d at 1561. Furthermore, "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to state court." See Coker, 709 F.2d at 1440-41; see also Pacheo de Perez, 139 F.3d at 1380 ("Where a plaintiff states even a colorable claim against the resident defendant, joinder is proper and the case should be remanded to state court.").

This court must construe removal jurisdiction narrowly, *with all doubts resolved in favor of remand*. See University of So. Ala. v. American Tobacco Co., 168 F.3d 405, 411 (11th Cir. 1999) (emphasis added). In making its determination, the court should not speculate about the futility of the plaintiff's claim in state court. Id.

2

Although the plaintiffs' claims against defendant Parker appear to raise novel questions of Alabama state law, this court will not speculate that the plaintiffs have *no* possibility of establishing a cause of action against this non-diverse defendant. Little, if any, discovery has been done to date in this case; thus, it would be premature for this court to make rash decisions regarding the nature and timing of the injuries sustained by the plaintiffs, or the employment history of defendant Parker. Nor can the court conclusively determine that the plaintiffs would not be successful in urging its various theories under Alabama law.

Because the defendants have not clearly proven that this court has jurisdiction based on diversity under 28 U.S.C. § 1332, and because this court must resolve *all* doubts in favor of remand, the Plaintiffs' Motion to Remand is hereby GRANTED. The clerk is ordered to transfer the file on this case back to the Circuit Court of Jefferson County, Alabama.

DONE and ORDERED this /2th day of December, 2004.

KARON OWEN BOWDRE
UNITED STATES DISTRICT COURT

3

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

**FILED**

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

JAN 2 3 2004

**CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA**

|  |  |  |
|---|---|---|
| SARA BLAIR, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION NO. 03-T-1251-S |
| WYETH, et al., | ) | |
| Defendants. | ) | |

ORDER

This lawsuit, which was removed from state to federal court based on diversity-of-citizenship jurisdiction, 28 U.S.C.A. §§ 1332, 1441, is now before the court on plaintiffs' motion to remand. The court agrees with plaintiffs that this case should be remanded to state court. First, there has not been <u>fraudulent joinder</u> of any resident defendant (that is, plaintiffs have colorable claims against such a defendant), see <u>Coker v. Amoco Oil Co.</u>, 709 F.2d 1433, 1440 (11th Cir. 1983); <u>Cabalceta v. Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989).

Second, there has not been <u>fraudulent misjoinder</u> of any resident defendant (that is, plaintiffs have reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), see <u>Tapscott v. MS Dealer Service Corp.</u>, 77 F.3d 1353, 1360 (11th Cir. 1996).

**EOD** _January 23, 2004_

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiffs' motion to remand, filed on December 30, 2003 (Doc. No. 7), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Dale County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 22nd day of January, 2004.

MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

01/23.2004 14:55 FAX 2052523536          K Stephen Jackson PC                    004

FILED

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION JAN 2 3 2004

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

RITA BRUNSON,                    )
                                 )
        Plaintiff,               )
                                 )
    v.                           )    CIVIL ACTION NO. 03-T-1167-S
                                 )
WYETH, et al.,                   )
                                 )
        Defendants.              )

ORDER

This lawsuit, which was removed from state to federal court
based on diversity-of-citizenship jurisdiction, 28 U.S.C.A. §§
1332, 1441, is now before the court on plaintiff's motion to
remand. The court agrees with plaintiff that this case should be
remanded to state court. First, there has not been _fraudulent_
_joinder_ of any resident defendant (that is, plaintiff has colorable
claims against such a defendant), see Coker v. Amoco Oil Co., 709
F.2d 1433, 1440 (11th Cir. 1983); Cabalceta v. Standard Fruit Co.,
883 F.2d 1553, 1561 (11th Cir. 1989).

Second, there has not been _fraudulent misjoinder_ of any
resident defendant (that is, plaintiff has reasonably joined such
a defendant with other defendants pursuant to Rule 20 of the
Federal Rules of Civil Procedure), see Tapscott v. MS Dealer
Service Corp., 77 F.3d 1353, 1360 (11th Cir. 1996).

# EOD  1/23/04



Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiff's motion to remand, filed on December 16, 2003 (Doc. No. 11), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Geneva County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the ___23rd___ day of January, 2004.

Myron. Or
MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION FILED

·JAN 23 2004

CLERK VM
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

VALERIE BALLARD, et al.,          )
                                  )
        Plaintiffs,               )
                                  )
    v.                            )    CIVIL ACTION NO. 03-T-1255-N
                                  )
WYETH, et al.,                    )
                                  )
        Defendants.               )

ORDER

This lawsuit, which was removed from state to federal court
based on diversity-of-citizenship jurisdiction, 28 U.S.C.A. §§
1332, 1441, is now before the court on plaintiffs' motion to
remand. The court agrees with plaintiffs that this case should be
remanded to state court. First, there has not been <u>fraudulent
joinder</u> of any resident defendant (that is, plaintiffs have
colorable claims against such a defendant), <u>see</u> <u>Coker v. Amoco Oil
Co.</u>, 709 F.2d 1433, 1440 (11th Cir. 1983); <u>Cabalceta v. Standard
Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989).

Second, there has not been <u>fraudulent misjoinder</u> of any
resident defendant (that is, plaintiffs have reasonably joined such
a defendant with other defendants pursuant to Rule 20 of the
Federal Rules of Civil Procedure), <u>see</u> <u>Tapscott v. MS Dealer
Service Corp.</u>, 77 F.3d 1353, 1360 (11th Cir. 1996).

EOD 1/23/04

12

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiffs' motion to remand, filed on January 6, 2004 (Doc. No. 8), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Covington County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 28 day of January, 2004.

_____
MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

04 JAN 30  PH 3: 46

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SANDRA STOREY, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| v. | ] | CV-04-BE-27-E |
| | ] | |
| WYETH, INC., WYETH | ] | |
| PHARMACEUTICAL, and | ] | |
| ANTHONY CHERRY, | ] | |
| | ] | |
| Defendants. | ] | |
| | ] | |
| | ] | |
| | ] | |

ENTERED

JAN 3 0 2004

## MEMORANDUM OPINION AND ORDER REMANDING CASE TO STATE COURT

The case comes before the court on the plaintiff's "Motion to Remand" (Doc. 5). Having reviewed the entirety of the pleadings and briefs of counsel, the court hereby GRANTS the motion to remand. The court is not persuaded that the plaintiffs failed to state a viable claim against the non-diverse defendant, or that the non-diverse defendant was fraudulently joined, and, thus, is not persuaded that the case was properly removed for the reasons stated below.

The defendants removed this case to federal court on January 7, 2004, from the Circuit Court of Calhoun County, Alabama. Although the complaint purports to state claims against corporate defendants who admittedly are not Alabama residents, it also names as a defendant Anthony Cherry, admittedly a resident of Alabama, whose presence precludes removal under 28 U.S.C. § 1441. Defendants argue, however, that Mr. Cherry is fraudulently joined.

The standard for successfully removing a case from state to federal court is a high one,

and the burden rests heavily upon the removing party to establish that federal jurisdiction exists. See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989); Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983). This burden is especially high when the defendants allege fraudulent joinder as the basis for subject matter jurisdiction. See Pacheo de Perez v. AT&T Company, 139 F.3d 1368, 1381 (11th Cir. 1983). In making the fraudulent joinder determination, a district court "must evaluate factual allegations in the light most favorable to the plaintiff and resolve any uncertainties about the applicable law in plaintiff's favor." Pacheco de Perez, 139 F.3d at 1380.

To establish fraudulent joinder, the removing party must show either (a) that the plaintiff would have no possibility of establishing a cause of action against a non-diverse defendant in state court, or (b) that the plaintiff's pleading of jurisdictional facts has been made fraudulently. Cabelcata, 883 F.2d at 1561. Furthermore, "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to state court." Coker, 709 F.2d at 1440-41; see also Pacheo de Perez, 139 F.3d at 1380 ("Where a plaintiff states even a colorable claim against the resident defendant, joinder is proper and the case should be remanded to state court.").

This court must construe removal jurisdiction narrowly, *with all doubts resolved in favor of remand.* See University of So. Ala. v. American Tobacco Co., 168 F.3d 405, 411 (11th Cir. 1999). In making its determination, the court should not speculate about the futility of the plaintiff's claim in state court. Id.

Although whether the plaintiff will be able to successfully prove Mr. Cherry's liability is unclear, this court will not speculate that the plaintiff has *no* possibility of establishing its claims

of negligence and fraud against this non-diverse defendant. Little, if any, discovery has been done to date in this case; thus, this court cannot make rash decisions regarding actions made by the defendants and their resulting consequences. Nor can the court conclusively determine that the plaintiff would not be successful in urging her various theories under Alabama law.

Similarly, the court is not prepared to conclude that the plaintiff's fraud claims should be struck for lack of specificity. While the complaint is indicative of a "form" pleading, it adequately informs the defendants of the nature of the fraud.

Because the defendants have not clearly proven that this court has jurisdiction based on diversity under 28 U.S.C. § 1332, and because this court must resolve all doubts in favor of remand, the Plaintiff's Motion to Remand is hereby GRANTED. The clerk is ordered to transfer the file on this case back to the Circuit Court of Calhoun County, Alabama.

DONE and ORDERED this 30th day of January, 2004.

KARON OWEN BOWDRE
UNITED STATES DISTRICT COURT

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

04 FEB -3 AM 10: 15

U.S. DISTRICT COURT
N.D. OF ALABAMA

SANDRA CASH,                          )
                                      )
            Plaintiff,                )
                                      )
                                      )
                                      )
vs.                            :      )     CIVIL ACTION NO. 03-RRA-3378-E
                                      )
WYETH, et al.,                        )
                                      )
            Defendants.               )

ENTERED

FEB - 3 2004

## MEMORANDUM OF DECISION

This action was removed from the Circuit Court of Calhoun County, Alabama. The

plaintiff has filed a motion to remand. The complaint alleges that she suffered valvular heart

disease as a result of taking the drug Pondimin or Redux. (The defendants state that the

plaintiff took Pondimin only.) The question before the court is whether defendant Anthony

Cherry, Wyeth's sales representative, was fraudulently joined as a defendant in order to defeat

diversity jurisdiction.

Remand must be granted if there is a possibility that the state court would find that the

plaintiff has stated a claim against the defendant in question. *Cabalceta v. Standard Fruit Co.*,

883 F.2d 1553, 1561 (11th Cir. 1989). Evidence may be considered as well as the allegations

in the complaint:

> To determine whether the case should be remanded, the district court must
> evaluate the factual allegations in the light most favorable to the plaintiff and must
> resolve any uncertainties about state substantive law in favor of the plaintiff. *Id.* at 549.
> The federal court makes these determinations based on the plaintiff's pleadings at the



time of removal; but the court may consider affidavits and deposition transcripts submitted by the parties.

*Crowe v. Coleman*, 113 F.3d 1536, 1538 (11ᵗʰ Cir. 1997), *quoting B, Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir. Unit A 1981). Along with other submissions, the defendants have submitted the affidavit of Cherry, and the plaintiff has presented the affidavit of her doctor, Omar Khalaf. The parties have not conducted discovery.

The complaint alleges the following against Cherry:

22. Upon information and belief the positive tortious acts which were committed by the Sales Rep Defendant in his individual and/or corporate capacity, include, but are not limited to, the following:

   a.  Sales Rep Defendant <u>failed to convey adequate warnings to the Plaintiff through the prescribing physician</u> set forth above regarding the risks of prescribing fenfluramine (Pondimin®) and dexfenfluramine (Redux™);

   b.  Sales Rep Defendant was in the business of marketing, promoting, selling and/or distributing the unreasonably dangerous pharmaceutical drug fenfluramine (Pondimin®) and dexfenfluramine (Redux™) which has caused harm to the Plaintiff SANDRA CASH;

   c.  Sales Rep Defendant <u>negligently distributed, marketed, advertised and/or promoted</u> the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™);

   d.  Sales Rep Defendant made <u>fraudulent and reckless misrepresentations regarding the character, safety and efficacy</u> of the drug fenfluramine (Pondimin®) and dexfenfluramine (Redux™), and;

   e.  Sales Rep Defendant, <u>with knowledge of unreasonable risks</u> associated with the ingestion of fenfluramine (Pondimin®) and dexfenfluramine (Redux™), alone and/or in combination with phentermine <u>continued to make misrepresentations regarding the character, safety and efficacy</u> of drug fenfluramine (Pondimin®) and dexfenfluramine (Redux™), while providing and/or offering incentives, rebates, reimbursements, perks, and/or other consideration to Plaintiff's prescribing physician

2

> in furtherance of attempting to influence the prescribing of
> said diet drugs.

> 23.   Defendant Anthony Cherry is a citizen of Calhoun County and is over nineteen
> years of age.  At all times material hereto, this Defendant was in the business of
> promoting, marketing , developing, selling and/or distributing the pharmaceutical
> drugs fenfluramine and/or dexfenfluramine in the State of Alabama and did market,
> develop, sell, detail and/or distribute said drugs to Plaintiff, Sandra Cash's prescribing
> physician, Omar Khalaf, M.D.  This defendant was also involved in a conspiracy to
> conceal certain information relating to the dangers associated with the subject drug
> products from the consuming public, including but not limited to Plaintiff.

*Complaint*, ¶¶22-23 (emphasis added). Thus, the complaint alleges that Cherry failed to warn

of the dangers of Pondimin, negligently marketed and distributed this dangerous drug,

recklessly and intentionally misrepresented its dangers, and conspired to conceal its dangers.

The defendants state that under Alabama law the plaintiff clearly cannot state a claim

against Cherry.  They cite law holding that, absent personal participation, an employee is not

liable for the negligence of his employer, that the fraud and conspiracy claims are not pled

with particularity, and that a conspiracy claim fails when the claims underlying the conspiracy

fail. Moreover, they factually contend that Cherry said nothing about Pondimin whatsoever.

Relying on Cherry's affidavit, the defendants state that Cherry did not even promote

Pondimin, that Wyeth composed warnings and other information concerning Pondimin for

Cherry, who was not a part of that process, and that Cherry did not have the expertise to

question the accuracy of any information supplied by Wyeth.  Cherry further states in his

affidavit that he was unaware of any association between Pondimin and the heart disease of

which the plaintiff complains, and he made no representation whatsoever concerning this

drug. The defendants assert in their written opposition to remand that this evidence is uncontroverted. However, Dr. Khalaf states that Cherry visited his office and "promoted and marketed" Pondimin, *Khalaf Affidavit*, ¶3, and that Cherry "continuously represented that [Pondimin and Redux] were safe and effective. Also, [Cherry] represented to [him] that the drugs were safe and effective for long term use," *id.* at ¶6.[1] Khalaf additionally states:

> The reliance I placed on Mr. Cherry and Mr. Lavender regarding safety issues for Pondimin and Redux was made even more critical by the fact that warnings to physicians prescribing Pondimin and Redux that these drugs could cause valvular heart disease were not contained in the Physicians' Desk Reference ("PDR") until the 1998 edition, which was after Pondimin and Redux were withdrawn from the market.

*Id.* at ¶7.

## Whether to Defer to MDL Judge

The defendants want the court to allow this remand issue to go to the MDL court. In her motion to remand, the plaintiff responds that in an MDL hearing the judge "indicated a preference" for all remand motions to be handled by the various district courts. In their written opposition to remand, the defendants respond that a copy of the transcript of the 1998 hearing stating such "sentiments" has not been supplied by the plaintiff. The defendants, however, do not deny that the judge did, in fact, indicate such a preference.

The defendants refer to statements in an August, 2003 memorandum written by the MDL judge:

---

[1] Materials presented to the court by the defendants included information sent to Wyeth's sales force. In "Questions and Answers About Pondimin" and in the Pondimin "Fact Sheet" it is stated that Pondimin is for short-term use.

> [R]ecurrent issues have continued to emerge in connection with motions to remand to state courts cases removed by Wyeth on the basis of diversity of citizenship. We have now developed a broader perspective than is usually available to individual transferor courts in dealing with widespread efforts fraudulently to join Phentermine manufacturers as a tactic to thwart removal of cases to the federal courts. Likewise, we are continuing to address the fraudulent joinder of individual physicians and pharmacies as defendants as a means to prevent removal. Many of these issues have common patterns as well as ramifications far beyond any specific case. Again, we believe these issues are best resolved in a uniform manner through the coordinated proceedings of MDL 1203. :

This memorandum was addressing motions to remand all pending *cases* to the various transferor courts on the ground that the MDL had done its work. The court gave several reasons why the cases should not be remanded to the transferor courts, one of which was that, after all its work, the MDL had developed a "broader perspective than is usually available" to the transferor courts in dealing with motions to remand to state courts based on fraudulent joinder.

Also, the defendants cite *In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990):

> Agent Orange cases are particularly well-suited for multidistrict transfer, even where their presence in federal court is subject to a pending jurisdictional objection. The jurisdictional issue in question is easily capable of arising in hundreds or even thousands of cases in district courts throughout the nation. That issue, however, involves *common questions of law and fact, some or all of which relate to the Agent* Orange class action and settlement, *see In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1396 (E.D.N.Y.1985), *aff'd in part, rev'd in part*, 818 F.2d 179 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2899, 101 L.Ed.2d 932 (1988), and there are real economies in transferring such cases to Judge Weinstein, who has been handling the Agent Orange litigation for several years, *see In re "Agent Orange" Prod. Liab. Litig.*, MDL No. 381, 818 F.2d 145, 154-59 (2d Cir.1987) (describing history of proceedings before Judge Weinstein), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). Once transferred, the jurisdictional objections can be heard and resolved by a single court and reviewed at the appellate level in due course. Consistency as well as economy is thus served. We hold, therefore, that the MDL

> Panel has jurisdiction to transfer a case in which a jurisdictional objection is pending, *cf. United States v. United Mine Workers*, 330 U.S. 258, 290, 67 S.Ct. 677, 694, 91 L.Ed. 884 (1947) (district court has authority to issue injunction while jurisdictional questions are pending), that objection to be resolved by the transferee court.

*Id.* at 9. This language points out what lies at the heart of MDL litigation: common questions of law or fact.

The question of whether Cherry was negligent or made fraudulent statements is specific to this case. The MDL court would not be in a better position to decide remand than this court. Also, this court has heard oral argument and considered the parties' contentions. Wherefore, the court will exercise its discretion to decide the question of fraudulent joinder.

### Whether There Is Fraudulent Joinder

The defendants' argument against remand is premised upon the evidence being uncontroverted that Cherry did not promote or market or make any representation to Dr. Khalaf about Pondimin. If that were true, the motion to remand might be due to be denied. But there is clearly a factual dispute about what Cherry did and said, as Dr. Khalaf states that Cherry visited his office, promoted and marketed Pondimin, and represented that Pondimin was safe and effective for long-term use. Wherefore, there is at least a possibility that the plaintiff has a claim against Cherry.

### Decision

For the reasons stated above, the court has decided to exercise its discretion to decide

6

the remand issue, this is not a case of fraudulent joinder, and the motion to remand is due to be granted for lack of subject matter jurisdiction. An appropriate order will be entered.

DONE this _2nd_ day of February, 2004.

Robert R. Armstrong, Jr.
United States Magistrate Judge

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JEVENARI MARSHAL, DIANE POLITO, )
and MAXINE SMITHEY, )
)
Plaintiffs, )
)
vs. )
)
WYETH, INC., WYETH )
PHARMACEUTICALS, INC., )
BEN LAVENDER, and WILLIAM OWEN, )
)
Defendants. )

**ENTERED**

FEB 18 2004

Case No. CV-04-TMP-179-S

## ORDER OF REMAND

This cause is before the court on the plaintiffs' emergency motion to remand, filed

January 30, 2004. The motion has been briefed by both sides, and the court finds that the action is

due to be remanded.

### Procedure History

Plaintiffs Marshal, Polito, and Smithey filed their joint complaint against defendants Wyeth,

Inc., and Wyeth Pharmaceuticals, Inc., (hereinafter collectively "Wyeth") and two of Wyeth's

pharmaceutical salesmen, Lavender and Owen, in the Circuit Court of Jefferson County, Alabama,

on December 30, 2003. It alleges claims for "strict liability (defective product)," "strict

liability–failure to warn," "strict liability–failure to test," negligence, breach of warranties, fraud and

misrepresentation, negligent and reckless misrepresentation, and conspiracy to defraud and

fraudulently conceal, all arising from the plaintiffs' use of one or both of certain diet medications

manufactured and distributed by Wyeth, formerly known as American Home Products, Inc. In

particular, the complaint alleges that Wyeth manufactured, marketed, and distributed two drugs,

Pondimin (fenfluramine) and Redux (dexfenfluramine), which later were recognized as associated with several medical problems, including primary pulmonary hypertension and heart valve defects. Plaintiffs allege that their doctors prescribed one or both of these drugs to them and, consequently, have suffered medical injuries due to that use. With respect to defendants Lavender and Owen, plaintiffs contend that these salesmen were one of the primary sources by which Wyeth communicated to physicians the risks and benefits associated with use of these medications and, further, that these defendants either innocently, negligently, or recklessly failed to reveal to physicians all of the information known about the risks of using Pondimin and Redux.

Defendants timely removed the action to this court on January 29, 2004, contending that the court has original diversity jurisdiction because Lavender and Owen, both Alabama residents, are fraudulently joined and should be dismissed for purposes of establishing subject-matter jurisdiction. Plaintiffs have replied in their emergency motion, filed the next day, that Lavender and Owen are not fraudulently joined and that the removal to this court was intended to do nothing more than delay the case long enough for it to be transferred to the Eastern District of Pennsylvania to be joined with an MDL case pending there. Hence, the plaintiffs have requested the court to consider their remand motion on an expedited basis before the case can be transferred to the MDL court.

## Fraudulent Joinder

The parties agree that the case involves more than $75,000 in controversy and that the plaintiffs' citizenship is diverse from that of Wyeth. They also agree that Lavender and Owen are Alabama residents and, therefore, not diverse from the plaintiffs. Plaintiffs assert for that reason that no diversity jurisdiction exists, the court lacks subject matter jurisdiction, the removal was improper,

2

and the case is due to be remanded to the state circuit court. Defendants maintain, however, that

Lavender and Owens were fraudulently joined by plaintiffs simply to defeat diversity jurisdiction

and, therefore, their presence in the case should be ignored for jurisdictional purposes. As the basis

for this contention, defendants have offered evidence that Lavender and Owen did not sell or

promote the drug Pondimin at all and that they knew nothing about the medical risks associated with

Redux. Consequently, defendants argue, there is no possibility of a recovery against either Lavender

or Owen, making their joinder in this action fraudulent.

     The Eleventh Circuit Court of Appeals addressed the issue of removal grounded on diversity

jurisdiction when it is alleged that a non-diverse defendant has been fraudulently joined in Crowe

v. Coleman, 113 F.3d 1536 (11th Cir. 1997). There the court stated:

> In a removal case alleging fraudulent joinder, the removing party has the burden of
> proving that either: (1) there is no possibility the plaintiff can establish a cause of
> action against the resident defendant; or (2) the plaintiff has fraudulently pled
> jurisdictional facts to bring the resident defendant into state court. Cabalceta v.
> Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). The burden of the
> removing party is a 'heavy one.' B, Inc. v. Miller Brewing Co., 663 F.2d 545, 549
> (5th Cir. Unit A 1981).

Id. at 1538. The standard is onerous because, absent fraudulent joinder, the plaintiffs have the

absolute right to choose their forum. Courts must keep in mind that the plaintiff is the master of

his complaint and has the right to choose how and where he will fight his battle.

> This consequence makes sense given the law that "absent fraudulent joinder, plaintiff
> has the right to select the forum, to elect whether to sue joint tortfeasors and to
> prosecute his own suit in his own way to a final determination." Parks v. The New
> York Times Co., 308 F.2d 474, 478 (5th Cir. 1962). The strict construction of
> removal statutes also prevents "exposing the plaintiff to the possibility that he will
> win a final judgment in federal court, only to have it determined that the court lacked
> jurisdiction on removal," see Cowart Iron Works, Inc. v. Phillips Constr. Co., Inc.,
> 507 F. Supp. 740, 744 (S.D. Ga.1981)(quoting 14A C. Wright, A. Miller & E.

Cooper, Federal Practice and Procedure § 3721), a result that is costly not only for the plaintiff, but for all the parties and for society when the case must be re-litigated.

Id.

To establish fraudulent joinder of a resident defendant, the burden of proof on the removing party is a "heavy one," requiring clear and convincing evidence. Although affidavits and depositions may be considered, the court must not undertake to decide the merits of the claim while deciding whether there is a *possibility* a claim exists. The Crowe court reiterated:

> While 'the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed. R. Civ. P. 56(b),' [B. Inc., v. Miller Brewing Co., 663 F.2d 545, 549, n.9 (5th Cir., Unit A 1981)], the jurisdictional inquiry 'must not subsume substantive determination.' Id. at 550. Over and over again, we stress that 'the trial court must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits.' Id. at 548- 49. **When considering a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law.** See id. 'If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court.' Coker v. Amoco Oil Co., 709 F.2d 1433, 1440-41 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533 (11th Cir. 1993).

Id. (Emphasis added).

More recently, in Tillman v. R.J. Reynolds Tobacco, 253 F.3d 1302, 1305 (11th Cir. 2001), the court of appeals emphasized the limits of the fraudulent joinder analysis, saying:

> For removal under 28 U.S.C. § 1441 to be proper, no defendant can be a citizen of the state in which the action was brought. 28 U.S.C. § 1441(b). Even if a named defendant is such a citizen, however, it is appropriate for a federal court to dismiss such a defendant and retain diversity jurisdiction if the complaint shows there is no possibility that the plaintiff can establish any cause of action against that defendant. See Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998). "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." Coker v. Amoco

4

Oil Co., 709 F.2d 1433, 1440-41 (11th Cir. 1983), *superceded by statute on other grounds as stated in* Wilson v. General Motors Corp., 888 F.2d 779 (11th Cir. 1989). "The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate." Triggs, 154 F.3d at 1287 (emphasis in original).

See also Tillman v. R.J. Reynolds Tobacco, 340 F.3d 1277, 1279 (11th Cir. 2003)("[I]f there is a possibility that a state court would find that the complaint states a cause of action against any of the resident defendants, the federal court must find that the joinder was proper and remand the case to state court."). Clearly, the fraudulent joinder issue does not permit the court to examine the merits of the claim asserted against a non-diverse defendant beyond seeking to determine whether there is "a possibility" that a state court might find a valid claim to be stated.

In this case, the court is persuaded that the plaintiffs have stated a legally possible claim against the non-diverse defendants, Lavender and Owen, in the form negligent fraud claims. To state such a possible claim, the plaintiffs need only allege that Lavender and Owens misrepresented certain material facts about the risks associated with use of Pondimin[1] and Redux and that plaintiffs, through their physicians, reasonably relied upon such misrepresentations. It is unimportant that Lavender and Owen did not know of the risks and, therefore, did not *intentionally* misrepresent the risks associated with these drugs. Alabama law recognizes an action for innocent or negligent

---

[1] Lavender and Owen have given affidavits in which they state they never sold, marketed, or promoted the drug Pondimin. They reason from this and the fact that plaintiff Smithey took only Pondimin that there is no possibility that, at the very least, Smithey has any claim against them. They nonetheless admit that when questioned by physicians about Pondimin, they attempted to provide answers based on the information they received from Wyeth. Thus, it remains "possible," as alleged in the complaint, that they made misstatements about the risks of use of Pondimin as well as Redux. Whether that "possibility" is something that can be developed factually goes to the merits of the claim and is beyond the fraudulent joinder analysis the court must undertake.

misrepresentation as well as for reckless and intentional misrepresentations. For example, the Alabama Court of Civil Appeals has explained:

> An innocent misrepresentation is as much a legal fraud as an intended misrepresentation. The good faith of a party in making what proves to be a material misrepresentation is immaterial as to whether there was an actionable fraud. Smith v. Reynolds Metals Co., 497 So. 2d 93 (Ala. 1986). Under the statute, even though a misrepresentation be made by mistake and innocent of any intent to deceive, if it is a material fact and is acted upon with belief in its truth by the one to whom it is made, it may constitute legal fraud. Mid-State Homes, Inc. v. Startley, 366 So. 2d 734 (Ala. Civ. App. 1979).

Goggans v. Realty Sales & Mortgage, 675 So. 2d 441, 443 (Ala. Civ. App., 1996); see also Cain v. Saunders, 813 So. 2d 891 (Ala. Civ. App. 2001).

Even if the court assumes that Lavender and Owen did not know of the PPH and valvular heart disease risks associated with these drugs and, therefore, did not recklessly or intentionally misstate what *they* knew, their innocent misrepresentations, at least as alleged by the complaint, understating the risks constitute a "possible" cause of action in Alabama. As long as it is possible that a state court may find that the complaint states a claim against the non-diverse defendant, even if it is a claim with poor prospects of ultimate success, the non-diverse defendant has not been fraudulently joined and the case must be remanded for lack of proper diversity jurisdiction.

The court is persuaded that the defendants have not carried the "heavy burden" of showing fraudulent joinder of Lavender and Owen. There is a possibility that the plaintiffs can state a claim against them, as sales representatives who met with physicians and answered questions regarding the risks and benefits of these drugs, for negligently or innocently misrepresenting the material facts concerning the risks associated with the drugs. At the very least, the claim against Lavender and

6

Owen is not so clearly lacking in substance that the court assuredly has subject-matter jurisdiction of this case. Questions must be resolved in favor of remand. In a contested removal, a presumption exists in favor of remanding the case to state court; accordingly, all disputes of fact must be resolved in favor of the plaintiff and all ambiguities of law must be resolved in favor of remand. Crowe v. Coleman, 113 F.3d 1536 (11th Cir. 1997); Whitt v. Sherman International Corp., 147 F.3d 1325 (11th Cir. 1998). Because Lavender and Owen are not fraudulently joined in this action, diversity jurisdiction is lacking and the court must remand the case to the state court.

## Order

Based on the foregoing considerations, it is therefore, ORDERED that the plaintiffs' motion to remand is due to be and hereby is GRANTED. Upon the expiration of fifteen (15) days from the date of this Order, the Clerk is DIRECTED to REMAND this action to the Circuit Court of Jefferson County, unless stayed by further Order of the court.

Any party may seek a review of this Order pursuant to Federal Rule of Civil Procedure 72(a) within ten (10) days after entry of this Order. Failure to seek a review may be deemed consent to the entry of this Order. See Roell v. Withrow, ___ U.S. ___, 123 S. Ct. 1696, 155 L. Ed. 2d 775 (2003).

The Clerk is DIRECTED to forward a copy of the foregoing to all counsel of record.

DONE this ___18th___ day of February, 2004.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 FEB 23  PM 3: 34

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| JUANITA JOHNSON, LORETTA SUE<br>KERCE, MYRTICE D. MILLS,<br>VICKI N. PARSONS, DEENA L. PHILLIPS,<br>LINDA J. PIPER, BRENDA J. ROTH,<br>ALLISON L. WEST,<br><br>    Plaintiffs,<br><br>vs.<br><br>WYETH, a corporation; DAVID WURM, an<br>individual, et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ENTERED**

FEB 2 3 2004

Case No. CV-04-TMP-224-S

## MEMORANDUM OPINION AND REMAND ORDER

This cause is before the court on the plaintiffs' motion to remand and for sanctions (Doc. 8)

filed February 10, 2004, as well as defendant Wyeth's motion to stay pending transfer to the Multi-

District Litigation court (Doc. 10), filed February 17, 2004. For the reasons expressed below, the

court finds that the motion for remand is due to be granted, the motion for sanctions denied, and the

motion for a stay denied.

### Procedure History

Plaintiffs filed their joint complaint against defendants Wyeth and one of Wyeth's

pharmaceutical salesmen, David Wurm, in the Circuit Court of Jefferson County, Alabama, on

January 5, 2004. They allege claims under the Alabama Extended Manufacturers Liability Doctrine

("AEMLD") and for product liability–failure to warn, breach of the implied warranty of

merchantability, negligence, wantonness, fraud, misrepresentation, and suppression, all arising from the plaintiffs' use of one or both of certain diet medications manufactured and distributed by Wyeth, formerly known as American Home Products, Inc. In particular, the complaint alleges that Wyeth manufactured, marketed, and distributed two drugs, Pondimin (fenfluramine) and Redux (dexfenfluramine), which later were recognized as associated with several medical problems, including primary pulmonary hypertension and valvular heart disease. Plaintiffs allege that their doctors prescribed one or both of these drugs to them and, consequently, have suffered medical injuries due to that use. With respect to defendant Wurm, plaintiffs contend that this salesmen was one of the primary sources by which Wyeth communicated to physicians the risks and benefits associated with use of these medications and, further, that he either innocently, negligently, or recklessly failed to reveal to plaintiffs' physicians all of the information known about the risks of using Pondimin and Redux.

Defendants timely removed the action to this court on February 4, 2004, contending that the court has original diversity jurisdiction because Wurm is fraudulently joined and should be dismissed for purposes of establishing subject-matter jurisdiction. Plaintiffs have replied in their motion to remand that Wurm is not fraudulently joined and that the removal to this court was intended to do nothing more than delay the case long enough for it to be transferred to the Eastern District of Pennsylvania to be joined with an MDL case pending there. Hence, the plaintiffs have requested the court to consider their remand motion on an expedited basis before the case can be transferred to the MDL court.

2

## Fraudulent Joinder

The parties agree that the case involves more than $75,000 in controversy and that the plaintiffs' citizenship is diverse from that of Wyeth. They also agree that Wurm, a pharmaceutical representative employed by Wyeth and its predecessor, American Home Products, Inc., is an Alabama resident and, therefore, not diverse from the plaintiffs. Plaintiffs assert for that reason that no diversity jurisdiction exists, the court lacks subject matter jurisdiction, the removal was improper, and the case is due to be remanded to the state circuit court. Defendants maintain, however, that Wurm was fraudulently joined by plaintiffs simply to defeat diversity jurisdiction and, therefore, his presence in the case should be ignored for jurisdictional purposes. As the basis for this contention, defendants have offered evidence that Wurm did not sell or promote the drug Pondimin at all and that he knew nothing about the medical risks associated with Redux. Consequently, defendants argue, there is no possibility of a recovery against Wurm, making his joinder in this action fraudulent.

The Eleventh Circuit Court of Appeals addressed the issue of removal grounded on diversity jurisdiction when it is alleged that a non-diverse defendant has been fraudulently joined in Crowe v. Coleman, 113 F.3d 1536 (11th Cir. 1997). There the court stated:

> In a removal case alleging fraudulent joinder, the removing party has the burden of proving that either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court. Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). The burden of the removing party is a 'heavy one.' B, Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir. Unit A 1981).

Id. at 1538. The standard is onerous because, absent fraudulent joinder, the plaintiffs have the absolute right to choose their forum. Courts must keep in mind that the plaintiff is the master of

3

his complaint and has the right to choose how and where he will fight his battle.

> This consequence makes sense given the law that "absent fraudulent joinder, plaintiff
> has the right to select the forum, to elect whether to sue joint tortfeasors and to
> prosecute his own suit in his own way to a final determination." Parks v. The New
> York Times Co., 308 F.2d 474, 478 (5th Cir. 1962). The strict construction of
> removal statutes also prevents "exposing the plaintiff to the possibility that he will
> win a final judgment in federal court, only to have it determined that the court lacked
> jurisdiction on removal," see Cowart Iron Works, Inc. v. Phillips Constr. Co., Inc.,
> 507 F. Supp. 740, 744 (S.D. Ga.1981)(quoting 14A C. Wright, A. Miller & E.
> Cooper, Federal Practice and Procedure § 3721), a result that is costly not only for
> the plaintiff, but for all the parties and for society when the case must be re-litigated.

Id.

To establish fraudulent joinder of a resident defendant, the burden of proof on the removing

party is a "heavy one," requiring clear and convincing evidence. Although affidavits and depositions

may be considered, the court must not undertake to decide the merits of the claim while deciding

whether there is a *possibility* a claim exists. The Crowe court reiterated:

> While 'the proceeding appropriate for resolving a claim of fraudulent joinder is
> similar to that used for ruling on a motion for summary judgment under Fed. R. Civ.
> P. 56(b),' [B. Inc., v. Miller Brewing Co., 663 F.2d 545, 549, n.9 (5th Cir., Unit A
> 1981)], the jurisdictional inquiry 'must not subsume substantive determination.' Id.
> at 550. Over and over again, we stress that 'the trial court must be certain of its
> jurisdiction before embarking upon a safari in search of a judgment on the merits.'
> Id. at 548- 49. **When considering a motion for remand, federal courts are not to**
> **weigh the merits of a plaintiff's claim beyond determining whether it is an**
> **arguable one under state law.** See id. 'If there is even a possibility that a state
> court would find that the complaint states a cause of action against any one of the
> resident defendants, the federal court must find that joinder was proper and remand
> the case to state court.' Coker v. Amoco Oil Co., 709 F.2d 1433, 1440-41 (11th Cir.
> 1983), *superseded by statute on other grounds as stated in* Georgetown Manor, Inc.
> v. Ethan Allen, Inc., 991 F.2d 1533 (11th Cir. 1993).

Id. (Emphasis added).

More recently, in Tillman v. R.J. Reynolds Tobacco, 253 F.3d 1302, 1305 (11th Cir. 2001),

the court of appeals emphasized the limits of the fraudulent joinder analysis, saying:

4

> For removal under 28 U.S.C. § 1441 to be proper, no defendant can be a citizen of
> the state in which the action was brought. 28 U.S.C. § 1441(b). Even if a named
> defendant is such a citizen, however, it is appropriate for a federal court to dismiss
> such a defendant and retain diversity jurisdiction if the complaint shows there is no
> possibility that the plaintiff can establish any cause of action against that defendant.
> See Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998). "If
> there is even a possibility that a state court would find that the complaint states a
> cause of action against any one of the resident defendants, the federal court must find
> that the joinder was proper and remand the case to the state court." Coker v. Amoco
> Oil Co., 709 F.2d 1433, 1440-41 (11th Cir. 1983), *superceded by statute on other
> grounds as stated in* Wilson v. General Motors Corp., 888 F.2d 779 (11th Cir. 1989).
> "The plaintiff need not have a winning case against the allegedly fraudulent
> defendant; he need only have a *possibility* of stating a valid cause of action in order
> for the joinder to be legitimate." Triggs, 154 F.3d at 1287 (emphasis in original).

Id.; see also Tillman v. R.J. Reynolds Tobacco, 340 F.3d 1277, 1279 (11th Cir. 2003)("[I]f there is

a possibility that a state court would find that the complaint states a cause of action against any of

the resident defendants, the federal court must find that the joinder was proper and remand the case

to state court."). Clearly, the fraudulent joinder issue does not permit the court to examine the merits

of the claim asserted against a non-diverse defendant beyond seeking to determine whether there is

"a possibility" that a state court might find a valid claim to be stated.

In this case, the court is persuaded that the plaintiffs have stated a legally possible claim

against the non-diverse defendant, Wurm, in the form of a negligent fraud claim. To state such a

possible claim, the plaintiffs need only allege that Wurm misrepresented certain material facts about

the risks associated with use of Pondimin[1] and Redux and that plaintiffs, through their physicians,

---

[1] Wurm has filed an affidavit in which he states that he never sold, marketed, or promoted
the drug Pondimin. Even if these plaintiffs all used only Pondimin, there is a "possible" basis for
Wurm's liability. Wurm admits that when questioned by physicians about Pondimin, he attempted
to provide answers based on the information he received from Wyeth. Thus, it remains "possible,"
as alleged in the complaint, that he made misstatements about the risks of using Pondimin, as well
as Redux. Whether that "possibility" is something that can be developed factually goes to the merits
of the claim and is beyond the fraudulent joinder analysis the court must undertake.

reasonably relied upon such misrepresentations. It is unimportant that Wurm did not know of the risks and, therefore, did not *intentionally* misrepresent the risks associated with these drugs. Alabama law recognizes an action for innocent or negligent misrepresentation as well as for reckless and intentional misrepresentations. For example, the Alabama Court of Civil Appeals has explained:

> An innocent misrepresentation is as much a legal fraud as an intended misrepresentation. The good faith of a party in making what proves to be a material misrepresentation is immaterial as to whether there was an actionable fraud. Smith v. Reynolds Metals Co., 497 So. 2d 93 (Ala. 1986). Under the statute, even though a misrepresentation be made by mistake and innocent of any intent to deceive, if it is a material fact and is acted upon with belief in its truth by the one to whom it is made, it may constitute legal fraud. Mid-State Homes, Inc. v. Startley, 366 So. 2d 734 (Ala. Civ. App. 1979).

Goggans v. Realty Sales & Mortgage, 675 So. 2d 441, 443 (Ala. Civ. App., 1996); see also Cain v. Saunders, 813 So. 2d 891 (Ala. Civ. App. 2001).

Even if the court assumes that Wurm did not know of the PPH and valvular heart disease risks associated with these drugs and, therefore, did not recklessly or intentionally misstate what *he* knew, his innocent misrepresentations, at least as alleged by the complaint, understating the risks constitute a "possible" cause of action in Alabama. As long as it is possible that a state court may find that the complaint states a claim against the non-diverse defendant, even if it is a claim with poor prospects of ultimate success, the non-diverse defendant has not been fraudulently joined and the case must be remanded for lack of proper diversity jurisdiction.

The court is persuaded that the defendants have not carried the "heavy burden" of showing fraudulent joinder of Wurm. There is a possibility that the plaintiffs can state a claim against him,

6

as a sales representative who met with physicians and answered questions regarding the risks and benefits of these drugs, for negligently or innocently misrepresenting the material facts concerning the risks associated with the drugs. At the very least, the claim against Wurm is not so clearly lacking in substance that the court assuredly has subject-matter jurisdiction of this case. Questions must be resolved in favor of remand. In a contested removal, a presumption exists in favor of remanding the case to state court; accordingly, all disputes of fact must be resolved in favor of the plaintiff and all ambiguities of law must be resolved in favor of remand. Crowe v. Coleman, 113 F.3d 1536 (11th Cir. 1997); Whitt v. Sherman International Corp., 147 F.3d 1325 (11th Cir. 1998). Because Wurm, a non-diverse defendant, is not fraudulently joined in this action, diversity jurisdiction is lacking and the court must remand the case to the state court.

<div align="center">Order</div>

Based on the foregoing considerations, it is therefore, ORDERED that the plaintiffs' motion to remand is due to be and hereby is GRANTED. Upon the expiration of fifteen (15) days from the date of this Order, the Clerk is DIRECTED to REMAND this action to the Circuit Court of Jefferson County, unless stayed by further Order of the court.

The defendants' motion to stay is DENIED.

Any party may seek a review of this Order pursuant to Federal Rule of Civil Procedure 72(a) within ten (10) days after entry of this Order. Failure to seek a review may be deemed consent to the entry of this Order. See Roell v. Withrow, ___ U.S. ___, 123 S. Ct. 1696, 155 L. Ed. 2d 775 (2003).

<div align="center">7</div>

The Clerk is DIRECTED to forward a copy of the foregoing to all counsel of record.

DONE this ___23rd___ day of February, 2004.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE

8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 FEB 24 AM 10: 15

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| ANN McGOWAN, BECKY PARTINGTON, and LAURA STANFIELD, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. CV-04-TMP-298-S |
| WYETH, INC., WYETH PHARMACEUTICALS, INC., BEN LAVENDER, and ANTHONY CHERRY, | ) ) ) ) ) | |
| Defendants. | ) | |

**ENTERED**

FEB 24 2004

MEMORANDUM OPINION AND ORDER OF REMAND

This cause is before the court on the plaintiffs' emergency motion to remand, filed February 17, 2004, to which defendants responded with a motion to stay pending transfer to the MDL proceedings on February 19, 2004. The motion has been briefed by both sides, and the court finds that the action is due to be remanded.

Procedure History

Plaintiffs McGowan, Partington, and Stanfield filed their joint complaint against defendants Wyeth, Inc., and Wyeth Pharmaceuticals, Inc., (hereinafter collectively "Wyeth") and two of Wyeth's pharmaceutical salesmen, Ben Lavender and Anthony Cherry, in the Circuit Court of Jefferson County, Alabama, on January 16, 2004. The complaint alleges claims for "strict liability–defective product," "strict liability–failure to warn," "strict liability–failure to test," negligence, breach of warranties, fraud and misrepresentation, negligent and reckless misrepresentation, and conspiracy to defraud and fraudulently conceal, all arising from the plaintiffs' use of one or both of certain diet

medications manufactured and distributed by Wyeth, formerly known as American Home Products, Inc. In particular, the complaint alleges that Wyeth manufactured, marketed, and distributed two drugs, Pondimin (fenfluramine) and Redux (dexfenfluramine), which later were recognized as associated with several medical problems, including primary pulmonary hypertension and valvular heart disease. Plaintiffs allege that their doctors prescribed one or both of these drugs to them and, consequently, they have suffered medical injuries due to that use. With respect to defendants Lavender and Cherry, plaintiffs contend that these salesmen were one of the primary sources by which Wyeth communicated to physicians the risks and benefits associated with the use of these medications and, further, that these defendants either innocently, negligently, or recklessly failed to reveal to physicians all of the information known about the risks of using Pondimin and Redux.

Defendants timely removed the action to this court[1] on February 13, 2004, contending that the court has original diversity jurisdiction because Lavender and Cherry, both Alabama residents, are fraudulently joined and should be dismissed for purposes of establishing subject-matter jurisdiction. Plaintiffs have replied in their emergency motion, filed the next day, that Lavender and Cherry are not fraudulently joined and that the removal to this court was intended to do nothing more than delay the case long enough for it to be transferred to the Eastern District of Pennsylvania to be joined with an MDL case pending there. Hence, the plaintiffs have requested the court to consider their remand motion on an expedited basis before the case can be transferred to the MDL court.

---

[1] There has been a spate of these removals in the last few weeks. The undersigned himself has dealt with two earlier removals in Marshal, et al., v. Wyeth, Inc., et al., CV-04-TMP-179-S, and Johnson, et al., v. Wyeth, et al., CV-04-TMP-224-S. Consequently, the court is thoroughly familiar with the positions and arguments of the parties.

<u>Fraudulent Joinder</u>

The parties agree that the case involves more than $75,000 in controversy and that the plaintiffs' citizenship is diverse from that of Wyeth. They also agree that Lavender and Cherry are Alabama residents and, therefore, not diverse from the plaintiffs. Plaintiffs assert for that reason that no diversity jurisdiction exists, the court lacks subject matter jurisdiction, the removal was improper, and the case is due to be remanded to the state circuit court. Defendants maintain, however, that Lavender and Cherry were fraudulently joined by plaintiffs simply to defeat diversity jurisdiction and, therefore, their presence in the case should be ignored for jurisdictional purposes. As the basis for this contention, defendants have offered evidence that Lavender and Cherry did not sell or promote the drug Pondimin at all and that they knew nothing about the medical risks associated with Redux. Consequently, defendants argue, there is no possibility of a recovery against either Lavender or Cherry, making their joinder in this action fraudulent.

The Eleventh Circuit Court of Appeals addressed the issue of removal grounded on diversity jurisdiction when it is alleged that a non-diverse defendant has been fraudulently joined in <u>Crowe v. Coleman</u>, 113 F.3d 1536 (11th Cir. 1997). There the court stated:

> In a removal case alleging fraudulent joinder, the removing party has the burden of proving that either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court. <u>Cabalceta v. Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989). The burden of the removing party is a 'heavy one.' <u>B, Inc. v. Miller Brewing Co.</u>, 663 F.2d 545, 549 (5th Cir. Unit A 1981).

<u>Id.</u> at 1538. The standard is onerous because, absent fraudulent joinder, the plaintiffs have the absolute right to choose their forum. Courts must keep in mind that the plaintiff is the master of his complaint and has the right to choose how and where he will fight his battle.

3

This consequence makes sense given the law that "absent fraudulent joinder, plaintiff has the right to select the forum, to elect whether to sue joint tortfeasors and to prosecute his own suit in his own way to a final determination." Parks v. The New York Times Co., 308 F.2d 474, 478 (5ᵗʰ Cir. 1962). The strict construction of removal statutes also prevents "exposing the plaintiff to the possibility that he will win a final judgment in federal court, only to have it determined that the court lacked jurisdiction on removal," see Cowart Iron Works, Inc. v. Phillips Constr. Co., Inc., 507 F. Supp. 740, 744 (S.D. Ga.1981)(quoting 14A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3721), a result that is costly not only for the plaintiff, but for all the parties and for society when the case must be re-litigated.

Id.

To establish fraudulent joinder of a resident defendant, the burden of proof on the removing

party is a "heavy one," requiring clear and convincing evidence. Although affidavits and depositions

may be considered, the court must not undertake to decide the merits of the claim while deciding

whether there is a *possibility* a claim exists. The Crowe court reiterated:

> While 'the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed. R. Civ. P. 56(b),' [B. Inc., v. Miller Brewing Co., 663 F.2d 545, 549, n.9 (5ᵗʰ Cir., Unit A 1981)], the jurisdictional inquiry 'must not subsume substantive determination.' Id. at 550. Over and over again, we stress that 'the trial court must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits.' Id. at 548- 49. **When considering a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law.** See id. 'If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court.' Coker v. Amoco Oil Co., 709 F.2d 1433, 1440-41 (11ᵗʰ Cir. 1983), *superseded by statute on other grounds as stated in* Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533 (11ᵗʰ Cir. 1993).

Id. (Emphasis added).

More recently, in Tillman v. R.J. Reynolds Tobacco, 253 F.3d 1302, 1305 (11ᵗʰ Cir. 2001),

the court of appeals emphasized the limits of the fraudulent joinder analysis, saying:

4

> For removal under 28 U.S.C. § 1441 to be proper, no defendant can be a citizen of the state in which the action was brought. 28 U.S.C. § 1441(b). Even if a named defendant is such a citizen, however, it is appropriate for a federal court to dismiss such a defendant and retain diversity jurisdiction if the complaint shows there is no possibility that the plaintiff can establish any cause of action against that defendant. See Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998). "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." Coker v. Amoco Oil Co., 709 F.2d 1433, 1440-41 (11th Cir. 1983), *superceded by statute on other grounds as stated in* Wilson v. General Motors Corp., 888 F.2d 779 (11th Cir. 1989). "The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate." Triggs, 154 F.3d at 1287 (emphasis in original).

Id.; see also Tillman v. R.J. Reynolds Tobacco, 340 F.3d 1277, 1279 (11th Cir. 2003)("[I]f there is a possibility that a state court would find that the complaint states a cause of action against any of the resident defendants, the federal court must find that the joinder was proper and remand the case to state court."). Clearly, the fraudulent joinder issue does not permit the court to examine the merits of the claim asserted against a non-diverse defendant beyond seeking to determine whether there is "a possibility" that a state court might find a valid claim to be stated.

In this case, the court is persuaded that the plaintiffs have stated a legally possible claim against the non-diverse defendants, Lavender and Cherry, in the form negligent fraud claims. To state such a possible claim, the plaintiffs need only allege that Lavender and Cherry misrepresented certain material facts about the risks associated with use of Pondimin[2] and Redux and that plaintiffs,

---

[2] Lavender and Cherry have given affidavits in which they state they never sold, marketed, or promoted the drug Pondimin. Even if these plaintiffs all used only Pondimin, there is a "possible" basis for Lavender's and Cherry's liability. They admit that when questioned by physicians about Pondimin, they attempted to provide answers based on the information they received from Wyeth. Thus, it remains "possible," as alleged in the complaint, that they made misstatements about the risks of use of Pondimin as well as Redux. Whether that "possibility" is something that can be developed factually goes to the merits of the claim and is beyond the fraudulent joinder analysis the court must

5

through their physicians, reasonably relied upon such misrepresentations. It is unimportant that

Lavender and Cherry did not know of the risks and, therefore, did not *intentionally* misrepresent the

risks associated with these drugs. Alabama law recognizes an action for innocent or negligent

misrepresentation as well as for reckless and intentional misrepresentations. For example, the

Alabama Court of Civil Appeals has explained:

> An innocent misrepresentation is as much a legal fraud as an intended
> misrepresentation. The good faith of a party in making what proves to be a material
> misrepresentation is immaterial as to whether there was an actionable fraud. Smith
> v. Reynolds Metals Co., 497 So. 2d 93 (Ala. 1986). Under the statute, even though
> a misrepresentation be made by mistake and innocent of any intent to deceive, if it
> is a material fact and is acted upon with belief in its truth by the one to whom it is
> made, it may constitute legal fraud. Mid-State Homes, Inc. v. Startley, 366 So. 2d
> 734 (Ala. Civ. App. 1979).

Goggans v. Realty Sales & Mortgage, 675 So. 2d 441, 443 (Ala. Civ. App., 1996); see also Cain v.

Saunders, 813 So. 2d 891 (Ala. Civ. App. 2001).

Even if the court assumes that Lavender and Cherry did not know of the PPH and valvular

heart disease risks associated with these drugs and, therefore, did not recklessly or intentionally

misstate what *they* knew, their innocent misrepresentations, at least as alleged by the complaint,

understating the risks constitute a "possible" cause of action in Alabama. As long as it is possible

that a state court may find that the complaint states a claim against the non-diverse defendant, even

if it is a claim with poor prospects of ultimate success, the non-diverse defendant has not been

fraudulently joined and the case must be remanded for lack of proper diversity jurisdiction.

---

undertake.

6

The court is persuaded that the defendants have not carried the "heavy burden" of showing fraudulent joinder of Lavender and Cherry. There is a possibility that the plaintiffs can state a claim against them, as sales representatives who met with physicians and answered questions regarding the risks and benefits of these drugs, for negligently or innocently misrepresenting the material facts concerning the risks associated with the drugs. At the very least, the claim against Lavender and Cherry is not so clearly lacking in substance that the court assuredly has subject-matter jurisdiction of this case. Uncertainties must be resolved in favor of remand. In a contested removal, a presumption exists in favor of remanding the case to state court; accordingly, all disputes of fact must be resolved in favor of the plaintiff and all ambiguities of law must be resolved in favor of remand. Crowe v. Coleman, 113 F.3d 1536 (11th Cir. 1997); Whitt v. Sherman International Corp., 147 F.3d 1325 (11th Cir. 1998). Because Lavender and Cherry are not fraudulently joined in this action, diversity jurisdiction is lacking and the court must remand the case to the state court.

### Order

Based on the foregoing considerations, it is therefore, ORDERED that the plaintiffs' motion to remand is due to be and hereby is GRANTED. Upon the expiration of fifteen (15) days from the date of this Order, the Clerk is DIRECTED to REMAND this action to the Circuit Court of Jefferson County, unless stayed by further order of the court.

The defendants' motion to stay is DENIED.

Any party may seek a review of this Order pursuant to Federal Rule of Civil Procedure 72(a) within ten (10) days after entry of this Order. Failure to seek a review may be deemed consent to

the entry of this Order. See Roell v. Withrow, ___ U.S. ___, 123 S. Ct. 1696, 155 L. Ed. 2d 775 (2003).

The Clerk is DIRECTED to forward a copy of the foregoing to all counsel of record.

DONE this _____ day of February, 2004.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE

8

IN THE UNITED STATES DISTRICT COURT FILED
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION
04 FEB 25 PM 1:51

U.S. DISTRICT COURT
N.D. OF ALABAMA

MARTHA M. DAVIS,

    PLAINTIFF,

vs.                                    CASE NO. CV 03-J-3167-J

WYETH, et al.,

    DEFENDANTS.

**ENTERED**
FEB 25 2004

## ORDER

In accordance with the accompanying memorandum opinion entered this day,

It is **ORDERED** by the court that the plaintiff's motion to remand (doc.10) is

**GRANTED**, the court finding that this action was improvidently removed. The

plaintiff's motion for sanctions is **DENIED**. This case is hereby **REMANDED** to the

Circuit Court of Walker County, Alabama.

**DONE** and **ORDERED** this the ___ day of February, 2003.

INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

FILED

04 FEB 25 PM 1:5

U.S. DISTRICT COURT
N.D. OF ALABAMA

MARTHA M. DAVIS,

    PLAINTIFF,

vs.

    CASE NO. CV 03-J-3167-J

WYETH, et al.,

    DEFENDANTS.

ENTERED

FEB 2·5 2004

## <u>MEMORANDUM OPINION</u>

This matter is before the court on the plaintiff's motion to remand and motion

for sanctions (doc. 10) and the defendant's opposition to remand (doc. 13). The court

having previously stayed this matter pending decision on conditional transfer by the

Judicial Panel on Multidistrict Litigation, said stay is hereby **LIFTED**.[1]  Having

considered the motion to remand and the opposition thereto, the court finds as follows:

Plaintiff filed suit in the Circuit Court of Walker County against defendant

Wyeth, Inc. ("Wyeth"), and three of defendant Wyeth's pharmaceutical sales

representatives, Mary Lou Carnaggio, Nikki N. Windham and David Wurm. The

parties do not dispute that the sales representatives are Alabama residents. The

plaintiff asserts claims under the Alabama Extended Manufacturer's Liability Doctrine

---

[1]The court has received notice from the Judicial Panel on Multidistrict Litigation
concerning opposition to the conditional transfer order. Said notice further states that said
conditional transfer order "does not in any way limit the pretrial jurisdiction of [this] court." The
letter further encourages the court to rule on "a motion pending before you in the action –
particularly a motion to remand to state court ..." Given this stance by the Judicial Panel, this
court has revisited its prior stay of this litigation and the motion to remand pending before it.



(AEMLD), failure to warn, breach of warranty of merchantability, negligence, wantoness and fraud, misrepresentation and suppression arising from her use of the diet drugs fenfluramine (Pondimin) and dexfenfluramine (Redux). These diet drugs were removed from the market in 1997 due to their association with medical problems such as primary pulmonary hypertension and heart valve defects. Complaint, ¶¶ 14, 25-49. Defendant Wyeth removed this action from the Circuit Court of Walker County, Alabama, asserting that this court has jurisdiction under 28 U.S.C. § 1332 and that the individual defendants were fraudulently joined as the plaintiff has no reasonable possibility of prevailing on any of her claims against them. Notice of Removal, ¶¶ 4, 7.

"Diversity jurisdiction under 28 U.S.C. § 1332 requires complete diversity – every plaintiff must be diverse from every defendant." *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353, 1359 (11ᵗʰ Cir.1996), rev'd on other grounds, *Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000). *See also Carden v. Arkoma Associates*, 494 U.S. 185, 187, 110 S.Ct. 1015, 1017, 94 L.Ed.2d 615 (1990) ("Since its enactment, we have interpreted the diversity statute to require 'complete diversity' of citizenship); citing *Strawbridge v. Curtiss*, 3 Cranch 267, 2 L.Ed. 435 (1806).

The only means by which this case may remain in this court is if the lack of diversity which appears on the face of the complaint is through the fraudulent joinder

2

of the non-diverse party, as alleged by the defendant. Joinder is fraudulent when "there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant." *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440 (11th Cir.1983), *superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533 (11th Cir.1993).

> "If there is *even a possibility* that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." *Coker*, 709 F.2d at 1440-41. The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate.

*Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir.1998).

The defendant, as the party removing the action to federal court, have the burden to establish federal jurisdiction. *See Pacheco de Perez v. AT & T Co.*, 139 F.3d 1368, 1373 (11th Cir.1998); *Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir.1996). All doubts (and uncertainties) about federal court jurisdiction must be resolved in favor of a remand to state court. *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir.1994)); *Diaz*, 85 F.3d at 1505. "The burden of the removing defendant is a 'heavy one.' To determine whether the case should be remanded, the district court must evaluate the factual allegations in the light most favorable to the plaintiff and must

3

resolve any uncertainties in favor of the plaintiff." *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir.1997) (citation omitted).[2]

Plaintiff alleges in her complaint that each of the defendants promoted, detailed, distributed, sold, and/or marketed and made representations to Dr. Jerry V. Mosely, the plaintiff's physician, concerning these drugs. Complaint, ¶ 8. Based on these representations, the plaintiff was prescribed these drugs by her physician, *Id.* Defendant Wyeth argues that the individual defendants never promoted Pondimin and hence, said individual defendants can not be liable for the plaintiffs' injuries from Pondimin. Defendant's opposition, at 4. However, this argument goes to the merits of the plaintiff's claim against the individual defendants, which is not the issue before this court. The fact that plaintiff may not ultimately prevail against any of the individual defendants is not a proper inquiry for this court in considering a motion to remand. Rather, this court may only consider whether the plaintiff has the possibility of stating a valid cause of action against the non-diverse defendants. *Triggs*, 154 F.3d at 1287. The individual defendants admit that they promoted Redux to physicians based on information provided to them by Wyeth. *See e.g.,* Affidavit

---

[2]This court is cognizant of the Eleventh Circuit's admonition in *Burns v. Windsor Insurance Company*, 31 F.3d 1092, 1095 (11th Cir.1994), where the Court stated "Federal courts are courts of limited jurisdiction. While a defendant does have a right, by statute, to remove in certain situations, plaintiff is still the master of his own claim (citations omitted). Defendant's right to remove and plaintiff's right to chose his own forum are not on equal footing ... removal statutes are construed narrowly ... uncertainties are resolved in favor of remand (citations omitted)."

4

of defendant Wurm, ¶ 5, 7. Because the court need only find one possible valid cause of action against the non-diverse defendants, the court considers only the plaintiff's claim of fraud, misrepresentation and suppression (Count VI), which the plaintiff has pleaded against all defendants.[3]

To establish misrepresentation under Alabama law, irrespective of whether the misrepresentation was made willfully, recklessly, or mistakenly, the plaintiff must prove (1) a false representation, (2) that the false representation concerned an existing material fact, (3) that the plaintiff relied on the false representation, and (4) that the plaintiff was damaged as a proximate result of the reliance. *Chase v. Kawasaki Motors Corp*, 140 F.Supp.2d 1280, 1291 (M.D.Ala.2001). The fact that the representation was made to a different individual than the one suffering the injury is not fatal to a claim for misrepresentation under Alabama law. *See Thomas v. Halstead*, 605 So.2d 1181, 1184 (Ala.1992) ("if a third person is injured by the deceit, he may recover against the one who made possible the damages to him by practicing the deceit in the first place"); *Chase*, 140 F.Supp.2d at 1291, n. 8 ("The court notes that under Alabama law it is not always required that a plaintiff prove that a misrepresentation was made directly to him, so long as his injuries resulted from the

---

[3]The court has not considered whether Counts I-V state possibly valid causes of action against the individual defendants. Rather, as only one stated cause of action must have a possibility of validity to destroy diversity jurisdiction, the court makes no judgment as to any cause of action stated in the complaint other than the count for misrepresentation.

5

misrepresentation"). Thus "there is a duty not to make a false representation to those to whom a defendant intends, for his own purposes, to reach and influence by the representation." *Wheelan v. Sessions*, 50 F.Supp.2d 1168, 1174 (M.D.Ala.1999) (quoting *Colonial Bank of Ala. v. Ridley & Schweigert*, 551 So.2d 390, 396 (Ala.1989).

Common sense dictates that the reason drug representatives make representations to physicians is to encourage physicians to prescribe the products the representatives promote to the physicians' patients. In other words, the drug representatives should have reasonably foreseen that the physicians' reliance on their representations would cause the prescription by the physicians of the products they promote to the physicians' patients for their consumption. There can be no other purpose to promote said products to physicians. Such a situation is clearly within Alabama law on third party standing in misrepresentation cases. "[T]he entire basis for third party standing in misrepresentation cases is that the deceiver contemplated that the third party would be induced to act by the deceiver's misstatements made to someone else." *Chase*, 140 F.Supp.2d at 1293, citing *Sims v. Tigrett*, 229 Ala. 486, 158 So. 326, 330 (1934). *See also Ex parte Grand Manor Inc.*, 778 So.2d 173, 182 (Ala.2000) ("If the fraudulent statement is made with the intent and expectation that the one to whom it is made will pass the statement on to the plaintiff, then the plaintiff

6

is entitled to rely on that statement, even if it is not made personally or directly to the plaintiff"); 37 Am.Jur.2d § 292 ("Third parties may recover damages for a fraudulent misrepresentation if they can establish that they relied upon the misrepresentation to their detriment and that the defendant intended the misrepresentation to be conveyed to them"). The court is therefore of the opinion that the plaintiff has stated a cause of action for misrepresentation against the non-diverse defendants.

Under Alabama law, this meets the requirement of "a possibility" of stating a valid cause of action. That is all that is necessary for joinder not to be fraudulent. The allegation that the individual defendants misrepresented material facts about Pondimin and Redux to a physician, who thereafter, and in reliance on said representations, prescribed these medications to a patient who was injured by them, possibly states a valid cause of action. The fact that the drug representatives made no attempt to ascertain the truth of the facts they presented is not a bar to liability under Alabama law. Rather, even an innocent misrepresentation made in good faith may constitute a legal fraud is such misrepresentation is of a material fact. *See Goggans v. Realty Sales & Mortgage*, 675 So.2d 441, 443 (Ala.Civ.App.1979).

Having reviewed the allegations set forth in Count VI of the plaintiff's complaint, the court finds such allegations do state a possible cause of action against the resident defendants. The plaintiff need not have a winning case against the

7

allegedly fraudulent defendant; she need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate. *Triggs*, 154 F.3d at 1287. That possibility exists in the pleadings before this court.

Having found that the plaintiff has stated a claim against the non-diverse defendants, this court finds that complete diversity between all parties is lacking. *See* 28 U.S.C. §§ 1332 and 1441(b)("Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the state in which such action is brought"). Thus, the court finds that the joinder was proper and must remand the case to the state court. *See Coker*, 709 F.2d at 1440-41.

The court having considered the foregoing and finding that this case has been improvidently removed, the court shall grant the plaintiff's motion to remand this case to the Circuit Court of Walker County, Alabama, by separate Order.

**DONE** this the _____ 25 day of February, 2004.


INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

8

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 04 FEB 27 AM 8: 30
MIDDLE DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| RHONDA P. BRADFORD, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | *Case No.:* CV 03-P-3157-M |
| | ) | |
| WYETH, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

D⌐

# ENTERED

## FEB 2 7 2004

### ORDER

Pending before the court are several motions including Plaintiffs' Motion to Remand (Doc.
#10) filed on December 22, 2003, and Plaintiffs' Motion for Emergency Hearing and/or Ruling (Doc.
#34) filed on February 25, 2004.

On February 20, 2004, the Chairman of the Judicial Panel on Multidistrict Litigation, Judge
Wm. Terrell Hodges, sent a letter to all judges, including the undersigned, involved with MDL-
1203—*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation.*
In this notice, the Judicial Panel on Multidistrict Litigation encouraged judges to issue rulings on
pending motions and in particular, motions to remand.

With this directive from the *Judicial Panel in mind* and based upon the analysis set forth in
recent related remand decisions by other judges of this court, Plaintiffs' Motion to Remand is
**GRANTED**, and this case is **REMANDED** to the *Circuit Court of Etowah County. See, e.g.,*
*Martha M. Davis v. Wyeth, et al.,* United States District Court for the Northern District of Alabama,
Jasper Division, CV 03-J-3167-I, February 25, 2004 (Doc. #17); *Ann McGowan, et al. v. Wyeth, Inc.,*
*et al.,* United States District Court for the Northern District of Alabama, Southern Division, CV 04-

36

TMP-298-S, February 24, 2004 (Doc. #12); *Juanita Johnson, et al. v. Wyeth, et al.*, United States District Court for the Northern District of Alabama, Southern Division, CV 04-TMP-224-S, February 23, 2004 (Doc. #11); *Jevenari Marshal, et al. v. Wyeth, Inc., et al.*, United States District Court for the Northern District of Alabama, Southern Division, CV 04-TMP-179-S, February 18, 2004 (Doc. #17).

Accordingly, Plaintiffs' Motion for Emergency Hearing and/or Ruling (Doc. #34) is **GRANTED IN PART** as to the request for a ruling and **DENIED IN PART** as to the request for an emergency hearing. Plaintiffs' Motion for Sanctions (Doc. #10) is **DENIED**. Defendants' Motion to Stay (Doc. #23) filed on January 21, 2004, is **DENIED**. The various pending motions to strike (Docs. #24, #27, #29, #32) are **MOOT**. Defendants' Motion to Amend Answer (Doc. #16) filed on January 13, 2004, remains pending and will be transferred back with the court file to the Circuit Court of Etowah County.

DONE and ORDERED this _____26th_____ day of February, 2004.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 04 FEB 27 PM 3: 26
MIDDLE DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOHN W. SMITH,                    }
                                  }
        Plaintiff,                }
                                  }
v.                                }        Case No.: CV 04-P-226-M
                                  }
WYETH, et al.,            :       }
                                  }        **ENTERED**
        Defendants.               }

FEB 2 7 2004

### ORDER

On February 16, 2004, the court entered an Order staying this litigation pending action by the

Judicial Panel on Multidistrict Litigation. *See In re Diet Drugs (Phentermine/Fenfluramine*

*/Dexfenfluramine) Products Liability Litigation*, MDL-1203. (Doc. #11). Based upon the analysis

set forth in recent related remand decisions by other judges of this court, the stay is **LIFTED**,

Plaintiffs' Motion to Remand (Doc. #8) filed on February 10, 2004, is **GRANTED**, and this case is

**REMANDED** to the Circuit Court of DeKalb County. *See, e.g., Martha M. Davis v. Wyeth, et al.*,

United States District Court for the Northern District of Alabama, Jasper Division, CV 03-J-3167-J,

February 25, 2004 (Doc. #17); *Ann McGowan, et al. v. Wyeth, Inc., et al.*, United States District Court

for the Northern District of Alabama, Southern Division, CV 04-TMP-298-S, February 24, 2004

(Doc. #12); *Juanita Johnson, et al. v. Wyeth, et al.*, United States District Court for the Northern

District of Alabama, Southern Division, CV 04-TMP-224-S, February 23, 2004 (Doc. #11); *Jevenari*

*Marshal, et al. v. Wyeth, Inc., et al.*, United States District Court for the Northern District of

Alabama, Southern Division, CV 04-TMP-179-S, February 18, 2004 (Doc. #17).

Plaintiffs' Motion for Sanctions (Doc. #8) is **DENIED**.

DONE and ORDERED this _27+h_ day of February, 2004.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

BOUDREAUX, et al.,                    )
                                      )
        Plaintiffs,                   )
                                      )
v.                                    )        Case No.: CV 04-P-227-M
                                      )
                                      )        **ENTERED**
WYETH, et al.,                        )
                                      )
        Defendants.                   )        FEB 27 2004

## ORDER

On February 18, 2004, the court entered an Order staying this litigation pending action by the Judicial Panel on Multidistrict Litigation. *See In re Diet Drugs (Phentermine/Fenfluramine /Dexfenfluramine) Products Liability Litigation*, MDL-1203. (Doc. #11). Based upon the analysis set forth in recent related remand decisions by other judges of this court, the stay is **LIFTED**, Plaintiffs' Motion to Remand (Doc. #8) filed on February 10, 2004, is **GRANTED**, and this case is **REMANDED** to the Circuit Court of Marshall County. *See, e.g., Martha M. Davis v. Wyeth, et al.*, United States District Court for the Northern District of Alabama, Jasper Division, CV 03-J-3167-J, February 25, 2004 (Doc. #17); *Ann McGowan, et al. v. Wyeth, Inc., et al.*, United States District Court for the Northern District of Alabama, Southern Division, CV 04-TMP-298-S, February 24, 2004 (Doc. #12); *Juanita Johnson, et al. v. Wyeth, et al.*, United States District Court for the Northern District of Alabama, Southern Division, CV 04-TMP-224-S, February 23, 2004 (Doc. #11); *Jevenari Marshal, et al. v. Wyeth, Inc., et al.*, United States District Court for the Northern District of Alabama, Southern Division, CV 04-TMP-179-S, February 18, 2004 (Doc. #17).

Plaintiffs' Motion for Sanctions (Doc. #8) is **DENIED**.



COPY

☑ Steve      ☑ Lisa
☐ Tia        ☐ Sheree
☑ Josh       ☐ Kim
☑ Jimmy      ☐ Robert
☐ Joel       ☐ Meredith
☐ Lori       ☐ Ashley

02/27/2004 10:21 FAX 2052523596     K Stephen Jackson PC                          ☎004

DONE and ORDERED this _____27th_____ day of February, 2004.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

FILED

04 MAR -2 PM 3:30

U.S. DISTRICT COURT
N.D. OF ALABAMA

MILDRED BRIDGES, )
)
Plaintiff, )
) CIVIL ACTION NO.
v. ) 04-AR-0297-J
)
WYETH, et al., )
)
Defendants. )


ENTERED
MAR 02 2004

### ORDER OF REMAND

For the separate and several reasons articulated by Honorable Inge Johnson of this court in *Davis v. Wyeth, et al*, CV-03-J-3167-J, and by other judges of this court in similar cases, this court finds that it lacks subject-matter jurisdiction over the above-entitled removed case. The court is not prepared to express the belief that there is no reasonable possibility that Alabama courts will allow the joinder of an agent of a manufacturer as a defendant in an Alabama Extended Manufacturer's Liability Doctrine (AEMLD) case. See the muddy water stirred by *Tillman v. R. J. Reynolds Tobacco Co.*, ___ So. 2d ___, 2003 WL 21489707 (Ala.). Accordingly, the motion to remand filed by plaintiff, Mildred Bridges, is GRANTED, pursuant to 28 U.S.C. §1447(c), and the above-entitled case is hereby REMANDED to the Circuit Court of Walker County, Alabama, from which it was improvidently removed.

Defendant, Wyeth, has, in the alternative, requested a certification for interlocutory appeal to the Eleventh Circuit pursuant to 28 U.S.C. § 1292(b). Upon reflection, the court is

just as unwilling attempt to pass off to the Eleventh Circuit this serious question of Alabama law as it is to pass it off to the Multi-District Panel.

The Clerk is DIRECTED to effectuate this order.

The parties shall bear their own respective costs in this court.

DONE this _2nd_ day of March, 2004.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DEBRA HOUGH, et al.,                    )

        PLAINTIFF,                       )

VS.                                      )          CV-04-H-393-S

WYETH, et al.,                          )

        DEFENDANTS.                      )

**ENTERED**

MAR 0 5 2004

### ORDER OF REMAND

The court has before it plaintiffs' emergency motion to
remand filed March 2, 2004 and the response thereto of Wyeth
filed on March 4, 2004 titled "Wyeth's Motion to Stay to Allow
Transfer to the Multi-District Litigation Proceeding." Wyeth's
motion includes a memo addressing the merits of a possible stay,
and in paragraph one of Wyeth's motion counsel discusses a number
of cases out of the three district courts in Alabama confronted
with the same or a related issue with which this court is
confronted. It is interesting to note that none of the ten very
recent orders of Judges Clemon, Johnson, Bowdre, Proctor, and
Acker, and Magistrate Judges Putnam and Armstrong of the Northern
District of Alabama listed in footnote 3, *infra*, are included in
the otherwise exhaustive list of relevant cases. The court also

has before it plaintiffs' opposition to Wyeth's motion to stay.[1]

It is clear to the undersigned that jurisdictional issues in a removed case should be decided as quickly as possible. The failure to do so may allow an improperly removed case to languish for many, many months before being remanded to state court.[2] Where a motion to remand is founded only on a claim of fraudulent joinder as is the circumstance before this court,[3] the motion can be resolved quickly. The court is to consider whether the removing party has met the onerous burden[4] of showing that "there

---

[1] Interestingly, plaintiff's opposition was filed on March 2, 2004 in "anticipation" of defendant's March 4, 2004 motion.

[2] It is not irrelevant that on February 20, 2004, the Chairman of the Judicial Panel on Multidistrict Litigation, District Judge Wm. Terrell Hodges, sent a letter to all judges involved with MDL-1203 - In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation. In this letter, the Judicial Panel on Multidistrict Litigation encouraged judges to issue rulings on pending motions and in particular, motions to remand.

[3] Plaintiff's emergency motion to remand is based on the same issue *recently* addressed by the following judges in this district: Chief Judge U.W. Clemon (CV-03-C-2564-M), Judge William Acker (CV-04-AR-0297-J), Judge Karon Bowdre (CV-03-BE-2876-S and CV-04-BE-27-E), Judge Inge Johnson (CV-03-J-3167-J), Judge David Proctor (CV-03-P-3157-M and CV-04-P-226-M), Magistrate Judge Robert Armstrong (CV-03-RRA-3378-E), and Magistrate Judge Michael Putnam (CV-04-TMP-179-S and CV-04-TMP-298-S). All of these judges have entered remand orders in factually similar cases to the one with which this court is presented. However, the application of the law pertinent to removal and fraudulent joinder is particularly well stated in Judge Putnam's orders of remand, and therefore it is Magistrate Putnam's orders to remand which this court follows most closely.

[4] The standard facing the removing party is an onerous one because absent fraudulent joinder, plaintiffs have the absolute right to choose their forum.

is no possibility that the plaintiff can establish a cause of action against the resident defendant."[5] Crowe v. Coleman, 113 F.3d 1536, 1538 (11ᵗʰ Cir. 1997). The merits of the claim against a diversity destroying defendant must not be weighed by the federal court; rather the task for the court is merely to determine whether the claim against a non-diverse defendant is a possible one under applicable state law. See id. The court must find joinder proper and remand to state court if there is *any possibility* that, on the facts as pled, the complaint states a cause of action against any non-diverse defendant. See Coker v. Amoco Oil Co., 709 F.2d 1433, 1440-41 (11ᵗʰ Cir. 1983) (emphasis added).

For the foregoing reasons, Wyeth's motion to stay is **DENIED**. And upon review of the record, the court is persuaded that under Alabama law the plaintiffs have stated a legally possible claim against the non-diverse defendants, Lavender and Cherry.[6]

---

[5] The removing party may also succeed in a claim for fraudulent joinder by proving that "the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court." Crowe, 113 F.3d at 1538. Defendant Wyeth does not attempt to show fraudulent joinder by use of this second method.

[6] Lavender and Cherry have given affidavits stating that they never advertised, assembled, created, designed, detailed, distributed, labeled, made, manufactured, marketed, packaged, promoted, sold, sterilized, supplied, tested, or warranted the drug Pondimin. They also state that they never assembled, created, designed, distributed, labeled, made, manufactured, packaged, sold, sterilized, supplied, tested, or warranted the drug Redux. They assert that they were not aware of any alleged association between Pondimin and Redux and/or valvular heart disease until the time such an allegation was publicized.

Therefore, plaintiff's emergency motion to remand is **GRANTED** and this case is **REMANDED** to the Circuit Court of Blount County, Alabama for all further proceedings.

DONE this _5th_ day of March, 2004.

_[signature]_

SENIOR UNITED STATES DISTRICT JUDGE

---

Nevertheless, Lavender and Cherry's alleged innocent misrepresentations understating the risks associated with the use of the combination of drugs for weight loss constitutes a possible cause of action under Alabama law. See Ala. Code § 6-5-101 (Michie 1993); see also Ala. Pattern Jury Instructions Civil, 2d., APJI 18.03 (1993).

FILED

MAR 8 2004

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JOAN REEDER,                      )
                                  )
        Plaintiff,                )
                                  )
    v.                            )        CIVIL ACTION NO.
                                  )        04-T-066-N
WYETH, a corporation,             )
et al.,                           )
                                  )
        Defendants.               )

ORDER

This lawsuit, which was removed from state to federal
court based on diversity-of-citizenship jurisdiction, 28
U.S.C.A. §§ 1332, 1441, is now before the court on
plaintiff's motion to remand. The court agrees with
plaintiff that this case should be remanded to state court.
First, there has not been fraudulent joinder of any
resident defendant (that is, plaintiff has colorable claims
against such a defendant), see Coker v. Amoco Oil Co., 709
F.2d 1433, 1440 (11th Cir. 1983); Cabalceta v. Standard
Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). Second,
there has not been fraudulent misjoinder of any resident

EOD  3/8/04

defendant (that is, plaintiff has reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), see Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1360 (11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiff's motions to remand, filed on January 30, 2004 (doc. no. 8), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Elmore County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 8th day of March, 2004.

MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION    *FILED*

MAR  8 2004

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| EARLENE BROGDEN, et al.,, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 04-T-068-S |
| WYETH, a corporation, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

This lawsuit, which was removed from state to federal
court based on diversity-of-citizenship jurisdiction, 28
U.S.C.A. §§ 1332, 1441, is now before the court on
plaintiffs' motion to remand.  The court agrees with
plaintiffs that this case should be remanded to state
court.  First, there has not been <u>fraudulent joinder</u> of any
resident defendant (that is, plaintiffs have colorable
claims against such a defendant), see <u>Coker v. Amoco Oil
Co.</u>, 709 F.2d 1433, 1440 (11th Cir. 1983); <u>Cabalceta v.
Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989).
Second, there has not been <u>fraudulent misjoinder</u> of any

**EOD**  3-8-04

21

resident defendant (that is, plaintiffs have reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), see Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1360 (11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiffs' motion to remand, filed on January 30, 2004 (doc. no. 7), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Dale County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 8th day of March, 2004.

_____
MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

04 MAR -9  AM 8: 29

U.S. DISTRICT COURT
N.D. OF ALABAMA

WILMA SUE EATON, et al.,                )
                                        )
    Plaintiffs,                       )
                                        )
v.                                      )      **Case No.: CV 04-P-380-M**
                                        )
WYETH, et al.,                          )
                                        )      **ENTERED**
    Defendants.                       )      **MAR - 9 2004**

## ORDER

This case is before the court on Plaintiffs' Emergency Motion to Remand (Doc. # 9) filed on February 27, 2004; Defendant Wyeth's Motion for Entry of Briefing Schedule (Doc. # 10) filed March 2, 2004; and Defendant Wyeth's Motion to Stay to Allow Transfer to the Multi-District Litigation Proceeding (Doc. # 11) filed on March 4, 2004. Plaintiffs' motion is **GRANTED**, and this case is **REMANDED** to the Circuit Court of Marshall County. *See, e.g., Martha M. Davis v. Wyeth, et al.,* United States District Court for the Northern District of Alabama, Jasper Division, CV 03-J-3167-J, February 25, 2004 (Doc. #17); *Ann McGowan, et al. v. Wyeth, Inc., et al.,* United States District Court for the Northern District of Alabama, Southern Division, CV 04-TMP-298-S, February 24, 2004 (Doc. #12); *Juanita Johnson, et al. v. Wyeth, et al.,* United States District Court for the Northern District of Alabama, Southern Division, CV 04-TMP-224-S, February 23, 2004 (Doc. #11); *Jevenari Marshal, et al. v. Wyeth, Inc., et al.,* United States District Court for the Northern District of Alabama, Southern Division, CV 04-TMP-179-S, February 18, 2004 (Doc. #17). Defendant Wyeth's motions for entry of briefing schedule (Doc. # 10) and motion to stay (Doc. # 11) are **DENIED**.



**DONE** and **ORDERED** this ____8th____ day of March, 2004.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | |
|---|---|
| KIM ALLEN, et al., )<br>)<br>    Plaintiffs, )<br>)<br>    v. )<br>)<br>WYETH, )<br>et al., )<br>)<br>    Defendants. ) | CIVIL ACTION NO.<br>2:04cv0238-T |


<u>ORDER</u>

This lawsuit, which was removed from state to
federal court based on diversity-of-citizenship
jurisdiction, 28 U.S.C.A. §§ 1332, 1441, is now before
the court on plaintiffs' motion to remand. The court
agrees with plaintiffs that this case should be remanded
to state court. First, there has not been <u>fraudulent</u>
<u>joinder</u> of any resident defendant (that is, plaintiffs
have colorable claims against such a defendant), <u>see</u>
<u>Coker v. Amoco Oil Co.</u>, 709 F.2d 1433, 1440 (11th Cir.
1983); <u>Cabalceta v. Standard Fruit Co.</u>, 883 F.2d 1553,

1561 (11th Cir. 1989). Second, there has not been fraudulent misjoinder of any resident defendant (that is, plaintiffs have reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), see Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1360 (11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiffs' motion to remand, filed on March 12, 2004 (doc. no. 7), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Barbour County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 9th day of April, 2004.

/s/ Myron H. Thompson
_____

MYRON H. THOMPSON
UNITED  STATES  DISTRICT  JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION


EUNICE CHESTNUT, et al.,              )
                                      )
        Plaintiffs,                   )
                                      )
        v.                            )      CIVIL ACTION NO.
                                      )        1:04cv0295-T
WYETH,                                )
et al.,                               )
                                      )
        Defendants.                   )

<u>ORDER</u>

        This lawsuit, which was removed from state to

federal court based on diversity-of-citizenship

jurisdiction, 28 U.S.C.A. §§ 1332, 1441, is now before

the court on plaintiffs' motion to remand.  The court

agrees with plaintiffs that this case should be remanded

to state court.  First, there has not been <u>fraudulent</u>

<u>joinder</u> of any resident defendant (that is, plaintiffs

have colorable claims against such a defendant), <u>see</u>

<u>Coker v. Amoco Oil Co.</u>, 709 F.2d 1433, 1440 (11th Cir.

1983); <u>Cabalceta v. Standard Fruit Co.</u>, 883 F.2d 1553,

1561 (11th Cir. 1989). Second, there has not been fraudulent misjoinder of any resident defendant (that is, plaintiffs have reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), see Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1360 (11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiffs' motion to remand, filed on April 1, 2004 (doc. no. 8), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Geneva County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 3th day of May, 2004.

/s/ Myron H. Thompson
_____
MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

M. REBECCA CROSS, et al.,               )
                                        )
        Plaintiffs,                     )
                                        )
v.                                      )    CIVIL ACTION NO.
                                        )    03-0882-BH-M
WYETH, et al.,                          )
                                        )
        Defendants.                     )

### ORDER

This action is before the Court on plaintiffs' motion (Doc. 14) to reconsider and to

lift the stay imposed on February 19, 2004 (Doc. 13), and thus to reverse the Court's prior

denial of plaintiffs' motion to remand (Docs. 6 and 7). Upon consideration of the parties'

oral arguments presented on March 15, 2004, as well as those set forth in Wyeth's

Supplemental Response (Doc. 19), and all other pertinent portions of the record, the Court

concludes that plaintiffs' motion to reconsider is due to be granted because the Court

lacked jurisdiction at the outset to enter an order denying plaintiffs' motion to remand and

in imposing a stay until the action could be transferred for consolidation with the pending

MDL-1203 case.

As recognized by other federal Courts in Alabama, the grounds upon which Wyeth

contends that the Wyeth Sales Representatives Paul Windham and John Land have been

fraudulently joined go to the merits of plaintiffs' claims against these individual resident

defendants, which is not a proper inquiry for this Court, rather than the viability of the claims themselves.[1]  *See e.g., Martha M. Davis v. Wyeth, et al.*, Civil Action No. CV 03-J-3167-J (N.D. Ala. February 25, 2004)(J. Johnson).  *See also, Michael Hall, et al. v. Wyeth, et al.*, Civil Action No. CV 04-J-0434-NE (N.D. Ala. March 9, 2004)(J. Johnson); *Smith v. Wyeth et al.*, Civil Action No. CV 04-P-226-M (N.D. Ala. February 27, 2004)(J. Proctor); *Sharon C. Crittenden, et al., v. Wyeth, et al.*, Civil Action No. 03-T-920-N (M.D. Ala. November 21, 2003)(J. Thompson); *Pamela Floyd, et al., v. Wyeth, et al.*, Civil Action No. 03-C-2564-M (N.D. Ala. October 20, 2003)(J. Clemon); *Haleb v. Merck & Co., Inc., et al.*, Civil Action No. CV 03-AR-1026-M (N.D. Ala. June 26, 2003) (J. Acker). This Court **cannot** declare at this juncture of the litigation that "there is no possibility that the plaintiff[s] can prove a cause of action against the resident (non-diverse) defendant[s]," a prerequisite to any declaration that the resident defendants were fraudulently joined. *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440 (11th Cir. 1983). *See also, Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998)("The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have the possibility of stating a valid cause of action in order for the joinder to be legitimate.").

For the above stated reasons, it is **ORDERED** that the Orders entered by this Court on February 5, 2004 (Doc. 11) denying plaintiffs' motion to remand and February 19, 2004

---

[1]Consequently, Wyeth's reliance on such cases as *Fisher v. Comer Plantation, Inc.* 772 So.2d 455 (Ala. 2000), and *Speigner v. Howard*, 502 So.2d 367 (Ala. 1987), is misguided because they were decided on the merits on motions for summary judgment following the completion of discovery.

(Doc. 13) granting Wyeth's motion to stay, be and are hereby **VACATED AND SET ASIDE**. In lieu thereof, it is now **ORDERED** that plaintiffs' motion to remand (Doc. 6) be and is hereby **GRANTED**. The Clerk is directed to take such steps as are necessary to transfer this case back to the Circuit Court of Dallas County, Alabama, from whence it was removed.

As a final matter, the Court acknowledges that plaintiffs' motion to remand also contained a motion for sanctions against Wyeth. The Court concludes, however, that sufficient questions existed concerning the appropriateness of removal, as evidenced by this Court's initial decision to deny remand, to preclude the requisite finding that the removal in this case was not only improvident but done in bad faith. It is therefore **ORDERED** that plaintiff's motion for sanctions be and is hereby **DENIED**.

**DONE** this 29th day of March, 2004.

\_\_\_\_\_ s/ W. B. Hand \_\_\_\_\_
SENIOR DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

JERRY BRADEN, et al.,         )
                              )
     Plaintiffs,              )
                              )
     v.                       )    CIVIL ACTION NO.
                              )    1:04cv0384-T
WYETH, etc.,                  )
et al.,                       )
                              )
     Defendants.              )

<u>ORDER</u>

This lawsuit, which was removed from state to federal

court based on diversity-of-citizenship jurisdiction, 28

U.S.C.A. §§ 1332, 1441, is now before the court on

plaintiffs' motion to remand. The court agrees with

plaintiffs that this case should be remanded to state court.

First, there has not been <u>fraudulent joinder</u> of any resident

defendant (that is, plaintiffs have colorable claims against

such a defendant), <u>see</u> <u>Coker v. Amoco Oil Co.</u>, 709 F.2d

1433, 1440 (11th Cir. 1983); <u>Cabalceta v. Standard Fruit

Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989). Second, there

has not been <u>fraudulent misjoinder</u> of any resident defendant

(that is, plaintiffs have reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), see Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1360 (11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiffs' motion to remand, filed on April 27, 2004 (doc. no. 9), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Coffee County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 24th day of May, 2004.

/s/ Myron H. Thompson

_____
MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


BARBARA CULPEPPER, et al.,    )
                              )
      Plaintiffs,             )
                              )
      v.                      )    CIVIL ACTION NO.
                              )      2:04cv0411-T
WYETH, INC.,                  )
et al.,                       )
                              )
      Defendants.             )


<u>ORDER</u>

This lawsuit, which was removed from state to federal court based on diversity-of-citizenship jurisdiction, 28 U.S.C.A. §§ 1332, 1441, is now before the court on plaintiffs' motion to remand. The court agrees with plaintiffs that this case should be remanded to state court. First, there has not been <u>fraudulent joinder</u> of any resident defendant (that is, plaintiffs have colorable claims against such a defendant), <u>see</u> <u>Coker v. Amoco Oil Co.</u>, 709 F.2d 1433, 1440 (11th Cir. 1983); <u>Cabalceta v. Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989). Second, there has not been <u>fraudulent misjoinder</u> of any resident defendant

(that is, plaintiffs have reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), <u>see</u> <u>Tapscott v. MS Dealer Service Corp.</u>, 77 F.3d 1353, 1360 (11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiffs' motion to remand, filed on May 4, 2004 (doc. no. 10), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Montgomery County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 24th day of May, 2004.

/s/ Myron H. Thompson

_____

MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
LONNE KING, et al.,            )
                               )
      Plaintiffs,              )
                               )
      v.                       )    CIVIL ACTION NO.
                               )      2:04cv0409-T
WYETH, INC., etc.,             )
et al.,                        )
                               )
      Defendants.              )
```

<u>ORDER</u>

This lawsuit, which was removed from state to federal court based on diversity-of-citizenship jurisdiction, 28 U.S.C.A. §§ 1332, 1441, is now before the court on plaintiffs' motion to remand. The court agrees with plaintiffs that this case should be remanded to state court. First, there has not been <u>fraudulent joinder</u> of any resident defendant (that is, plaintiffs have colorable claims against such a defendant), <u>see</u> <u>Coker v. Amoco Oil Co.</u>, 709 F.2d 1433, 1440 (11th Cir. 1983); <u>Cabalceta v. Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989). Second, there has not been <u>fraudulent misjoinder</u> of any resident defendant

(that is, plaintiffs have reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), <u>see</u> <u>Tapscott v. MS Dealer Service Corp.</u>, 77 F.3d 1353, 1360 (11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiffs' motion to remand, filed on May 4, 2004 (doc. no. 1), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Barbour County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 24th day of May, 2004.

/s/ Myron H. Thompson

_____
MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
VICTORIA BENNETT, et al.,      )
                               )
     Plaintiffs,               )
                               )
     v.                        )    CIVIL ACTION NO.
                               )      2:04cv0416-T
WYETH, INC., etc.,             )
et al.,                        )
                               )
     Defendants.               )
```

<u>ORDER</u>

This lawsuit, which was removed from state to federal
court based on diversity-of-citizenship jurisdiction, 28
U.S.C.A. §§ 1332, 1441, is now before the court on
plaintiffs' motion to remand.  The court agrees with
plaintiffs that this case should be remanded to state court.
First, there has not been <u>fraudulent joinder</u> of any resident
defendant (that is, plaintiffs have colorable claims against
such a defendant), <u>see</u> <u>Coker v. Amoco Oil Co.</u>, 709 F.2d
1433, 1440 (11th Cir. 1983); <u>Cabalceta v. Standard Fruit
Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989).  Second, there
has not been <u>fraudulent misjoinder</u> of any resident defendant

(that is, plaintiffs have reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), see Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1360 (11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that plaintiffs' motion to remand, filed on May 4, 2004 (doc. no. 9), is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this cause is remanded to the Circuit Court of Crenshaw County, Alabama.

It is further ORDERED that all other outstanding motions are denied.

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 2nd day of June, 2004.

/s/ Myron H. Thompson
_____
MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

TOM DAVIS, VIRGINIA,
CHAIRMAN

CHRISTOPHER SHAYS, CONNECTICUT
DAN BURTON, INDIANA
ILEANA ROS-LEHTINEN, FLORIDA
JOHN M. MCHUGH, NEW YORK
JOHN L. MICA, FLORIDA
GIL GUTKNECHT, MINNESOTA
MARK E. SOUDER, INDIANA
STEVEN C. LATOURETTE, OHIO
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
CANDICE MILLER, MICHIGAN
MICHAEL R. TURNER, OHIO
DARRELL ISSA, CALIFORNIA
VIRGINIA BROWN-WAITE, FLORIDA
JON C. PORTER, NEVADA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. MCHENRY, NORTH CAROLINA
CHARLES W. DENT, PENNSYLVANIA
VIRGINIA FOXX, NORTH CAROLINA

HENRY A. WAXMAN, CALIFORNIA,
RANKING MINORITY MEMBER

TOM LANTOS, CALIFORNIA
MAJOR R. OWENS, NEW YORK
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
CHRIS VAN HOLLEN, MARYLAND
LINDA T. SANCHEZ, CALIFORNIA
C.A. DUTCH RUPPERSBERGER,
MARYLAND
BRIAN HIGGINS, NEW YORK
ELEANOR HOLMES NORTON,
DISTRICT OF COLUMBIA

BERNARD SANDERS, VERMONT,
INDEPENDENT

ONE HUNDRED NINTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY    (202) 225-5074
FACSIMILE    (202) 225-3974
MINORITY    (202) 225-5051
TTY    (202) 225-6852

http://reform.house.gov

# MEMORANDUM

## May 5, 2005

**To:**          Democratic Members of the Government Reform Committee

**From:**      Rep. Henry A. Waxman

**Re:**          The Marketing of Vioxx to Physicians

On November 9, 2004, the Committee on Government Reform requested that Merck provide the Committee with a wide range of documents related to the anti-inflammatory drug Vioxx. The request expressly sought "all presentations, training sessions, or materials given to Merck employees and agents who marketed Vioxx" and "all records of communication provided to healthcare providers and pharmacists concerning the safety and efficacy of the drug."[1]  In response to this request, Merck provided the Committee with over 20,000 pages of internal company documents, including course curricula, bulletins to the field, training manuals, company talking points, memoranda among senior executives, and promotional materials for use with physicians. The Committee also received documents from FDA related to Vioxx.

These documents provide an extraordinary window into how Merck trained its sales representatives and used them to communicate to physicians about Vioxx and its health risks. In fact, the documents may offer the most extensive account ever provided to Congress of a drug company's efforts to use its sales force to market to physicians and overcome health concerns.

To assist members in their preparation for the May 5, 2005, hearing on FDA and Vioxx, this memorandum summarizes the key documents received by the Committee. It assesses how Merck trained its sales representatives, whether this training was consistent with a primarily educational purpose for contacts with physicians, and whether Merck's sales representatives were instructed to discuss fairly and accurately the cardiovascular risks of Vioxx with physicians.

---

[1] Letter from Chairman Tom Davis to Merck Chief Executive Officer Ray Gilmartin (Nov. 9, 2004).

The Committee did not receive documents from Pfizer related to its anti-inflammatory drugs Celebrex and Bextra, nor has the Committee received or reviewed documents from other drugs companies related to the marketing of other drugs. Thus, this memorandum cannot assess whether Merck's practices are better or worse than or the same as those of other drug companies.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................2

I.    INTRODUCTION ...............................................................................................4

II.   HOW MERCK TRAINED ITS SALES REPRESENTATIVES ............................................7
      A. General Sales Techniques ...............................................................................7
      B. Specific Marketing Strategies .........................................................................12

III.  COMMUNICATIONS ABOUT VIOXX AND ITS RISKS ................................................16
      A. The VIGOR Trial .......................................................................................16
      B. The FDA Advisory Committee Meeting..............................................................20
      C. The *New York Times* Article ......................................................................23
      D. *JAMA* Study .........................................................................................25
      E. Changes to the Vioxx Label .........................................................................26

IV.   CONCLUSION...............................................................................................29

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## EXECUTIVE SUMMARY

By the time Merck voluntarily withdrew the anti-inflammatory drug Vioxx from the market in September 2004, more than 100 million prescriptions had been dispensed in the United States. Yet the vast majority of these prescriptions were written by physicians after evidence of Vioxx's risks had already surfaced. Even as evidence mounted that use of Vioxx was associated with heart attacks and strokes, physicians continued to prescribe Vioxx to millions of patients. How could this have happened?

A partial answer may be found by examining the strategies that Merck used to market Vioxx to physicians. Based on a review of the Merck documents, it appears that Merck sent over 3,000 highly trained representatives into doctor's offices and hospitals armed with misleading information about Vioxx's health risks. The documents indicate that Merck instructed these representatives to show physicians a pamphlet indicating that Vioxx might be 8 to 11 times safer than other anti-inflammatory drugs, prohibited the representatives from discussing contrary studies (including those financed by Merck) that showed increased risks from Vioxx, and launched special marketing programs — named "Project XXceleration" and "Project Offense" — to overcome the cardiovascular "obstacle" to increased sales.

The documents reveal that Merck exhaustively trained its representatives on how to persuade doctors to prescribe Vioxx and other Merck products. No interaction with physicians appears to have been too insignificant for instruction. Merck representatives were taught how long to shake physicians' hands (three seconds), how to eat their bread when dining with physicians ("one small bitesize piece at a time"), and how to use "verbal and non-verbal" cues when addressing a physician to "subconsciously raise[] his/her level of trust." Merck instructed its representatives on the various personality types of doctors (including "technical," "supportive," and "expressive") and recommended targeted sales techniques for each type. And Merck rewarded its sales force with thousands of dollars in cash bonuses for meeting sales goals. The company assigned individual doctors a "Merck potential" and graded them on how often they prescribed Merck products.

The documents describe in detail how Merck used this highly trained sales force to respond to reports of Vioxx's safety risks. The first public indication that Vioxx posed a heightened risk of heart attack and stroke came in March 2000, when Merck's VIGOR study showed a five-fold increase in the risks of heart attacks in patients on Vioxx compared to patients on naproxen. This study was followed by cautionary discussions of the cardiovascular risks of Vioxx at a meeting of an advisory committee to the Food and Drug Administration in February 2001, in a *New York Times* article in May 2001, and in a paper in the Journal of the American Medical Association in August 2001.

After each of these developments, Merck sent bulletins or special messages to its sales force, directing them to use highly questionable information to assuage any physician concerns.

For example, the Merck documents show:

3

- After Merck's VIGOR study reported increased heart attack risks, Merck directed its sales force to show physicians a "Cardiovascular Card" that made it appear that Vioxx could be 8 to 11 times safer than other anti-inflammatory drugs. This card omitted any reference to the VIGOR findings and was based on data FDA considered to be inappropriate for a safety analysis.

- After the FDA advisory committee voted that physicians should be informed about the risks found in the VIGOR study, Merck sent a bulletin to its sales force that advised: "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS COMMITTEE ... OR THE RESULTS OF THE ... VIGOR STUDY." If physicians asked about the VIGOR study, Merck representatives were directed to respond, "I cannot discuss the study with you."

- After the *New York Times* reported on the cardiovascular dangers of Vioxx, Merck instructed its field staff to tell physicians that patients on other anti-inflammatory medications were eight times more likely to die from cardiovascular causes than patients on Vioxx. The Merck bulletin told its sales force to show physicians the Cardiovascular Card and state: "Doctor, As you can see, Cardiovascular Mortality as reported in over 6,000 patients was Vioxx .1 vs. NSAIDS .8 vs. Placebo 0."

After extensive negotiations, FDA and Merck agreed on a label change for Vioxx in April 2002 that mentioned the cardiovascular findings from the VIGOR study. The final label included the statement that the significance of these findings were "unknown." According to the documents, Merck instructed its representatives to emphasize this statement on new label to counter physician safety concerns.

Drug companies maintain publicly that their representatives play a vital role in the health care system by educating physicians about new drugs and ongoing research. But the Merck documents reveal another side to company marketing efforts. The documents show that Merck trained its representatives to capitalize subtly on every interaction with physicians to promote Merck products. When concerns about Vioxx's safety arose, Merck appeared to use this highly trained force to present a misleading picture to physicians about the drug's cardiovascular risks. Merck's promotional efforts appear to explain in part why Vioxx sales remained strong even as the evidence of the drug's dangers mounted.

## I.    INTRODUCTION

On September 30, 2004, Merck & Co, Inc., announced that in a major clinical trial, patients on the anti-inflammatory drug Vioxx had experienced significantly more heart attacks and strokes than those on a placebo. On the same day, Merck voluntarily withdrew Vioxx from the market.[2]

---

[2] Merck, *Merck Announces Voluntary Worldwide Withdrawal of Vioxx* (Sept. 30, 2004) (online at http://www.vioxx.com/vioxx/documents/english/hcp_notification_ physicians.pdf).

At the time of Vioxx's withdrawal, more than 2 million patients around the world were taking the drug.[3] Since May 1999, when Vioxx was approved by the Food and Drug Administration, more than 100 million prescriptions had been dispensed in the United States alone.[4] Vioxx is considered safer for the stomach than aspirin and other anti-inflammatory drugs. Yet recent research indicates many, if not most, patients on Vioxx were at low or very low risk of stomach problems and would have done well on standard medications.[5]

When exposure to a drug is so widespread, even a small safety problem can have major public health consequences. A recent study estimated that as many as 88,000 to 140,000 Americans may have suffered Vioxx-related heart attacks, strokes, and other serious medical complications.[6]

The vast majority of Vioxx prescriptions were written after serious safety questions were first raised. In March 2000, less than a year after approval, Merck announced the results of a clinical trial in which Vioxx was associated with significantly more heart attacks and strokes than another anti-inflammatory drug.[7] Paradoxically, following the announcement of these results, Vioxx's sales soared. The drug reached $2 billion in sales faster than any other drug in Merck's history.[8]

Vioxx sales remained strong even as other reports of Vioxx's dangers emerged. These included new data presented at an FDA advisory committee in February 2001,[9] a major exposé in the *New York Times* in May 2001,[10] an article in the *Journal of the American Medical*

---

[3] *Merck: Vioxx Withdrawal a Harsh Blow to Drug Giant*, Chicago Tribune (Oct. 3, 2004).

[4] D. Graham et al., *Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with Cyclo-oxygenase 2 Selective and Non-Selective Non-Steroidal Anti-Inflammatory Drugs: Nested Case-Control Study*, Lancet, 475–481 (Feb. 5, 2005).

[5] Carolanne Dai, Randall S. Stafford, G. Caleb Alexander, *National Trends in Cyclooxygenase-2 Inhibitor Use Since Market Release*, Archives of Internal Medicine, 171-177 (Jan. 24, 2005).

[6] *Id.*

[7] *Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX(R)*, PR Newswire (Mar. 27, 2000).

[8] Merck, *Merck Annual Report 2001, We're Strengthening Our Arthritis Franchise* (2002) (online at http://www.anrpt2001.com/4.htm).

[9] Food and Drug Administration, *Arthritis Advisory Committee* (Feb. 8, 2001) (online at http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2.htm).

[10] *Doubts Are Raised on the Safety of Two Popular Arthritis Drugs*, New York Times (May 22, 2001).

*Association* in August 2001,[11] and changes to the Vioxx label in April 2002.[12] Despite growing concern over Vioxx's dangers, sales in 2003 reached $2.5 billion.[13]

This memorandum summarizes key Merck documents that shed light on why clinicians continued to prescribe so much Vioxx even as evidence of harm began to mount. Based on a review of over 20,000 pages of internal company documents, it focuses on an aspect of the drug industry that has historically been hidden from public view: promotional activities directed at physicians.[14]

Promotions targeting physicians account for the majority of drug industry spending on marketing and promotion. In 2003, pharmaceutical companies spent $9 billion on marketing and promotion. Of this amount, $5.7 billion (over 60%) was aimed at physicians.[15] As many as ninety thousand sales representatives meet with physicians about their companies' products every day.[16]

Vioxx was no exception. According to Merck, the company assigned over 3,000 company representatives across the country to engage in face-to-face discussions with physicians about Vioxx.[17]

According to the Pharmaceutical Research and Manufacturers Association of America, an industry trade group, the efforts of pharmaceutical representatives are "essential for

---

[11] D. Mukherjee, S. Nissen, and E. Topol, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, Journal of the American Medical Association, 954–9 (Aug. 22–29, 2001).

[12] Food and Drug Administration, *FDA Approves New Indication and Label Changes for the Arthritis Drug, Vioxx*, FDA Talk Paper (Apr. 11, 2002).

[13] *Merck Withdraws Arthritis Medication*, Washington Post (Oct. 1, 2004).

[14] Other factors beyond the scope of this report have been cited as contributors to robust Vioxx sales. These include Merck's $300 million direct-to-consumer advertising campaign and FDA's failure to strongly and promptly warn the public and physicians of cardiovascular risks. *See New Study Criticizes Painkiller Marketing*, Washington Post (Jan. 25, 2005); Daniel H. Solomon, Jerry Avorn, *Coxibs, Science, and the Public Trust*, Archives of Internal Medicine, 158-160 (Jan. 24, 2005);

[15] According to the Pharmaceutical Research and Manufacturers Association, drug companies spent $5.7 billion on office promotion, hospital promotion, and journal advertising in 2003, compared to $3.3 billion in direct-to consumer advertising. They also spent an additional $16.3 billion in providing samples of medications to physicians. PhRMA, *Pharmaceutical Research and Promotion* (Nov. 2004).

[16] *It's All in the Detail*, Med Ad News (Oct. 1, 2004).

[17] Teleconference briefing by Merck for staff of the Government Reform Committee (Apr. 25, 2005).

6

physicians, allowing physicians to have sufficient information about new drugs so they can prescribe them appropriately."[18]  The trade group also has stated, "Many physicians learn about new drugs — indeed, about ongoing research in their areas of specialization — largely through information provided by the companies that market new products."[19]

In fact, the documents suggest that Merck's sales representatives did not appropriately educate physicians about the research showing Vioxx's cardiovascular risks.  To the contrary, it appears that Merck's highly trained sales force was instructed not to address the new research findings, but to emphasize outdated and misleading data that indicated Vioxx was safer than alternatives.  The documents thus raise serious questions about the role played by Merck's representatives in physician prescribing of a risky drug.

## II.    HOW MERCK TRAINED ITS SALES REPRESENTATIVES

The documents reveal that the 3,000-person sales force Merck used to promote Vioxx to physicians was extraordinarily well trained.  Virtually every possible interaction with physicians — from the act of shaking hands to navigating through complex hospital power struggles — is addressed in some portion of the Merck materials.  The overriding goal of the training appears clear:  to maximize sales of Merck products.

This part of the memorandum describes the general training Merck provided to its sales representatives.  This training instructed the representatives in techniques thought to enhance "professional presence" and "captivate the customer."  It also addressed sensitive subjects such as medical reprints, physician targeting, hospital dynamics, and physician education.  Although not addressed here, Merck representatives were also required to attend numerous courses and exercises covering a variety of medical topics, including pharmacology, anesthesiology, rheumatology, and pain management.[20]

The next part of this memorandum (part III) examines how Merck used this highly trained sales force to communicate with physicians about the risks of Vioxx.

### A.    General Sales Techniques

Merck provided its representatives with extensive training in sales techniques.  This training emphasized that "gaining access and building relationships ... are key to providing you

---

[18] PhRMA, *Marketing and Promotion of Pharmaceuticals* (Oct. 23, 2000) (online at http://www.phrma.org/publications/quickfacts/23.10.2000.184.cfm).

[19] *Id.*

[20] *See, e.g.,* Merck, *Analgesic and Anti-Inflammatory Training,* Modules 1-8 (undated).

the opportunity to influence your customers' behaviors."[21]  Merck's sales staff were instructed that a successful career can depend upon "how you present yourself professionally."[22]

Some of the training materials addressed the basic elements of a visit with physicians. For example, the course *Selling Skills* instructed representatives to begin by "painting a word picture that describes a patient type that can benefit from the Merck product." *Selling Skills* then advised that representatives ask "strategic questions" about the physician's approach to the patient that "help you influence and control the discussion," which should be followed by a transition to a "compelling message" for the Merck product. The fourth step in the process involved "obstacle handling," which addresses overcoming physician concerns about the product. Finally, *Selling Skills* instructed representatives that the last step of a visit is "closing," which involves summarizing "the point(s) you want the customer to remember," checking for agreement, asking for "a specific, realistic, measurable action," and "follow-up to ensure action."[23]

Other training materials taught more sophisticated and subtle techniques.  For example, one Merck course, entitled "Access Success," advised representatives to master nonverbal cues to communicate effectively with doctors.[24] See Figure 1.

Figure 1:  Merck Instruction on Face-to-Face Communication

| Verbal (7%) What someone says when listening. . . | Vocal (38%) How they say something when listening. . . | Visual (55%) What they're doing when listening. . . |
|---|---|---|
| ▪ Hmmm, Yes, Okay, I see<br><br>▪ Acknowledge<br><br>▪ Ask questions<br><br>▪ Summarize<br><br>▪ Stay open to ideas<br><br>▪ Short periods of silence | ▪ Sound interested<br><br>▪ Mimic or match vocal behavior of speaker<br><br>▪ Use voice inflection and energy<br><br>▪ Use empathetic voice | ▪ Nod head<br><br>▪ Eye contact<br><br>▪ Smile (if appropriate)<br><br>▪ Don't interrupt<br><br>▪ Take notes<br><br>▪ Openness in gestures |

---

[21] Merck, *Professional Presence* (undated).

[22] *Id.*

[23] Merck, *Selling Skills for Hospital Representatives & HIV Specialists* (undated).

[24] Merck, *Access Success* (Apr. 2000).

8

Similarly, the course "Captivating the Customer" recommended that field staff learn nonverbal techniques involving the eyes, head, fingers and hands, legs, overall posture, facial expression, and mirroring.[25]  Curriculum notes for leaders of the course explained the last concept further:

> Mirroring is the matching of patterns; verbal and non-verbal, with the intention of helping you enter the customer's world.  It's positioning yourself to match the person talking.  It subconsciously raises his/her level of trust by building a bridge of similarity.[26]

In a course entitled "Champion Selling," Merck sought to teach staff to "employ a variety of selling skills and techniques to more effectively handle challenging selling situations."[27]  One such technique was to analogize the "defining moments" of selling Merck drugs to critical points in the lives of "champions" in other fields, including Helen Keller, Martin Luther King, Tiger Woods, and even George Washington.[28]  See Sidebar.

Another important technique emphasized in "Champion Selling" was to assess the personality of doctors in order to determine what type of information would be most convincing to them.  For a doctor with a "technical" personality, sales representatives were taught to "use figures, percentages" in their pitches; for a doctor with a "supportive personality," representatives were advised to "focus on benefits to patients"; and for a doctor with an "expressive personality," representatives were told to "show enthusiasm; appeal to his/her ego."[29]

---

[25] Merck, *Captivating the Consumer* (June 2001).

[26] *Id.*

[27] Merck, *Champion Selling: Milestone Leader's Guide* (Jan. 2002).

[28] *Id.*

[29] *Id.*

---

**Sidebar:  Analogies in Champion Selling**

*Champion Selling* instructed that when faced with a doctor who does not have time to talk about a Merck product, field staff should recall that "it's those defining moments that distinguish all champions."  Course leaders were asked to remind trainees:

- Helen Keller could have felt sorry for herself when she went blind and deaf.
- Martin Luther King could have laid low when his home was firebombed.
- Tiger Woods could have avoided the pressure by not turning pro as young as he did.
- George Washington could have finished his years with a comfortable life without the challenges of taking on the presidency.*

\* Merck, *Champion Selling: Milestone Leader's Guide* (Jan. 2002).

---

Merck paid special attention to teaching its field representatives how to "refocus a conversation from non-business subjects to business subjects."[30]  In one curriculum, sales representatives were asked to judge sample responses to statements from doctors such as "What a nice restaurant!  I hear that the food is wonderful," "I love coming to this restaurant, my husband I come here a lot," "What a great football game yesterday," and "So what plans do you have for the holidays?"[31]  One response suggested for discussion to the last question was:

> Well, my wife and I are going to visit my grandmother.  It should be a lot of fun though I feel so bad for her.  She really has advanced osteoporosis and can't travel at all.  She wasn't on any treatment plan for the longest time.  Physician, what do you think the reasons are that some physicians don't do much about osteoporosis until it's in its advanced stages and nearly too late?[32]

Another curriculum instructed representatives to use a "respond→ advance" model to move conversation gradually from general topics to selling Merck products.[33]  See Figure 2.

---

[30] Merck, *Planning, Conducting & Following up Successful HEL Programs* (1999).

[31] *Id.*

[32] *Id.*

[33] Merck, *Ensuring Rewarding HEL Programs* (Apr. 2000).

10

Figure 2: Instructions on Transitioning Topics



The documents show that Merck trained its sales staff on minute details of encounters with physicians. One Merck training course, entitled "Professional Presence," even provided detailed instructions on handshakes.[34] See Figure 3. The curriculum advised representatives to shake hands when "someone offers his/her hand to you," when "first meeting someone," when "greeting guests," when "greeting your host/hostess," when "renewing an acquaintance," and when "saying good-bye."[35]

---

[34] Merck, *Professional Presence* (undated).

[35] *Id.*

11

Figure 3:  Merck Instruction on Handshake Technique



Another section of the same course instructed representatives on where to sit and how to eat when dining with physicians.  For example, the curriculum stated:  "Bread should be eaten one small bitesize piece at a time.  Break off and butter bread one single piece at a time.  Bread dipped in olive oil should also be broken off and eaten one single piece at a time."[36]

### B.    Specific Marketing Strategies

In addition to training its staff in general sales techniques, the documents show that Merck provided its sales representatives with detailed instructions on a range of sensitive subjects specific to the marketing of drugs.  The subjects covered in these materials included selectively using reprints from the medical literature that supported Merck products, tracking detailed prescribing behavior of each clinician in their territory, modeling how to get Merck drugs on hospital formularies, and fostering contact between representatives and key opinion leaders.

**Medical Reprints.**  Merck representatives were trained to use reprints of medical journal articles in sales discussions, but only when those articles presented Merck products in a favorable light.  One course workbook instructed participants that medical journal articles relating to Merck drugs fell into two categories:  "approved" and "background."  "Approved" articles were those to be discussed with doctors because they "provide solid evidence as to why [doctors] should prescribe Merck products for their appropriate patients."[37]  In contrast, "background" articles were not approved for use with physicians.[38]  According to the workbook,

---

[36] *Id.*

[37] Merck, *Join the Club* (Mar. 2001).

[38] *Id.*

12

"These articles may contain valuable background information, but this information cannot be used, and the articles cannot be referenced, during sales discussions with your customers."[39] In fact, discussing unapproved background articles with physicians "is a clear violation of Company Policy."[40] Merck instructed representatives to refer any questions about these articles to the medical services department.[41]

**Physician Prescribing Patterns.** The documents reveal that Merck provided its representatives with highly detailed information on individual doctors' prescribing habits and that this data was used to target physicians to increase their prescribing of Merck drugs. Merck purchased this prescribing data from an outside company, which obtained the data from pharmacy records of filled prescriptions.[42] Based on this data, representatives would be given access to monthly reports on each doctor in their territory. For each doctor, the reports showed the number of filled prescriptions for Merck and competitor products. They also showed each doctor's "market share" by calculating the percentage of Merck versus competitor product prescriptions. An important concept was each doctor's "Merck potential," which Merck defined as a "dollar estimate of each prescriber's total prescribing volume that can realistically be converted to Merck prescriptions."[43]

Based on the data for individual doctors, Merck's software could compile monthly reports on overall sales and market share for each representative's territory. Representatives were told that their bonuses would be based on these overall sales figures, and representatives could see estimates of their bonus along with the data.[44] Thus, representatives could see a direct correlation between the number of prescriptions they convinced doctors to write each month and their bonuses.

Merck also told the sales representatives that doctors would be given grades from D to A+ for each product category depending on how often they prescribed a Merck product and what percentage of their prescriptions were for the Merck product.[45] See Figure 4.

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] Merck, *Data Sources* (May 2003).

[43] Merck, *Basic Training Participant Guide* (Jan. 2002).

[44] *Id.*; Merck, *Foundations Reference Guide, Business Management Field Sales Performance Report* (undated).

[45] Merck, *Basic Training Participant Guide* (Jan. 2002); Merck, *Role of the National Account Executive* (undated).

Figure 4:  Example of Merck Tracking of Physician Prescribing

# Physician Profile

★ **Specialty:**  Internal Medicine

| | |
|---|---|
| Cash: | 12% |
| MediCaid: | 10% |
| Mail Order: | 10% |
| 3rd Party: | 68% |
| #1 Top Regional Plan: | 35% (24% of total market) |
| # 2 Top Regional Plan: | 25% (17% of total market) |

| | | |
|---|---|---|
| Lipids: | A, | Z Flat (5%), L Inc.(22%), P Dec(34%) |
| AHTN: | B, | Coz Dec(23% All),ACEIs 1st, CCBs 2nd,), Dio Flat(50% All) |
| Migraine: | B, | Max Inc(10%) Imitrex Dec(80%), |
| A&A: | A-, | V Flat (7.6) Ibup Flat(33%) Cel Flat(8.4%) |
| Osteo: | A, | FOS flat(59%), ERT 1st Act Inc(5%), Evi Flat(19%) |
| Asthma: | B, | Sing Inc(8%) Acc dec(9%), Flo inc(28%), Ser inc(20%) |

Top

Slide 53 of 56

**Hospital Formularies.** Other instruction provided by Merck addressed approaches for getting Merck drugs onto hospital formularies, which are the lists of the drugs easiest for local physicians to access. These strategies included an elaborate simulation in which representatives played an entire cast of hospital staff, including departments of pharmacy, orthopedic surgery, emergency medicine, rheumatology, endocrinology, a pain clinic, internal medicine, anesthesiology, cardiology, nursing, and oncology.  The simulation instructions described the "power structures that existed in each department."[46]

Interactions with hospital staff in the simulation were designed to reveal lessons for representatives such as "the importance of leaving no stone unturned and the fact that all personnel in the hospital are potentially useful to you."[47]  The simulation also showed how doctors' ambitions could be used to gain formulary support.  In one scenario, a doctor described as an "ambitious Attending Physician" wants "sponsorship to enable him to attend a major symposium in Sydney, Australia. . . . He was willing to act as a sponsor for Vioxx if you offered

---

[46] Merck, *Hospital Strategy Simulation:  Roleplayers Guide* (Sept. 2000).

[47] *Id.*

14

to help him attend the meeting."[48]  In another scenario the fact that two doctors play golf together is used to gain a sponsor.[49]

Departmental power structures were explored in a scene where a senior trauma nurse is "seen by many as running the department" and does not get along with a new "ambitious young Attending Physician."[50]  The nurse sees the young doctor as "'rocking the boat,'" while he does not like "the power she wield[s]," so the representative in the simulation must turn to a more senior doctor who gets along with the nurse rather than asking the new young doctor for formulary support.[51]  In general, the representatives in the simulation learn to gauge who is influential, ambitious, or a potential informer in a given department and to use this knowledge to maximum benefit in the campaign to achieve formulary status.

**Physician Education.**  Merck's extensive training also addressed how sales representatives could use speaker programs and other educational events as opportunities to enhance sales of Merck products.  These speaker programs, sometimes referred to as Health Education Learning (HEL) programs, often take the form of a dinner and featured speaker or panel of speakers on a topic of medical interest.  Merck advised its representatives to invite speakers based in part on whether they viewed Merck products favorably and whether they were influential among their peers.[52]  One curriculum ranked potential speakers as follows:

> A preferred speaker is a qualified advocate who is willing and able to conduct multiple HEL programs.  Preferred speakers should have outstanding delivery and provide <u>favorable</u> yet balanced HEL presentations. . . . A recommended speaker is a qualified advocate who is willing and able to conduct multiple HEL programs.  Recommended speakers also deliver <u>favorable</u>, scientifically balanced programs, however they may not be as strong of a speaker, or as willing to do talks. . . . A speaker classified as "Other" . . . could be one of your speakers in-development, who can deliver <u>favorable</u>, scientifically balanced HEL programs.[53]

In a training for specialty representatives, Merck explained how to create an "Advocate Action Plan" that would help them "sell through the science, by combining scientific data and marketing to create meaningful messaging."[54]  Representatives were provided detailed instructions on how to identify and cultivate a "thought leader" who can "[i]nfluence colleagues

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] Merck, *Specialty Foundations Participant Self-Study Workbook:  Specialty Representative Advocate Development* (May 2001)

[53] *Id.* (emphasis added).

[54] *Id.*

15

through peer-to-peer relationships" and "is very familiar with the prescribing information for the Merck product(s) and understands and supports the medically/legally approved materials for available for the product(s)."[55]

Merck told its representatives that fees and honoraria for speakers could range from $250 to $2,000 per engagement.[56]

The Merck documents indicate that education of physicians was not the only barometer of a successful event. Using the abbreviation of "Rx" for prescribing, one curriculum instructed representatives to tally the "% of attendees whose Rx of program-related Merck products increased."[57]

## III.    COMMUNICATIONS ABOUT VIOXX AND ITS RISKS

Merck's meticulous approach to marketing to physicians is reflected in its communications to physicians about Vioxx and its risks. Beginning in March 2000, a series of studies and news reports raised serious questions about the safety of Vioxx. The Merck documents reveal that the company gave its highly trained representatives detailed instructions for responding to these developments. These instructions had a common theme: reassure physicians about the safety of Vioxx by providing highly questionable information about cardiovascular risks. At the same time, Merck continued to use an array of incentives and messages to inspire its staff to market Vioxx aggressively to physicians.

### A.    The VIGOR Trial

After a major study showed a five-fold increase in the risk of heart attacks for patients on Vioxx, Merck instructed its field staff to show doctors a pamphlet suggesting that Vioxx was 8 to 11 times safer than other anti-inflammatory drugs. This pamphlet summarized studies that were not appropriate for an analysis of cardiovascular safety.

At issue was a clinical trial known as Vioxx Gastrointestinal Outcomes Research (VIGOR), whose results were announced to the public on March 27, 2000,[58] and published in the *New England Journal of Medicine* on November 23, 2000.[59] The study randomly assigned more than 8,000 patients with rheumatoid arthritis into two groups. One group received 50 mg per day

---

[55] *Id.*

[56] Merck, *Business Management, HEL Programs* (undated).

[57] Merck, *Planning, Conducting & Following up Successful HEL Programs* (1999).

[58] *Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX(R)*, PR Newswire (Mar. 27, 2000).

[59] C. Bombadier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, New England Journal of Medicine, 1520–8 (Nov. 23, 2000).

of Vioxx for approximately nine months, while the other received the anti-inflammatory drug naproxen. According to Merck's press release, the patients receiving Vioxx had fewer gastrointestinal problems, while the patients receiving naproxen suffered fewer heart attacks and strokes.[60] The actual data from the study showed that patients in the VIGOR study on Vioxx were five times more likely to suffer a heart attack than those on naproxen.[61]

Soon after the release of these results, physicians began asking Merck representatives whether Vioxx could cause heart attacks. On April 28, 2000, in a bulletin to "all field personnel with responsibility for Vioxx," Merck provided a "new resource" "to ensure that you are well prepared to respond to questions about the cardiovascular effects of Vioxx."[62] The resource was the "Cardiovascular Card."

The Cardiovascular Card was a tri-fold pamphlet containing data that supported the safety of Vioxx. One panel, featuring the headline "Overall Mortality Rates," indicated that patients on Vioxx were 11 times less likely to die than patients on standard anti-inflammatory drugs, and 8 times less likely to die from heart attacks and strokes.[63] See Figure 5. Another panel indicated that the rate of heart attack among patients on Vioxx was less than half of the rate of patients receiving placebo and virtually identical to that of patients receiving other anti-inflammatory drugs.[64]

Figure 5: Selection from the Cardiovascular Card

| Overall mortality and cardiovascular mortality[.1] | | | |
|---|---|---|---|
| Events per 100 Patient-Years | | | |
| | **VIOXX** N=3,595 | NSAIDs[†] N=1,565 | Placebo N=783 |
| Total mortality | 0.1 | 1.1 | 0.0 |
| Cardiovascular mortality | 0.1 | 0.8 | 0.0 |

---

[60] Merck took the position that the study's cardiovascular results showed the cardioprotective effect of naproxen, not the dangers of Vioxx. *Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX(R)*, PR Newswire (Mar. 27, 2000).

[61] Merck, *Bulletin for Vioxx: New Obstacle Response* (May 1, 2000).

[62] Merck, *Bulletin for Vioxx: NEW RESOURCE: Cardiovascular Card* (Apr. 28, 2000).

[63] Merck, *Cardiovascular System*, 4 (2000).

[64] *Id.* at 3.

Merck gave its representatives specific instructions on how to use the Cardiovascular Card. According to these instructions, Merck's representatives were to refer to the mortality data and "use this page to show physicians that in terms of mortality, which is most important to the physician and their patients, the rate for total mortality and cardiovascular mortality was low."[65]

The data presented in the Cardiovascular Card appears to have little or no scientific validity. The card did not present actual numbers of events or any statistical tests of significance, which are standard in medical communications. It also did not contain any information from the VIGOR study, the most recent study of cardiovascular safety in rheumatoid arthritis patients.[66]

Instead, the card presented pooled data from clinical trials conducted prior to the drug's approval in osteoarthritis patients. For several reasons, however, these studies were not appropriate for an overall analysis of cardiovascular safety. For example:

- Vioxx's pre-approval studies involved few patients taking the doses of Vioxx that were linked to heart problems. According to FDA, fewer than 300 patients in these studies took as much as 50 mg per day of Vioxx for more than 6 months,[67] compared to approximately 4,000 patients in the VIGOR study.[68] As a result, the studies were not nearly as sensitive as VIGOR in detecting a possible problem with the drug.

- The pre-approval studies had been conducted to test the efficacy of the drug to treat pain, not to assess whether the drug caused heart attacks and strokes. None of these early studies had included an expert assessment of whether adverse events were related to the cardiovascular system.[69] Such an "adjudication" process improves the quality of the data and was part of the VIGOR study.

- The pre-approval studies varied widely, involving different doses, different patient populations, and different comparator drugs. In 1999, prior to Vioxx's approval, FDA had expressed serious concerns about combining these disparate studies in a single safety analysis.[70]

---

[65] Merck, *Bulletin for Vioxx: NEW RESOURCE: Cardiovascular Card* (Apr. 28, 2000).

[66] Merck, *Cardiovascular System* (2000).

[67] Food and Drug Administration, *FDA Advisory Committee Briefing Document, NDA 21-042, s007, VIOXX Gastrointestinal Safety*, 19 (Feb. 8, 2001).

[68] *Id.* at 5.

[69] Telephone briefing between Merck and minority staff, Government Reform Committee (Apr. 28, 2005).

[70] In 1999, Merck attempted to combine the pre-approval studies to advance a position on Vioxx's gastrointestinal safety. FDA made a special presentation to the advisory committee on the problems with combining these different studies. Food and Drug Administration, Arthritis Advisory Committee, *Review of NDA #21-042, Vioxx (Rofecosib) Merck Research Laboratories*, 162–167 (Apr. 20, 1999).

18

The analyses presented in the Cardiovascular Card were not drawn from a scientific paper.[71] The card's two references included "data on file" at Merck and a brief research abstract from a 1999 meeting of the American College of Rheumatology.[72]

When given the opportunity, FDA scientists have expressed "serious concerns" about using the data summarized on the Cardiovascular Card to address cardiovascular safety.[73] One FDA medical reviewer, in a briefing this week with Committee staff, said that the relevance of Vioxx's pre-approval studies to the drug's cardiovascular safety was "nonexistent" and that it would be "ridiculous" and "scientifically inappropriate" to present mortality comparisons from these trials to physicians.[74]  ..

On May 1, 2000, Merck sent another bulletin to "all field personnel with responsibility for Vioxx."[75] This bulletin instructed the sales force how to respond to a competitor's argument that "Vioxx has an increased incidence of heart attacks compared to Celebrex."[76] This response again involved advice to representatives to respond to physicians by "guiding them through the Cardiovascular Card."[77]

Notwithstanding the results of the VIGOR study, Merck's employees were given new financial incentives to sell Vioxx. In the spring of 2000, Merck launched the "2000 Field

---

[71] A pooled analysis of a subset of the studies included in the card was published in the January 15, 2002, issue of the *American Journal of Cardiology*. This analysis did not provide any data on mortality and did not present data on strokes and heart attacks as presented in the Cardiovascular Card. A. Reicin et al., *Comparison of Cardiovascular Thrombotic Events in Patients with Osteoarthritis Treated with Rofecoxib Versus Nonselective Nonsteroidal Anti-Inflammatory Drugs (Ibuprofen, Diclofenac, and Nabumetone)*, American Journal of Cardiology, 204–9 (Jan. 15, 2002).

[72] When compared against the abstract, the Cardiovascular Card appears to substantially overstate the amount of data used for the analysis of mortality. According to the abstract, this analysis was based on data from 3,595 patients on Vioxx treated for an average of 5.5 months each. By contrast, the Cardiovascular Card indicates that the mortality analysis was based upon 3,595 "person-years" of data on Vioxx. This would be the equivalent of 3,595 patients treated for an average of 12 months each. Brian Daniels and Beth Seidenberg Rahway, *Cardiovascular Safety Profile of Rofecoxib in Controlled Clinical Trials*, Arthritis and Rheumatism, S143 (1999).

[73] Food and Drug Administration, *FDA Advisory Committee Briefing Document, NDA 21-042, s007, VIOXX Gastrointestinal Safety*, 19 (Feb. 8, 2001).

[74] FDA briefing for staff of the Government Reform Committee (May 3, 2005).

[75] Merck, *Bulletin for Vioxx: New Obstacle Response* (May 1, 2000).

[76] *Id.*

[77] *Id.*

Incentive Plan for Vioxx."[78]  This plan promised rewards to the company's hospital representatives, specialty representatives, and other sales representatives if the Vioxx share of the market for exceeded certain thresholds.  As a bulletin to field staff explained:

> 1.  Hit 51% . . . for at least one month by March 2000 and get $2,000!
> 2.  Hit 55% . . . for at least one month between April and December 2000 and get $2,000!
> 3.  Hit 61% . . . for at least one month between April and December 2000 and get $2,000![79]

To achieve this sales growth, in mid-2000, Merck set a basic strategy for outreach to physicians.  The plan was for field representatives to highlight Vioxx's effectiveness against pain and to transition quickly from any discussion with doctors on safety back to efficacy.  As a memo to company vice presidents dated July 28, 2000, stated:

> In order to win the on-going . . . battle, many of you agree our sales force needs to STOP defending Vioxx against the outrageous claims from our competitors, and START offensively selling the core benefit of this product . . . EFFICACY.[80]

### B.    The FDA Advisory Committee Meeting

Attention to the cardiovascular risks of Vioxx surged in February 2001 as the result of a meeting of the FDA Arthritis Advisory Committee.  After FDA scientists raised serious concerns about the drug's safety, the Committee voted that doctors should be informed about the data from the VIGOR study.  The next day, however, Merck instructed its field representatives not to discuss the VIGOR results with doctors and instead reassure physicians using the Cardiovascular Card.

In advance of the advisory committee meeting, FDA scientists provided the Committee with an analysis of all studies on Vioxx conducted to date.[81]  FDA's assessment covered:

- The VIGOR study, which found a substantial and statistically significant increase in all serious thrombotic events, including heart attack and stroke, in patients on Vioxx compared to patients on naproxen;[82]

---

[78] Merck, *Bulletin for Vioxx: 2000 Field Incentive Plan for Vioxx* (Apr. 5, 2000).

[79] *Id.*

[80] Merck, *Memo re: Offensive Positioning for Vioxx* (July 28, 2000).

[81] Food and Drug Administration, *FDA Advisory Committee Briefing Document, NDA 21-042, s007, VIOXX Gastrointestinal Safety*, 19 (Feb. 8, 2001).

[82] *Id.* at 9–12.

- Another study, called the Advantage study, which showed a trend toward excess heart attacks in osteoarthritis patients in the Vioxx group, compared to naproxen;[83] and

- Two new studies, 085 and 090, which, according to FDA, appeared to "follow the pattern observed in the VIGOR study." These studies were conducted in patients with osteoarthritis.[84]

FDA also addressed whether Vioxx's pre-approval studies, which were the basis of the Cardiovascular Card, could be used to assess the drug's cardiovascular safety. The agency informed the committee that the studies should not be used for a safety analysis. Regarding the pre-approval study 058, the FDA reviewer wrote:

> Because of the small size and short duration, this study is inadequate to detect differences in clinically relevant adverse events between rofecoxib [Vioxx] and nabumetone [another anti-inflammatory drug].[85]

Regarding study 069, which contained data on a set of other pre-approval studies, the reviewer stated:

> The Division has serious concerns with a combined analysis of studies of different length and dosing regimens. The database overall included short term, low doses of rofecoxib [Vioxx]. . . . None of the studies were powered to detect differences in serious CV [cardiovascular] thrombotic events compared to the active comparator.[86]

The Arthritis Advisory Committee heard from FDA, the public, and Merck.[87] The Committee then concluded that clinicians should be informed that VIGOR study showed "an excess of cardiovascular events in comparison to naproxen."[88]

---

[83] *Id.* at 18.

[84] *Id.* at 17.

[85] *Id.* at 19.

[86] *Id.*

[87] At the meeting, Merck presented a large pooled analysis of all Vioxx trials. In response, FDA told the advisory committee that combining so many different studies to assess safety was fundamentally flawed. Bonnie Goldmann, Regulatory Affairs, Merck Research Laboratories, *FDA Arthritis Advisory Committee* (Feb. 8, 2001); Quan Li, *Advisory Committee Presentation on Vioxx: Discussion on the Metaanalysis for Cardiovascular Risk Assessment* (Feb. 8, 2001).

[88] Food and Drug Administration, *Transcript of Meeting of Arthritis Advisory Committee, NDA # 21-042/s007, Vioxx (Rofecoxib, Merck)*, 206 (Feb. 8, 2001).

The next day, Merck sent a bulletin to "all field personnel with responsibility for Vioxx."[89] The bulletin instructed the sales force to "stay focused on the EFFICACY messages for VIOXX."[90] Contrary to the Committee's recommendation, the bulletin advised:

DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE ... OR THE RESULTS OF THE ...VIGOR STUDY.[91]

To respond to doctors who asked about these topics, Merck instructed its field representatives to take three steps.

First, Merck told representatives to say that "because the study is not in the label, I cannot discuss the study with you."[92] This position did not accurately reflect FDA regulations. Under the law, pharmaceutical representatives are permitted to discuss evidence of safety concerns with doctors, even if such data are not on the drug's label.[93]

Second, Merck told the representatives to advise physicians to submit written questions to the company's medical services department. Responses to these questions described the same highly questionable data used in the Cardiovascular Card data before discussing VIGOR and other studies. For example, one response to a clinician contained the same mortality table used in the Cardiovascular Card, but without the column for "placebo." The text stated, "Both the overall mortality . . . and the cardiovascular mortality was lower in the rofecoxib [Vioxx] group compared to the NSAID group."[94]

Third, Merck told representatives to refer to the Cardiovascular Card.[95] Staff were apparently instructed not to leave this pamphlet with physicians.[96]

FDA's advisory committee meeting did not slow Merck's marketing of Vioxx. Early in 2001, Merck launched "Project A&A XXceleration" to reach sales goals through "revised

---

[89] Merck, *Bulletin for Vioxx: FDA Arthritis Advisory Committee Meeting for Vioxx* (Feb. 9, 2001).

[90] *Id.*

[91] *Id.*

[92] Merck, *Bulletin for Vioxx: FDA Arthritis Advisory Committee Meeting for Vioxx* (Feb. 9, 2001).

[93] 21 CFR 202.1

[94] Letter from Jeffrey M. Melin, Associate Director, Medical Services to Dr. Joseph Torg (Mar. 16, 2001).

[95] Merck, *Bulletin for Vioxx: FDA Arthritis Advisory Committee Meeting for Vioxx* (Feb. 9, 2001).

[96] It was a "non leave" sales aid. *Id.*

targeting, messaging and advocate development." [97]  "A&A" refers to arthritis and analgesia, two clinical indications for Vioxx.  The slogan for Project A&A XXceleration was apparently "In It to Win It." [98]

As part of this effort, in an April 2001 bulletin for office-based field staff, Merck instructed that each salesperson make a list of his or her "top 50" physicians who were considered "high volume targets." [99]

On April 27, 2001, Merck executive Jo Jerman left a voice mail for field staff involved in Project A&A XXceleration.  She stated:

> The most recent performance numbers show a continued trend upward ... the share of VIOXX in the A&A market is up to 17.2% — that's an all time high —and the share of VIOXX in the Coxib market 51.2% — another all-time high.  Woo doggie!  That is exciting. [100]

She concluded:

> The only thing left is to put "Project A&A XXceleration" into overdrive ... the time is now and I wouldn't want anyone on the task but all of you.  Last, but certainly not least, you've got some extra dollars to shoot for as well.  As you recall from our incentive program, if you hit those 2–4 share point increases, you'll be rewarded handsomely . . . . Go get em guys, Good luck and Great selling! [101]

## C.    The *New York Times* Article

On May 22, 2001, a long article on the front page of the business section of the *New York Times* raised questions about the cardiovascular safety of Vioxx.  Merck responded by instructing representatives to read favorable data on the Cardiovascular Card directly to physicians.

The *New York Times* article described a pharmaceutical industry analyst who "was warning his clients, many of them institutional investors who hold Merck shares, that they should

---

[97] Merck, *Bulletin for Vioxx: ACTION REQUIRED—"Project A&A Accleration": Top 50 Targeting* (Apr. 20, 2001).

[98] Merck, *MVX for Vioxx: Jo Jerman, Audience—Field Sales, April 27, 2001, Topic: Project A&A XXceleration, Length—approx 1 min 30 Sec* (Apr. 27, 2001).

[99] Merck, *Bulletin for Vioxx: ACTION REQUIRED—"Project A&A Accleration": Top 50 Targeting* (Apr. 20, 2001).

[100] Merck, *MVX for Vioxx: Jo Jerman, Audience—Field Sales, April 27, 2001, Topic: Project A&A XXceleration, Length—approx 1 min 30 Sec* (Apr. 27, 2001).

[101] *Id.*

watch the issue carefully since it could hurt the company's stock price." The article also quoted FDA Arthritis Advisory Committee member Dr. M. Michael Wolfe, who stated, "There must be a warning . . . . The marketing of these drugs is unbelievable . . . . I'm sure there are many people out there who are taking these drugs that should not be."[102]

In response, Merck quickly issued a press release entitled "Merck Confirms Favorable Cardiovascular Safety of Vioxx."[103] Inside FDA, scientists rejected this conclusion. In a warning letter to the company sent several months later, FDA would cite the title of Merck's press release as "simply incomprehensible" in the face of data from the VIGOR study.[104]

A Merck bulletin to its field representatives also emphasized the drug's safety. The bulletin again advised:

> DO NOT INITIATE DISCUSSIONS ON THE RESULTS OF THE ... VIGOR STUDY, OR ANY OF THE RECENT ARTICLES IN THE PRESS ON VIOXX.[105]

In the case that a physician had further questions, Merck instructed its representatives to display the Cardiovascular Card. The bulletin told field staff to highlight data on the card suggesting that Vioxx might be much safer than other "NSAIDS," non-steroidal anti-inflammatory drugs.[106] Specifically, Merck advised representatives to state:

> Doctor, As you can see, Cardiovascular Mortality as reported in over 6,000 patients was Vioxx .1 vs. NSAIDs .8 vs. Placebo 0.[107]

---

[102] *Doubts Are Raised on the Safety of Two Popular Arthritis Drugs*, New York Times (May 22, 2001).

[103] Merck, *Merck Confirms Favorable Cardiovascular Safety of Vioxx* (May 22, 2001).

[104] This warning letter contained other examples of inappropriate promotions of Vioxx. These were educational events in 2000 in which a Merck consultant provided false data or made extremely inappropriate comparisons between Vioxx and other products. In response, Merck stated that the events violated company policy and had stopped using the speaker in question. At the request of FDA, Merck also sent letters to physicians who attended the educational events. Letter from Thomas W. Abrams, Director, Division of Marketing, Advertising and Communications, Food and Drug Administration, to Raymond V. Gilmartin, President and CEO, Merck & Co, Inc. (Sept. 17, 2001); Letter from Louis M. Sherwood, Senior Vice President, U.S. Medical & Scientific Affairs, Merck, to Health Care Provider (Nov. 2001).

[105] Merck, *Bulletin for Vioxx: Action Required: Response to New York Times Article* (May 23, 2001).

[106] *Id.*

[107] *Id.*

24

D.    *JAMA* Study

On August 22, 2001, a study published in the *Journal of the American Medical Association* (*JAMA*) raised serious questions about the safety of Vioxx and other drugs in its class. In an alert to field representatives about this study, Merck urged them to express confidence in Vioxx's cardiovascular safety and use the Cardiovascular Card.

The *JAMA* paper reviewed new data from VIGOR and other recent studies on the safety of Vioxx and Celebrex, a similar drug.[108] Authors Dr. Deborbate Mukherjee, Dr. Steven E. Nissen, and Dr. Eric J. Topol from the Cleveland Clinic concluded that there was evidence of a "potential increase in cardiovascular event rates for the presently available COX-2 inhibitors."[109] Until additional studies of safety are conducted, they wrote, "we urge caution in prescribing these agents to patients at risk for cardiovascular morbidity."[110]

One day prior to the *JAMA* paper's release, Merck executive Jo Jerman left a confident and reassuring voice mail for the company's field representatives. She stated:

#1. Stay focused. Stay focused with your efficacy and GI risk awareness messages and stay focused with your confidence in cardiovascular safety and overall safety of VIOXX.[111]

Ms. Jerman also instructed representatives that "if asked about CV effects, use your CV card."[112] She continued: "As your piece shows, CV events and cardiovascular mortality rates between Vioxx and NSAIDS ... were similar in [osteoarthritis] studies."[113] Ms. Jerman then reminded Merck's field representatives that additional information from the medical services department could be faxed to physicians upon request.[114]

The *JAMA* paper did not lead Merck to moderate its approach to selling Vioxx. Instead, in the fall of 2001, Merck launched Project Offense, a major new marketing campaign with the

---

[108] D. Mukherjee, S. Nissen, E. Topol, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, Journal of the American Medical Association, 954–9 (Aug. 22–29, 2001).

[109] *Id.*

[110] *Id.*

[111] Merck, *MVX for Vioxx, Field Sales—USHH, Jo Jerman, August 21, 2001, "JAMA article" FINAL (approx 4 minutes)*, 3 (Aug. 21, 2001).

[112] *Id.*

[113] *Id.*

[114] *Id.*

25

goal of increasing Vioxx's share of the market.[115]  The central message of Project Offense was efficacy.  The company instructed its sales representatives to emphasize that Vioxx demonstrated a potential advantage over narcotics for pain management.

As part of Project Offense, Merck instructed field representatives to deliver the efficacy message multiple times to top prescribers (those physicians who had the highest rates of prescribing Vioxx to their patients).  The representatives were also expected to "quickly and effectively address all physician obstacles and return to the core messages for VIOXX."[116]  Merck used the term "obstacles" to refer to concerns physicians might have about prescribing Vioxx.

Project Offense included a decision tree to help address the cardiovascular safety concerns of physicians.  Known as the "CV Obstacle Response," this decision tree began by advising field representatives to tell doctors about the differences between Vioxx and aspirin.[117]

Merck then advised its field representatives to "REVIEW ENTIRE CV CARD" with doctors, including:

- CV thromboembolic Adverse Events per 100 patient years
- Specific CV events
- Overall Mortality
- CV Mortality[118]

The "CV Obstacle Response" concluded:

Doctor, I hope this data has addressed your concern.  Let me show you some new efficacy data for VIOXX.[119]

### E.    Changes to the Vioxx Label

Nearly two years after Merck filed a request for label changes for Vioxx based on the results of the VIGOR study, FDA approved a new label that discussed the cardiovascular risks of the drug.  The extended delay resulted, in part, from FDA's need to convene an advisory committee meeting and conduct extra analyses.  It also was due to a series of disputes between the agency and the company.  Under the Food, Drug and Cosmetic Act, FDA and manufacturers must agree on label changes.  For approximately six months, Merck resisted a variety of FDA's

---

[115] Merck, *Project* OFFENSE *MEETING AGENDA & CONTENT:  Representative Meetings* (2001).

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*

proposals, leading to an extended series of conference calls to negotiate differences. Throughout this period, Merck continued to use the Cardiovascular Card with physicians. Eventually, it appears that FDA officials conceded on several key points of dispute.

FDA initially requested that the label warn physicians that Vioxx could cause heart attacks and other cardiovascular problems. FDA proposed that the warning state:

> VIOXX should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarction and angina and in patients with pre-existent hypertension and congestive heart failure.
>
> ..
>
> The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with VIOXX 50 mg (0.5%) as compared to patients treated with naproxen (0.1%). . . . This finding was consistent in a smaller and shorter study using VIOXX 25 mg that allowed the use of low dose ASA [aspirin]. Prospective, well powered, long-term studies required to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators other than naproxen have not been performed.[120]

This warning was unacceptable to Merck, which sought to move information on the VIGOR study to the "precautions" section.[121]

Merck sought to add additional data to the label from other studies, including results from ongoing studies in Alzheimer's Disease.[122] FDA initially advised against including these studies, saying that the studies should be completed and their findings incorporated in the label later.[123]

On February 15, 2002, FDA proposed to Merck that the label include a special graphic called a Kaplan-Meier curve to show a worsening of cardiovascular risks on Vioxx for those with the longest exposure to the drug.[124] During a teleconference, FDA officials stated that the "best way to display the data is the Kaplan Meier curve."[125] FDA's minutes of the call add, "Note: The time devoted to how to best display cardiovascular safety from VIGOR reflects how important the Agency considers the topic of clear labeling of safety information."[126] Merck objected to the idea.[127]

---

[120] Merck, *FDA Text of 15 Oct 2001 with Merck Proposals Shown with Revision Marks* (2001).

[121] *Id.*

[122] Food and Drug Administration, *Telecon Minutes* (Jan. 30, 2002).

[123] *Id.*

[124] Food and Drug Administration, *Telecon Minutes* (Mar. 7, 2002).

[125] *Id.*

[126] *Id.*

[127] *Id.*

By the end of the negotiation, FDA gave ground on several key issues. Two Alzheimer's studies, which showed no increase in cardiovascular events, were noted in the label. The Kaplan-Meier curve was not included. The cardiovascular risk was listed not as a "warning," but as a "precaution." And perhaps most important to Merck, the label included the statement that "the significance of the cardiovascular findings of these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown."

But Merck did not get everything it wanted in the label. The company had sought to include in the label data from Vioxx's pre-approval studies — the same studies summarized in the Cardiovascular Card that the company's representatives had been showing to physicians for two years.[128] FDA rejected Merck's proposal. According to the agency, the analysis of pre-approval data was "not adequately informative to warrant inclusion in the label" because the analysis included "trials of different design, size, and duration, using different doses of VIOXX and different comparators."[129]

After the label change, Merck altered its instructions to field representatives regarding cardiovascular risk. The new instructions still prohibited representatives from initiating discussion on any new cardiovascular data. But the instructions now drew heavily from the language in the label that emphasized uncertainty about the cardiovascular risk of the drug.

For example, on September 17, 2003, Merck sent a bulletin to its sales representatives about a pending abstract to be presented at a meeting of the American College of Rheumatology. The abstract, which was based on epidemiological research funded by Merck, reported a higher risk of heart attack in patients on Vioxx compared to those on its competitor Celebrex or placebo.[130] Merck instructed its representatives:

> DO NOT INITIATE DISCUSSIONS ON ANY OF THE UPCOMING ABSTRACTS ON VIOXX THAT WILL BE PRESENTED AT THIS YEAR'S AMERICAN COLLEGE OF RHEUMATOLOGY MEETING.[131]

The bulletin contained an "obstacle response" to be used in case a physician asked a Merck representative about the study. The response instructed representatives to review selected portions of the label and then say, "As stated here in the label, the significance of the cardiovascular findings ... is unknown."[132]

---

[128] Food and Drug Administration, *Telecon Minutes* (Feb. 8, 2002).

[129] *Id.*

[130] Merck, *Bulletin for VIOXX: Upcoming Abstracts for VIOXX at the 2003 American College of Rheumatology Meeting and Obstacle Response for Observational Analysis by Solomon, et. al.* (Sept. 17, 2003).

[131] *Id.*

[132] *Id.*

Similar instructions were given to representatives in response to other research showing an elevated risk of cardiovascular complications with Vioxx.[133]

Meanwhile Merck's promotional efforts continued. In 2003, Merck launched "Project Power Play" with the objectives to "gain or extend coxib leadership," "play offense on efficacy," and "stay on strategy."[134]

## IV.    CONCLUSION

A review of over 20,000 pages of Merck documents suggests that the company used its sales force of thousands to counter growing evidence of concern over the safety of Vioxx. These efforts involved providing highly questionable information to physicians and pursuing aggressive marketing strategies. Merck's promotional activities appear to help explain robust sales of Vioxx despite mounting evidence of risk.

---

[133] Merck, *Bulletin for Vioxx: Action Required: Observational Analysis by Graham et al.* (Aug. 24, 2004).

[134] Merck, *Bulletin for VIOXX: Project Power Play Teleconferences* (Apr. 4, 2003).

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

03 JUN 26  PM 3: 58

U.S. DISTRICT COURT
N.D. OF ALABAMA

LAVAUGHN HALES,      )
                     )
        Plaintiff,   )
                     )      CIVIL ACTION NO.
v.                   )
                     )      03-AR-1028-M
MERCH & CO., INC., et al.,  )
                     )
        Defendants.  )
                     )      ENTERED
                     )      JUN 2 6 2003

ORDER OF REMAND

In accordance with the accompanying memorandum opinion, plaintiff's motion to remand is GRANTED upon the court's finding pursuant to 28 U.S.C. § 1447(c) that it lacks subject matter jurisdiction. Accordingly, the above-entitled action is REMANDED to the Circuit Court of Dekalb County, Alabama from which it was improvidently removed. The Clerk is DIRECTED to effectuate this order.

The parties shall bear their own respective costs in this court.

DONE this 26th day of June, 2003.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

LAVAUGHN HALES,                    )
                                   )
            Plaintiff,             )
                                   )
v.                                 )        CV 03-AR-1028-M
                                   )
MERCK & CO., INC., et al.          )
                                   )
            Defendant.             )

**MEMORANDUM OPINION**

Before the court is a motion to dismiss filed by Hal

Henderson ("Henderson")[1], Steve Santos ("Santos")[2], and Matthew

King ("King")[3] and a motion to remand to the Circuit Court of

DeKalb County, Alabama filed by plaintiff, Lavaughn Hales

("Hales").  Hales brought this products liability case against

defendant, Merck & Co., Inc. ("Merck"), and its agents Henderson,

Santos, King, and Patricia Aiken ("Aiken")[4], alleging that she

_____

[1]Henderson is a district sales manager for Merck, and a resident
of Cobb County, Georgia.

[2]Santos is a district sales manager for Merck and a resident of
Montgomery County, Alabama.

[3]King is a sales representative for Merck, and a resident of
Jefferson County, Alabama.

[4]Aiken is a sales representative for Merck, and a resident of
Jefferson County, Alabama.  Aiken had not yet been served when
the case was removed to this court.

1



suffered a heart attack after taking the prescription drug Vioxx, manufactured and marketed by Merck.

### Facts

Hales filed suit in the state court on March 24, 2003. Her complaint contained five counts charging various defendants with 1)designing, manufacturing, and/or selling a defective product and failing to warn; 2)negligence; 3)breach of express warranty; 4)breach of implied warranty; 5)negligent, reckless, intentional and fraudulent misrepresentation and suppression. Three of the individual non-diverse defendants were served on April 3, 2003. Merck, Henderson, Santos, and King are all represented by the same counsel. On May 5, 2003, Merck, Santos, Henderson, and King filed their notice of removal and answer in this court alleging diversity jurisdiction based on plaintiff's alleged fraudulent joinder of the four non-diverse individual defendants. The court deemed the affirmative defense of fraudulent joinder a motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6), and included Aiken because a dismissal of the action against Aiken is as necessary to this court's diversity jurisdiction as a dismissal of the action against the three non-diverse individuals who have filed appearances. Oral argument was heard at the court's regular motion docket on June 20, 2003.

2

The dispositive jurisdictional question is whether Hales can assert **any** valid cause of action against a non-diverse sales representative/manager under Alabama's substantive law or under a legitimate prospect for a change in Alabama law.  This court in *Barnes v. American Honda Motor Co.*, 02-AR-1664-J, stated a court's duty in evaluating a motion to remand a diversity removal challenged on fraudulent joinder grounds as follows: "If there is a *possibility* that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder is proper and remand the case to the state court."  *Whitlock v. Jackson Nat'l Life Ins.*, 32 F. Supp. 2d 1286, 1289 (M.D. Ala. 1998)(emphasis supplied).  In the present action Hales argues that she has a valid AEMLD claim against the sales representatives/managers for supplying and/or for failing to warn and/or inadequately warning and/or failing to instruct her treating physician of the dangers of Vioxx.  Henderson, Santos, and King argue that no cause of action has been stated nor can be stated against the sales representatives/managers because only the manufacturer is liable as a "seller" of a defective product under AEMLD, and all other claims are subsumed or merged into the AEMLD claim.  Hales argues to the contrary that the Alabama

3

Supreme Court has never addressed whether an individual employee of a defendant designer and manufacturer of a prescription drug, who has responsibility for marketing and selling the drug on behalf of his employer, can be held liable on a claim arising under AEMLD, and accordingly the court has never rejected individual liability against intermediary "sellers."

Furthermore, Hales points out that under Alabama law a person is liable for his intentional torts. Hales asserts that a cause of action exists against Henderson, King, Santos, and Aiken for the intentional tort of fraudulent misrepresentation and suppression of material information regarding the safety and efficacy of Vioxx, and the participation in an aggressive marketing campaign that fraudulently misrepresented the product to treating physicians. Hales also contends that a cause of action for negligence and breach of warranty exists against the individual sales representatives because they had a duty to warn her treating physician of the dangers of Vioxx.

Hales cites three decisions by federal courts in Alabama that have remanded in cases similar to the instant action: *Roughton v. Warner-Lambert Co.*, 01-D-865-N (De Ment, J.)(court remanded for a second time a products liability case brought in state court against the defendant Warner-Lambert, Co. as the

4

manufacturer and its sales representatives/territory manager, an Alabama citizen. The case was originally remanded after Judge Myron H. Thompson found that defendants had not met their burden of showing either fraudulent joinder or fraudulent misjoinder); *Pace v. Davis a division of Warner-Lambert*, 00-J-3046 (Johnson, J.)(court remanded a products liability case against a drug manufacturer and the non-diverse treating physician); *McCaffery v. Warner-Lambert Co.*, 00-PT-2848-M (Propst J.) (court remanded in case brought against drug manufacturer and treating physician).

Henderson, Santos and King cite *Tillman v. R.J. Reynolds Tobacco*, 253 F.3d 1302 (11th Cir. 2001) in support of their position that claims asserted against a retailer merge into an AEMLD claim against the manufacturer. But in *Tillman*, the Eleventh Circuit certified the following question to the Alabama Supreme Court: "Whether there is any potential cause of action under any theory against any retail defendants including those that employ pharmacists who sell cigarettes for claims brought under the Alabama Extended Manufactures Liability Doctrine, or premised on negligence wantonness, or civil conspiracy under Alabama law." The question has not been answered. A similar question was certified in *Spain v. Brown & Williamson Tobacco*

5

Corp., 230 F.3d 1300 (11th Cir. 2000). It too, has not been answered.

This court unashamedly quotes itself: "[T]his court cannot substitute its uncertain judgment of what the Alabama law ought to be, or to predict what it someday will be, when this court's jurisdiction is premised on 28 U.S.C. §§ 1441 and 1332. The court must give a plaintiff the benefit of all doubt on questions of Alabama law when deciding upon subject matter jurisdiction that depends upon the state of the state of the law." *Barnes,* at 3.

Henderson, Santos, and King argue alternatively that even if there is a viable cause of action against intermediary sellers under AEMLD, there is no cause of action against these four sales representatives/managers because three of them have presented affidavits stating that they have never visited Dr. Cornelius B. Thomas, Hales' treating physician, and accordingly there is no causation. The court notes, without finding it unduly significant, that there is no such affidavit for Aiken. The court disagrees. If the court were to consider the affidavits of Henderson, Santos, and King it would have to convert the motion to dismiss under Rule 12(b)(6) to one under Rule 56 and find as a matter of law that no genuine issue of material fact existed.

6

This would require the court do what it explicitly said it could not do in *Barnes*, adjudicate the claims against the defendants on their merits before finding that the court has subject matter jurisdiction. *Barnes*, at 3-4.

### Conclusions

Because the defendants must prove by clear and convincing evidence that no cause of action exists, and because the question of whether a cause of action exists against an intermediary supplier under AEMLD is uncertain, plaintiff's motion to remand is due to be granted, and defendants' motions to dismiss are due to be denied. A separate order will be entered.

DONE this _26th_ day of June, 2003.


_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

2006 May 29 PM 02:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RUBY WHITE,

  Plaintiff,

v.            CASE NO: 8:05-cv-243-T-26MSS

MERCK & CO., INC., GENA ORTEGA f/k/a
GENA GHAZZI and JOHN E. (JACK) KILKELLY,

  Defendants.

_____/

## O R D E R

Before the Court are Plaintiff's Motion to Re-open Case and for Reconsideration of Judge's Order Granting Defendants' Motion to Stay (Dkt. 10) and Plaintiff's Motion to Remand (Dkt. 9).[1] After careful consideration of the Motions, the pleadings and papers on file, and an almost identical case handled by the Honorable James D. Whittemore, the Court concludes that this case should be re-opened and remanded to the state court.

Plaintiff correctly argues that this Court lacks jurisdiction based on diversity of citizenship because, contrary to the assertions of Defendant Merck in its notice of removal and in its arguments in <u>Kozic v. Merck</u>, the two drug sales representatives were

---

[1] The Court does not need a response from Defendant Merck because of the extensive argument in the Notice of Removal (Dkt. 1) and the arguments already presented to the Honorable James D. Whittemore in <u>Kozic v. Merck & Co., Inc., Ghazzi and Kilkelly</u>, No. 8:04-cv-324-T-27TBM.

not fraudulently joined. This Court must review the pleadings to determine whether there is a reasonable basis for predicting that a state court might impose liability on the resident defendants. See Crowe v. Coleman, 113 F.3d 1536, 1542 (11th Cir. 1997). A review of the Complaint[2] leaves no doubt that it states a cause of action under Florida law as to the two individual Defendant sales representatives.[3] See Albertson v. Richardson-Merrell, Inc., 441 So.2d 1146 (Fla.Dist.Ct.App. 1983). Because Defendants Ortega and Kilkelly are citizens of Florida, capable of being sued for the non-fraudulent and non-frivolous causes of action alleged in Counts II, III, and IV, this Court is without subject matter jurisdiction to hear this case.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)    Plaintiff's Motion to Re-open Case and for Reconsideration of Judge's Order Granting Defendants' Motion to Stay (Dkt. 10) is **GRANTED**. The Clerk shall re-open this case for the Court's reconsideration of the order entered February 9, 2005. (Dkt. 7). The Order granting a stay (Dkt. 7) is hereby **VACATED**.

---

[2]    The Complaint filed in state court (Dkt. 2) seeks compensatory damages for the Plaintiff's ingestion of Vioxx for pain over a prolonged time. Defendant Merck & Co., Inc. (Merck) is a foreign corporation authorized to do business in Florida. Defendants Ortega and Kilkelly, both residents of Florida, were sales representatives for Merck who sold Vioxx to prescribing physicians. Counts II, III, and IV seek relief against Merck, Ortega and Kilkelly for negligence, negligent misrepresentation, and fraud, respectively, in failing to warn prescribing physicians of the significant risks involved with the use of Vioxx.

[3]    The Complaint also comports with Federal Rules of Civil Procedure 8 and 9.

(2)    Plaintiff's Motion to Remand (Dkt. 9) is **GRANTED**.

(3)    The Clerk is directed to remand this case to the Circuit Court of the Twelfth

Judicial Circuit in and for Sarasota County, Florida.  Once remand is

effectuated, the Clerk is directed to close this case.

**DONE AND ORDERED** at Tampa, Florida, on February 14, 2005.


_____s/_____

**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


<u>COPIES FURNISHED TO</u>:
Counsel of Record

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REFIC KOZIC,

        Plaintiff,

vs.                                     Case No. 8:04-CV-324-T-27TBM

MERCK & CO., INC., GENA GHAZZI,
and JOHN E. (JACK) KILKELLY,

        Defendants.
                                    /

## ORDER ON PLAINTIFF'S MOTION FOR REMAND

     **BEFORE THE COURT** is Plaintiff's Motion for Remand (Dkt. 6). Upon consideration, Plaintiff's motion is granted.

### Introduction

     Plaintiff sued Defendants Merck & Co., Inc. ("Merck") and two sales representatives employed by Merck, Gena Ghazzi and John E. (Jack) Kilkelly alleging that he suffered a heart attack as a result of ingesting Merck's drug, Vioxx. (Dkt. 2). In the Complaint, Plaintiff further alleges that Ghazzi and Kilkelly negligently and fraudulently misrepresented the safety and effectiveness of Vioxx to Plaintiff's physicians. (Dkt. 2). The Complaint, initially filed in Florida state court, was removed to federal court on the grounds that Ghazzi and Kilkelly was fraudulently joined in this action. (Dkt. 1). Plaintiffs seek to remand the case to Florida state court. (Dkt. 6).

### Applicable Standards

     An action may be removed to federal court even if all of the parties are not diverse if the joinder of the non-diverse party was fraudulent. Triggs v. John Crump Toyota, Inc., 154 F.3d 1284.

Plaintiff's Exhibit 1

1287 (11ᵗʰ Cir. 1998). "Fraudulent joinder is a judicially created doctrine that provides an exception
to the requirement of complete diversity." Id. at 1287. Fraudulent joinder is established by showing
either (1) there is no possibility the plaintiff can establish any cause of action against the resident
defendant, or (2) the plaintiff has fraudulently pled jurisdictional facts in order to bring the resident
defendant into state court. Crowe v. Coleman, 113 F. 3d 1536 (11th Cir. 1997); Cabalceta v.
Standard Fruit Co., 883 F. 2d 1553 (11th Cir. 1989). The removing defendant has the burden of
proving fraudulent joinder. Crowe, 113 F.3d at 1538.

In addressing whether a party has been fraudulently joined, the Court must "pierce the
pleadings" to determine whether, under controlling state law, the plaintiff has a possible or arguable
claim against the non-diverse defendant, or whether, on the other hand, it is clear there can be no
recovery. See Crowe, 113 F. 3d at 1538; Bobby Jones Garden Apartments, Inc. v. Suleski, 391 F.
2d 172 (5th Cir. 1968). All factual issues and questions of controlling law are evaluated in favor of
the plaintiff. Cabalceta, 883 F. 2d at 1561.

## Discussion

In the Complaint, Plaintiff alleges that Defendants Ghazzi and Kilkelly negligently and
fraudulently misrepresented material information regarding the safety and effectiveness of Vioxx.
(Dkt. 2, ¶¶ 22-50). To establish a cause of action for fraud, Plaintiff must prove:

> (1) a misrepresentation of material fact; (2) [a] a knowledge of the
> representor of the misrepresentation, or [b] representations made by
> the representor without knowledge as to either truth or falsity, or [c]
> representations made under circumstances in which the representor
> ought to have known, if he did not know, of the falsity thereof; (3) an
> intention that the representor induce another to act on it; and (4)
> resulting injury to the party acting in justifiable reliance on the
> representation.

2

Albertson v. Richardson-Merrell, Inc., 441 So. 2d 1146 (Fla. 4th DCA 1983). In Albertson, the court concluded that the plaintiff could state a claim against a drug sales representative for making fraudulent statements to plaintiff's physician regarding the safety and efficacy of a drug. 441 So. 2d 1146.

Here, Plaintiff has alleged that Defendant sales representatives made misrepresentations concerning the safety and effectiveness of Vioxx and concealed or understated its dangerous side effects. (Dkt. 1, ¶¶ 10, 26, 38). Defendant sales representatives allegedly "knew or should have known that their drug product had defects, dangers, and characteristics that were other than what the Defendants had represented to prescribing doctors or other dispensing entities, the FDA and the consuming public, including Plaintiff herein." (Dkt. 1, ¶¶ 30, 43). Plaintiff further alleges that the misrepresentations were made with the "intention and specific desire that Plaintiff, Plaintiff's prescribing physician or other dispensing entities and the consuming public would rely on such information in selecting, requesting, or prescribing treatment." (Dkt. 1, ¶¶ 28, 41). According to the Complaint, Plaintiff suffered serious injuries as a result of Plaintiff's reliance on the alleged misrepresentations concerning the safety of Merck's drug Vioxx. (Dkt. 1, ¶¶ 37, 50).

Plaintiff can state a cause of action against Defendant sales representatives Ghazzi and Kilkelly and has done so in accordance with Albertson and Fed. R. Civ. P. 8 and 9. As such, they were not fraudulently joined in this action and their citizenship cannot be disregarded. Ghazzi and Kilkelly's status as Defendants and their Florida citizenship prevents this Court from exercising jurisdiction. It is, therefore,

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Remand (Dkt. 6) is **GRANTED.** This case is remanded to the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-80514-CIV-HURLEY

EVELYN IRVIN, as personal representative of
the Estate of RICHARD IRVIN, JR.,
    plaintiff,

vs.

MERCK & CO., INC., JOE GHEZZI and
CHRIS METROPULOS,
    defendants.

_____/

FILED by _____ D.C.

OCT · 9 2003

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · W.P.B.

ORDER REMANDING CASE TO FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
and CLOSING FILE

THIS CAUSE is before the court upon plaintiff's motion for remand for lack of subject

matter jurisdiction [DE# 6], the defendants' response in opposition [DE#17] and the plaintiff's

reply [DE#19]. For reasons stated below, the court will grant the motion and remand this case

to the state court in which it was originally filed.

I. BACKGROUND

Plaintiff originally filed suit against defendants in state court on May 14, 2003 in the

Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, alleging

state common law tort claims arising out of the wrongful death of plaintiff's decedent in

consequence of his ingestion of the prescription drug Vioxx, a product manufactured and

marketed by defendant Merck & Co., Inc. According to the complaint, Joe Ghezzi and Chris

Metropulos, both Florida residents, were sales representatives or sales managers employed by

1

Plaintiff's Exhibit 2

Merck to promote, distribute and sell this prescription drug to physicians in the State of Florida, including the plaintiff's decedent's physician.

The defendant Merck filed a notice of removal in this court on June 6, 2003 [DE#1] asserting diversity jurisdiction under 28 U.S.C. §1332 on theory that the two non-diverse individual defendants, Ghezzi and Metropulos, were fraudulently joined to defeat the jurisdiction of this court that would otherwise exist.

## II. DISCUSSION

Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity in three instances: (1) where there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant: (2) where there is outright fraud in the plaintiff's pleading of jurisdictional facts, and (3) where a diverse defendant is joined with a non-diverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the non-diverse defendant. *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998).

The burden of establishing fraudulent joinder is a heavy one. The determination must be based upon the plaintiff's pleadings at the time of removal, supplemented by any affidavit and deposition transcripts submitted by the parties, with all factual allegations construed in the light most favorable to the plaintiff, with any uncertainties about the applicable law resolved in the plaintiff's favor. *Pacheco de Perez v AT & T Co.*, 139 F.3d 1368 (11th Cir. 1998). If even a colorable claim against a non-diverse defendant is stated, joinder is proper and the case should be remanded to state court. *Id.*

2

In this case, plaintiff has asserted facts which state potential causes of action against the individual Florida defendants, having specifically alleged that these defendants were personally involved in the marketing of the prescription drug Vioxx to Florida physicians, including the plaintiff's decedent's physician. In opposing remand, defendants have filed affidavits of the individual defendants who both aver that their sales territory encompasses Broward and Palm Beach County, Florida, but not St. John's County. "Presuming" that plaintiff's decedent and relevant treating physician resided and worked in St. John's County— the alleged county of the plaintiff's residence-- from here the defendant urges the inference that there can be no causal connection between the marketing activities of these defendants and the alleged injury to plaintiff's decedent; thus, defendants contends that plaintiff can state no viable cause of action against the non-diverse defendants, and that they are therefore fraudulently joined.

It is not appropriate for the court, in passing on a motion for remand, to make a fact finding on causation drawn from an inference upon an inference. Reminded that the court is "not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law, *Crowe v Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997), the court concludes that the defendants in this case have failed to carry their burden of establishing that plaintiff can state no colorable claim against the non-diverse defendants who are therefore not fraudulently joined. Because their presence as party defendants defeats complete diversity among the parties, this court does not have subject matter jurisdiction to hear this case.

3

It is accordingly **ORDERED and ADJUDGED** :

1.    Because the court lacks subject matter jurisdiction over this case, this action is **REMANDED** to the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

2.    The clerk of the court shall **CLOSE** this case, **DENY** any pending motions as *MOOT* and send a certified copy of *this order to the Clerk of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida pursuant to 28 U.S.C. §1447.*

**DONE and SIGNED** in Chambers in West Palm Beach, Florida this ___ day of October, 2003.

Daniel T K Hurley
United States District Judge

copies to:

Philip L. Valente, Jr., Esq.
Angelo Patacca, Jr., Esq.
David Miceli, Esq
Sharon Kegerreis, Esq.

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 04-14335-CIV-MOORE

MARK TOMLIN and APRIL TOMLIN,

Plaintiffs,

vs.                                                    ORDER

MERCK & CO., INC.,KEVIN BEDELL,
and WALGREEN CO. d/b/a Walgreens,

Defendants.

_____/

CLOSED
CIVIL
CASE

THIS CAUSE came before the Court upon Plaintiffs' Motion to Remand (DE #4) and

Merck's Motion to Stay (DE #9).

UPON CONSIDERATION of the Motions, the pertinent portions of the record, and being

otherwise fully advised in the premises, the Court enters the following Order.

## MOTION TO STAY

Merck argues that the Court should stay all proceedings, including Plaintiffs' Motion to

Remand, pending a decision by the Judicial Panel on Multi-district Litigation ("MDL") regarding

whether to establish an MDL Court to hear all Vioxx related cases.[1] Plaintiffs oppose the Motion

to Stay, and ask this Court to rule on their Motion to Remand before deciding whether a stay is

appropriate. While the Court acknowledges that it has discretion to either resolve Plaintiffs'

Motion to Remand, or to decline to decide the Motion to Remand and grant Merck's Motion to

Stay, the Court chooses to reach the merits of Plaintiffs' Motion. In doing so the Court notes that

other, factually similar cases removed by Merck to federal court based on fraudulent joinder have

been remanded. See Irvin v. Merck & Co., Inc., Case No. 03-80514-CIV-HURLEY; Kozic v.

_____

[1] Merck argues that a stay is appropriate because five other Vioxx cases have already been stayed in the Southern
District of Florida, and that these decisions "make clear the necessity of a stay here." Mot. to Stay at 6-7. However,
it appears from a review of those cases that one of them is a class action, and that the plaintiffs in the other four
cases did not oppose a stay. Therefore, contrary to Merck's contentions, these cases do not make clear the necessity
of a stay because they present different factual circumstances than the instant case.

1

<u>Merck & Co., Inc.</u>, Case No. 8:04-CV-324-T-27TBM (M.D. Fla. Aug. 9, 2004). Merck attempts to distinguish these cases by arguing that, at the time they were remanded, no MDL had been requested. This attempt is disingenuous at best, and only serves to obscure the real issue before this Court of whether Merck should have removed this case based on fraudulent joinder in light of the prior remands in factually similar cases. Accordingly, Merck's Motion to Stay is DENIED and the Court will address the merits of Plaintiffs' Motion to Remand.

<div align="center">

**MOTION TO REMAND**

</div>

**I.    BACKGROUND**

Plaintiff originally filed this case on November 5, 2004, in the Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County, Florida, Case No. 56-2004-CA-001523. Merck filed a Notice of Removal on December 1, 2004, alleging diversity of citizenship pursuant to 28 U.S.C. § 1332, on the basis that Plaintiffs had fraudulently joined defendant Kevin Bedell, and therefore his Florida citizenship should be ignored for purposes of diversity jurisdiction. Plaintiffs then filed a Motion to Remand, arguing that the joinder of Bedell was not fraudulent, and consequently, this Court lacks subject matter jurisdiction to hear the case.

**II.   LEGAL STANDARD**

    A.    **Motion to Remand**

A federal district court must remand to state court any case that was removed improperly or without the necessary jurisdiction. <u>Campos v. Sociedad Aeronautica De Medellin Consolidada, S.A.</u>, 882 F. Supp. 1056, 1057 (S.D. Fla. 1994). In deciding a motion to remand, a district court "must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff." <u>Crowe v. Coleman</u>, 113 F.3d 1536, 1539 (11th Cir. 1997). "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court

<div align="center">2</div>

must find that the joinder was proper and remand the case to state court." Cooker v. Amoco Oil Co., 709 F. 2d 1433, 1440 (11th Cir. 1983). This strict construction of removal statutes prevents "exposing the plaintiff to the possibility that they may win a final judgement in federal court, only to have it determined that the court lacked jurisdiction..." Crowe, 113 F. 3d at 1538.

### B. Fraudulent Joinder

Merck's removal of this case to federal court was based upon its claim of fraudulent joinder. When a case is removed based on fraudulent joinder, the " removing party bears the burden of proving that the joinder of the resident defendant was fraudulent." Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir.1989)(citations omitted). The burden on the defendant is a "heavy one." Crowe, 113 F.3d at 1538. In order to satisfy this burden, the defendant must establish either that the jurisdictional facts were fraudulently alleged, or that there is "no possibility that plaintiff can establish any cause of action against the resident defendant." Id. "The fact that the plaintiffs may not ultimately prevail against the individual [non-diverse] defendants ... does not mean that the plaintiffs have not stated a cause of action for purposes of the fraudulent joinder analysis." Pacheco de Perez v. AT&T Co., 139 F.3d 1368, 1380 (11th Cir. 1998). Furthermore, in a fraudulent joinder inquiry, the court is not to weigh the merits of the plaintiffs' claims "... beyond determining whether it is an arguable one under state law." In this analysis, the court is to look at plaintiff's pleadings at the time of removal. Cabalceta, 883 F.2d 1553, 1561.

### III. DISCUSSION

Plaintiffs argue that a remand is necessary because they have a valid cause of action under Florida law against Bedell, and therefore his citizenship cannot be disregarded. In response, Merck argues that the "issue present here... is whether the pleading was sufficient to allege misrepresentations." Resp. at 18. Accordingly, Merck's arguments against remand, and in support

3

of removal, are based on the viability of Plaintiffs' complaint, rather than on whether Florida law generally provides for a cause of action against pharmaceutical sales representatives.[2] As a result, in deciding whether a remand is appropriate, the Court must determine whether Plaintiffs have provided sufficient allegations within their complaint to support any of the claims against Bedell.

Plaintiffs' complaint asserts three causes of action against the non-diverse defendant, Bedell: Count II for negligence, Count III for negligent misrepresentation, and Count IV for fraud. In order for Plaintiffs to prevail on their Motion to Remand, it is only necessary that they state one viable claim under Florida law against Bedell. Estate of Ayres v. Beaver, 48 F. Supp. 2d 1335, 1342 (M.D. Fla. 1999).

Plaintiffs' negligence claim against Bedell includes the following allegations: (1) that Bedell was a sales representative, detail person, or sales manager employed by Merck to promote, sell, distribute and encourage physicians, including Plaintiff's physician, to prescribe Vioxx;(2) that Bedell had a continuing duty to warn Plaintiff and/or Plaintiff's physician in a timely manner about the potential risks and complications associated with Vioxx; (3) that Bedell knew or should have known that Vioxx caused unreasonably dangerous risks and side effects; (4) that Bedell failed to adequately and appropriately warn prescribing physicians of the significant risks of cardiovascular events associated with the use of Vioxx; (5) that Plaintiff suffered a heart attack in December of 2003; and (6) that such heart attack was the direct and legal result of the negligence of Bedell. See Pl. Compl. at 2-12.[3]

---

[2] Under Florida law, a pharmaceutical sales representative can be held liable for damages resulting from a patient's use of a drug. See Albertson v. Richardson-Merrell, Inc., 441 So. 2d 1146 (Fla. Dist. Ct. App. 1983)(holding that drug manufacturer and individual who promoted drug to medical profession could be held liable for damages resulting from patient's use of drug).

[3] Plaintiffs' complaint contains several additional allegations regarding claims for negligent misrepresentation and fraud. However, because the complaint contains sufficient allegations to support their negligence claim against Bedell, the Court need not address the sufficiency of the additional claims.

4

In light of these allegations, Plaintiffs have stated an arguable claim for negligence under Florida law against Bedell. As a result, Merck has failed to meet its burden of proving that the joinder of Bedell was fraudulent. Therefore, because Bedell and Plaintiffs are Florida residents, there is not complete diversity and this Court lacks jurisdiction to hear this case.

## IV.    CONCLUSION

Based on the foregoing it is ORDERED AND ADJUDGED as follows:

1) Merck's Motion to Stay (DE #9) is **DENIED**;

2) Plaintiffs' Motion to Remand (DE #4) is **GRANTED**, based on lack of subject matter jurisdiction;

3) This case is remanded to the Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County, Florida;

4) In light of Merck's prior notice that Plaintiffs' claim against a pharmaceutical representative was viable under Florida law, Plaintiffs may, pursuant to 28 U.S.C. § 1447(c), move this Court for costs and expenses incurred as a result of Merck's removal;

5) This case is CLOSED.

DONE AND ORDERED in Chambers at Miami, Florida, this /8th day of February, 2005.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record

5





"I am concerned with the potential edema that occurs with Vioxx."

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115297





"I am concerned with dose-related increases in hypertension with Vioxx."

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115298





"Can Vioxx be used in patients
using low dose aspirin?"

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115299



# Dodge Ball

# VIOXX ®
## (rofecoxib)



**OBSTACLE 1**

"I am concerned about the cardiovascular effects of Vioxx?"

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115300





"The competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than Celebrex."

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115301





"There is no difference between
Vioxx and Celebrex, why
should I use Vioxx?"

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115302





"Vioxx cannot be used for longer
than five days when treating
patients for acute pain?"

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115303





"I use Celebrex. I'm concerned about the safety profile with Vioxx?"

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115304





"I understand the new COXIB,
Mobic, was just approved."

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115305





"Searle/Pfizer just presented me with data
which showed Celebrex 800 mg daily did not
exhibit dose dependent increases in side
effects compared to the OA and RA doses, and
that Vioxx exhibited dose dependent increases
in side effects with the 50 mg dose."

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115306





"The new narcotic data looks great, now I'll use Vioxx for all my acute pain patients."

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115307



# VIOXX ®
## (rofecoxib)



"I can't use Vioxx because the HMO's require the patients to be on generic NSAIDS first."

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115308



# VIOXX®
## (rofecoxib)



# DODGE!

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115309



# VIOXX® 
## (rofecoxib)



# DODGE!

Confidential—Disclosure to
Unauthorized Persons forbidden
by Order of the United States District
Court of Southern District of Illinois

LEH 0115310

# OBSTACLE RESPONSE GUIDE VIOXX®



CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La )



EXHIBIT

" B "

MRK-ABR B 0002256

## INFLAMMATORY MANAGEMENT BULLETIN
## OBSTACLE RESPONSE GUIDE

**TO:**
Field Sales Team for VIOXX®

**PURPOSE:**
To provide you with the initial Obstacle Response Guide. Over time we will be providing you updates and modifications to this resource.

**CONTENT:**
You are all aware of the process identified for resolving obstacles:
- Pause
- Clarify the Question
- Verify your Understanding of the Issue
- Resolve & Return to the Core Messages

Let's take just a moment to focus on the clarification of the issue. As we launch VIOXX®, we have entered into a very competitive marketplace. Our competition has been aggressively "pre-positioning" our product. This is likely to generate obstacles or issues that need to be resolved before some customers are comfortable prescribing the product for appropriate patients. It will be critical that we clarify the issue prior to attempting to resolve. Many times, the customer may be vague in their statement, such as "I understand VIOXX® has some safety concerns at higher doses." Statements like this could apply to three different issues, methotrexate, warfarin or edema. Unless you clarify, you might respond regarding edema when the physicians concern was warfarin. This approach would actually result in you creating an additional obstacle for yourself.

Some customers may be hesitant to state their true concerns and will use obstacles as a "smokescreen". They hope to distract or redirect you in an attempt to end a product discussion. Again, clarification will be critical. One honest obstacle effectively handled is a tremendous opportunity. Obstacles should be viewed as selling opportunities. Essentially the customer is saying, "I would prescribe if only I knew...." and when you resolve this question, you have earned the right to ask for appropriate patients.

A few final quotes regarding obstacles and the obstacle handling step in selling:

"Obstacles are those frightful things you see when you take your eyes off your goals" – *Unknown*

"The difference between the right words and the almost right words, is the difference between a lightening bolt and a lightening bug." – *Mark Twain*

"Wise people take the complicated and make it simple and understandable." – *Einstein*

"No problem can stand the assault of sustained thinking." – *Voltaire*

"Chance favors the prepared mind." – *Louis Pasteur*

Remember the final step in effective obstacle resolution is to return to the core selling messages of the product. As you review this Obstacle Response Guide, take time to practice both resolving the issue, transition back to your messages and closing the call.

**ACTION REQUIRED:**
We will be counting on you for two important steps in this process:
1. Identify the issues you are encountering on territory that require a response
2. Effectively implement the responses to resolve the concerns expressed by your customers.

Good Luck and GOOD SELLING!

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D La.)

MRK-ABR B 0002257

Obstacles / Responses

CONFIDENTIAL—SUBJECT-TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002258

> **1. "There is no difference between VIOXX® and Celebrex.  Why should I use VIOXX®?"**

**Clarify:**  Doctor, while they both work by inhibiting COX-2, I would like to point out some key clinical areas of distinction that may be important to you and your patients.

<u>INDICATIONS</u>
Once daily VIOXX® is indicated for the relief of the signs and symptoms of OA, management of acute pain in adults and treatment of primary dysmenorrhea, representing all of the indications that were submitted to the FDA for approval of VIOXX®.

Celecoxib is indicated for the signs and symptoms of OA and RA.

**Reference:**
A&A Training Program ⇒ Module 5 (NSAIDs)
VIOXX® PI ⇒ Indications and Usage (V22)
Celecoxib PI ⇒ Indications and Usage (C23)

<u>CONTRAINDICATIONS</u>
Both VIOXX® and celecoxib are contraindicated in patients who are allergic to them, aspirin or other NSAIDs.  Once daily VIOXX® is not contraindicated in patients with sulfonamide allergies, commonly known as sulfa allergies.

In contrast, celecoxib <u>is</u> contraindicated in patients with allergic-type reactions to sulfonamides.  This contraindication is unique to celecoxib, due to its molecular structure, and is <u>not a class effect</u>.  Sulfonamide allergies are common drug allergies in the US population and allergic reactions can range from mild to more serious.

Once daily VIOXX® offers simplicity - simplified prescribing without having to worry about a sulfonamide allergy contraindication.

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

1

MRK-ABR B 0002259

Reference:
VIOXX® PI ⇒ Contraindication (V23)
Celecoxib PI ⇒ Contraindication (C24)

## DOSING

Doctor, VIOXX® offers dosing simplicity of once daily dosing for <u>all</u> indications – the relief of the signs and symptoms of OA, management of acute pain in adults, and the treatment of primary dysmenorrhea. With celecoxib, each time you see an OA patient you must decide whether to prescribe it once a day or twice a day. VIOXX® also offers the option to increase the dose to 25 mg once daily for OA patients who need additional relief. Celecoxib has one dose – 200 mg, and its label states that no additional efficacy is seen with 200 mg BID.

Reference:
VIOXX® PI ⇒ Dosage and Administration ⇒ Osteoarthritis (V65) and Management of Acute Pain and Treatment of Primary Dysmenorrhea (V66)
Celecoxib PI ⇒ Dosage and Administration ⇒ Osteoarthritis (C54)

## METABOLISM

Once daily VIOXX® is metabolized primarily through cytosolic enzymes in the liver. Unlike once daily VIOXX®, celecoxib <u>is</u> metabolized through the cytochrome P450 system.

(Remember to provide appropriate balancing information on use in hepatic insufficiency and hepatic effects.)

Reference:
VIOXX® PI ⇒ Clinical Pharmacology ⇒ Pharmacokinetics ⇒ Metabolism (V7)

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002260

## COMPREHENSIVE CLINICAL STUDIES

Once daily VIOXX® has been comprehensively studied. In OA patients, once daily VIOXX® was compared to diclofenac in two 1-year studies. The endoscopy studies were six-month studies. We have data on serious upper GI events out to one year. This was the most comprehensive clinical program ever run by Merck. Let me share some of the data with you...

Transition to strength, safety and simplicity messages.

**Reference:**
VIOXX® PI ⇒ Clinical Studies ⇒ OA (V16)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

3

MRK-ABR B 0002261

> **2. "I can't use VIOXX® with patients being treated with methotrexate."**

Doctor, once daily VIOXX® is <u>not</u> contraindicated in patients receiving methotrexate. No dosage adjustments of once daily VIOXX® and no change in the standard monitoring for methotrexate are required for patients taking methotrexate with once daily VIOXX®.

If probed further:
Doctor, according to the product circular for once daily VIOXX®, at doses of 75 mg (which is 3 to 6 times the OA therapeutic dose), once daily VIOXX® increased plasma concentrations of methotrexate by 23%. At 24 hours post dose or at the trough period, a similar proportion of patients receiving VIOXX® or placebo had methotrexate plasma concentrations below the measurable limit. According to the methotrexate label, methotrexate-toxicity is believed to be more dependent on time of exposure rather than peak levels. Again doctor, no dosage adjustments of once daily VIOXX® and no change in the standard monitoring for methotrexate are required for patients taking methotrexate with once daily VIOXX®.

Transition to strength, safety and simplicity messages.

Reference:
VIOXX® PI ⇒ Precautions ⇒ Drug Interactions ⇒ Methotrexate (V47)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002262

### 3. "Is VIOXX® contraindicated in patients being treated with warfarin?"

No.  Once daily VIOXX® is <u>not</u> contraindicated in patients taking warfarin <u>and no</u> change in standard monitoring is required. According to the package insert, when therapy with once daily VIOXX® is initiated or changed, patients should be monitored for INR* values.  Doctor, the recommendation for once daily VIOXX® is the same recommendation for warfarin when <u>any</u> new therapy is initiated.

Transition to strength, safety and simplicity messages.

If further probed, refer to the PI:
In a 21-day multiple-dose study in healthy individuals stabilized on warfarin (2 to 8.5 mg daily), administration of VIOXX® 25 mg QD was associated with mean increases in INR* of approximately 8% (range of INR on warfarin alone, 1.1 to 2.2; range of INR on warfarin plus VIOXX®, 1.2 to 2.4). Somewhat greater mean increases in INR of ~11% (range of maximum INR on warfarin alone, 1.5 to 2.7; range of maximum INR on warfarin plus VIOXX®, 1.6 to 4.4) were also seen in a single dose PK screening study using a 30-mg dose of warfarin and 50 mg of VIOXX®.  Standard monitoring of INR values should be conducted when therapy with VIOXX® is initiated or changed, particularly in the first few days, in patients receiving warfarin or similar agents.

(Submit a PIR if appropriate.)

Transition to strength, safety and simplicity messages.

Reference:
VIOXX® PI ⇒ Precautions ⇒ Drug Interactions ⇒ Warfarin (V51)

*INR – International Normalized Ratios.  This is a standardized way of measuring the degree of anti-coagulation produced by warfarin.

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002263

**4. "I'm concerned about the potential edema that occurs with VIOXX®."**

Clarify:
What are your specific concerns regarding edema?

**If the physician's concern is the overall incidence of edema with once daily VIOXX®, then respond:**

Doctor, edema is reported with all NSAIDs and is thought to result from cyclooxygenase inhibition in the kidney. Clinical trials with once daily VIOXX® 12.5 and 25 mg have shown renal effects such as edema similar to those observed with comparator NSAIDs. In these studies, the incidence rates for lower extremity edema were as follows: (In the AE table, point to row on edema under Body As A Whole)

VIOXX® 12.5 mg or 25 mg once daily – 3.7%
Ibuprofen 2400 mg – 3.8%
Diclofenac 150 mg –3.4%
Placebo – 1.1%

In clinical trials, the effects of edema were mild and there were no discontinuations due to edema.

**If the physician's concern is the dose related increase of edema with once daily VIOXX® 50 mg, then respond:**

Doctor, let me explain where the use of 50 mg is recommended. 50 mg is recommended for use in acute pain in adults. It has been studied for up to 5 days. In these studies, the renal effects of once daily VIOXX®– such as edema – were generally similar to comparator NSAIDs.

The 50 mg dose is not recommended for OA. However, in clinical trials with once daily VIOXX® 50 mg up to 6 months, there was a higher incidence of lower extremity edema.

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al
(02-0196 W.D. La.)

6

MRK-ABR B 0002264

Finally, let me point out that edema is reported with all NSAIDs and is thought to result from cyclooxygenase inhibition (COX-2) in the kidney.

Transition to strength, safety and simplicity messages.

**Reference:**
VIOXX® PI ⇒ Adverse Reactions ⇒ OA ⇒ Table and second paragraph (V59)
VIOXX® PI ⇒ Precautions ⇒ Fluid Retention and Edema (V35)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

**5. "It is my understanding that VIOXX® was denied an indication for RA by the FDA."**

**Clarify:** Doctor, what is your true concern?

**If physician mentions denial of an RA indication, respond:**
Doctor, Merck was not denied any indications. Once daily VIOXX® is indicated for relief of the signs and symptoms of OA, management of acute pain in adults, and for the treatment of primary dysmenorrhea. These represent all of the indications that Merck submitted to the FDA for the approval of once daily VIOXX®.

*If appropriate, state:* Last month when I was in, you stated that the majority of your arthritis patients suffer from OA. I would like for us to discuss how once daily VIOXX® could benefit these patients.

Transition to strength, safety and simplicity messages.

(After close: If you need information on the use of VIOXX® in RA, I can submit a PIR.)

**If the physician is concerned about the anti-inflammatory effect, see obstacle #6.**

Reference:
VIOXX® PI ⇒ Indications and Usage (V22)
VIOXX® PI ⇒ Clinical Pharmacology ⇒ Mechanism of Action (V3)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

8

MRK-ABR B 0002166

## 6. "VIOXX® is not an anti-inflammatory drug."

Doctor, the Mechanism of Action section of the package insert for once daily VIOXX® clearly states: "VIOXX® is a nonsteroidal anti-inflammatory drug that exhibits anti-inflammatory, analgesic, and anti-pyretic activities in animal models." Once daily VIOXX® 12.5 and 25 mg reduced the signs and symptoms of OA as effectively as 2400 mg of ibuprofen. Also, once daily VIOXX® produced significant reductions in joint stiffness upon first awakening in the morning. Doctor, as you know, morning stiffness is one indicator of inflammation.

In addition, let me point out that in the label it also states "because of the anti-inflammatory effects of VIOXX®, the pharmacological activity of VIOXX® in reducing inflammation, and possibly fever, may diminish the utility of these diagnostic signs in detecting infectious complications of presumed noninfectious, painful conditions."

Doctor, would you agree that once daily VIOXX® has anti-inflammatory effects?

Transition to strength, safety and simplicity messages.

**Reference:**
VIOXX® PI ⇒ Clinical Pharmacology ⇒ Mechanism of Action (V3)
VIOXX® PI ⇒ Clinical Studies ⇒ OA (V16)
VIOXX® PI ⇒ Precautions ⇒ General (V31)

CONFIDENTIAL—SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002267

## 7. "Can VIOXX® be used in patients using low dose aspirin?"

Let me share with you the experience we have on the concomitant use of once daily VIOXX® and low-dose aspirin. At steady state, once daily VIOXX® 50 mg had no effect on the anti-platelet activity of low-dose (81 mg once daily) aspirin.

I should also remind you that once daily VIOXX® is not a substitute for aspirin for cardiovascular prophylaxis and that concomitant administration of low-dose aspirin with once daily VIOXX® may result in an increased risk of GI ulceration or other complications compared with use of once daily VIOXX® alone.

Transition to strength, safety and simplicity messages.

**Reference:**
VIOXX® PI ⇒ Precautions ⇒ Drug Interactions ⇒ Aspirin (V41)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002268

> **8.** "I understand that VIOXX® has sulfur as part of its chemical structure. Is it contraindicated for patients with "sulfa allergies?"

No. Doctor, let me show you the contraindications section of the label. Once daily VIOXX® is not contraindicated for patients with known sulfonamide allergies, commonly known as "sulfa allergies."

Unlike once daily VIOXX®, celecoxib is contraindicated in patients with sulfonamide allergies. Celecoxib contains a sulfonamide group $(S-NH_2)$, which is associated with sulfa allergies. This contraindication is based on the specific chemical structure of celecoxib and is not a class effect. Sulfonamide allergies are common drug allergies in the US population and allergic reactions can range from mild to more serious.

Once daily VIOXX® offers simplicity, with no sulfonamide allergy contraindication.

~~Transition to strength, safety and simplicity messages.~~

**Reference:**
VIOXX® PI ⇒ Contraindications (V23)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002269

## 9. "Why wasn't VIOXX® 50 mg studied for longer than five days in acute pain?"

To obtain an indication for the management of acute pain in adults, all analgesic drugs are studied in short-term standard pain models as defined by the FDA. The maximum time for these studies for once daily VIOXX® was 5 days. However, let me point out that while it is not a recommended dose for OA, once daily VIOXX® 50 mg was studied out to 6 months. In these studies, the general safety profile of once daily VIOXX® 50 mg was similar to the recommended doses, except for a higher incidence of GI symptoms, lower extremity edema, and hypertension. Also, let me point out that once daily VIOXX® is indicated for the treatment of acute pain. The studies that support this acute pain indication lasted up to 5 days. But as I mentioned, while it is not a recommended OA dose, once daily VIOXX® 50 mg was studied for up to 6 months in OA patients – so the profile is well defined in the circular.

If further probed: "But, I'm worried about GI safety long-term." Doctor, in two identical studies of OA patients receiving once daily VIOXX® 25 or 50 mg for up to 24 weeks, once daily VIOXX® demonstrated significantly fewer endoscopic ulcers than ibuprofen.

Once daily VIOXX® also has GI event data from clinical trials up to one year. Among 3,357 patients who were treated with once daily VIOXX® 12.5, 25, and 50 mg in controlled clinical trials of 6-weeks to 1 year, a total number of four patients experienced a serious upper GI event. Two patients experienced an upper GI bleed within 3 months (0.06%); one experienced an obstruction within 6 months; and one experienced an upper GI bleed within 12 months, for a total incidence of 0.12% over 1 year.

Transition to strength, safety and simplicity messages.

Reference:
VIOXX® PI ⇒ Clinical Studies ⇒ Analgesic Studies (V17)
VIOXX® PI ⇒ Clinical Studies ⇒ OA (V16)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002270

## 10. "Why didn't you compare VIOXX® to higher doses of ibuprofen or naproxen sodium for the management of pain?"

To obtain an indication for the management of acute pain in adults, a drug must be studied in standard pain models as defined by the FDA. As it states in the ibuprofen PI, in clinical studies using doses of ibuprofen greater than 400mg are no more effective than the 400mg dose in analgesia. Also, the maximum recommended dose of naproxen for analgesia is 550 mg.

In acute analgesic models of post-orthopedic surgical pain, post-operative dental pain and primary dysmenorrhea, once daily VIOXX® relieved pain that was rated by patients as moderate to severe. In post-surgical dental pain studies, the onset of action with a single 50mg dose of once daily VIOXX® occurred within 45 minutes.

Transition to strength, safety and simplicity messages.

### Reference:
VIOXX® PI ⇒ Clinical Studies ⇒ Analgesia (V17)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

13

MRK-ABR B 0002271

## 11. "When do I prescribe VIOXX® 12.5 mg, 25 mg, or 50 mg once daily?"

Whether you're treating OA or acute pain, once daily VIOXX® is <u>always</u> a simple once daily dose.

### 12.5 mg or 25 mg once daily for OA

Once daily VIOXX® 12.5mg is the starting dose for OA. If a patient requires greater pain relief, you have the flexibility to increase the dose to 25mg once daily at no additional cost to the patient.

### 50 mg once daily for Acute Pain and Primary Dysmenorrhea

In patients with moderate to severe acute pain, the dose is 50mg once daily. Once daily VIOXX® relieved moderate to severe pain following orthopedic surgery, dental surgery and primary dysmenorrhea.

In addition to the simplicity of once daily dosing, once daily VIOXX® also adds the flexibility of oral suspension for both strengths.

Transition to strength, safety and simplicity messages:

Reference:
VIOXX® PI ⇒ Dosage and Administration (V65-V67)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002272

## 12. "Can I use VIOXX® in patients with renal impairment?"

No dosage adjustment is recommended for patients with mild to moderate renal impairment. Use of once daily VIOXX® in patients with advanced renal disease is not recommended because no safety information is available regarding the use of once daily VIOXX® in these patients.

Transition to strength, safety and simplicity messages.

Reference:
VIOXX® PI ⇒ Precautions ⇒ Renal Effects (V33)
VIOXX® PI ⇒ Precautions ⇒ Fluid Retention and Edema (V35)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

15

MRK-ABR B 0002273

## 13. "Why doesn't VIOXX® have a 50 mg tablet?"

Once daily VIOXX® is not offered in a single 50 mg tablet and a dosage of 50mg can be easily achieved by taking two 25 mg tablets.

Transition to strength, safety and simplicity messages.

Reference:
VIOXX® PI ⇒ Dosage and Administration (V66)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

16

MRK-ABR B 0002274

**14. "How does your price compare to Celebrex and other branded NSAIDs?"**

Doctor, the catalog price for once daily VIOXX® is $2.02 for both 12.5 mg and 25 mg, offering your patients one of the best values available.

The catalog price for celecoxib is $2.38 for 100mg bid and $2.02 for 200 mg qd.

In addition, the catalog price for the oral suspension of once daily VIOXX® is competitive with other NSAIDs at $3.00.

This price comparison does not establish that products have comparable efficacy. These prices reflect direct cost and do not reflect actual costs paid by consumers.

Transition to strength, safety and simplicity messages.

---

(For your reference, the average wholesale price (AWP) for once daily VIOXX® is $2.42 for both 12.5 mg and 25 mg. AWP for celecoxib is $2.86 for 100 mg BID and $2.42 for 200 mg qd. AWP for the oral suspension of once daily VIOXX® is competitive with other NSAIDs at $3.60.)

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002275

### 15. "Isn't a 17-hour half-life inconsistent with once daily dosing?"

The 17 hour half-life of once daily VIOXX® is entirely consistent with its once daily dosing. In all OA studies, lasting from 6 to 86 weeks with 3900 patients, once daily treatment with VIOXX® 12.5 and 25 mg in the morning was associated with a significant reduction in joint stiffness upon first awakening in the morning. At doses of 12.5 and 25 mg once daily, the effectiveness of once daily VIOXX® was shown to be comparable to ibuprofen 800mg TID and diclofenac 50 mg TID.

If probed further on half life:
Doctor, many drugs with half-lives shorter than 24 hour are effective when dosed once a day, for example Singulair, Prinivil, and Zocor.

Transition to strength, safety and simplicity messages.

**Reference:**
VIOXX® PI ⇒ Clinical Pharmacology ⇒ Excretion (V8)
VIOXX® PI ⇒ Clinical Studies ⇒ OA (V16)
SINGULAIR® PI ⇒ Clinical Pharmacology ⇒ Excretion
PRINIVIL® PI ⇒ Clinical Pharmacology ⇒ Excretion
ZOCOR® PI ⇒ Clinical Pharmacology ⇒ Excretion

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER IN
ABRUSLEY V. MERCK, et al.
(02-0196 W.D. La.)

MRK-ABR B 0002276

FILED
2006 Nov 29 PM 02:22
U.S. DISTRICT COURT
N.D. OF ALABAMA



Professional Presence

Gaining access and building relationships with the gatekeeper and customers are key to providing you the opportunity to influence your customers behaviors. "We've talked about the universals you can apply as you build relationships with your customer (block party) and how the gatekeepers perceptions could make break your access to physician (gatekeeper video). How you present yourself professionally can make a difference on how successful you are in building relationships, gaining access and selling. Let's take a look at the basics of professional presence.

1

Confidential - Subject To Protective Order

MRK-H.5STM000331



Before we get into the basic behaviors of professional presence. We have a lot of sales/professional experience in the room. Let share...

Q: "What does Professional Presence look like to you?"

2

Confidential - Subject To Protective Order

**Merck Professionalism**

**Appearance**
- Business Attire
- Name Badge

**Be Prepared/Organized**
- Samples
- Sales Aids

**Common Courtesy**
- Aware of your surroundings
- Respectful of customers' time and needs

*USHH Professional Development System*
*The Track to the Top*

2. Appearance - refer back to Expectations presentation day 1. Your appearance should always be well groomed with appropriate attire. Always wear your name tag. Look prepared/organized with sales aids and samples.

3. Common Courtesy - You should always be aware of your surroundings. Be respectful of paying customers; time constrains of your gatekeeper; needs of the entire staff and logistics. Position yourself in the office so you're in "eyesight" of the gatekeeper (look interested and ready to respond)

ǷDiscuss Best Practices on how you can use "waiting" time in physician's office.

ǷDiscuss Tips on when/how to re-approach gatekeeper when you've been waiting to see the physician.

3

Confidential - Subject To Protective Order

MRK-H.5STM000333

## Merck Professionalism cont'd

Nonverbal cues
- Smile
- Eye contact
- Look interested
- Posture

Remember, when the customer sees you, s/he
sees MERCK

*USHH* Professional
Development System
The Track to the Top

4. Nonverbal cues - are just as important for professional presence. Make eye
     contact with the person your talking to; smile and look
     interested like you belong there to provide value added service

Ρ Remember, when the gatekeeper sees you... s/he sees Merck... One of the
best assets you have is what Merck stands for. A reputation forged by many
representatives before you, symbolizing the best!!!

4

Confidential - Subject To Protective Order

MRK-H.5STM000334



All successful sales representatives are well organized and well prepared. These skills translate in winning over our customers. After introducing yourself, ask for the office policy and procedures for seeing reps. Get all the necessary information and record it for future reference. Always get the name of the person you are speaking too. Find out any special needs for the office.

5

Confidential - Subject To Protective Order

MRK-H.5STM000335



Always follow the rules of the office. Remember to utilize the information gathered every time your in the office. Remember the goal is to differentiate you from your competitor by being seen as a partner/consultant to the office that provides value added service to the office.

6

Confidential – Subject To Protective Order

MRK-H.5STM000336



Let us take a look at Merck's standards when it comes to professional presence...

1. Introduction - always present your business card and state your name, the company and your product responsibilities. Remember the ABCs of Introductions and Salutations:

*A stands for Authority* - The old rule of age or gender no longer applies in the business setting. When introducing others, mention the name of the person of greatest authority first. Otherwise, introduce a customer first.

Persons of lesser authority are introduced to persons of greater authority.

> "Dr. Jones, I would like to introduce you to Bob Wagner, my Business Manager."

*B stands for Basic* - Say each person's name once.

*C stands for Clarify* - Give a bit of information about each person.

> "Dr. Brenner, I'd like you to meet Ms. Bernadatte Smith, who is this region's Senior Business Director for Merck."

The host should meet and greet the guests at business functions upon their arrival. If you are not introduced, do it yourself.

> "Hi. I'm Cynthia Phillips with Merck. Jim and I share this territory."

Another "rule" about introductions is that every one should stand when being introduced.

7

Confidential - Subject To Protective Order

MRK-H.5STM000337



8

MRK-H.5STM000338

Confidential - Subject To Protective Order



The Proper Shake...

Comes with Eye Contact
Is Firm but Painless
Lasts about 3 seconds
Starts and stops crisply
Does not continue through
the entire introduction

USHH Professional Development System
The Track to the Top

You Shake When:

⇒Someone offers his/her hand to you

⇒First meeting someone

⇒Greeting guests

⇒Greeting your host/hostess

⇒Renewing an acquaintance

⇒Saying good-bye

•Initiate the handshake if you are the highest ranking person of authority in the group. If not, wait for the highest ranking person of authority to extend his/her hand first.

•If the person in authority has not extended her/his hand, then extend your hand, while saying your name.

The Proper Shake:

⇒Proper positioning for the handshake is to extend your hand at a slight angle, touch thumb joint to thumb joint, and then wrap your fingers firmly, then gently pump your hand up and down two or three times, then let go.

⇒Comes with eye contact

⇒Is firm but painless

⇒Lasts about three seconds

⇒Starts and stops crisply

⇒Does not continue through the entire introduction

9

Confidential - Subject To Protective Order



Following are some general notes about business and dining etiquette. This guide and module is offered to Basic Training participants prior to attending an HEL lunch or dinner program during the Integrated Learning Week. This handout provides some basic guidelines about introductions and salutations, followed by information about meals and functions.

Why do we care about etiquette? Whether it is fair or not, one reason is that people will make character judgments about us based on how we handle social situations. This can be a crucial factor when superiors and customers make decisions about us.

In every human situation, there are correct actions, incorrect actions and appropriate actions. *Knowing* the rules is essential because it puts us in the position of knowing when it is appropriate to break or adapt our behaviors.

Manners vs. Etiquette:

Once, a foreign guest at a dinner given by a famous hostess drank the water from his finger bowl. The hostess immediately followed suit, and the other guests took their cue from her. Using the finger bowl as intended would have been proper etiquette, but it would not have been good manners.

Good manners are based on kindness & respect, which transcend etiquette.

10

Confidential - Subject To Protective Order

MRK-H.5STM000340



As the host of a business dining event, you should choose an appropriate restaurant at which to host your meal.

As the host and person inviting the guests, you do the paying. Plan to arrive about 15 minutes earlier than your invited guests and to avoid playing tug-of-war with the bill, have your credit card scanned before your guests arrive. This way there is no argument over the bill.

If possible, wait for your guest by the door. If you must take your seat, leave your napkin on the table, and don't eat or drink anything until your guest arrives. The napkin should be placed on the lap after everyone has been seated.

Stand up when your guest arrives, and remain standing until s/he is seated.

11

Confidential - Subject To Protective Order

MRK-H.5STM000341



When ordering food and drinks, follow these general guidelines:

Follow your guest's lead on ordering a drink. If your guest orders a drink, you should order a drink. It doesn't have to be an alcoholic drink, and no explanations are necessary. Decline a drink if your guest does.

If you are ordering wine and neither you nor your guest is familiar with which wine to choose, ask the wine steward or your server for their recommendation. Let them know ahead of time (before your guests arrive) what your price range is so they can help you make an appropriate selection. A general rule of thumb is that red wine accompanies "red" food (meat, tomato sauce, etc.) and white wine accompanies "white" food (chicken, fish, alfredo sauce, etc.)

Appetizers should be offered. To ensure your guest feels comfortable, you should order comparatively, i.e. don't order a cheeseburger if your guest orders lobster. And speaking of lobster, be careful of difficult-to-eat foods. Encourage your guest to have dessert if they like. If they do, you do. If they don't, you don't.

Be the one to order the extra rolls, missing fork, extra coffee, etc...

Order last and follow your guests' lead. Order the same progression of food, so the guest will not be eating alone.

12

Confidential - Subject To Protective Order

MRK-H.5STM000342



Here are some basics about the place setting. First look at the flatware. Start at the outside and move in. Knives & spoons are on the right. Forks & napkins are on the left. On the right, you will find your glassware. Bread & butter plates are on the left.

Two useful ways to remember which salad, roll, bread plates, etc. are yours is to remember SL-LR (Slur) or Solids Left/Liquids Right. Solids are placed on your left, and liquids on your right. Another way to remember where solids and liquids are placed on the table is to remember that fork has four letters, just like left, and spoon has five letters, just like right. You use a fork to eat solids and a spoon to move liquids (like soup) to your mouth.

Here are some more basics to remember about flatware:
* Once you have picked up a piece of flatware, it never touches the tabletop again.
* Do not tip silverware against your plate.
* Place flatware at "4 o'clock" when finished. Line up the spoon ("O"), fork ("W") and knife ("L") to spell out "OWL" on your plate. The spoon is closest to you; the knife the furthest.
* The coffee/tea spoon goes in the saucer beside the cup.
* Use the utensils from the outside first and move inward.
* The utensils at the top of your plate are for dessert.

13

Confidential - Subject To Protective Order                    MRK-H.5STM000343



Glassware is located at the tip of the knife. The water goblet is the largest stemmed piece of glassware on the table. It is located above the tip of the knife, slightly to the left of the wine glass.

Wine glasses should be held by the stem, not the bowl. White wine is served chilled and the bottle would be placed in an ice bucket next to the table. The heat from your hand would warm the glass of white wine, if you held it near the bowl. Since red wine is served at room temperature (the bottle would be placed on the table), it is acceptable to hold the red wine glass closer to the bowl.

The dinner plate is the largest plate and should be placed directly in front of you.

The salad plate is placed to the left of the dinner plate.

The small bread and butter plate is located above the forks.

14

Confidential - Subject To Protective Order

MRK-H.5STM000344



When eating soup, move the spoon away from yourself. It is acceptable to leave your spoon in a very shallow soup bowl (sometimes referred to as a soup plate). Deeper soup bowls should be served with a liner. You should place your spoon on the liner when finished eating your soup.

Whoever is seated closest to the bread or rolls should pick up the basket and pass it to the person on the right. Food is passed in a counterclockwise direction. Ideally you wait to serve yourself until the basket has made its way around the table. Butter is passed in the same direction.

Bread should be eaten one small bitesize piece at a time. Break off and butter bread one single piece at a time. Bread dipped in olive oil should also be broken off and eaten one single piece at a time.

Order entrees that can be eaten neatly. Consider lasagna or cannelloni instead of tough-to-swirl spaghetti or linguini.

Pass food in a counterclockwise direction. The salt and pepper shaker should be passed together. Remember to wait until everyone is served to begin eating, unless permission has been granted by the diner whose food service is delayed.

15

Confidential - Subject To Protective Order



Remember the following regarding table manners (if you try hard enough, you can almost hear it said in your mother's voice...):

☑ Sit up straight.

☑ Keep your elbows off the table.

☑ Don't hurry or dawdle.  Keep pace with others at the table.

☑ If you use the wrong piece of flatware, don't panic.  Continue using it.

☑ Don't talk with your mouth full.

16

Confidential - Subject To Protective Order



The following general tipping guidelines should be followed:

$ A typical tip for a server is 15-20%.
$ If a person other than your server took the order, add 5% more for that person
$ A wine steward should get 15% of the cost of the wine
$ Coatroom clerks should get $1 per coat
$ The garage attendant should get $1-$2

Settle the bill quietly with your company credit card. Excuse yourself to the hostess station to straighten out any conflict in the bill.

When you are ready to leave, simply stand up and say, "It was a pleasure having dinner with you. I'm looking forward to dining with you again."

Do not feel obligated to stay until all hours of the night. However if your guest leaves before you, you should escort your guest to the door.

17

Confidential - Subject To Protective Order

MRK-H.5STM000347



When you are conducting a dinner program, you need to "work the room". You should make sure you greet each guest upon their arrival, offer them a beverage and bring them into a group.

Decide with your clustermates in advance who will sit with which doctors and make sure you have one "host" at each table.  Seat the guest of honor at the right of the host or hostess.

You should also determine, in advance of the meeting, if there are any special diets (e.g. religious, vegetarian, diabetic, etc.) you need to accommodate.

If your speaker is presenting during dinner and will eat after he/she has finished speaking, have one person eat dinner or dessert with him/her.

18

Confidential - Subject To Protective Order

MRK-H.5STM000348

## Sources:

Baldrige, Letitia. New Complete Guide to Executive Manners. New York:Macmillan, 1993.

Bixler, Susan. Professional Presence. New York: Putnam Publishing, 1991.

Brody, Marjorie and Barbara Pachter. Minding Your Business Manners. Mission, Kansas: SkillPath Publications, 1996.

Mazzei, George. The New Office Etiquette. New York: Pocket Books, 1983.

Stewart, Marjabelle Young and Marian Faux. Executive Etiquette In The Workplace. New York: St. Martin's Press, 1994.

*Special thanks to Merck & Co., Inc. employees*
*Cynthia Ancona and Eileen Martin for their presentation notes*

USHH *Professional Development System*

*The Track to the Top*

19

Confidential - Subject To Protective Order

MRK-H.5STM000349

USHH
Professional
Development System
The Track to the Top

# General Guidelines
# for Business Dining Etiquette



Confidential - Subject To Protective Order

MRK-H.5STM000350

USHH
Professional
Development System
The Track to the Top

# General Guidelines
## for
# Business Dining Etiquette

Confidential - Subject To Protective Order

MRK-H.5STM000351



# Business Dining

USHH Professional Development System
The Track to the Top

·Confidential - Subject To Protective Order

MRK-H.5STM000352

# Ordering

Offer appetizers

Order comparatively

Be careful of difficult-to-eat foods

Encourage your guest to have dessert, if they like

**USHH** *Professional Development System*
*The Track to the Top*

Confidential - Subject To Protective Order

MRK-H.5STM000353



# The Place Setting

## Knives & spoons are on the right

## Forks & napkins are on the left

## Glassware is on the right

## Bread & butter plates are on the left



Confidential - Subject To Protective Order

MRK-H.5STM000354

# Glassware and Dinnerware

Water Goblet

Wine

Red

White

Dinner plate

Salad plate

Bread & butter plate



USHH Professional Development System
The Track to the Top

**MRK-H.5STM000355**

Confidential - Subject To Protective Order

# Eating

Soup – spoon away from yourself

Bread – one single piece at a time

Entrée – avoid messy foods

Passing – counterclockwise direction

Starting – wait until everyone is served

USHH Professional Development System
The Track to the Top



Confidential – Subject To Protective Order

MRK-H.5STM000356

USHH
Professional
Development System
The Track to the Top

# Remember....





Confidential - Subject To Protective Order

MRK-H.5STM000357

USHH Professional Development System
The Track to the Top

# Tips and Gratuities

Server

Wine Steward

Coatroom clerks

Garage attendant



Confidential - Subject To Protective Order

MRK-H.5STM000358

USHH Professional Development System
The Track to the Top

# Dinner Programs



Confidential - Subject To Protective Order

MRK-H.5STM000359

# Sources:

Baldrige, Letitia. New Complete Guide to Executive Manners. New York:Macmillan, 1993.

Bixler, Susan. Professional Presence. New York: Putnam Publishing, 1991.

Brody, Marjorie and Barbara Pachter. Minding Your Business Manners. Mission, Kansas: SkillPath Publications, 1996.

Mazzei, George. The New Office Etiquette. New York: Pocket Books, 1983.

Stewart, Marjabelle Young and Marian Faux. Executive Etiquette In The Workplace. New York: St. Martin's Press, 1994.

*Special thanks to Merck & Co., Inc. employees*
*Cynthia Ancona and Eileen Martin for their presentation notes*

USHH Professional
Development System
The Track to the Top

Confidential - Subject To Protective Order

FILED
2006 Nov-29  PM 02:28
U.S. DISTRICT COURT
N.D. OF ALABAMA



Selling Skills for Hospital Representatives & HIV Specialists

(FD 007)

Confidential - Subject To Protective Order

MRK-AAR0032036

Selling Skills Agenda

- 10:00-12:00
  - Introduction & Overview
  - Critical Components
  - Create the Need
  - Assess
  - Transition
- 12:00-1:00
  - Lunch
- 1:00-2:30
  - Compelling Message
- 2:30-3:00
  - Break

Confidential - Subject To Protective
Order

MRK-AAR0032037



Confidential - Subject To Protective Order

MRK-AAR0032038



Confidential – Subject To Protective
Order

MRK-AAR0032039



Confidential - Subject To Protective
Order

MRK-AAR0032040



Confidential - Subject To Protective Order

MRK-AAR0032041



Confidential - Subject To Protective Order

MRK-AAR0032042



*Identify the Need*

Is the process leading to an opening statement that captures the physician's attention by painting a word picture that describes a patient type that can benefit from the Merck product. It defines the incidence, severity, and seriousness of the problem.

Confidential - Subject To Protective Order



## "Need" Components

- An Opening Statement

  (describing the incidence, severity or seriousness of the problem).

- A Patient Profile

  (describing specific characteristics of a patient or population that may benefit from the Merck product).

Confidential - Subject To Protective Order

MRK-AAR0032044

# Activity #1 - Create the Need

- Divide up into groups of 3 and turn to page 3 in your workbook and review effective feedback.

- Complete page 4 in workbook. Develop openings that create a need and utilize a patient profile.

- Take 15 minutes to develop and practice role playing openings.

- Each group presents their opening to class.

Confidential - Subject To Protective Order

MRK-AAR0032045



Confidential - Subject To Protective
Order

MRK-AAR0032046



Confidential - Subject To Protective
Order

MRK-AAR0032047



Confidential - Subject To Protective Order

MRK-AAR0032048



Confidential – Subject To Protective
Order

MRK-AAR0032049



Confidential – Subject To Protective Order

MRK-AAR0032050



Confidential - Subject To Protective
Order

MRK-AAR0032051



Confidential – Subject To Protective Order

MRK-AAR0032052



Confidential - Subject To Protective Order

MRK-AAR0032053



Confidential - Subject To Protective
Order

MRK-AAR0032054



# Transition

Example of transition statement:

Doctor prescribes Lipitor: "Doctor, prescribing a statin to aggressively treat hyperlipidemia is in keeping with the NCEP guidelines..."

Confidential - Subject To Protective Order

MRK-AAR0032055

# Activity #2 - Need/Assess/Transition

- Divide up into new groups of 3 and turn to pages 5 & 6 in your workbook.

- Develop openings, strategic questions, & transition statements (make sure to determine *what & why*).

- Take 20 minutes to develop and practice role playing openings, strategic questions, & transition statements.

- Each group presents an example to the class.

Confidential - Subject To Protective Order

MRK-AAR0032056



Compelling Message

Confidential - Subject To Protective Order

MRK-AAR0032057

Activity #3 -
Key Marketing Messages

- Break out room into 3 groups.
- Turn to page 7 in workbook and take 10 minutes to fill out the key marketing messages for one of your products and flip chart your responses.
- Choose a person from your group to present flip chart to class.

Confidential - Subject To Protective Order

MRK-AAR0032058



Confidential - Subject To Protective Order



Obstacle Handling

Confidential - Subject To Protective Order



Confidential - Subject To Protective
Order

MRK-AAR0032061



Confidential – Subject To Protective
Order

MRK-AAR0032062



Confidential – Subject To Protective
Order

MRK-AAR0032063

# Activity #5 - Obstacle Handling

- Turn to page 13-14 and review vague statements.

- Pair-up and develop responses to vague statement(s) for your lead product on pages 15&16.

- Practice responding to obstacles by role playing utilizing vague statements.

Confidential - Subject To Protective Order



Confidential - Subject To Protective
Order

MRK-AAR0032065



Confidential - Subject To Protective
Order

MRK-AAR0032066



Confidential - Subject To Protective
Order

# Four Steps in a Final Close

- Summarize the point(s) you want the customer to remember.

- Check for agreement (i.e., Have you been using trial closes throughout the call?)

- Ask for a specific, realistic, measurable action.

- Follow-up to ensure action.

Confidential - Subject To Protective Order

MRK-AAR0032068



Confidential - Subject To Protective
Order

MRK-AAR0032069



Confidential - Subject To Protective
Order

MRK-AAR0032070

# Activity #6 - Full Call & Closing

- Breakout room into 2 groups.

- Turn to page 17-19 and develop full product discussions.

- Practice Role Playing with a focus on the close

  - Create the Need
  - Assess
  - Transition
  - Compelling Message
  - Obstacle Handling
  - CLOSE

Confidential - Subject To Protective Order

MRK-AAR0032071



Confidential - Subject To Protective
Order

MRK-AAR0032072

2006 May 29 PM 02:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Captivating the Customer

## Milestone 1 - Selling Skills

Confidential - Subject To Protective Order

MRK-H.2STM001595

# Impact of Communication

★ Words              7%

★ Tone of Voice   38%

★ Body Language  55%

Confidential - Subject To Protective Order

MRK-H.2STM001596

# Definition of "charisma"

An "exceptional" ability to secure other people's devotion or loyalty.

Webster's

Confidential - Subject To Protective Order



Comfort/Value Index

Confidential - Subject To Protective Order

MRK-H.2STM001598

# Driving Discussion Words

★ Quality of life plummets....

★ Unnecessary pain/cost/...

★ The shocking truth is....

★ The staggering statistic is....

★ The immense pain causes...

★ This is a critical time to .....

★ Survival is the foundation for cholesterol therapy

★ Early diagnosis and treatment is crucial to quality of life....

Confidential - Subject To Protective Order

MRK-H.2STM001599

# Driving Discussion Words

★ **Many** of the features you would expect...

★ **The respected** participant in scientific outcomes

★ **The solid experience offers...**

★ **The respected** leader in scientific outcomes...

★ **High performance**

★ **Has won the respect of...**

★ **Has played a major role in...**

Confidential - Subject To Protective Order

MRK-H.2STM001600

# Non-Verbal Techniques

★ Eyes

★ Head

★ Fingers/Hands

★ Legs

★ Overall Posture

★ Facial Expressions

★ Mirroring

Confidential - Subject To Protective Order

MRK-H.2STM001601

# 3-Step Process

1. Determine customer's BEST style picking up Cues and Clues

2. Align yourself with the customer's BEST style through verbal and vocal skills

3. Align yourself with the customer's BEST style through visual and non-verbal skills

Confidential - Subject To Protective Order

MRK-H.2STM001602

**MILESTONE 1 LEADER GUIDE**

# Captivating The Customer





MERCK

SALES TRAINING & PROFESSIONAL DEVELOPMENT

*Selling Skills*

Confidential - Subject To Protective Order

MRK-H.2STM001603

# CAPTIVATING THE CUSTOMER

## OVERVIEW

As a result of this program, participants will improve customer relationships by applying verbal and non-verbal engaging attributes to enhance overall effectiveness of sales discussions.

## OBJECTIVE

At the completion of this course participants will be able to:

- Recognize their individual engaging attributes which enhance their ability to gain access and improve overall customer communications to cultivate long-term, value-driven relationships
- Identify, build skills and self-assess via videotaping and role-plays the three components of communication which keep physicians engaged: verbal, vocal and visual skills
- Recognize and apply impactful Verbal skills, i.e., clearly stated targeted messages tied to specific needs; crisp, concise vocabulary; Driving Discussion words, etc.
- Recognize and delete verbal Weakeners from Verbal communications
- Recognize and cultivate expert vocal skills: voice tone, pitch, inflection, volume, clarity and tempo
- Recognize and develop expert non-verbal techniques: use of body language, specifically posture, eyes, hands, and arm movements
- Recognize verbal and non-verbal cues identifying physician's communication styles
- Lead a sales discussion applying assertiveness, persuasiveness, strategic questioning and engaging skills

## SPECIFICATIONS

✓ AUDIENCE: Office-Based Representatives
✓ PDS LEVEL: Milestone 1
✓ COMPETENCY: Selling Skills
✓ DELIVERY METHOD: Classroom
✓ CORE OR ELECTIVE: Elective
✓ PREWORK ASSOCIATED WITH THIS COURSE: N/A
✓ POINT DESIGNER(s)/Trainer(s): Sue Clark
✓ VENDOR: N/A
✓ PROPOSED AVAILABILITY DATE: August 2001

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-H.2STM001604

# CAPTIVATING THE CUSTOMER

✓ TOTAL TIME AND NUMBER OF LEARNING OBJECTS: 3.5 hours, 8 Objectives

✓ TRAINER QUALIFICATIONS DESIRED/REQUIRED (Background, experience, knowledge, skills, etc.):

✓ LEARNING LINKS: No Pre-requisites

✓ COURSE RATING: 2

| MATERIALS/ EQUIPMENT | | |
|---|---|---|
| ■ Overheads<br>■ Please refer to Appendix<br>■ Overhead Projector<br>■ Video Cameras (4-6)<br>■ Videotapes (1/participant)<br>■ TV/VCR's (4-6)<br>■ Masking Tape<br>■ Blank Flipcharts (3-4) | ■ Prepared Flip Charts<br>■ Please refer to Appendix<br>■ Markers<br>■ Index Cards<br>■ People Magazine (1 each partic.)<br>■ BEST Styles Poster<br>■ NBS Poster<br>■ Body Position Posters with Answer Key | ■ Participant Guides<br>■ Handouts (in Appendix)<br>  ■ Sales Discussion<br>    Checklist<br>  ■ Tone of Voice Script<br>■ Play Microphone |

## ROOM SET-UP REQUIREMENTS (IF APPLICABLE):

**Facilitator Tip:**   Be sure all cameras, tripods, TV's and VCR's are set up in advance and are fully function.

Prepare all fill-in flipcharts in advance.

Leader's Guide        Revised 6/01        Page 3

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-H.2STM001605

# CAPTIVATING THE CUSTOMER

## PROGRAM OUTLINE

| Segment Name /Timing | Point/Rationale | Summary | Materials/Resources |
|---|---|---|---|
| Introduction and Videotaping (30 minutes) | Introduces the concept of captivating the customer through a study on communication. Give participants an opportunity to videotape themselves presenting a sales discussion to use as a baseline to assess their own ability to engage a customer. | ▪ Icebreaker: Charismatic People<br>▪ Agenda<br>▪ Psych study on communication<br>▪ Pair videotaping of sales discussion<br>▪ Activity: Sales Discussion in Trios: Rep, Physician, Observer | Overheads<br>Video cameras (√)<br>Blank tapes (1 for each participant)<br>Participant Workbook<br>Sales Discussion Checklist |
| Engaging Attributes (15 minutes) | Introduces the concept of captivating a customer through the participants' own experiences with customer service. Examines "charisma" and allows participants to start evaluating their own engaging attributes. | ▪ Flips Positive and Negative Experiences<br>▪ WB: My Engaging Attributes<br>▪ Definition of Charisma<br>▪ Value/Comfort Index and Activity | Prepared Flips:<br> ▪ Negative Experiences<br> ▪ Positive Experiences<br>Participant Workbook<br>Overheads |
| V1: Verbal Qualities (30 minutes) | Identify and use impact words known as Driving Discussion words, recognize and delete verbal Weakeners through discussion and practice activities. | ▪ Discussion: Three Components (or 3V's) of Communication: Verbal, Vocal, Visual<br>▪ Driving Discussion Words<br>▪ Verbal Weakeners<br>▪ Activity: Fixing "Broken" Statements to make captivating<br>▪ WB: Sample Engaging Openings<br>▪ WB Activity: Develop Engaging Openings | Overheads<br>Participant Workbook<br>Prepared Flips:<br> ▪ "Broken"<br> ▪ Statements |
| V2: Vocal Qualities (30 minutes) | Through discussion and activities, participants will identify and use their vocal tone, pitch, and inflection that impacts engaging a customer. | ▪ 3V's<br>▪ FC: Voice Qualities<br>▪ Activity: 4 Scenarios using Vocal Qualities<br>▪ Activity: Deliver Engaging Openings | Overheads<br>Participant Workbook<br>Prepared Flips:<br> ▪ Voice Qualities<br> ▪ Scenario Debrief<br>Handout: Tone of Voice<br>Script |

For internal use only - Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-H.2STM001606

## CAPTIVATING THE CUSTOMER

| Segment Name/Timing | Point/Rationale | Summary | Materials/Resources |
|---|---|---|---|
| **V3: Visual Qualities (30 minutes)** | Participants will identify and discuss common body language signals that impact communication with their customer. | ▪ Non-verbal Techniques<br>▪ Body Positions<br>▪ Activity: Mirroring | Overheads<br>Participant Workbook<br>5 Body Position Posters |
| **Flexing to the Customer: BEST Styles Alignment (60 minutes)** | After a brief review of the BEST Styles, participants will discuss and use activities to build skills allowing them to pick up on cues from their customers that indicate the customer's BEST style. This allows the representative to adjust accordingly, therefore becoming more engaging to their customer. | ▪ Three Steps to Flexing<br>▪ BEST Styles Review<br>▪ Physician BEST Styles<br>▪ Engaging Our Physicians<br>▪ Activity: Needs Based Selling Discussion Guide<br>▪ Debrief Styles and Approach | Overheads<br>Participant Workbook<br>BEST Styles Poster<br>Prepared Flips:<br>▪ 4 Styles |
| **Videotape Review and Wrap-up (75 minutes)** | Review videotaped sales discussion from beginning of workshop; strategize how to captivate the customer based on what they learned today. Wrap up with debrief of top takeaways. Participants complete the Learning Check. | ▪ Review video tapes in small groups<br>▪ Debrief review of videotapes<br>▪ Develop personal strategy for becoming Captivating<br>▪ Debrief Top Takeaways<br>▪ Collect and destroy videotapes | TV/VCR's<br>Videotapes<br>Overheads<br>Participant Workbooks<br>Prepared Flips:<br>▪ Top Takeaways |
| **TOTAL TIME** | **4.5 hours** | | |

Confidential - Subject To Protective Order

MRK-H.2STM001607

# CAPTIVATING THE CUSTOMER

## Introduction and Videotaping

### Learning Objective:

*Identify, build skills, and self-assess via a videotaped and observed sales discussion role-play the three components of communication which keep physicians engaged; verbal, vocal and visual skills*

### Time: 30 minutes

| At A Glance - Material/Media | Instruction |
|---|---|
| **OH #1 – Captivating the Customer** | **Icebreaker/Opening Activity** |
| | ■ Handout People Magazines as participants enter the room |
| **People Magazine** | ■ **Refer to WB Page: Icebreaker Activity and Say:** Look through the magazine and find individuals you think are charismatic people. Use this page in your workbook to jot any notes down about what makes that person charismatic. Be specific. Are there any particular traits or qualities that add or detract from that person's charisma? |
| | **Note to Facilitator:** Browse through the People Magazine you've purchased for the workshop. Choose 6-10 individuals and write their names and charismatic characteristics in advance of the workshop. |
| | ■ Allow 5-10 minutes. |
| | ■ Spend 5 minutes debriefing the qualities, traits and characteristics of each individuals the participants found in the magazine. |
| **FC** | ■ Write common characteristics, qualities and traits for each individual on one FC: Common Characteristics of Charismatic Individuals |
| | Note to Facilitator: Hang the flipchart on the wall. |
| **FC** | ■ **Say:** Welcome to Captivating the Customer! Today we're going to discuss the key communication skills that are integral to successful sales discussions. Charisma is just one part of what makes a person engaging or captivating. We've just looked at well-known individuals and identified what makes them charismatic. We'll identify tools and techniques in this workshop that will allow us to develop our charisma; the ability to engage and captivate our customers. |
| | ■ **Say:** Let's review the Agenda for today's workshop. |
| | ■ Introductory and Videotape/Role-play Activities |

Confidential - Subject To Protective Order

MRK-H.2STM001608

# CAPTIVATING THE CUSTOMER

- Icebreaker/Opening Activity and Discussion
  - Charismatic People Mixer
  - Study on Communications
- Videotaping Activity
  - Groups of 2-3
  - Each practice a sales discussion
  - Peers evaluate
- Engaging Attributes
  - Examine own customer service experiences
  - Link to the NBS method
  - Examine concept of charisma
  - Your engaging attributes
  - Value/Comfort Index Tool
- The 3V's
  - V1: Verbals – the words we use, driving discussion words
  - V2: Vocals – the tone, pitch and pace of our voices
  - V3: Visuals – our body language and that of our customer's
- Flexing to the Customer
  - Putting it all together; the 3V's, our BEST Style, our customer's BEST Style to be as engaging as possible with our customers
- **Say:** Throughout each of these segments we will be doing a variety of activities connected to your experiences and best practices.

**OH # 2 – Impact of Communication**

**Say:** Albert Mehrabian, an expert in the communication field, researched an often-quoted statistic. He found when communications are received, the following weights are applied to the mediums (fill in percentages as you discuss each)

---

Leader's Guide                    Revised 6/01                    Page 7

Confidential - Subject To Protective Order

MRK-H.2STM001609

CAPTIVATING THE CUSTOMER

**Refer to OH: Impact of Communications**

- Communications: 7% to the words;

- 38% to the tone of voice;

- 55% to the body language

Note to Facilitator: Cover the percentages with an index card. Uncover us you talk through the slide.[Source: "Communication Without Words" In *Psychology Today* in 1968.]

Note to Facilitator: If you'd like more information on Albert Mehrabian and the studies he's conducted around communications, the following website contains a full bibliography of this work: http://www.kaaj.com/psych/home.html.

In addition, Albert Mehrabian wrote a book on the impact of communications titled ""Silent Messages"" – A Primer of Nonverbal Communication (Body Language) for the General Audience".

■ **Say:** Your physicians are getting only 7% from your words; 38% your tone of voice and 55% of the message when you're expressing yourself as you lead a sales discussion. In today's session we're going to focus on all 3 components that make up the skill of being engaging: the actual words you're utilizing during discussions, how you're expressing item in your tone of voice and how you appear visually as you converse with the physician. *Ask:* "What does it mean to engage or captivate?"

■ *Possible Responses: Catch a person's attention, charm someone, develop a rapport or conversation with a person*

■ **Ask:** By a show of hands, how many of you "use it", meaning know what strengths/attributes you

Confidential - Subject To Protective Order

MRK-H.2STM001610

## CAPTIVATING THE CUSTOMER

have and leverage them, put them out there?

- **Say:** To engage or captivate is classified as an Influence Skill.

- **Ask:** "Why do you think it's termed as an "Influence" Skill?"

- *Possible Responses: You influence the customer through your attributes, and they pay more attention to you*

- Engaging is a key "Influence" skill to use with customers, as are being assertive, persuasive, effective with questioning, and good listening.

  - **Ask:** What is the difference between being assertive vs. being aggressive?

  - **Possible response:** Aggressive is construed as a negative behavior while assertiveness is boldly going after something in a constructive manner.

  - **Ask:** What does being assertive mean? Why is this skill valuable to you as a representative?

  - **Possible response:** Asserting is being confidently aggressive; knowing your products and aggressively selling them to your physicians.

  - **Ask:** What does being persuasive mean and what is its value?

  - **Possible Responses:** Persuading is the ability to influence someone's decision by presenting sufficient knowledge and evidence to change behavior.

  - **Ask:** What are the characteristics of asking good questions? What is the value of good questioning skills?

  - **Possible Responses:** Good questioning is the ability to ask well thought out, open-ended, goal-oriented questions.

  - **Ask:** What are the characteristics of active listening? What is the value of the active listening skill?

  - **Possible Responses:** Active listening is the ability to become completely other-person centered in a discussion and demonstrating verbally and non-verbally your total involvement and understanding in what they're saying.

- **Say:** Without truly understanding a physician's concerns, how can you proactively adjust your approach to sell them your product? It is extremely important for access and success with customers to be sensitive to their needs and in tune to their styles of conversing and working.

- Explain the skill of engaging involves using your energy and unique attributes such as your verbal

Confidential - Subject To Protective Order

MRK-H.2STM001611

# CAPTIVATING THE CUSTOMER

|  |  |
|---|---|
|  | and non-verbal skills to inspire, interest and motivate your customers so to build and sustain some long-term and highly valued relationships. |
|  | ■ Instruct participants to get into groups of three. Each person should bring a sales aid to his or her group. |
|  | ■ Say: We'll start today's workshop by getting into groups of three to practice and videotape each of you doing a sales discussion and practicing the skill of engaging your customer. |
| Video cameras (4) |  |
|  | ■ Give each trio 3 blank videotapes and instruct them to write their names on the outside cover of the video. Video cameras should be set-up ahead of time on tripods in either corners of the large training room or (ideally) in breakout rooms. |
|  | ■ Explain how to use the video camera, i.e., eject and play buttons. |
| FC | ■ Refer to FC: Videotaping Instructions and review. |
|  | ■ Five minutes to prepare a sales discussion |
|  | ■ Use the sales aid you brought with you |
|  | ■ Three minutes to present it and be videotaped |
|  | ■ Observer starts and stops recording AND completes Checklist |
|  | ■ Remaining participant plays the part of the physician |
| • Sales Aid | |
| • Sales Discussion Checklist | |
|  | ■ Tell the participants they will each have an opportunity to act as a sales rep, a physician and an observer. Each should take five minutes to prepare a 3-minute sales discussion based on the sales aid they wish to use. Then each will take turns leading a sales discussion using their sales aid while the others in their group will act as a physician and an observer. The observer will have a checklist and will start and stop the recording. Each observer should give the checklist to the sales rep they observed when completed. |

Confidential - Subject To Protective Order

MRK-H.2STM001612

## CAPTIVATING THE CUSTOMER

- Handout the Checklists
- Review the Checklist with the participants.
- Instruct them that when they are the observer they should check off items the sales rep does during the sales discussion then give it to the person they observed.
- Ask: What questions do you have about the checklist or the videotaping activity?

- Instruct participants to take five minutes to prepare their sales discussion.
- Call time after five minutes
- Instruct participants to videotape the first sales discussion.

- Allow each participant to rotate roles so each has an opportunity to be videotaped. Allow ten minutes for each.
- Instruct participants to hold onto the checklist for reference later in the workshop.
- **Say:** Later in today's workshop, you will have the opportunity to review your videotape and your checklist filled out by the observer in your group. Right now, let's debrief your sales discussions for a few minutes.

**FC**

- Refer to FC: Ranking
- Ask: From a customer's perspective, on a scale of one to ten, how interesting do you think you were to listen to?
- Plot each participants' rankings on a the FC: Ranking
- Ask: How effectively did you use your verbals, such as power or driving discussion words?
- Ask: What weakeners did you use/hear?
- Ask: What about your non-verbals? Was your body language, hand gestures, facial expression engaging?
- **Say:** As you're aware, the need to be compelling and captivating to your customer is key to keeping him/her involved and interested. We can all be captivating in many different ways. Some by appearances, some by non-verbals, some by verbals. You may or may not think that you were engaging during your role-playing. The art or skill of being engaging comes naturally for some and takes some concentrated effort for others.

Confidential - Subject To Protective Order

**MRK-H.2STM001613**

CAPTIVATING THE CUSTOMER

**Transition:** Throughout this workshop, we're going to be looking at various tools and techniques to help us become more engaging. Let's look at some characteristics of being engaging in the next section; Engaging Attributes.

Leader's Guide                                  Revised 6/01                                  Page 12

Confidential – Subject To Protective Order

MRK-H.2STM001614

# CAPTIVATING THE CUSTOMER

## Engaging Attributes

**Learning Objective:**

■ *Recognize individual engaging attributes that enhance the ability to gain access and improve overall customer communications to cultivate long-term, value-driven relationships*

**Time: 30 minutes**

| At A Glance - Material/Media | Instruction |
|---|---|
| | ■ **Say:** Sometimes it's helpful to observe others' skills in captivating customers to improve our own. Let's examine how others have engaged us. |
| Participant Workbook | ■ Refer to Workbook page: Positive/Negative Experiences |
| | ■ **Ask:** Think back to a time when you were the customer. Think of a positive customer service experience you've had (in a store, restaurant, hotel, etc.) and the person responsible for this positive experience; what attributes do they possess that engage their buyers? Say: Write the attributes in your workbook. We'll share them in a few minutes. |
| | ■ Allow 1-2 minutes. |
| | ■ Call time after 1-2 minutes. |
| PC: Negative Experiences | ■ **Say:** Now think about a negative customer experience you've had. Write down the attributes the individual had that disengaged you. We will share them in a few minutes. |
| | ■ Allow 1-2 minutes. |
| | ■ Call time after 1-2 minutes. |
| FC: Positive Experiences | ■ Ask participants to share their negative customer service experience first and list on FC: Negative Experiences |
| | ■ **Ask:** Looking over the list, what other items might we need to add? |
| | ■ Ask participants to share their positive experiences and the engaging attributes of the salesperson and list on FC: Positive Experiences. |
| | ■ **Ask:** Looking over the list, what other items might we need to add? |
| Participant Workbook | ■ **Referring to Workbook page:** My Engaging Attributes, ask: If your physicians and office staff were polled and asked to compile a list of your engaging attributes, what would you think would be |

Confidential - Subject To Protective Order

MRK-H.2STM001615

## CAPTIVATING THE CUSTOMER

| | |
|---|---|
| | on the list? Have participants jot down their list. |
| | ■ Ask participants to share their lists with a partner. |
| | ■ Ask volunteers to share their attributes aloud from Workbook page: My Engaging Attributes and record on FC |
| **NBS Model Poster** | ■ **Referring to steps of the NBS process on the NBS Model Poster;** |
| | **Say:** Engaging occurs throughout the selling process. It's required for you to gain access and get in the door! Engaging involves knowing what attributes you possess and how to ratchet them up or down based on your customers. You need to be sensitive to, and recognize both verbal and non-verbal customer cues. |
| | **Ask:** What does "charisma" mean? |
| | *Possible responses: Charm, magnetism, personality, appeal, allure* |
| **OH #3 - Def. of charisma** | ■ **Refer to OH: Definition of Charisma:** "An "exceptional" ability to secure other people's devotion or loyalty." |
| | ■ **Say:** Possessing engaging attributes are similar to having Charisma. |
| | **Ask:** When you think of someone who has charisma or is charismatic, who comes to mind? |
| | *Possible Responses: Martin Luther King, Jr., John F. Kennedy, Bill Clinton* |
| | **Ask:** What attributes do they possess that make them charismatic? |
| | *Possible Responses: magnetism, charm, personality, appear larger than life* |
| | **Ask:** Do you see any similarities between our positive list on the flipchart and the attributes that make a person charismatic? What are the similarities? |
| | *Possible Responses: Yes (If not, relate to meaning of charisma)* |
| **OH #4 : Value/Comfort Index** | ■ **Refer to OH: Value/Comfort Index** |
| | **Say:** How attentively your physician listens to you depends on two important factors: the *value* s/he perceives you bring to the interaction - what you're saying and the *comfort* felt in the situation with you, the speaker. Most likely the value is much more important- we could stretch the comfort element to mean the situation at hand for the physician- time he can offer, issues in the office all can affect the comfort he has to sit and listen to a representative. |

Confidential - Subject To Protective Order

MRK-H.2STM001616

## CAPTIVATING THE CUSTOMER

- In situations of High Value and High Comfort, he'll find it easy to listen attentively.

- In situations of High Value and Low Comfort, the picture changes. He's still motivated to listen but has to expend more energy in order to do so.

- In situations of Low Value and High Comfort, his listening behavior is bound to drop off because his full attention is not fully on you.

- In situations of Low Value and Low Comfort, he's inclined not to listen at all.

■ Think about your physicians and the value and comfort levels you place on them. Those with whom you have strong rapport, smooth and comfortable conversations, as well informative, information exchanging discussion are probably falling within the High Comfort and High Value block. It's fair to say that any of your selling situations that are not High in Comfort and Value are at risk! Might your competitors be enjoying a high comfort and high value relationship with your customers?

■ Instruct participants to think about a recent sales discussion they had with a physician. Using the Value/Comfort Index, ask them to summarize the discussion and then rank it on the Index.

■ **Time for 3-5 minutes.**

■ **Call time.**

■ Ask participants to briefly share the summary of their discussion and how they ranked it on the Value/Comfort Index. Ask the participants why they ranked the discussion the way they did.

**Transition:** Today we're going to be focusing on learning to engage our physicians so we captivate their interest and listen to our messages during sales discussions. We will be talking about the three components of being engaging; verbal, vocal and visual qualities

Confidential - Subject To Protective Order

MRK-H.2STM001617

# CAPTIVATING THE CUSTOMER

## First V: Verbal Qualities

### Learning Objectives:

- Recognize and apply impactful Verbal skills, i.e., clearly stated targeted messages tied to specific needs; crisp, concise vocabulary; Driving Discussion words, etc.

- Recognize and delete verbal Weakeners from Verbal communications

### Time: 30 minutes

| At A Glance - Material/Media | Instruction |
|---|---|
| FC | ■ **Referring to FC: 3V's, explain:** The three components to effective communication can be categorized as the 3Vs. Each plays an integral role in how your communication and how your sales discussion is received by the physician. Each also, when utilized skillfully, engages your physician. |
| Participant Workbook | ■ **Referring to Workbook page: The 3 V's, review the Verbal, Vocal and Visual components of good communication: Verbal**- the words we utter; **Vocal**- how we utter the words; and **Visual**- what we look like when we're expressing ourselves. |
| | **Explain: The first V: Verbal:** These are the words and phrases you use when you communicate- the core messages for the product, compelling language, good vocabulary and grammar, clinical study information, competitive information, etc. |
| | ■ **Ask:** How does our effective use of verbal skills positively impact our relationships? |
| OH #5-6 : Driving Discussion Words | ■ **Referring to Overhead and Workbook pages: Driving Discussion (DD) Words and Weakeners,** Let's' review some words that enhance our verbal messages |
| | ■ Read aloud more Driving Discussion words and phrases |
| | ■ **Ask:** What words or phrases would you add to this list? Write participant responses on a flipchart. |
| | ■ **Say:** Discussion Driving Words add a lot of interest to your compelling message. They add the zest and punch to hook your physician and maintain his/her interest during the sales discussion. They also are effective throughout the discussion, especially the opening. |
| | ■ **Say:** Of course, there are also words that detract from our Verbals that we call Weakeners, such as ums, uhs, and 's, like, and repetitive fillers. |
| | ■ **Say:** Are you aware of how you use Driving Discussion words and Weakeners? Are you heavy on one side vs. the other? Let's do a quick test. Instruct participants to pair up and get back to back. |

Confidential - Subject To Protective Order

MRK-H.2STM001618

## CAPTIVATING THE CUSTOMER

- Direct them to take turns providing 1 minute compelling message to their partner. Instruct partners to keep count on the number of driving Discussion words they hear as well as Weakeners, tell their partners, then switch.
- **Allow 3 minutes.**
- Ask class by show of hands: How many had 5 or more Driving Discussion words? 7? 10? 12? Etc.
- Ask: How many had 10 or more Weakeners? 7? 5? 2c.
- **Say:** Awareness is the first step! Think about your Driving Discussion words and avoidance of weakeners prior to every call. Pick up the habit of starting off on the right foot with every call!
- Ask: How effective are our openings and compelling messages? Do they have "drive" and add some real "punch"? Or are they weak and flat?
- Ask: Why are Verbals so important as well as challenging for representatives?
- *Possible Responses: Difficulty in knowing what might interest/hook a physician intimidation, uncertainty if physician will listen to you, weak starts, hard to know how to connect to physician, etc.*
- **Explain:** One of your main goals on a call is to hook the physician right off the bat. With the great number of reps calling on doctors today, there is a real need for a rep to stand out from the pack. This is accomplished with a stimulating, compelling opening!
- Ask: How do you stand out with an opening?
- *Possible Responses: Preparation and practice! Using openings containing Driving Discussion words, being well prepared, and appearing confident and professional.*
- **Say:** Let's do a quick activity that you can use in the field when you prepare your compelling openings.
- **Instruct** participants to take out the sales aids they've been using during the workshop.
- **Explain** they will have 1-2 minutes to look through the sales aid and count the number of power or driving discussion words in the sales aid. Ask them to write the words down.
- **Allow 2 minutes.**
- **Call time.**
- Ask class: In the sales aid you chose, what power or driving discussion words did you find?
- Allow participants to share the words they found in the sales aids.

Confidential - Subject To Protective Order

MRK-H.2STM001619

# CAPTIVATING THE CUSTOMER

|  |  |
|---|---|
|  | ▪ Write words on flipchart. |
|  | ▪ **Say:** You can use your sales aids to help you develop your sales discussion. You can also use the list of driving discussion words in your workbook. |
| **FC: "Broken" Statements** | ▪ **Say:** Let's do one more activity. Now that you are aware of power words and weakeners, let's practice fixing "broken" opening statements. I will show a "broken" opening statement on the flipchart. Your task is to "fix" the statement and make it more compelling or captivating by using power words and getting rid of the weakeners. |
|  | **Note to Facilitator: "Broken" statements are contained in the Appendix.** |
| **Participant Workbook** | ▪ Divide the class into groups of 2-3 each. |
|  | ▪ **Refer** participant to **WB page: Fixing Broken Statements** |
|  | ▪ **Explain** that when the "broken" statement is shown, they may work in their teams to "fix" the statement by rewriting it using driving discussion words. They will have 1 minute, then the next statement will be shown. |
|  | ▪ **Review** the example "broken" statement and the "fixed" statement on the flipchart. |
|  | ▪ **Ask:** What questions do you have on the activity? |
|  | ▪ **Show** Flipchart pages one at a time until you've gone through all of them. |
|  | ▪ **Say:** Let's share some of our "fixed" statements. I'd like the presenter of the statement to read the "broken" statement and then read the fixed statement in a tone of voice appropriate to that message. We'll be talking about the importance of tone of voice in the next section. |
|  | ▪ Allow the groups to share some of their "fixed" statements and briefly debrief. |
| **Participant Workbook** | ▪ **Refer** participants to Workbook page: **Sample Engaging Openings and review** |
|  | ▪ **Ask** for volunteers to read the sample statements aloud so they can hear the impact or DD words. ) |
| **Participant Workbook** | ▪ **Refer** participants to **Workbook page: Developing Engaging Openings** and direct them to brainstorm as a group five engaging statements utilizing Driving Discussion words- their own and/or those in their Workbooks |
|  | ▪ **Say:** You may choose to use your sales aid for this activity. |

Confidential - Subject To Protective Order

MRK-H.2STM001620

## CAPTIVATING THE CUSTOMER

■ Ask volunteer quads to share their openings.

**Transition:** Just as important as verbal qualities, vocal tone and pitch have just as much impact on how engaging we are to our customer. What we sound like can dissuade or persuade our customer to prescribe Merck products.

Confidential - Subject To Protective Order

MRK-H.2STM001621

# CAPTIVATING THE CUSTOMER

## Second V: Vocal Qualities

*Learning Objective:*

Recognize and cultivate expert vocal skills: voice tone, pitch, inflection, volume, clarity and tempo

*Time: 30 minutes*

| At A Glance - Material/Media | Instruction |
|---|---|
| FC: 3 V's | ■ **Referring to FC: 3 V's, ask:** So you have the words down, but how are you *expressing* them? Did you ever hear yourself on tape and think you don't sound like yourself. This is because we have preconceived assumptions that may be way off. What do you sound like when you're talking? Professional? Enthusiastic? Interested? Confident? Are you presenting yourself *engagingly?* |
| | ■ **Ask:** Think about people you know and interact with regularly that have engaging or captivating voices. What is their secret? Why are their voices so effective? |
| | ■ **Share a personal example:** |
| Participant Workbook<br>FC: Vocal Qualities | ■ **Referring to Workbook page and FC: Vocal Qualities, Say:** The voice qualities for you to work on enhancing to engage your physicians are: |
| | ⇒ Volume: Are you so quiet and soft that people can't always hear you or so loud you're annoying? |
| | ⇒ Pitch: Do you speak high and squeaky or low and gruff-sounding? |
| | ⇒ Tone: Do you have a cold, flat or pleasant, warm tone of voice? |
| | ⇒ Inflection: Are you punching the right words for emphasis to keep the listener with you? |
| | ⇒ Clarity: Do you slur or mutter or enunciate your words and articulate? |
| | ⇒ Tempo: Do you talk nervously fast or boringly slow? |
| | ■ **Say:** Let's try an activity that will demonstrate these qualities. |
| | ■ Select two volunteers from the class, preferably one male and one female. The male will play Part A and the female will play Part B. |
| | ■ Instruct the participants to practice getting into character for each scenario listed on the script for a few minutes out in the hall. They should really play it up and get into using their voices to convey the scenario so the rest of the class can guess what is happening. |

Confidential - Subject To Protective Order

MRK-H.2STM001622

# CAPTIVATING THE CUSTOMER

Note to Facilitator: The script is located in the Appendix of this Leader's Guide.

■ While volunteers are in the hall preparing:
  ■ Explain to the participants that they are going to hear the same dialogue in 4 different scenarios to illustrate the power of vocal tone.

Say: As the scenarios are being presented, watch carefully and try to figure out what is going on in the scenario by the tone of what is being said.

■ Call volunteers back into the room.
■ Volunteers should present the first scenario

**FC:**   ■ Refer to FC: Scenario Debrief and debrief the scenario with the following questions:
  ■ What is going on in this scenario?
  ■ How can you tell?
  ■ What is it about their vocal tones that give you the clues you need?

■ Allow participants to share out any other observations they made about the scenario presented.
■ Allow volunteers to present second scenario and then debrief.
■ Repeat until all scenarios have been presented.

Say: The tone and inflection of our voices can be very powerful tools to engage and captivate our customers. In the same way that we listened to tone of voice to deduce the details of the situation presented to us, we can use tone to capture someone's attention. We can also listen to our customer's tone of voice to gain clues about their interest or disinterest in what we are saying to them during sales discussions.

**Participant Workbook**

■ **Refer to Workbook page: Developing Engaging Openings-** Have participants pair up and practice delivering the statements they developed during the Developing Engaging Openings activity in the previous section to each other applying strong voice quality.

■ Refer to FC: Vocal Qualities

Say: Pay attention to your voice qualities as you practice delivering your engaging openings to your partner.

---

Confidential - Subject To Protective Order

**MRK-H.2STM001623**

## CAPTIVATING THE CUSTOMER

- Allow 5-7 minutes.
- Call time after 5-7 minutes.
- Pass: Microphone around and ask for volunteers to share some examples with the whole class.
- Debrief each opening that participants share with the following questions:
  - What was effective about the vocal tone?
  - How did the Vocal Qualities list and the Tone of Voice activity help you to become more attuned to how you use your tone of voice?

Say: We can all continue to improve how we use our vocal skills during sales discussions.

**Transition:** Now let's move on to the last "V" – visual - which covers what our customers "see" in us, that creates their perception of us, remembering that perception is reality.

Confidential - Subject To Protective Order

MRK-H.2STM001624

# CAPTIVATING THE CUSTOMER

## Third V: Visual Qualities

**Learning Objective:**

*Recognize and develop expert non-verbal techniques: use of body language, specifically posture, eyes, hands, and arm movements*

**Time: 30 minutes**

| At A Glance - Materia/Media | Instruction |
|---|---|
| | ■ **Say:** Visual and accounts for the largest percentage- 55%- of what people pay attention to when listening. This is listening with your eyes; here non-verbals are key! |
| | ■ **Ask participants:** "Why do you think people put so much emphasis on body language or things other than the actual words spoken?" |
| | *Possible Responses: We're visual people and become distracted by appearances and the style people have in communicating. You don't have as conscious control over your non-verbals as verbals- especially if you're expressive. These are therefore usually truer indicators of how you feel.* |
| | ■ **Ask:** How does our effective use of Visual skills positively impact our relationships? |
| | ■ **Explain:** If there is a discrepancy between what we hear verbally and what we see in the body language, we have learned that the body tends to tell more of the truth. Remember the saying, "actions speak louder than words"! |
| **OH #8 – Non-Verbal Techniques** | ■ **Say:** The most common body language cues are divided into parts of the body: Refer participants to Overhead and Workbook pages: **V3-Visual Qualities - Non-Verbal Techniques** and review some common cues and what they signal to the speaker. |
| Participant Workbook | ⇒ Eyes - listen with your eyes |
| | ⇒ Head - listen by nodding |
| | ⇒ Fingers/hands/arms- What are you doing with your fingers/hands/arms? |
| | ⇒ Legs – crossed, moving back and forth |
| | ⇒ Overall posture – slouching, sitting tall and straight, sitting back |
| **WB: Body Positions** | ■ **Refer to Workbook page: Body Positions** and explain that you're going to describe some body positions a physician may take and ask participants to interpret their meaning. |

Confidential - Subject To Protective Order

MRK-H.2STM001625

CAPTIVATING THE CUSTOMER

■ Show Posters for each position: Ask participants to interpret each body position's meaning.

   Note: Answer is on the back of each poster.

■ Ask: For each of the positions, what strategies can we use to respond appropriately while maintaining engagement with the physician?

■ Instruct participants to fill in strategies in Workbook. As they're discussed, ensure the following are covered:

**Graphic: Open Position**

⇒ *Open Position:* The physician is in a *receptive* mood. You should continue to deliver a compelling message and gain agreement

**Graphic: Evaluator Position**

⇒ *Evaluator Position:* The physician is weighing your discussion. If he begins to move backward away from his desk, it may be a negative sign. If he leans forward and asks questions, it may be a positive sign. You should adjust the course of your discussion to keep his interest or answer any objections.

**Graphic: Defensive Position**

⇒ *Defensive Position:* The physician is withdrawing from discussion and may be bored or threatened. A change in strategy is needed.

**Graphic: Point-To-Be-Made Position**

⇒ *Point-To-Be-Made Position:* The physician wants to raise a point or ask a question. Allow him free expression and probe for better understanding.

**Graphic: Closed Position**

⇒ *Closed Position:* The physician may have already reached a decision and is probably not listening to you anymore. Find out what the decision is and attempt to overcome any objections. Disengage appropriately.

■ Ask: How do you remedy a situation where a physician exhibits several closed positions?

*Possible Responses: vary tone, ask an open-ended question, use humor*

■ Ask: Are there any other positions you've observed during a sales discussion?

■ Ask volunteers to "act out" the additional positions they've observed and instruct class to guess:

   1. The position

   2. The message of the position

   3. How they would best respond

■ Ask: What best practices do you use to remedy these situations when you are in sales discussions, with your customers?

Confidential - Subject To Protective Order

MRK-H.2STM001626

CAPTIVATING THE CUSTOMER

**OH #8**

■ Allow participants to share their experiences and resolutions for a few minutes.

■ Referring to OH: Non-verbal Techniques , say: Another effective non-verbal technique to align with your physicians and increase your chances of good rapport is to use mirroring.

■ Ask: " Just from the sound of it, what would you think mirroring involves?"

■ Explain: Mirroring is the matching of patterns; verbal and non-verbal, with the intention of helping you enter the customer's world. It's positioning yourself like to match the person talking. It subconsciously raises his/her level of trust by building a bridge of similarity. Sometimes we mirror without being aware we're doing it- especially when we have a close relationship with someone. Have you ever observed two close friends talking and looking like they're matching body language?

■ Say: Basically there are three components of mirroring:

  ⇒ Static body movements, sitting or standing

  ⇒ Dynamic body movements such as head bobs, eye movements, shoulder movements

  ⇒ Key gestures, especially when used for emphasizing important points

■ Demonstrate mirroring with a participant.

■ Instruct participants to pair up and have a two-minute conversation about anything and mirror each other as they do so.

■ Debrief the activity:

  ■ How did it feel to mirror somebody?

  ■ How did it feel when you were being mirrored?

■ Sum up explaining that no body movement or position has a precise, universal social meaning that is the same in every situation for every individual. It is extremely important to consider the specific context and personalities involved in a situation when you attempt to interpret body language. The key is to be observant and use the cues presented.

**Transition:** In addition to the 3 V's: Verbal, Vocal and Visual, we can also use the knowledge we have about a customer's BEST style and our own BEST Style to help us engage that customer.

Confidential - Subject To Protective Order

MRK-H.2STM001627

CAPTIVATING THE CUSTOMER

## Flexing to the Customer: BEST Styles Alignment

*Recognize verbal and non-verbal cues identifying physician's communication styles*

**Time: 30 minutes**

| At A Glance - Material/Media | Instruction |
|---|---|
| **OH #9 :** | ■ **Referring to Workbook page and Overhead: Three Steps to Flexing**, review the three-step technique to improve your ability to engage others in conversation: |
| | 1. Determine customer's BEST style picking up Cues and Clues |
| | 2. Align yourself with the customer's BEST style through Verbal and Vocal skills |
| | 3. Align yourself with the customer's BEST style through Visual and Non-Verbal Skills. |
| | ■ **Review BEST Styles briefly.** |
| **BEST Styles Poster** | ■ **Refer to Workbook pages: Physician BEST Styles and Pushing Their Buttons.** For each style review the following factors after each for additional ideas from class based on their personal experiences: |
| | ■ Qualities |
| | ■ Appreciations |
| | ■ Pet Peeves |
| | ■ How to Connect |
| | ■ **Refer to Workbook Pages: Engaging our Physicians** and ask participants to think about two physicians they call on that are difficult and jot down their names on **Workbook page: Engaging Our Physicians**. Instruct them to write down what the physician does verbally, vocally and visually and what strategies they can use to reach that physician and what the physician's BEST Style is. Refer back to BEST pages in their workbooks when developing their strategy. |
| | ■ **Allow 5 minutes for completion.** |
| | ■ **Ask: What are some of the strategies you came up with to reach your difficult physician?** |
| | ■ **Allow participants to share their strategies with the class.** Encourage participants to take notes to gain ideas for the future. |

Confidential – Subject To Protective Order

MRK-H.2STM001628

CAPTIVATING THE CUSTOMER

| At A Glance - Material/Media | Instruction |
|---|---|
| Participant Workbook | ■ Ask: What are some of the best practices you heard when we shared our strategies? |
| | ■ Refer to Workbook page: Needs Based Selling Discussion Guide and instruct participants to individually create a sales discussion for their difficult doctor. |
| | **Allow 5-7 Minutes** |
| | ■ Instruct participants to pair up to practice their new sales discussion. |
| | ■ Instruct pairs to take turns leading short (2-3 minute) discussions. Partners will take turns playing physician and rep. If they are the physician they should role-play according to the characteristics of their partner's difficult doctor. If they are the rep, they should practice their sales discussion based on the strategy they developed earlier in the workshop. |
| Participant Workbook | ■ Instruct pairs to provide feedback to each other following the exercise using the **Workbook Page: Skill Practice Checklist.** |
| | ■ Remind participants that they should provide feedback on their partner's ability to connect with styles, as well as application of all V's: Verbal, Vocal and Visual. |
| | ■ Following the Skills Practice, **Ask Participants:** |
| | – What was effective? |
| | – What was Ineffective? |
| | – What would you do differently next time with this physician type? |
| | – How will you use the 3V's when you see this physician back on territory? |
| FC | ■ As class is sharing outcomes, collect best strategies for each BEST style using four flipcharts positioned in each corner of the room marked for each style, as well as best practices on the three V's captured on one flipchart marked Best V's. |

**Transition:** We've talked about a lot of different ways communication is impacted: by our verbals, vocals and visual. Also, we related all of those things to how we can best flex to our customer to be engaging for them.

Confidential - Subject To Protective Order

MRK-H.2STM001629

# CAPTIVATING THE CUSTOMER

## Videotape Review and Wrap-up

Identify, build skills and self-assess via videotaping and role-plays the three components of communication that keep physicians engaged: verbal, vocal and visual skills

Time: 45 minutes

| At A Glance - Material/Media | Instruction |
|---|---|
| **TV/VCR's**<br><br>Participant Videotapes | ■ Instruct participants to get back into their original groups from the videotaping activity at the beginning of the workshop.<br><br>■ Tell the participants they will have 15 minutes to view their videotaped sales discussions.<br><br>■ Refer Participants to WB Page: Sales Discussion Checklist.<br><br>■ Say: While you are viewing your videotaped sales discussion, assess yourself using the checklist. After you have watched your tape, allow your peers in your group to give you any additional feedback, then move on to the next videotape.<br><br>■ Allow 15 minutes.<br><br>■ Monitor participants and address any issues or questions.<br><br>■ Call time.<br><br>■ Spend about 5-10 minutes debriefing the self-assessment using the following questions:<br><br>　■ What types of things did you notice about your sales discussion now that you didn't before?<br>　　■ In terms of Verbals?<br>　　■ In terms of Vocals?<br>　　■ In terms of Visuals?<br>　　■ In terms of your BEST Style?<br>　　■ In terms of the BEST Style of the physician and how they were reacting/responding to you?<br><br>■ Refer participants to WB Page: Strategies for Becoming Captivating and say: Spend the next 5 minutes reviewing your checklist and come up with a strategy to improve how captivating you are to your customer. Write your plan in your workbook.<br><br>■ Allow five minutes.<br><br>■ Call time.<br><br>■ Say: Share your strategy with a partner for the next 2 minutes. |

Confidential - Subject To Protective Order

MRK-H.2STM001630

CAPTIVATING THE CUSTOMER

FC

- Allow two minutes.
- Call time.
- Debrief the Top Takeaways with the following questions:
  - What will you take with you today to apply tomorrow as a result of what was just shared?
  - Will your strategies help you to apply these new skills?
- Continue asking for participants to share their Takeaways.
- Write the top takeaways on FC: Top Takeaways.
- Thank class for their hard work and great participation.
- Handout Level 1 Evaluations.
- Say: Please complete the Evaluations and leave with me.
- Collect and destroy videotapes per Legal requirement.

Page 29

Leader's Guide                    Revised 6/01

Confidential - Subject To Protective Order

MRK-H.2STM001631

CAPTIVATING THE CUSTOMER

# APPENDIX

**QUALITY CHECKS:**
*THE APPENDIX SHOULD INCLUDE:*

FLIPCHART GUIDE

- POSTER IMAGES
  - NBS Poster
  - BEST Styles Poster
  - Body Position Posters
- SLIDE/POWERPOINT IMAGES (LARGE ENOUGH TO READ PRINT)
- ANSWER KEYS TO EXERCISES
  - Body Position Poster Answers

Confidential - Subject To Protective Order

MRK-H.2STM001632

[C O U R S E   N A M E]

The following pages contain a listing of flipcharts that will be utilized during this workshop.

Flipcharts marked *"Printed"* will be provided to you with the workshop materials.

Flipcharts marked *"Fill-in"* will have to be prepared by your prior to or during the workshop.

Leader's Guide                                    Revised 6/01                                    Page 31

Confidential - Subject To Protective Order

MRK-H.2STM001633

WORKSHOP DOCUMENTS

[COURSE NAME]



**Fill-In**
**Agenda**

- Introductory and Videotape/Role-play Activities
- Engaging Attributes
  - The 3V's: Verbals, Vocals, and Visual
- Flexing to the Customer
- Videotape Review and Wrap-up

**Fill-In**
**Videotaping Instructions**

- Five minutes to prepare a sales discussion
- Use the sales aid you brought with you
- Three minutes to present it and be videotaped
- Observer starts and stops recording AND completes Checklist
- Remaining participant plays the part of the physician

**Fill-in**
**Positive Experiences**

Confidential - Subject To Protective Order

MRK-H.2STM001634



[COURSE NAME]

*WORKSHOP DOCUMENTS*

**Negative Experiences**

**The 3 V's**

**"Broken" Statements**
- Dr., I just wanted to share some information with you about Osteoarthritis.
- Dr. Asthma is a killer that affects thousands of people.
- Osteoporosis is a preventable disease.
- Heart disease affects the lives of individuals and families alike.
- Hypertension is a major problem in the U.S.
- 75% of women aged 60-70 have evidence of OA of the hand, it is the most common form of arthritis.
- How is Vioxx going?

**Vocal Qualities**

Volume
Pitch:
Tone
Inflection
Clarity
Tempo

**Scenario Debrief**

#1

#2

#3

#4

**4 Styles - Bold**

Confidential - Subject To Protective Order

MRK-H.2STM001635



[COURSE NAME]

*WORKSHOP DOCUMENTS*

4 Styles – Expressive

4 Styles - Supportive

4 Styles - Technical

Leader's Guide

Revised 6/01

Page 34

Confidential - Subject To Protective Order



*WORKSHOP DOCUMENTS*

[COURSE NAME]

Best V's

Top Takeaways

Leader's Guide

Revised 6/01

Page 35

Confidential – Subject To Protective Order

WORKSHOP DOCUMENTS

[COURSE NAME]

Tone of Voice Activity Script

Use the dialogue below for each of the following scenarios:

Scenario 1: Two people who are angry at each other.

Scenario 2: Two people who are good friends, but B is sad about something.

Scenario 3: Two people who know each other, but B does not recognize A.

Scenario 4: Man attempting to ask a woman out on a date.

Dialogue:

A.    Hi.
B.    Hello

A.    So, how are things going?
B.    About the same.

A.    I didn't expect to see you here.
B.    I could say the same of you.

A.    Are you busy?
B.    No, not really.

A.    Would you like to talk?
B.    I could.. for a little while.

A.    All right.
B.    Fine.

Confidential - Subject To Protective Order

MRK-H.2STM001638

[C O U R S E   N A M E]  _____  *W O R K*

<p align="center">Sales Discussion Checklist</p>

## Verbals

1. Does the representative use Driving Discussion words? Write them down.

2. Did the representative use any Weakeners? (i.e. uh, um, really, like)

3. Was their discussion concise yet impactful?

## Vocals

Rate the following voice qualities on a scale of 1-5, 5 being the best.

1. Volume: Are they so quiet and soft that people can't always hear them or so loud they're annoying?

2. Pitch: Do they speak high and squeaky or low and gruff-sounding?

3. Tone: Do they have a cold, flat or pleasant, warm tone of voice?

4. Inflection: Are they punching the right words for emphasis to keep the listener with them?

5. Clarity: Do they slur or mutter OR enunciate their words and articulate?

6. Tempo: Is their pace appropriate for the situation?

## Visuals

1. Did the representative maintain an open and friendly position during the discussion?

2. Did the representative use body language to help their message or hurt it?

_____

Leader's Guide                              Revised 6/01

Confidential - Subject To Protective Order

MRK-H.2STM001639

MILESTONE 1 LEADER'S GUIDE

# Champion Selling



**MERCK**

SALES TRAINING & PROFESSIONAL DEVELOPMENT

*Selling Skills*



Confidential - Subject To Protective
Order

*MILESTONE 1*

# CHAMPION SELLING

## OVERVIEW

The purpose of this workshop is to enable Milestone 1 Specialty representatives to be more successful by improving the level of their selling skills. This workshop covers many of the concepts examined during the Selling Skills Seminar – but reinforcing them, providing additional practice and feedback, and reviewing some in more depth. New content and techniques are therefore of limited focus, whereas more in-depth practice and refinement of key fundamentals of success are the emphasis.

The framework for the workshop is the notion that four behaviors differentiate "champions" in any field, and they apply very closely to the pharmaceutical sales endeavor. The themes are: winning mindset, strategic preparation and execution, goal-focus, and continuous improvement.

An additional framework is that call success depends on getting attention, keeping attention, and changing behavior.

A key learning method for the workshop is the use of break-out groups consisting of 4 reps and a PDT or business manager as coach. In these break-outs, participants drill the use of the skills covered in the program via constrained 2-minute selling time stand-up practices applied to critical incident physician scenarios, which represent challenging situations they actually face on territory. The time constraint is vital, as an important learning point is how to optimize the short selling time that reps generally face by extending the time via gaining the physician's attention. The coach's role is critical in pulling through the classroom content and pre-work assignment via discussion and feedback discussion.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048834

CHAMPION SELLING

*MILESTONE 1*

**OBJECTIVE**

At the completion of this workshop participants will be able to:

■ Employ a variety of selling skills and techniques to more effectively handle challenging selling situations.

■ Identify and demonstrate key components of successful selling based on behaviors of champions in other fields of endeavor: winning mindset, strategic preparation and execution, goal-focus, and continuous improvement.

■ Demonstrate techniques for extending the selling time.

■ Demonstrate effective use of all the steps of the NBS model.

■ Effectively use the CRCT model to uncover and handle obstacles.

**PRE-CLASS REQUIRED PARTICIPANT PREPARATION**

Participant receives brief self-guided pre-assignment workbook and is required to analyze a critical incident selling situation (representative challenging physician), and then discuss with his or her business manager.

Topics:

1.  Overview of Champion Selling and Pre-work

2.  Assignment #1: Critical Incident/Physician Profile Identification

3.  Assignment #2: Pre-Call Analysis

4.  Assignment #3: Influencing Skills Reminder

5.  Assignment #4: NBS Review

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048835

*MILESTONE 1*

# CHAMPION SELLING

## SPECIFICATIONS

- Target Audience: Specialty
- PDS Level: Milestone 1
- Competency: Selling Skills
- Delivery Method: Classroom
- Core or Elective: Core
- Course Code: MI0100
- Prework for this Course: Yes – Situation Critical
- Total Time and Number of Learning Objectives: 8 hours, 15 min.; 5 learning objectives
- Point Designer(s)/Trainer(s): Sharon Fox & Teri Santivasci/Randy Grimes
- VENDOR: Influence Mastery
- Proposed Availability Date: January, 2002
-

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048836

# CHAMPION SELLING

*MILESTONE 1*

## MATERIALS/EQUIPMENT

ASSUMPTION: 6 Breakout groups each comprised of 4 participants and a business manager or PDT.

- LCD, Laptop and Screen
- VCR, Monitor
- 6 Flipchart Stands with Markers and Blank Flip Pads (2 for facilitator + 4-5 for classroom teams depending # of tables)
- Participant Workbook
- Wall Posters
- Masking Tape, Duct Tape and Push Pins (for wall posters)
- Cassette or CD player and upbeat music
- 3 x 5 Index cards – two per participant

- In each Break-out Room:
  ⇒ VHS Video Camera
  ⇒ Tripod
  ⇒ 1 blank compact VHS videotape per rep
  ⇒ Flipchart Stand with markers, blank flip pad and masking tape
- Prepared Flipcharts
- 4" x 6" Post-its – one per participant

- Handouts
- Overheads (Powerpoint)
- Leader's Guide for Business Managers for break-out sessions
- Pre-class preparation package
- Inflatable plastic weight lifting Bell Bar
- Optional: 2 empty wine (or water, though less effective) bottles as props for Obstacle Handling opening anecdote
- Hat or box for collecting index cards

For Internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048837

*MILESTONE 1*

# CHAMPION SELLING

**PRE-CLASS COMMUNICATION WITH COACHES**

■ Due to the critical role that Business Managers will play in the success of your workshop, trainers must prepare those who will coach the workshop by doing the following via teleconference, email or MVX:

⇨ Provide an overview of the program and its objectives;

⇨ Explain what is expected of the them – see "Business Manager Role" below;

⇨ Reinforce the importance of Business Managers thoroughly becoming familiar with the "Leader's Guide for Business Managers" in advance; and

⇨ Answer or be available to answer any questions.

**BUSINESS MANAGER ROLE**

■ In the Break-outs:

⇨ Facilitate 2 break-out call practice sessions, where you will:

- Set up and coordinate practice (including videotaping) calls.

- Provide feedback.

- Lead a "Break-out Discussion" by following the step-by-step activity listing in "Leader's Guide for Business Managers."

- Keep group on time.

- Be responsible for opening and locking your break-out room with the key provided by the trainer.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048838

CHAMPION SELLING

*MILESTONE 1*

**BUSINESS MANAGER ROLE**

■ In the Full Group:

⇒ Participate in front-of-room demonstrations with trainer, if pre-arranged.

⇒ Coach small group in-class exercises in which participants practice NBS steps and obstacle handling, should the trainer request that role.

⇒ Provide individualized coaching off-line to participants as needed.

⇒ Enhance class discussions as you deem appropriate following participants' working through the points and topics of discussion, but refrain from answering facilitator discussion questions so as to allow participants to be more involved.

⇒ Assist the trainer in logistics, setting up and facilitating the session (as needed).

■ Before and After the Workshop:

⇒ Reinforce the value of representatives' attendance, and active participation in, the training workshop.

⇒ Ensure appropriate coaching is conducted to reinforce compliance with Company policies and correct any behavior that might violate those policies.

⇒ Most importantly, reinforce learnings on the job with participants both during the pre-classroom preparatory assignment and following the workshop.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048839

*MILESTONE 1*

## CHAMPION SELLING

### FACILITATOR TIPS

- Prior to the program, review the participant roster and discuss with business managers who will be attending how to create break-out teams. One suggested option:

  ⇒ Lead reps in a district stay together: all 1's together, all 2's together, etc.

- Seek to make linkages to champion themes throughout program.

- Cue the Martin Luther King videotape to 12minutes 30 seconds. The tape should start with, "Even though we face difficulties of today and tomorrow…" and stop the tape at 14 minutes 15 seconds at the end of, "I have a dream my 4 little children will one day live in a nation where they will not be judged by the color of their skin but the content of their character. I have a dream today."

- Follow up discussion questions with "what else?" to seek additional thoughtful responses. Allow adequate time for participants to think through responses before providing the desired answers.

- Be sure all cameras and monitors are fully functional and set up in advance.

- Provide your MVX # and email address in communication that accompanies pre-class preparatory assignment to participants so they can contact you with any questions about the assignment.

### PARTICIPANT HANDOUTS

1. Best Call Notes – 2 per participant

2. Baseline Taping Observation Sheets – 4 per participant

3. Focus Areas – 1 per participant

4. Final Practice Observation Sheets – 4 per participant

5. Workshop Evaluation Sheet – one for each participant

Handouts # 2-4 should be inserted in each participant's workbook back pocket in advance, with Coach receiving a full packet separately.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048840

CHAMPION SELLING

*MILESTONE 1*

## PARTICIPANTS SHOULD BRING

- Latest sales aids for products they promote with critical incident physician.
- Completed pre-class preparation package.

## LEGAL COMPLIANCE

You are reminded that all of your activities must comply with all applicable Policy Letters and Corporate Policies. Although many such policies apply to your activities in this training course, Policy Letters 110 and 118 are of particular relevance.

You are further reminded that anyone who violates any Policy Letter is subject to immediate disciplinary action up to and including termination.

It is the Trainer's responsibility to make sure all trainees are aware of the legally appropriate process, policy, procedure and/or answer while delivering this program.

## PROGRAM OUTLINE

| Segment/Timing | Point of the Segment | Summary | Materials/Supplies |
|---|---|---|---|
| 1. Introduction<br>8:30-9:20<br>(50 min) | Participants will understand the rationale for the course and the specific objectives that will be covered during the course.<br><br>Participants will learn the four champion themes used throughout the course.<br><br>Participants will quickly review the Call Success Elements model, B.E.S.T. styles and the role of the NBS model.<br><br>Participants will receive | - Welcome and introduction by trainer<br>- Symbolic raising of the bar by participants<br>- Purpose of the program and difference from SSS<br>- Importance of continued focus on fundamentals<br>- Introduction of workshop themes and relationship to pharmaceutical sales. | Cassette or CD Player and upbeat music<br><br>Inflatable plastic weightlifting "Bell Bar"<br><br>Wall posters:<br>- Welcome<br>- Champion Themes<br>- Call Success Elements<br>- Agenda |

Leader's Guide

1/2002

For internal use only. Not to be distributed or used outside of Merck.

Page 8

Confidential – Subject To Protective Order

MILESTONE 1

CHAMPION SELLING

## PROGRAM OUTLINE

| Sequence/Time | Point/Rationale | Summary | Materials/Resources |
|---|---|---|---|
| | instructions for baseline videotaping. | Champions, whether in sales or elsewhere, share these success themes: Winning Mindset, Strategic Preparation and Execution, Goal-Focus, Continuous Improvement | Ground Rules |
| | | | B.E.S.T. Styles |
| | | | Influence Skills |
| | | | NBS Steps |
| | | ■ Champions identification exercise | Prepared Flipcharts: |
| | | | ■ Success Comes From… |
| | | ■ Introduce example around how we pay money and invest time to get better at our hobbies (golf, piano lessons, etc.) but we don't invest to get better at our profession – selling skills | ■ Break-out Schedule (or prepare as handout –one to a participant) |
| | | | Participant workbook |
| | | | Pre-Classroom Preparatory Assignment |
| | | ■ Call Success Elements model: get attention, keep attention, change behavior | Overheads: |
| | | | ■ Title Slide |
| | | ■ Brief discussion around words, tone of voice, non-verbals and that words matter least | ■ Program Objectives |
| | | | ■ Champion Selling vs. SSS |
| | | ■ Agenda | ■ Agenda |
| | | ■ Housekeeping and Groundrules | ■ Agenda |
| | | ■ Quick review of Pre-Classroom Preparatory Assignment: B.E.S.T. Styles | ■ B.E.S.T. Styles |
| | | | ■ Influence Zone |
| | | | ■ NBS Support Orbits |
| | | | ■ Baseline Practice Guidelines |

Leader's Guide

1/2002

For internal use only. Not to be distributed or used outside of Merck.

Page 9

Confidential - Subject To Protective Order

MRK-AAR0048842

M I L E S T O N E   1

CHAMPION SELLING

PROGRAM OUTLINE

| Sequence/ Timing | Point/Rationale | Summary Points | Materials/Resources |
|---|---|---|---|
| 2. Baseline Videotaping and Break 9:20-10:20 (60 min) | Participants will conduct a videotaped call that will be used as a baseline call for the course. | and Influence Skills • Role and value of NBS model • Instructions for subsequent baseline videotaping • Participants conduct 2-minute stand-up taped call based on critical incident physician from pre-work • Observation sheet is completed silently by team members and then distributed to role play rep ⇒ No additional discussion about the feedback ⇒ 5-10 mins round trip travel time to break-out rooms + 5 mins/role play (including prep and set-up time) X 4 team members + 4 mins/role play X 4 for replay = minimum of 45 mins) ⇒ NOTE: Option – If room is large enough, have groups do videotaping in corners of the room to save time. | Leader's Guide for Business Managers In each break-out room: VCR, monitor, video camera, tripod, blank tapes (one per participant), flipchart, markers and masking tape Pre-Classroom Preparatory Assignment Workbook: Handouts in Pocket: ▪ Best Call Notes (1 per participant) ▪ Baseline Observation Sheets (4 per participant + 1 for coach) |

For Internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048843

CHAMPION SELLING

PROGRAM OUTLINE

*MILESTONE 1*

| Session/Timing | Purpose/Rationale | Summary | Materials/Resources |
|---|---|---|---|
| | | ⇒ NOTE: Videotaping is not always feasible if PDT is not training in their RBG location. Cameras would need to be shipped from location to location. Option is to skill practice instead. | |
| 3. Discuss Taping Experience in Full Group<br>10:20-10:30<br>(10 min) | Participants will discuss their experience with the baseline videotaping. | ■ Strengths<br>■ Challenges | |
| 4. NBS Refresher<br>10:30-10:50<br>(20 min) | Participants will identify the relevant NBS step for each challenging sales call.<br>Participants will receive advice from their team members on how to more effectively handle the challenges. | ■ Table discussion of critical incident challenges and NBS steps; share best practices for challenges. | Participant Workbook<br>Overheads:<br>■ Instructions for NBS Advice Sharing<br>Pre-Class Preparatory Assignment<br>Wall posters:<br>■ Agenda<br>■ NBS Steps |
| 5. Short Selling Time Challenge | Participants will discuss the challenges of short selling time.<br>Participants will learn that bold openings and S.O.A.P. are | ■ Short selling time is a reality<br>■ Call success element: get attention | Participant Workbook<br>Wall posters:<br>■ Agenda |

Leader's Guide    1/2002    For internal use only. Not to be distributed or used outside of Merck.    Page 11

Confidential - Subject To Protective Order

MILESTONE 1

CHAMPION SELLING

PROGRAM OUTLINE

| Sequence / Timing | Program Rationale | Content Summary / Key Points | Materials/Resources |
|---|---|---|---|
| 10:50-11:50 (60 min) | openings and S.O.A.P. are effective ways to get attention. Participants will have the opportunity to create a bold opening. Participants will watch and analyze a demonstration of how to use the NBS model in a short selling time situation. | ■ Demo/discussion of ineffective responses to short time<br><br>■ Defining moment of opportunity: pen in air<br><br>· Champion linkage<br><br>■ Most physicians can find the time if they see the value<br><br>■ Solution to short selling time: gain attention especially by showing you have useful information to add<br><br>■ Requirements for getting attention<br><br>■ Using bold openings and S.O.A.P. to get attention<br><br>■ Value of Identify Need – engages physician and provides focus for call<br><br>■ Patient profile as primary element of Identify Need<br><br>■ Patient profile can be given to physician (S.O.A.P.) or get physician to provide it (bold opening)<br><br>■ Group exercise: creating | ■ Call Success Factors<br><br>Pre-Class Preparatory Assignment |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048845

# CHAMPION SELLING

MILESTONE 1

## PROGRAM OUTLINE

| Sequence & Timing | Objectives | Content/Discussion Points | Materials/Aids/References |
|---|---|---|---|
| | | bold openings. ■ How to revise bold openings for different B.E.S.T. styles ■ Employing NBS despite short selling time: Trainer demo and class analysis | |
| LUNCH 11:50-12:40 50 minutes | | | |
| 6. Assessment Step 12:40-1:20 (40 min) | Participants will review the importance of the assessment step. Participants will learn how to improve their assessment questions by using strategic questions. Participants will have the opportunity to improve their current assessment questions and then practice using the improved questions. | ■ Importance of assessment step ■ Group Exercise: flipchart assessment questions typically used with rep's critical incident physician ■ Requirements for effective assessment questions – introduce strategic questioning and how their current what/why questions could be more effective by using strategic questions ■ B.E.S.T. styles with assessment questions ■ Given short selling time, assessment questions asked must be on target because | Overheads: ■ Emerson Quote ■ Assessment Questions ■ Practice Instructions Participant Workbook Wall posters: ■ Call Success Elements ■ NBS |

Page 13

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048846

CHAMPION SELLING

*MILESTONE 1*

## PROGRAM OUTLINE

| Sequence/Timing | Learning Points/Rationale | Training Activity | Materials/Roadblocks |
|---|---|---|---|
| 7. Obstacle Handling 1:20-2:00 (40 min) | Participants will review the CRCT model. Participants will watch a demonstration of how to use the CRCT model. Participants will learn that most obstacles are about efficacy. Participants will practice obstacle handling. Participants will share advice on handling challenging obstacles. | not many opportunities for follow-up questions ▪ Ways to vary assessment questions and make them more powerful (describe/compare/how/what factors, etc.) ▪ Group Exercise: return to questions written down earlier and improve them ▪ Practice questions with partner ▪ Sharing of questions in full group ▪ Building credibility via effectively handling obstacles story ▪ Quick CRCT review with trainer demo ▪ Identification of critical incident obstacles by reps ▪ Categorization and analysis of obstacles raised: most obstacles are ultimately about efficacy ▪ Dealing with different types of obstacles; Uncovering real issue | Participant Workbook Wall poster: CRCT Model Overhead: Helen Keller Quote |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048847

MILESTONE 1

CHAMPION SELLING

PROGRAM OUTLINE

| Segment/Timing | Participants will... | Summary | Material/Resources |
|---|---|---|---|
| | | • Strategizing of critical incident obstacle handling with role play practice<br>• Discussion of handling challenging obstacles<br>• Dealing with perceived dead ends<br>• Champion quote | |
| Break<br>2:00-2:15<br>15 min. | | | |
| 8. Closing Step<br>2:15-2:35<br>(20 mins) | Participants will review the steps involved in closing a call.<br>Participants will learn the value of gaining mini-agreements throughout the call.<br>Participants will have the opportunity to map out and practice the close step for a call. | • Review of Closing sub-steps<br>• 4th closing step: Promise to follow up on action<br>• Getting Mini-Agreements along the Way<br>• Assertiveness and B.E.S.T. styles in closing<br>• Exercise: map out close for critical incident<br>• Assign Pull-Together break-out practice | Wall Poster: NBS Steps<br>Participant Workbook<br>Handout in workbook pocket: Best Call Notes<br>Overhead: Steps in Closing |
| 9. "The Pull-Together" – Final Practice | Participants will re-tape the same call from the baseline videotape and focus on | • Business manager leads discussion of key points about getting attention, | Leader's Guide for Business Managers<br>In each break-out room: VCR, |

Leader's Guide

1/2002

For internal use only. Not to be distributed or used outside of Merck.

Page 15

Confidential - Subject To Protective Order

*MILESTONE 1*

CHAMPION SELLING

PROGRAM OUTLINE

| Session/Timing | Point/Rationale | Summary/Flow | Materials/Resources |
|---|---|---|---|
| in Break-Out Room and Break<br><br>2:35-3:55<br><br>(1 hour, 20 min) | incorporating all the techniques reviewed during the course. | assessing, obstacle handling and closing.<br><br>■ Participants identify focus areas. They then re-tape the same short selling time critical incident, incorporating improvements.<br><br>■ They view the baseline tape and then the final tape to compare.<br><br>■ During re-taping, other reps and coach write down feedback, which is then shared and discussed with rep. Focus of discussion should be on reinforcing improvements seen so they will be continued on territory and on identifying any areas for further focus by working with business manager on territory. | monitor, video camera, tripod, baseline tapes, flipchart, marker and masking tape<br><br>Workbook: Handouts in pocket of workbook:<br>■ Focus Areas<br>■ Best Call Notes<br>■ Final Practice Observation Sheets (4 per participant + 1 for coach) |
| 10. Wrap-Up<br>3:55-4:15<br>(20 min) | Participants understand the importance of beginning to use these techniques as soon as possible on territory. | ■ Reference to Final Taping<br>■ Achievement of class objectives check<br>■ How to transfer learnings going forward<br>■ Individual learnings: | 3 x 5" Index cards: one to a participant<br><br>4" x 6" post-its: one to a participant<br><br>Inflatable plastic "bell bar"<br><br>Cassette or CD player and music |

1/2002

For internal use only. Not to be distributed or used outside of Merck.

Page 16

Leader's Guide

MILESTONE 1

# CHAMPION SELLING

## PROGRAM OUTLINE

| Sequence/Time | Learning Activities | Content/Key Points | Materials/Resources |
|---|---|---|---|
| | | ⇒ Identification on post-it of one key specific learning enabling better handling of critical incident – post on back of shirt and circulate to read colleagues' post-its<br><br>+<br><br>⇒ Identification of one area to focus on continuing to improve on job – write on index card to be given to business manager<br><br>■ M.I.K. videotape – champion theme wrap-up<br><br>■ Final raising of the symbolic bar<br><br>■ Distribute token gift related to champion themes<br><br>■ Evaluation sheets | Handout: Evaluation sheets |
| 11. Level II<br>4:15–4:45<br>(30 min) | Participants will take a multiple choice learning check in order to evaluate how well the course objectives have been met. | ■ Discuss Coaching Guide<br>■ Distribute Level II/Review Answers | |
| **Total Time: 4 hours 45 minutes** | | | |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048850

CHAMPION SELLING

MILESTONE 1

## 1. Introduction

*Time: 50 minutes (8:30-9:20)*

| At A Glance | Material/Media | Instructions |
|---|---|---|
| | | ■ Review course objectives and agenda |
| | | ■ **Explain:** In order to see how well this course has met these objectives, you'll be taking a Learning Check at the end of the program. We recognize that you will not be able to apply knowledge and skills that have not been able to learn. The Learning Check will consist of a series of multiple choice, knowledge and application questions, which will measure how well the course was designed and delivered to meet the objectives. You'll learn more about the Learning Check at the end of the day. |
| Cassette or CD Player with Music | | ■ Play upbeat music as participants arrive. |
| ■ **Welcome** | OH: Title Slide | ■ Show Overhead (title slide) and refer to Wall Poster: Welcome to Champion Selling. Welcome participants to the workshop. |
| WP: Becoming a Selling Champion | | |
| ■ **Introduction of Trainer** | | ■ Say: "Hello, I'm _____. I'm really excited about working with all of you today because I know you are going to find this class incredibly beneficial and we're going to have some fun along the way." |
| ■ **Symbolic Bar for Raising** | | ■ Say: "As you as you develop your skills more and more, you'll be raising the bar on the level of your selling success. People who raise the bar, get better." |
| | | ■ Say: "We know you're champions already; we want to help you to be greater champions." |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MILESTONE 1

# CHAMPION SELLING

| At A Glance - Material/Media | |
|---|---|
| Plastic Inflatable Bell bar | ■ **Pick up** plastic inflatable "Bell Bar." Humorously lift over head. Hand off to a participant to lift and pass around to others to lift. |
| ■ Champion Selling vs. SSS | ■ **Refer to Workbook Page: Purpose and Objectives.** |
| | |
| OH: Program Objectives | ■ **Show Overhead: Program Objectives** |
|  | |
| | ■ **Say:** "During the Selling Skills Seminar, you had an opportunity to establish your selling effectiveness. In this workshop, our purpose is not to introduce a lot of new techniques and models. Instead, it is to give you the opportunity to 'raise the bar,' your bar, by enhancing and refining those fundamental skills so critical to success so you can be a true 'selling champion.'" |
| OH: Champion Selling vs. SSS | ■ **Show Overhead: Champion Selling vs. SSS.** |
|  | |
| | ■ **Say:** "We'll do that by: |
| | ⇨ Examining how to be more strategic, |
| | ⇨ sharing best practices, |
| | ⇨ focusing on your critical incident challenging sales call, and |
| | ⇨ through in-depth practice, feedback and coaching in small groups." |

---

Leader's Guide

1/2002

Page 19

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048852

*MILESTONE 1*

CHAMPION SELLING

| Talking Points/Material Handouts | Instructions |
|---|---|
| ■ **Importance of Continued Practice of Fundamentals** | ■ **Say:** "It is well known that Michael Jordan, as great as he was, kept practicing over and over again, hundreds of times during practices, the basic skill of making foul shots. That way, when he was on the line in crucial moments of a game – just as you are when you're with a physician – he could shoot them so well and so confidently that he could hit his shots with his eyes closed, which he did on one occasion! Jordan raised his bar so that in crucial moments of the game, the was so confident that he wanted the ball because he knew he could come through." |
| | ■ **Option: Say:** "Jordan developed a potent fade-away jump shot over time, to accompany his driving lay-ups, to beat his opponents in different ways. Likewise, you need a full array of techniques that you can adapt to different physician situations. A true champion doesn't just rely on what has worked in the past." |
| ■ **Introduce Business Managers Role** | ■ **Say:** "Helping us out is a superb team of business managers: _____. Much of the learning in this seminar will take place in small break-out groups, where they will be coaching you for success based on their strong knowledge and experience. Please take full advantage of this opportunity!" |
| | ■ **Option:** Give business managers a reinforcing role by asking them to say a few words at this point about their role, the importance they see of this session and their enthusiasm for contributing. |
| ■ **Key Workshop/Champion Themes (5 minutes)** | ■ **Say:** "The framework for the Selling Skills Seminar was basically the NBS model. We'll also be focusing on critical elements of that model. Now, you have all the time you want to be able to apply that model, don't you?" (Pause and smile so participants know this is a prompt for "push-back" reaction.) |
| | ■ **Say:** "Of course not! So we'll be looking at how to apply your selling skills to the reality of the short selling time that you generally have with the physician. To help us to do that, we've adopted an interesting framework for this workshop: the key elements that make the difference in success." |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048853

*MILESTONE 1*

# CHAMPION SELLING

| At A Glance : Material/Media | Instruction |
|---|---|
| FC: Success Comes From  | ■ **Show Flipchart: Success Comes From:** Attitude, Behavior, Skills, Knowledge. |
| | ■ **Say:** "Successful people have all of these in common: attitude, behaviors, skills and knowledge." |
| | ■ **Say:** "We examined successful people in other endeavors and identified many parallels between them and successful pharmaceutical sales representatives. We know there are many others. However, we've selected the top four. They're not just athletes. That's why our workshop model looks like this...." |
| WP & WB: Champion Themes  | ■ **Refer to Workbook Page: Champion Themes and Review Wall Poster: Champion Themes.** |
| ■ **Relationship of Champion Themes to Job** (5 minutes) | ■ Ask what each theme means and how does each champion theme relate to our everyday jobs as pharmaceutical reps? |
| | **Possible Responses:** (provide this information if class does not offer all of the following): |
| | ⇒ Winning Mindset of Champions: |
| | • **EXPECT TO WIN:** Champions adopt a positive, can-do, win-win mindset that perseveres in the face of resistance and obstacles. They bring a passionate enthusiasm to what they do that rubs off on and motivates others. |
| | • **Reps:** We need a *winning mindset* to overcome obstacles and resistance from physicians, to beat out the competition and to be motivated every day to give our best. |
| | ⇒ Strategic Preparation and Execution: |
| | • **PLAN:** Champions work hard but they work smarter, not just harder, than others do. |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048854

CHAMPION SELLING

*M I L E S T O N E  1*

At-A-Glance / Material/Media | Instructions

- That means doing their preparation and taking a strategic, creative approach to achieve goals.

- Reps: We need strategic preparation (pre-call planning) and execution (use of NBS, CRCT, strategic questioning, etc.) to get an edge on competition and to overcome those obstacles.

⇒ Goal-Focus:

- KNOW WHAT YOU'RE GOING TO DO: Champions are in control of their situation.

- They do that by identifying and focusing on a clear goal, beginning with the end in mind.

- Reps: We need goal focus to have clarity of call and to provide framework for the call.

⇒ Continuous Improvement:

- KEEP LEARNING AND PRACTICING: Champions, even when they are on top, never stop learning, trying new approaches, getting feedback and assistance from others, and practicing what they do, in order to be the best.

- Champions never stop "raising the bar" for their own performance; they continually refresh, refine and improve, which is the reason for, and the name of, this workshop.

- Like an athlete who practices shooting foul shots by the hundred each practice session or the dancer who practices the same move by the hundred each practice session, champions know they have to keep repeating the fundamentals or the bells and whistles won't work.

- Reps: We need continuous improvement to not fall prey to the competition which is also continuously trying to improve and to keep adding value for the physician and the patient in a rapidly changing environment.

■ Ask: "What helps us maintain a continuous improvement mindset?" – an open mind

■ Say: "In order to change behavior of people, you must have the ability to demonstrate some or all of the champion themes when needed. Let's talk about four champion themes to help us understand those foundation themes so we can relate them to our daily activities as reps."

Leader's Guide                                1/2002                                Page 22

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

# CHAMPION SELLING

**At-A-Glance Material/Media**

WB: Champion Themes



■ **Refer** participants to **Workbook Page: Champion Themes** and **say:** The first person is Helen Keller. Despite being deaf and blind, Helen learned to read, write and talk. She graduated from Radcliffe College and wrote a book that became the Oscar-winning movie, "The Miracle Worker". Helen fought for social justice and also toured military hospitals during World War II. She was awarded the Medal of Freedom, the highest honor for a U.S. civilian.

■ **Point** to the Wall Poster and **ask:** Which of the Champion Themes was demonstrated most by Helen Keller?

**Possible Response:**

⇒ Winning Mindset

■ **Say:** The second person is Martin Luther King. He dedicated his life to the non-violent struggle to end segregation in America. During the 1950's, King led boycotts, demonstrations and marches aimed at fighting segregation laws throughout the country. In 1963, King organized a march on Washington where he delivered his famous "I have a dream" speech, describing his vision of interracial brotherhood in America. His focus inspired others and led to dramatic civil rights changes.

■ **Ask:** Which of the Champion Themes was demonstrated most by Martin Luther King?

**Possible Response:**

⇒ Goal-Focus

■ **Say:** The third person is George Washington. Washington was a brilliant strategic general. During the Revolutionary War, he chose to attack Trenton, New Jersey, which was held by British forces on the day after Christmas when the British troops would be sleeping off the party of the night before. His creativity and planning paid off in the surprise winning of the Battle of Trenton, which was a turning point in the Revolutionary War.

■ **Ask:** Which of the Champion Themes was demonstrated most by George Washington?

**Possible Response:**

---

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048856

## CHAMPION SELLING

*MILESTONE 1*

| AV/Glance/Material/Media |
|---|

⇒ Strategic Preparation and Execution

■ **Say:** The fourth person is Tiger Woods. Tiger dominated amateur golf matches through his teens. At the age of 22, he won the 1997 Masters Tournament by 12 strokes, the largest margin ever. After winning the Masters, Tiger decided to take a risk and change his winning golf swing. He realized that in the long run, refining it was going to pay off. His approach paid off as he won the Grand Slam of Golf in 2000 at the age of 24. By taking a risk with his swing, he found greater success.

■ **Ask:** Which of the Champion Themes was demonstrated most by Tiger Woods?

**Possible Response:**

⇒ Continuous Improvement

- ■ **Invest in Hobbies but not in Profession**

■ **Ask:** Speaking of golf, how many of you take golf lessons or piano lessons or some other type of lesson related to a hobby?

■ **Say:** OK, I see that many of you are spending time getting better at your hobbies. Now, how many of you invest time learning how to improve your selling skills?

■ **Say:** It's interesting to see how we invest the time and money to get better at our hobbies but don't invest the time to get better at our profession.

■ **Say:** Just as Tiger Woods focuses on continuously improving his golf swing, so should you strive to sharpen your selling skills.

■ **Say:** Let's return to our discussion about champions and how they influence others.

- ■ **Introduction of Call Success Elements Model (5 minutes)**

■ **Ask:** "Did any of the champions change others' behavior for the better, just as you have to change doctor's behavior for the better?"

**Possible Responses:**

⇒ Martin Luther King's impact on civil rights

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048857

CHAMPION SELLING

MILESTONE 1

**AA Glance : Material/Media**

⇒ Helen Keller's impact on the public's perception of people with disabilities

■ **Ask:** "It's been found that some 87% of all calls last 2 minutes or less. How does that gibe with your experience?"

■ **Say:** "Let's think about what we need to do in order to get the physician to spend more than 2 minutes with us."

■ **Refer to Workbook Page: Call Success Elements.**

■ **Say:** "To change others' behavior, champions first get attention of others and then keep that attention. That's exactly what you're doing on a sales call in order to change physician's prescribing behavior for a win-win."

**WP: Call Success Elements**

■ **Show Wall Poster: Call Success Elements** (get attention>>keep attention>>change behavior).

■ **Say:** "You have to get and keep the physician's attention so you can change their prescribing habits. That requires the influence skills you reviewed in pre-work, and we will be looking at how to do that more specifically in this program."

■ **Say:** Also, we have a better chance of changing our physicians' prescribing habits if we have a deeper relationship with them. But how do we build a deeper relationship?

■ **Say:** A UCLA study in the 1980's determined that three areas influence relationships. The first area is words, which is what you say, your presentations. The second is your vocal elements, which is how you say things: your voice, tone, pitch. The third is your non-verbal which is your body language.

■ **Say:** The study found that words influence relationships only 7% of the time. This statistic suggests that every time you open your mouth you're actually operating at a 93% failure rate! Vocal elements influence relationships 38% of the time and non-verbal has the greatest influence at 55%.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048858

*MILESTONE 1*

# CHAMPION SELLING

### At A Glance - Material/Media

■ Say: What this suggests is maybe our words aren't as important as the physician's words. We should focus on what we are asking and on showing interest in the physician's response with our body language.



"This class is not about just picking up new techniques. It's about enhancing them which is why we'll be sharing best practices. And, being a champion is also about who you are – it's part of your being. It begins with thinking like a champion and moves to behaving like a champion – a continual effort to raise the bar."

"Are you ready to be even greater selling champions than you already are?!"

### At A Glance - Material/Media

■ Agenda (5 minutes)

OH: Agenda

■ Note to Trainer: Refer to the champion themes throughout the workshop where appropriate such as by asking, for example, "What did (name of champion) do when they were confronted by obstacles?" The foundation themes are also referred to throughout the workshop as they relate to specific topics. Inspiring quotes from these and other champions reinforcing the workshop themes will be shared later in the class.

■ Refer to Workbook Page: Agenda.

■ Say: "Here's how we're going to raise the bar with your ability to put these themes into practice."

■ Review Overhead: Agenda

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048859

*MILESTONE 1*

## CHAMPION SELLING

■ **At A Glance: Material/Media**

■ **OPTIONAL: Link Themes to Agenda**

■ As you review topics, *quickly* ask or explain linkage of topics to champion themes as follows:

⇒ Pre-Work

Strat. Prep, Goal-Focus

⇒ Baseline Videotaping

Cont. Improvement

⇒ The Short Selling Time Challenge

Win Mindset, NBS Model Refresher

⇒ Break-out Rooms and Final Practice

Strat.Prep, Goal-Focus, Winning Mindset, Cont. Improvement

⇒ Obstacle Handling

Win Mindset; Strat. Execution

⇒ "The Pull-Together / Pull-Together"

Cont.Improve, Closing: Goal-Focus, Winning Mindset

■ **Personalizing the Learning**

■ Say: "The program will review the skills and techniques. However, it is up to each of you to add your *personal* champion characteristics to pull through to success. You can take control of your learning by relating what we cover throughout the workshop to your personal challenge and critical incident. Make sure that by the end of the workshop, you have identified and practiced tips and best practices that will enable you to overcome your real and specific challenge."

■ **Housekeeping and Groundrules (3 minutes)**

WP: Groundrules

■ Provide basic housekeeping (location of restrooms and phones, breaks, etc.)

■ **Review Wall Poster: Groundrules.**

⇒ 100% Participation

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048860

CHAMPION SELLING

MILESTONE 1

AIA Clinics' Material Middle

⇒ On Time

⇒ Be a Learner

⇒ Respectful

⇒ Stay in the Room

⇒ Cell phones off ringer (not on Wall Poster, so add verbally)

■ Ask: "What others would you like to add?"



"Champions have self-awareness. We'll begin by providing you an opportunity to assess where you are now in your selling effectiveness. Just as in the Selling Skills Seminar, we'll do that by asking you to tape a baseline call with your critical incident physician."

Leader's Guide

1/2002

For internal use only. Not to be distributed or used outside of Merck.

Page 28

## CHAMPION SELLING

MILESTONE 1

| At-A-Glance Material/Media | Trainer Instructions |
|---|---|

**Refer to Pre-Work**

Pre-Classroom Assignment

- **Instruct** participants to take out their Pre-Classroom Preparatory Assignment.

- **Say:** "Your pre-work assignment #2 asked you to do some pre-call analysis of your critical incident physician. An element of that planning is to consider your physician's communication style and how you can most effectively work with it."

- **Ask:** "How many have taken a class in B.E.S.T. communication styles?"

- **Say:** "Most of you are familiar with B.E.S.T. and a summary of the styles was included in the pre-work. Therefore, we'll just do a real quick review here because understanding and employing the knowledge will certainly increase physician receptivity and help your call success. You'll want to include that analysis in your practice taping."

- **Note to Trainer:** make this review of B.E.S.T. and Influence Skills VERY brief (10-15 minutes). Summary of B.E.S.T. styles was provided in the Pre-work Assignment.

**B.E.S.T. Styles**

WP & WB: B.E.S.T. Styles



- **Refer** to Wall Poster: B.E.S.T. Styles and Workbook Page: B.E.S.T. Styles.

- **Say:** "We know that everyone has a preferred style or styles of communicating, taking in information, processing information, making decisions, and relating to others."

- For each of the 4 styles, ask full class: "How many believe they predominantly prefer that particular style?" (only one vote)



- **Write** on blank flipchart the number of reps who identify with each style.

For Internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048862

CHAMPION SELLING

*MILESTONE 1*

| At A Glance: Material/Media | Instructions |
|---|---|
| | ■ Say: "There is no right or wrong style, even for reps. However, successful champions are aware of their own predominant style, notice others' preferred styles, and flex the way they communicate to best work with that other style so they can be more effective in building rapport and transmitting their message." |
| **■ B.E.S.T. Analysis** | ■ For each of the 4 styles, ask: |
| | ⇒ "Who has a critical incident physician who you think, from visual and verbal clues, prefers that communication style?" |
| | ⇒ "Describe for us what clues suggest that style." |
| | ⇒ "Full group: how would you advise your colleague to tailor their call given that pre-call analysis?" |
| | ■ Post a few bullets of strategies provided, on a blank flipchart next to each respective letter of B.E.S.T. |
| | ■ Ask: "What questions do you have about B.E.S.T. styles?" |
| | ■ Say: "When you practice your call, prepare the rep who role plays the doctor as to what style they should demonstrate, and tailor your call to work with that style." |
| **■ Influence Skills** | ■ Say: "Your Pre-work Assignment also included a reminder about Influence Skills." |
| Pre-Classroom Assignment WP: Influence Skills | ■ Refer to Wall Poster: Influence Skills and summary of Influence Skills on prior **Workbook Page: B.E.S.T. Styles.** |
| | ■ Say: "Champions exhibit them all in being successful persuaders." |
| | ■ Ask: "In view of the short selling time that we'll be addressing, which influence skill is most critical?" |

Leader's Guide

1/2002

Page 30

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

# CHAMPION SELLING

*MILESTONE 1*

| At-A-Glance Material/Media | |
|---|---|
| | **Desired Responses:** All of them. However, Asserting and Engaging are most necessary upfront to gain time to be able to Persuade, use Strategic Questions, Actively Listen, and then Close. |
| | ■ **Ask:** "Which skills do we have to be particularly watchful for letting go by the wayside when confronted with a short selling period?" |
| | **Desired Responses:** All of them. However, Actively Listening and asking Strategic Questions tend to get lost when we rush. |
| ■ Influence Zone | ■ **Say:** "Keep in mind, as you conduct your baseline call, to use your influence skills." |
| OH: Influence Zone | ■ **Show Overhead: Influence Zone.** |
| Pre-Classroom Assignment | ■ Refer participants to the Influence Zone graphic in their Pre-work Assignment. |
| | ■ **Say:** "Champions who achieve win-win's use all 6 influence skills. If you identified yourself as towards either end of the win-lose continuum with your critical incident physician, make a conscious effort in your upcoming practice to move to the center situation of "Influencer" by backing off or by asserting more and consciously employing more of the influence skills that may be lacking." |
| ■ Role of NBS Model | ■ **Say:** "The NBS Model is a wonderful strategic roadmap for guiding your call. There's room for everyone to put their personal stamp on it while still staying within the intent and framework that we know is effective." |
| WP: NBS Model Steps | ■ **Show the Wall Poster: NBS Model Steps** and read off the names of the 5 steps. |
| OH: NBS Model Support Orbits | ■ **Show Overhead: NBS Model Support Orbits.** |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048864

# CHAMPION SELLING

**At A Glance: Material/Media** | **Instruction**

■ Say: "The NDS Model is the framework through which you use your relationship and knowledge skills to achieve your goal. Later today we will take a quick look at how to make the model work best for us and we'll give you a chance to analyze a demo call using it within the short selling time context."

- **Instructions for Videotaping of Critical Incident in Break-Out Rooms (5 minutes)**

■ Say: "We're now ready for the first break-out session with your coach. Here's how we'll handle the taping of your baseline videotape."

■ Refer to Workbook Page: Baseline Practice Guidelines.



OH: Baseline Practice Guidelines

■ Review Overhead: Baseline Practice Guidelines:

⇒ Purpose: Effectively demonstrate real, challenging sales call.

⇒ Later: With learning, feedback, coaching: 1 practice of same situation/partner to make call even better.

⇒ Situation: Pre-work: Physician "Critical Incident" representing selling challenges.

⇒ Realistic Short Selling Time: Stand up + 2-minute cut-off.

⇒ Use sales aids. Consider pre-call analysis.

⇒ Doctor: provide at least one obstacle. Adopt actual B.E.S.T. style.

⇒ Bring Pre-work and Workbook with you to break-out room (write your name on them).

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048865

*MILESTONE 1*

CHAMPION SELLING

**A: A Glance: Major Hi/Media**

- **Team Make-up and Location**

  FC: Breakout Schedule

  

**Attention: Participate Intellectually**

- **Refer to Flipchart: Break-out Schedule (or distribute handout).** Assign participants to their teams, coaches, and locations.

  Notes:

  ⇨ This assignment should be worked out in advance in conjunction with the business managers. Adjust as necessary to reflect no-shows.

  ⇨ Each coach will already have a Leader's Guide for Business Managers that they should have reviewed in advance. It contains the detailed instructions for each break-out session.

  ⇨ Each business manager should be given the key to his or her break-out room, which should be locked after each break-out session.

- **Logistics**

- **Provide logistics:**

  ⇨ Main classroom will be locked so take what you need

  ⇨ Directions to break-out rooms.

  ⇨ Return time.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048866

*MILESTONE 1*

CHAMPION SELLING

## 2. Baseline Videotaping

*Time: 60 minutes including break (9:20-10:20)*

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- Videotaping of Critical Incident in Break-Out Rooms (60 minutes including break)

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- See instructions above. Note: If videotaping is not feasible, another option is to conduct a skill practice instead.

Leader's Guide                    1/2002                    Page 34

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

# CHAMPION SELLING

*MILESTONE 1*

## 3. Full Group Debrief upon return from break-out rooms

*Time: 10 minutes (10:20-10:30)*

**Advance Materials/Media**

- Full Group Debrief upon return from break-out rooms

**Instructions**

- Ask: "What did you find were your greatest strengths?"

- **Note to Trainer:** probe by asking, "What else?"
- Ask: "What were your greatest challenges?"
- **Note to Trainer:** probe by asking, "What else?"
- Ask: "Physicians, did the representatives get your attention?"
- Ask: "Representatives, who did most of the talking?"
- Provide summary observations:

- **Note:** In the event any of the promotional messages are not consistent with approved messages or Company policy, coach the representative and the group as to the issue raised and the proper approach.

  ⇒ Pressure is on with videotaping, just as it is when speaking with a physician in short time call.

  ⇒ Strategic planning (pre-call analysis) is critical to success – knowing what your goal is and what you will say to get there.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048868

MILESTONE 1

CHAMPION SELLING

## 4. NBS Model Refresher

**Time: 20 minutes (10:30-10:50)**

**At-A-Glance / Material/Media**

■ **NBS Model**

| Instruction |
|---|
| ■ **Ask:** "How many of you used the NBS model in your videotaped sales call? How many of you use the NBS model every day?" |
| ■ **Say:** The NBS Model is a wonderful strategic roadmap for guiding your call. |
| ■ **Say:** You all understand the model, so let's raise the bar by sharing some best practices in using it with your critical incidents and looking at how to apply it within the constraints of the short selling time." |
| ■ **Say:** "What we want to do now is share your critical incidents with colleagues and get some advice on how to better handle those challenges. You'll also be able to pinpoint where in the NBS model you should particularly focus in order to handle the call more effectively." |
| ■ **Show Overhead: Instructions for NBS Advice Sharing and refer to Workbook Page: Instructions for NBS Advice Sharing.** |

■ **NBS Best Practices and Challenges Table Discussion (10 minutes)**

OH: Instructions for NBS Advice Sharing



Pre-work Prep Assignment

| |
|---|
| ■ **Instruct** tables as follows: |
| ⇒ Quickly review on your own the Pre-work Preparatory Assignment section entitled: "Your Experience in Using NBS with your Critical Incident Physician." |
| ⇒ **Share Critical Incident Challenge:** Each member briefly share at your table the key challenge(s) you identified in pre-work that makes your critical incident physician a tough sell. Avoid discussing challenges that are unrelated to the call itself or that are unique to a particular physician. Record each rep's primary challenge on table's flipchart. |
| ⇒ **Identify Related NBS Step:** Identify the NBS step that each challenge relates to, either that they are having difficulty using the step effectively to get past the challenge or that better use of the step would help get past the challenge. |

Leader's Guide

1/2002

Page 36

Confidential - Subject To Protective Order

MRK-AAR0048869

*MILESTONE 1*

# CHAMPION SELLING

## At-A-Glance: Material/Media

- **Debrief (10-15 minutes)**

  ⇒ Share Advice: Each member receives 2 minutes (someone at each table keep track of time) of suggestions from colleagues at the table for possible ways to better handle the challenge of the step.

  ⇒ Allow 10 minutes.

  - **Debrief** by asking each table:

    ⇒ "What is the challenge?"

    ⇒ "What step causes the most trouble and why? Or the step that would be most helpful to use more effectively to overcome the challenge"

    ⇒ "What were the most useful suggestions for better using that step of the NBS model?

  - **Note to Trainer:** sample responses:

    ⇒ challenge = "yes man" doctor; step that is useful = Assess;

    ⇒ challenge = time constraint; step that is useful = Identify a Need;

  - **Request** and add additional suggestions, noting that each step (except Messaging) will be reviewed in detail during the rest of the program.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048870

*MILESTONE 1*

# CHAMPION SELLING

## 5. The Short Selling Time Challenge

*Time: 60 minutes (10:50-11:50)*

| Agenda/Leader Action/Media | Instruction |
|---|---|
| ■ Close Eyes Vision Exercise | ■ Say: "I want you to close your eyes. Now imagine the following scenario: you walk into the physician's office. He immediately comes out and greets you with a smile. The physician ushers you graciously into his office, offers you a comfy chair and something to drink. He then sits back and announces that, although he is very busy with patients, he is so interested in what you have to say that he wants to provide the next 30 minutes of undivided attention to you! Now open your eyes." |
| ■ Short Time is the Reality | ■ Ask: "Was that realistic?" |
| | ■ Say: "Unfortunately, we have to take a cold dose of reality!" |
| ■ Call Success Element: Get Attention | ■ Say: "As we discussed earlier, some 87% of all calls last 2 minutes or less." |
| WP: Agenda | ■ Refer to Wall Poster: Agenda. |
| | ■ Say: "Given that reality, let's look closely at dealing with the common challenge of making the most out of what appears to be a short selling time. Think back to the call success elements." |
| | ■ Ask: "What is the first element?" |
| | Desired Response: Get attention. |
| WP: Call Success Elements | ■ Refer to Wall Poster: Call Success Elements |
| ■ Demonstrate Ineffective Methods of Responding Short Time (3 minutes) | ■ Say: "Let's look at some typical "attention getters" used in the short selling time. Tell me if they sound familiar." |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order                    MRK-AAR0048871

MILESTONE 1

# CHAMPION SELLING

| At A Glance: Material/Media | Instructions |
|---|---|
| | ■ Say: "The doctor's looking harried and waving his pen in the air and says, 'I don't have time for you today. What do you have for me to sign?'" |
| WP: Call Success Elements | ■ Refer to the **Wall Poster: Call Success Elements.** |
| | ■ Ask: "Which of the 3 Call Success Elements are needed now?" |
| | **Desired Response:** Get Attention |
| | ■ **Demonstrate** several ineffective responses: |
| | ⇒ By just giving in: "I realize you're busy, doctor, is there a better time I can speak further with you?" |
| | ⇒ By just providing a compelling message and a close, such as: "Dr., Zocor® saves lives. Will you prescribe it for all your patients with high cholesterol?" |
| | ⇒ By throwing in a benign question such as, "How's it going with Merck product?" or "Are you using many of those samples?" |
| | ⇒ By talking really fast to get in most of the steps of the NBS model quickly, sounding robotic, and not causing the physician to focus on what you're saying. |
| ■ **Discussion Questions** | ■ Ask: "What's the result of those approaches?" |
| | **Possible Responses** (provide this information if class does not offer all of the following): no changing of behavior |
| | ■ Ask: "What does the physician think of you when you take those strategies?" |
| | **Possible Responses** (provide this information if class does not offer all of the following): you devalue what you say; you communicate that you have no value to add, and that you will go away quietly |
| | ■ Ask: "How do you feel about yourself afterwards?" |
| | **Possible Responses** (provide this information if class does not offer all of the following): not very good! |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048872

*M I L E S T O N E   1*

## CHAMPION SELLING

### At A Glance: Material/Media

- **Defining Moment of Opportunity**

  ### Instructions

  - **Say:** "You've got to have adequate time to get your message across. You have a clear choice to make at the defining moment when the physician's pen is in the air: get the physician's signature and just toss in something to say about the product OR change the dynamic of the call by gaining the physician's attention to extend time."

  - **Say:** "If you do not try to extend the time you have, by piquing the physician's interest you will pass up a critical opportunity – a defining moment of champions."

- **OPTION: Champion Linkage**

  - **Say:** "It's those defining moments that distinguish all champions:

    ⇒ Helen Keller could have felt sorry for herself when she went blind and deaf.

    ⇒ Martin Luther King could have laid low when his home was firebombed.

    ⇒ Tiger Woods could have avoided the pressure by not turning pro as young as he did.

    ⇒ George Washington could have finished his years with a comfortable life without the challenges of taking on the presidency."

  - **Ask:** "When the doctor says, 'I'm busy,' what's he or she really saying in most cases?'"

- **I'm Busy = Do you have value for me?**

  **Possible Responses:** Convince me that it's worth my busy time to spend with you.

  - **Say:** "Sure, there are times where all hell's breaking loose and no matter what you say or do, there really isn't any time. But the vast majority of the time, the physician just needs to be shown the usefulness of the information you have to offer. Champions have the confidence and the know-how to demonstrate their value, and it becomes a self-fulfilling prophecy because they gain the physician's respect. Martin Luther King kept repeating the phrase, 'I have a dream' until it rang in listeners' heads, and became memorable. If he had just said it once, it would not have had the same impact."

---

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048873

# CHAMPION SELLING



MILESTONE 1

Say: "Let's look at how you can be more strategic to take advantage of those critical moment opportunities- when the physician's pen is dangling in the air."

| At A Glance: Material/Media | Presentation/Instruction |
|---|---|
| ■ **Requirements to Get Attention**<br>WP: Call Success Elements | ■ Refer to Wall Poster: Call Success Elements, first factor: "Get Attention."<br><br>■ Ask: "What makes an attention-getter effective?"<br><br>**Possible Responses:**<br><br>⇒ what the doctor is interested in;<br><br>⇒ what's relevant to the doctor;<br><br>⇒ what the doctor needs -- the latest disease and treatment information;<br><br>⇒ a competitive understanding of drugs and their application to their patients;<br><br>⇒ related to core messages or the product<br><br>■ Say: "Sure, there's room for using creative ways to get attention that are unrelated to your product, such as talking about something of personal interest to the physician. But the bottom line is still going to be getting and keeping attention by <u>showing you have value to add</u>. That's how you distinguish yourself from the other companies' reps who just try to be cute."[1]<br><br>■ Say: Let's talk about two effective ways for getting the physician's attention: bold openings and S.O.A.P. Most of you are familiar with S.O.A.P. but bold openings are probably a new concept. |

[1] **Note:** Value is defined as something intrinsically important that guides or motivates an individual. It does NOT refer to anything of monetary value which is in violation of Merck policy.

Leader's Guide

1/2002

Page 41

For internal use only. Not to be distributed or used outside of Merck.

*MILESTONE 1*

# CHAMPION SELLING

## At A Glance - Material/Media    ## Instruction

- **Say:** A bold opening accomplishes three things: it gets the physician's attention, makes the physician stop what he/she is doing and gets them to respond. Not only does it get the physician to respond, but even better, it gets the physician to respond with a patient profile.

- **Say:** Tell me what you think about this bold opening.

- **Facilitator:** Give an example of a bold opening that includes two parts: 1) an approved message about a Merck product and 2) a question such as "What patient in your practice would you not start on drug X?"

- **Ask:** "What were the two parts of the bold opening example that I just used?"

  **Possible Responses:**

  ⇒ Compelling message

  ⇒ Question about the physician's patients/practice

- **Say:** The bold opening will give you a competitive advantage for many reasons. First, it will differentiate you from the competition since it's a different type of opener. Second, it should result in the physician talking to you and even giving you a patient profile. Third, it's probably more concise than the openers you have used in the past. Finally, even if the physician doesn't give you an answer, you have still left him/her with a compelling message!

- Point out how many openings, are really variations of the step of "Identify Need."

- **Say:** "Identify Need is your primary method for getting attention of the physician upfront so you can engage them enough to deliver your message and persuade them to change their behavior."

- **Say:** "When we think of identifying the need, we usually think of using a patient profile in Brands that have approved Patient Profiles. Some reps eliminate that step."

- **Ask:** "Why is that?"

  **Possible Responses:** Too lengthy and cumbersome.

### Value and Role of Identify Need Step

Leader's Guide                     1/2002                                      Page 42

For internal use only. Not to be distributed or used outside of Merck.

CHAMPION SELLING

*MILESTONE 1*

| At A Glance: Major Media | Instruction |
|---|---|
| | ■ **Provide** example of a cumbersome Identify Need step, such as "Doctor Jones, how would you treat a 65 year old, Caucasian woman with a T-Score of –2.7, 2 previous vertebral fractures and a family history of osteoporosis?" |
| | ■ **Say:** "So, our bold opening not only gets the physician's attention but it should also identify the need by getting the physician to provide us with a patient profile. |
| | ■ **Ask:** "What other value does the Identify Need step provide besides getting attention?" |
| | **Possible Responses:** provides focus for call; you can tie your close back to the need identified at the call start; you can refer to the need with examples throughout the call. |
| ■ **Group Exercise: Bold Openings** | ■ **Break** participants into groups by product groups. |
| | ■ **Refer** participants to **Workbook Page: Bold Openings.** |
| | ■ **Instruct** each group to: |
| | ⇒ Create 1 bold opening for their lead product. |
| | ⇒ Determine for which B.E.S.T. style physician would the bold opening be most effective. |
| | ⇒ Flipchart their answers. |
| | ■ **Allow** 8 minutes. |
| ■ **Debrief** | ■ **Debrief** by asking each group to share their answers and ask class to provide feedback on each bold opening. |
| ■ **B.E.S.T. Styles** | ■ **Ask:** "In general, which B.E.S.T. style physician does the bold opening work best with?" |
| | **Desired Response: Bold.** |
| | ■ **Ask:** "How can we change the wording of the bold opening or how should we use our non-verbals in order to effectively deliver these bold openings to other B.E.S.T, styles?" |

Leader's Guide                                1/2002                                Page 43

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048876

CHAMPION SELLING

■ AT A Glance : Material/Media

- **Variety of Methods**

**Possible Responses:**

⇒ Technical – use figures, percentages

⇒ Supportive – focus on benefits to patients

⇒ Expressive – show enthusiasm; appeal to his/her ego

■ Say: "Another option to get the physician's attention is to do a 15-30 second S.O.A.P. This technique works especially well with physician's that have a Technical BEST style. In this case, you are providing the physician with a patient profile."

■ Say: "It just goes to show that there's no one way, although there are some key components. You have to use your personality style, your relationship with the physician and knowledge of his or her B.E.S.T. style, and what works with the context of the situation."

■ Say: "In any case, you have to be mentally prepared to extend the time from the 15 second call to the 5 minute call. It's an attitude of 'I'm going to get the time!' And goal-focus keeps you in control."

■ Say: "You must also, of course, know what you're talking about -- have the disease and product knowledge in order to extend that call. Once again, it's a combination of attitude, behavior, skills, and knowledge that distinguish champions."

■ Say: "Try out some of the methods we've discussed today. Make a commitment to engage the physician instead of walking away – the next day after the class."

■ Point out Workbook Page: Key Points about Extending the Short Selling Time.



For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048877

# CHAMPION SELLING

*MILESTONE 1*

| At-A-Glance Material/Media | Instructions |
|---|---|
| ■ **Demo NBS with Short Selling Time (10 minutes)** | ■ **Say:** "We've talked about how you don't have to cut out NBS steps when time is short. Instead, you use the first step, Identify Need, or some other method to gain attention, and the rest of the NBS steps to keep attention. I'm going to demonstrate the use of the NBS model with a Business Manager in a short selling time situation. We'll try to make this realistic in the sense of the physician not easily giving up on their time constraint or their obstacle. However, the point is to demonstrate that you can cover NBS quickly and you can extend time with the physician using it." |
| WB: Demo Checklist | ■ **Refer to Workbook Page: NBS Demo Observation Checklist.** |
| | ■ **Instruct** participants to listen carefully during the first demo and take notes on the following: |
| | ⇒ Which steps are used. |
| | ⇒ The impact of each of the steps on the way the call unfolds. |
| | ⇒ How is the short time handled. |
| | ⇒ What gets the physician's attention. |
| | ⇒ What keeps the physician's attention. |
| | ⇒ Overall Liked Best/Next Time. |
| ■ **Explain Situation** | ■ **Explain** to the class the physician profile, and goal for the call. |
| | ■ **Request** that someone keep track of time and announce 2 minutes into the call as a way of giving a sense of how much can be covered quickly. |
| ■ **Demo** | ■ **Demonstrate** the call. |
| | ■ **Note to Trainer:** |
| | ⇒ It is advisable to prepare the example and coordinate with your partner. |

Leader's Guide      1/2002      Page 45

For Internal use only. Not to be distributed or used outside of Merck.

# CHAMPION SELLING

*MILESTONE 1*

| At-A-Glance Material/Media | Instructions |
|---|---|
| | ⇒ The physician should be realistically tough and include at least one obstacle, which should be handled with CRCT. |
| | ⇒ Begin call same way as baseline taping: "What have you got for me to sign?" |
| ■ **Debrief** | ■ **Debrief** the workbook questions and **discuss.** |
| | ⇒ Which steps are used. |
| | ⇒ The impact of each of the steps on the way the call unfolds. |
| | ⇒ How is the short time handled. |
| | ⇒ What gets the physician's attention. |
| | ⇒ What keeps the physician's attention. |
| | ⇒ The use of questions. |
| | ⇒ Overall Liked Best/Next Time. |
| ■ **Opportunity to Influence Call** | ■ **Say:** "We know that in reality, a call does not always go so smoothly as we would like, because there are numerous factors that are hard to directly control. However, as we review further concepts in this class, you will see how much you can at least influence, if not actually control." |
|  | "The NBS model has tremendous power if you use it effectively and strategically, along with your Relationship skills and Knowledge. As we continue the workshop, we'll look further at how to make the model work for us." |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order



MILESTONE 1

CHAMPION SELLING

**Lunch**

*Time: 50 minutes (11:50-12:40)*

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048880

# CHAMPION SELLING

## 6. Assessment Step

*Time: 40 minutes (12:40-1:20)*

- Importance of Assessing
  WP: NBS Model Steps

- ■ **Refer to Wall Poster: NBS Model Steps Step 2: Assess.**

- ■ **Ask:** "You already have a lot of data about what the physician is prescribing from Insight. And, of course, you're examining that data as part of your pre-call planning. So, why would you still want to include the Assess step in pretty much every call?"

  **Possible Responses** (provide this information if class does not offer all of the following):

  ⇨ Understand not only what they are doing, but their thinking behind that prescribing choice, the "why":

  ⇨ Get physician thinking about their current prescribing habits – they may not be fully aware of them -- so you can raise doubt in their mind about use of competition

  ⇨ Gain understanding of physician perceptions and misperceptions so you can change them and clear them up

  ⇨ OPTION: give example of misperception that might be discovered from assessment and then dealt with

  ⇨ Gain understanding of physician's decision making process, values and criteria for choosing treatment, so you can influence them

- Champion Quote
  OH: Emerson Quote

- ■ **Show Overhead: Emerson Quote.**



1/2002

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048881

*MILESTONE 1*

CHAMPION SELLING

| At A Glance Material | Instruction |
|---|---|
| ■ Group Exercise: Identify Assessment Questions (5 minutes) | ■ Say: "Questions are so valuable. Another champion, Ralph Waldo Emerson, the highly influential essayist and poet, said in 1852, 'When we have arrived at the question, the answer is already near.'" |
| | ■ Say: "Let's see what kinds of questions you're using to assess." |
| | ■ Ask participants to share some of the assessment questions they typically use or would use with their critical incident physician. Flipchart their responses. |
| | ■ Note to Trainer: this exercise is simply a set-up for talking about how to make assessment questions they are asking more effective. Later, the group will return to the questions on the flipchart to improve them. Therefore, do not do a major debrief and analysis now. |
| ■ Short Time: Assessment Questions Must be on-Target | ■ Say: "However, we have to be sure that our assessment questions are really on-target and strategic. In the short selling time we have, we can't afford to waste a question that doesn't provide us useful information because we don't get a lot of opportunity for many follow-up questions." |
| ■ Requirements for Effective Assessment Questions | ■ Ask: "What makes an assessment question effective?" |
| | **Possible Responses:** |
| | ⇒ gets physician thinking and focused on what you want them to consider, |
| | ⇒ engages physician interest to extend time, |
| | ⇒ provides rep new information, |
| | ⇒ reveals true prescribing rationale, |
| | ⇒ is not threatening, |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

CHAMPION SELLING

*MILESTONE 1*

- **B.E.S.T. Styles**

  - Ask: "How would you differ your assessment question depending on the physician's B.E.S.T. Style?"

  - Lead brief discussion, pointing out, for instance, how a question that might be engagingly provocative to a Bold might be threatening to a Supportive. Also, note how the tone of voice affects how the questions are received.

- **Increasing Power of Assessment Questions**

  - Ask: "Even if you do not have children, I think you can relate to the following example. What kind of response are you likely to get if, at the dinner table, you ask your adolescent, 'How'd school go today?'"

    **Possible Responses:**

    ⇒ "OK"

  - "What did you learn?"

    **Possible Responses:**

    ⇒ Not much."

- **Strategic Questions**

  - Ask: "However, what kind of response are you likely to get if you ask, 'Describe for me what happened today in school compared to yesterday.' Examples of richer responses: "My math teacher wouldn't explain the problem I had trouble with in a different way but yesterday she was really nice to me." "Johnny was spreading rumors about my girlfriend and yesterday he was acting like my best friend."

  - Ask: "What's different in the type of response evoked by the question?"

    Possible Responses: Richer, more engaged response.

  - Ask: "What was different about the question that made it work?"

    Possible Responses: More focused while still being open-ended makes person think, especially about feelings, and open up more

Leader's Guide

1/2002

Page 60

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048883

| At A Glance - Material/Media | Instruction |
|---|---|
| | ■ **Say**: Strategic questions that begin with phrases like "describe", or "share with me" and ask the person to compare can make your questions more effective and lead to more in-depth responses. |
| | ■ **Say**: Comparisons are based on the following: time (vs. last year), trends (what is happening in the marketplace), thought leaders and surveys. |
| | ■ **Say**: By making the person think about his/her response, you get a richer conversation. |
| | ■ **Provide** an example of a weak assessment question and then a powerful one to illustrate the difference: "What results do you get with Zocor®?" vs. "Describe for me the last patient you put on Zocor® and the effects you have seen compared to other patients." OR "Tell me about how you treated the last lipid patient and how does it compare with what how you were treating your lipid patients a year ago." |
| ■ **Alternative Assessment Lead-ins**<br>WP: Call Success Elements | ■ **Refer** to **Wall Poster: Call Success Elements**, Keep Attention. |
| | ■ **Say**: "Asking questions that start with 'what' and 'why' aren't bad, but we can do better. Since we have to Keep Attention, we want more questions that engage and that distinguish you from the competitors' questions. Let's look at some additional ways to vary your assessment questions so they don't sound canned and to make them more powerful so you maximize the value you obtain." |
|  | ■ **Ask** for alternative ways of asking what and why. Post on blank **flipchart**.<br><br>**Possible Responses**: "how," "what factors," "describe," "compare," "tell me about," "explain," "show me," "teach me about." |
| | ■ **Say**: "Phrased this way, it leads the physician to the fact that his need and his patient's needs are the most important thing. And, it often enables the physician to show their smarts, which we know they like to do." |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

*MILESTONE 1*

CHAMPION SELLING

| Leader's Guide/Instructions | Instructions |
|---|---|

**Re-evaluate Assessment Questions (5 minutes)**



- **Instruct** participants to review the assessment questions listed on the flipchart earlier and then to do the following:

- **Evaluate** and then **reword** any questions that can be made more powerful and effective.

- **Consider** whether some of the questions may be made more varied or powerful by using an alternative lead-in.

- Ask participants to share any improved assessment questions and **instruct** them to write down the improved assessment questions on **Workbook Page: Assessment Questions.**

**Verbally Trying Out Improved Questions (5 minutes)**

- **Say:** "What really matters is what comes out of your mouth, not what goes on paper. Therefore, here's an opportunity for you to try out asking these improved assessment questions."

OH: Assessment Questions Practice Instructions

- **Review Overhead: Assessment Questions Practice Instructions:**



⇒ Pair up and stand facing partner.

⇒ Ask each assessment question out loud to partner.

⇒ Receive feedback from partner about the effectiveness of each question. Doctors: notice, and then include in your feedback, how it felt being asked the question – how appropriately assertive was the question's wording and delivery.

⇒ Switch back and forth in delivering the questions.

- **Announce** that time is up after 4 minutes.

**Share Out (5 minutes)**

- **Call on** several participants to share some of their most interesting or valuable improved assessment questions.

- **Discuss** the effectiveness of those questions and why they are effective

---

Leader's Guide                                    1/2002

For internal use only. Not to be distributed or used outside of Merck.

Page 52

Confidential - Subject To Protective Order

MRK-AAR0048885

CHAMPION SELLING

*MILESTONE 1*

### At A Glance · Main Points

■ **Point out Workbook Page: Key Points about Assessing.**

■ Say: "We've raised the bar on Assessing by simply making the questions richer so you'll obtain richer responses and more honest, valuable information, keep attention, and differentiate from the competition."

■ **Conclusion**



"As we've seen, our champions all know how to handle obstacles – whether blindness or a sandtrap! – and so should you! Now, we'll look at dealing with obstacles that are raised by the physician."

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048886

*M I L E S T O N E   1*

CHAMPION SELLING

## 7. Obstacle Handling

*Time: 40 minutes (1:20-2:00)*

WP: Agenda

- **Building Credibility via Obstacle Handling: Restaurant Story (5 minutes)**

- **Refer to Wall Poster: Agenda** to highlight the topic of obstacle handling.

- **Note to Trainer:** It is okay to read the following verbatim and act out as much as you can. If you prefer, use an example of your own to make the same points. A simpler alternative to the following story is: You ask Waiter what he recommends. He responds, "Everything's good." Vs. Waiter who describes the specials in detail.

- **Say:** "Imagine you and your significant other have gone out to a nice Italian restaurant for dinner. The waiter asks you if you would like to have a bottle of wine with the meal. You reply that the two of you prefer red wine to white, but that in looking at the wine list, you see that the restaurant only has Italian wines and your experience is that those wines tend to be lighter bodied and less smooth than the California cabernets that you favor, so maybe you'll just have a couple of glasses of tap water."

- **Ask:** "Now, what do you think of the waiter who passively says 'OK'?" (not much)

- **Ask:** "How much credibility does the waiter gain in your eyes for his ability to recommend food dishes if he just says, 'Well, I don't really think that's the case' and doesn't know enough about the different wines to suggest something to your liking?" (very little)

Leader's Guide

1/2002

Page 54

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048887

*MILESTONE 1*

# CHAMPION SELLING

**Activity Instructions/Media**

- **Ask:** "On the other hand, what do you think of the waiter who says, 'A nice full red wine would go well with what you've ordered. Do you prefer something full-bodied that is more redolent of spices or something fruitier?' and shows you the two bottles. (*Trainer: for effect, actually demonstrate with 2 empty (!) bottles of wine or bottled water meant to exemplify wine.*) He then goes on from your response to indicate that there is a wonderful big Barolo from the Piedmont region made from the Nebbiolo grape which, as the name suggests, gives its finest wines in those areas where early morning fog, nebbia in Italian, often shrouds the vines at vintage time. It will provide a long-lasting taste and a remarkable bouquet reminiscent of violets and fresh-turned earth, not dissimilar to a good California cab. He then asks if that would meet with your approval, and receiving an enthusiastic affirmative, he goes off to get the bottle, while you salivate!" (*Impressive waiter – I'll listen to him.*)

- **Ask:** "Might you then be inclined to listen to this guy's recommendation for a place to go, perhaps, dancing afterwards, too?" (*you bet!*)

- **Ask:** "What has he built up?"

- **Possible Response:** Credibility based on preparation, enthusiasm, knowledge and presentation.

- **Say:** "And that credibility is what enables you to add value because the buyer will listen to you. It also extends the time you have with that person for that same reason."

- **Ask:** "How did he gain that credibility?"

- **Possible Response:** He knew his stuff and he used the CRCT model and his statements were true and accurate.

- **Credibility through Obstacle Handling**



"Being prepared with product and competitive knowledge and an enthusiastic attitude is up to you. What we're going to focus on here is raising the bar for your ability to augment those ingredients."

Leader's Guide    1/2002    Page 55

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048888

# CHAMPION SELLING

*MILESTONE 1*

| At A Glance/Materials/Media | |
|---|---|
| ■ **Quick Review of CRCT Steps (3 minutes)**<br><br>WP: CRCT<br> | ■ Refer to Wall Poster: CRCT and Workbook Page: Key Points about Obstacle Handling. |
| ■ **C-R-C-T** | ■ Quickly review each step:<br><br>⇒ C: Clarify -- be sure you understand the obstacle correctly and specifically<br><br>⇒ R: Resolve -- use your sales aids and data to help the doctor deal with the issue<br><br>⇒ C: Confirm -- ensure the concern has been resolved before moving on<br><br> - **Ask:** "What are ways you ask for confirmation?"<br><br>  **Possible Responses:** "Does that address your question?" "How does that sound?" "How are you now feeling about that issue?"<br><br>⇒ T: Transition -- move on to your message |
| ■ **Importance of All CRCT Steps (2 minutes)** | ■ **Ask:** "What steps do we most likely leave out when we handle obstacles?"<br><br>**Possible Response:** Clarify and Confirm<br><br>■ **Ask:** "Why do we sometimes leave them out?"<br><br>**Possible Response:** Trying to save time; Making assumptions; Afraid of answer if ask for confirmation<br><br>■ **Ask:** "What could happen if you leave out 'Clarify'?"<br><br>**Possible Response:** May be wrong about real issue; may be stuck with a smokescreen obstacle; may provide validity to obstacle as though it's one you hear all the time that does not need clarification |

Leader's Guide

1/2002

Page 56

For Internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048889

*MILESTONE 1*

## CHAMPION SELLING

**AV/Quick Material/Media**

- **Transitioning Example**

  ■ **Ask:** "What could happen if you leave out 'Confirm'?"

  **Possible Response:** May not have solved it to satisfaction of physician, but it does not go away and catches up with you later when you try to close

  ■ **Provide example of transitioning while *linking to patient profile*:**

  ⇒ "Now that we have agreed that <u>Merck product</u> and <u>competitor</u> are similar in efficacy, when it comes to what separates these two in terms of meeting the needs of your <u>profile patients</u>, it is with _____."

  Or, here is an example of *transitioning to a close*:

  ⇒ "Given the efficacy and convenience of Singulair®, will you prescribe Singulair® as a First-Line Controller in appropriate mild-persistent patients who now require daily controller therapy?"

- **Demonstration of CRCT (3 minutes)**

  ■ **Ask:** "Would someone provide me with a typical obstacle you face?"

  ■ Demonstrate use of CRCT by handling the obstacle, using the volunteer to role play the physician.

- **Demo Debrief (5 minutes)**

  ■ Debrief full group and hold discussion as follows:

  ⇒ **Ask:** "What did you find most effective in my handling of the obstacle?"

  ⇒ **Ask:** "What might you have done differently and why?"

  ■ **Re-run** the demo using the different responses that are suggested, with the new volunteers OR request that the volunteers conduct the demo using their approaches – but always ensure that CRCT is at the core of what they do!



"Let's look at some tough obstacles you run into, and figure out what's behind them and how to best deal with them."

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048890

*MILESTONE 1*

CHAMPION SELLING

**5 Categories**



■ **Write on blank flipchart the following 5 phrases:**

⇒ Cost
⇒ Managed care
⇒ Class effect
⇒ Compliance
⇒ Efficacy

■ **Identify Obstacles**

■ Ask participants to share their most common challenging obstacle from their critical incident physician and flipchart their responses.

■ For each, **ask**: "Which of the 5 categories do they fall under?"

■ **Note to Trainer:** Shorter Alternative: Just **ask** class, "Do they all fall under these 5 categories?"

■ Ask selected participants: "How would you ask questions to uncover the real obstacle?"

■ **Say:** "Almost all obstacles are really about efficacy. The other four obstacles, Cost, Managed Care, Compliance and Class Effect, are usually smoke screens."

■ **Example**

■ Share Cost example:

⇒ Rep: "Dr., how many of your patients are cash paying?"
⇒ M.D. response: "15%".
⇒ Rep: "Then, will you write Zocor® in the 85% of the rest of the patients in your practice?"

For Internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048891

*MILESTONE 1*

## CHAMPION SELLING

### AT A Glance - Material/Media

⇒ M.D. response: "No."

⇒ Rep: "So, it isn't cost that is the issue."

■ **Say:** "If the physician truly believes the Merck product is the best in the class, they will write the product. IT'S ALL ABOUT EFFICACY!! When you resolve, you have to ensure you include the efficacy message."

- **Solutions (5 minutes)**

■ **Instruct** participants to pair up and discuss with a partner how to handle each of their respective critical incident obstacles. **Instruct** them to take into consideration the B.E.S.T. style of their critical incident physician.

■ **Instruct** participants to write on prior **Workbook Page: Critical Incident Obstacle** the questions they would ask to clarify and the way they would use each other step of CRCT as a result of the discussion.



■ **Say:** "We want to be sure that when you do your final practice and, of course, on territory, you are as confident and effective as possible. That requires actually working through the obstacle. So, we'll give you another quick practice opportunity before heading back to the break-outs."

- **Role Play and Feedback (5 minutes)**

■ **Instruct** participants to stand back and role play handling the obstacle with their partner as follows:

⇒ Physician raises obstacle to rep (obstacle and specific Merck drug prompted before role playing by rep).

⇒ Rep responds using CRCT with physician responding naturally and answering clarify questions.

⇒ Physician provides feedback to rep: what worked well and what could be done better.

⇒ Switch roles and repeat steps 1-3.

- **ALTERNATIVE OPTION**

■ **Note to Trainer:** If time permits and you feel that the class would benefit from more concentrated coaching, instead of a paired exercise, divide up the full group into teams and assign a coach to role play the physician and provide feedback and coaching.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective
Order

*MILESTONE 1*

## CHAMPION SELLING

| AV Guide Material/Media | Instructions |
|---|---|
| ■ **Advice for Handling Challenging Obstacles (10 minutes)** | ■ Ask volunteers to share their tough obstacles and how they handled them. |
| | ■ **Ask, and then briefly discuss:** "How did you tailor your handling of the obstacle based on the physician's B.E.S.T. style?" |
| ■ **Perceived Dead-End (5 minutes)** | ■ Ask full group for other ideas and provide additional advice. |
| | ■ **Say:** "Sometimes you feel that you've tried everything and you can't get past the physician's resistance or complacency. That can be really frustrating – OR a personal challenge that our champions would probably relish because any success is so much the sweeter." |
| ■ **Solicit Best Practices** | ■ **Ask:** "What are some best practices you can suggest regarding what to do when you feel you've met a dead end of continued resistance over a period of time?" |
| | **Possible Responses** (provide this information if class does not offer all of the following): |
| | ⇒ Show new data |
| | ⇒ Ask what it would take to convince the physician to switch |
| | ⇒ Ask a colleague in your cluster to help out |
| | ⇒ Obtain a 3rd party advocate for credibility |
| | ⇒ Be persistent and creative but patient |
| | ⇒ Rely on the "bandwagon theory" – everyone likes to be associated with a winner: end a compelling message with approved statements that emphasize the success of the Merck Product you are promoting. |
| ■ **Champion Quote** | ■ **Say:** "Remember, you have additional resources to use and additional opportunities to change that physician's behavior. You may not think you're getting through to them, but you'd be surprised how they are hearing your messages." |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

*MILESTONE 1*

# CHAMPION SELLING

**At-A-Glance Materials Guide**

- **Keller Quote**

    OH: Tough Obstacles

- **Show Overhead: Tough Obstacles** (Helen Keller Quote).

- **Say:** "One of our champions who knew something about overcoming frustration, Helen Keller, once said, 'Defeat is simply a signal to press onward.'"

Leader's Guide

1/2002

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048894

MILESTONE 1

CHAMPION SELLING

**Break**

*Time: 15 minutes (2:00-2:15)*

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective
Order

MRK-AAR0048895

MILESTONE 1

CHAMPION SELLING

## 8. Closing

*Time: 20 minutes (2:15–2:35)*

| At A Glance: Material/Method | Instructions |
|---|---|
| ■ **Review of Closing** (10 minutes)<br><br>WP: NBS Model Steps<br><br>■ **Importance of Finishing** | ■ **Refer to Wall Poster: NBS Model Steps** to refer to the topic of closing.<br><br>■ **Say:** "You KNOW that our champions don't work so hard to blow it when the goal is in sight. You, too, have been working hard as you've made your way through the NBS model and are now ready for the payoff – the close. By having made a strong opening as you identified need, and strategically working the physician along via the NBS steps, the close should be a natural next step." |
| ■ **Steps of Closing**<br><br>OH: Steps to Closing<br><br> | ■ **Ask:** "What are the 3 elements of the Close?"<br><br>■ Post on blank flipchart, then **Refer to Workbook: Key Points about Closing and Show Overhead: Steps to Closing**<br><br>**Desired Responses:**<br><br>⇒ Summarize key points for the physician to remember.<br><br>⇒ Check for agreement that there are no obstacles remaining.<br><br>⇒ Ask for specific, realistic and measurable action. |
| ■ **4th (Unofficial) Step:** Follow Up Promise | ■ **Say:** "There's really a fourth step to the Close: tell the doctor that you'll follow up on the action that he or she has agreed to. Step 3, 'specific, measurable action,' enables you to hold their feet to the fire. It will increase the chances of them actually following through, knowing you'll be calling them on it. Use it when you do your final practice of the critical incident in a moment." |
| ■ **Need All Steps** | ■ **Ask:** "What's the danger of going straight to the 3rd step, 'Ask for action,' without first summarizing and checking in?" |

Leader's Guide

1/2002

Page 63

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048896

# CHAMPION SELLING

*MILESTONE 1*

| At A Glance: Material/Media | Instruction |
|---|---|
| | **Possible Responses:** asking for action is harder if you don't remind the doctor of what they've agreed to |
| ■ **Summarize Crisply** | Say: "The first step of the Close, 'Summarize,' can't be long-winded; you must make it a crisp summary of the key messages and comparative advantages." |
| ■ **Gain Agreement** | Say: "The second step of the close is 'Gaining Agreement/Trial Closes.'" |
| | Ask: "What might that sound like?" |
| ■ **Example** | Provide example of 4-step close. |
| ■ **Mini-Agreements** | Say: "Not only do you want to check in and ask this 'trial close' at the end before asking for action, but you're also seeking a series of 'mini-agreements' along the way during the call." |
| ■ **Value** | Ask: "What's the value of gaining 'mini-agreements' all along the way?" |
| | Possible Responses (provide this information if class does not offer all of the following): |
| | ⇒ minimizes surprises at end; gets physician saying "yes" |
| | ⇒ enables rep to move on by building to inevitable conclusion |
| | ⇒ provides trial close information. |
| ■ **Seek Examples** | For each response, ask: "What might it sound like to ask for or confirm that agreement?" |
| | Possible Responses (provide this information if class does not offer all of the following): |
| | ⇒ Confirmation that obstacles have been overcome: "So, Doctor Jones, it sounds like all your concerns and questions have been addressed, or is there anything still outstanding?" |
| | ⇒ Confirmation that data backs up message: "How convincing, then, would you say is the clinical data in favor of prescribing *Merck product*?" |
| | ⇒ Agreement that Merck product is a sound medical option for appropriate patients: "Is there any reason why you wouldn't prescribe *Merck product*?" |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

## CHAMPION SELLING

*MILESTONE 1*

| Data Slide or Material/Media | Instructions |
|---|---|
| ■ **Open Ended** | ■ Say: "What do you notice about these examples?" |
| | **Possible Responses:** the door is open for a more genuine answer from the physician because the question is asked more open-ended than a traditional, "Would you agree....?" |
| ■ **Ask for Action** | ■ Say: "Be sure that your 'checking in' does not become a substitute for your final close. The third step is the core of the close -- asking for action." |
| ■ **Example** | ■ Ask: "How do you ask for action?" |
| | **Possible Response:** "Will you prescribe...?" |
| ■ **Assertive request** | ■ Say: "Be more specific and bolder than just 'Will you consider prescribing...?'" |
| | ■ Ask: "What can you tie that request to in order to make it more powerful?" |
| | **Desired Response:** patient profile |
| ■ **B.E.S.T. Styles** | ■ Say: "As we've examined each step of NBS, we've made note of how it can be tailored to be more effective based on your analysis of your physician's B.E.S.T. style." |
| | ■ Ask: "How might you adapt your close for each of the 4 B.E.S.T. styles?" |
| ■ **Individual Application Exercise (6 minutes)** | ■ Instruct participants to remove from their workbook pocket Handout: Best Call Notes. |
| Handout: Best Call Notes | |
| | ■ **Instruct participants to do the following:** |
| | ⇒ For your critical incident scenario, identify what you would say for each of the four sub-steps of the Close step. Go through the 4 steps and write them down. Remember, what business are you asking for? The identified need -- the patient profile. |
| | ⇒ Deliver to a neighbor and get feedback. |
| ■ **Debrief (4 minutes)** | ■ Request volunteers to share novel closes. |

Leader's Guide

1/2002

For Internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048898

*MILESTONE 1*

## CHAMPION SELLING

### A Champion Material Module

- **Conclusion**

  - Coach when appropriate to correct use of unapproved closes.

  - Say: "Champions are not afraid to ask for the close because their winning mindset tells them they have earned it. They've done their preparation, they've added value for the client. In fact, since it's the natural next step to create the win-win, champions feel uncomfortable not asking for the business when the time is right. The only way you get to change behavior is to ask for it; the compelling message, alone, won't do it."



"The time is now right for you to put it all together by revisiting your critical incident and redoing the role play call based on all you've discussed, learned and practiced over the course of the workshop. Are you ready for "The Pull-Together?!" It's time to put together all that we've looked at in a final break-out room practice and taping. Back to your break-outs, where your coach has instructions. Good luck and we'll see you back here at __:__ ."

---

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048899

CHAMPION SELLING

*MILESTONE 1*

## 9. "The Pull-Together" – Final Practice in Break-Out Rooms

*Time: 1 hour, 20 minutes (2:35-3:55)*

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- **Videotaping of Final Practice in Break-Out Rooms**



▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- See instructions above. Note: If videotaping is not feasible, another option is to conduct a skill practice instead.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

*M I L E S T O N E  1*

CHAMPION SELLING

## 10. Wrap-Up

*Time: 20 minutes (3:55-4:15)*

- Reference to Final Taping

  - Ask: "How many feel they hit a home run on that last call?"

  - Say: "I want to hear everyone say 'Grand Slam' when I ask that question again!"

  - Ask: "How many feel they hit a home run on that last call?"

  - Desired Response: "Grand Slam!"

  - Say: "That's better! Now, you know what, if you don't feel like you hit a home run, that's okay. Because your coach and your colleagues are there to help you further raise the bar to go from that triple you slammed to slugging it out of the park."

- Achievement of Objectives of Class

  - Say: "Let's go back to the objectives for this class. We wanted to go back to the fundamentals and drill them and refine them and make sure you can use those basic tools like NBS and CRCT confidently and effectively, because they do work. And use them effectively within the reality of the short selling time that you face."

  - Ask: "How helpful was it to do that?"

  - Ask: "To what extent did that coaching in your break-outs make you feel more confident that you can handle the challenging calls and extend the time?"

- Transfer Learnings Going Forward

  - Say: "Don't leave the learnings from this class behind. Your first task when you return to territory should be to get in front of that critical incident physician and apply what you did in that 'Full Monty' call and take it even further, because it'll be live and real!

  - And keep making use of your business manager – their job is to help you be successful, so ask them questions, get their advice, take advantage of their expertise!

  - You've been learning a lot of tips from your colleagues. I recommend you pull those workbook pages at the back out and keep them handy for when you pre-call plan your calls for tomorrow."

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048901

*MILESTONE 1*

# CHAMPION SELLING

### Balance-Model Media

- In fact, I challenge you to use just a couple most valuable learnings tomorrow and let me know of your positive experiences in an MVX.

- Write your MVX on a blank flipchart.

■ **Summary of Individual Learnings**

4" x 6" Post-its  (1 per rep)

Blank Index Cards (1 per rep)

CD Player or Cassette Player and Music



- **Distribute** 1 index card and 1 post-it (4" x 6") to each participant.

- **Instruct** participants to write:

  ⇒ on a *post-it*: 1 key specific learning enabling them to better handle their critical incident

  ⇒ on the *index card*: 1 area to focus on continuing to improve on job

- **Instruct** participants to stick the post-it on their back and circulate reading as many other post-its as possible (while trainer plays upbeat music)

- **Instruct** participants to mail their index card to their business manager, who will be asking for it.

■ **M.L. King Video**

VCR, Monitor, King Video clip

- **Say:** "Let's listen to part of Martin Luther King's "I Have a Dream speech."

- **Show** video clip (last words are " I have a dream today.").

- **Say:** "King was someone with goal-focus – he kept getting shut down but kept going."

- **Ask:** "How many times did he repeat the phrase, 'I have a dream'?"

- **Say:** "Just as with a physician, you must keep repeating the compelling message and at some point, the physician will be 'free at last' when he or she prescribes the Merck drug if that is the most appropriate for the patient!"

For internal use only.  Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048902

MILESTONE 1

CHAMPION SELLING

| Activities/Material/Media | Instructions |
|---|---|
| ■ **Raising the Symbolic Bar** | ■ **Say**: "All right, champions, let's raise the bar!" |
| | ■ **Instruct** everyone to: |
| | ⇒ line up, |
| | ⇒ first person in line raises the plastic inflatable bar overhead, and |
| | ⇒ each person passes it overhead to the person behind them. |
| ■ **Gifts** | ■ **Distribute** token gifts that are related in some way to the champion concepts. |
| Tiger Woods Book | |
| ■ **Class Evaluation Forms** | ■ **Distribute** Handout: Workshop Feedback Form. |
| HO: Workshop Feedback Form | |
| | ■ **Collect** when completed. |
| ■ **Announcements** | ■ **Announce** any necessary travel or reimbursement logistics or news. |
| ■ **Thanks and Good Bye** | ■ **Thank** business manager coaches and participants and wish participants good luck. |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048903

*MILESTONE 1*

CHAMPION SELLING

## 11. Level 2

*Time: 30 minutes (4:15-4:45)*

Audio-Visual Materials Introduction

- **Distribute** a copy of the *Business Manager Coaching Guide* for the course.

- **Point** out the key behaviors their Business Managers will be looking for during field visits. Emphasis the purpose of the Coaching Guide is to help the Business Manager support what they've learned during the course and reinforce application on the job.

- **Instruct** participants on how to complete the Learning Check for this course.

- **Explain**: During the introduction of this course I mentioned that you would be completing a Learning Check. The purpose of the Learning Check is developmental only. There will be no pass/fail grades and no scoring of the learning checks. You will be provided with individualized feedback. The aggregate data will enable Sales Training to evaluate Merck's sales training investment. So please, take your time to carefully answer each question. Over time the combined results of this Learning Check will be used to revise both the Learning Check questions and the content of the course.

- **Instruct** participants to click on *Learning Check Icon* and follow directions. Explain the on-line help feature as well as how to use the job aids to follow the learning check process.

- **Instruct** participants to close their laptop when they are finished.

- **Allow** time for everyone to complete the learning check (typically it will take 1 minute or less per question).

- **Note to Facilitator:** There are 2 *options* for debriefing the learning check. Choose the most appropriate debrief based on the time remaining at the end of the course.

For internal use only. Not to be distributed or used outside of Merck.

CHAMPION SELLING

*MILESTONE 1*

- **Debrief: Option 1 (30 minutes)**



- ■ **Refer to OHs: Learning Check and WB: Learning Check.**

- ■ **Say:** We'll now review the answers to the Learning Check questions. Please follow along with me on the overhead since once you submit your answers you no longer to have access to the questions on your laptop. As we review the questions, please write down the numbers of those questions that you believe you answered incorrectly. Place a star next to those questions that were particularly challenging for you.

- ■ **Review** the question (quickly) by reading them or having a participant read the question from the overhead and identifying the answer.

- ■ **Ask** participants to raise their hands if they found that question challenging.

- ■ **Refer to prepared FC: Challenging Questions** and tally the # of participants that raised their hand for each question number.

- ■ **Review** all questions and answers.

- ■ **Tally** the numbers for each question on the **flipchart** and **identify** the 3 questions that were the most challenging for participants.

- ■ **Say:** In order to assist you with applying information and skills from this course back on territory, let's spend a few minutes reviewing the rationale for the top three questions you found the most challenging. Unfortunately we don't have time to review the rationale for all the questions you found challenging.

- ■ **Review** the rationale for the answers to the challenging questions. You may need to refer back to the classroom materials for the specific learning points. If time permits, ask a participant to provide rationale for the correct answer.

Leader's Guide

1/2002

Page 72

For Internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

CHAMPION SELLING

MILESTONE 1

**At-A-Glance: Material/Media**

- **Debrief: Option 2 (15 minutes)**

■ **Ask** participants what questions they have before you move on to the next question. After all questions have been reviewed **thank** the class for their participation and interest in the learning check.

■ **Remind** them that their scores will be sent to them via email.

■ **Say:** Since we are almost out of time, I'm going to review the answers and rationale to only those questions that you found challenging.

■ **Refer to OHs: Learning Check**

■ **Say:** Please follow along with me on the overhead since once you submit your answers you no longer to have access to the questions on your laptop. Take a look at the questions on the overheads.

■ **Ask:** Which questions did you find the most challenging?

■ **Ask** participants to raise their hands if they found that question challenging.

■ **Refer to prepared FC: Challenging Questions** and **tally** the # of participants that raised their hand for each question number.

■ **Note to Facilitator:** Review ONLY the challenging questions on the OH and the answer and rationale for each. You may need to refer back to the course materials to review specific learning points. If timing is an issue, only review the top three.)

■ **Ask:** What questions do you have about the rationale or the key learning point?

■ **Move** on to the next most challenging question. After the most challenging questions have been reviewed **thank** the class for their participation and interest in the learning check.

■ **Remind** them that their scores will be sent to them via email.

**Level One Evaluation**

Leader's Guide                1/2002                Page 73

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048906

*MILESTONE 1*

CHAMPION SELLING

A A A Glarion Material Media

■ **Distribute** *Level One Evaluations* as participants complete the Learning Check (make sure course code and session number is filled in on form)

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0048907

# Planning, Conducting & Following up Successful HEL Programs

**LEADER'S GUIDE**

This document has been produced by Merck's Performance Enhancement Center for the exclusive use of Certified Facilitators to assist in their delivery of this workshop.

This document contains proprietary information and trade secrets and any use other than the above is strictly prohibited.

Copyright © 1999 by Merck & Co., Inc.

**MERCK**
PERFORMANCE ENHANCEMENT CENTER

Confidential - Subject To Protective Order

MRK-H.5STM001605

## Note to Facilitator:

The following is a list of materials and supplies you and your participants will utilize during this workshop.

**EQUIPMENT**
- Overhead projector
- Computer/Proxima

**SUPPLIES**
☒ Flipchart Markers    ☒ Masking Tape    ☒ Push Pins    ☒ Blank Flip Pads  (   )    ☒ Flipchart Stand  (

**OVERHEADS**
- HEL Timeline
- Program Introduction…
- Marketing Information Summary
- Communications Concepts
- Program Introduction Guidelines
- Good Opening Questions
- Communications Concepts
- Post-Program Results

**PRE-PREPARED FLIPS**
- Lessons Learned
- Lessons Learned 2
- Hot Topic Inventory
- The "Right Kind" of Call
- Monitoring Program Information
- Physician Needs and Participant Centered Objectives
- Monitoring Positive Audience Behavior
- Facility Selection and Evaluation

**PARTICIPANT MATERIALS/ HANDOUTS**
- Completed observation form (one page; from self-study program)
- Completed Evaluation form (three pages; from the self-study program)
- Participant workbook
- Transition Role Cards

**OTHER**
- Participants must have submitted completed Evaluation and Observation forms prior to class.

The following is an explanation of the icons used throughout this guide.



Activity or Exercise requires use of blank flipchart

Activity or Exercise based on flipchart material

Activity or Exercise requires use of overheads

Small group Activity or Exercise

Group discussion

Activity requires voluntary sharing of information or experience

Workbook Reading or Exercise

Demonstra- tion of how to access computer information

Lecture

Activity requires handouts

AUTO DATE FIELD
REDACTED

ader's Guide:  HEL Program Workshop

Page

2

**OVERVIEW** | The purpose of this workshop is to provide representatives with feedback and reinforcement on their observations of HEL programs facilitated by others, and for HEL programs they have planned, implemented and followed up.

**OBJECTIVES** | 1. Given the name of a planning, implementation or follow-up task, participants will be able to:
- Describe the procedures (i.e., the sub-steps) required to carry out the task.
- State the rationale for following these prescribed procedures according to standard.
- Identify the Merck resources available to carry out the task/procedure.

2. Self-assess their effectiveness in carrying out all tasks/procedures to plan, implement, and follow-up on HEL programs, using an Evaluation form.

3. Use other attendees as a "help group" after the workshop as a resource for topics/ideas/best practices.

**MODULE FLOW**

| | Topic | Objective | Time | Learning Method |
|---|---|---|---|---|
| Workshop Introduction | Set workshop agenda | • Establish the norm that participants "drive" the class.<br>• Emphasize the importance of application activities (from self-study).<br>• Gauge the strengths and needs of attendees.<br>• Establish a norm of open communication and involvement. | 20-30 Minutes | • Class activity |
| Program Planning | Selecting a topic | • Review procedures for accessing approved HEL topics.<br>• Compile an "inventory" of "hot topics."<br>• Emphasize how identification of topics from physician comments is one indication that the rep is making the "right" type of calls. | 20-30 Minutes | • Class activity |

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page    3

Confidential - Subject To Protective Order

MRK-H.5STM001607

| | | | |
|---|---|---|---|
| | Setting program objectives | • Explore the relationship between identifying participant-centered program objectives and making effective calls on physicians.<br>• Provide practice in identifying participant-centered objectives.<br>• Discuss how to determine if participant-centered objectives have been accomplished. | 20 Minutes | ▪ Trainer-led discussion<br>▪ Class activity |
| | Selecting participants | • Review procedures for selecting participants.<br>• Re-emphasize the importance of involving key physicians in the planning of the HEL program. | 20 Minutes | ▪ Class activity<br>▪ Demonstration |
| | Selecting a speaker. | • Review procedures for selecting and preparing a speaker | 15 minutes | • Class activity<br>• Demonstration |
| | Selecting a facility. | • Emphasize the importance of selecting and preparing a facility and the factors that should be considered. | 15 minutes | • Class activity |
| Program Implementation | Lessons Learned | • Review how implementing a program gives the rep feedback on his/her planning activities. | 15-20 minutes | • Small group |
| | Speaker Introduction | • Review the program introductions made by participants for the HEL programs they conducted.<br>• Provide a framework (i.e., a skill model) for planning speaker introductions and self-evaluating the effectiveness of these introductions | 15 minutes | • Role play |
| | Communication Concepts | • Demonstrate that communication--both one-to-one and group--is at best an imperfect process, one prone to generating false assumptions. | 10 minutes | • Class activity |
| | Monitoring program information | • Emphasize the importance of monitoring a program's subject matter (i.e., the degree to which it deals with audience needs). | 10 minutes | • Class activity |
| | Monitoring Audience Behavior | • Identify audience activities/behavior that indicate interest, attention, and learning. | 10 minutes | • Class activity |

AUTO DATE FIELD
REDACTED

Page    4

Confidential - Subject To Protective Order

MRK-H.5STM001608

| | | | |
|---|---|---|---|
| Follow-Up | Guiding Discussions | • Transition from non-business to business discussions. <br> • Differentiate between keeping discussions business-related and overtly "Selling." <br> • Emphasize the dangers of overtly "selling" during an HEL program. | 20 minutes | • Small group activity <br> • Trainer-led discussion |
| | Post-program follow-up | • Provide feedback to participants on their post-program follow-up activities. <br> • Emphasize the importance of these activities. <br> • Examine the relationship-building aspects of planning, implementing, and following up an HEL program. | 45 minutes | • Trainer-led discussion |
| | | **Maximum Total Time:** | 4 hours, 10 minutes | |

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001609

**About participants:** Prior to this workshop, participants should have completed a self-study program and carried out a series of on-the-job *application activities*, specifically:

- Observed an HEL program and completed a one-page observation form, and
- Planned, conducted and followed up on an HEL program and completed a three-page Evaluation form.

These activities and completed forms are "tickets for admission" to this workshop. They are essential for a meaningful learning experience. Attendees must submit these completed forms to program trainer several days prior to the workshop.

Note: You should carefully review both forms prior to this program. They are included in the front of the Appendix.

**About the design of this workshop:** Because learners will have carried out the application activities mandated in the self-study precursor program, they will be highly motivated to contribute to and "*drive*" this classroom portion of the program. Specifically, they are expected to:

- Share experiences and insights about the on-the-job application activities mandated in the self-study program.
- Get feedback on these activities and have questions answered.
- Advance their knowledge through access to a subject matter expert and interaction with other participants.
- Apply what they learn in this session back on the job.

Thus, this workshop is a continuation of the learning and application process begun with the self-study program. Equally important, it is a validation of the prior program and its application activities. Conversely, failure to "honor the assignments" will send a negative message about management's commitment to the earlier program and interrupt the learning and application progression.

The sequence of the topics covered in this workshop generally follows the timeline of planning, implementation and follow-up actions presented in the self-study program. However, participants should exercise significant control over the workshop. Therefore, many of the topics and learning activities presented in this leader's guide should be considered "potential" elements of the workshop that will be covered when participants have applicable questions and concerns, successes or cautionary tales to share.

**About your role:** You are expected to be a meeting facilitator and subject matter resource who responds to the questions, concerns and needs of the class. While you may focus class attention on a particular topic, how you deal with the topic and the amount of time you devote to it depends on the class.

---

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page     6

Confidential - Subject To Protective Order

**MRK-H.5STM001610**

# Facilitation Tips

> Teaching isn't telling. Learning isn't listening.
> Learning is DOING.

## Early in the workshop...

- Tell the class that everyone is expected to participate actively. (i.e., You are not an entertainer.)
- Initial workshop activities should establish the norm of participant involvement and control of the workshop.
- Reinforce (i.e., make positive comments about) participant contributions. Avoid negative comments on honest contributions. The only "sin" is not to try or not to take the workshop seriously.
- Particularly early in the workshop, exercise care in discussing mistakes, errors or other deficient performance.

## When setting an agenda...

- Guide participants to consider successes they wish to share as well as questions, needs or weaknesses they want to discuss.
- The group should consider both knowledge issues dealing with the self-study program and performance issues dealing with planning, facilitating and following up on an HEL program.

## To encourage open and honest communication...

- When possible, get the group's approval/consensus on the topic you wish to cover next.
- Ask what participants would do *"differently"* in the future, not necessarily what they did wrong.
- When you ask for volunteers (as opposed to requiring everyone to participate), try not to skip anyone who wishes to contribute.
- Build on the positive aspects of performance (i.e., successes) rather than focusing on negatives.
- For very demanding questions for which participants may feel insecure as to whether the objectives are "correct," always ask for volunteers.

Confidential - Subject To Protective Order

MRK-H.5STM001611

## Program Expectations and Logistics

This workshop is designed to answer your questions, allow you to share your experiences and advance your knowledge in planning, implementing, and following up HEL programs. All of you have conducted at least one HEL program and many of you have observed HEL programs conducted by others. You have also completed the self-study experience program and carried out a series of "application activities" mandated by that program and discussed them with your business manager. In other words, you are already knowledgeable about conducting HEL programs.

Therefore, you are expected to "drive" this class, to take an active role, to make sure this workshop meets your needs, and ultimately to take responsibility for your own development. For the next four hours I am your resource and it is your job to make effective use of my expertise and the expertise of your colleagues.

*Time: 20-30 minutes*

**At a Glance: Topic**

**Instruction**

Set workshop agenda



■ ASK each participant: "What do you want to accomplish in this workshop?" (DIRECT participants to respond after they have reviewed the completed Evaluation and Observation forms they brought to class.)

WRITE all responses on the FC: "To Be Accomplished."

POST these responses where they can be seen throughout the workshop.

■ REFER to the FC and SAY: "While I will try to ensure that the next 4 hours meets these goals, it is the responsibility of each person here to 'make it happen.'"

Confidential - Subject To Protective Order

MRK-H.5STM001612

## Topic, continued | Instruction

**Set agenda, continued**

- DISPLAY OH/Workbook page: "HEL Program Timeline."

- SAY: "While, in general, this workshop will follow the timeline sequence of actions presented in the self-study program, I would first like to get a rough idea of your experiences in observing and conducting HEL programs."

### HEL Program Timeline

**Six weeks before an HEL program...**
1. Select a program topic.
2. Set program objectives.
3. Determine program type.
4. Select participants.
5. Select a speaker.
6. Agree on a date and time.

↓

**Four to six weeks before...**
1. Select and book the facility.
2. Prepare the speaker.
3. Send out invitations.
4. Market the program.

↓

**One hour before the program...**
1. Review preparations and program events with owner/manager/event coordinator.
2. Review program with speaker.
3. Work the room.

**During the program...**
1. Introduce the program.
2. Monitor the presentation.
3. Gather post-program reactions
4. Settle up.

↓

**After the program...**
1. Record your observations.
2. Complete paperwork.
3. Follow up with the speaker.
4. Follow up with attendees.
5. Evaluate program success.

DISPLAY the OH as you do the following...

Confidential - Subject To Protective Order

MRK-H.5STM001613

## Topic

Set agenda, continued







## Instruction

■ ASK: "What are our overall strengths and needs in planning, facilitating and following up on HEL programs?"

SUGGEST that the group refer to page two of the Evaluation form they completed prior to class.

*Note:* Ask what participants would do "*differently*" in the future, not necessarily what they did wrong. Particularly early in the workshop, exercise care in discussing mistakes, errors or other deficient performance.

■ RECORD participant responses in the appropriate columns of the FC: "*Lessons Learned.*"

| *Lessons Learned* | |
|---|---|
| **What to duplicate** | **What to do differently** |
| 1. | 1. |

■ You may POINT OUT any "linkages" between these responses or between those from the previous topic. (E.g., One learner's "do differently" lesson may match what s/he wishes to accomplish in this workshop. Or one participant may place a given activity in the "duplicate" category--i.e., it is a strength--and another has categorized it as "do differently.")

■ RECAP both FC columns by asking: "What are our overall strengths and needs?"

■ ASK: "In light of our strengths and needs, which of the steps on this HEL Program timeline do you feel are most important for us to cover in this workshop?" (This is the OH referred to on the previous page.)

*Note:* Guide participants to consider successes they wish to share as well as questions, needs or weaknesses they want to discuss. The group should consider both knowledge issues dealing with the self-study program and performance issues dealing with planning, facilitating and following up on an HEL program.

■ HIGHLIGHT appropriate timeline steps on the OH, using a colored marker.

---

Confidential - Subject To Protective Order

MRK-H.5STM001614

The self-study program made the point that if you're making "the right kind of call," you should already have an inventory of topics that appeal to the physicians you call on. Thus, your ability to identify your own topics is one way to diagnose your effectiveness in dealing with them.

*Time: 20-30 minutes*

| Topic | Instruction |
|---|---|
| Selecting a topic | *Note:* Unless otherwise indicated, the time devoted to this and all subsequent topics depends on the needs and interests of participants. |
| | ■ ASK each participant, one at a time: "What were the topics of the HEL programs you have conducted or observed?" "How was the topic selected?" "Who assisted you in making this selection?" |
| | ■ ASK: "Does anyone have any questions about how to use Insight to access HEL-approved topics?" If there are any questions or problems the class wishes to discuss... |
| | ■ DEMONSTRATE and EXPLAIN all procedures, using Proxima or OHs of relevant Insight screens you prepared beforehand. Do any or all of the following: |
| | • Perform and explain all steps, including why steps are important and common errors often made. |
| | • Confirm understanding by asking questions (e.g., "Do you understand why I did that?" "What did I just do?" "What do I do next?") |
| | • Possibly direct the participant who asked the question or doesn't understand to carry out one or more procedures. |
| | • Direct participants who had problems/asked questions to take notes. |
| | ■ ASK: "What are some additional topics that your physicians have talked about, that have appeared in the recent literature, or that other reps have told you are "hot" right now?" |
| | ■ RECORD participants' responses on the prepared FCI/Workbook page: *"Hot Topic Inventory."* |

*Hot Topic Inventory*

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001615

| Topic | Instruction |
|---|---|
| Selecting a topic, continued | **Note:** In essence, this segment asks participants to describe "the right kind of call" referred to in the self-study program. |

■ For several of these "Hot Inventory" topics that were suggested by physicians, ASK the person who volunteered it:

- "What was the context in which the physician's suggestion occurred?" (i.e., "What were you and the physician talking about?")
- "What is your past history with the physician?" Your relationship with the physician?"

Then ASK the entire class:

- "What did this conversation tell the rep about the physician's needs, concerns, goals, etc?"
- "What did this suggestion and its context indicate about the physician's opinion of the rep?"

■ SUMMARIZE by reviewing the OHIWorkbook page: "*The Right Kind of Call.*"

---

### The "Right Kind" of Call

❖ **Two-way dialogue (not just a product feature and benefit lecture).**

❖ **Physician's needs, problems, goals discussed.**

❖ **The physician feels free to speak his/her mind (i.e., s/he perceives the rep to be customer-oriented).**

❖ **The physician perceives the rep to be technically competent/knowledgeable.**

❖ **The physician perceives the rep to add value.**

---

■ ASK: "What questions do you have regarding how topics are selected?"

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD REDACTED

Page ___ 12

Confidential - Subject To Protective Order

MRK-H.5STM001616

*Time: 20 minutes*

In order to focus your planning efforts, to generate physician interest in the program, and to ultimately evaluate its success, you need to set program objectives. As you learned in the self-study program, your objectives should be both Merck-centered and participant-centered.

| Topic | Instruction |
|---|---|
| Setting program objectives | ■ **ASK:** "What are some of the Merck- and participant-centered objectives you established for your HEL programs?" |
| | *Note:* Because this is demanding and many participants may be insecure as to whether their objectives are "good" ones, use volunteers. |
| | ■ **WRITE** these objectives on the FC: *"Program Objectives."* |
| | ■ **ASK** each of these volunteers: |
| | • "How did the HEL program topic help achieve Merck's business objectives?" |
| | • "How did the topic appeal to your physician needs, problems, goals?" (i.e., "Explain why the topic was of interest to physicians.") |
| | • "Do you feel the HEL program achieved its objectives? Why? Why not?" |

Confidential - Subject To Protective Order

MRK-H.5STM001617

**Topic**

Setting program
objectives, continued





**Instruction**

- DISPLAY the FCs/Workbook pages: *Fact-Finding Questions*" and "*Needs and Objectives*" as shown below.

- SAY: "You can't set participant-centered objectives without a thorough understanding of your physicians' needs. This first flip chart lists some of the questions you should ask yourself to identify needs that apply to an HEL program.

| Fact-Finding Question |
|---|
| ❖ *What has the physician stated he/she wants?* |
| ❖ *What has the physician stated he/she doesn't want?* |
| ❖ *What has the physician said would help his patients?* |
| ❖ *What does the physician want to avoid with his patients?* |
| ❖ *What are competitors and their products doing well?* |
| ❖ *What are they doing poorly?* |

| Physician Need | Participant-Centered Objective |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

AUTO DATE FIELD
REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001633

| Topic | Instruction |
|---|---|
| Setting program objectives, continued | ■ ASK the following questions and **WRITE** responses in the "physician need" column of the FC:<br><br>• "What is something your physicians say he/she *want*?"<br><br>• "What is something your physicians say he/she *don't* want?"<br><br>• "What is something your physicians say would *help* their patients?"<br><br>• "What is something your physicians say he/she want to *avoid* with their patients?"<br><br>• "What is something your physicians say a *competitor* or a competitive product is doing well? Doing poorly?"<br><br>• "What is something your physicians say he/she want to *learn more about*?"<br><br>■ REFER BACK to an FC entry (i.e., need) just volunteered<br><br>■ ASK: "What is an HEL program objective for this need?"<br><br>■ **WRITE** responses in the "participant-centered objectives" column of the FC.<br><br>■ **SUMMARIZE** this segment by saying: "When you set participant-centered objectives for an HEL program based on important physician needs, you increase the likelihood that you will achieve good attendance at the program. It will improve your relationship with your physicians and ultimately accomplish Merck-centered business objectives." |

AUTOMATE FIELD
DEFAULTED

Confidential - Subject To Protective Order

**MRK-H.5STM001619**

**Time: 20 minutes**

In order to produce economic results, your HEL program must not only attract physicians, but attract the "right" physicians, those whose practice has significant economic potential. As you learned in the self-study program, Merck offers significant resources to identify such physicians. However, you also exercise considerable control on attracting them.

| Topic | Instruction |
|---|---|
| Selecting participants | ■ **DIRECT** the class to refer to the Evaluation forms they completed prior to class |

■ **ASK** volunteers the following:

- "How were key physicians selected for your HEL program?"
- "What, if any, professional relationships exist between attendees?
- "What percentage of attendees were A physicians? B+ physicians?'
- "What percentage of those who were invited actually attended the program?"

■ **ASK:** "Does anyone have any questions about how to use Insight and the Merlin views to identify high potential physicians?" .

If there are any questions or problems the class wishes to discuss...

■ **DEMONSTRATE** and **EXPLAIN** all procedures, using Proxima or OHs of relevant Merlin views you prepared beforehand.

■ **DIRECT** participants to complete all six entries on the Workbook page: *"Marketing Information Card."*

■ **TELL** participants to refer to any notes they brought with them and the *Marketing Opportunities Checklist* form completed in the self-study program.




Confidential - Subject To Protective Order

MRK-H.5STM001620

| Topic | Instruction |
|---|---|

Selecting participants, continued

■ ASK each participant, one at a time: "What were the two attendance percentages you entered on the card?"

■ WRITE these figures in the appropriate boxes of the OH: *"Marketing Information Summary."* (You can enter information for as many as ten participants on this overhead.)



**Marketing Information Summary**

| | Overall attendance percentage | Attendance % of physicians involved in planning |
|---|---|---|
| 1 | % | % |
| 2 | % | % |
| 3 | | |

■ ASK: "What can you conclude by examining all of the percentages we have listed on this flip chart?"

■ *Response:* The attendance percentages of the physicians involved in planning should be higher than for those who were not involved.

Confidential - Subject To Protective Order

MRK-H.5STM001621

The speaker you select is often as important as the topic. Again, Merck has significant resources to help you select a speaker. Preparation of the speaker also contributes significantly to his or her success.

*Time: 15 minutes*

| Topic | Instruction |
|---|---|
| Selecting a speaker | ■ **DIRECT** participants to refer to the entries they completed on the HEL program Evaluation form during the self-study. **ASK** several volunteers to answer the following questions:<br><br>• "Who helped you in selecting the speaker for your HEL program and what criteria was used?"<br>• "Did you or someone else prepare the speaker? What topics were discussed?"<br>• "What was your ultimate evaluation of the speaker that you entered on the Evaluation form?"<br><br>■ **ASK:** "what questions do you have about using Insight accessing the HEL department's speakers' bureau or completing the speaker's request form?"<br>If there are any questions or problems the class wishes to discuss...<br><br>■ **DEMONSTRATE** and **EXPLAIN** all procedures, using Proxima or OHs of relevant Insight screens you prepared beforehand. Need list and overheads(or PPT) of Insight screens necessary for trainers to review- we don't have the Insight in our computers to bring up from our own<br><br>■ **DIRECT** the group's attention to the "Resolution to Common Problems/Speaker's Request Form" from the HEL Department's *Rules of the Road* binder, which has been included on pages 8 -11 of the Participant Workbook. You do not have to review these pages now, just point them out to the class for future reference. |

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD<br>REDACTED

Page ___ 18

Confidential - Subject To Protective Order

MRK-H.5STM001622

**Time: 15 minutes**

Most of us know how much a facility can enhance or detract from our enjoyment of an event. Your experience in observing and conducting an HEL program has probably given you additional insight into the preparation required to provide a pleasant learning atmosphere. In the next few minutes we'll do a quick profile of your experiences with the facility you selected.

## Topic

### Selecting a facility



## Instruction

*Note:* Keep this discussion somewhat general in nature. Try to avoid extensive discussion of specific examples or "lessons learned." This type of information will be generated in the next topic.

■ TELL the class to refer to the notes they brought to the workshop and to the first page of the Evaluation forms they brought to class.

■ ASK a volunteer:

• "How did you learn about the facility you selected?" (Then) "How many of the rest of you learned about the facility in this way?"

• "What factors influenced you in selecting it?"

• "What special requests did you make?"

■ WRITE each answer in the blanks of the prepared FCs: *"How you learned about the facility," "Factors that influenced facility selection,"* and *"Special requests."*



**How you learned about the facility:**

❖ ❖ ❖ ❖ ❖ ❖

**Special requests:**

❖ ❖ ❖ ❖ ❖ ❖

**Factors that influenced facility selection:**

❖ ❖

AUTO DATE FIELD
REDACTED

Leader's Guide: HEL Program Workshop

Page 19

Confidential - Subject To Protective Order

MRK-H.5STM001623

| Topic | Instruction |
|---|---|

**Selecting a facility, continued**

- ASK the class:
  - "How many of you learned about the facility in some other way?"
  - "Were any of you influenced by other factors in your selection of a facility?"
  - "Did anyone have other special requests?"

- WRITE each answer on the appropriate FC.

- PROFILE the class by asking for a show of hands for each entry you wrote on the FC and writing the number in the appropriate box to the right.

- Then ASK the entire class: "Overall, did the facility meet, exceed, or fall below your expectations?"

- WRITE the appropriate participant numbers (i.e., hands raised) in the boxes to the right of this entry on the FC: "*Facility evaluation*."

**Facilitation evaluation**

- ❖ Expectations exceeded ☐
- ❖ Expectations met ☐
- ❖ Expectations not met ☐

- SUMMARIZE the points raised by the class.

AUTO DATE FIELD
REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001624

**Time: 20-30 minutes**

| Topic | Instruction |
|---|---|

Most of you probably learned a lot about the effectiveness of your planning activities when you actually implemented your HEL program and that's what we'll investigate next...

- DIRECT participants to divide into small groups of 3 or 4.
- DISTRIBUTE/POST one copy of the prepared FC: *"Lessons Learned during Pre-Program Checks and Implementation"* and a marker for each group.

Program
Implementation:
Lessons Learned

### Lessons Learned during Pre-Program Checks and Implementation

| | Incidents | Lessons Learned |
|---|---|---|
| Topic | Positive: | |
| | Negative: | |
| Participant | Positive: | |
| | Negative: | |
| Speaker | Positive: | |
| | Negative: | |
| Facility | Positive: | |
| | Negative: | |

AUTO DATE FIELD
REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001625

## Topic :



## Instruction

- **SAY** "In the next five minutes I want you to consider what you learned about your *planning* activities during your pre-program checks and during program implementation. Specifically, what did you learn about your *planning* for the program *topic*, its *participants*, the *speaker*, and the *facility*? To do this, on the flip chart you just received list both positive and negative incidents you encountered for each of these planning activities. For now, only fill out the 'incidents' column. Generate as many incidents as you can; don't worry if your team can't think of a positive or negative incident for every box."

- **ADVISE** the class when 3 and 1 minute remain.

- In turn, **DIRECT** each team to discuss each positive and negative incident they listed.

- When all teams have presented their incidents, **DIRECT** the class to volunteer what can be done in the future to prevent the negative incidents and encourage those that are positive.

*Note:* Be alert for and **COMMENT** on any common threads that run through the incidents or the lessons learned. For example, does the group seem to have trouble involving physicians early in the planning of HEL programs? Did they generally do a good job in working with the facility?

---

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
*REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001626

**Time: 15 minutes**

## Topic

Program
Implementation:
Speaker
Introduction

## Instruction

One important task you performed during program implementation was to introduce the speaker and the topic. As you probably learned, this step helped set the tone of the program and required careful planning and rehearsal.

■ DIRECT a volunteer to re-enact the introduction s/he presented his/her HEL program.

■ DISPLAY the prepared OH/Workbook page: *"Program Introduction: Sequence of Events."*

■ TELL the group to note each of the four overhead elements as they occur during the re-enactment.

---

*Program Introduction: Sequence of Events*

1. **Thank participants for attending.**
2. **Enthusiastically explain why the topic is important to attendees.**
3. **Introduce the speaker.**
   - ❖ **Qualifications**
   - ❖ **Your Appreciation**
4. **Explain the meeting agenda.**
   - ❖ **Meal**
   - ❖ **How/when questions handled**

**Throughout your introduction, pay attention to your body language, your tone of voice, and the clarity of your message.**

---

■ After the re-enactment, ASK the class:

"Did ____ (the volunteer) ____ complete the four-step sequence of events?"

"Was his/her body language relaxed and confident?"

"Did his/her tone of voice and pacing convey confidence and professionalism?"

"Was the meeting agenda clearly and thoroughly explained?"

■ CONCLUDE by SAYING: "In general, 55% of communication is accomplished by body language, 38% of communication is accomplished through tone of voice, and only 7% accomplished through the meanings of the words themselves."

---

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page    23

Confidential - Subject To Protective Order

**MRK-H.5STM001627**

**Time: 10 minutes**

| Topic | Instruction |
|---|---|



Program
Implementation:
Communications
Concepts

During the program your ongoing responsibility is to monitor the flow of information and the reactions of your audience to it. First and foremost, you do this so you can take action to improve the flow of information. As you monitor the program, keep in mind these concepts...

- REVIEW the OH/Workbook page: "*Communications Concepts.*"

### Communications Concepts

**People listen poorly—**

- They assume they know what you're going to say and don't hear what you actually do say.
- They think about what they want to say next and don't listen to what you're saying.
- They hesitate to ask you to define a word they're unsure of.
- They generally don't ask for examples.
- They rarely volunteer that they don't understand a point or a concept.

**People communicate poorly—**

- They use vague or ambiguous words.
- They talk in abstract and general terms and don't use specific examples that illustrate what they mean.
- They omit key points or concepts. (i.e., They talk in a type of "mental shorthand" that has meaning for them alone.)
- They slip into jargon or use cliches.
- They don't check for understanding.

- SUMMARIZE the discussion by making the following points:
  - Many audiences—including physicians—assume they have a better understanding of a presentation than, in fact, they do.
  - Many people—and physicians—in an audience hesitate to take actions to aid their understanding.
  - Many speakers—including those in HEL programs—are unaware when they are not understood and assume a higher level of understanding than, in fact, is the case.
  - When monitoring an HEL program, never assume that a smile, nod, or eye contact with the speaker means that everyone understands or agrees with what is being said.

Confidential - Subject To Protective Order

MRK-H.5STM001628

| Topic | Instruction |
|---|---|

**Instruction**

■ ASK: "Who can volunteer examples from your HEL programs, your work experience, or from this workshop that illustrate how people listen and communicate poorly?"

■ DISCUSS the following:

- Whether the professional representative should ever *interrupt* a presentation to ask for examples, definitions or explanations.
- How the representative should pursue these clarifications later, during question and answers sessions.

AUTO DATE FIELD
REDACTED

Page 25

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001629

| Topic | Instruction |
|---|---|
| Program Implementation: Monitoring Program Information  | So we know that communication is an imperfect process at best. And it is your job to monitor this process to gauge participant interest and learning. In so doing, you essentially track several things at once. The first of these is the nature of the presentation's subject matter.... |

■ DIRECT the group's attention to the OH/Workbook page: *"Monitoring HEL Program Information,"* which contains the information used earlier when talking about objectives:

> **Monitoring HEL Program Information**
>
> **What did the Program cover that your physicians say...**
> ❖ They want?
> ❖ They don't want?
> ❖ Would help their patients?
> ❖ They want to avoid with their patients
> ❖ Our competitors are doing well or poorly?
> ❖ They want to learn more about?

■ SAY: "These questions helped you write participant-centered objectives. They can also guide your observations and note-taking during the program.

■ ASK any or all of the following: "What is an example from your HEL programs in which the speaker, the discussion, or the materials covered...

...Something your physicians have said he/she want?"
...How to avoid something your physicians say he/she don't want?"
...Something your physicians have said would help their patients?"
...Something your physicians say he/she don't want to happen to their patients?"
...Products or services our competitors are offering that our physicians like or don't like?"
...Something your physicians have said he/she want to learn more about?"

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page 26

Confidential - Subject To Protective Order

MRK-H.5STM001630

**Time: 10 minutes**

| Topic | Instruction |
|---|---|
| Program Implementation: Monitoring Audience Behavior  | Keeping track of the topics covered in an HEL Program assumes that when an audience's needs are covered, they are likely to be interested and paying attention. Similarly, the observable reactions of participants to the speaker and his or her message indicate interest and attention. While a smile, nod, or eye contact with the speaker are not failsafe indicators, other actions are more valid... |

■ ASK: "What are examples of *observable* behavior that indicate that the audience perceives a program to be a valuable and interesting learning event?"

■ WRITE all responses on the prepared FG/Workbook page: *"Monitoring Positive Audience Behaviors."*



**MONITORING POSITIVE AUDIENCE BEHAVIORS**

1.

2.

3.

■ If necessary, PROMPT or STATE the following responses:
  • A high percentage of the audience participates in discussions or Q&A.
  • Questions and comments indicate that participants are applying program information to their own practices.
  • Participants ask for clarification, explanation and/or examples.
  • Participants stay around after the completion of the formal "program."
  • Participants request additional information, pick up promotional material, etc.
  • Participants tell you they liked the program/found it helpful.
  • Participants make positive comments about the program topic, the speaker, other attendees, the facility. (All reflect on the quality of your planning.)
  • Participants offer suggestions on how to improve the next program. (They care enough to offer suggestions and are thinking about the next program.)
  • Participants ask technical questions (e.g., how a study was carried out).

SAY: "All of these external, observable actions are valid indications of participants' internal reactions and should be included in notes you write as you monitor the program."

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page    27

Confidential - Subject To Protective Order

MRK-H.5STM001631

*Time: 20 minutes*

You can feel confident if your HEL program is generating interest-related responses from your audience and the subject matter of the presentation matches their needs. But, a good speaker, a relevant topic, and an interested audience may not be enough to insure a "successful" HEL program. You need to be perceived as an integral part of the HEL program, not merely someone standing on the sidelines taking notes. Strengthening your relationships with your physicians requires engaging in business- and program-related conversations.

| Topic | Instruction |
|---|---|
| Engaging the Physician through Opening Statements and Transitioning Techniques   | ■ ASK: "What does it mean to be engaging?" <br><br> *Possible Responses:* Get someone's attention and involvement in a discussion, possess charisma or charm, ease in developing rapport or conversing with another. <br><br> ■ ASK: "Reflecting on some HEL programs you've attended, what have you or any of your colleagues said or done to be engaging with physicians?" <br><br> ■ ASK: "When might you attempt to engage your physicians during an HEL program?" <br><br> *Possible Responses:* As physicians enter the meeting facility and you're greeting them, during cocktail hour, when introducing physicians to each other. <br><br> ■ SAY: "Many representatives find it very challenging to be engaging." <br><br> ■ ASK: "Why are opening questions or statements such a challenge for representatives at an HEL program?" <br><br> *Possible Responses:* Difficulty in knowing what might interest/hook a physician, representatives "clumping" to talk to each other if more than one Merck representative is present, intimidation etc, uncertainty if physician will listen to you, hard to know how to connect to physician. <br><br> ■ REFER to OH: *"Techniques to Engage,"* and SAY: "Two techniques which can help you engage your physicians during an HEL program are: <br><br> 1. Effective questioning to open up a discussion. <br><br> 2. Smooth transitioning to refocus a conversation from non-business subjects to business subjects. <br><br> ■ ASK: "How effective are your opening questions? Do they encourage physicians to discuss their needs and problems that are related to the program topic? What are the actual words you use? |

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page    28

Confidential - Subject To Protective Order

MRK-H.5STM001632

| Topic | Instruction |
|---|---|

■ REFER to the OH/Workbook page: *"Good Opening Questions"* and SAY: "Here are some opening questions you can make before and after the presentation at an HEL program. Notice that these questions in each row are related and that questions asked before the presentation largely apply to an individual physician, while the questions in the right column apply to addressing a group."

### Good Opening Questions

| Before the Presentation | After the Presentation |
|---|---|
| "Many of the physicians I talk to are concerned with _[problem related to topic]_. Is it also a concern of yours?" | "Is _[problem mentioned in presentation]_ a problem you're seeing out there?" |
| "How many of your patients does _[problem]_ affect?" | "How many of your patients does _[problem]_ affect?" |
| "How are you currently handling _[condition to be discussed]_?" | "For how many of you is _[mode of treatment]_ discussed by _[speaker]_ a realistic option?" |
| "What changes are you anticipating in _[mode of treatment to be covered]_?" | "Based on what you've heard today, what, if anything, will you do differently?" |
| "What about _____ would you like the speaker to cover?" | "What else about _____ would you like to learn more about?" |
| "What questions about _[topic]_ do you want answered today?" | "Dr. _____, earlier you told me you wanted _[speaker]_ to answer three questions. Have they been answered?" |

■ DIRECT each participant to select a pair of opening questions from the OH and write them to apply to the HEL program s/he conducted prior to class. After 3 minutes:

■ ASK each participant to read aloud his/her opening questions. For each participant:

■ ASK: "Did you feel natural and comfortable (i.e., not phony) asking the question?" Then, ASK the group: "If you were a physician attending a HEL program, how would you react to these questions?"

Confidential - Subject To Protective Order

MRK-H.5STM001633

A good opening question can generate a stimulating discussion between you and the physician but suddenly you might realize that the two of you have slipped into a non-business discussion that is ultimately unproductive. On the one hand, you want to avoid the impression of making a "hard sell." But remember: even if a physician initiates a non business- or topic-related discussion, later on s/he may remember you as someone who wasted his/her time with small talk.

Many of you do a great job transitioning between products during a sales discussion. Let's test your skills in transitioning in an HEL situation....

| Topic | Instruction |
|---|---|
| | ■ ASK participants to get into trios- one will play a Physician, one a Rep and one a Recording Observer. |
| | ■ DISTRIBUTE *"Transition Role Cards"* to each trio. |
| | ■ INSTRUCT participants playing the physician to read their card and participants playing the rep to transition from the non-business topic to a business topic. |
| | ■ REFER to the Workbook page: *"Observer's Sheet: Transitioning."* INSTRUCT observers to carefully listen and jot down basics of what they heard, then rate the quality of each as either: 1- Excellent transition; 2- Average transition and why or 3- Ineffective transition and why. Trios should then brainstorm on ways the transitions could have been improved. |
| | ■ CONDUCT a full-class debriefing on transitions heard, soliciting actual examples for each. DISCUSS those that are most effective and why. Encourage participants to jot down these transitions to test out at their next HEL program. |



Confidential - Subject To Protective Order

MRK-H.5STM001634



**Time: 20 minutes**

You've demonstrated some effective skills to transition a conversation to a more business- or topic-related direction. But a "business-related" discussion at an HEL program is NOT necessarily a "sales" discussion. In fact, in this situation you must often resist your urge to "sell." You must walk a fine line to keep discussion "business-related" without jeopardizing the program's commitment to learning and to helping those physicians who attend.

| Topic | Instruction |
|---|---|
| Program Implementation: Guiding Discussions | ■ **ASK:** "Why can it be counterproductive for you to "sell" during an HEL program?"<br><br>■ **WRITE** participant responses on a blank FC. Be sure the following points are made:<br><br>• The implicit promise of an HEL program is that it will be a helpful learning experience. Being subjected to a hard "sell" during a program violates this promise and can be interpreted as "bait and switch."<br><br>• Physicians know that, while educational interests predominate, an HEL program is intended to advance the interests of Merck. Overt "selling" at this time can be insulting and seen as unprofessional overkill.<br><br>• Overt selling during an HEL program can be seen as an organizational lack of confidence. The results of the studies and their applicability to patients should make the case for Merck products, not the persuasive techniques of its representatives.<br><br>• Selling during an HEL program can damage relationships with attendees because it calls into doubt the rep's customer-orientation and ultimately his/her trustworthiness.<br><br>• Selling can also violate government and Merck policy guidelines.<br><br>■ **SAY:** "So the question becomes how can you keep HEL program discussions on topic and business-related without being seen as *selling*. The next activities offer some suggestions for how to do this." |

AUTO DATE FIELD
REDACTED

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001635

**Topic**

Program
Implementation:
Guiding Discussions
continued



**Instruction**

- DIVIDE the class into groups of 2 or 3 (to a maximum of 4 groups) and DIRECT their attention to the Workbook page: "Guiding Program Discussions."

### Guiding Program Discussions

**Concept:** To avoid being perceived as selling, talk about the features and benefits of a Merck Product or patient needs and problems without mentioning the product name or the name of competitive products.

**Directions:**
1. Discuss the reactions you would have to one of the statements below if you were a physician attending an HEL program.
2. Revise the statement according to the above concept.
3. Share your reactions and revisions with other participants.

| Rep Statement | Your Reactions | Revision |
|---|---|---|
| 1. "As a result of what you've heard today, are you more likely to use ___[Merck product]___ than ___[competitive product]___ for...?" | | |
| 2. "Wouldn't you agree that ___[Merck product]___ has a superior side effect profile for the treatment of...?" | | |
| 3. "How many of you will use ___[Merck product]___ as your initial mode of treatment for...?" | | |
| 4. How many of your ___patients are candidates for ___[Merck product]___?" | | |

- READ ALOUD/DISCUSS the concept at the top of the page.

   *Option:* If there are fewer than 4 teams, you may wish to revise the first rep statement on the workbook page to illustrate the concept. Or you may wish to discuss a rep statement that demonstrates the concept.

- READ ALOUD the directions on the workbook page. ASSIGN each team one of the rep statements. TELL the group they have 5 minutes to complete the activity.

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page 32

Confidential - Subject To Protective Order

MRK-H.5STM001636

| Topic | Instruction |
|---|---|

Guiding
Discussions,
continued

- After 5 minutes, DIRECT each team to report their reactions and revisions to the class.
- REVIEW OH: "Good Opening Questions" with the class.  (Also page 18 of the workbook.)

### Good Opening Questions

- ❖ "What did you find most useful in the presentation?"
- ❖ "Is _____ what you're seeing out there?"
- ❖ "Is _____ a problem you're encountering?
- ❖ "Based on what you've heard today, what will you do differently?"
- ❖ "What would you like to learn more about?"
- ❖ "How many of your patients does _____ affect?"

Confidential - Subject To Protective Order

**MRK-H.5STM001637**

| Topic | Instruction |
|---|---|
| Guiding Discussions, continued  | ■ DIRECT the groups' attention the Workbook page: *"Guiding Program Discussions (2)."* |

**Guiding Program Discussions (2)**

Concept: As much as possible, during an HEL program attendees should initiate discussion of Merck products or competitive products. Respond naturally and factually but don't "sell." Again, talk features and benefits, patient problems and needs.

Directions:
1. Below, write several physician comments or questions that mention a Merck and/or competitive product by name.
2. For each, write a response you might make that follows the above concept.

| Physician Statement | Rep Response |
|---|---|
| 1. | |
| 2. | |

■ READ ALOUD/DISCUSS the concept at the top of the page. (Participants should remain in teams.)

■ READ ALOUD the directions on the workbook page. TELL teams how many statements they should complete (1, 2, or 3). After 5 minutes:

■ DIRECT each team to report their reactions and revisions to the class.

---

Confidential - Subject To Protective Order

**MRK-H.5STM001638**

**Time: 45 minutes**

Following up after your HEL program includes two interrelated activities: First, you are using the program to continue your systematic relationship-building with attendees. Second, you are measuring the results of the program.

| Topic | Instruction |
|---|---|

**Program Follow-up**

■ In turn, DIRECT each participant to share his/her measurements of post-program activities and results (i.e., what they wrote on page three of the Evaluation form). These measurements should consist of both six percentage figures, which you record in one column of OH: "*Post-Program Results*," and evidence/examples, which the group discusses.

*Note:* There are 10 columns in the OH, enough to record percentages for 10 participants.

### Post Program Results

|  | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| 1. **% of attendees who made positive comments about the program:** | % | % | % | % | % |
| 2. **% of attendees with whom you have discussed topic(s) related to program:** | % | % | % | % | % |

■ When everyone's percentages have been entered on the overhead, REVIEW the results of the HEL programs participants have conducted.

Confidential - Subject To Protective Order

MRK-H.5STM001639

| Topic | Instruction |
|---|---|
|  | ■ **ASK:** "How does planning, implementing and following up an HEL program enable you to demonstrate that... <br>     • ...you are competent, knowledgeable and professional?" <br>     • ...you have access to valuable information resources?" (i.e., You are backed up by Merck.) <br>     • ...you are truly concerned with the needs of your physicians?" (i.e., You place their needs on a par with your own/with Merck's. You're not always ""selling."") <br>     • ...you are dependable?" (i.e., You deliver what you promise. Your actions match your words.) <br> **Note:** All of the characteristics listed in these questions are based on the how a salesperson with a strong customer relationship is perceived by the customer. |
| | We've covered a lot of ground today, more than can be summarized quickly. In any event, it's your job to summarize this workshop... |
| | ■ **ASK** each participant: "What is the single most important thing you learned today?" <br> ■ **WRITE** these responses on the FC. <br> ■ **ASK** each participant: "What did you say you wanted to accomplish today and did you meet this goal?" <br> ■ **WRITE** these responses on the FC. <br> ■ **SAY:** "This workshop should also have shown you how valuable it is to share your experiences with your colleagues and to hear about their successes, problems and insights. I encourage you exchange business cards to facilitate easy contact each other over the next year. In the long run your colleagues may prove to be more most valuable resources in planning, conducting and following up on HEL programs." <br> **Note:** At this time, you may set up a conference call in 4 to 6 weeks for all participants to discuss their HEL program efforts. <br> ■ **THANK** the group for their hard work and wish them luck on future HEL programs. |

Confidential - Subject To Protective Order

MRK-H.5STM001640

# APPENDIX

AUTO DATE FIELD
REDACTED

Page 37

Leader's Guide. HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001641

# To Be Accomplished

Confidential - Subject To Protective Order

MRK-H.5STM0018.12



## Lessons Learned
### What to do differently

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.

### What to duplicate

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.

AUTO DATE FIELD

Page 39

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001643

AUTO DATE FIELD
DEPICTED

Page 40

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

# HEL Program Timeline



**During the program...**

1. Introduce the program.
2. Monitor the presentation.
3. Gather post-program reactions.
4. Settle up.

**After the program...**

1. Record your observations.
2. Complete paperwork.
3. Follow up with the speaker.
4. Follow up with attendees.
5. Evaluate program success.

**Six weeks before an HEL program...**

1. Select a program topic.
2. Set program objectives.
3. Determine program type.
4. Select participants.
5. Select a speaker.
6. Agree on a date and time.

**Four to six weeks before an HEL program...**

1. Select and book the facility.
2. Prepare the speaker.
3. Send out invitations.
4. Market the program.

**One hour before the program...**

1. Review preparations and program



Leader's Guide: HEL Program Workshop

AUTO DATE FIELD REDACTED

Page 41

Confidential - Subject To Protective Order

MRK-H.5STM001645

events with owner/manager/event coordinator.

Review program with speaker.

Work the room.



Confidential - Subject To Protective Order

*Hot Topic Inventory*

1.

2.

3.

4.

5.

6.

7.

8.

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page 43

Confidential - Subject To Protective Order

**MRK-H.5STM001647**

9.

10.

AUTO DATE FIELD
REDACTED

Leader's Guide: HEL Program Workshop

Page 44

Confidential – Subject To Protective Order

# The "Right Kind" of Call

❖ Two-way dialogue (not just a product feature and benefit lecture).

❖ Physician's needs, problems, goals discussed.

❖ The Physician feels free to speak his/her mind (i.e., s/he perceives the rep to be customer-oriented).

❖ The Physician perceives the rep to be technically competent/knowledgeable.

AUTO DATE FIELD
REDACTED

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001649

# Program Objectives

AUTO DATE FIELD
REDACTED

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001650

# Physician Needs and Participant-Centered Objectives

| Need | Objective |
|------|-----------|
|      |           |

- ❖ *What has the Physician stated he/she wants?*
- ❖ *What has the Physician stated he/she doesn't want?*
- ❖ *What has the Physician said would help his/her patients?*
- ❖ *What does the Physician want to avoid with his/her patients?*
- ❖ *What do competitors and their products do well?*

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page 47

Confidential - Subject To Protective Order

MRK-H.5STM001651

- ❖ *What do he/she do poorly?*
- ❖ *What does the Physician want to learn more about?*

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD REDACTED

Page 48

Confidential - Subject To Protective Order

MRK-H.5STM001652

## Fact-Finding Questions

❖ *What has the physician stated he wants?*

❖ *What has the physician stated he doesn't want?*

❖ *What has the physician said would help his patients?*

❖ *What does the physician want to avoid with his patients?*

❖ *What do competitors and their products do well?*

❖ *Do poorly?*

❖ *What does the physician want to learn more about?*

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001653

| Physician Need | Participant-Centered Objective |
|---|---|
| | |

AUTO DATE FILED

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001654

# Marketing Information Card

Refer to any notes and forms you completed during the self-study program to enter the following information.

Number of physicians invited:

Number of physicians attended the HEL program:

Attendance percentage:

Number of physicians who were involved during planning in discussion of topic, or of the speaker or of the time, date, or location of the program:

Number of these physicians who attended the HEL program:

Attendance percentage:

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page 51

Confidential - Subject To Protective Order

MRK-H.5STM001655



## Marketing Information Summary

**Overall attendance percentage**

**Attendance % of physicians involved in planning**

| | Overall attendance percentage | Attendance % of physicians involved in planning |
|---|---|---|
| 1 | % | % |
| 2 | % | % |
| 3 | % | % |
| 4 | % | % |
| 5 | % | % |
| 6 | % | % |
| 7 | % | % |
| 8 | % | % |
| 9 | % | % |
| 10 | % | % |

Leader's Guide: HEL Program     AUTO DATE FIELD REDACTED     Page 52



Confidential - Subject To Protective Order

MRK-H.5STM001656

AUTO DATE FIELD

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001657

# How You Learned About the Facility:

_____

❖ _____

❖ _____

❖ _____

❖ _____

❖ _____

❖ _____

AUTO DATE FIELD
REQUESTED

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001658



**Factors that Influenced Facility Selection:**

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD

Confidential - Subject To Protective Order

MRK-H.5STM001659



Special Requests:

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD)

Confidential - Subject To Protective Order

MRK-H.5STM001660

# Facility Evaluation

❖ **Expectations exceeded**

❖ **Expectations met**

❖ **Expectations not met**

AUTO DATE FIELD
REDACTED

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001661



sons Learned during Pre-Program Checks and Implementation

| | Lessons Learned | Incidents |
|---|---|---|
| About the topic… | | Positive: |
| | | Negative: |
| About participants… | | Positive: |
| | | Negative: |
| About the speaker… | | Positive: |
| | | Negative: |

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD

Page 58

Confidential - Subject To Protective Order

MRK-H.5STM001662

**About the facility...**

| Positive: |
|---|
| Negative: |

AUTO DATE FIELD
REDACTED

Leader's Guide: HEL Program Workshop

Page 59

Confidential - Subject To Protective Order

MRK-H.5STM001663

# Program Introduction: Sequence of Events



1. **Thank participants for attending.**

2. **Enthusiastically explain why the topic is important to attendees.**

3. **Introduce the speaker.**

   ❖ Qualifications

   ❖ Your Appreciation

4. **Explain the meeting agenda.**

   ❖ Meal

   ❖ How/when questions handled

Confidential - Subject To Protective Order

MRK-H.5STM001564

**Throughout your introduction, pay attention to your body language, your tone of voice, and the clarity of your message.**

AUTO DATE FIELD
REDACTED

Page    61

Leader's Guide:  HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001665

# Communications Concepts



**People listen poorly...**

- They assume they know what you're going to say and don't hear what you actually do say.

- They think about what they want to say next and don't listen to what you're saying.

- They hesitate to ask you to define a word they're unsure of.

- They generally don't ask for examples.

- They rarely volunteer that

**People communicate poorly...**

- They use vague or ambiguous words.

- They talk in abstract and general terms and don't use specific examples that illustrate what they mean.

- They omit key points or concepts. (i.e., They talk in a type of "mental shorthand" that has meaning for them alone.)

- They slip into jargon or use cliches.

- They don't check for

AUTO DATE FIELD

Confidential - Subject To Protective Order

MRK-H.5STM001666

they don't understand a point or a concept.

understanding.

Confidential - Subject To Protective Order

MRK-H.5STM001667

# Monitoring HEL Program Information

What did the Program cover that your physicians say...

- ❖ He/she wants?

- ❖ He/she doesn't want?

- ❖ Would help their patients?

- ❖ He/she wants to avoid with their patients?

- ❖ Our competitors are doing well or poorly?

- ❖ He/she wants to learn more about?

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page 64

Confidential - Subject To Protective Order

MRK-H.5STM001668

# MONITORING POSITIVE AUDIENCE BEHAVIORS



1.

2.

3.

4.

5.

6.

7.

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001669

8.

9.

10.

# Techniques to Engage

1. **Effective questioning to open up a discussion.**

2. **Smooth transitioning to refocus a conversation from non-business subjects to business subjects.**



Confidential - Subject To Protective Order

MRK-H.5STM001670

# Good Opening Questions



## Before the Presentation

"Many of the physicians I talk to are concerned with [problem related to topic]. Is it also a concern of yours?"

"How many of your patients does ____ [problem] affect?"

"How are you currently handling [condition to be discussed] ?"

"What changes are you anticipating in [mode of treatment to be covered]?"

"What about ____ would you like the speaker to cover?"

## After the Presentation

"Is ____ [problem mentioned in presentation] a problem you're seeing out there?"

"How many of your patients does ____ [problem] affect?"

"For how many of you is ____ [mode of treatment] discussed by [speaker] a realistic option?"

"Based on what you've heard today, what, if anything, will you do differently?"

"What else about ____ would you like to learn more about?"

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001671

"What questions about
[topic] do you want
answered today?"

"Dr. _____, earlier you told
me you wanted [speaker]
to answer three questions.
Have they been answered?"

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REV/CTED

Page 68

Confidential - Subject To Protective Order

MRK-H.5STM001672



# Scenario 1

"What a nice restaurant! I hear that the food is wonderful."

**Physician says:**

**Possible Rep response:**

"You're right, it is. I'd only arrange the best for you. I'm sure you feel the same way about your patients. When you decide to prescribe an antihypertensive, what characteristics make one product stand out from another?"



# Scenario 2

AUTO DATE FIELD
REDACTED

Page 69

Confidential - Subject To Protective Order

MRK-H.5STM001673

**Physician says:** "I love coming to this restaurant, my husband and I come here a lot. They have a great menu."

**Possible Rep response:** "That's one of the reason's why I chose this place. You can get boiled lobster or a venison steak. Speaking of a great menu, what concerns you about the HMO's you're dealing with, limiting your choices when choosing a specific drug therapy for a patient?"

## Scenario 3

**Physician says:** "What a great football game yesterday. Did you see how effective Drew Bledsoe was in the 4th quarter? That guy is amazing."

Confidential - Subject To Protective Order

MRK-H.5STM001674

**Possible Rep response:**

"Bledsoe is effective on so many levels, He's a leader, you feel safe with him carrying the ball, and he's a proven winner. You know who else that sounds like? Zocor, a market leader, an eight year safety record, and proven to save the lives of your patients. Physician, what concerns to you have about have Zocor leading your team in the fight against CHD?"

## Scenario 4

**Physician says:**

"So what plans do you have for the holidays?"

**Possible Rep response:**

"Well, my wife and I are going to visit my grandmother. It should be a lot of fun though I feel so bad for her. She really has advanced osteoporosis and can't travel at all. She wasn't on any treatment plan for the longest time. Physician, what do you think the reasons are that some physician don't do much about osteoporosis until it's in its advanced stages and nearly too late?"

Leader's Guide: HEL Program Workshop

AUTO RATE FIELD
REDACTED

Page 71

Confidential - Subject To Protective Order

MRK-H.5STM001675

AUTO DATE FIELD
REDACTED

Page — 72

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001676

# Observer's Sheet: Transitioning

**Instructions:** As you hear representative's transitioning statement/question, jot down the gist of how they move from a non-business to business discussion and rate the quality of the transition.

## Scenario 1

Doctor:     *"What a nice restaurant, I hear that the food*  *."*

Transition Statement/Question:

Rating *(circle one):*     1     2     3

## Scenario 2

Doctor:     *"I love coming to this restaurant, my husb*
            *here a lot.   They have a great menu."*

Possible Rep Response:



Leader's Guide: HEL Program Workshop     AUTO DATE FIELD     Page    73
                                         REDACTED

Confidential - Subject To Protective Order

Rating *(circle one)*:    1    2    3

Confidential – Subject To Protective Order

MRK-H.5STM001678

# *Observer's Sheet: Transitioning* (cont.'d)

## Scenario 3

Doctor:   "What a great football game yesterday. Did you :
          effective Drew Bledsoe was in the 4th quarter? T..    azing."



Possible Rep Response:

Rating *(circle one)*:        1        2        3

## Scenario 4

Doctor:   "So what plans do you have for the holidays?"



Possible Rep Response:

Leader's Guide: HEL Program Workshop          AUTO DATE FIELD          Page    75
                                              REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001679

Rating (*circle one*):      1      2      3

## *Guiding Program Discussions*

**Concept:**  To avoid being perceived as selling, talk about the features and benefits of a Merck product or patient needs and problems without mentioning the product name or the name of competitive products.

**Directions:**
1. Discuss the reactions you would have to one of the statements below if you were a physician attending an HEL program.
2. Revise the statement according to the above concept.
3. Share your reactions and revisions with other participants.

| Rep Statement | Your Reactions | Revision |
|---|---|---|
| | | |

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD

Confidential - Subject To Protective Order

MRK-H.5STM001680

| | |
|---|---|
| 1. "As a result of what you've heard today, are you more likely to use [Merck product] than [competitive product] for...?" | |
| 2. "Wouldn't you agree that [Merck product] has a superior side effect profile for the treatment of ...?" | |
| 3. "How many of you will use [Merck product] as your initial mode of treatment for...?" | |
| 4. How many of your patients are candidates for [Merck product] ?" | |

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page 77

Confidential - Subject To Protective Order

MRK-H.5STM001681

# Guiding Program Discussions [2]

**Concept:** As much as possible, during an HEL program, attendees should initiate discussion of Merck products or competitive products. Respond naturally and factually but don't "sell." Again, talk features and benefits, patient problems and needs.

**Directions:**

1. Below, write several physician comments or questions that mention a Merck and/or competitive product by name.
2. For each, write a response you might make that follows the above concept.

| Physician Statement | Rep Response |
|---|---|
| 1. | |
| 2. | |

Leader's Guide: HEL Program Workshop

AUTO DATE FIELD
REDACTED

Page 78

Confidential - Subject To Protective Order

MRK-H.5STM001682



3.

AUTO DATE FIELD
REDACTED

Page 79

Leader's Guide: HEL Program Workshop

Confidential - Subject To Protective Order

MRK-H.5STM001683

# Post Program Results

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. % of attendees who made positive comments about the program: | % | % | % | % | % | % | % | % | % | % |
| 2. % of attendees with whom you have discussed topic(s) related to program: | % | % | % | % | % | % | % | % | % | % |
| 3. % of attendees to whom you dropped off/discussed written materials related to program topic: | % | % | % | % | % | % | % | % | % | % |
| 4. % of attendees to whom you have improved access: | % | % | % | % | % | % | % | % | % | % |
| 5. % of attendees whose Rx of program-related Merck products increased: | % | % | % | % | % | % | % | % | % | % |
| 6. % of attendees for whom the quality of calls has improved: | % | % | % | % | % | % | % | % | % | % |

AUTO DATE FIELD
REDACTED

Confidential - Subject To Protective Order

MRK-H.5STM001684

# Basic Training



# Participant Guide
## 2002

Confidential - Subject To Protective Order

MRK-H.10STM000578



# Table of Contents

Key Takeaways.................................................................................................... 1
Basic Principles.................................................................................................... 3
Pathway For Success............................................................................................ 9
Running My Business........................................................................................... 10
New Territory Scenario........................................................................................ 11
Field Sales Performance Report (FSPR)................................................................ 12
Prescription/Plan Market Share Report (PPMSR)................................................. 13
Field Sales Performance Report & Prescription/Plan Market Share Report Worksheet............ 14
Merck Potential.................................................................................................... 15
PLUS Prescriber................................................................................................... 16
New Territory Scenario (Continued) .................................................................... 17
Merlin Territory Today ........................................................................................ 18
Merlin Explorer..................................................................................................... 19
Merlin View Layout & Navigation ...................................................................... 20
Merlin: Customizing a View: Select Elements  (Three Dot Box) ......................... 21
Merlin: Data Analysis: Quick Sort vs. Advanced Sort ........................................ 22
Merlin: Analysis Enhancement: Highlight Options ............................................. 23
Merlin Scenario 1................................................................................................. 24
Merlin Scenario 2................................................................................................. 25
Merlin Scenario 3 ................................................................................................ 26
Merlin Seek & Find ............................................................................................. 27
INSIGHT: Customizing the look of Insight.......................................................... 29
Insight: Customer View Tabs ............................................................................... 32
Insight: Planning For Your Customers ................................................................. 33
Insight: Reporting Customer Calls....................................................................... 35
Explorer Activity ................................................................................................. 38
Insight Reports .................................................................................................... 40
Merlin Territory Glossary .................................................................................... 47
Glossary ............................................................................................................... 54
Lead Representative Roles & Responsibilities...................................................... 59



Confidential - Subject To Protective Order

**MRK-H.10STM000579**

Tab "Module 1"

Confidential - Subject To Protective Order

# Key Takeaways....

| WAR | Merck Connect | FSNET/UUNET |
|-----|---------------|-------------|
|     |               |             |

Confidential - Subject To Protective Order

MRK-H.10STM000581



**2**

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000582

Tab "Module 2"

Confidential - Subject To Protective Order



## Basic Principles

Territory Management
*Introduction to Basic Principles
& Pre-call Planning*

Module 2

Notes

---

*Agenda - Module 2*
- Overview of Basic Principles
- Call planning process
- Customizing the Weekly Activity Report
- Synchronizing Data/Merck Connect
- Who wants to be an Awesome Rep on Territory?
- Pre-call Planning in Insight

Notes

---

*What is Market Volume?*

- Market Rx Volume is the number of prescriptions written within an entire market for the customer.

- Allows you to target customers based on the volume of prescriptions they write within a specific market.

Notes

---

*What is Rx Volume?*

- Rx Volume is the number of prescriptions written for a specific product by a customer.

- Allows you to target customers based on the number of actual prescriptions written for a product.

Notes

---

Confidential - Subject To Protective Order

MRK-H.10STM000584



## What's the difference between Market Volume and Rx Volume?

Market Rx Volume - 300
Rx Volume - 100

- Dr. Jones wrote 300 prescriptions for NSAIDs. 100 prescriptions were written for VIOXX.

Notes

## What is Market Share?

- Market Share - represents a percentage of a pool of Rx's
- Market Share = Rx Volume/Market Volume x100

- New Rx Share - represents new prescriptions. Gives you a good idea how your business is trending.
- Total Rx Share - represents new and refill prescriptions

Notes

## How can a physician's New Rx Share for a product be higher than the Total Rx Share, isn't New a component of Total?

- Market share represents a % of a pool of Rx's.

- New Rx Share represents the product's % of the pool of the New prescriptions while total Rx share represents the product's % of the pool of total prescriptions.

- Since the sizes of the pools differ, it's not uncommon for the New Rx share and the Total Rx share to differ.

Notes

## New Rx Share vs Total Rx Share

New Rx Share - 50 %



100 new
prescriptions written
for NSAIDs - 50 of
the 100 written for
VIOXX

Total Rx Share - 25 %



200 total
prescriptions written
for NSAIDs - 50 of
the 200 written for
VIOXX

Notes

**4**

Confidential - Subject To Protective Order

MRK-H.10STM000585



### What is Plus Prescriber (+Rxer)?

- Individual market share report for each physician.

- Pinpoints a prescriber's current habits.

- Used to identify which products are currently in favor with the physician in order to develop a strategy to change these prescriptions into Merck prescriptions.

Notes

### What time frame does the +Rxer data represent in Insight?

- Current Month (CM) - data for the month that was most recently sent to the field.

- Previous Month (PM) - data for the month prior.

- Rolling 6 Months (R6M) - data for the six months prior.

Notes



Notes

### What is Merck Potential (MP)?

- A quantitatively derived dollar estimate of each prescriber's total prescribing volume that can be realistically converted to Merck prescriptions.

- Calculated quarterly using +Rxer market share and volume data.

- Serves as a *targeting tool* to help you choose who to target based upon the total $ a customer is able to contribute to your business

- A+/B Category Rating

Notes

*Basic Training Participant Guide (1/02)*

**5**

Confidential - Subject To Protective Order

**MRK-H.10STM000586**





Notes

### Who will receive +Rxer and Merck Potential data?

· Only physicians with valid MEDED #'s
   AND

· All A+/B MP Category Rating physicians
   OR

· All targeted (02' and Spec) within a Market

Notes

### What is a Flag?

· A way of grouping customers that have similar prescribing trends.

· Three types: personal, cluster, headquarter

· Signals you to deliver specific product discussion based on how customer is flagged.
   – Example: Zocor 02, Vioxx 02

· All flagged 02 customers should be included in weekly routing.

Notes



Notes

**6**

Confidential - Subject To Protective Order

MRK-H.10STM000587



## What is a Detail?

- Product discussion with a customer

- Details should be recorded in Insight in the order they were discussed with the customer.

Notes

## Call Planning and Reporting Process

- Utilize the Insight Today View to view customer information prior to planning your call strategies
  - Analyze +Rxer data and call history.

- Develop call strategy and enter into Insight

- Make call on customer

- Report calls as soon as possible after the call

- Call notes will increase team selling

Notes

## Weekly Activity Report

- Summarizes your call activity for the week

- Located in Insight Reports

- Highlight your week in the Notes section

- Send to your Business Manager and ROA

- Can be customized to reflect calls on physicians with a particular flag and/or physicians with a particular category rating.

Notes

Notes

*Basic Training Participant Guide (1/02)*

**7**

Confidential - Subject To Protective Order

MRK-H.10STM000588



WAR: Customize to reflect flagged physicians or physicians ranked in a particular market

Notes

Notes



## Synchronization

- Conduct a Merck Connect Session 5 days/week

- Call echoing happens during this process

- Headquarters sends information to you by this system (new flags, factoids, plus prescriber, reports, etc.)

- Utilize the Autophone Feature

- Wait until the session is complete before disconnecting your phone line/shutting down computer.

- Call the helpline if you are having problems.

Notes

Synchronization screen

Notes

**8**

Confidential - Subject To Protective Order

MRK-H.10STM000589

Tab "Module 3"

Confidential - Subject To Protective Order



# Pathway For Success



This model depicts a path that leads to successful results on territory. Over the next couple of days, we will focus on all of the steps depicted in this model.

Notice Insight is in the center of these activities. Insight enables you to do these activities in less time with more effectiveness.

Confidential - Subject To Protective Order

MRK-H.10STM000591



# Running My Business

As a business operator, answering these questions can help you to run your business successfully. Consider the answers to these questions when following your Pathway for Success.

- Who are my customers?
- Which customers offer the most potential?
- Are my markets growing? steady? declining?
- Is my market share growing? steady? declining?
- How will I attract? hold? increase my market share?
- Who are my top competitors?
- How are their businesses: steady? increasing? decreasing?
- What are their strengths and weaknesses?
- How does their product or service differ from mine?
- What resources are available to provide assistance in this area?
- Based on Merck's strategies, how will I promote my products?

**10**

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

**MRK-H.10STM000592**



# New Territory Scenario

From the Blue Chip activity, you know how important information is to your ability to analyze your customers. Let's look at a situation that is more realistic. Read the following scenario and answer the question. Use the space below to take down notes about how Merlin Sales Reports are used to solve the scenario.

> Imagine that you are a new Merck representative, and have just completed Merck Basic Training. It is your first week on your own. It is your job to decide:

- Which product in my product group has had the greatest impact on my performance (positively or negatively) to date?

- Based on my finding which products need more attention?

- How is my product performing compared to the competition?

Confidential - Subject To Protective Order

MRK-H.10STM000593



# Field Sales Performance Report (FSPR)

*Definition:*

The Field Sales Performance Report (FSPR), issued monthly, provides data on sales dollars, objectives and performance. It is the most complete picture of your territory because it includes sales for each product by every customer segment. This is the report to look at first when analyzing a territory.

*Benefits:*

The Field Sales Performance Report allows you to:

- Identify which customer segments to target.

- Determine which products are driving your business and their sales by customer segment.

- Identify the impact of each promoted USHH product on overall territory performance.

- Have a starting point in Business Analysis.

*Key Point:*

This is the report on which bonus is paid.

**12**

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000594



# Prescription/Plan Market Share Report (PPMSR)

*Definition:*

The Prescription/Plan Market Share Report contains market share values expressed as a percentage of <u>prescriptions</u> (new and total) by payor type. The third party market share information is then broken down by <u>plan</u>, and the mail order is broken down into *National RX and All Other Mail Order*. The Prescription Plan/Market Share Report is based on prescriptions dispensed through the retail channel and mail order companies. This report is issued monthly.

*Benefits:*

The Prescription/Plan Market Share Report allows you to:

- Determine different payor types (cash, Medicaid, third party and mail order contribution to the territory).
- Identify market share trends by payor within customer segments, as well as within individual third party plans and mail order.

*Key Points:*

This is the primary report to track various payor segments and third party organizations for market share of both Merck and competitor products.

- Plan Cutoffs

  Due to space and paper limitations, there may be situations where not all of the third party plans can be printed on the report.

Confidential - Subject To Protective Order

**MRK-H.10STM000595**



# Field Sales Performance Report & Prescription/Plan Market Share Report Worksheet

Based on the FSPR and PPMSR report handouts, answer the following questions about your business.

1. Which product is contributing the most Y-T-D sales dollars to the total geography?

2. Based on your answer above, what are the sales, growth %, and PPO of this product Y-T-D?
   - Sales:

   - Growth:

   - PPO:

3. What is the territory total, RCQ % Volume Change for the *ANTIARTHRITIC* Market? How will this information impact your strategy for this product?

4. What is the territory total Market Share Change from RPQ to RCQ for:

   Vioxx®:                          Ultram®:

   Celebrex®:                       Mobic®:

   Arthrotec®:                      Ibuprofen:

   Relafen®:                        Naproxen:

   Daypro®:

**14**

Confidential - Subject To Protective Order

MRK-H.10STM000596



# Merck Potential

### Definition:

Merck Potential (MP) is a quantitatively derived dollar estimate of each prescriber's total prescribing volume that can be realistically converted to Merck prescriptions. A physician's Total MP dollar value represents the physician's potential value to Merck on a quarterly basis. Merck Potential is calculated quarterly using PLUS Prescriber market share and volume data. The goal is to move each physician's Merck share to the target share.

### Benefits:

Merck Potential is designed to help you make targeting and resource allocation decisions in your geography. Merck Potential can help you address the following questions:

- Which physicians are the most important to my retail business?                        MP Total $

- Which physicians are prescribing the most Merck products?                            MP Met $

- Which physicians have the most potential for growth?                                MP Unmet $

### Key Points:

Merck Potential is a targeting tool to help you choose who to target based upon the total dollars the customer is able to contribute to your business. It allows you to spend more time and resources on the customers which have the greatest potential.

- Met Potential $

  The dollarized value of the actual number of prescriptions written for Merck products.

- Unmet Potential $

  The dollarized value of the projected number of prescriptions each physician has the potential to write for Merck products, less what they are currently writing.

**Total Merck Potential $ = Met Potential $ + Unmet Potential $**

Confidential - Subject To Protective Order

MRK-H.10STM000597



# PLUS Prescriber

*Definition:*

PLUS Prescriber is an individual market share report for each physician. It pinpoints a prescriber's current habits. Use PLUS Prescriber to identify which products are currently in favor with the physician and develop a strategy to change these prescriptions into Merck prescriptions.

*Benefits:*

Plus Prescriber allows you to:

- Identify the current prescribing habits of a physician in a particular market segment.
- Develop targeted messages to reinforce or change habits.
- Identify the physicians most recent trends.

*Key Points:*

The data of Plus Prescriber is based on the number of prescriptions written and not the number of tablets dispensed.

Plus Prescriber data is only taken from the retail market segment.

Physicians are placed into Category Ratings based upon how many prescriptions they write in a class compared to all other physicians per quarter. The Category Ratings are A+, A, A-, B, C, and D. A+ is the highest and D is the lowest of writers.

**16**

Confidential - Subject To Protective Order

MRK-H.10STM000598



# New Territory Scenario
## (Continued)

> Imagine that your manager will be traveling with you on your first day. She has requested to see the top six physicians in the Antiarthritic market.

List the names of the Top Six Physicians in the Antiarthritic Market below.

1.

2.

3.

4.

5.

6.

Confidential - Subject To Protective Order

MRK-H.10STM000599



# Merlin Territory Today



Confidential – Subject To Protective Order

MRK-H.10STM000600



# Merlin Explorer



Toolbar contains print, Excel export, cut, copy, & paste functionality as well as information viewing options within the Merlin Explorer.

Toggle between open views & the Merlin Explorer.

View details provides additional information beyond a view name. This pane will display a list of the views in each folder or a list with each view's detailed information. This information is accessed by selecting View > Details or List.

Open Frozen provides quick access to data beyond the view's default setting. A "shell" of the view opens in approximately five seconds, make query changes, then select Run icon to open view.

Description Pane provides information on the data included in each view. This information is accessed by selecting View > Description Pane.

A customized Outlook Bar provides "Big Button" access to frequently used information. Folders, the Recycle Bin, and the Merlin Territory Today page may be "dragged" to the Outlook Bar.

*Basic Training Participant Guide (1/02)*

**19**

Confidential - Subject To Protective Order    **MRK-H.10STM000601**



# Merlin View Layout & Navigation



Confidential - Subject To Protective Order

MRK-H.10STM000602



REDACTED

*Basic Training Participant Guide (1/02)*

21

Confidential - Subject To Protective Order



REDACTED

22

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order



REDACTED

*Basic Training Participant Guide (1/02)*

**23**

Confidential - Subject To Protective Order

MRK-H.10STM000605



# Merlin Scenario 1

Now it's your turn to use Merlin to solve a business problem. Complete the scenario exercise that corresponds to your group number. If you have any questions, please ask the trainers for help. After you work through the scenario, be prepared to share your responses with the larger group.

You are reviewing the Field Sales Performance Report Summary (FSPR) for your territory. You notice that the PPO for Vioxx® is below 100%. The Antiarthritic market is shrinking. Market share for Vioxx® has decreased slightly. Next week, your business manager will be riding with you and wants you to identify twelve customers. The top six customers to target with a "Growth" strategy and the top six customers to target with a "Maintenance" strategy.

**Hint:** Focus on the high prescribers of Celebrex to identify the six physicians to target with a growth strategy.

- Which view gives you this information?

- How did you manipulate the view to obtain the information you want? List out the steps.

- List the names of the physicians (use New Rx volume).

| Top six customers for Growth Strategy | Top six customers for Maintenance Strategy |
|---|---|
| 1. | 1. |
| 2. | 2. |
| 3. | 3. |
| 4. | 4. |
| 5. | 5. |
| 6. | 6. |

**24**

Confidential - Subject To Protective Order

MRK-H.10STM000606



REDACTED

*Basic Training Participant Guide (1/02)*

25

Confidential - Subject To Protective Order

MRK-H.10STM000607



# Merlin Scenario 3



- Which top 5 physicians have the highest Rx volume for Celebrex?

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000608



# Merlin Seek & Find

Merlin allows you to easily manipulate views and quickly find the information you need. The following questions will enable you to be more comfortable utilizing Merlin. Working alone, search in Merlin and answer the following questions. If you have any questions, don't hesitate to ask for help. Unless otherwise mentioned, always focus on NEW Rx and always remember to select the "02" product flag when running views. *Complete the exercises for the promotional products that pertain to you.*



6. Out of the VIOXX 02' target universe, how many Orthopedic Surgeons are in your call deck?

7. Find the top 3 prescribers of Vioxx® in your call deck.

8. Which physician in St. Joseph has the largest positive share change for VIOXX®?

9. What is the New Rx Volume (CM) for VIOXX® for this customer?

REDACTED

Confidential - Subject To Protective Order

MRK-H.10STM000609

**28**

Confidential - Subject To Protective Order

**MRK-H.10STM000610**

Tab "Module 4"

Confidential - Subject To Protective Order

MRK-H.10STM000611



# INSIGHT: Customizing the look of Insight



| Insight Today | HEL Programs View |
| Customers View | Insight News |
| Calendar View | Performance Reports View |
| Insight Reports View | |

## *Insight Today Welcome Page*

Insight 3.0 opens to the Insight Today Welcome Page. On this page, you will see information on your data transmissions including Insight Synchronization and Plus Prescriber downloads. You will also be able to Run and Send a WAR Report and Report Time Off Territory. Lastly, you will be able to Customize Insight Today, Back up your Insight Database, and Take the Insight Today Tour from here.

Confidential - Subject To Protective Order

MRK-H.10STM000612





*Customizing the look of Insight*

Insight provides the opportunity to customize the application to meet your needs. Go to *Change the look of Insight Today* link, the *Customize Icon*, or *View Options* to customize your Insight system. Start with the Today tab.

**Today Tab**

This is where you select what you will see on your Insight Today view. This view provides you with your daily schedule. We suggest you have Call Strategy, Flags, Merck Potential, Hot Notes, IDs, PIR, & Plus Prescriber displayed on your Insight Today page. Experiment to determine what works best for you.

Hint: If you are going to have Plus Prescriber displayed on your Insight Today page, only check a few key products. The more products you have checked. The slower the system runs.

**Customers Tab**

This is where you determine which factoids are displayed for your customers.

**30**

Confidential - Subject To Protective Order

MRK-H.10STM000613



### Reports Tab

This is where you determine the reports that will show up in your favorites folder. We suggest that you select the "Weekly Activity Report".

### Calls

This is where you customize and determine the order of your product detail list. This is the list of products that will appear when you report a call.

### Program Tab

Determines the speakers and HEL locations that are downloaded to your system.

### Smart Edit

This allows you to enter abbreviations for frequently used words which will display in your call and weekly notes (ex. Type Vx for Vioxx®)



Confidential - Subject To Protective Order

MRK-H.10STM000614

# Insight: Customer View Tabs

There are several tabs listed in the Customer View. As a new representative, you are most likely to use the information contained in the General, Location, Activities, Flags, and Performance tabs.

Use the space below to note what kinds of information you can find under each of those tabs.

- General:

- Location & Contacts:

- Activities:

- Flags:

- Performance:

**32**

Confidential - Subject To Protective Order

MRK-H.10STM000615



# Insight: Planning For Your Customers

You have seen how to navigate in the Insight Today view. Now you'll populate your Insight Today with the targeted customers.

Using the Call Wizard, populate your Insight Today view with the following customers:

- Top Six Physicians in the Antiarthritic Market:

  1. Shoon Lee
  2. Charles Rhodes
  3. John Stafford
  4. Frederick Born IV
  5. James Grannell
  6. Teresita Villasis

- What did you learn about Dr. Lee from the Insight Today view that will help you shape your call strategy?

- What additional information about past call activity will help you in your call strategy? (Hint: In the Insight Today View look under Historical Notes)

With all of the information you have at your fingertips, you can easily develop a needs-based call strategy. Go to the Insight Today view and use all of the information available to you to create a Needs-Based Call strategy for each customer. Jot down some of the information used to develop these strategies.

Once you have entered your call strategies, be sure to check the Calendar View to confirm your planned calls are there.

Confidential - Subject To Protective Order

MRK-H.10STM000616

**34**

Confidential - Subject To Protective Order

MRK-H.10STM000617

Tab "Module 5"

Confidential - Subject To Protective Order

MRK-H.10STM000618



# Insight: Reporting Customer Calls

Once you have conducted the sales call, you need to report the call. The key to remember is that you always want to convert your Planned calls to Reported calls.

There is more than one way to Report a Call.

1. Click on the report call link (upper right hand corner)

2. Use the Call Wizard to Report Calls

3. In the Calendar View click on the customer name and open a planned call as reported.

From the Insight Today view, convert the planned calls to reported for the following customers. Be sure to type in Accomplishments and Next Call strategies for these customers. Also, plan calls for each physician listed below one month from now from the Next Call strategies window.

---

*Dr. Charles Rhodes*

**Accomplishment:**

Discussed the features/benefits of Vioxx® over Celebrex. Reviewed new acute pain data for Vioxx®. He will continue to Rx Vioxx®. He has seen good results with Singulair® in combination with ICS. Said he will be able to attend Zocor Roundtable next month.

**Next Call Strategy (based on the accomplishment, formulate a balanced next call strategy for this customer):**

Remember to plan a call one month from now.

**Details:**

Vioxx®, Zocor®, Singulair®

**Samples:**

Receipt#12354

**PIR:**

Physicians wanted more information on the safety of Vioxx® in elderly patients.

---

Confidential - Subject To Protective Order

MRK-H.10STM000619



*Dr. John Stafford*

**Accomplishment:**

Discussed benefits of Singulair® as first line therapy.  Reviewed positive managed care formulary status of Vioxx®. Reviewed new acute pain data for Vioxx®.  He has seen good results with Fosamax® in patients that had a follow up DEXA one year after starting therapy.

**Next Call Strategy (based on the accomplishment, formulate a balanced next call strategy for this customer):**

**Details:**

Singulair®, Vioxx®, Fosamax®

**Samples:**

Receipt#12356

---

*Dr. Frederick Born IV*

**Accomplishment:**

Said he would continue using Vioxx® as first line therapy  for acute pain and OA. Reviewed new acute pain data for Vioxx®.  Reviewed information on once-weekly dosing for Fosamax®.

**Next Call Strategy (based on the accomplishment, formulate a balanced next call strategy for this customer):**

**Details:**

Vioxx®, Fosamax®, Singulair®

**Samples:**

Receipt #12357

Confidential - Subject To Protective Order

MRK-H.10STM000620



*Dr. James Grannell*

**Accomplishment:**

Reviewed the benefits of Zocor®. Said he will attend the Cozaar® Roundtable next week. Reviewed new acute pain data for Vioxx®.

**Next Call Strategy (based on the accomplishment, formulate a balanced next call strategy for this customer):**

**Details:**

Zocor®, Cozaar®/Hyzaar®, Vioxx®, Maxalt®

**Samples:**

Receipt #12358

---

*Dr. Teresita Villasis*

**Accomplishment:**

Reviewed new acute pain data for Vioxx®. She indicated she would consider speaking for Merck on the benefits of Vioxx® to her colleagues.

**Next Call Strategy (based on the accomplishment, formulate a balanced next call strategy for this customer):**

Remember to plan a call one month from now.

**Details:**

Vioxx®

**Samples:**

Receipt #12355

**PIR:**

She wanted more information on the incidence of edema with Vioxx®

**Check the Calendar View. How did the Planned Call icon change?**

*Basic Training Participant Guide (1/02)*

**37**

Confidential - Subject To Protective Order



# Explorer Activity

During your calls, the following information was uncovered with each of the customers listed below. Enter the customer maintenance information into the appropriate places in Insight. The clues may help you to determine where to go to look for the information.

---

*Shoon Lee*

Dr. Lee has opened an additional location - he will be at this location on Mondays and Fridays from 8 AM to 5 PM. The office address is 1356 Pine Avenue, St. Joseph, MI 49085. The phone number is 616-789-9675. He also attended your lunch (Hint: Select the new program button from the menu bar to record the lunch / FMC). The program was from 12:30-1:30. The other attendees you need to record are:

- Kathleen Andries, M.D.

- John Proos, M.D.

- James Grannell, M.D.

**Clue:** Best Times are specific for a location. Also, enter the zip code first.

---

*Charles Rhodes*

Dr. Rhodes is one of your Vioxx advocates - you found out that Pfizer is sponsoring a program in the Bahamas and he is attending. You want to make sure everyone that calls on Dr. Rhodes is aware of this.

**Clue:** Under the general tab is a "Hot Note".

---

You just received a message from WP that you need to flag the following physicians with the "General RBG – Vioxx® flag":

- Charles Alderdice, D.O.

- Betty Koshy, M.D.

- James Wierman, D.O.

- Daniel Hayward, M.D.

- Dave Puzycki, M.D.

**Clue:** Look under Tools - A Flag Wizard will help you out. The Flag Wizard allows you to attach flags to multiple doctors.

---

**38**

Confidential - Subject To Protective Order

MRK-H.10STM000622



---

*John Stafford*

Dr. Stafford has a new partner, Dr. Joe Ward. Dr. Ward's address will be 1815 Anthony Drive, St. Joseph, MI 49085. His phone number is 616-429-4145. His State License # is 2401041240. Add Dr. Ward to your call deck

**Note:** When adding a new physician, you must choose one of the following quick types from the new customer wizard:

- Physician – Group Practice
- Physician – Solo Practice
- Physician – Hospital

*Also a State License number is required to add a new physician

**Clue:** Look under Customer's on the menu bar. Notice you can also add new customers here. Add Dr. Ward as a new customer – Select "physician group practice" and remember professional designation is M.D.

---

- Remember, you were unable to see Dr. Frederick Born IV. Move your planned call for today to 4 weeks from now.

  **Check Insight Today to ensure that the NEXT CALL strategies you entered during the Reporting Calls for Your Customers appear on Insight Today four weeks from today.**

Confidential - Subject To Protective Order

MRK-H.10STM000623



# Insight Reports

Reports provide summary information on a variety of topics from customers to activity.

Working as a group, answer the questions below about your assigned report. Use the parameters listed for each report. Be prepared to share your answers with the rest of the class.

*Note: The training database only contains HEL activity data for Group B products.

| | |
|---|---|
| **Group 1:** | **Activity / Time Off Territory** |
| Date: | 06/01/01 – 10/01/01 |
| **Group 2:** | **Activity / WAR Report (select flags)** |
| Flags: | Vioxx 02, Singulair 02, Zocor 02 |
| **Group 3:** | **Groupings / Customer Flag Report** |
| Flags: | Maxalt 02, Fosamax 02, Cozaar 02 |
| **Group 4:** | **Customer & Colleagues / Customer List Report** |

• How might you use the information in this Report?

• How might your manager use the information in this Report?

• What information about creating or running this report do your classmates need to know?

**40**

Confidential - Subject To Protective Order

MRK-H.10STM000624



As other groups share their answers, jot down any important information about each of these reports.

- Time off Territory Report

- War report (selected flags)

- Customers Flag Report

- Customer List Report

Confidential - Subject To Protective Order

MRK-H.10STM000625

## Territory Management Training - Business Analysis Template

Page 1

*Instructions: Using the FSPR and PPMSR from your Territory Management Workshop as well as the Merin and Insight training database, answer the following questions to analyze the business for your core promotional products.*

### Core Promotional Product

| **Field Sales Performance Report (FSPR)** | | | |
|---|---|---|---|
| | 1 | What is the YTD PPO of the product? | 1 |
| | 2 | What is the YTD Growth of the product? | 2 |
| | 3 | What is the YTD total objective of the product? | 3 |
| | 4 | What % of sales does your product contribute to the total geography YTD? | 4 |
| | 5 | What % of sales does your product contribute to your product group YTD? | 5 |

| **Prescription Plan Market Share Report (PPMSR)** | | | |
|---|---|---|---|
| | | Look at NEW prescription data for RCQ (Rolling Current Quarter) for collecting the data below. | |
| | 7 | What is the % market volume change for my geography total? | 7 |

| | | | Market Share | Share Change |
|---|---|---|---|---|
| | 8 | What is the market share for your product? What is the share change? | 8 | |

| | | | Competitor | Share | Share Change |
|---|---|---|---|---|---|
| | 9 | Who is the lead competitor to your product? What is their market share? What is their share change? | 9 | | |

10 What is the % contribution of each of the customer segments to your geography total?
(summary page, column 2)

| | | | |
|---|---|---|---|
| 10a | Cash | 10a | |
| 10b | Third Party | 10b | |
| 10c | Medicaid | 10c | |
| 10d | Mail | 10d | |

**42**

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000626



Territory Management Training - Business Analysis Template                    Page 2

| Customer Information Analysis/ Merlin | 11 | ■ *Run Merlin View #4 for your targeted physicians and product.*<br>■ *Choose your market for your lead product and 2002 target universe flag.*<br>■ *Rerun the view*<br>■ *Sort by Rx Volume to find highest volume prescribers for lead product.* |

For each of the physicians identified, which competitor is impacting them the most?  What are the competitors' Rx volume, Market Share, and Market Share change (RCQ vs RPQ)?

| | Physician Name | Competitor | Competitor Volume | Competitor Market Share | Competitor Share Change |
|---|---|---|---|---|---|
| 11a | | | | | |
| 11b | | | | | |
| 11c | | | | | |
| 11d | | | | | |
| 11e | | | | | |
| 11f | | | | | |
| 11g | | | | | |
| 11h | | | | | |
| 11i | | | | | |
| 11j | | | | | |

**Call Planning/ Reporting Insight**

12  For each of the physicians above, develop a NBS strategy for each customer and enter it into Insight for your pre-call plan.

13  Convert the planned calls into reported calls for each customer.

14  Send a WAR report to your trainer to profile your call activity on these customers.

*Basic Training Participant Guide (1/02)*

**43**

**Territory Management Training - Business Analysis Template**

Page 1

*Instructions: Using the FSPR and PPMSR from your Territory Management Workshop as well as the Merlin and Insight training database, answer the following questions to analyze the business for your core promotional products.*

Core Promotional Product _____

| Field Sales Performance Report (FSPR) | | |
|---|---|---|
| 1 | What is the YTD PPO of the product? | 1 |
| 2 | What is the YTD Growth of the product? | 2 |
| 3 | What is the YTD total objective of the product? | 3 |
| 4 | What % of sales does your product contribute to the total geography YTD? | 4 |
| 5 | What % of sales does your product contribute to your product group YTD? | 5 |

**Prescription Plan Market Share Report (PPMSR)**

*Look at NEW prescription data for RCQ (Rolling Current Quarter) for collecting the data below.*

7  What is the % market volume change for my geography total?    7

|  | Market Share | Share Change |
|---|---|---|

8  What is the market share for your product?    8
   What is the share change?

|  | Competitor | Share | Share Change |
|---|---|---|---|

9  Who is the lead competitor to your product? What is their market share?  What is their share change?    9

10  What is the % contribution of each of the customer segments to your geography total? *(summary page, column 2)*

10a  Cash    10a

10b  Third Party    10b

10c  Medicaid    10c

10d  Mail    10d

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000628



Territory Management Training – Business Analysis Template                    Page 2

| Customer Information Analysis/ Merlin | 11 | <ul><li>*Run Merlin View #4 for your targeted physicians and product.*</li><li>*Choose your market for your lead product and 2002 target universe flag.*</li><li>*Rerun the view*</li><li>*Sort by Rx Volume to find highest volume prescribers for lead product.*</li></ul> |
|---|---|---|

For each of the physicians identified, which competitor is impacting them most? What are the competitors' Rx volume, Market Share, and Market Share change (RCQ vs RPQ)?

| | Physician Name | Competitor | Competitor Volume | Competitor Market Share | Competitor Share Change |
|---|---|---|---|---|---|
| 11a | | | | | |
| 11b | | | | | |
| 11c | | | | | |
| 11d | | | | | |
| 11e | | | | | |
| 11f | | | | | |
| 11g | | | | | |
| 11h | | | | | |
| 11i | | | | | |
| 11j | | | | | |

**Call Planning/ Reporting Insight**

12  For each of the physicians above, develop a NBS strategy for each customer and enter it into Insight for your pre-call plan.

13  Convert the planned calls into reported calls for each customer.

14  Send a WAR report to your trainer to profile your call activity on these customers.

*Basic Training Participant Guide (1/02)*

**45**

Confidential - Subject To Protective Order

MRK-H.10STM000629



46

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000630

Tab "Appendix"

Confidential - Subject To Protective Order

MRK-H.10STM000631



# Merlin Territory Glossary

| Term | Definition | Usage |
|---|---|---|
| Annual Detail Target | The optimal number of details (product-specific) a physician should receive in a year from all representatives. Annual Detail Targets are FBG-assigned according to physician value and capacity. | Allows you to target customers based upon their assigned product-specific annual detail numbers. |
| Attendance Count | The number of customers attending a product-specific program during a specific time period. | Allows you to assess attendance counts of HEL programs conducted within a specific time period. Designed to be used in conjunction with the Program dimension, not the Customer dimension. |
| Call Count | The number of calls recorded for a particular customer within a specific time period. | Allows you to target customers based upon the number of calls made on them in a specific time period. |
| Call Frequency | For a single customer, Call Frequency equals Call Count. For a group of customers, Call Frequency equals the average number of calls on the group during a specific time period. | Allows you to monitor the number of calls made on a customer or an average number of calls for a group of customers. |
| Call Reach % | Call Reach % equals 100 for a customer with a Call Count of 1. Call Reach % for a group of customers is the percentage reached for that group, which have been detailed at least once. | Allows you to monitor the percent of a group of customers (i.e. A+ physicians) that have been called upon during a specific time period. Measure is useful primarily at Subtotal/Grand Total levels. |
| Customer Count | The number of Merck ratings a specific customer has in a particular market. | Allows you to count the number of customers within a specific subset. Necessary if the Merck Rating Dimension is placed on the y-axis. The measure should be qualified as: Customer Count >= 1 |

Confidential - Subject To Protective Order

MRK-H.10STM000632

| Term | Definition | Usage |
|------|-----------|-------|
| Detail % to Plan | Defined as the percent of Annual Detail Target achieved within a specific time period. Calculation: Detail Count / Annual Detail Target *100 | Allows you to monitor your detail activity against the determined number of annual details. |
| Detail Count | The number of details recorded for a particular product, within a time period, for a customer. | Allows you to target customers based upon the number of details conducted for a product in a specific time period. |
| Detail Frequency | For a single customer, Detail Frequency equals Detail Count. For a group of customers, Detail Frequency equals the average number of details on the group during a specific time period. | Allows you to monitor the number of product details made on a customer or an average number for a group of customers. |
| Detail Reach % | Detail Reach % equals 100 for a customer with a Detail Reach Count of 1. Detail Reach % for a group of customers is the percentage reached for that group, which have been detailed at least once. | Allows you to monitor the percent of a group of customers (i.e. A+ physicians) that have been detailed for a product in a specific time period. Measure is useful primarily at Subtotal/Grand Total levels. |
| Detail Reach Count | The number of details a customer has received for a product within a given time period. A 1 indicates that the customer has received one or more details and a 0 indicates no details.. | Allows you to monitor whether a customer has been detailed or not for a product in specific time period. Measure is useful primarily at Subtotal/Grand Total levels. |

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000633



| Term | Definition | Usage |
|------|-----------|-------|
| HEL Reach % | HEL Reach % equals 100 for a customer who has attended at least 1 product specific program. A zero means that customer has not attended any product specific programs. HEL Reach % for a group of customers is the percentage reached for that group, which have attended at least one product specific program. | Allows you to monitor customers that have or have not attended a HEL program for a specific product. Measure is useful primarily at Subtotal/Grand Total levels. |
| HEL Reach Count | The number of product-specific HEL programs a customer has attended within a given time period. A 1 indicates that the customer has attended one or more HEL programs and a 0 indicates no HEL attendance. | Allows you to monitor whether a customer has attended an HEL program during a specific time period. Measure is useful primarily at Subtotal/Grand Total levels. |
| Market Met Potential $ (CQ) | The dollarized value of the actual number of prescriptions written for Merck products for a specific market or total portfolio of markets. | Allows you to target the customers that are contributing the most dollars to your business and need to be maintained. |
| Market Met Potential % (CQ) | Defined as the percent of total Market Potential $ which had been achieved during the current quarter. (Market Met Potential $ (CQ) / Market Potential $ (CQ)) | Allows you to target the customers that are contributing the most dollars to your business and need to be maintained. |
| Market Met Potential % Chg | Defined as a change in a physician's achievement of Market Met Potential $ from the previous quarter to the current quarter. (Merck Met Potential $ (CQ) - Merck Met Potential $ (PQ)) / Merck Met Potential $ (PQ) | Allows you to determine whether promotion should shift from a maintenance to a growth strategy. |

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000634



| Term | Definition | Usage |
|---|---|---|
| Market Potential $ (CQ) | A quantitatively derived dollar estimate of each customer's total prescribing volume that can be realistically converted to Merck prescriptions within a specific market. | Allows you to target the customers that realistically have the largest impact on your business. |
| Market Rx Vol (CM) | The number of prescriptions written within an entire market for the Current Month (CM) by a customer. | Allows you to target customers that write many prescriptions within a specific market. |
| Market Rx Vol Chg | Market Rx Vol (CM) minus Market Rx Vol (PM). | Allows you to monitor the increase or decrease of the number of prescriptions a customer writes in a specific market from month to month. |
| Market Rx Vol % Chg | (Market Rx Vol (CM) minus Market Rx Vol (PM)) / Market Rx Vol (CM). | Shows you a percent change of the market volume for a specific customer or group of customers from month to month. |
| (Market) Rx Vol of Products Displayed (CM) | Creates a custom Market Volume (CM) comprised of the sum of product Rx Volumes (CM) displayed. | Allows you to create custom markets (i.e. Coxib, Bisphosphonate, NNRTI, etc.) in order to more effectively analyze customer performance in specific markets. |
| Market Un-Met Potential $ (CQ) | The realistic dollarized value of the projected number of prescriptions each physician has the potential to write for Merck products, less what they are currently writing. | Allows you to target the customers that have the highest likelihood for growth. |
| Market Un-Met Potential % (CQ) | Defined as the percent of total Market Potential $ which had been unachieved during the current quarter. Calculation: (Market Un-Met Potential $ (CQ) / Market Potential $ (CQ)) | Allows you to target the customers that have the highest likelihood for growth. |

**50**

Confidential - Subject To Protective Order

MRK-H.10STM000635



| Term | Definition | Usage |
|------|-----------|-------|
| Market Un-Met Potential % Chg | Defined as a change in a physician's achievement of Market Un-Met Potential $ from the previous quarter to the current quarter. Calculation: (Merck Un-Met Potential $ (CQ) - Merck Un-Met Potential $ (PQ)) / Merck Un-Met Potential $ (PQ) | Allows you to determine whether promotion should shift from a maintenance to a growth strategy. |
| Merck Market Rating | The Merck Rating A+/D that is provided in the PlusRxer data. | Permits you to combine Merck Market Rating with the Market dimension to generate a list of Merck Market Ratings across multiple markets. |
| Merck Rating Count | The number of Merck ratings a specific customer has in a particular market. | Allows you to count the number of customers within a specific subset. Necessary if the Merck Rating Dimension is placed on the y-axis. The measure should be qualified as: Merck Rating Count >= 1 |
| Program Count | The number of product-specific programs a customer attended for a given time period. | Allows you to target customers based upon the number of product-specific programs attended in a specific time period. |
| Resident Count | The number of calls recorded on residents for a particular hospital within a specific time period. | Allows you to track activity with residents in a specific time period. Designed to be used with the Customer Type dimension set to 'Hospital'. |
| Rx Breadth | A 1 means that the customer has written at least 1 prescription for a particular product. A zero means they have not written any prescriptions. | Allows you to monitor whether a customer has written a prescription or not for a product. Measure is useful primarily at Subtotal/Grand Total levels. |

*Basic Training Participant Guide (1/02)*

**51**

Confidential - Subject To Protective Order

MRK-H.10STM000636



| Term | Definition | Usage |
|------|-----------|-------|
| Rx Breadth % | Rx Breadth % equals 100 for a customer with an Rx Breadth of 1. Rx Breadth % for a group of customers is the percentage for that group, which have written at least 1 prescription for the product. | Allows you to monitor the percent of a group of customers (i.e. A+ physicians) that have written a prescription for a product in a specific time period. Measure is useful primarily at Subtotal/Grand Total levels. |
| Rx Depth (CM) | Rx Depth (CM) equals Rx Vol (CM) for a specific customer. | Allows you to target customers based on the number of actual prescriptions written for a product. |
| Rx Depth Chg | Rx Depth (CM) minus Rx Depth (PM). | Allows you to monitor the increase or decrease of the number of prescriptions a customer writes for a specific product from month to month. |
| Rx Depth % Chg | Rx Depth (CM) minus Rx Depth (PM) divided by Rx Depth (CM). | Shows you a percent change of the Rx Depth for a specific customer or group of customers. |
| Rx Share (CM) | Product Rx Volume (CM) / Market Rx Volume (CM) | Allows you to target customers based on the Rx Share (CM) of a product within a market. |
| Rx Share of Products Displayed (CM) | Creates a custom Rx Share (CM) calculated using the products displayed within the view.  Rx Volume (CM) of product / Sum of Product Rx Volumes (CM) displayed. | Allows you to create custom market shares (i.e. Coxib, Bisphosphonate, NNRTI, etc.) in order to more effectively analyze customer performance in specific markets. Product Strengths impact share calculation. |
| Rx Share Chg | Rx Share (CM) minus Rx Share (PM). | Allows you to monitor the increase or decrease of the prescription share a customer writes for a specific product from month to month. |

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000637



| Term | Definition | Usage |
|------|-----------|-------|
| Rx Share Chg of Products Displayed | Rx Share of Products Displayed (CM) minus Rx Share of Products Displayed (PM). | Allows you to monitor the increase or decrease of the prescription share a customer writes for a specific product within a custom market from month to month. |
| Rx Vol (CM) | The number of prescriptions written for a specific product for the Current Month (CM) by a customer. | Allows you to target customers based on the number of actual prescriptions written for a product. |
| Rx Vol Chg | Rx Vol (CM) minus Rx Vol (PM). | Allows you to monitor the increase or decrease of the number of prescriptions a customer writes for a specific product from month to month. |
| Rx Vol % Chg | Rx Vol (CM) minus Rx Vol (PM) divided by Rx Vol (CM). | Shows you a percent change of the Rx volume for a specific customer or group of customers. |
| Sample Count | The number of product samples recorded for a particular customer within a specific time period. | Allows you to track sample allocation to targeted customers. |
| Un-Met Details | The number of unattained product details for a particular customer versus their annual detail targets. Calculation: Annual Detail Targets minus Detail Count = Un-Met Details | Allows you to target customers based upon the number of annual details not attained for a product in a specific time period. |

Confidential - Subject To Protective Order

MRK-H.10STM000638



# Glossary

*Tab Definitions*

## General Tab

General customer information consists of the customer's name and other basic information depending on the customer's type. You can also add and view hot, shared, and personal notes. Hot notes consist of very important customer information. All representatives who call on the customer should be aware of this information. Clustered representatives in can see each other's hot and shared notes.

## Locations

A customer can have more than one office location. The addresses and the designation of the primary address are located in this tab. Also, the business hours associated with the customers locations are located in this tab.

## ID's

Identification numbers are codes assigned to customers to uniquely identify them for reasons such as acquiring performance data. The ID's for the customer is located in this tab. A checkmark in front of an ID indicates that Merck has validated it with an internal or external source. You cannot change or delete validated IDs. An ID with a question mark has not been validated and may not be linked in Insight to performance data. An ID with an X is invalid.

## Activities

Customer activities consist of calls you make on customers and the programs customers attend. All calls planned and reported for a customer can be quickly viewed from the Activities tab. Calls are listed by date for each call. The call strategy, next call strategy, accomplishments, and notes are listed, if entered previously. You will also be able to review the programs conducted and the customers that attended by reviewing the Programs tab.

## Associations

Each customer entered in Insight can have one or more associations with other customers. These associations reflect relationships between customers. These relationships are depicted in the Associations tab.

## Flags

Flags group customers by common characteristics so you can quickly view all individuals or organizations by these flags. Flags can be assigned at a global (headquarters) level or at a personal level. The flags assigned to a specific customer will be stored in the flag tab.

**54**

Confidential - Subject To Protective Order

MRK-H.10STM000639



## Performance

This tab contains all of the performance information that has been captured for a specific customer. This tab includes Plus Prescriber for all of the therapeutic categories that the customer is rated in (this can be viewed by either market share or market volume) and also Merck potential for these categories. The tab also shows the category rating that the customer has in each therapeutic category.

## Factoids

Customer Factoids contain demographic information about a customer, by date. They are arranged by category and can be found in this tab.

## Formularies

Customer formularies list the Merck and not-Merck products approved or unapproved by a customer for use by its members. Products are listed by therapeutic class for each product, and restrictions and position statements can be provided. The formulary information has been entered by West Point, your National Account Representative, and/or your Hospital representatives. You will only add formularies in this tab if you are responsible for a hospital or account that has a formulary and is not covered by an NAE or hospital representative.

## Attachments

Attachments are the files you send to or keep about your customers. These can include WORD documents, Excel spreadsheets, and PowerPoint slides. You can link these attachments to a customer in Insight for tracking purposes. The attachments you have linked will be found in this tab.

## *Merlin Territory View Descriptions*

### Analysis Views Folder:

- 01 Market Potential and Share Data by Customer:

  Organizes Customers by Market Category Rating according to Un-Met and Met Potential (CQ), Market Volume (RCQ), Rx Volume, Rx Share and Rx Share Change RCQ vs. RPQ.

  This view is designed to segment customers according to a growth or maintenance strategy. To determine a Customer Growth Strategy sort by Un-Met Potential $ to identify physicians with the most opportunity to contribute new sales. A Customer Maintenance Strategy can be obtained by sorting on Met Potential $ to determine physicians that currently contribute the most to sales dollars. [99.2]

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000640



- 02 Product Group A - Rx Volume/Change by Customer:

  This view is designed to display Rx volume and Rx volume change for Group A products by customer.Table View:

  - If Rx volume equals zero the customer has Plus Rxer data for the product's market but no volume for the product.
  - If Rx volume is blank the customer has no Plus Rxer data for the product's market. [99.2]

- 02 Product Group B - Rx Volume/Change by Customer:

  This view is designed to display Rx volume and Rx volume change for Group B products by customer.

  Table View:

  - If Rx volume equals zero the customer has Plus Rxer data for the product's market but no volume for the product.
  - If Rx volume is blank the customer has no Plus Rxer data for the product's market. [99.2]

- 02 Product Group C - Rx Volume/Change by Customer:

  This view is designed to display Rx volume and Rx volume change for Group B products by customer.

  Table View:

  - If Rx volume equals zero the customer has Plus Rxer data for the product's market but no volume for the product.
  - If Rx volume is blank the customer has no Plus Rxer data for the product's market. [99.2]

- 03 Market Potential $ by Payor Type Segment:

  This view is designed to display a customer's Payor Type breakdown into 3rd Party, Cash, Mail, and Medicaid segments relative to Market Potential $ (CQ) and Market Met Potential % (CQ).

  This view provides the flexibility to sort by segment (i.e. highest Merck Potential Cash or Medicaid customers) to provide direction for targeting. For example, high Cash customers in the Lipid Market could be targeted for coupon initiatives. Additionally, customers affected by an NDC lockout against your product could be targeted for their Medicaid segment.[99.2]

- 04 Key Product Share Comparison by Customer:

  Organizes customers by Market Rx volume (RCQ), Rx Volume (RCQ), Rx Share (RCQ,) and Rx Share Change RCQ vs. RPQ.

  This view is designed to rank customers by market volume and provide a comparison of Rx volume and Rx Share data across key products within a particular market. [99.2]

**56**

Confidential - Subject To Protective Order

MRK-H.10STM000641



- 05 Key Product Share Comparison by City:

  Organizes Cities by Market volume (RCQ), Rx volume (RCQ), Rx Share (RCQ,) and Rx Share Change RCQ vs. RPQ.

  This view is designed to rank cities by market volume and provide a comparison of Rx volume and Rx share data across key products within a particular market. [99.2]

- 06 Market/Rx Volume and Change by Customer:

  Organizes customers by Market Category Rating according to Market volume (RCQ), Market volume Change RCQ vs. RPQ, Rx Volume (RCQ), and Rx Volume Change RCQ vs. RPQ.

  This view is designed to display New and Total Rx Type volume data by customer. Customers are sorted by New Rx Market volume, highest to lowest. [99.2]

- 07 Breadth & Depth - Reach & Frequency by Customer:

  This view is designed to identify customers that have written at least one prescription (breadth) for a key Merck product in a given market as well as the amount (depth) prescribed by that customer, and shows the volume change RCQ vs. RPQ. This view also identifies customers that have received at least one detail for a given product (reach), the number of product details received by that customer (frequency), and the number of product specific HEL programs attended.

  - Detail % Reach = The % of customers within a given market category rating that have received at least one detail for a product in a given time period.
  - Frequency = Total # of details for a given market category rating divided by the total # of customers within that category rating.
  - HEL Reach % = The % of customers within a given market category rating that have attended at least one product specific HEL program in a given time period. [99.2]

- 08 Calls, Details and HEL Activity:

  This view is designed for all representatives to track activity for key promoted products. [99.2]

- 09 Annual Detail Target Activity by Customer - YTD:

  This view is designed to identify customers within a market that have annual detail targets for a key Merck product. This view will allow users to monitor Market Rx volume (RCQ), Rx volume (RCQ), Rx Share (RCQ), and Rx Share Change RCQ vs. RPQ; as well as YTD global activity progress against annual detail targets. [99.2]

Confidential - Subject To Protective Order

MRK-H.10STM000642



- 10 Physicians Not Detailed by Month:

  This view is designed to monitor promotional "activity and inactivity" by Product Targets, A+..B customers in a specific therapeutic category, or any other flag group by month. Detail data is displayed from October 2000 through March 2001; and sorted on Total Call Count. Only customers with market volume data for a given therapeutic category will be included in this view. [99.2]

- 11 Bubble Graph - Market Rx Volume and Share Data by Customer:

  This view creates a Bubble Graph organizing A+, A, or A- Customers by Market Rx Volume or Market Potential $ according to Rx Volume and Rx Share Change RCQ vs. RPQ. This view is designed to visually segment customers according to a growth or maintenance strategy. [99.2]

**Targeting Tools Folder:**

- Group A, B, & C Views:

  Designed to be processed and exported to stored formatted Excel spreadsheets. Each folder contains Group-specific views allowing a representative to review their data in a Portfolio snapshot (across all responsible markets) or in one of the Therapeutic sheets.

- Portfolio View:

  These views are designed to display Rx Volume, Rx Share, Rx Volume Change, Mrkt Rx Vol (RCQ), Cluster YTD Details for the Group's promoted markets. [99.2]

- Therapeutic View:

  Organizes customers by Cluster YTD Details, Market Un-Met %, Market Rx Volume (RCQ), % of Mrkt Total, Market Rank, Rx Volume (RCQ), Rx Share (RCQ,) and Rx Share Change RCQ vs. RPQ. These views are designed to rank customers by market volume and provide a comparison of Rx Volume and Rx Share data across key products within the market. [99.2]

- COX II Market:

  Rx Share of Products Displayed:

  This view calculates the market share for VIOXX and Celebrex within the COX II market. Customers are sorted by a "custom" market volume (highest to lowest) which is determined by the products displayed in the view. [99.2]

**58**

Confidential - Subject To Protective Order



**Lead Representative Roles & Responsibilities**

Lead Representative
Roles and Responsibility

Notes

Confidential - Subject To Protective Order

MRK-H.10STM000644



# Lead Representative

## Purpose

*The Lead Representative role evolved as a means for the cluster to ensure execution excellence and to integrate activities with Specialty and Hospital Representatives and HSAs.*

Notes

**60**

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000645



# Lead Representative

## Role and Responsibilities

- Maintains ongoing lead product situation analysis for cluster
- Assesses and maintains product strategy within the Account Plans
- Guides planning and oversight for cluster attainment of reach and frequency as well a breadth and depth goals
- Coordinates and communicates product, disease, market and competitive issues within a cluster
- Serves as a point of integration for Specialty and Hospital Representatives and HSAs
- Identifies cluster/district resource and training needs
- Drives HEL planning and control; accountable for quality of effort
- Leads all product-specific special projects ( i.e. Goal to Control, VIP, special target audiences, etc.)

Notes

Confidential - Subject To Protective Order

MRK-H.10STM000646



# Lead Representative
## Role Differentiation

- **Lead Representative**
  - Administrative role to coordinate execution excellence regarding a strategic product within the cluster and to integrate activities with Specialty and Hospital Representatives and HSAs.
- **Specialty Representative**
  - Defined position to support marketing strategies of a key strategic product by focusing on key Specialty Audiences. Lead the implementation of specific Marketing Programs, i.e. HCP, TSP. Focuses on defined target audience and unique resources. Role includes enhanced product, disease and market knowledge.
  - HSA
  - Defined position to identify and contact National Thought Leaders, with the primary objective of developing National Advocates and Speakers to support Merck products. Receive intensive initial and ongoing training within a defined therapeutic area. Operate under Policies 110 and 130.

**Notes**

*Basic Training Participant Guide (1/02)*

Confidential - Subject To Protective Order

MRK-H.10STM000647



# The Point

**To ensure all Lead Representatives:**

- Apply a consistent, integrated approach to conducting a product situational analysis

- Can determine the appropriate tactical plan based on that analysis

- Can communicate those resultant tactics to their clustermates

Notes

Confidential - Subject To Protective Order

MRK-H.10STM000648



# Lead Representative Training Objectives

## Apply a consistent, integrated approach to analyzing lead product

- What are the key performance indicators?
- What is this data telling me?
- What actions does the team need to take in light of this information?
- How am I going to communicate these actions to the rest of the team?
- How will I track progress to ensure the desired result?

*Notes*

Confidential - Subject To Protective Order

**MRK-H.10STM000649**

# HOSPITAL STRATEGY
## Simulation

### Roleplayer's Guide
September, 2000



Confidential - Subject To Protective
Order

MRK-AAR0049752

*** Slip Sheet ***

Child

Instructions

Confidential - Subject To Protective Order

MRK-AAR0049753



## Roleplayer Instructions

### Materials Needed

- *Roleplayer's Guide* (this document), including hospital profile, plot narrative, and Customer Profile cards

- *Participant's Guide*, including instructions and customer profile cards

- Participant/Team Evaluation Checklists

### How to Prepare for Roleplaying

| Materials | How to Prepare |
|---|---|
| *Roleplayer's Guide*<br>• Memorial Hospital profile | 1. *Review* the hospital profile. |
| • Plot narrative | 2. *Read* the plot narrative, for a more detailed overview of the relationships underlying the simulation.<br><br>*Note that very few details of the plot are included on the participant version of the Customer Profile cards. Therefore, the plot narrative should not be revealed to the participants.* |
| • Customer Profile cards | 3. *Locate* and *read* the profiles for the department and customers you have been assigned to roleplay. |
|  | 4. *Review* only the Customer Profiles for the department you will represent. If your Customer Profile cards refer to an existing relationship with customers in other departments (e.g., Dr. Tang in Internal Medicine holds a bone disease clinic with Dr. Sholing in Endocrinology) *review* these related profile cards as well.<br><br>*Note that the information in the participant's version of the Customer Profile may not always be consistent with the information on your cards.*<br><br>*Note that the Customer Profile cards for the Pharmacy and the Satellite Pharmacy are identical. This is to avoid a backup of teams all choosing to call on Pharmacy for their first appointments.* |

Confidential - Subject To Protective Order                                    MRK-AAR0049754

| Materials | How to Prepare |
|---|---|

*Roleplayer's Guide (cont.)*

• Customer Profile cards

*Note that irrespective of which product representatives are promoting, all representatives are required to call on Pharmacy and Emergency Medicine. To simplify the plot for the roleplayers, there are Pharmacy Customer Profile cards for representatives for Aggrastat and Pharmacy Customer Profile cards for representatives for Vioxx. Similarly, there are Emergency Medicine Customer Profile cards for representatives for Aggrastat and Emergency Medicine Customer Profile cards for representatives for Vioxx.*

*Note that for some customers the information that you can reveal and what you can agree to in the call differs depending on whether this is the first , second or third call a team is making to you. There is some information customers for Vioxx (specifically those who can write a Preferred Status Request Letter) can only reveal the second time a team calls on the customer. This information is presented in bold, italic type on the Customer Profile card. Preferred Status Request Letters may only be given on the second call. There is some information customers for Aggrastat can only reveal the second and third time a team calls on the customer. Second call information is presented in bold, italic type on the Customer Profile card. Third call information is presented in ordinary type on the Customer Profile card.*

5. *Review* the product-related question on each Customer Profile Card (see "Say/Ask the Representative") before you roleplay that customer. Each representative for Vioxx will have to address one question/comment. Each representative for Aggrastat will have to address up to three questions/comments. Each question or comment will test the representative's ability to deal with obstacles. Each question or comment has been selected to fit the profile of the customer, for example, Dr. Avery in Emergency Medicine is concerned about the safety profile of GP IIb/IIIa platelet inhibitors and will ask the representative about the incidence of bleeding episodes associated with Aggrastat. Use your judgement to decide when to ask the question or make the comment to the representative.

6. *Be prepared* to play the role of any of the customers in your department as requested by the team/participant when they begin the appointment.

Confidential - Subject To Protective
Order

MRK-AAR0049755

| Materials | How to Prepare |
|---|---|
| *Participant's Guide* | 1. *Read* the instructions and the participant version of the Customer Profile cards.<br><br>2. *Review* the participants' objectives for the simulation, paying particular attention to how much information they are presented for each customer and how this differs from your customer profiles.<br><br>*Note that the main objective for representatives for Vioxx is to upgrade the formulary status of Vioxx to preferred agent that specifically inhibits COX-2. They can only achieve this objective by gaining the commitment of 4 physicians of at least Attending Physician designation to write preferred Status Request Letters to Dr. Nettles, the Directory of Pharmacy Services.*<br><br>*Note that the objective for representatives for Aggrastat is to gain the commitment of the Cardiologists to include Aggrastat as the exclusive short-acting GP IIb/IIIa platelet inhibitor in an Unstable Angina Treatment Protocol for use in Emergency Medicine.*<br><br>3. *Attend* the introduction to the simulation for the participants. |
| Participant/Team Evaluation Checklists | 1. *Locate* and *read* the Participant/Team Evaluation Checklists to familiarize yourself with the parameters against which individual participants and teams will be evaluated. |

### Roleplay Guidelines

- When performing each roleplay, try to stay within character as described in the profile. *It is important that you be consistent in the way you roleplay each customer.* No profile has been designed to be especially difficult for the participants.

- Be realistic about the time for each roleplay. Based on their profile and position in the department, some customers will only spare a few minutes; others will offer more time.

Confidential - Subject To Protective Order

MRK-AAR0049756

- Note that each appointment slot is for representatives for Vioxx is 10 minutes in length and 20 minutes in length for representatives for Aggrastat. The team observers are responsible for helping you remain aware of this timeframe. If a team completes a call on one specific customer within a department in less than the allotted time, the team may use the balance of the time to ask to roleplay with a different customer from the same department. This transition from one customer to another will need to take place very quickly on your part.

- If the customer you are portraying is described as friendly and open, initiate the conversation with topics such as vacations, hobbies, etc. Do not prompt the participant to begin the "business"; he or she will need to lead you into it.

- If the customer is the considered, analytical type, do not initiate any conversation. Use one- or two-word answers for any questions the participant asks you. If the participant is very good at questioning, you can open up a little.

- If you are playing a customer who likes new things, stick with the subject of "newness." You may want to ask about other R & D products that Merck is developing.

- If the profile describes you as controlling, efficient, or domineering, get down to business immediately. State that you only have a few minutes for the call, and stick to it.

- If the representative asks you for information that the profile card does not allow you to reveal, say "I'm not aware of that," or "I don't have that information," or "I can't answer that at this time." Use this type of reply rather than trying to invent or expand on the profile information. It is preferable to "step out" of the simulation of a real call to this extent and refer deliberately to not having or not being able to provide information, rather than "overcueing" the participants by providing too much information.

Confidential - Subject To Protective Order

MRK-AAR0049757

- Remember that participants have been specifically directed to play detective and dig for information in addition to selling Vioxx and Aggrastat. They will probe for information about the customer's prescribing, about the prescribing of the customer's colleagues, and any other physicians with whom the customer has a working relationship. For example, Dr. Ingle in Orthopedic Surgery works closely with a Clinical Pharmacist and an anesthetist in PACU; the representative should ask Dr. Ingle about these collaborations. This means that representatives may start the call with very direct questions — no small talk — on purpose. This is appropriate. Your communication style and the information you respond with should be governed by the profile card of the customer you are playing at that time.

- If representatives for Vioxx ask for a *Preferred Status Request Letter* inappropriately (i.e., on the first call, or without having asked any other questions), decline by saying "I won't be able to do that for you at this time." Note that those customers who can provide a *Preferred Status Request Letter* in each department are *only* directed to do so in the second call by a given team. Potential letter writers should not write a *Preferred Status Request Letter* except in response to a specific request (e.g., "Doctor, will you write a letter to Pharmacy requesting preferred status on formulary for Vioxx?").

- If representatives for Aggrastat ask for inclusion of Aggrastat in an *Unstable Angina Treatment Protocol* inappropriately (i.e., on the first call, or without having asked any other questions, or for non-high-risk unstable angina patients), decline by saying "I won't be able to do that for you at this time." Note that those customers who can commit to including Aggrastat in an *Unstable Angina Treatment Protocol* in each department are *only* directed to do so in the third call by a given team. Potential advocates for Aggrastat should not agree to include Aggrastat in an *Unstable Angina Treatment Protocol* except in response to a specific request (e.g., "Doctor, will you include Aggrastat in an *Unstable Angina Treatment Protocol* for use in Emergency Medicine?).

Confidential - Subject To Protective Order

MRK-AAR0049758

# Hospital Profile, Memorial Hospital

## General Information

| Priority: High | Type: Teaching | |
|---|---|---|
| Address:<br>123 Main St.<br>New York, USA | Tel #: 984-111-2222<br>Fax #: 984-111-2233<br>E mail: mem@hosp.com<br>Web site: none | Number of beds: 1,400 |
| Outpatient centers:<br>Memorial Clinic | Associated hospitals:<br>St. Jude's (maternity) | Sign-in procedure: At pharmacy, ask for book |
| Switchboard staff: Joe, Helen | Reception: Maria, Courtney | Paging procedure: Use black phones; Dial 9, then the page number; Then replace the handset |

## P & T Committee Members

| Name | Specialty | Access |
|---|---|---|
| 1. Dr. Nettles | Director of Pharmacy | Appt |
| 2. Dr. Joplin | General Surgery | Operating suite (not profiled) |
| 3. Dr. House | Rheumatology | Department meetings |
| 4. Dr. Ovenden | Hematology | Appt (not profiled) |
| 5. Dr. Omerod | Pharmacology | Appt (not profiled) |
| 6. Dr. Jackson | Internal Medicine | Appt |
| 7. Dr. Guidry | Endocrinology | Appt |
| 8. Layperson | | |

Confidential - Subject To Protective
Order

MRK-AAR0049759

*P & T Committee Meetings*

| Frequency: 2 per year | Time: 1st Monday in February and July | Place: Usually seminar room 108b |
|---|---|---|
| Procedure for formulary inclusion (existing products): Sponsor must present clinical data to committee and complete forms | Procedure for new product introduction: Can replace an old product or be added; Sponsor must be at least a Fellow; Forms are obtained in the pharmacy | Procedure for formulary status upgrade to "preferred" status: Written requests to the Director of Pharmacy must be obtained from four physicians of at least Attending Physician designation. |

*Departments*

| Specialty | Department Chief |
|---|---|
| Pharmacy | Dr. Nettles |
| Satellite Pharmacy | Dr. Nettles |
| Orthopedic Surgery | Dr. Moran |
| Emergency Medicine | Dr. Avery |
| Rheumatology | Dr. Randolph |
| Endocrinology | Dr. Guidry |
| Internal Medicine | Dr. Jackson |
| Anesthesiology | Dr. Kalms |
| Cardiology | Dr. Stanley |
| • Catheter Laboratory | Dr. Omey |
| • Coronary Care Unit | Dr. Jensen |
| Nursing | Nurse Kildaire |
| Oncology | Dr. DeVita |

Confidential - Subject To Protective Order                                    MRK-AAR0049760



## Hospital Strategy Simulation:
Previous Plot Summary

The last time you worked in Memorial Hospital, your objective was to act as a "detective" and discover which customers were potential formulary sponsors for Vioxx. Once you evaluated these key customers, you had to gain their commitment to act as formulary sponsors for Vioxx.

What follows is a synopsis of the influences and power structures that existed in each department. It will also remind you which physicians agreed to act as formulary sponsors for Vioxx.

### *Pharmacy*

Ms. Amos was the extremely friendly Resident in Pharmacy. While she had no power or influence, she proved to be a good source of information about her colleagues in the Pharmacy and other physicians who were important for Vioxx. A call to Ms. Amos taught two valuable lessons: the importance of leaving no stone unturned, and the fact that all personnel in the hospital are potentially useful to you.

Mr. Filan was the tight-lipped Purchasing Pharmacist. He monitored each department's expenditure on drugs and sent monthly updates about this to Dr. Nettles, the Director of Pharmacy Services. Mr. Filan came across as a closed book, and you had to probe very skillfully to extract information from him.

Dr. Nettles was the cost-conscious Director of Pharmacy Services. Dr. Nettles was particularly important because she sat on the P & T Committee. Her first question to you was: "who are you seeing in my hospital, what are you selling, and for which patients?" It was Dr. Nettles' opinion that agents that specifically inhibit COX-2 were just the latest addition to a long list of budget-busters currently used at Memorial Hospital.

Dr. Nettles circulated a memo to all hospital staff underlining the efficacy and cost-effectiveness of generic NSAIDs. In it she stated that COX-2 inhibitors were "just expensive NSAIDs."

Dr. Svanold, the Pharm D., had a close working relationship with Dr. Ingle in Orthopedic Surgery. She revealed useful information about this department's general approach to the management of acute pain.

Confidential - Subject To Protective
Order

MRK-AAR0049761

Dr. Nettles agreed to listen to an argument in favor of formulary approval for Vioxx, but only if it was strictly reserved for elderly patients with acute pain and inflammation who have a documented history of NSAID-induced GI bleeds. You had to be aware of the fact that Dr. Nettles tried to niche Vioxx; this would have prevented you from realizing its full potential.

It was important to quell any fears about Vioxx being a budget-buster, and instead approach other opinion leaders, such as Dr. Helmann (the Attending Physician in the Pain Clinic) and Dr. Tang (the Attending Physician in Internal Medicine), to act as advocates for Vioxx. You had to achieve this without making Dr. Nettles feel duped.

It was important that you called on enough members of the pharmacy so that any potential opposition to Vioxx was neutralized.

*No one in Pharmacy could give a Formulary Sponsor Card.*

## Orthopedic Surgery

In Orthopedic Surgery, the drug of choice for acute pain was a narcotic analgesic. Some patients received narcotics for up to 5 days post-operatively, a practice that Dr. Heinz, a Research Fellow in the department, was not happy about. The fact that narcotic use was high in Orthopedic Surgery was important information, as it provided you with the opportunity to win new business for Vioxx.

Dr. Ingle, the ambitious Attending Physician in the department, wanted sponsorship to enable him to attend a major symposium in Sydney, Australia later in the year. He was willing to act as a sponsor for Vioxx if you offered to help him attend the meeting.

The department chief, Dr. Moran, devised the "Moran knee prosthesis." As a "traveling lecturer," she was sponsored by several companies to speak at various national and international symposia. Although she was away a lot, she indicated to you that the other physicians in her team could handle an assessment of Vioxx in her absence. Dr. Moran played golf with Dr. Randolph (Chief, Rheumatology) and provided you with the opportunity to gain soft support for Vioxx. Dr. Moran was willing to act as a formulary sponsor.

Dr. Peters was busy studying for exams and was unwilling to make any commitment to you.

Confidential - Subject To Protective Order

MRK-AAR0049762

Dr. Zagni was the third-year Resident who recently arrived from Emergency Medicine. If you probed about her last rotation, she revealed useful information about the influence of Dr. Payne and Nurse Munson (both in Emergency Medicine).

*Dr. Moran was willing to act as formulary sponsor.*

## Emergency Medicine

Dr. Avery, chief of Emergency Medicine, was willing to act as a sponsor for Vioxx provided it was assessed first.

Dr. Lo, the Intern in the department, was firmly convinced of the benefits of Vioxx and agreed to prescribe it first-line for acute pain. It was unfortunate that Dr. Lo was leaving the department in a few weeks to take up a new post at another hospital.

One of the key players in this department was the senior trauma nurse, Nurse Munson. You were able to find out that she had the ear of Dr. Avery and that she was seen by many as running the department. Nurse Munson was very involved with analgesia in the department and initiated a follow-up program for patients in the community who were taking painkillers.

The ambitious young Attending Physician, Dr. Orlowski, was new to the department. Many of his colleagues saw him as an upstart. Dr. Orlowski did not get along with Nurse Munson; Nurse Munson thought he was "rocking the boat," and he did not like the power she wielded.

Although you could have approached Dr. Orlowski to be a formulary sponsor for Vioxx (he was more than willing), this would have been a mistake, since Nurse Munson would have sabotaged the application through her influence on Dr. Avery.

Dr. Payne, a Resident in the department, got along well with Nurse Munson and was loyal to Dr. Avery. Dr. Avery was happy to sanction sponsorship if both Dr. Payne and Nurse Munson were involved with an assessment of Vioxx.

Dr. Treveena, another Resident in the department, agreed to sponsor Vioxx. However, you will have noticed early in the sales call that he was a "yes man" and would not deliver on any promises about being a formulary sponsor for Vioxx.

*Dr. Avery was willing to act as formulary sponsor.*

Confidential - Subject To Protective Order

MRK-AAR0049763

*Rheumatology*

Dr. Hannah, one of the Attending Physicians in Rheumatology, was very skeptical about new products and felt that agents that specifically inhibited COX-2 were not "tried and tested." It was difficult to change Dr. Hannah's belief that ibuprofen was adequate for treating pain and inflammation, but he did agree to review the clinical data supporting Vioxx.

Dr. House, the other Attending Physician in the department, was a member of the P & T Committee. She was obviously an independent thinker who was able to make considered decisions. She was very ethical in her approach and told you that she considered product sponsorship and her role on the P & T Committee to be incompatible. Dr. House, therefore, would not act as a sponsor, but it was nevertheless very important to gain her support for Vioxx. Dr. House thought that agents that specifically inhibit COX-2 had a valid place in the management of pain and inflammation, but would give soft support for Vioxx only if you had won a sponsor card from another physician.

Dr. Lee was a new resident who recently rotated from the ER. Dr. Lee was too junior to be a sponsor, but he indicated that he would like to be involved with any Vioxx trial. Dr. Lee suggested that Dr. House and Dr. Randolph might be good contacts for you. He also revealed information about the power structure within Emergency Medicine, specifically that Dr. Payne and Nurse Munson were good contacts.

Dr. Mason was the ambitious Chief Resident who was heavily involved in the department's trials program. She wanted to see the clinical data supporting Vioxx before she would offer support.

Dr. Miles was the friendly and open Fellow in the department. His patients adored him because he was kind. He agreed to act as a sponsor for Vioxx, but warning bells will have sounded when you noticed that he was a bad timekeeper and highly disorganized. Dr. Miles would have been a poor choice of product sponsor because he could not say "no" and would have had difficulty completing the formulary application.

Dr. Randolph, chief of Rheumatology, was very interested in the concept of COX-2 selectivity. He was willing to support Vioxx, provided that another senior physician made the formulary application. Dr. Randolph revealed his colleague Dr. House as a potential supporter, not sponsor, for Vioxx. You will have found out that Dr. Randolph did not get along with Dr. Helmann (Pain Clinic), and so you could not use Dr. Randolph to help gain her support.

*No one in Rheumatology was willing to act as formulary sponsor, but support could be gained.*

Confidential - Subject To Protective Order

MRK-AAR0049764

### Endocrinology

One of the biggest potential uses for Vioxx in the department of Endocrinology was to treat pain resulting from vertebral fractures associated with osteoporosis, which occur in the context of the menopause, secondary to diabetes, or following corticosteroid use.

Mr. Andrews, the Physician Assistant, had a lot of patient contact and could help identify patients suffering from pain and NSAID-related GI side effects. He also gave information about the weekly bone clinic held by Dr. Tang (Internal Medicine) and Dr. Sholing for patients with bone disease. Mr. Andrews suggested you call on Dr. Sholing in this department and Dr. Helmann in the Pain Clinic.

Budget control was a major concern for Dr. Guidry, the Department Chief and member of the P & T Committee. Dr. Guidry told you that Dr. Jackson's department (Internal Medicine) over-uses NSAIDs and prescribes them inappropriately to people at high risk for GI hemorrhage and ulceration. Dr. Guidry's department receives many referrals from Internal Medicine, and Dr. Guidry was open to having a joint meeting with Dr. Jackson's department in order to address this inappropriate prescribing PATTERN. Dr. Guidry agreed that there was an important role for Vioxx in the management of patients with pain and inflammation.

Dr. Kattering was not good at making decisions. He wanted to know what Dr. Guidry and Dr. Sholing thought about Vioxx. He agreed that Vioxx was a useful product and said he would consider trial usage.

Dr. Sholing told you he received a mailing about agents that specifically inhibit COX-2 and said he was impressed with the presumed benefits they offer. Dr. Sholing prescribes a lot of analgesics in patients with vertebral fractures due to osteoporosis. He also told you about the weekly bone clinic he holds with Dr. Tang in Internal Medicine; they treat patients with vertebral diseases, many of which are painful. Dr. Sholing agreed to persuade Dr. Guidry to review the literature on Vioxx. He also agreed to give soft support for a formulary application for Vioxx, as long as you persuaded Dr. Tang (Internal Medicine) to act as a sponsor for Vioxx.

Dr. Wiltz did not have a very positive attitude toward the pharmaceutical industry and told you that she believed the high cost of drugs was mostly due to the cost of the advertising that promotes them. It was important to remember that Dr. Wiltz's unwillingness to prescribe Vioxx did not mean she did not have need for it; this physician may therefore present an opportunity in the future.

*No one in Endocrinology was willing to act as a formulary sponsor, but support could be gained.*

Confidential - Subject To Protective Order                              MRK-AAR0049765

## Pain Clinic

The Senior Nurse Practitioner in the Pain Clinic, Nurse Berger, told you that she liked the convenience of the once-daily dosing of Vioxx. She was important because she developed individualized pain management strategies for patients. She told you that Dr. Randolph (Rheumatology) and Dr. Helmann did not see eye to eye. She suggested you call on her colleague, Dr. O'Mara, and she agreed to speak with Dr. Helmann about the possibility of including Vioxx in Dr. Helmann's pain management guidelines.

Dr. Crisp, chief of the Pain Clinic, expressed concerns about containing the cost of running the department. He suggested you call on Nurse Berger to discuss Vioxx.

You were able to find out that Dr. Helmann, the Attending Physician in the Pain Clinic, receives referrals from colleagues within the hospital and from surrounding centers. She was clearly an expert on the management of pain and wrote the popular undergraduate text book *Advances in Pain Management*. She built a co-operative and cross-disciplinary working relationship with a number of colleagues in the hospital, including Dr. Sholing (Endocrinology) and Dr. Tang (Internal Medicine). Dr. Helmann agreed to act as a formulary sponsor for Vioxx and to consider including it in her pain management guidelines.

Both Dr. O'Mara and Nurse Berger regarded Dr. Helmann as their mentor; the three individuals had an excellent working relationship. Dr. O'Mara gave you a good lead about Dr. Sholing, suggesting that he may be an advocate for Vioxx. Dr. O'Mara also agreed to discuss with Dr. Helmann the possibility of including Vioxx in Dr. Helmann's pain management guidelines for the hospital.

Dr. Randolph did one session a week in the Pain Clinic, but it was not possible to persuade Dr. Helmann to positively influence Dr. Randolph as the two physicians did not get along.

You had to unearth the good working relationship that existed between Dr. Helmann, Dr. O'Mara, and Nurse Practitioner Berger, and their power to influence óne another.

*Dr. Helmann was willing to act as a formulary sponsor.*

Confidential – Subject To Protective Order

MRK-AAR0049766

*Internal Medicine*

Dr. Griffiths, the Chief Resident in Internal Medicine, told you that the Department Chief, Dr. Jackson, prescribes generically to contain drug costs in the department. Dr. Griffiths also revealed that Nurse Hardy acted as the gatekeeper for the department, dictating which representatives would, and which representatives would not, see Dr. Jackson. Dr. Griffiths agreed to speak in favor of Vioxx to her roommate, Dr. Zagni (Orthopedic Surgery).

Nurse Hardy was very protective of Dr. Jackson and told you that there was no point in detailing Vioxx, as Dr. Jackson nearly always prescribes generic products. Only a convincing Vioxx detail to Nurse Hardy that persuaded him of the benefits of Vioxx opened the door to Dr. Jackson. If you probed Nurse Hardy about Dr. Tang, he would have revealed that Dr. Tang is important because he dictates the informal prescribing policy in the department. Nurse Hardy also suggested that Dr. Sholing, who works with Dr. Tang, might be interested in Vioxx.

As well as being chief of the department, Dr. Jackson was a member of the P & T Committee. Though he said he prescribed generic products whenever possible, he was open to the benefits of Vioxx and suggested you call on Dr. Tang. If you convinced Dr. Jackson of the benefits of Vioxx, he agreed to ask Dr. Tang to assess Vioxx in NSAID-intolerant patients.

The key mover and shaker in the department was Dr. Tang, the ambitious Attending Physician who had considerable influence over Dr. Jackson. He expressed an interest in the mechanism of COX-2 selectivity and revealed, if you probed, that he had prescribed Celebrex but was unhappy with its safety profile. Together with Dr. Sholing in Endocrinology, Dr. Tang told you he referred patients to Dr. Helmann in the Pain Clinic.

Provided you had seen Dr. Jackson, Dr. Tang agreed to speak to Dr. Sholing (Endocrinology) about conducting a trial on Vioxx before applying for formulary inclusion.

*Dr. Tang was willing to act as a formulary sponsor.*

Confidential - Subject To Protective Order

MRK-AAR0049767

*** Slip Sheet ***

Child

Plot

Confidential - Subject To Protective
Order



**Hospital Strategy Simulation:**
Current Plot Profile

*Important Note:* This outline of the simulated scenario within each department is provided for your information only. Do NOT present this information to the participants.

### Pharmacy (Vioxx)

Ms. Amos is an extremely friendly Pharmacy Resident. She makes it her business to know the politics at play in each department and can pinpoint some of the key physicians in departments that are targets for Vioxx and Aggrastat. Probing Ms. Amos will reveal that Dr. Svanold, the Clinical Pharmacist, can influence Dr. Nettles, the Principal Pharmacist; that the representative for Celebrex "always seems to be calling" on Dr. Randolph, Chief of Rheumatology; and that Dr. McKenzie, another Clinical Pharmacist, is highly respected by his colleagues in Cardiology.

It appears that Ms. Amos has no direct power or influence on prescribing decisions in the hospital. However, as editor of the monthly *Adverse Event Alert*, the drug-related adverse event notification system in Memorial Hospital, she is in control of a potentially powerful tool. In view of this, representatives should take the opportunity to show the evidence for the safety and tolerability profiles of Vioxx and Aggrastat.

Her position as editor of this bulletin becomes important when representatives hear anecdotal reports of adverse events associated with competitor drugs. Representatives should ask Ms. Amos to report these adverse events in the next edition of the bulletin. Since they need her cooperation, representatives should treat Ms. Amos as they would any important physician in the hospital. A colleague of Ms. Amos, the Clinical Pharmacist, Dr. Svanold, is the only person who can reveal that she is the editor of the bulletin.

Mr. Filan, the tight-lipped Purchasing Pharmacist is so concerned about containing drug expenditure that he is known by many of his colleagues in Medicine as "penny pincher". He continues to scrutinize each department's expenditure on drugs and prides himself on the detailed summaries he provides to the Principal Pharmacist,
Dr. Nettles.

Confidential - Subject To Protective
Order

MRK-AAR0049769

The objective of calls to Mr. Filan is to make a solid pharmacoeconomic case for upgrade to the formulary status of Vioxx to preferred agent that specifically inhibits COX-2. The representative therefore needs to extract details of departmental expenditure on analgesics, NSAIDs, $H_2$ antagonists and proton pump inhibitors [Data to be supplied by Merck]. In a first call Mr. Filan can provide this data for the hospital as a whole. In a second call, Mr. Filan can provide this data for Orthopedic Surgery, Rheumatology, Anesthesiology and Emergency Medicine.

Dr. McKenzie, a Clinical Pharmacist who works closely with the Cardiologists in the Cath Lab and Coronary Care Unit (CCU) is the key player in Pharmacy for Aggrastat. He is an expert on cardiac drugs and is highly respected by his colleagues in Cardiology. He should be approached by the representative for Aggrastat early on as he can reveal important information about the management of unstable angina in the Cath Lab, CCU and Emergency Medicine.

The representative will have to convince Dr. McKenzie of the benefits of Aggrastat, because the Cardiologists will want to know that he is in favor of naming Aggrastat as the exclusive short-acting GP IIb/IIIa platelet inhibitor on the hospital formulary.

Dr. Nettles is the cost-conscious Director of Pharmacy Services and a member of the P &T Committee. The first question she will ask the representative is: "who are you seeing in *my* hospital, what are you selling, and for which patients?" She has written to all the chiefs of department requesting a reduction in their expenditure on drugs.

Dr. Nettles must receive four *Preferred Status Request Letters* for Vioxx from physicians of at least Attending Physician designation, and only she can reveal this. If the other pharmacists are asked about the procedure for upgrading the formulary status of Vioxx, they will tell the representatives to speak to Dr. Nettles about that. This means that each team must call on Dr. Nettles. Dr. Nettles is influenced by Mr. Filan, Dr. McKenzie and Dr. Svanold, another Clinical Pharmacist in the hospital.

Dr. Svanold is the key player in Pharmacy for the Vioxx representative since she works closely with a number of departments that are targets for Vioxx, including the Department of Orthopedic Surgery, and the Pain Clinic, which is part of the Department of Anesthesiology.

If representatives probe Dr. Svanold about these links, she will hint that Dr. Ingle in Orthopedic Surgery might write a letter for Vioxx. This hint is useful because it means that there may be two letter writers in Orthopedic Surgery, Dr. Ingle and Dr. Moran, who, as previous formulary sponsor for Vioxx, should automatically be a target for the representative.

Confidential - Subject To Protective Order                                      MRK-AAR0049770

Dr. Svanold will ask the representative about the use of Vioxx in patients with sulfa allergies and will reveal that she recently had two reports of sulfa-type allergies in patients in Orthopedic Surgery receiving Celebrex. Probing will reveal that Ms. Amos edits the *Adverse Event Alert*. If asked, Dr. Svanold will tell Ms. Amos to include these adverse events in the next edition of the bulletin. Dr. Svanold will be cagey about which physicians reported the sulfa-type allergies, so the representative will have to find out about this from another source.

An ideal approach for the representative for Vioxx in Pharmacy would be to start by gathering information from Ms. Amos. Ms. Amos will reveal a piece of information relevant to Aggrastat to the representative for Vioxx, and a piece of information relevant to Vioxx to the representative for Aggrastat. This means that representatives will need to listen carefully for comments about their colleague's product and communicate them accurately.

Next, the representative should pay a visit to Dr. Nettles, and find out that four letters are required for upgrade to the formulary status of Vioxx.

Then, the representative should call on Dr. Svanold in order to gain her support for upgrade to the formulary status of Vioxx. Successful probing of Dr. Svanold will help the representative identify both positive and negative influences on business for Vioxx in relevant departments. This will enable the representative to identify and approach potential letter writers for upgrade of the formulary status of Vioxx and identify and neutralize physicians (such as Dr. Randolph in Rheumatology) that could block it. At the same time, Mr. Filan will have to be presented with a good pharmacoeconomic argument for nominating Vioxx as the preferred agent on formulary that specifically inhibits COX-2.

The representative will need to return to both Mr. Filan and Dr. Nettles to convince them of the pharmacoeconomic case for Vioxx.

It is important that representatives call on enough members of the pharmacy so that any potential opposition to Vioxx and Aggrastat and is neutralized.

Ms. Amos — Dr. Nettles — Dr. Svanold — Mr. Filan — Dr. Nettles — Mr. Filan — Dr. Svanold.

*No one in Pharmacy can write a Preferred Status Request Letter.*

Confidential - Subject To Protective Order

## Pharmacy (Aggrastat)

The most influential person in Pharmacy for the representative for Aggrastat is Dr. McKenzie. He is highly respected by the Cardiologists, who value his drug and clinical trial reviews.

The representative must obtain Dr. McKenzie's agreement to review clinical data for Aggrastat for the Cardiologists and physicians in Emergency Medicine.

Ms. Amos, the Pharmacy Resident, can reveal Dr. McKenzie's influence with the Cardiologists. She will also comment that the representative for Integrilin "always seems to be calling" on Dr. Hartley, a hint that Integrilin is being prescribed in CCU.

Mr. Filan, the Purchasing Pharmacist, regularly updates Dr. Stanley, (Department Chief, Cardiology) Dr. Omey (Director, Cath Lab) and Dr. Jensen (Director, CCU), on drug expenditure in their departments.

Mr. Filan is very concerned about the expenditure on ReoPro. If the representative can convince him that prescribing of Aggrastat in Emergency Medicine would reduce the total cardiology drug bill, Mr. Filan, for once, would be a happy man. His enthusiasm shows through when he reveals in a second call that Dr. McKenzie's review of Aggrastat "looks impressive".

Dr. McKenzie will reveal during a first call that the physicians in the Cath Lab "like to keep their options open". If probed, he will reveal that ReoPro is prescribed in the Cath Lab and Integrilin is prescribed in CCU in patients not suitable for revascularization.

Dr. McKenzie can reveal that Ms. Amos edits the *Adverse Event Alert*; this becomes relevant when the representative discovers the intracranial bleed associated with Integrilin that occurred in Emergency Medicine. The representative has the opportunity to call back on Ms. Amos and ask her to publish the details of the IC bleed in the next edition of the bulletin.

Dr. McKenzie will summarize his review of Aggrastat by stating that the data supporting Aggrastat is stronger than the data supporting Integrilin. If the representative asks, Dr. McKenzie will agree to recommend Aggrastat as the preferred GP IIb/IIIa platelet inhibitor to the Cardiologists.

Dr. Nettles is the Director of Pharmacy Services. Although he plays a small role in the plot for Aggrastat, he expects a full detail and will ask the representatives about their plans for the hospital.

Confidential - Subject To Protective Order                                              MRK-AAR0049772

Dr. Svanold, a Clinical Pharmacist, is the final member of the department. Her links are with Orthopedic Surgery, so she is a target for the representative for Vioxx. If representatives for Aggrastat call on Dr. Svanold, she will direct them to Dr. McKenzie.

The ideal approach for the representative for Aggrastat in Pharmacy is to pay a courtesy call on Dr. Nettles, and quell any fears he may have about the cost of widespread prescribing of Aggrastat by Cardiology and Emergency Medicine.

Next, the representative should call on Ms. Amos and Mr. Filan to gather as much information as possible before calling on Dr. McKenzie.

If the representative does a thorough review of the Aggrastat clinical reprints with Dr. McKenzie, he will agree to review Aggrastat and to circulate his report to the physicians in Cardiology and Emergency Medicine. Finally, Dr. McKenzie can be persuaded to recommend Aggrastat as the preferred GP IIb/IIIa platelet inhibitor to the Cardiologists and the physicians in Emergency Medicine.

Since Dr. Svanold works closely with the Orthopedic Surgeons, the representative for Aggrastat should not waste time calling on her.

Dr. Nettles — Ms. Amos — Mr. Filan — Dr. McKenzie — Mr. Filan — Dr. McKenzie

## Orthopedic Surgery

The physicians in Orthopedic Surgery prescribe a wide range of analgesics, including agents that specifically inhibit COX-2. Dr. Moran, Chief of Orthopedic Surgery, acted as a formulary sponsor for Vioxx and continues to be a Vioxx (and Celebrex) prescriber.

Dr. Heinz, the cost-conscious Fellow in Orthopedic Surgery prescribes Celebrex and Vioxx so that post-operative patients can be taken off narcotics as early as possible. Dr. Heinz has recently started prescribing Mobic because he has been told that it is not only an agent that specifically inhibits COX-2, but is also less expensive than Vioxx.

The representative needs to address these two misconceptions. If probed, Dr. Heinz will reveal information about the working relationships that exist between the two key players in Orthopedic Surgery, Dr. Moran, and Dr. Ingle, and physicians from other departments who are important to the prescribing of Vioxx.

Confidential - Subject To Protective Order

MRK-AAR0049773

Dr. Ingle, the Attending Physician in Orthopedic Surgery, has encouraged the reduction in the prescribing of narcotics in his department because of their cost and adverse effects. The use of agents that specifically inhibit COX-2, both Celebrex and Vioxx, is therefore increasing in his department.

Dr. Ingle is concerned about the potential edema that occurs with Vioxx 50 mg and therefore reserves Celebrex for patients with renal disease. The representative needs to provide the data that will assure Dr. Ingle of the good safety profile of Vioxx. Addressing Dr. Ingle's concerns is important because he is influential with his colleagues in the department and, in Dr. Moran's absence, dictates the department's strategy for the management of pain.

If probed, Dr. Ingle will reveal that his influence extends outside his own department, to Dr. Svanold, the Clinical Pharmacist, and to Dr. Kalms, the anesthetist with whom he works in PACU. He can reveal that Dr. Kalms is dissatisfied with the adverse effects of Toradol, an obvious opportunity for Vioxx.

All Dr. Ingle's colleagues can reveal that the representative for Celebrex has approached him seeking upgrade to the formulary status of Celebrex. If the representative asks Dr. Ingle about this, he will reveal his uncertainty about Celebrex, having recently seen sulfa-type allergies in two of his patients receiving Celebrex. The representative should ask Dr. Ingle to ensure these adverse events are reported in the *Adverse Event Alert*.

Most importantly for the representative, Dr. Ingle can write a *Preferred Status Request Letter*, but the representative needs to return a second time to obtain it.

The Chief of Orthopedic Surgery, Dr. Moran, is a "traveling lecturer" and is sponsored by several companies to chair various national and international symposia. She delegates the running of the department to Dr. Ingle in her absence. Dr. Moran is important since like Dr. Ingle, she can write a *Preferred Status Request Letter*.

Dr. Moran believes that Vioxx cannot be used for more than 5 days in patients with acute pain and therefore thinks that the long term safety of Vioxx cannot have been established. The representative should address this misconception and discuss the data on the long-term safety profile of Vioxx.

Confidential - Subject To Protective Order

MRK-AAR0049774

Previously, Dr. Moran was a formulary sponsor for Vioxx. She is therefore an obvious choice to ask to write a letter to Pharmacy seeking upgrade to the formulary status of Vioxx. If the representative asks Dr. Moran to support an application for preferred status on formulary for Vioxx, she will tell the representative that she would firstly need to know what the Rheumatologists (particularly Dr. Randolph) think, since they are the thought leaders on NSAIDs in the hospital.

The representative will have found out from Pharmacy that Dr. Randolph prescribes Celebrex. Thus, the representative is faced with a dilemma; Dr. Moran's request for upgrade to the formulary status of Vioxx is dependent on support from Rheumatology, yet Dr. Randolph, Chief of Rheumatology, prescribes Celebrex.

One solution to this problem, if Dr. Randolph is resolute in his support for Celebrex, is to seek support from another senior Rheumatologist. The representative should eventually discover that the best choice is Dr. House, Attending Physician (and P & T Committee member) in Dr. Randolph's team.

Dr. Peters, the other Resident in Orthopedic Surgery, thinks that studies show there is a faster onset of action in OA pain with Celebrex than with Vioxx. The representative needs to clarify the basis of this belief and review the clinical studies that show an onset of action of Vioxx 50 mg in 45 minutes. Though Dr. Peters has little prescribing autonomy, he can reveal important information about his colleagues in the department.

Dr. Zagni is the third-year resident in Orthopedic Surgery who has a special interest in trauma. She will ask the representative why she has to discontinue Vioxx post-operatively. The representative needs to clarify her question, and review the data that shows that Vioxx has no effect on platelet aggregation.

Dr. Zagni recently arrived from ER and will casually drop this information into the conversation. This should prompt the representative to probe Dr. Zagni for any information relating to the use of Vioxx in Emergency Medicine.

Since Emergency Medicine is a target department for Aggrastat too, the representative should probe for any relevant information relevant to Aggrastat, with a view to passing it on to his/her colleague who promotes Aggrastat.

Confidential - Subject To Protective Order

MRK-AAR0049775

Dr. Zagni will recall the day that she and Nurse Munson had to deal with an intra-cranial bleed in a patient being treated with Integrilin. Dr. Zagni can reveal that the Attending Physician in ER, Dr. Orlowski, is very keen to initiate GP IIb/IIIa platelet inhibitors in their UA patients, but that the Chief, Dr. Avery, will not allow this until an *Unstable Angina Protocol*, approved by Cardiology is in place. This information will enable representatives for Aggrastat to refine the focus of their strategy for Aggrastat.

The ideal way to approach Orthopedic Surgery is to be mindful of Dr. Moran's previous role as formulary sponsor for Vioxx and assess his current attitude towards it. Dr. Moran will agree to write a letter as long as the representative can show that the Rheumatologists too are in agreement. The representative needs to gain support from Rheumatology and call back to Dr. Moran and ask for a letter.

The representative should have found out from Pharmacy and Dr. Ingle's colleagues that he is likely to agree to write a letter. A convincing detail will secure a letter from Dr. Ingle. Other issues to address are each physician's misconceptions about Vioxx, the potential encroachment of Mobic, and the threat from the activity of the representative for Celebrex.

Dr. Moran — Dr. Ingle — Dr. House — Dr. Moran —

*Dr. Moran and Dr. Ingle can write Preferred Status Request Letters.*

### Emergency Medicine (Vioxx)

The physicians in Emergency Medicine prescribe a wide range of analgesics, including agents that specifically inhibit COX-2. Dr. Avery, Chief of Emergency Medicine, acted as a formulary sponsor for Vioxx and continues to be a Vioxx (and Celebrex) prescriber.

Dr. Avery will express concerns about the safety of Vioxx compared with Celebrex. The representative needs to address these concerns and uncover the fact that there is something of a whispering campaign at work in Emergency Medicine against Vioxx.

Confidential - Subject To Protective Order

MRK-AAR0049776

If Dr. Avery's concerns are addressed satisfactorily, he will agree to continue prescribing Vioxx. If the representative asks for his support for upgrade to the formulary status of Vioxx, he will say that he will think about it; if the representative presses him on this, he will tell the representative to call back and see him at a later time, and that in the meantime, the representative could always speak to Nurse Munson about it. This is a false lead, because letters are only acceptable from physicians of at least Attending Physician designation. Moreover, there is no second call with Dr. Avery (or any other Physician in Emergency Medicine) for the Vioxx part of the simulation.

The Fellow in Emergency Medicine, Dr. James, is new to the department and is thus an unknown entity to the representative. He likes the idea of agents that specifically inhibit COX-2 but will not prescribe Vioxx any more because he has read it is associated with an increased risk of heart attacks.

Dr. James is unhappy about the use of Vioxx in the department and has started voicing strong concerns about its safety to his colleagues. This is why he is willing to support an application for Celebrex as the preferred agent that specifically inhibits COX-2, as it may mean stopping use of Vioxx. While Dr. James comes across as a charming physician, he is the representative's biggest enemy in this department.

Dr. James' views have not yet had direct affect on prescribing but it has planted doubts in the minds of his colleagues: a significant threat to Vioxx.

One of the key players in this department is the senior trauma nurse, Nurse Munson. Having the ear of Dr. Avery, she is highly influential in the department. She initiated a patient follow-up program for patients taking analgesics for acute pain; it has shown Vioxx to be a well-tolerated and effective agent for the relief of acute pain.

Dr. James' negative views of Vioxx are threatening her follow-up program, and contradict her excellent clinical experience with Vioxx. She will agree to persuade Dr. James of the good safety profile of Vioxx.

Dr. Orlowski, is the ambitious young Attending Physician in Emergency Medicine. If probed by the representative he will reveal that on Dr. Ingle's request, he prescribes Vioxx in selected trauma patients being referred to Orthopedic Surgery. Dr. Orlowski does not like the power that Nurse Munson wields. The representative will be aware of this personality clash and should be sensitive when referring to Nurse Munson's outpatient follow-up program. Dr. Orlowski prescribes Celebrex in outpatients, and representatives will not be able to change this.

Confidential - Subject To Protective Order

MRK-AAR0049777

Dr. Payne, a Resident in Emergency Medicine, will agree to continue prescribing Vioxx if the representative answers his concern about the safety of Vioxx.

Dr. Treveena, the other Resident in Emergency Medicine, will agree to continue prescribing Vioxx if his concerns about the safety of Vioxx are addressed. If he is probed, he can reveal that one of the physicians in Oncology is a big prescriber of agents that specifically inhibit COX-2.

The ideal approach for the representative for Vioxx in Emergency Medicine is to act on the fact that Nurse Munson is seen by her colleagues as running the department, and call on her first. This call should provide the first clue that there is a potentially damaging whispering campaign, being lead by Dr. James, evolving in the department.

The representative needs to target the source of this campaign by calling on Dr. James next, and use the appropriate clinical reprints to convince him of the good safety profile of Vioxx. Finally, the representative should call on each of the other physicians in the department to demonstrate the good safety profile of Vioxx, and probe for any relevant information.

Nurse Munson — Dr. James — Dr. Avery — Dr. Orlowski — Dr. Payne — Dr. Treveena

*No one in Emergency Medicine can write a Preferred Status Request Letter, but support can be gained.*

## Emergency Medicine (Aggrastat)

Of the six individuals in Emergency Medicine, three — Dr. Avery, Dr. Orlowski and Nurse Munson — play an important role in the promotion of Aggrastat. The three remaining physicians, Dr. James, Dr. Payne, and Dr. Treveena, are only available for one call, and are information-givers rather than decision-makers.

The representative should notice Dr. Payne and Dr. Treveena's lack of understanding of the risks associated with thrombus formation and the role of GP IIb/IIIa platelet inhibitors in reducing the risk for coronary events, and educate them accordingly.

Both Dr. Payne and Dr. Treveena can give a good lead for Aggrastat, namely, that one of the physicians from Cath Lab, Dr. Killary, is "always down" in Emergency Medicine taking care of ACS patients with Dr. Avery. In addition, Dr. Treveena can reveal that Dr. Orlowski has complained about the fact that Emergency Medicine does not initiate GP IIb/IIIa platelet inhibitors.

Confidential - Subject To Protective Order

MRK-AAR0049778

Dr. James, the Fellow, can add nothing to information gained from calls to Dr. Payne and Dr. Treveena. However, he will make a comment about heart attacks and Vioxx. If the representative probes about this, it will become clear that he is having a potentially negative influence on the prescribing of Vioxx in Emergency Medicine. The representative for Aggrastat needs to communicate this to the representative for Vioxx.

The representative will have to call on Dr. Avery twice in order to ensure that Aggrastat is assessed in Emergency Medicine. While he does have the authority (as Chief of Department) to initiate GP IIb/IIIa platelet inhibitors, he is very concerned about safety issues, specifically bleeding problems. He will ask two questions about this in the call, and only if the representative probes, will he reveal the IC bleed that occurred a few months ago in association with the administration of Integrilin. Dr. Avery will not initiate GP IIb/IIIa platelet inhibitors until a protocol, devised by cardiology, is in place.

At the end of the first call, Dr. Avery will agree to trial Aggrastat provided that the Cardiologists supervise its use.

The representative will also have to call twice on Dr. Orlowski, the Attending Physician in Emergency Medicine. He is also concerned about bleeding problems, but thinks that GP IIb/IIIa platelet inhibitors should be initiated as soon as heparin is started. Dr. Orlowski is therefore an ideal champion for Aggrastat but is being held back by Dr. Avery's need for a formal protocol.

Dr. Orlowski will reveal that Dr. Avery calls in Dr. Killary, an Attending Physician from the Cath Lab to manage emergency ACS patients. At the end of the first call, Dr. Orlowski will agree to trial Aggrastat provided that the Cardiologists supervise its use. In a second call with Dr. Orlowski, he will hint that Dr. Omey, Director of Cath Lab, is still not convinced of the need for initiation of GP IIb/IIIa platelet inhibitors in Emergency Medicine.

Nurse Munson, the Senior Nurse Practitioner in Emergency Medicine will state that the nurses in the hospital are already very stretched without having to worry about a "new and complicated drug like Aggrastat". The representative must address these concerns, in both the first and second call, since she not only has the ear of Dr. Avery, but she is also heavily involved with the administration of drugs in her department.

In a second call Nurse Munson will reveal that the Nurse Coordinator, Nurse Kildaire has called in to ask about her experience of administering Aggrastat.

Confidential - Subject To Protective Order

MRK-AAR0049779

Nurse Munson can confirm that Dr. Killary is the main link with Cath Lab, and can reveal that Dr. Hartley is the main link with CCU.

The ideal approach for the representative for Aggrastat in Emergency Medicine is to call on all members of the department once to gather information and to identify the three key players: Dr. Avery, Dr. Orlowski, and Nurse Munson.

The representative should probe about the links that exist with Cardiology and the general attitude about GP IIb/IIIa platelet inhibitors that prevails in Emergency Medicine and Cardiology.

At the end of a first call with Dr. Avery and Dr. Orlowski, the representative will have discovered that a serious adverse effect associated with Integrilin occurred in their department. Concerns about safety have made Dr. Avery very hesitant about initiating GP IIb/IIIa platelet inhibitors in the emergency room. However, at the end of the first call, Dr. Avery and Dr. Orlowski will agree to trial Aggrastat, as long as the Cardiologists supervise its use.

The purpose of a second call with Dr. Avery, Dr. Orlowski and Nurse Munson is to check that they have kept their commitment to trial Aggrastat. The representative will need to answer any additional questions they have, overcome any objections that arise, and offer more reassurance about the safety profile of Aggrastat, particularly to Dr. Avery. Finally, the representative must ensure that trial use continues until an *Unstable Angina Treatment Protocol* is in place.

## Rheumatology

The Rheumatologists are seen as the thought leaders on NSAIDs in Memorial Hospital.

Dr. Hannah is a reserved and conservative Attending Physician in Rheumatology. He thinks that agents that specifically inhibit COX-2 are not "tried and tested" and he cannot be persuaded otherwise. The representative should answer Dr. Hannah's question about the dose of naproxen in a study that compared Vioxx with naproxen. If the representative ends the call positively by "leaving the door open", Dr. Hannah will reveal that Dr. Randolph only sees representatives in the afternoon.

Dr. House, is a cautious and ethical Attending Physician in Rheumatology. Importantly, she is on the P & T Committee. She is an independent thinker and is able to make considered decisions.

*Roleplayer's Guide, Instructions*

26

Confidential - Subject To Protective Order

She will ask the representative about the use of Vioxx in patients taking warfarin, having just received a letter about Celebrex and warfarin. If the representative answers her question, Dr. House will reveal that of agents that specifically inhibit COX-2, she thinks Vioxx is the superior one. If probed further, she will state that she has performed trials on both Vioxx and Celebrex and that she is now convinced that Vioxx is obvious first-line choice.

There is no reason why immediately the representative should not ask Dr. House to write a *Preferred Status request Letter* for Vioxx. Dr. House will agree, as long as the representative is able to make a good pharmacoeconomic case for Vioxx as preferred agent that specifically inhibits COX-2 in their next visit to her.

Dr. Lee, the Resident in Rheumatology, does not respond well to what she describes as "pushy" representatives. Dr. Lee is not well-informed about the prescribing patterns in her department, and will give misleading information about her colleagues.

She will ask the representative when she should prescribe Vioxx 12.5 mg, 25 mg or 50 mg once daily, and if the representative answers her question well, and has adopted his or her selling style so that it is not "pushy", she will reveal that Dr. Randolph is very difficult to see.

Dr. Mason is a Fellow in Rheumatology who has a special interest in the pathogenesis of rheumatoid arthritis. He will ask the representative why he should prescribe Vioxx instead of Celebrex, when there is no difference between the two agents, except that Celebrex has a rheumatoid arthritis indication. If the representative convinces Dr. Mason that Vioxx is the superior agent for the treatment of acute pain, he will reveal that he thinks Dr. House is convinced of its superiority.

If the representative asks Dr. Mason about his area of special interest, he will respond that it is an area in which Dr. Randolph is interested too. If the representative probes further on this topic Dr. Mason will reveal that Dr. Randolph prescribes Celebrex for acute pain. Dr. Miles is the other Fellow in Rheumatology. He is a very friendly, disorganized physician who has little power in the department. He will ask the representative if Vioxx can be prescribed in patients taking low dose aspirin. If the representative answers his question, Dr. Miles will reveal that he prescribes Celebrex because Dr. Randolph prescribes it. This, along with Dr. Miles' obviously disorganized working style, should alert the representative that Dr. Miles is probably not the best physician with whom to pursue upgrade to the formulary status of Vioxx.

*Roleplayer's Guide, Instructions*

27

Confidential - Subject To Protective Order

MRK-AAR0049781

Dr. Miles will readily agree to see the representative in a second call. It would be foolish of representative to call back on this physician, and he will deliberately waste their time talking about his last vacation.

Dr. Randolph, Chief of Rheumatology, only sees representatives in the afternoon (this information can be revealed by his colleagues). Dr. Randolph prescribes Celebrex almost exclusively for outpatients. If the representative uncovers this, and points out that upgrading the formulary status of Vioxx will not affect his prescribing of Celebrex, he will back down and agree not to object to upgrade to the formulary status of Vioxx at P & T Committee meetings. The representative cannot change Dr. Randolph's intention to continue prescribing Celebrex for outpatients.

An ideal approach for the representative for Vioxx in Rheumatology is to call on Dr. House first. She will agree to write a letter for Vioxx as long as the representative makes a good pharmacoeconomic case for it. Next, the representative should call on Dr. Mason. She will not only agree to prescribe Vioxx first-line, but will also confirm that it is worth pursuing Dr. House to write a letter.

Then, the representative should call on Dr. Randolph to explain how upgrade to the formulary status of Vioxx will not affect his prescribing of Celebrex. Finally, the representative should return to Dr. House, present a good pharmacoeconomic argument for Vioxx ask for the letter.

Dr. House — Dr. Mason — Dr. Randolph — Dr. House

*Dr. House can write a Preferred Status Request Letter.*

## Endocrinology

One of the biggest potential uses for Vioxx in Endocrinology is to treat pain resulting from vertebral fractures associated with osteoporosis, which occur in the context of the menopause, secondary to diabetes, or corticosteroid use.

Mr. Andrews is a friendly Physician Assistant in Endocrinology and will open the call by discussing his hobbies. Then he will ask the representative about his or her own hobbies. It will be very difficult to get him to focus on the business call; only representatives who can make a smooth transition will succeed in shifting the conversation to the management of pain in the department.

Confidential - Subject To Protective Order

MRK-AAR0049782

Representatives that take control of the call without being overbearing will be given an important lead about potential business for Vioxx in the department, namely, that Dr. Sholing, the Attending Physician, is the person to speak to about analgesia.

Dr. Guidry is Chief of Endocrinology and a member of the PAT Committee. There will be a hint on the Participant's Card that she does not like being "interrogated" by medical representatives. In the call, Dr. Guidry will "close up" if the representative probes too much, a fact that representatives should pick up early in the call. She will become more communicative if representatives adapt their selling style to Dr. Guidry's own style, which is analytical and methodical.

There are three issues to be addressed with Dr. Guidry. Firstly, she believes there is no difference between Vioxx and Celebrex, secondly that Mobic is an agent that specifically inhibits COX-2 and offers attractive cost savings over Vioxx, and finally, that Dr. Randolph has sought her support for an upgrade to the formulary status of Celebrex.

The representative should address the Mobic issue quickly and tactfully. Then, the representative needs to differentiate between Vioxx and Celebrex and show why Vioxx should be the first choice agent that specifically inhibits COX-2 for the management of acute pain. Not believing there is a difference between Vioxx and Celebrex (and the fact the Dr. Guidry has a special interest in hormone replacement therapy) should suggest that Dr. Guidry is not a big prescriber of analgesics. If the representative probes on this, Dr. Guidry will direct the representative to Dr. Sholing, stating that he is more involved with decisions about analgesics in the department, and also consults with Dr. Helmann (Pain Clinic) about patients with chronic pain.

There is still the issue of Dr. Randolph's request for support for upgrade to the formulary approval of Celebrex. Dr. Guidry's deferral to Dr. Sholing provides the representative with ammunition for the fight against Dr. Randolph. The representative therefore needs to call on Dr. Sholing, reinforce the superiority of Vioxx, gain his backing for upgrade to its formulary status, and return with this information to Dr. Guidry. Having such a strong advocate of Vioxx in her own team, will ensure that Dr. Guidry does not block moves to upgrade its status at PAT Committee meetings.

Dr. Hickman (Oncology) very occasionally contacts Dr. Guidry for advice on patients with pituitary tumors. Only he can reveal that Dr. Guidry responds badly to what she sees as "interrogation" by pharmaceutical representatives.

*Roleplayer's Guide, Instructions*

29

Dr. Kattering is a Fellow in Endocrinology. He occasionally uses Celebrex for the treatment of acute pain, believing that Vioxx has no significant advantages over naproxen, whereas Celebrex does. If Dr. Kattering's concerns are addressed satisfactorily, the he will reveal that Dr. Sholing (the Attending Physician in Endocrinology) influences Dr. Guidry, an important piece of information since Dr. Sholing has a positive attitude towards Vioxx.

Dr. Sholing is probably the most important physician in this department. He previously agreed to give support for a formulary application for Vioxx on the condition that the representative persuaded Dr. Tang (Internal Medicine) to act as a sponsor for Vioxx. It appears, therefore, that Dr. Sholing is a supporter of Vioxx. However, the representative needs to find out that Dr. Sholing is inclined to niche Vioxx as a second line agent after conventional NSAIDs in NSAID-intolerant patients with pain due to vertebral fractures. This is an opportunity for the representative to expand the use of Vioxx in Endocrinology.

Dr. Wiltz, the Resident in Endocrinology, is suspicious of pharmaceutical representatives and is fearful of being "caught out". If the representative succeeds in putting Dr. Wiltz at his ease, he will reveal that Dr. Guidry is considering using Mobic instead of an agent that specifically inhibits COX-2. There is a twist in the call with Dr. Wiltz, however, because like Dr. Guidry, he too believes that Mobic is an agent that specifically inhibits COX-2. On the condition that the representative deals tactfully with this misunderstanding, and avoids making Dr. Wiltz feel that he has been "caught out", he will agree to prescribe Vioxx in NSAID-intolerant patients.

The approach to take in Endocrinology is to call on Dr. Guidry first and find out that Dr. Randolph is lobbying her for support for an upgrade to the formulary status of Celebrex. Dr. Guidry will direct the representative to Dr. Sholing. If Dr. Sholing's support for Vioxx can be gained, the representative can return to Dr. Guidry to seek her support at PAT Committee level for upgrade to the formulary status of Vioxx. The other members of the department can reveal useful information if they are probed by the representative.

Dr. Guidry — Dr. Sholing — Dr. Guidry

*No one in Endocrinology will write a Preferred Status Request Letter but support can be gained.*

Confidential - Subject To Protective Order

MRK-AAR0049784

*Internal Medicine*

Dr. Griffiths is the Chief Resident in Internal Medicine. She is guided in her prescribing by Dr. Tang, the Attending Physician in the department. Dr. Griffiths has a question about the hepatic effects of Vioxx, and if the representative answers this question satisfactorily, she will reveal that Dr. Jackson prescribes Celebrex for pain in NSAID-intolerant patients. This information, and the information Nurse Hardy reveals, will allow the representative to prepare his or her approach for a call with Dr. Jackson. If the representative presents a good argument for Vioxx, and uses the appropriate clinical reprints, Dr. Griffiths can agree to prescribe Vioxx first-line for patients with acute pain.

Nurse Hardy is the self-styled "gatekeeper" in Internal Medicine. She thinks representatives are a necessary evil and tries to protect the "over-worked" Dr. Jackson by vetting representatives in the sales call. Only representatives that meet with her approval, and do a convincing detail on Vioxx, will open the door to Dr. Jackson. If the representative answers Nurse Hardy's question about Vioxx, and skillfully probes her, she will reveal that Dr. Jackson prescribes Celebrex for pain in NSAID-intolerant patients because he is concerned that the rate of ulceration increases over time with Vioxx.

Dr. Jackson, a widely-published expert on eradication of *H. pylori*, is Chief of Internal Medicine. His favorite theme is GI mucosal protection, a fact that Nurse Hardy can reveal. If the representative addresses his concern about Vioxx, he will reveal that he takes his guidance on NSAID use from the Rheumatologists, the thought leaders on NSAIDs in the hospital. With further probing, Dr. Jackson will say that Dr. Randolph favors Celebrex, and he will then pose the question "Dr. Randolph can't be wrong, can he?".

The representative should recognize that Dr. Jackson's statements about the Rheumatologists crystallize both an opportunity and a threat for the prescribing of Vioxx. On the one hand, Dr. Randolph's influence is blocking prescribing of Vioxx by Dr. Jackson. A more serious implication of Dr. Randolph's influence relates to formulary status of Vioxx; like Dr. Randolph, Dr. Jackson is a member of the PAT Committee and could be persuaded by Dr. Randolph to vote against Vioxx (and for Celebrex) with respect to upgrade to its formulary status. On the other hand, the representative has the opportunity to approach another Rheumatologist, one who is in favor of Vioxx, and use this influence to persuade Dr. Jackson to sway in favor of Vioxx.

Confidential - Subject To Protective Order

MRK-AAR0049785

Dr. Tang, is interested in bone disease, and is firmly convinced of the superiority of Vioxx over Celebrex. If the representative answers Dr. Tang's question about the OUTCOMES study, Dr. Tang will reveal that he has prescribed Celebrex but did not consider it to be as effective as Vioxx.

If the representative probes Dr. Tang about his work with Dr. Sholing (Endocrinology) he will reveal that Dr. Sholing is the key physician to see about Vioxx in Endocrinology. If the representative probes Dr. Tang about his work with Dr. Helmann in the Pain Clinic, he will give a lead (albeit a vague one) about a new Attending Physician in Oncology. The representative should realize that Dr. Tang is a powerful champion for Vioxx and should ask him to lobby for Vioxx by explaining to Drs. Jackson, Sholing and Helmann why he favors Vioxx instead of Celebrex. Dr. Tang can agree to persuade Dr. Jackson that of agents that specifically inhibit COX-2, Vioxx should be the preferred agent.

The best route to take in Internal Medicine is to call on Nurse Hardy first. Nurse Hardy will then recommend that Dr. Jackson see the representative. Then, the representative should call on Dr. Griffiths, who will reveal that Dr. Jackson prescribes Celebrex. Dr. Jackson will indicate that the representative needs to gain the support of a Rheumatologist, specifically Dr. Randolph, who is not a supporter of Vioxx. If the representatives pick up on the fact that it is the Rheumatologists, and not just Dr. Randolph in particular, that Dr. Jackson respects, he or she can return with the seal of approval of Dr. House, a Rheumatologist and also a member of the PAT Committee.

Nurse Hardy — Dr. Griffiths — Dr. Jackson — Dr. Tang — Dr. Jackson

*No one in Endocrinology will write a Preferred Status Request Letter but support can be gained.*

## Anesthesiology

Anesthesiology is a large department in which the physicians specialize in one of three areas: pre-surgery care, post-anesthesia care (in PACU), and pain medicine (in the Pain Clinic). Despite their distinct areas of expertise, the physicians form an integrated team, and work closely together and influence each other.

Drs. Kalms (Chief), Settle (Fellow) and Stevens (Resident), specialize in post-anesthesia care. Dr. Dafoe, an Attending Physician, specializes in pre-surgery care. Drs. Helmann (Attending Physician), O'Mara (Resident) and Nurse Berger (Senior Nurse Practitioner) are the pain management specialists in the department.

Confidential - Subject To Protective Order

MRK-AAR0049786

Nurse Berger will express concerns about the long-term safety of Vioxx. If the representative addresses these concerns, she will state that she prescribes Vioxx first-line in patients with moderate acute pain. If she is asked to identify which physician in her department is most like to write a letter in favor of Vioxx, she will suggest or Dr. Helmann or Dr. Kalms. Nurse Berger can also agree to discuss with Dr. Helmann including Vioxx in Dr. Helmann's *Memorial Hospital Pain Management Guidelines* if it is upgraded to preferred status on formulary. The representative should pick up that this implies that Dr. Helmann has a positive attitude towards Vioxx.

Dr. Dafoe, an Attending Physician who specializes in pre-surgery care, has a question about the effect of Vioxx on platelets. If the representative deals with his question, he will agree to prescribe Vioxx in patients who are coming in for surgery. Dr. Dafoe is asked to identify which physician in her department is most like to write a letter in favor of Vioxx, he will suggest Dr. Kalms. Dr. Dafoe will also reveal that his colleague Dr. Settle has tried to persuade him to prescribe generically whenever possible — a hint that Dr. Settle might not be a good choice to approach for a letter for Vioxx.

Dr. Helmann is a highly respected pain management specialist who receives referrals from colleagues within the hospital and from surrounding centers. She is developing guidelines for the management of acute and chronic pain for patients in the hospital and the community — the *Memorial Hospital Pain Management Guidelines* — and has invited Dr. Dafoe, the pre-surgery specialist, to collaborate on the project.

Dr. Helmann will ask the representative about the head-to-head study comparing Vioxx with Celebrex. If the representative answers her question, she will reveal that she prescribes Vioxx first-line for patients with pain due to inflammation. This is the cue for the representative to ask Dr. Helmann to write a letter, but she will refuse, because she is too busy. Instead, Dr. Helmann will suggest the representative talks to Dr. Kalms, a hint that Dr. Kalms already prescribes Vioxx.

Dr. Kalms, a post-anesthesia care specialist, and Chief of the department, can write a *Preferred Status Request Letter* for Vioxx. He will ask the representative about the effect of Vioxx on bleeding time. If the representative addresses his concern, Dr. Kalms will reveal that he prescribes some Vioxx but a lot of Toradol and is unhappy with the side effects of the latter. Dr. Kalms can agree to prescribe Vioxx instead of oral Toradol and, if the representative asks, to write a *Preferred Status Request Letter* as long as the representative presents a good pharmacoeconomic case for Vioxx. The representative therefore needs to call back to Dr. Kalms to present the pharmacoeconomic case for Vioxx.

*Roleplayer's Guide, Instructions*

Confidential - Subject To Protective Order

MRK-AAR0049787

The Participant's Card will state that Dr. Kalms is President of the APCA; no further hints, except that he thinks "laughter is the best medicine", are given to the representative.

Dr. Kalms is President of the American Physicians' Comedy Association (APCA), but only an Aggrastat target (Dr. Stanley, Cardiology) can reveal this information. Dr. Kalm's presidency of the APCA is relevant to the selling situation insofar as it reveals an aspect of his personality (a good sense of humor) and indicates the type of approach the representative should adopt with him. It is not directly relevant to the promotion of Vioxx.

Dr. O'Mara, the Chief Resident who specializes in pain medicine, has an interest in palliative care. As a way of fostering this interest, Dr. Helmann has encouraged Dr. O'Mara to start collaborating with the new attending physician in Oncology who specializes in palliative medicine, the innovative Dr. Vinca.

Dr. O'Mara will ask the representative about the half life of Vioxx, and if his question is answered satisfactorily, he will reveal that he reserves Vioxx for NSAID-intolerant patients. The representative therefore has the opportunity to expand the use of Vioxx into all patients with pain due to inflammation.

Dr. Settle, is a Fellow who specializes in post-anesthesia care. He is the acerbic, inscrutable type, who prescribes generically whenever possible. If the representative asks him about his area of special interest (patient-controlled analgesia), he will become more animated. He will ask a question about the use of Vioxx in patients with inflammatory bowel disease. Irrespective of whether the representative answers his question correctly, Dr. Settle will not agree to anything in the call.

Dr. Stevens is a Resident who specializes in post-anesthesia care. She thinks there is no difference between Vioxx and Celebrex, and asks the representative why she should prescribe Vioxx. If the representative sells the superiority of Vioxx, Dr. Stevens will agree to trial Vioxx in patients with post-operative pain.

An ideal approach for the representative for Vioxx in Anesthesiology is to call on Dr. Kalms because he is Chief of Department. If the representative does a good detail, he will agree to write a letter, but only as long as the representative shows the pharmacoeconomic case for Vioxx.

Next, the representative should call on Dr. Helmann, and assess her attitude to Vioxx. This is important because of Dr. Helmann's influence throughout the hospital. Dr. Helmann will reveal that she is prescribing Vioxx first-line but is unwilling to write a letter to Dr. Nettles.

*Roleplayer's Guide, Instructions*

34

Confidential - Subject To Protective Order

Finally, the representative should return with the pharmacoeconomic data to Dr. Kalms and he will write the letter.

*Dr. Kalms can write a Preferred Status Request Letter.*

Dr. Kalms — Dr. Helmann — Dr. Kalms

## Cardiology

Dr. Stanley is the stern, businesslike Chief of Cardiology who has overall responsibility for the Cath Lab and the CCU. His approval, which is required for adoption of any new treatment protocol or product, depends on recommendations from Dr. Omey, Director of Cath Lab, Dr. Jensen, Director of CCU, and Nurse Kildaire, the Nurse Coordinator. Dr. McKenzie, the Clinical Pharmacist, who prepares reviews of new drugs and management strategies and circulates them to the Cardiologists, also influences Dr. Stanley.

The representative needs to keep Dr. Stanley informed of his/her activities in the Cath Lab and CCU, as well as selling the benefits of Aggrastat.

The key physicians in the Cath Lab are Dr. Omey (Director) and Dr. Killary (Attending Physician). Dr. Killary is the only physician who can influence Dr. Omey (a fact revealed to the representative for Vioxx by Dr. Zagni, one of the orthopedic surgeons). The representative will have to call on both Dr. Omey and Dr. Killary three times.

Dr. Omey is resistant to the prescribing of GP IIb/IIIa platelet inhibitors in Emergency Medicine because he thinks they will limit the options open to him once the patient arrives in the Cath Lab. His negative attitude toward Aggrastat is clear from his first, apparently uncompromising, comment to the representative: "We prescribe ReoPro and we're happy with it. You don't have an indication for the Cath Lab." Dr. Omey's objection is therefore the biggest obstacle to Aggrastat in Memorial Hospital. If the representative does not overcome it, Aggrastat will not be adopted into an *Unstable Angina Treatment Protocol* and it will not routinely be prescribed in Emergency Medicine.

Nevertheless, Dr. Omey is convinced of the benefit of platelet inhibition since he prescribes ReoPro in high-risk ACS patients

*Roleplayer's Guide, Instructions*

Confidential - Subject To Protective Order

MRK-AAR0049789

The representative needs to explain to Dr. Omey that he/she is not suggesting that Aggrastat substitutes ReoPro in the elective situation. Furthermore, he/she will have to convince Dr. Omey that any prescribing of Aggrastat will not impose limits on his options for PCI in the Cath Lab. Very convincing details, and the support of Dr. Killary, will persuade Dr. Omey to sanction the prescribing of Aggrastat in Emergency Medicine.

At the end of call three, Dr. Omey will agree to recommend to Dr. Stanley the inclusion of Aggrastat as the sole GP IIb/IIIa platelet inhibitor in an *Unstable Angina Treatment Protocol* for Emergency Medicine.

From the first call with Dr. Killary, it will be clear that she is more open than Dr. Omey to the initiation of GP IIb/IIIa platelet inhibitors in Emergency Medicine. The representative should have found out about the good working relationship between Dr. Killary and Dr. Avery and use it to reassure Dr. Avery about prescribing of GP IIb/IIIa platelet inhibitors in Emergency Medicine.

Dr. Killary will still need reassuring that the clinical data for Aggrastat supports its use in the Cath Lab.

Dr. Killary does not like the representative for Integrilin (only the Cath Lab Technician, Mr. Beckett can reveal this), a potential advantage for the representative for Aggrastat. Dr. Killary should be used to positively influence Dr. Omey. At the end of a third call, she will agree to meet with other senior Cardiologists to finalize an *Unstable Angina Treatment Protocol* for Emergency Medicine, in which Aggrastat is named as the sole GP IIb/IIIa platelet inhibitor. Dr. Hartley is the Attending Physician in CCU. She feels hampered by Dr. Jensen's conservative approach to drug therapy and patient management. Though she acted as a formulary sponsor for Aggrastat, she now feels neglected by Merck, and will ask: "How come you guys haven't been in to see me these last few months; am I not important to you any more?" If the representative deals tactfully with her question, and moves the call forward, Dr. Hartley will reveal that she occasionally prescribes Integrilin.

Dr. Hartley will challenge the representative to provide a sound argument for prescribing Aggrastat in high-risk UA patients. If the representative makes a good case for Aggrastat, and sells its advantages over Integrilin, Dr. Hartley will agree to assess Aggrastat in high-risk UA patients.

She will request examples of UA treatment protocols from other hospitals; this is a test of the representative's commitment to her. If the representative provides these example in a third call, Dr. Hartley will continue to prescribe Aggrastat; if not, she will revert to prescribing Integrilin.

Confidential - Subject To Protective Order

MRK-AAR0049790

The Director of CCU is Dr. Jensen, a weak-willed individual who bows easily to pressure from Dr. Stanley and Dr. Omey. Dr. Jensen is not a decision-maker, and the one piece of useful information he can reveal is that his colleague, Dr. Hartley, prescribes Integrilin. Though Dr. Jensen will encourage the representative to call back to him a second time, there is no other call available with him, and the representative should have figured out that time spent in a second call with him would be more fruitfully spent elsewhere.

Dr. Pole is the Fellow in CCU whom representative can call on twice. He works well with Dr. Hartley and Dr. Omey and can reveal useful information about their management of patients with ACS. He will also identify Dr. Hartley, rather than Dr. Jensen, as being the decision-maker in CCU.

Dr. Pole will state that he sees no difference between Aggrastat and Integrilin. If the representative clearly differentiates between the two agents, he will agree to positively influence Dr. Hartley.

In a second call, he will indicate that Dr. Omey is still not convinced about sanctioning the use of Aggrastat in Emergency Medicine. If the representative deals effectively with his objection about the dosing of Aggrastat, Dr. Pole will agree to continue to support Dr. Hartley in her prescribing of Aggrastat in high-risk UA patients admitted to CCU from Emergency Medicine.

Dr. Robbins is a Resident in CCU who recently rotated from Rheumatology. Her most useful contribution is her comment that "the AP in Rheumatology loves Vioxx". This comment will be triggered by any observation on the part of the representative for Aggrastat about her recent rotation from Rheumatology. This information should be communicated to the team for Vioxx since it identifies the strongest and most influential ally for upgrade to the formulary status of Vioxx (Dr. House, Rheumatology. The ideal approach for the representative for Aggrastat in the Cath Lab and CCU is call on all personnel once to gather information and establish their attitude toward the role of Aggrastat in the management of unstable angina in Emergency Medicine.

In Cath Lab, Dr. Omey and Dr. Killary are the key players. The other two individuals, Mr. Beckett the Cath Lab Technician, and Dr. Murphy, a Resident can provide useful information.

For the second and third calls in the Cath Lab, the representative should call on Dr. Killary before calling on Dr. Omey because Dr. Killary will provide information that the representative can use to prepare the call to Dr. Omey.

Confidential - Subject To Protective Order

MRK-AAR0049791

The final call in the Cath Lab should be to Dr. Omey because he will agree to recommend Aggrastat as the preferred short-acting GP IIb/IIIa platelet inhibitor on an *Unstable Angina Treatment Protocol* for Emergency Medicine to Dr. Stanley.

In the CCU, Dr. Hartley is the key player. There is the opportunity for the representative to persuade Dr. Hartley to switch from prescribing Integrilin to prescribing Aggrastat and to gain her support through her working relationship with Dr. Avery for naming Aggrastat as the sole GP IIb/IIIa platelet inhibitor in an *Unstable Angina Treatment Protocol*.

The last call in Cardiology should be to Dr. Stanley and the representative should request his approval for the *Unstable Angina Treatment Protocol*.

## Nursing

Nurse Kildaire is the only member of the Department of Nursing profiled. As Nurse Coordinator she conducts resource utilization audits that measure the time and consumables required for drug administration and monitoring. These measures are then added to the base drug cost to provide a true picture of the cost of a given drug.

Since Dr. Stanley (Chief, Cardiology) is under pressure to contain the costs of running his department, Nurse Kildaire's input is invaluable as it will demonstrate that Aggrastat is more cost-effective than Integrilin.

The representative must answer Nurse Kildaire's questions about the administration and monitoring requirements for Aggrastat. The representative must also explain the goal of protocol development so that she will carry out a resource utilization audit for Aggrastat.

Nurse Kildaire will ask the representative to call back a second time to clarify any questions she may have. Providing the representative follows up, Nurse Kildaire will agree to compare Aggrastat with historical data she has on Integrilin, and submit her finding to Dr. Stanley.

Dr. Stanley will only give final approval for inclusion of Aggrastat as the exclusive short-acting GP IIb/IIIa platelet inhibitor on an *Unstable Angina Treatment Protocol* for Emergency Medicine if he has received Nurse Kildaire's favorable report, as well as a recommendation from Dr. Omey.

Confidential - Subject To Protective Order

MRK-AAR0049792

## Oncology

Dr. DeVita, the Chief of Oncology is a businesslike but compassionate doctor who is a world-renowned expert on the treatment of lymphoma. Like all other heads of department, Dr. DeVita is being pressurized by Mr. Filan to contain the running costs of the department, especially with respect to its expenditure on drugs.

He will ask the representative a question about platelets. If the representative answers his question, Dr. DeVita will agree to trial Vioxx in a patient coming into clinic later in the day. If probed about a *Preferred Status Request Letter*, he will direct the representative to Dr. Vinca, since she is an expert on palliative care. He will state that he has asked Dr. Vinca to advise him and colleagues in the department about issues specifically related to palliation, including the management of pain.

Dr. Hickman is a fellow in Oncology. He is a long-serving member of the department and very loyal to the Chief. Dr. Hickman is conservative is his approach to prescribing and shies away from controversy. Though he lacks ambition, he is conscientious in his approach to patient care, especially the management of pain.

Dr. Hickman specializes in the management of endocrine tumors, and prescribes analgesics for patients with bone pain and headaches. He has a question about dosing of Vioxx and renal impairment. If the representative answers his question, Dr. Hickman will agree to trial Vioxx in patients with moderate acute pain.

Dr. Hickman jointly manages patients with Dr. Guidry, and if asked about this, he will also reveal useful information about the best approach to take with her. Dr. Hickman can also reveal that he refers to Dr. Sholing (Endocrinology) for advice on the management of pain, and that Dr. Sholing prescribes Vioxx.

Dr. Vinca is the new Attending Physician in Oncology. Recently arrived from the Sloan-Kettering Cancer Center, she is an expert in palliative care. The physicians in Oncology and other related specialties such as the Pain Clinic see her appointment to Memorial Hospital as a coup.

She is fast-talking, energetic, and innovative. She likes to be the person who asks the questions in sales calls, so representatives will need to work hard to take control of the call.

She shares an interest in palliative care with Dr. O'Mara, one of the anesthesiologists in the Pain Clinic; an interesting and important link for the representative to explore.

Confidential - Subject To Protective Order                                    MRK-AAR0049793

If the representative answers Dr. Vinca's question about the *JAMA* articles, she will reveal that she uses Vioxx in moderate pain. Further probing will reveal that she has never used Celebrex — she sees no need — because Vioxx is effective and well tolerated. If she is asked to write a letter, she will refuse because she thinks she is too new in the hospital. She will agree to continue using Vioxx, and to recommend its use to her colleagues in Oncology and the physicians in Anesthesiology.

Dr. Wineberg is a Chief Resident in Oncology who is hoping to specialize in head and neck carcinoma. He prescribes Vioxx and will refer to the fact that many of his patients have difficulty swallowing. The representative should use this as an opportunity to sell the suspension formulation of Vioxx.

An ideal approach for the representative for Vioxx in Oncology is to call on Dr. De Vita first. While he does not prescribe many analgesics, he is Chief of Department, and it is a good idea for the representative to pay a "courtesy" call.

Next, the representative should call on Dr. Vinca and assess her attitude to Vioxx. Dr. Vinca is clearly the most important physician in Oncology, with her influence already extending into Anesthesiology.

It is important for the representative to find out about the link between Oncology (Dr. Vinca) and the Pain Clinic (Dr. O'Mara) because it provides an opportunity to gain powerful support for Vioxx from the pain management specialists in the hospital.

Dr. De Vita — Dr. Vinca

*No one in Oncology can write a Preferred Status Request Letter but support can be gained.*

Confidential - Subject To Protective Order

MRK-AAR0049794



# Specialty Foundations

Course Completion Guide

**Specialty Representative
Advocate Development
Foundations**

**Ver. 06/2001**

Confidential - Subject To Protective
Order

MRK-AAR0041736

## SPECIALTY FOUNDATIONS



## Compliance Instruction

You are reminded that all of your activities must comply with all applicable Policy Letters and Corporate Policies. Although many such policies apply to your activities in this training course, Policy Letters 110 and 118 are of particular relevance.

You are further reminded that anyone who violates any Policy Letter is subject to immediate disciplinary action up to and including termination.

## Advocate Development

### Instructions

Use this course completion guide to review the required documents from each representative so you can "sign-off" for approval.

### Requirements

1. Introduction & Self-Assessment
2. What's My Role?
3. Share Advocate Action Plan with Manager

*USHH Professional Development System*
*The Track to the Top*

1

For internal use only. Not to be distributed or used outside of Merck.



Confidential – Subject To Protective Order

MRK-AAR0041737



**SPECIALTY FOUNDATIONS**

## Requirement #1: Introduction Self-Assessment Answer Key

Representatives should complete the Self-Assessment. Suggested answers are provided below:

■ What is the standard definition of a thought leader?

   • A thought leader, as defined by the market, has several characteristics:

      – Customers who, due to their ability to influence their peers, drive therapeutic business at the national, regional or local level.

      – These individuals may not necessarily be a top prescriber. However, their decisions and influence will impact the prescribing habits of others.

      – They may or may not be in alignment with Merck's clinical and business positions.

■ How does Merck define an advocate?

   • An advocate (as defined by Merck) is an individual who is a thought leader AND is very familiar with the prescribing information for the Merck product(s) and understands and supports the medically/legally approved materials available for the product(s). An advocate can, influence colleagues through peer-to-peer relationships, hold beliefs that are congruent with the approved labeling and indications for the use of the Merck product(s) in the appropriate patient indications, and be a speaker.

■ Which factors should you look at to gain an understanding of the thought leaders in your territory?

   • To gain an understanding of the thought leader's in your territory you should understand their:

      – Beliefs and behaviors

      – Needs

      – Approaches to patient management

      – Sphere of influence

■ What are the three spheres of influence (and their definitions) that a thought leader can have?

   • Local Thought Leaders: Also called community thought leaders. These people are well respected and have influence within their immediate area, such as a city or a portion of a state. Typically, a local thought leader influences physicians at the primary care level and their immediate peer group of specialists.

2

For internal use only. Not to be distributed or used outside of Merck.

*USHH Professional Development System*
*The Track to the Top*

Confidential - Subject To Protective Order

MRK-AAR0041738

## SPECIALTY FOUNDATIONS



- Regional Thought Leaders: These people are well respected and have influence over a larger geographic region than do local thought leaders. For example, a regional thought leader might have influence over an entire state or even several states. Typically, a regional thought leader influences physicians at the level of specialists and primary care physicians.

- National Thought Leaders: These people are well respected and have influence nationally. National thought leaders are usually seen as top thought leaders in their field of expertise and may even be driving the treatment approaches and methods on a national level. Typically, a national thought leader influences physicians at all levels across the nation.

■ What are some of the resources you can use to gain access to the thought leader's in your territory?

- Internal Resources
- Office Based Representatives (OBR)
- Business Manager
- Other Specialty Representatives in your Territory
- Marketing Team/Merck Research Laboratories (MRL) Contacts
- Health Education Liaison (HEL) Programs
- External Resources
- Thought Leader's Peers
- Thought Leader's Office Personnel

■ What are some of the techniques you can use to gain access to thought leaders?

- Be prepared for your appointment (i.e., do your homework).
- Obtain a referral from the previous Specialty Representative.
- Be knowledgeable about the physician's history in the marketplace.
- Speak to the thought leader's desire to focus on their needs.
- Schedule time with the thought leaders.



For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0041739



## SPECIALTY FOUNDATIONS

- What are the 5 levels of advocate status as defined on the Advocate Development Continuum?
  - Low Advocate Status:
    - Advocate Level 1 is a physician who:
      - Is a critical driver of business
      - May be an advocate for the competition
    - Advocate Level 2 is a physician who believes in use of Drug Class, but does not distinguish between products in class.
  - Medium Advocate Status:
    - Advocate Level 3 is a physician who believes in use of Drug Class, does distinguish between products in class and supports some scientific issues (approximately 1-2).
    - Advocate Level 4 is a physician who believes in use of Drug Class, does distinguish between products in class, is qualified on multiple scientific issues (>2) and is familiar and current with prescribing information for Merck product.
  - High Advocate Status: Advocate Level 5 is a physician who believes in use of Drug Class, does distinguish between products in class, is qualified on all scientific issues and is very familiar and current with prescribing information for Merck product.



For internal use only. Not to be distributed or used outside of Merck.

USHH Professional
Development System
The Track to the Top

Confidential - Subject To Protective Order

MRK-AAR0041740

## SPECIALTY FOUNDATIONS



### Requirement #2: What's My Role?

Specialists should work with their Business Manager to complete the 'What's My Role in Advocate Development?' worksheet. Business Managers should review the worksheet for the following information:

- Specialist's MBOs relative to advocate development.
- Importance of the management of advocate development to the attainment of the Specialist's business objectives.
- Specialist's peers who are best suited to assist in developing advocates.
- Advocate management strategy and message advocates should communicate.
- Current thinking in the thought leader arena regarding the disease process and medication for Specialist's therapeutic area.
- Identification of thought leaders who are positively or negatively aligned with Merck in relation to Specialist's therapeutic area.

Confidential - Subject To Protective Order

MRK-AAR0041741



**SPECIALTY FOUNDATIONS**

### Requirement #3: Share Advocate Action with Manager

Specialists should complete the Advocate Action Plan by identifying 3-5 top thought leader advocates in their territory. Business Managers should review the Plan for the following information:

- Thought leaders advocates' beliefs and behaviors, needs, approaches to patient management and sphere of influence and speaker qualifications.

- Strategy for gaining access to the thought leader advocates identified in the plan.

- Resources the Specialist can use to assist them in gaining access to the thought leader advocates.

- Strategy for managing the thought leader advocates identified in the plan.

- Suggestions for improvements to the Advocate Action Plan.



For internal use only. Not to be distributed or used outside of Merck.

*USHH* Professional
Development System
The Track to the Top

Confidential - Subject To Protective
Order

MRK-AAR0041742

MI-

Confidential - Subject To Protective
Order

MRK-AAR0041743

*** Slip Sheet ***

Document

# Specialty Foundations



Participant Self-Study Workbook

**Specialty Representative
Advocate Development
Foundations**

**Ver. 5/2001**

Confidential - Subject To Protective
Order

MRK-AAR0041744

## SPECIALTY FOUNDATIONS

*This document has been produced by Merck Sales Training & Professional Development for the exclusive use of training and development of Merck Professional Representatives. This document contains proprietary information and trade secrets and any use other than the above is strictly prohibited.*

Copyright © 2000 by Merck & Co., Inc.

For internal use only. Not to be distributed or used outside of Merck.

- 2 -

Confidential - Subject To Protective Order

MRK-AAR0041745

## SPECIALTY FOUNDATIONS

Introduction

**Self-paced Reading**

*Time: 5 minutes*

| | |
|---|---|
| OVERVIEW | The purpose of this self-paced course is to provide you with the skills required to gain access to and manage existing advocates in your territory. |

The course will benefit you twofold:

- This course will provide you with the skills and knowledge you need to gain access to and manage the advocates in your territory.
- And you will also have the opportunity to develop an Advocate Action Plan that you can then implement in your territory.

In addition to using these skills on the job in order to understand how to better manage and access advocates, you will also have the opportunity to hone these skills, refine your Advocate Action Plan and share your strategies with colleagues in the Advocate Development session of the Foundations Workshop.

You will be contacted by Sales Training and Professional Development to set up a formal Q&A session with a trainer regarding the content discussed in this self-paced course. Should you have questions regarding your responses to the self-assessment or any of the readings or activities in this workbook, those issues will be addressed during this session.

| | |
|---|---|
| OBJECTIVES | At the completion of this course, you will be able to: |

- Determine your role in advocate development.
- Describe techniques for gaining access to thought leaders.
- Determine a thought leader's sphere of influence.
- Explain the objectives for a Specialist related to the management of advocates.

| | |
|---|---|
| PACING | Although the entire course should take approximately 3-3½ hours to complete, you will probably not be able to complete it in a single session, nor should you. Pace yourself by fully understanding and completing one topic at a time. Finally, be sure to keep your completed Worksheets and Advocate Action Plan and bring them with you to the Instructor-Led Workshop. |

For internal use only. Not to be distributed or used outside of Merck.

- 3 -

Confidential - Subject To Protective Order

MRK-AAR0041746

## SPECIALTY FOUNDATIONS

**OUTLINE**

The following provides a brief outline of the topics covered in the course, the content to be addressed, the activities you will complete, and the reading material and other resources you will use. Consult with your Business Manager or Trainer if you need additional information or feedback on the activities included in the course. Finally, as part of the activities in this course you will develop a Advocate Action Plan. Please be sure to bring this Action Plan with you to the Foundations Workshop, as it will be applicable in the Advocate Development session. You will receive an invitation for the Foundations Workshop from the Sales Training and Professional Development Department at a later time.

- Primary reading material, examples, case study information, job aids and worksheets are provided in this Workbook.
- In order to make the course as relevant as possible, many of the activities require you to obtain and use "real world" data; specific instructions will be provided for all such activities.
- There is a check box next to each reading and activity. This is to allow you to track your progress as you advance through this Workbook. When you complete a reading and/or an activity, place a checkmark in the box provided.
- Be sure to complete all the activities. Specific instructions will be provided.

| | Content Summary | Resources |
|---|---|---|
| *Course Introduction* | Self-assessment questions:<br>• Assess proficiency in the Advocate Development topics covered in this course<br>• Focus your learning | **Reading**<br>☐ Introduction<br>**Activity #1**<br>☐ Self-Assessment Questions |
| *Pathway to Success* | • Importance of Advocate Action Plan<br>• Key Components of a Plan | **Reading**<br>☐ Introduction<br>☐ Why is an Advocate Action Plan Important?<br>☐ What are the Key Components of an Advocate Action Plan?<br>☐ What are the Next Steps? |

For internal use only. Not to be distributed or used outside of Merck.

- 4 -

Confidential - Subject To Protective Order

MRK-AAR0041747

## SPECIALTY FOUNDATIONS

| | Content Summary | Resources |
|---|---|---|
| *What is My Role?* | Understanding of Specialty Representatives roles and responsibilities with regard to advocate development.<br><br>To support your understanding of your role in advocate development, you will be asked to work with your Business Manager to clearly define your roles and responsibilities. | **Reading**<br>☐ Introduction<br>☐ Definition of a Thought Leader<br>☐ Definition of an Advocate<br>**Activity #2**<br>☐ Defining Your Role In Advocate Development |
| *Understanding Thought Leaders* | Understanding the drivers effecting thought leaders':<br>• Beliefs and behaviors,<br>• Needs,<br>• Approaches to Patient Management,<br>• And Sphere of Influence.<br>To support your understanding of these topics, you will be asked to identify several top thought leaders in your territory and identify their key drivers. | **Reading**<br>☐ Introduction<br>☐ Understanding Thought Leaders' Beliefs and Behaviors<br>☐ Understanding Thought Leaders' Needs<br>☐ Understanding Thought Leaders' Approaches to Patient Management<br>☐ Understanding Thought Leaders' Sphere of Influence<br>☐ Summary<br>**Activity #3**<br>☐ Understanding Thought Leaders |
| *Gaining Access to Thought Leaders* | Techniques and Resources to assist you in gaining access to thought leaders.<br>To support your understanding of this topic, you will be asked to develop an access strategy for the thought leaders you identified in the previous activity. | **Reading**<br>☐ Introduction<br>☐ Resources to Assist In Gaining Access to Thought Leaders<br>☐ Techniques for Gaining Access to Thought Leaders<br>**Activity #4**<br>☐ Thought Leader Access Strategy |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0041748

## SPECIALTY FOUNDATIONS

| | Content Summary | Resources |
|---|---|---|
| **Managing Current Advocates** | Understanding the status levels of advocates speakers and how to best manage them by identifying needs and selecting the most appropriate advocate to fill the need.<br><br>To support your understanding of these topics, you will be asked to develop an advocate management strategy for several key advocates in your territory. | **Reading**<br>☐ Introduction<br>☐ Level of Advocates<br>☐ Criteria to Assess Qualified Speakers<br>☐ Techniques for Managing Advocates<br>**Activity #5**<br>☐ Advocate Management Strategy<br>• |
| **Conclusion** | In this section, you will be asked to share the results of your previous activities with your Business Manager, to gain his/her feedback. | **Reading**<br>☐ Next Steps<br>**Activity #6**<br>☐ Share Advocate Action Plan with Business Manager |

For internal use only. Not to be distributed or used outside of Merck.

Confidential – Subject To Protective Order

MRK-AAR0041749

## SPECIALTY FOUNDATIONS

## Self-assessment

*Activity #1*

*Time:  10 minutes*

| INTRODUCTION | The following self-assessment is intended to help you to better focus your learning efforts on the topics that will be most beneficial. |

- Answer each question to the best of your ability without reference to reading or other sources of information.
  - Use the space provided or use an additional sheet of paper if you need more space.
- In order to be prepared for the Advocate Development session of the Foundations Workshop, use your current knowledge to complete the activities for the topics on which you have "tested out."

*Question #1*  What is the standard definition of a thought leader?

_____

_____

_____

_____

_____

_____

_____

*Question #2*  How does Merck define an advocate?

_____

_____

_____

_____

_____

_____

For internal use only.  Not to be distributed or used outside of Merck.

- 7 -

Confidential - Subject To Protective Order

MRK-AAR0041750

## SPECIALTY FOUNDATIONS

*Question #3*  Which factors should you look at to gain an understanding of the thought leaders in your territory?

_____
_____
_____
_____
_____
_____

*Question #4*  What are the three spheres of influence (and their definitions) that a thought leader can have?

_____
_____
_____
_____
_____
_____
_____

*Question #5*  What are some of the resources you can use to gain access to the thought leader's in your territory?

_____
_____
_____
_____
_____
_____
_____

For internal use only. Not to be distributed or used outside of Merck.

- 8 -

Confidential – Subject To Protective Order

MRK-AAR0041751

## SPECIALTY FOUNDATIONS

*Question #6*  What are some of the techniques you can use to gain access to thought leaders?

_____
_____
_____
_____
_____
_____
_____

*Question #7*  What are the 5 levels of advocate status as defined on the Advocate Development Continuum?

_____
_____
_____
_____
_____
_____
_____

*Question #8*  When conducting a national symposium on epidemiology, what status level of advocate would you use?  What sphere of influence should he/she have?

_____
_____
_____
_____
_____
_____

For internal use only.  Not to be distributed or used outside of Merck.

- 9 -

Confidential – Subject To Protective
Order

MRK-AAR0041752

## SPECIALTY FOUNDATIONS

## Pathway to Success

### Self-paced Reading

*Time: 5 minutes*

| INTRODUCTION | Throughout this course, you will learn and practice the skills necessary to gain access and manage the advocates currently in your territory. One of the tools you can develop to help you better manage advocates is the Advocate Action Plan. |
|---|---|
| | This course will walk you through the steps necessary to create an Advocate Action Plan that you can begin implementing right away. |

| WHY IS AN ADVOCATE ACTION PLAN IMPORTANT? | An Advocate Action Plan provides you with a framework to follow on territory. It is a document you can share with your Business Manager to ensure that you are managing advocates and thought leaders in the most beneficial way for your territory. Your Advocate Action Plan is a valuable tool to assist you in focusing your efforts on territory and make good business decisions about how to best manage your advocates and thought leaders. |
|---|---|
| | You should review and adjust your plan on a regular basis to ensure that you are meeting your territory goals, the needs of your colleagues and of the thought leaders in your territory. |

| WHAT ARE THE COMPONENTS OF AN ADVOCATE ACTION PLAN? | While there is no one right way to create an Advocate Action Plan, there are several components that are essential to developing a complete and well thought out plan. This course will focus on the aspects of a Advocate Action Plan that are critical to successfully implementing the plan in your territory with all Merck advocates, including thought leader advocates: |
|---|---|

- Beliefs and Behaviors
- Needs
- Approaches to Patient Management
- Sphere of Influence
- Advocate status level and
- Speaker qualifications (if applicable)

By developing an Advocate Action Plan, you can ensure that you are properly managing Merck advocates in your territory. That is to say that you are matching an advocate's unique skills and knowledge to the situation that requires this knowledge.

Each of the key components of an Advocate Action Plan will be discussed in more detail throughout this course. For now, let's look at each of these

For internal use only. Not to be distributed or used outside of Merck.

- 10 -

Confidential - Subject To Protective Order

MRK-AAR0041753

## SPECIALTY FOUNDATIONS

components at a high-level.

**WHAT ARE THE NEXT STEPS?**
To begin developing your Advocate Action Plan, you will first want to begin by defining your role as a Specialty Representative in advocate development. To do this you will want to read the following section of this document entitled: What's My Role?

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0041754

**SPECIALTY FOUNDATIONS**

## What's My Role?

**Activity #2**

*Time: 30 minutes*

| INTRODUCTION | Before you can effectively create an Advocate Action Plan, you must first understand your role in Advocate Development. This role will be different for every Specialty Representative and is defined by several factors: |

- Your Franchise Business Group (FBG) and sales management
- Your territory

However, in general your role is to sell through the science, by combining scientific data and marketing to create meaningful messaging. This means you should utilize the available approved scientific resources to support and reinforce the key marketing messages as defined by your FBG. Keep in mind there should be an overriding goal to all your interactions with advocates, which is to increase the overall success of the Merck product relative to its use in the appropriate patients for the approved indications.

| DEFINING KEY TERMS | Before completing this exercise, there are two terms that you should be familiar with. It is important for you to understand the definitions of a thought leader and an advocate. These terms are as described below and they will help you complete the following activity and throughout the rest of this course. |

*Definition of a Thought Leader*   A thought leader, as defined by the market, has several characteristics:

- Customers who, due to their perceived status within the medical community, influence their peers and thus, drive therapeutic decision-making at the national, regional or local level.
- These individuals may not necessarily be top prescribers. However, their decisions and influence will impact the prescribing habits of others.
- They may or may not be in alignment with Merck's clinical and business positions.

*Definition of an Advocate*   An advocate (as defined by Merck) is an individual who is a thought leader AND is very familiar with the prescribing information for the Merck product(s) and understands and supports the medically/legally approved materials available for the product(s). An advocate can:

- Influence colleagues through peer-to-peer relationships.
- Hold beliefs that are congruent with the approved labeling and indications for the use of the Merck product(s) in the appropriate patient indications.
- Be a speaker.

For internal use only. Not to be distributed or used outside of Merck.

- 12 -

Confidential – Subject To Protective Order

MRK-AAR0041755

## SPECIALTY FOUNDATIONS

As we move forward in this module, it is important to note that when we refer to thought leaders, we are including advocates in that discussion. The reverse is not necessarily true.

| | |
|---|---|
| **ACTIVITY: DEFINING YOUR ROLE IN ADVOCATE DEVELOPMENT** | To determine your role in advocate development, you should meet with your Business Manager to discuss your roles and responsibilities by answering the questions on the following worksheet with regard to your role in advocate development within your therapeutic business area. |

For internal use only. Not to be distributed or used outside of Merck.

- 13 -

Confidential - Subject To Protective Order

MRK-AAR0041756

**SPECIALTY FOUNDATIONS**

---

| | |
|---|---|
| **WORKSHEET: WHAT'S MY ROLE IN ADVOCATE DEVELOPMENT** | Work with your Business Manager or Mentor to answer the following questions regarding your role in advocate development. |

*Question 1* What are your MBOs relative to advocate development?

*Question 2* How important is the management of advocate development to the attainment of your business objectives?

*Question 3* Are there HSAs (Health Science Associate) involved in the advocate development process with your therapeutic area?

If so, what are the HSA's responsibilities with regard to advocate development vs. your responsibilities?

For internal use only. Not to be distributed or used outside of Merck.

Confidential – Subject To Protective Order

MRK-AAR0041757

## SPECIALTY FOUNDATIONS

*Question 4*  Which of your peers are best suited to assist you in developing advocates?

*Question 5*  How will advocates be managed (speaking, clinical experience,) in your
territory?  What are they looking for an advocate to communicate?

*Question 6*  What is the current thinking in the thought leader arena regarding the disease
process and medication for your therapeutic area?

*Question 7*  Which thought leaders are positively or negatively aligned with Merck in
relation to your therapeutic area?

For internal use only.  Not to be distributed or used outside of Merck.

- 15 -

Confidential - Subject To Protective
Order

MRK-AAR0041758

**SPECIALTY FOUNDATIONS**

## Understanding Thought Leaders

**Self-Paced Reading**

*Time: 20 minutes*

| | |
|---|---|
| **INTRODUCTION** | Now that you understand your roles and responsibilities in developing advocates, you're ready to focus on how to gain an understanding of the key drivers of the thought leaders in your territory. Gaining an understanding of the thought leaders in your territory will improve your ability to interact with a wider range of customers and provide you with insight into the issues and concerns facing them. |
| **UNDERSTANDING THOUGHT LEADERS' BELIEFS AND BEHAVIORS** | Thought leaders are valuable resources to you. They impact the clinical and business decision making involved in the delivery of health care by what they say and do. To properly support and manage these valuable resources, it is important that you understand their underlying drivers; in other words, what makes them tick. This will enable you to forge stronger and deeper relationships with the thought leaders in your territory. |

Thought leaders' beliefs and behaviors can be shaped by many different factors:

- Clinical Experience
  - Thought leaders may have shaped their beliefs and behaviors based on their own clinical experience. Their clinical experience is often the foundation of their thinking and subsequent research endeavors.
- Other Thought Leaders
  - Thought leaders may be influenced by other thought leaders. Typically a local thought leader is influenced by a regional or national thought leader, and a regional thought leader is influenced by a thought leader at the national level. National thought leaders can be influenced by other national or even international thought leaders.
- Published Research
  - Many thought leaders are influenced by published research. These physicians may not place much validity in the information you provide them until they have read peer review journals that support the same conclusions.
- Peers
  - Thought leaders can also be influenced by their colleagues. These physicians may closely follow what the peers in their community or their practice partners say and do. These physicians may follow their community's popular conscience in their treatment beliefs.
- Societal Factors
  - Social factors can also have a strong influence on a thought leader's beliefs and behaviors. There are many societal factors that can influence

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0041759

## SPECIALTY FOUNDATIONS

a thought leader, such as:

→  Politics – A thought leader's beliefs and behaviors may be influenced by current events in government. For example, attempts at health care reform during the Clinton administration stirred much interest in the role of economics and managed care in the delivery of health care. Subsequently, the inclusion of outcomes data relative to cost became an important research endpoint.

→  Hospital Policies – The policies of the hospital a thought leader is associated with can influence his/her beliefs and behaviors. For example, a thought leader may be more likely to engage in patient education initiatives because the hospital requires the clinician to do so.

→  Education – A thought leader's educational training will play a role in shaping their beliefs and behaviors. Medical schools have different approaches to patient management, and this is often reflected in the thought leader's approach to managing his/her patients.

→  Medical Training – A thought leader's mentors during residency can have a huge impact on his/her beliefs and behaviors. The beliefs and behaviors of the mentor are often reflected in those of the thought leader. In addition, the thought leader may look to the mentor for guidance throughout their career.

→  Personal Bias – Thought leaders are also human. This means that they bring personal beliefs and bias to their work. A thought leader may be influenced by social considerations, monetary concerns or other personal factors. Either they or a family member might have the condition they specialize in treating.

Most likely, a thought leader is influenced by more than one of the factors discussed above. In order to truly understand what influences each of the thought leaders in your territory, you need to build a solid relationship with that thought leader and determine his/her individual beliefs and behaviors.

***Determining Thought Leaders' Beliefs and Behaviors***  Now that you are beginning to understand that there are many potential drivers of thought leaders' beliefs and behaviors, it is important that you know what "clues" to look for in your thought leaders' to determine what factor(s) influence them. There are many different approaches you can use to determine your thought leaders' beliefs and behaviors. For example, you can ask them questions regarding their beliefs:

- How did you develop your interest in the disease?
- What publications do you read regarding the disease?
- What influences your treatment decisions?
- What other physicians do you work with?
- How were you trained (surgical vs. family practice vs. DO)?
- Where did you train?

For internal use only. Not to be distributed or used outside of Merck.

- 17 -

Confidential - Subject To Protective Order

MRK-AAR0041760

## SPECIALTY FOUNDATIONS

- Who do you consider to be the experts in this field?

In addition to asking the physician such open-ended questions, you may want to obtain information regarding the physician such as:

- What types of meetings do you like to attend? A physician who attends large national meetings to obtain continuing medical education may have a stronger academic interest in disease management vs. a physician who uses mail correspondence courses. The latter physician is probably more interested in remaining clinically competent vs. understanding all the facets of the current research relative to the disease.
- Do you serve on any committees in the hospital?
- What types of publications does the physician have in his/her private office?
- Are you affiliated with a teaching hospital vs. a community hospital?
- Do you have a clinical appointment vs. research appointment?
- Do you teach?
- Do you have residents doing rotations in your setting?
- Are you a department chair?
- What does the information provided on the Curriculum Vittae (CV) tell you about the physician?
  - Where and how extensively are they published?
  - Who is the co-author(s) in their publications?

Much of this information can be obtained from the physicians CV or by asking their colleagues or office staff.

Remember, direct questioning of the physician is not the only way to gain information about him/her. For example, the style and ambiance of the physician's waiting room can also be used as a clue to their beliefs and behaviors. You might deduce that a dermatologist with a "spa like" waiting room is more interested in cosmetic procedures than a dermatologist that has a more conventional waiting room. The style and ambiance of the waiting room should not be used as a sole indicator of a thought leader's beliefs and behaviors, and it should always be confirmed by more concrete data. But this information can assist in deciding what types of questions to ask the thought leader to gain insight into his/her beliefs and behaviors.

| UNDERSTANDING THOUGHT LEADERS' NEEDS | Understanding a thought leader's beliefs and behaviors is only one factor to consider when building a relationship. It is also important to understand a thought leader's needs. By understanding his/her needs, you can build stronger relationships with the thought leader. A thought leader has many different needs, such as: |
| --- | --- |

- Business Needs – Physicians often have many business needs that they must satisfy in order to be successful, such as:
  - Utilizing computers to track outcomes data for patients,

For internal use only. Not to be distributed or used outside of Merck.

- 18 -

MRK-AAR0041761

## SPECIALTY FOUNDATIONS

- Filing for reimbursement,
- Obtaining funding for research,
- Training for their staff,
- And marketing and advertising their services.

- Academic Needs – Thought leaders may also have a strong need to stay abreast of the latest scientific information regarding specific diseases.
- Clinical Needs –It can be important to some thought leaders to remain current on the changing approaches to disease management. These changes may impact the types of treatment they prescribe, the equipment they invest in for their practice as well as the staff them might need to recruit and train. In addition, the physician may have clinical practice guidelines imposed by MCOs and/or hospitals.
- Personal Needs – Thought leaders also have personal needs that they must satisfy, such as:
  - Networking within their professional community and within their patient population,
  - Developing their speaking skills and finding opportunities to speak.
  - Having a forum to receive feedback from peers
  - Serving on committees
  - Teaching
  - Publishing articles

As with understanding a thought leader's beliefs and behaviors, it is important to keep in mind that he/she may have many of the needs discussed above. In order to improve and strengthen your relationship, you need to understand which needs are driving their behavior. For example, by helping an advocate develop his/her presentation skills he/she will benefit by having an opportunity to network with his/her colleagues during the presentations. You will benefit from this by ensuring that you provide the highest quality speaker presentations to your customers.

**Determining Thought Leaders' Needs** Now that you understand some of the needs of your thought leaders, it is important that you know what "clues" to look for in your thought leaders to determine what factors influence them. To determine a thought leader's needs, you might ask any of the following questions:

- How do you currently treat the disease?
- What is your current clinical approach to the disease? How do you make those decisions?
- How do you get your information to make treatment decisions?
- Do you track patient outcomes?
- How effective is your tracking of patients relative to follow up visits?
- Would you like to attract a different type of patient?
- Where do you see yourself and your practice in 2-5 years?
- What are your immediate and long-term goals?

For internal use only. Not to be distributed or used outside of Merck.

- 19 -

Confidential - Subject To Protective Order

MRK-AAR0041762

## SPECIALTY FOUNDATIONS

In addition to asking the physician the above questions, you may want to consider the following:

- What is the thought leader's reaction to your presentation of information? What resources does he/she react best to: approved sales aides or approved literature (reprints)? Do they show interest in understanding the clinical data you provide or, do they refute the data suggesting that clinical experience is more relevant? Reactions are indicators of preferences and needs. Further exploration of the thought leader's reactions will help you determine their needs over time.

Understanding a thought leader's needs will assist you in developing a strong relationship with him/her and it will enable you to properly manage that advocate to create win-win situations for both Merck and the thought leader.

**UNDERSTANDING THOUGHT LEADERS' APPROACHES TO PATIENT MANAGEMENT**

A number of factors can influence a physician's choice with regard to patient management. Their decisions, although based on objective data, are subjective in that they are the result of how that physician chooses to interpret the data and integrate it into his/her practice. It may be based on:

- His/Her own clinical experiences,
- Other physicians' opinions
- Patient desires
- Clinical research studies
- And/or messages from competitors.

As you are building a relationship with the thought leaders in your territory, it is important that you take into consideration their approach to patient management when looking at the factors that drive their behaviors.

*Determining Thought Leaders' Approaches to Patient Management*

In order to determine a thought leader's approach to patient management, you might ask the physician questions such as:

- What influences your decisions when selecting a therapy?
- What motivates you to prescribe a particular class of products?
- In what situations do you not prescribe the Merck product?
- What information do you need to make treatment decisions?
- How do you track patient outcomes?

- In addition to asking the physician the above questions, you may want to consider the following:
  - The managed care environment in which the physician practices.
  - Possible influences from other companies that have treatment options relative to the disease.
  - Treatment options that were current when the physician was in training.

Understanding the "why" behind a physician's prescribing behaviors can assist

For internal use only. Not to be distributed or used outside of Merck.

- 20 -

Confidential - Subject To Protective Order

## SPECIALTY FOUNDATIONS

you in crafting your message to the thought leader and ensuring that you properly manage that advocate based on their approach to patient management.

**UNDERSTANDING THOUGHT LEADERS' SPHERE OF INFLUENCE**

Once you understand the factors driving a thought leader's beliefs, behaviors, needs and patient management approaches, you'll want to determine their sphere of influence.

Thought leaders have varying degrees of influence over other physicians. These spheres of influence can be used to help you determine how to best manage a thought leader. There are three different classifications of thought leaders. This classification is based upon their sphere of influence:

Local Thought Leaders

- Also called community thought leaders. These people are well respected and have influence within their immediate area, such as a city or a portion of a state. Typically, a local thought leader influences physicians at the primary care level and their immediate peer group of specialists.

- For example, Dr. Smith is Chief of Medicine at Summertown Community Hospital; he has run an extremely busy practice in the area for 15 years and has served on various committees within the hospital as well as the County Medical Association. Dr. Smith is also a well-known member of the medical community. He has an appointment at the State University Medical School and routinely serves as a clinical site for medical students.

Regional Thought Leaders

- These people are well respected and have influence over a larger geographic region than do local thought leaders. For example, a regional thought leader might have influence over an entire state or even several states. Typically, a regional thought leader influences physicians at the level of specialists and primary care physicians.

- For example, Dr. Patel is Chief of Neurology at the State University Medical Hospital. In addition to her academic appointment, Dr. Patel sees a large base of private patients. Dr. Patel has participated in several clinical trials for pharmaceutical companies and she has been published in peer review journals on the topic of migraine. Dr. Patel also serves as a clinical preceptor for on-going education of family physicians in a variety of neurological areas including migraine.

National Thought Leaders

- These people are well respected and have influence nationally. National thought leaders are usually seen as top thought leaders in their field of expertise and may even be driving the treatment approaches and methods on a national level. Typically, a national thought leader influences physicians at all levels across the nation.

For internal use only. Not to be distributed or used outside of Merck.

- 21 -

## SPECIALTY FOUNDATIONS

- For example, Dr. Guru is a faculty member at Harvard Medical School. He is currently serving on the board of the American Medical Association and he belongs to several professional associations and has served in various leadership positions with in those associations. Dr. Guru is the editor of <u>Headache</u> and serves as a reviewer for several publications. His extensive clinical and academic research (primarily in the area of migraine) is well respected by his peers.

**Determining Thought leaders Sphere of Influence**  As you are building a relationship with the thought leaders in your territory and gaining an understanding of their key drivers, you'll also want to determine their sphere of influence. Of course, before you can determine a thought leader's sphere of influence, you must first determine if he/she is a thought leader. The following techniques can be used to assist you in identifying thought leaders.

- Looking at call records from the previous Specialty Representative
- Review call history information and targeting lists in Insight
- Talk with other Merck colleagues, such as your:
  - Business Manager,
  - Mentor,
  - Or cluster overlay representatives (OBRs, HSA, other Specialty Representatives, etc.).

In addition, you can also consult with the MIT and/or your FBG contacts.

Before you begin the activity, you should also review the definitions for a thought leader and an advocate, provided below.

The following techniques can be used to assist you in determining their sphere of influence of your thought leader:

- Obtain the thought leader's CV to see where they are in their development:
  - Where have they been speaking, publishing and researching?
  - Are they academically oriented? Where were they educated and trained?
  - Are they editors or reviewer for a peer reviewed journal?
  - What are their professional affiliations?
- Visit with the physician and engage in open dialogue regarding their activities and how they view themselves.
- Listen to hear what other physicians have to say about your thought leaders.

**SUMMARY**  In this section of the workbook, we have focused on how to understand the key factors that influence a thought leader. The information you gather about the thought leader's beliefs, behaviors, needs, approaches to patient management and sphere of influence can help you:

- Determine how to interact with the thought leader.
- Determine what activities the thought leader is best suited.
- How to best manage him/her based on this information (in terms of their

For internal use only. Not to be distributed or used outside of Merck.

- 22 -

Confidential - Subject To Protective Order

MRK-AAR0041765

## SPECIALTY FOUNDATIONS

activities and schedules).

Now you will have the opportunity to identify the top thought leader advocates in your territory and determine the key factors that influence them. Once you have completed this activity, you will then focus on how to access the thought leader advocates and on how to best manage the advocate based on their unique skills and needs.

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0041766

**SPECIALTY FOUNDATIONS**

## Understanding Thought Leaders

*Activity #3*

*Time: 30 minutes*

| | |
|---|---|
| **ACTIVITY:**<br>**UNDERSTANDING**<br>**THOUGHT**<br>**LEADERS** | Now that you know the key factors that influence a thought leader, it's time to identify the 3-5 **top** thought leader advocates in your territory and determine their:<br>• Beliefs and behaviors<br>• Needs<br>• Approach to patient management<br>• Sphere of influence |

Later in this course, you will be asked to develop a strategy to gain access to these thought leader advocates based on the work you complete in this activity.

To accomplish these tasks, you will need to complete columns 1-4 in your Advocate Action Plan located on page 34, 36, 38, 40 and 42 by:

1. Identifying the 3-5 top thought leader advocates in your territory

2. Determining each thought leader advocate's:
   - Beliefs and behaviors
   - Needs
   - Approach to patient management
   - Sphere of influence (including identifying specific physicians that the thought leader advocate influences)

For internal use only. Not to be distributed or used outside of Merck.

- 24 -

Confidential - Subject To Protective Order

MRK-AAR0041767

## SPECIALTY FOUNDATIONS

### Gaining Access to Thought Leaders

**Self-Paced Reading**

*Time: 15 minutes*

| | |
|---|---|
| **INTRODUCTION** | Everything you have learned thus far in this workbook can be used to assist you in understanding the motivations and key drivers of thought leaders and can be used to build strong relationships with your thought leaders. This section of the workbook will focus on the resources and techniques that you can use to gain access to your thought leaders. |

| | |
|---|---|
| **RESOURCES TO ASSIST IN ACCESSING THOUGHT LEADERS** | There are many resources available to assist you in accessing thought leaders. These resources are both internal and external to Merck. Some of the most valuable and knowledgeable resources are: |

**Merck Internal Resources**

- Office Based Representatives (OBR)
    - If you are new to your territory, your Office Based Representatives who call on a thought leader in your territory may have a better/stronger relationship with them than you do. Therefore, the OBR may be able to provide you with valuable insight to help you understand the thought leader and gain access to that individual. In addition, they may know the "workings" of the geographic area more intimately than you do. For example, they may know that Tuesday's are grand rounds and you may be able to access the physician at the hospital at that time.

- Your Business Manager
    - Your Business Manager may have a relationship with the thought leader that will allow you to gain access to him/her. If your Business Manager does have a relationship with the thought leader he/she may be able to provide you with support during a field visit.

- Other Specialty Representatives in Territory
    - Other Specialty Representatives can often provide you with support and insight into some of the thought leaders in your territory. In addition, they can assist you in developing strategies for understanding and gaining access to the thought leaders.

- Marketing Team/Merck Research Laboratories (MRL) and MEDSA Contacts
    - These people can work directly with your thought leader when appropriate. As extended team members, they are resources that can help you add value to and thus, strengthen your relationship and access to your thought leaders. They may explore opportunities of further research or answer questions relative to clinical and marketing issues beyond your scope of expertise.

- Health Education Liaison (HEL) Programs

For internal use only. Not to be distributed or used outside of Merck.

- 25 -

Confidential - Subject To Protective Order

MRK-AAR0041768

## SPECIALTY FOUNDATIONS

- HEL programs, such as roundtables or tutorials are an excellent way to gain access and build a relationship with a thought leader by providing a forum for interaction.
- Studies
  - Thought leaders can participate in studies as a clinical site investigator in an ongoing study of a product or disease. In addition, they can apply for medical school education grants.
- Consultants Meetings
  - These meetings are hosted by the marketing Team. They are typically a combination of scientific data presentations and market research information. Physicians attend, listen to and evaluate the presentation to help the FBG refine the information presented. These meetings can help you add value and build a stronger relationship with thought leaders.
- Strategic Advisory Board
  - This board consists of a few physicians that are a high-level thought leaders within their field of expertise. They then give us guidance on how to best utilize and position a product from a medical and marketing perspective that is consist with approved labeling. They also provide guidance on new developments from the disease and patient management perspective. A position on this board is viewed as an honor and thus can help you improve your relationship with your thought leaders.

### External Resources
- Thought Leader's Peers
  - Peers of the thought leader can be an excellent way to gain access to a physician. They can provide you with useful information about the thought leader and even facilitate an introduction. This affiliation can provide you with instant credibility in the eyes of the thought leader.
- Thought Leader's Office Personnel
  - Office personnel can be valuable sources of information regarding the thought leader's hours of availability and preferences. In addition, the office personnel may be able to provide you with insight into value added information or services you can provide to the physician.
- Continuing Medical Education (CME) Initiatives
  - Every physician is required to obtain CME credits. Often Merck will provide unrestricted educational grants to CME providers for the development of an education program on a specific disease. These courses can provide valuable information to your thought leaders or your thought leader may be asked, by the provider, to assist in the development of the course.

| | |
|---|---|
| **TECHNIQUES FOR GAINING ACCESS TO THOUGHT** | To gain access to a thought leader, you can employ any one or more of the following techniques:<br>- Be prepared for your appointment (i.e., do your homework). Before meeting |

For internal use only. Not to be distributed or used outside of Merck.

- 26 -

Confidential - Subject To Protective Order

MRK-AAR0041769

## SPECIALTY FOUNDATIONS

**LEADERS**

with a thought leader, you should be sure that you are well versed on Merck's data.

- Obtain a referral from the previous Specialty Representative. This can be done via a written letter of introduction or better yet a personal introduction. You might also suggest the previous Specialty Representative request an appointment for you to visit with the thought leader.
- Be knowledgeable about the physician's history in the marketplace:
  - What journals do they contribute to?
  - What is their relationship to other pharmaceutical companies? (This information can often be obtained through a consultation with the previous Specialty Representative or a tenured Specialty Representative within your district or territory, your Business Manager, MIT or the marketing team).
- Speak to the thought leader's desire to focus on their needs, through providing assistance in:
  - Providing opportunities to speak (if desired),
  - Helping them stay abreast of current research,
  - Helping them stay abreast of what peers and colleagues are doing in the marketplace,
- Schedule time with the thought leaders through:
  - Attending the same meetings they attend,
  - Asking them to participate in a tutorial or preceptorship,
  - Meeting with their administrative assistant to find out what are the key interests of the thought leader (i.e., teaching, patient care, research, etc.).

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0041770

SPECIALTY FOUNDATIONS

## Thought Leader Access Strategy

### Activity #4

*Time: 20 minutes*

| ACTIVITY: THOUGHT LEADER ACCESS STRATEGY | Now that you are beginning to understand your top 3-5 thought leaders advocates' key drivers, it's time to develop a strategy for accessing these physicians. In addition, you'll also want to identify the Merck resources to assist you in this effort.<br><br>To accomplish these tasks, you will need to complete the Access Strategy and Resources to Assist in Gaining Access sections of the Advocate Access Strategy Section of your Advocate Action Plan. In order to develop your strategy for accessing your physicians you will need to:<br>1. Develop an access strategy for each thought leader advocate you identified the previous exercise. Record this information in the "Access Strategy" section of your Advocate Action Plan (Page 34-43).<br>2. Identify the resources that can assist you in gaining access to a thought leader advocate. Record this information in the Resources to Assist in Gaining Access sections of your Advocate Action Plan |

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0041771

## SPECIALTY FOUNDATIONS

### Managing Current Advocates

Self-paced Reading

*Time: 10 minutes*

| INTRODUCTION | So far in this course, we've been focusing on understanding and gaining access to thought leaders. Now that you understand the key drivers of thought leaders and how to gain access to them, let's focus on how to appropriately manage the advocates in your territory. |
|---|---|

The key to managing advocates is assessment. Determining which advocate is the most appropriate in a given situation is important. In order to make this determination you need to consider the following:

- The advocate's sphere of influence (local, regional or national).
- The status level of the advocate (low, medium, high).
- The advocate's speaker qualifications (if they are an advocate who speaks).
- The area of advocate expertise required by the situation (clinical, teaching, research, business).

Earlier in this workbook we discussed sphere of influence, in this section we'll focus on the other factors that contribute to properly managing advocates. All this information helps you determine the strength and weaknesses of a particular advocate and to help you understand the impact they may have on your territory. In working with an advocate, it is important to match the advocate with situation to ensure a positive outcome for both you and the advocate.

| LEVELS OF ADVOCATES | Advocates are placed on the Advocate Development Continuum according to their beliefs and behaviors. This continuum can assist you in determining how to best work with and manage a given advocate. The advocate's status level, in addition to the factors mentioned above, will help you determine the best way to work with that advocate to achieve your objectives. |
|---|---|

- Low Advocate Status:
  - Advocate Level 1 is a physician who:
    - → Is a critical driver of business.
    - → May be an advocate for the competition.
  - Advocate Level 2 is a physician who believes in use of Drug Class, but does not distinguish between products in class.
- Medium Advocate Status:
  - Advocate Level 3 is a physician who believes in use of Drug Class, does distinguish between products in class and supports some scientific issues (approximately 1-2).
  - Advocate Level 4 is a physician who believes in use of Drug Class, does distinguish between products in class, is qualified on multiple scientific

For internal use only. Not to be distributed or used outside of Merck.

- 29 -

Confidential – Subject To Protective Order

MRK-AAR0041772

## SPECIALTY FOUNDATIONS

issues (>2) and is familiar and current with prescribing information for Merck product.

- High Advocate Status:
  - Advocate Level 5 is a physician who believes in use of Drug Class, does distinguish between products in class, is qualified on all scientific issues and is very familiar and current with prescribing information for Merck product.

| | |
|---|---|
| **CRITERIA TO ASSESS QUALIFIED SPEAKERS** | In addition to assessing an advocate's status, you'll also want to determine their speaking qualifications. The following criteria can be used to help you manage advocate speakers: |

- A **preferred speaker** is a qualified advocate who is willing and able to conduct multiple HEL programs. Preferred speakers should have outstanding delivery and provide favorable yet balanced HEL presentations. In general, the goal is to use these types of speakers approximately ten times per year, although the actual desired frequency of use may vary somewhat by therapeutic area and/or MBO objectives.

- A **recommended speaker** is a qualified advocate who is willing and able to conduct multiple HEL programs. Recommended speakers also deliver favorable, scientifically balanced HEL programs, however they may not be as strong of a speaker, or as willing to do talks as a preferred speaker. In general, the goal is to use these types of speakers approximately 5-6 times per year, although the actual desired frequency of use may vary somewhat by therapeutic area.

- A speaker classified as **"Other"** should only be used one or two times a year. 'Other' speakers may not be able or willing to do multiple HEL programs per year, and prefer to limit the number of speaker engagements. Or, they could be one of your speakers in-development, who can deliver favorable, scientifically balanced HEL programs.

- **Speakers without a status** means that for one reason or another this speaker should not be used for HEL programs. Regional HEL coordinators will NOT use speakers whose HEL status is left blank.

Like the advocate status, the speaker's rating can impacts which situations are best suited to a speaker's skills and personal goals.

| | |
|---|---|
| **TECHNIQUES FOR MANAGING ADVOCATES** | In managing advocates, you'll want to look at the criteria discussed previously, such as their beliefs and behaviors, needs, approaches to patient management, sphere of influence, advocate status and speaker qualifications to determine which situations are best suited for a particular advocate. |

It's important to remember, that advocacy status is defined by Merck, whereas thought leader status is defined by the marketplace and professional reputation.

For internal use only. Not to be distributed or used outside of Merck.

- 30 -

Confidential - Subject To Protective Order

MRK-AAR0041773

## SPECIALTY FOUNDATIONS

Therefore, there is the ability for you to create opportunities for working with advocates even if they are more aligned with a competitive product. For example, an advocate level 1 physician may be an appropriate choice to present on epidemiology or pathophysilogy. However, this person may not be the best choice to discuss current therapies for a given disease entity, as this might entail product comparisons. The goal is to respect the integrity and skill set of the Advocate without compromising the integrity of the opportunity to provide fair and balanced data relative to a disease and treatment options.

In managing advocates, you will also want to consider the advocate's unique skills and knowledge and the opportunities that exist to support your business goals as well as the advocates. In developing an advocate management strategy you may want to ask yourself the following questions:

- How will you manage access to them?
  - Will you control access to the advocates or would you prefer that other Merck professionals contact the advocates directly? You'll want to discuss your advocates' preference with regard to access before making any decisions.
- How will you ensure your advocates' needs are met?
  - How can you help them network among professional peers and patient population?
  - How can you help them learn from the clinical experience of other physicians?
  - How can you help them improve their clinical skills?
- How will you support your advocate's speaking needs?
  - How can you assist them in improving their speaking skills?
  - How can you assist them in the development of M/L approved slides?
  - How can you help them obtain M/L approved slide sets for their use?
  - How can you help them uncover forums for speaking?
- How can you match the right advocate with the right opportunity? For example:
  - Using lower level advocates for market expansion and professional education opportunities vs. those activities that are best served by higher level advocates (such as formulary decisions.)
  - Assessing the opportunity and managing the expectations of your Merck counterparts accordingly. It would be inappropriate to match a low level advocate to a very product specific opportunity
  - The following examples will provide you with some guidance on how to best manage an advocate to ensure you match their level of advocacy with the sphere of influence and the opportunity:
    - When conducting a large national symposium on epidemiology, a national thought leader (due to nationwide audience) is recommended. However, the advocacy level of the speaker is less of an issue (and could be rated low) because the subject matter is not product specific.

For internal use only. Not to be distributed or used outside of Merck.

– 31 –

Confidential - Subject To Protective Order

**SPECIALTY FOUNDATIONS**

→ When conducting a regional symposium to cover current therapies on Migraine a regional or national thought leader (due to audience makeup) is recommended. The speaker should also have a high advocate status (high-medium or above) because the discussion entails current therapies and will likely include M/L approved product discussions.

→ When addressing a national meeting for Pharm's, a national thought leader (due to the nationwide audience) is appropriate. In addition, the advocacy status should be high due to their need for accurate and fair balanced product information.

→ When conducting a roundtable in an area of your territory that accounts for a large segment of your overall business, a local or regional thought leader with a medium to high level of advocacy is appropriate.

When managing advocates it is critical to align the opportunity with the skills, knowledge, sphere of influence and status of the advocate. Using all of these factors will allow you to determine how to best manage the advocates in your territory.

For internal use only. Not to be distributed or used outside of Merck.

- 32 -

Confidential - Subject To Protective Order

MRK-AAR0041775

## SPECIALTY FOUNDATIONS

### Advocate Management Strategy

**Activity #5**

*Time: 30 minutes*

| | |
|---|---|
| **ACTIVITY: ADVOCATE MANAGEMENT STRAGEGY** | Now that you understand the techniques for managing the thought leader advocates in your territory, develop a strategy for managing the top 3-5 thought leader advocates from the previous exercises. |

In order to develop your management strategy you will need to:

1. Identify advocate level and speaker qualifications (if applicable), by completing column 5 and 6 of the Advocate Action Plan on pages 34-43.

2. Determine how you will best manage the thought leader advocate to ensure you are matching the advocate's abilities and desires with the appropriate opportunities. Record your goals in the Management Strategy section of the Advocate Action Plan.

3. Use the questions posed on page 30 in the Techniques for Managing Advocates section of this workbook.

For internal use only. Not to be distributed or used outside of Merck.

- 33 -

Confidential - Subject To Protective Order

MRK-AAR0041776

**SPECIALTY FOUNDATIONS**

## Conclusion

**Activity #6**

*Time: 30 minutes*

| NEXT STEPS | You should now have an understanding of the tools you need to access the thought leaders and manage the advocates in your territory. Since this is the first time you've developed an Advocate Action Plan as a Specialty Representative for Merck, you should share this plan with your Business Manager to obtain his or her feedback and refine the plan as necessary. |
| --- | --- |
| | Going forward, you should continually analyze the information regarding your thought leaders and update your Advocate Action Plan as necessary to ensure that you make the best use of your time on territory. |

| ACTIVITY: SHARE ADVOCATE ACTION PLAN WITH MANAGER | Once you have completed your Advocate Action Plan, schedule some time with your Business Manager to review your plan to obtain his or her feedback. Once you've discussed your plan, you will probably need to revise it based on your Manager's feedback. This process will help ensure that your plan is realistic and achievable. |
| --- | --- |
| | Finally, be sure to bring the most current version of your Advocate Action Plan to the Specialty Foundations Workshop. You will be using your plan throughout the Advocate Development session in that workshop to build upon the concepts discussed in this workbook. |

For internal use only. Not to be distributed or used outside of Merck.

- 34 -

Confidential – Subject To Protective Order

MRK-AAR0041777

# Advocate Action Plan

Thought Leader Advocate #1: _____

| Beliefs and Behaviors | Needs | Approach to Patient Management | Sphere of Influence | Advocate Level | Speaker Qualifications |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

Confidential - Subject To Protective Order

MRK-AAR0041778

## SPECIALTY FOUNDATIONS

**Access Strategy:**

**Resources to Assist in Gaining Access:**

**Management Strategy:**

For internal use only. Not to be distributed or used outside of Merck.

- 36 -

Confidential – Subject To Protective Order

MRK-AAR0041779

## SPECIALTY FOUNDATIONS

**Thought Leader Advocate #2:** _____

| Beliefs and Behaviors | Needs | Approach to Patient Management | Sphere of Influence | Advocate Level | Speaker Qualifications |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

For internal use only. Not to be distributed or used outside of Merck.

- 37 -

Confidential - Subject To Protective Order

MRK-AAR0041780

## SPECIALTY FOUNDATIONS

**Access Strategy:**

**Resources to Assist in Gaining Access:**

**Management Strategy:**

For internal use only. Not to be distributed or used outside of Merck.

- 38 -

Confidential – Subject To Protective Order

MRK-AAR0041781

## SPECIALTY FOUNDATIONS

Thought Leader Advocate #3: _____

| Beliefs and Behaviors | Needs | Approach to Patient Management | Sphere of Influence | Advocate Level | Speaker Qualifications |
|---|---|---|---|---|---|
| | | | | | |

For internal use only. Not to be distributed or used outside of Merck.

- 39 -

Confidential – Subject To Protective Order

MRK-AAR0041782

## SPECIALTY FOUNDATIONS

**Access Strategy:**

**Resources to Assist in Gaining Access:**

**Management Strategy:**

For internal use only. Not to be distributed or used outside of Merck.

- 40 -

Confidential – Subject To Protective
Order

MRK-AAR0041783

## SPECIALTY FOUNDATIONS

Thought Leader Advocate #4: _____

| Beliefs and Behaviors | Needs | Approach to Patient Management | Sphere of Influence | Advocate Level | Speaker Qualifications |
|---|---|---|---|---|---|
| | | | | | |

For internal use only. Not to be distributed or used outside of Merck.

- 41 -

Confidential - Subject To Protective Order

MRK-AAR0041784

## SPECIALTY FOUNDATIONS

**Access Strategy:**

**Resources to Assist in Gaining Access:**

**Management Strategy:**

For internal use only. Not to be distributed or used outside of Merck.

- 42 -

Confidential – Subject To Protective
Order

MRK-AAR0041785

## SPECIALTY FOUNDATIONS

**Thought Leader Advocate #5:** _____

| Beliefs and Behaviors | Needs | Approach to Patient Management | Sphere of Influence | Advocate Level | Speaker Qualifications |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

For internal use only. Not to be distributed or used outside of Merck.

- 43 -

Confidential - Subject To Protective Order

MRK-AAR0041786

## SPECIALTY FOUNDATIONS

**Access Strategy:**

**Resources to Assist in Gaining Access:**

**Management Strategy:**

For internal use only. Not to be distributed or used outside of Merck.

– 44 –

Confidential – Subject To Protective Order

MRK-AAR0041787

*** Slip Sheet ***

Document

# Specialty Foundations



## Course Completion Guide

### Specialty Representative
### Advocate Development
### Foundations

**Ver. 05/2001**

Confidential - Subject To Protective
Order

*This document has been produced by Merck Sales Training & Professional Development for the exclusive use of training and development of Merck Professional Representatives. This document contains proprietary information and trade secrets and any use other than the above is strictly prohibited.*

Copyright © 2000 by Merck & Co., Inc.

Confidential – Subject To Protective Order

MRK-AAR0041789

## SPECIALTY FOUNDATIONS

### Compliance Instruction

You are reminded that all of your activities must comply with all applicable Policy Letters and Corporate Policies. Although many such policies apply to your activities in this training course, Policy Letters 110 and 118 are of particular relevance.

You are further reminded that anyone who violates any Policy Letter is subject to immediate disciplinary action up to and including termination.

### Advocate Development

*Instructions:*
Use this course completion guide to review the required documents from each representative so you can "sign-off" for approval.

*Requirements:*
1. Introduction & Self Assessment
2. What's my Role?
3. Share Advocate Action Plan with Manager



USHH *Professional Development System* The Track to the Top

1

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

MRK-AAR0041790

## SPECIALTY FOUNDATIONS

### Requirement #1: Introduction Self-Assessment

Representatives should complete the Self-Assessment. *Suggested answers are provided below:*

- ❏ 1. What is the standard definition of a thought leader?
    - A thought leader, as defined by the market, has several characteristics:
        - Customers who, due to their ability to influence their peers, drive therapeutic business at the national, regional or local level.
        - These individuals may not necessarily be a top prescriber. However, their decisions and influence will impact the prescribing habits of others.
        - They may or may not be in alignment with Merck's clinical and business positions.

- ❏ 2. How does Merck define an advocate?
    - An advocate (as defined by Merck) is an individual who is a thought leader AND is very familiar with the prescribing information for the Merck product(s) and understands and supports the medically/legally approved materials available for the product(s). An advocate can, Influence colleagues through peer-to-peer relationships, hold beliefs that are congruent with the approved labeling and indications for the use of the Merck product(s) in the appropriate patient indications and be a speaker.

- ❏ 3. Which factors should you look at to gain an understanding of the thought leaders in your territory?
    - To gain an understanding of the thought leader's in your territory you should understand their:
        - Beliefs and behaviors
        - Needs
        - Approaches to patient management
        - Sphere of influence

USHH *Professional Development System*
*The Track to the Top*

For internal use only. Not to be distributed or used outside of Merck.

Confidential – Subject To Protective Order

MRK-AAR0041791

## SPECIALTY FOUNDATIONS

❑ 4. What are the three spheres of influence (and their definitions) that a thought leader can have?
  – Local Thought Leaders: Also called community thought leaders. These people are well respected and have influence within their immediate area, such as a city or a portion of a state. Typically, a local thought leader influences physicians at the primary care level and their immediate peer group of specialists.
  – Regional Thought Leaders: These people are well respected and have influence over a larger geographic region than do local thought leaders. For example, a regional thought leaders might have influence over an entire state or even several states. Typically, a regional thought leader influences physicians at the level of specialists and primary care physicians.
  – National Thought Leaders: These people are well respected and have influence nationally. National thought leaders are usually seen as top thought leaders in their field of expertise and may even be driving the treatment approaches and methods on a national level. Typically, a national thought leader influences physicians at all levels across the nation.

❑ 5. What are some of the resources you can use to gain access to the thought leader's in your territory?
  – Internal Resources
  – Office Based Representatives (OBR)
  – Business Manager
  – Other Specialty Representatives in Territory
  – Marketing Team/Merck Research Laboratories (MRL) Contacts
  – Health Education Liaison (HEL) Programs
  – Studies
  – Consultants Meetings
  – Strategic Advisory Board
  – External Resources
  – Thought Leader's Peers
  – Thought Leader's Office Personnel
  – Continuing Medical Education (CME) Initiatives

❑ 6. What are some of the techniques you can use to gain access to thought leaders?
  – Be prepared for your appointment (i.e., do your homework).
  – Obtain a referral from the previous Specialty Representative.
  – Be knowledgeable about the physician's history in the marketplace.
  – Speak to the thought leaders desire to focus on their needs.
  – Schedule time with the thought leaders.

USHH Professional Development System
The Track to the Top

3

For internal use only. Not to be distributed or used outside of Merck.

Confidential - Subject To Protective Order

No. COX 00-028
Apr 28, 2000

| Bulletin for VIOXX®: |
| NEW RESOURCE: Cardiovascular Card |

TO:

All Field Personnel with Responsibility for VIOXX®          ACTION REQUIRED

#### Background

The presentation of information regarding the VIGOR and CLASS trials has led to some misunderstanding in the field, as well as with physicians, regarding the cardiovascular effects of VIOXX.

To ensure that you are well prepared to respond to questions about the cardiovascular effects of VIOXX, Team VIOXX has developed a new resource, the Cardiovascular Card. The Cardiovascular Card will allow you to set the record straight with your physicians regarding the cardiovascular profile of VIOXX and how this profile compared to other NSAIDs in OA clinical trials with VIOXX. **The Cardiovascular Card is an obstacle handling piece and should only be used with physicians in response to their questions regarding the cardiovascular effects of VIOXX.** This bulletin contains a draft version of the Cardiovascular Card and a roadmap to explain the content of the Cardiovascular Card and how to use it to address obstacles from your physicians. **This is for your background only. You may not use the Cardiovascular Card or the roadmap with your physicians. You will receive the final printed version of this resource to use with your physicians by Federal Express on Monday.**

#### Draft of Cardiovascular Card (Note: The Cardiovascular Card is a tri-fold similar to the Renal Profile Card)



COX00(R)1_somedia.pdf

The Cardiovascular Card is a resource which will allow you to address your HI COXIB or HI NSAID physician's concerns regarding the cardiovascular effects of VIOXX. The Cardiovascular Card contains the following information:

- Page 2 shows that patients who were at risk for cardiovascular disease were not excluded from the OA studies with VIOXX. In fact, many patients who were included in the study had risk factors for cardiovascular disease.
- Page 3 shows that the number of cardiovascular thromboembolic events that occurred in OA clinical trials with VIOXX was low and similar to ibuprofen, diclofenac, and nabumetone. Page 3 breaks the information down even further, specifically for MI, stroke, and angina, and shows that VIOXX was similar to comparator NSAIDs and placebo for all these CV events.
- Page 4 shows that the overall and CV mortality rates from the OA clinical trials with VIOXX were low.
- Page 6 shows that in OA clinical trial with VIOXX, the discontinuation rates for patients with hypertension was low, <0.1%. It also shows that the incidence of hypertension in these patients was 3.5% for VIOXX, which was similar to the comparator NSAIDs, diclofenac and ibuprofen.

Confidential - Subject To Protective Order                                        MRK-AAR0038843

Please read the attached roadmap for this card. It will help you understand how to use this card to address physician's questions regarding the CV effects of VIOXX.



"CV Roadmap.doc"

If you have any questions regarding this bulletin, please contact the Merck National Service Center at 1-800-NSC MERCK.

Confidential - Subject To Protective Order

MRK-AAR0038844

**A Roadmap to the CV Card**



The CV Card will assist you with addressing your HI COXIB or HI NSAID physician's questions about the cardiovascular effects of VIOXX. Use this resource as an obstacle handling tool only, when your physicians ask you about the cardiovascular effects of VIOXX or express concern regarding the cardiovascular effects of VIOXX based on the VIOXX GI Outcomes Research trial (VIGOR).



Use page 2 to show your physicians that patients who were at risk for cardiovascular disease were not excluded from the OA studies with VIOXX. In fact, many patients who were included in the study had risk factors for cardiovascular disease. For example, 39% of patients had hypertension prior to their enrollment in the study.

Confidential – Subject To Protective Order

MRK-AAR0038845



Use page 3 of the CV Card to show physicians the number of cardiovascular thromboembolic adverse events that were seen per 100 patient years in OA clinical trials with VIOXX, comparator NSAIDs, and placebo.

(NOTE: Per 100 Patient Years of follow-up is a statistical calculation used to summarize results of multiple studies that are of different durations. It can be explained as the number of events that would be expected, if a group of patients were followed collectively for a total of 100 years. For example, it could be 100 patients each followed for one year, 20 patients each followed for 5 years, or any other combination totaling 100 years)

Using the table on page 3, explain to the physician that the rates were low in all studies and for all groups, and were comparable to placebo. The event rates were comparable for all doses of VIOXX, 12.5mg, 25mg, and 50mg, and these rates were comparable to Ibuprofen 2400mg, diclofenac 150mg, and nabumetone 1500mg.

Use the chart on the bottom of page 3 to drill down further. Show physicians the rate of specific cardiovascular thromboembolic events (MI, stroke or mini-stroke, and angina) and explain that for each of these specific events, the rate for VIOXX was similar to comparator NSAIDs and placebo. For example, the rate of MI was 0.6 for VIOXX, 0.5 for NSAIDs, and 1.4 for placebo.

Confidential - Subject To Protective Order

MRK-AAR0038846



Page 4 of the CV card relates to the overall mortality rates seen in OA clinical trials with VIOXX, NSAID comparators, and placebo. Use this page to show physicians that in terms of mortality, which is most important to the physician and their patients, the rate for total mortality and cardiovascular mortality was low.



Use the top of page 6 of the CV Card to show physicians that in OA clinical trials with VIOXX, at the approved 12.5mg and 25mg dose, the discontinuation rates for patients with hypertension was low, <0.1%. You can then show physicians that the incidence of hypertension in these patients was 3.5% for VIOXX, which was similar to the comparator NSAIDs, ibuprofen and diclofenac.

Ensure that the physician agrees that the cardiovascular events seen with VIOXX in OA clinical trials were low and similar to diclofenac and nabumetone. Return to your Top 5

Confidential - Subject To Protective Order

HI COXIB messages by beginning with message #1-VIOXX provides ONCE DAILY POWER in chronic osteoarthritis (OA) pain and POWERFUL RELIEF in the moderate to severe acute pain of post-orthopedic surgery. Remember, the comparators used in the clinical trials which support this message were diclofenac and ibuprofen, the same comparators referred to in the CV Card.

Confidential - Subject To Protective Order

MRK-AAR0038848

No. COX 00-029
May 01, 2000

**Bulletin for VIOXX®:**
**New Obstacle Response**

<u>TO:</u>
All field personnel with responsibility for VIOXX®                Action Required

<u>PURPOSE:</u>

To provide you with a new obstacle response relating to the press release and
Searle/Pfizer's promotion that VIOXX has an increased incidence of heart attacks
compared to Celebrex, based on the VIOXX GI Outcomes Trial compared to Celebrex in
the CLASS trial.

<u>Obstacle Response #38:</u>



"Doctor, there are no head-to-head studies comparing the cardiovascular profile of the two drugs. As a
result, you cannot compare the drugs and conclude that one drug had fewer events than the other. What you
may be referring to is press reports of the incidence rates in two separate studies. In the VIOXX GI
Outcomes Trial (VIGOR), the incidence of MI was 0.5% with VIOXX and 0.1% with naproxen. In a
separate GI outcomes trial of Celebrex, the CLASS study, Searle has reported that the incidence of MI was
0.5% with Celebrex, 0.3% with diclofenac, and 0.5% with ibuprofen. Again, doctor, I want to emphasize
that the results of two different studies can't be compared, and that's particularly true here when you have
studies of differing duration and in different patient populations."

If needed, continue to address the physicians concerns with the cardiovascular effects of VIOXX by guiding
them through the Cardiovascular Card as outlined in Roadmap for the CV Card.

Return to the appropriate HI NSAID or HI COXIB Top 5 Messages for VIOXX.

NOTE: There will be an additional PIR to address these issues available shortly.

If the doctor asks you further for the incidence of MI from the OA studies presented in the package
insert for VIOXX tell them:

"In the clinical OA trials for VIOXX reported in our package insert, the incidence of MI was less than 0.1%
with VIOXX."

If needed, continue to address the physician's concerns with the cardiovascular effects of VIOXX by
guiding them through the Cardiovascular Card as outlined in Roadmap for the CV Card.

Confidential - Subject To Protective Order

MRK-H.3STM001294

Return to the appropriate HI NSAID or HI COXIB Top 5 Messages for VIOXX.

Remember to provide appropriate balancing information as part of all product discussions.

### ACTION REQUIRED:

1. Review and practice this obstacle response and use it in appropriate discussions on VIOXX® with your physicians:

2. Print the response provided, and add it to your Obstacle Response Guide. As with all other Obstacle Responses, the Response itself should not be shown to or left with physicians.

NOTE: All responses are available under the Obstacle Response Guide on the website for VIOXX® on the FSNet.

Remember to provide appropriate balancing information as part of all product discussions.

**IF YOU HAVE ANY QUESTIONS CONCERNING THIS BULLETIN, PLEASE CONTACT THE MERCK NATIONAL SERVICE CENTER AT 1-800-NSC-MERCK.**

Confidential - Subject To Protective Order

MRK-H.3STM001295

FILED

2006 Nov-29  PM 02:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

No. COX 01-007
Feb 09, 2001

Bulletin for VIOXX®:
FDA Arthritis Advisory Committee Meeting for VIOXX®

**TO:**

All field personnel with responsibility for VIOXX®          Action Required
National Account Executives                                Background Information
and Customer Managers (All Segments)

*DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE (ADVISORY COMMITTEE) REVIEW OR THE RESULTS OF THE VIOXX® GI OUTCOMES RESEARCH (VIGOR) STUDY. YOU MAY RESPOND TO CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW.*

**Introduction:**

As previously communicated in June 2000, Merck submitted a supplemental NDA for VIOXX based upon the VIOXX GI Outcomes Research study (VIGOR). In this study, VIOXX 50mg daily significantly reduced the risk of serious gastrointestinal side effects by 54% vs. naproxen 1000mg daily. On Thursday, Feb 8, Merck and the FDA reviewed the study with the FDA's Arthritis Advisory Committee.

The purpose of this bulletin is to provide you with important, updated background information based on the results of this meeting and actions required by you.

**Action Required:**

1. Stay focused on the EFFICACY messages for VIOXX
2. Utilize the PIR system to respond to unsolicited physician inquiries
3. Review the updated background Q&A
4. Review the updated obstacles and responses for your physicians
5. Do not initiate discussions or respond to questions, except as outlined below

**Stay Focused on Efficacy**

It is critical that we remain focused on the 1S HI NSAID and HI COXIB messages for VIOXX with our targeted physicians. As discussed at your 1S District Meetings, both the OA efficacy data and the new acute pain narcotic efficacy data for VIOXX will continue to solidify the efficacy perception of VIOXX. Use the new core visual aid for VIOXX and the

Confidential - Subject To Protective Order

MRK-H.3STM001173

OA Efficacy Stock Bottle Challenge program to challenge physicians to gain experience with the 24 hour efficacy of VIOXX.

### Physician Inquiries:

In response to <u>unsolicited</u> requests for information regarding VIGOR, Medical Services will make a personalized, faxable PIR available for your customers within 24 hours. In addition, for those customers who request additional information, a separate, more comprehensive PIR packet can be Federal Expressed within 2 days.

Medical Services has made arrangements to extend the hours for the PIR hotline. Representatives should submit unsolicited PIR requests by either telephone or fax options from **2/9 through 2/23** by calling the PIR hotline **800MERCK66** (800-637-2566) during extended hours of **8:30 am to 6:30pm ET**. During these hours, a staff member will verbally request the following information from you to process the PIR request from the HCP  [After this time, the usual method options of INSIGHT, PIR hotline (800MERCK 66 – hours: 8:30 – 4:30pm ET) and fax can be followed].

### Faxable PIR Instructions:

- <u>Your name, field title and RDT</u>
- <u>The requesting HCP's  full name and professional degree</u>
- <u>HCP's full mailing address</u>
- <u>HCP's phone number</u>
- <u>HCP's FAX number</u>
- <u>Provide the question(s) asked by the HCP.</u>

PIR Requests may also be sent to Medical Services from 4:30 pm – 8:30am ET by leaving a voice message at 800MERCK66. The information as listed above should be provided in your voice message to Medical Services staff. Additionally, PIR requests may be submitted to Medical Services in writing by sending a fax to 800MERCk66. The information listed above should be included on your fax to Medical Services.

In Summary:

- If requested, a summary of the PIR will be faxed within 24 hours of receiving the request.
- If the physician requests more comprehensive information on the VIGOR study, you may request the comprehensive PIR. This will be sent via Fed EX within 2 days.
- Transition your discussion to the current strategy and messages for VIOXX®.
- <u>Do not proactively discuss the Advisory Committee Meeting or VIGOR.</u>  Respond to questions about the study by requesting a PIR and in accordance with the obstacle-handling guide.

### Updated Q&A Guide:

This is background information only.

Confidential - Subject To Protective Order

MRK-H.3STM001174



"VIGOR QA.doc"

Updated Obstacle Responses:



Obstacles.doc

These updated obstacles are provided for your reference and preparation for questions asked by your physicians.

**This information is provided for your background information *only* and is not to be used in discussions with physicians.**

Background Information:

Merck issued a press release summarizing the FDA Advisory Committee Meeting held on Feb 8. The press release is attached below for your background information only:

GAITHERSBURG, Md., Feb. 8, 2001 — The Arthritis Advisory Committee of the Food and Drug Administration today reviewed Merck & Co., Inc.'s application for changes to the prescribing information for Vioxx® (rofecoxib), Merck's medicine for osteoarthritis and acute pain, to reflect results from the Vioxx Gastrointestinal Outcomes Research (VIGOR) study.

The Advisory Committee agreed with Merck and the FDA that results from the study should be included in the labeling for Vioxx. The FDA is not obligated to follow the advice of the Advisory Committee, but usually does. The FDA noted that it will consider all available information, including the information reported and advice received at today's Advisory Committee meeting, before any final decisions are made on Merck's application and other issues discussed by the Committee.

"Merck is confident that the data presented today support the excellent safety profile of Vioxx, and we look forward to further discussions with the FDA to complete the review of our application to modify the labeling for Vioxx," said Eve Slater, M.D., senior vice president, Clinical and Regulatory Development, Merck Research Laboratories.

Vioxx was approved by the FDA in May 1999 to treat osteoarthritis and acute pain. The prescribing information for Vioxx currently contains the standard NSAID Warning about GI side effects. Merck's application to the FDA was based on the 8,000-patient VIGOR

Confidential - Subject To Protective Order

MRK-H.3STM001175

study, which evaluated the GI profile of Vioxx 50 mg compared to the non-selective NSAID naproxen, and on other studies with Vioxx.

In VIGOR, Vioxx 50 mg, a dose two-times the highest chronic dose approved for osteoarthritis, significantly reduced serious GI side effects by half compared to a commonly used dose of naproxen (1,000 mg) in rheumatoid arthritis patients. The Committee recommended that these results be included in the labeling. Vioxx is not indicated for rheumatoid arthritis.

Although the VIGOR study was a GI outcomes study and was not designed to show differences in cardiovascular effects, significantly fewer heart attacks were observed in patients taking naproxen (0.1 percent) compared to the group taking Vioxx 50 mg (0.5 percent) in this study. There was no difference in cardiovascular mortality between the groups treated with Vioxx or naproxen. Patients taking aspirin did not participate in VIGOR.

In extensive discussions, the Advisory Committee explored this finding, other studies of Vioxx and possible explanations for this result in VIGOR. In the completed osteoarthritis trials and on-going clinical trials with Vioxx 12.5 mg, 25 mg and 50 mg in 30,000 patients, there was no difference in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs and placebo.

Merck scientists said the VIGOR finding is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1 like aspirin, which is used to prevent second cardiac events in patients with a history of heart attack, stroke or other cardiac events. This is the first time this effect of naproxen on cardiovascular events has been observed in a clinical study. Other explanations were advanced by the FDA reviewer and were discussed with the Advisory Committee. The Committee recommended that the data on cardiovascular events in VIGOR be included in the labeling for Vioxx.

In addition, the Committee agreed that the prescribing information for both Vioxx and Celebrex® (celecoxib) should reflect the fact that neither of these selective NSAIDs confer cardioprotective benefits and are not a substitute for low-dose aspirin. The Committee also recommended that other studies be conducted to further explore the safety of concomitant use of selective NSAIDs and low-dose aspirin.


**Focus:**

**Remain focused on your efficacy messages for VIOXX. Remember that the primary attribute that physicians and patients are seeking is pain relief.**

Confidential - Subject To Protective Order

MRK-H.3STM001176

**For questions regarding this bulletin please contact your Business Manager. For product and service information, call the Merck National Service Center at 1-800-NSC MERCK (1-800-672-6372).**

Confidential - Subject To Protective Order

MRK-H.3STM001177

FILED

2005 May 28 PM 12:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

**MVX for VIOXX®**
Jo Jerman
Audience – Field Sales
April 27, 2001
Topic: Project A & A XXceleration
Length – approx 1 min 30 sec

Hi everybody, this is Jo Jerman with a quick in it to win it "Project A & A XXceleration" minute.

Now, I know that all of you have recently received MVXs, e-mails and a flurry of other information around "Project A & A XXceleration." With all this activity and enthusiasm swirling around, I just couldn't help but pick up the phone and put in my own two cents. Today, I'd like to take a couple of minutes to touch on a continued strong performance and re-cap your important role in "Project A&A XXceleration."

The most recent performance numbers show a continued trend upward…the share of VIOXX in the A & A market is up to 17.2%--that's an all time high-- and the share of VIOXX in the Coxib market 51.2%--another all time high. Woo doggie! That is exciting. Now I know those aren't huge jumps, but they sure are going in the right direction.

With those numbers to build on, there's no where to go but up. Now, some people might be satisfied with little increases at a time, but as you've heard, we need to give VIOXX a real boost to keep ourselves on track and make our goals for 2001. I've said it before and I'll say it again, you guys are the best. So, who better to kick off and implement an important initiative like "A & A XXceleration"? I truly believe that our success with "Project A&A XXceleration" is dependent on how well we band together, divvy up the targeting, resources and do some flat out selling.

By, now, I bet you are tired of cleaning up after the competition on territory. So, it's high time we hit the offensive with confidence in our messages, our selves and most of all, the efficacy of VIOXX. We've got a short amount of time, a short list of targets, and all hands on deck.

Are you ready to roll?

Confidential - Subject To Protective Order

MRK-H.10STM001202

Listen guys, I gotta tell you that it never ceases to impress me how quickly you can put a task into action. Your plans to rollout the PEAK program and those extra HEL dollars are moving right along. I also know that you're in the final stages of your targeting lists and coordination among counterparts. Thank you for your strong commitment, great reception and quick start with this important plan. The only thing left is to put "Project A & A XXceleraton" into overdrive...the time is now and I wouldn't want anyone on the task but all of you. Last, but certainly not least, you've got some extra dollars to shoot for as well. As you recall from the incentive program, if you hit those 2-4 share points increases, you'll be rewarded handsomely--both in the short term with the incentive program and the long term with overall PPO. Go get em guys, Good luck and Great selling!

Confidential - Subject To Protective Order

MRK-H.10STM001203

MVX for VIOXX®
Field Sales—USHH
Jo Jerman
August 21, 2001
"JAMA article" FINAL (approx 4 minutes)

HI everyone, this is Jo Jerman with a MVX for VIOXX going out to the entire field sales force. I hope you're all having a good week. I've got an important message for you all, so please take a moment to listen and I'll dive right in.

The Journal of the American Medical Association, or JAMA, will publish an article in the Aug 22 issue on the "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors." Press outlets are picking up this story, so you may receive questions from your customers. The authors of this review looked at the use of COX-2 inhibitors primarily in VIGOR and CLASS. The article focuses on VIOXX and Celebrex. I know I sound like a broken record, heck, I certainly feel like one, but, once again, this is NOT new data on VIOXX. It's simply the same data we've heard about over the last year analyzed by different authors.

OK. Let me put this article into context. Merck stands firmly behind overall and CV safety profile and favorable GI profile of VIOXX. Keep in mind that both VIOXX and celecoxib were under review in this article.

You'll recall that VIGOR was a gastrointestinal study not designed to show differences in cardiovascular effects. However, significantly fewer heart attacks were observed in patients taking the commonly used NSAID naproxen (0.1 percent) compared to patients taking VIOXX 50 mg (0.5 percent). This result is consistent with the ability of naproxen to inhibit platelet aggregation. There was no difference in cardiovascular mortality between the two groups. And there was no correlation between renal effects and cardiovascular events. Now, as you know, VIGOR is not yet a part of our

Confidential - Subject To Protective Order

MRK-H.10STM001204

label, so you are not allowed to discuss the results of that trial. If a physician asks for information in regards to VIGOR, you may offer to submit a PIR.

While we question the design of the JAMA meta-analysis, Merck does support statements made by the authors that say and I quote, "COX-2 inhibitors show less propensity for gastrointestinal toxicity" and that "aspirin and naproxen show greater potential for gastrointestinal toxicity but have a cardioprotective effect." Merck also agrees with the authors' statement that their analysis has several significant limitations. The authors conclude by saying that more data are needed on the cardiovascular profile of COX-2 inhibitors. However, Merck believes that extensive cardiovascular data already exist on Vioxx and that these data – which were not incorporated into the authors' analysis – suggest that there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx.

While the authors claim that more data are needed on the cardiovascular profile of COX-2 medicines and urge caution in prescribing them for patients at risk of cardiovascular morbidity, Merck firmly believes that extensive cardiovascular data already exist on VIOXX. These data, including a meta-analysis involving more than 28,000 patients, showed the relative risks of serious CV events were similar with VIOXX and placebo and with VIOXX and 3 widely prescribed NSAIDs, ibuprofen, diclofenac and nabumetone. However, these data were not included in the JAMA review article. Today, we issued a press release that gives our full response to this article. You can pick up a bulletin tonight that will include the press release for your background information and information on the availability of an updated, faxable PIR, to only be used in response to unsolicited inquiries pertaining to this article from Health Care Professionals.

2

Confidential - Subject To Protective Order

You're likely to encounter questions while you're on territory tomorrow. If you receive questions from HEL speakers, direct them to call the National Service Center or submit a PIR. Also, there are four actions that you can take:

#1. Stay focused. Stay focused with your efficacy and GI risk awareness messages and stay focused with your confidence in cardiovascular safety and overall safety of VIOXX.

#2. If asked about CV effects, use your CV Card. As your piece shows, CV events and cardiovascular mortality rates between VIOXX and NSAIDs, such as ibuprofen, diclofenac, and nabumetone, were similar in OA studies.

#3. Refer to Obstacle Response #38 that was issued in Bulletin COX 00-029.

#4. A faxable PIR will be available for any of your customers who have unsolicited questions about the article in JAMA. The faxable PIR will be available the morning of Wednesday, August 22nd. Log in when you get home today and there will be a new bulletin giving you directions on how to do that.

As always, remember to provide appropriate balancing information as part of all product discussions. Do not initiate discussion on this article with your physicians or customers.

Listen guys, I know it hasn't been easy for ya'all out there lately. Last week, Margie let you know that your objective would be lowered by 200 million to take away dollars for the things you can't control so you can focus on those that you can. So, focus on this. Keep in perspective the many benefits of VIOXX and stay confident in the balanced information that you have to take to our customers. Did you know that to date, more than 30 million patients have benefited from taking VIOXX in the US this year alone? So, use your resources-- stay calm and stay cool. I know you guys will go out and show our customers why you are truly the best. Cause to me, that's exactly what you are.

3

Confidential - Subject To Protective Order

FINAL

<center>
MVX for VIOXX®<br>
Field Sales—USHH<br>
Jo Jerman<br>
October 3, 2001<br>
"Project Offense"
</center>

Hey everybody--Jo Jerman here with a voicemail going out to all Representatives with responsibility for VIOXX. First off, I gotta warn you that I am fired-up today so hold on to your hats and listen up for some upbeat news. I'm here today to tell you about "Project Offense." This is an exciting game plan that will see us through 2001 and help us kick of 2002 in a powerful way.

"Project Offense?" What's it all about? First, our focus will shift from the A & A market to the Coxib market as we get ready for another competitor. The main components for "Project Offense" include the following: 1.) New oxycodone data 2.) Putting Renal and CV Issues into Perspective and 3.) The new VIP Hospital Contracting Strategy. You will hear all about these at your upcoming district or cluster meetings and you've already gotten a sneak preview of the oxycodone data through the recent field teleconferences and your brand spankin' new Mid 2S detail piece.

Along with all those good things going on with "Project Offense," we're also launching an exciting, new advertising campaign featuring Olympian figure skater, Dorothy Hamill. These television spots will kick off this week on major networks and cable stations. So, keep your eyes peeled for this memorable campaign.

Are you excited yet?

I gotta tell you, I haven't been this fired up in some time. With all that you've been through from the competition, media reports and recent developments, you guys are still strong owners of HALF the Coxib market. That's right. In the face of stiff competition, few breaks and a couple of setbacks, we're still riding strong with 50.5% share and holding onto Coxib leadership. Guess

Confidential - Subject To Protective Order

what? It's time to take back those shares that have recently slipped away and penetrate deeper into the Coxib market. I know you guys are ready to widen our lead with new messages that build on our already strong pain relief image of VIOXX. I can't tell you how proud I am of you all and what an absolutely terrific job you've been doing. I feel like we're really cooking with gas! Keep up the good work. Keep being strong. And fire-up to close the year strong with the power of VIOXX!

2

Confidential - Subject To Protective Order

MRK-H.10STM001208

FINAL

MVX for VIOXX®
Field Sales—USHH
Jo Jerman
November 5, 2001
"November Project Offense Update"

Hey guys—Jo Jerman here with a voicemail going out over the airwaves to all Representatives with responsibility for VIOXX. I hope you all had a great weekend. I'm here today with some outstanding news to jump-start your week.

Are you ready? Let me tell you how much you have accomplished by your collective focus back on efficacy.

Well, since your kick off of "Project Offense" we've been making strides in the forward and upward direction. I'd like to give you a couple of examples of the latest and greatest. This week, NRX Coxib share hit a strong 50.8%! We've been steadily increasing the last three weeks straight— that's about a 1.5 % share increase. I gotta tell you, I haven't seen market share in this neck of the woods since the end of August. That's awesome! Also, thanks to your hard work and pull through, we have more than 2,000 hospitals signed and committed to our VIP program for Vioxx! That's amazing. And last, but, certainly not least, we have grown over 10,000 scripts in the Coxib market since the launch of our new initiative. Now, that is magnificent! Talk about getting on the offense. You guys are doing a fabulous job out there. Keep up the super work, because as you can clearly tell—you're on the right track. Take Care out there and I'll be back soon with another power against pain update!

Confidential - Subject To Protective Order

MRK-H.10STM001209

FINAL

<div align="center">
MVX for VIOXX®
Field Sales—USHH
Jo Jerman
November 19, 2001
"Dear HCP Corrective Letter"
</div>

Hey everyone—Jo Jerman here with a voicemail going out over the airwaves to all Representatives with responsibility for VIOXX. Hope you all had a great week. Now, I know that I talked to you all just a couple of days ago, but I've got some quick directions that I need you to follow immediately.

Let me back up for a second.

As you are aware, Merck received a Warning Letter regarding Vioxx from the FDA in September. The warning letter directed that Merck issue a Dear Healthcare Provider letter. I wanted to let you know that we mailed those letter today to those in attendance at the audioconferences and at the two pharmacy meetings. Samples of the letter have been sent to you in Bulletin COX01-075 and will be waiting for you on your laptop. It is important that you open and read this bulletin as soon as possible. And, it is mandatory that you comply with the bulletin's directions immediately.

I won't keep you any longer, I know you've all got busy days planned. Thanks for listening up and complying with these directions. If I don't talk to you before, have a healthy, safe, and restful holiday. Take care, guys. I'll be back at ya soon with another update.

Confidential - Subject To Protective Order

**MVX for Vioxx®**
**Jo Jerman to USHH**
**November 20, 2001**
**Valdecoxib approval**

Hi y'all! Jo Jerman here with an MVX going out over the airwaves to all Representatives who have responsibility for VIOXX. I apologize for sending you another message especially this close to the holidays, but this information is too important for me to hold.

I am sending this message to let you know that Friday, Pharmacia and Pfizer announced FDA approval for their new oral COX-II Inhibitor valdecoxib, or "Bextra".

According to the Press Release that was issued by Pharmacia and Pfizer, valdecoxib is indicated for the treatment of the signs and symptoms of osteoarthritis (OA), adult rheumatoid arthritis (RA), and pain associated with menstrual cramping. Unlike VIOXX and Celebrex, valdecoxib apparently did not receive an indication for Acute Pain.

The dosing for valdecoxib is 10 mg once-daily for the treatment of osteoarthritis (OA ) and rheumatoid arthritis (RA), but unlike VIOXX, valdecoxib is dosed 20 mg b.i.d. for the treatment of the pain associated for menstrual cramping. Don't forget that Celebrex is also approved as a b.i.d. agent in primary dysmenorrhea, whereas VIOXX is once a day.

In the press release Pharmacia says that "in clinical studies lasting 3-6 months Bextra (10 mg once daily) was as effective as commonly prescribed doses of the conventional NSAID's ibuprofen (800 mg t.i.d.), diclofenac (75mg b.i.d.), and naproxen (500 mg b.i.d.), for treating the signs and symptoms of osteoarthritis." "Bextra was also as effective as Naproxen (500 mg twice daily) for treating the signs and symptoms of rheumatoid arthritis." And lastly, "Bextra (20 mg b.i.d. as needed) was also associated with comparable pain relief verses ...naproxen sodium (550 mg b.i.d.)" for menstrual pain.

In three studies, valdecoxib was "significantly less likely to cause endoscopically-detected gastroduodenal ulcerations than the three conventional NSAIDs against which it was studied." (You will recall that in two studies of OA patients VIOXX had significantly fewer endoscopic ulcers than ibuprofen.) As the press release points out, the correlation between endoscopic findings and thew incidence of clinically serious upper GI events has not been fully established. The

Confidential - Subject To Protective Order

press release also points out that "like all conventional NSAID's" including VIOXX and celebrex "valdecoxib should be used with caution in patients with fluid retention, hypertension, or heart failure.

So what do we do now?

It is important to continue to deliver our efficacy messages for VIOXX, particularly our data showing superior relief compared to oxycodone/acetaminophen in acute pain over 6 hours. Second, accelerate your enrollment and pull through of the VIP program, which is more important than ever. And third, confidently handle questions about VIOXX, utilizing PIR's as appropriate.

Remember, if any of your customers provide you with unsolicited information about valdecoxib, be sure to call it in to the National Service Center.

We should have the package circular soon so next week you will be receiving a bulletin with more information about valdecoxib as well as teleconference information.

In the mean time enjoy your week and we will be back to you on this very soon.

Confidential - Subject To Protective Order

FINAL

MVX for VIOXX®
Field Sales—USHH
Jo Jerman
December 11, 2001
"BEXTRA follow-up and CV Outcomes Trial"

Hey guys—Jo Jerman here with a voicemail going out over the airwaves to all Representatives with responsibility for VIOXX. I hope you all had a fantastic holiday and a chance to re-charge yourselves for the last stretch of the year.

Before I jump into an update on our latest competitor, it is important that you are aware of an announcement that Merck made on Tuesday at our Annual Business Briefing. At that meeting, Merck announced its plans to conduct Clinical CV Outcomes Trials for Vioxx and Arcoxia. The prospective data from these trials, along with other ongoing trials, when added to the extensive data that are already available, we will be able to provide an even more comprehensive picture of the cardiovascular safety profile of Vioxx and our still investigational medicine, Arcoxia. Next time you download, Bulletin COX 01-082 will be available for you. This bulletin will outline specific responses when faced with questions from HCPs about this recent announcement. Make sure that you review each question thoroughly so you can handle questions and quickly return to your efficacy messages for Vioxx. And remember, you cannot make statements or respond to questions about Arcoxia.

OK. Now let's touch on that other little thing that's been going on the last couple of weeks: Bextra. The last time we spoke, there was limited information to discuss. However, now that we've had a chance to look at their PI, I've got a couple of quick comments. First, this product is not what we expected. Because, unlike Bextra, VIOXX is indicated for the management of acute pain in adults and has once daily dosing across all indications. In addition, Bextra has renal and GI language in their circular similar to Vioxx and non-selective NSAIDs.

So, where does this leave us?

Confidential - Subject To Protective Order

MRK-H.10STM001213

I'd say in great shape to end the year on a high. However, don't be fooled into thinking the next few months will be a piece of cake either. Bextra has not one, but two tenacious sales forces behind it and a dissatisfied market in front of it. There will definitely be challenges for us ahead. The great news is that you've got all the tools you need and have already laid your tactical plans for success. So, keep your eye on the following steps: 1. Focus promotion on the efficacy data for VIOXX, both with our acute pain in adults data and our OA data and use it to make balanced presentations. 2. Continue to enroll targeted accounts for VIP and pull through business at VIP institutions 3. Prepare to confidently address obstacles by reviewing the Bextra product profile and upcoming obstacle guide. And, 4. Use your "Project Offense" Tactical Plan as your Tactical Plan for Bextra. See? You guys have already gotten yourselves into gear to handle the extra noise from the competition. Your confidence and preparedness will undoubtedly see you through to continued success. I know my confidence in you is at an all time high. You have consistently proven yourselves and surpassed expectations time and time again this year. Way to go. That's all for now, guys. Keep focused, capitalize on your teamwork and keep up the great work!

2

Confidential - Subject To Protective Order

FINAL

**MVX for VIOXX®**
Field Sales—USHH
Jo Jerman
January 25, 2002
"2002 Kick-Off"

Jo Jerman here with a voicemail going out over the airwaves to all Representatives with responsibility for VIOXX. First off, Happy New Year! I hope you all had a great and restful holiday. Today's MVX is all about being fired up for 2002. And, I tell ya, there are many reasons why I am, so let's get to it.

First, I'm VERY fired up about our weekly market share data. For the first time since November, we have once again cleared the 50% mark in the coxib class. This is due to your outstanding efforts with "Project Offense," and all the hard work you put in at the end of 2001. Fantastic! What a way to start out the year.

Second, I'm here to report that the National Business Manager's Meeting was just outstanding. I was so fired up all week long in San Diego that I barely needed a plane to get me home. I tell ya, your managers are just so full of energy and totally on top of everything, so get ready for some great district meetings. Now, these meetings are critical in laying the basis for our first semester. There are three important things that I'd like you to think about as take-aways for these meetings:

1. Deliver assigned, balanced messages and resources to high Cox-II prescribers
2. Enroll & pull-through VIP at targeted hospitals
3. Confidently address non-GI safety issues using appropriate materials

The key to a great 2002 is all about showing up, staying focused, and staying on the offense, no matter what the challenge of the day. Speaking of resources, keep a head's up for a new stock bottle initiative comin' your way later next week. I'm not going to elaborate any further, because you'll receive a bulletin soon, explaining all the details of this initiative.

Confidential - Subject To Protective Order

**MRK-H.10STM001215**

Well, all this talk about focus and resources leads me to a THIRD thing to be fired up about...our 2002 Vioxx objective. Now, I don't have to tell you how challenging last year was for all of us. Therefore, you'll be happy to know with the new year comes a fresh, new set of objectives. Let me go on the record and say that these objectives are not only ACHEIVABLE, but I must say even EXCEED-ABLE. And, I believe it is certainly exceed-able for those of you who get fired up and accomplish all three of your 1S goals.

Are you fired up and ready now?

I certainly hope so. I look forward to hearing about all your tremendous accomplishments in 2002. 'Til next time guys, stay tuned, stay focused, stay fired up, and most of all–stay the BEST!

2

Confidential - Subject To Protective Order

MRK-H.10STM001216

MVX for VIOXX®
Field Sales—USHH
Jo Jerman
March 26, 2002
"Post-Marketing Adverse Events: "Aseptic Meningitis Associated with Rofecoxib""

Jo Jerman here with a voicemail going out over the airwaves to all Representatives with responsibility for VIOXX. Hope you all had a relaxing weekend. Please listen up for a second because I've got some breaking news that I want to make sure you're aware of as you go into your offices over the next few days.

A report was published in the March 25 issue of *Archives of Internal Medicine*. Some of you may have heard about this report from your customers or various news outlets today. It reports five serious cases of aseptic meningitis were "associated with Vioxx® use." The report is based on information collected through the agency's Spontaneous Reporting System, intended to routinely monitor post-marketing adverse events in patients taking prescription medicines.

The lead author also notes that other nonsteroidal anti-inflammatory drugs, including ibuprofen and naproxen have been linked in rare cases to meningitis. The author concluded that "as with other NSAIDS Vioxx® should be considered in the differential diagnosis of aseptic meningitis in patients with or without rheumatological disease.

It is important to keep in mind the following things. First, patient safety is of paramount concern to Merck. We are vigilant in reporting adverse events we receive for all our products to regulatory authorities, including the FDA. Second, aseptic meningitis has been listed as a rare post-marketing adverse event regardless of causality in our current prescribing information for Vioxx since April 2000.

Now, for your background, aseptic meningitis is defined as inflammation of the brain and spinal cord. It is not caused by bacteria.

OK. Now that you understand the issue a little better, what should you do?

Confidential - Subject To Protective Order

MRK-H.10STM001217

First, download Bulletin COX02-019. This bulletin will provide you with further direction on how to answer customer inquires about media reports and the journal article. Do not deviate from the obstacles responses provided to you in this bulletin or bring up the issue proactively. It is of paramount importance to keep your focus on your strong efficacy messages and pulling through VIP and responding to non-GI obstacles effectively

That's all for now guys. Time to continue on with your day. Don't forget to log on line as soon as you get home to pull off Bulletin COX02-019. Thanks for your quick action and as always, thank you for being the absolute BEST!

2

Confidential - Subject To Protective Order

MRK-SMPFA0023372

Confidential - Subject To Protective Order

Shared Vioxx information and samples. Dr had attended a Pfizer program the day before. Damage control may be needed. Lunch & learn with this office on all specialty products. Information was well received and there was some questions on Vioxx. Lunch & learn(Central Std Time). Physicians were detailed briefly on Vioxx and [Redacted-OP] (given stethoscopes), [Redacted-OP], gave an invitation to Sebba program

MRK-MPF0589605

Confidential - Subject To Protective Order

Program Notes

this program is being used as a test for FDA Reporting.....gat 6/8/99

11/8/99 per ccr, program canceled....teb    9/28/99 - per rep, date changed from 9/14 to 10/19.  New CCRF sent.  pjw    Honorarium to be $1000 only

Per CCRF, program cancelled...gat 11/12/99    11/1 - per rep, date chg from 11/18 to 12/16  jmw.

Program Notes

05/18/01 check C5849945 for [black box] returned by postal service for incorrect address.  Per office, correct address is [black box]

Program Notes

Program Notes

MRK-MPF0589609

Confidential - Subject To Protective Order

| Last Contract Date | Honoraria - Vendor | Honorarium | Incidental Expense - Vendor | Sum: |
|---|---|---|---|---|
| 11/10/1999 | $0 | $250.00 | $0 | $250.00 |
| 11/10/1999 | $1,000.00 | $0 | $100.00 | $1,100.00 |
| 11/10/1999 | $200.00 | $0 | $0.00 | $200.00 |
| 11/10/1999 | $1,000.00 | $0 | $100.00 | $1,100.00 |
| 11/10/1999 | $1,000.00 | $0 | $100.00 | $1,100.00 |

Last Contract Date Honorarium Sum: $100.00 $100.00

Miscellaneous Sum: $100.00 $100.00 $300.00 $3,750.00

MRK-SMPA0023370

Confidential - Subject To Protective Order

Note_Text
Lunch. Covered [Redacted-OP]. Vioxx.
Invite to FLA program, and Gary Evans on the 21st.
Show cost advantage with coupons.

Has seen problems with hypertension/renal creatine levels rising with 25mg VX; provided with Merck info and sent PIR on the issues.   Follow-up.

Has seen some problems with hypertension/renal creatine levels rising with 25mg VX, provided with Merck info and sent PIR on the issues.   Follow-up.
L&L.
14 people (nurses, staff, rep)
Introduce myself. [Redacted-OP]
MD hasn't heard any feed back from patients regarding vioxx. [Redacted-OP]
v - oxlcodone data, safety in the elderly. safety in the elderly, GI safety   [Redacted-OP]
Percocet data, Tripple power. [Redacted-OP].
Vioxx label. [Redacted-OP].
Vigor Trial. [Redacted-OP].
Saftey and efficacy of the 12.5mg.
Blunting Bextra. [Redacted-OP]
Says he has put several patients on Vioxx but no feedback yet.
Lunch. Vioxx new label changes.
Vioxx 12.5.
Vioxx vs Bextra.
[Redacted-OP] Vioxx- success stories
[Redacted-OP]Vioxx- MD stated that he preferred vioxxover C and hasn't used any Celebrex in a while
[Redacted-OP]: efficacy Vioxx- efficacy over C and price over branded NSAIDS [Redacted-OP]
[Redacted-OP]Vioxx- efficacy over C and price over branded NSAIDS [Redacted-OP]
[Redacted-OP]: efficacy Vioxx- efficacy over C and price over branded NSAIDS [Redacted-OP]
Vioxx- GI outcome date [Redacted-OP]
Vioxx- GI outcome date [Redacted-OP]
[Redacted-OP] Vioxx - positive dose response and QD simplicity [Redacted-OP]
[Redacted-OP] Vioxx - positive dose response and QD simplicity [Redacted-OP]
[Redacted-OP] Vioxx- new data
Discussed the new additions to the Vioxx P.I.
[Redacted-OP] discussed PAP program
Signed up MD on efficacy program

Confidential - Subject to Protective Order

| Address | City | State | Zip | Name |
|---|---|---|---|---|
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY | AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | HARPER |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY | AL | 35010 | HENDERSON |
| 3368 HWY 280 | ALEXANDER CITY | AL | 35010 | HENDERSON |
| 3368 HWY 280 | ALEXANDER CITY | AL | 35010 | HENDERSON |
| 3368 HWY 280 | ALEXANDER CITY | AL | 35010 | SIMPSON |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY | AL | 35010 | SIMPSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | HENDERSON |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY | AL | 35010 | HENDERSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BARTLETT |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BARTLETT |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY | AL | 35010 | SPARKMAN |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | BAUER |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | SIMPSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY | AL | 35010 | SIMPSON |
| 3368 HWY 280 | ALEXANDER CITY | AL | 35010 | KINDT |
| 3368 HWY 280 | ALEXANDER CITY | AL | 35010 | KINDT |
| 3368 HWY 280 | ALEXANDER CITY | AL | 35010 | LOVETT |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY | AL | 35010 | LOVETT |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY | AL | 35010 | PHARR |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY | AL | 35010 | LOVETT |
| | ALEXANDER CITY | AL | 35010 | LOVETT |
| | ALEXANDER CITY | AL | 35010 | BAUER |
| | ALEXANDER CITY | AL | 35010 | BAUER |

NBR MPF05894956

MDL MDL0589520
Confidential - Subject To Protective Order

| | |
|---|---|
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL 35010 PATIL |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL 35010 PATIL |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL 35010 ISIMINGER |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL 35010 ISIMINGER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 PHARR |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 PHARR |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 LOVETT |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 PHARR |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 PHARR |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 MCCLUNEY |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL 35010 MCCLUNEY |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL 35010 MCCLUNEY |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HENDERSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HENDERSON |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 SIMPSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 SIMPSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 SIMPSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 MITCHAM |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 SPARKMAN |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 SPARKMAN |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 PATIL |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 SIMPSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 SIMPSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 SIMPSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 PATIL |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 LOVETT |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 MCCLUNEY |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL 35010 HARPER |

Confidential - Subject To Protective Order

MDL MRK-05889521

| First | Init. | Last | ID 1 | ID 2 | Date | VIOXX | Code |
|---|---|---|---|---|---|---|---|
| PRACHI | K | | 10146724 | 408051470 | 8/5/2004 | 6908 VIOXX 25 MG (1 X 20) | P7134 |
| PRACHI | K | | 10146724 | 408051470 | 8/5/2004 | 7269 VIOXX 50 MG (1 X 20) | P7131 |
| THERESA | P | | 10147283 | 308060128 | 8/6/2003 | 6897 VIOXX 12.5 MG (1 X 20) | N8064 |
| THERESA | P | | 10147283 | 308060128 | 8/6/2003 | 6908 VIOXX 25 MG (1 X 20) | N7558 |
| JERRY | T. | | 10123342 | 45648 | 8/7/2002 | 6314 VIOXX 50 MG (1 X 2) | M6644 |
| LORI | T. | | 10093831 | 20886 | 8/9/2002 | 6105 VIOXX 25 MG (1 X 4) | |
| JERRY | P | | 10123442 | 20267 | 8/9/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L4416 |
| JERRY | P | | 10123442 | 20267 | 8/9/2001 | 6105 VIOXX 25 MG (1 X 4) | L4501 |
| CORAL | F. | | 10123342 | 22015 | 8/11/2000 | 6127 VIOXX 25 MG (1 X 30) | |
| CORAL | F. | | 10123342 | 22015 | 8/11/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 22015 | 8/11/2000 | 6314 VIOXX 50 MG (1 X 20) | |
| EILEEN | S | | 10027774 | 408111459 | 8/11/2004 | 7269 VIOXX 50 MG (1 X 20) | P7111 |
| EILEEN | S | | 10027774 | 408111459 | 8/11/2004 | 6908 VIOXX 25 MG (1 X 20) | P7070 |
| EILEEN | S | | 10027774 | 408111459 | 8/11/2004 | 7266 VIOXX 12.5 MG (1 X 20) | P7130 |
| CORAL | F. | | 10027172 | 22015 | 8/11/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | | 10027774 | 20614 | 8/12/1999 | 6094 VIOXX 12.5 MG (1 X 4) | J8057 |
| CORAL | F. | | 10027172 | 20614 | 8/12/1999 | 6105 VIOXX 25 MG (1 X 4) | J8051 |
| CHARLES | NMN | | 10119078 | 306120502 | 8/12/2003 | 6897 VIOXX 12.5 MG (1 X 20) | N7787 |
| CHARLES | NMN | | 10119078 | 306120502 | 8/12/2003 | 6908 VIOXX 25 MG (1 X 20) | N7562 |
| CORAL | F. | | 10027172 | 20337 | 8/13/2001 | 6105 VIOXX 25 MG (1 X 20) | L4501 |
| CORAL | F. | | 10027172 | 20337 | 8/13/2001 | 6094 VIOXX 12.5 MG (1 X 20) | L4467 |
| SLOAN | F. | | 10027172 | 46070 | 8/13/2002 | 6776 VIOXX 12.5 MG (1 X 2) | M6604 |
| SLOAN | REED | | 10085299 | 45284 | 8/13/2002 | 6094 VIOXX 12.5 MG (1 X 4) | L4501 |
| CORAL | F. | | 10027172 | 46070 | 8/13/2002 | 6787 VIOXX 25 MG (1 X 2) | M6618 |
| CORAL | F. | | 10027172 | 46070 | 8/13/2002 | 6787 VIOXX 25 MG (1 X 2) | M6649 |
| CORAL | | | 10027172 | 46070 | 8/13/2002 | 6908 VIOXX 25 MG (1 X 2) | M6636 |
| SLOAN | REED | | 10085299 | 45284 | 8/13/2002 | 6589 VIOXX 50 MG (1 X 2) | M6644 |
| HENRY | C | | 10049333 | 20752 | 8/17/1999 | 6105 VIOXX 25 MG (1 X 4) | |
| DAVID | D | | 10079811 | 20339 | 8/18/1999 | 6094 VIOXX 12.5 MG (1 X 4) | |
| DAVID | D | | 10079811 | 20339 | 8/18/1999 | 6105 VIOXX 25 MG (1 X 4) | |
| PRACHI | | | 10146724 | 408191534 | 8/19/2004 | 7117 VIOXX 25 MG (1 X 20) | P7076 |
| SLOAN | REED | | 10085299 | 308200208 | 8/20/2003 | 6908 VIOXX 25 MG (1 X 20) | N7566 |
| SLOAN | REED | | 10085299 | 308200208 | 8/20/2003 | 6600 VIOXX 25 MG (1 X 30) | N2433 |
| SLOAN | REED | | 10085299 | 308200208 | 8/20/2003 | 6919 VIOXX 50 MG (1 X 20) | N7559 |
| LORI | | | 10093831 | 22303 | 8/21/2001 | 6105 VIOXX 25 MG (1 X 4) | L4501 |
| EILEEN | S | | 10027774 | 408241518 | 8/24/2004 | 7128 VIOXX 50 MG (1 X 20) | P7088 |
| CORAL | F. | | 10027172 | 23440 | 8/28/2001 | 6105 VIOXX 25 MG (1 X 4) | L4501 |

MRK-MDPF0589496

Confidential: Subject to Protective Order

| Name | Init | Vendor | Acct | ID | Date | Product | Code |
|---|---|---|---|---|---|---|---|
| MELISSA | SANTIAGO | | 10065256 | 45228 | 2/1/2002 | 6094 VIOXX 12.5 MG (1 X 4) | L4468 |
| MELISSA | SANTIAGO | | 10065256 | 45228 | 2/1/2002 | 6578 VIOXX 25 MG (1 X 4) | L7793 |
| MELISSA | SANTIAGO | | 10065256 | 45228 | 2/1/2002 | 6589 VIOXX 50 MG (1 X 2) | L4561 |
| MELISSA | SANTIAGO | | 10065256 | 402040788 | 2/4/2004 | 6897 VIOXX 12.5 MG (1 X 20) | N7135 |
| MELISSA | SANTIAGO | | 10065256 | 402040788 | 2/4/2004 | 6908 VIOXX 25 MG (1 X 20) | N7137 |
| MELISSA | SANTIAGO | | 10065256 | 402040788 | 2/4/2004 | 6919 VIOXX 50 MG (1 X 20) | N7139 |
| CORAL | F. | | 10027172 | 21234 | 2/8/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 45329 | 2/8/2002 | 6578 VIOXX 25 MG (1 X 20) | L7793 |
| MELISSA | SANTIAGO | | 10065256 | 402110827 | 2/11/2004 | 6908 VIOXX 25 MG (1 X 20) | N7137 |
| CHARLES | NNN | | 10119078 | 45221 | 2/12/2002 | 6578 VIOXX 25 MG (1 X 4) | L7793 |
| CHARLES | NNN | | 10119078 | 45221 | 2/12/2002 | 6094 VIOXX 12.5 MG (1 X 4) | L4468 |
| SLOAN | REED | | 10085299 | 45091 | 2/13/2002 | 6116 VIOXX 12.5 MG (1 X 30) | L3122 |
| SLOAN | REED | | 10085299 | 45091 | 2/13/2002 | 6127 VIOXX 25 MG (1 X 30) | L2982 |
| CHARLES | NNN | | 10119078 | 46267 | 2/13/2003 | 6776 VIOXX 25 MG (1 X 2) | M6181 |
| SCOTT | WILSON | | 10107292 | 45264 | 2/14/2002 | 6578 VIOXX 25 MG (1 X 4) | L7793 |
| SCOTT | WILSON | | 10107292 | 45264 | 2/14/2002 | 6589 VIOXX 50 MG (1 X 2) | L4561 |
| MELISSA | SANTIAGO | | 10065256 | 46378 | 2/14/2003 | 6776 VIOXX 25 MG (1 X 2) | M6181 |
| MELISSA | SANTIAGO | | 10065256 | 46378 | 2/14/2003 | 6787 VIOXX 25 MG (1 X 2) | M6374 |
| DSI | | VNDR1006 | 1669275 | 2/15/2003 | 7084 VIOXX 12.5 MG (1 X 1) | N0508 |
| DSI | | VNDR1006 | 1669275 | 2/15/2003 | 7095 VIOXX 25 MG (1 X 1) | N0505 |
| DAVID | D | | 10079811 | 22163 | 2/16/2001 | 6105 VIOXX 25 MG (1 X 4) | K6723 |
| MELISSA | SANTIAGO | | 10065256 | 45280 | 2/20/2002 | 6116 VIOXX 12.5 MG (1 X 30) | L3148 |
| MELISSA | SANTIAGO | | 10065256 | 45280 | 2/20/2002 | 6600 VIOXX 25 MG (1 X 30) | L3106 |
| CORAL | F. | | 10027172 | 21370 | 2/24/2000 | 6094 VIOXX 12.5 MG (1 X 4) | |
| SLOAN | REED | | 10085299 | 302250007 | 2/25/2003 | 6787 VIOXX 25 MG (1 X 2) | N7815 |
| SLOAN | REED | | 10085299 | 302250007 | 2/25/2003 | 6600 VIOXX 25 MG (1 X 30) | M2337 |
| MICHAEL | T | | 10112643 | 20048 | 2/28/2001 | 6105 VIOXX 25 MG (1 X 4) | |
| MICHAEL | T | | 10112643 | 20048 | 2/28/2001 | 6105 VIOXX 25 MG (1 X 4) | 146691 |
| LORI | T. | | 10093831 | 20048 | 3/1/2000 | 6094 VIOXX 12.5 MG (1 X 4) | 46729 |
| LORI | T. | | 10093831 | 20348 | 3/1/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| JERRY | P. | | 10123342 | 45163 | 3/2/2001 | 6105 VIOXX 25 MG (1 X 4) | L4573 |
| LORI | T. | | 10093831 | 21668 | 3/2/2001 | 6105 VIOXX 50 MG (1 X 2) | K6711 |
| LORI | T. | | 10093831 | 20807 | 3/3/2001 | 6314 VIOXX 25 MG (1 X 4) | K7413 |
| MELISSA | SANTIAGO | | 10065256 | 1683532 | 3/10/2000 | 7084 VIOXX 12.5 MG (1 X 1) | N0507 |

Confidential Subject To Protective Order
NBK MDL0589530

| Address | City/State | ZIP | Name |
|---|---|---|---|
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL | 35010 | MORLEY |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL | 35010 | MORLEY |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | SIMPSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | SIMPSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL | 35010 | MITCHAM |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | PHARR |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3355 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HENDERSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | BARTLETT |
| 3368 HIGHWAY 280 STE 108 | ALEXANDER CITY AL | 35010 | BARTLETT |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | BAUER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | BAUER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HENDERSON |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HWY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HWY 280 | ALEXANDER CITY AL | 35010 | SIMPSON |
| 3368 HWY 280 | ALEXANDER CITY AL | 35010 | HARPER |
| 3368 HWY 280 | ALEXANDER CITY AL | 35010 | BAUER |
| 3368 HWY 280 | ALEXANDER CITY AL | 35010 | BAUER |
| 3368 HIGHWAY 280 | ALEXANDER CITY AL | 35010 | HENDERSON |
| | ALEXANDER CITY AL | 35010 | HARPER |
| | ALEXANDER CITY AL | 35010 | WU |
| | ALEXANDER CITY AL | 35010 | WU |
| | ALEXANDER CITY AL | 35010 | WU |
| | ALEXANDER CITY AL | 35010 | BAUER |
| | ALEXANDER CITY AL | 35010 | HARPER |
| | ALEXANDER CITY AL | 35010 | PHARR |

Confidential - Subject to Protective Order

MRK-AFE0589631

| First | Name | MI | ID1 | ID2 | Date | Product | Code |
|---|---|---|---|---|---|---|---|
| DANIEL | MICHAEL | | 10153969 | 409230109 | 9/23/2004 | 6908 VIOXX 25 MG (1 X 20) | P7050 |
| DANIEL | MICHAEL | | 10153969 | 409230109 | 9/23/2004 | 7269 VIOXX 50 MG (1 X 20) | P6995 |
| SLOAN | REED | | 10085299 | 45319 | 9/25/2002 | 6776 VIOXX 12.5 MG (1 X 2) | M6639 |
| SLOAN | REED | | 10085299 | 45319 | 9/25/2002 | 6787 VIOXX 25 MG (1 X 2) | M6256 |
| SLOAN | REED | | 10085299 | 45319 | 9/25/2002 | 6589 VIOXX 50 MG (1 X 2) | M6648 |
| SLOAN | REED | F. | 10027172 | 23551 | 9/26/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L4518 |
| CORAL | F. | | 10027172 | 23551 | 9/26/2001 | 6105 VIOXX 25 MG (1 X 4) | L4524 |
| CORAL | F. | | 10027172 | 23551 | 9/26/2001 | 6314 VIOXX 50 MG (1 X 2) | L4469 |
| CORAL | F. | | 10027172 | 46288 | 9/26/2002 | 6776 VIOXX 12.5 MG (1 X 2) | M6254 |
| CORAL | F. | | 10027172 | 23551 | 9/26/2001 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 46288 | 9/26/2002 | 6787 VIOXX 25 MG (1 X 2) | M6273 |
| JERRY | P | | 10123342 | 20118 | 10/2/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L4518 |
| JERRY | P | | 10043933 | 20201 | 10/2/1999 | 6105 VIOXX 25 MG (1 X 4) | L4524 |
| HENRY | C | | 10123342 | 20118 | 10/2/2001 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 22206 | 10/6/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 22206 | 10/6/2000 | 6314 VIOXX 50 MG (1 X 2) | |
| MELISSA | SANTIAGO | | 10065256 | 20309 | 10/7/1999 | 6105 VIOXX 25 MG (1 X 4) | M6175 |
| MELISSA | SANTIAGO | | 10065256 | 20309 | 10/7/1999 | 6787 VIOXX 25 MG (1 X 2) | M6206 |
| SCOTT | WILSON | | 10107292 | 45985 | 10/9/2002 | 6589 VIOXX 50 MG (1 X 2) | N7575 |
| SCOTT | WILSON | | 10107292 | 45985 | 10/9/2002 | 6908 VIOXX 25 MG (1 X 20) | L4559 |
| SCOTT | NMN | | 10109435 | 310090435 | 10/9/2003 | 6589 VIOXX 50 MG (1 X 2) | M6261 |
| SCOTT | NMN | | 10107292 | 45985 | 10/9/2002 | 6314 VIOXX 50 MG (1 X 2) | M6175 |
| CHARLES | NMN | | 10119078 | 20480 | 10/12/2001 | 6105 VIOXX 25 MG (1 X 20) | M6019 |
| CHARLES | F. | | 10027172 | 46359 | 10/14/2002 | 6776 VIOXX 12.5 MG (1 X 2) | L4124 |
| CORAL | F. | | 10027172 | 46359 | 10/14/2002 | 6787 VIOXX 25 MG (1 X 2) | N7575 |
| CORAL | F. | | 10027172 | 46359 | 10/14/2002 | 6105 VIOXX 25 MG (1 X 4) | M6261 |
| CORAL | | | 10027172 | 46359 | 10/14/2002 | 6589 VIOXX 50 MG (1 X 2) | M6175 |
| SLOAN | REED | | 10085299 | 21983 | 10/17/2001 | 6787 VIOXX 25 MG (1 X 2) | M6019 |
| CORAL | F. | | 10027172 | 310170751 | 10/17/2003 | 6105 VIOXX 50 MG (1 X 2) | M6261 |
| CORAL | F. | | 10027172 | 45838 | 10/23/2002 | 6776 VIOXX 25 MG (1 X 4) | M6175 |
| CHARLES | NMN | | 10119078 | 45838 | 10/23/2002 | 6105 VIOXX 25 MG (1 X 20) | |
| CHARLES | NMN | | 10065256 | 20362 | 10/25/1999 | 6908 VIOXX 25 MG (1 X 20) | |
| MELISSA | SANTIAGO | | 10065256 | 20362 | 10/25/1999 | 6776 VIOXX 12.5 MG (1 X 2) | |
| MELISSA | SANTIAGO | F. | 10027172 | 23680 | 10/25/1999 | 6787 VIOXX 25 MG (1 X 2) | L4559 |
| CORAL | | | 10027172 | 20669 | 10/25/1999 | 6116 VIOXX 12.5 MG (1 X 30) | |
| YING | | | 10080454 | 20669 | 10/28/1999 | 6127 VIOXX 25 MG (1 X 30) | |
| YING | | | 10080454 | 20669 | 10/28/1999 | 6094 VIOXX 25 MG (1 X 4) | |
| YING | | | 10080454 | 45010 | 10/28/1999 | 6127 VIOXX 25 MG (1 X 30) | |
| JERRY | P | | 10123342 | | 11/2/2001 | 6105 VIOXX 25 MG (1 X 4) | L4559 |
| | | | | | | 6578 VIOXX 25 MG (1 X 4) | |

Confidential Subject to Protective Order

MRK MDF0589545

| Address | City | State | Zip | Name |
|---|---|---|---|---|
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| 83745 HWY9 | ASHLAND | AL | 36251 | PHARR |
| HWY9 | ASHLAND | AL | 36251 | PHARR |
| HWY9 | ASHLAND | AL | 36251 | BAUER |
| HWY9 | ASHLAND | AL | 36251 | LOVETT |
| HWY9 | ASHLAND | AL | 36251 | LOVETT |
| HWY9 | ASHLAND | AL | 36251 | LOVETT |
| HWY9 | ASHLAND | AL | 36251 | LOVETT |
| 83745 HWY9 | ASHLAND | AL | 36251 | BARTLETT |
| HWY9 | ASHLAND | AL | 36251 | BAUER |
| HWY9 | ASHLAND | AL | 36251 | PHARR |
| HWY9 | ASHLAND | AL | 36251 | LOVETT |
| HWY9 | ASHLAND | AL | 36251 | LOVETT |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | SPARKMAN |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | HOUSTON |
| HWY9 | ASHLAND | AL | 36251 | BAUER |
| HWY9 | ASHLAND | AL | 36251 | BARTLETT |
| HWY9 | ASHLAND | AL | 36251 | BARTLETT |
| HWY9 | ASHLAND | AL | 36251 | BARTLETT |
| HWY9 | ASHLAND | AL | 36251 | HOLMES |
| HWY9 | ASHLAND | AL | 36251 | SPARKMAN |
| HWY9 | ASHLAND | AL | 36251 | SPARKMAN |
| HWY9 | ASHLAND | AL | 36251 | HENDERSON |
| HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | SPARKMAN |
| HWY9 | ASHLAND | AL | 36251 | SPARKMAN |
| HWY9 | ASHLAND | AL | 36251 | MITCHAM |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |

Confidential - Subject to Protective Order

| Street | City | State | Zip | Name |
|---|---|---|---|---|
| HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | LOVETT |
| HWY9 | ASHLAND | AL | 36251 | LOVETT |
| 83745 HWY9 | ASHLAND | AL | 36251 | MITCHAM |
| 83745 HWY9 | ASHLAND | AL | 36251 | MITCHAM |
| 400 E 10TH ST | ANNISTON | AL | 36207 | DELK |
| 400 E 10TH ST | ANNISTON | AL | 36207 | DELK |
| 400 E 10TH ST | ANNISTON | AL | 36207 | DELK |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | LOVETT |
| HWY9 | ASHLAND | AL | 36251 | MITCHAM |
| HWY9 | ASHLAND | AL | 36251 | SPARKMAN |
| HWY9 | ASHLAND | AL | 36251 | MITCHAM |
| 83745 HWY9 | ASHLAND | AL | 36251 | HOLMES |
| 83745 HWY9 | ASHLAND | AL | 36251 | HOLMES |
| HWY9 | ASHLAND | AL | 36251 | BAUER |
| HWY9 | ASHLAND | AL | 36251 | BARTLETT |
| HWY9 | ASHLAND | AL | 36251 | SPARKMAN |
| HWY9 | ASHLAND | AL | 36251 | MITCHAM |
| HWY9 | ASHLAND | AL | 36251 | SPARKMAN |
| HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | HARPER |
| 83745 HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | HARPER |
| HWY9 | ASHLAND | AL | 36251 | HARPER |
| 83745 HWY9 | ASHLAND | AL | 36251 | HOLMES |

Confidential - Subject To Protective Order

MRK-MPE0589556

| Name | Initial | ID | Ref | Date | Description | Code |
|---|---|---|---|---|---|---|
| CORAL | F. | 10027172 | 21697 | 5/17/2000 | 8105 VIOXX 25 MG (1 X 4) | |
| LORI | T. | 10093831 | 20611 | 5/22/2000 | 6094 VIOXX 12.5 MG (1 X 4) | |
| LORI | T. | 10093831 | 20611 | 5/22/2000 | 6105 VIOXX 25 MG (1 X 20) | |
| HENRY | C. | 10043933 | 306050090 | 6/5/2003 | 8897 VIOXX 12.5 MG (1 X 20) | |
| HENRY | C. | 10043933 | 306050090 | 6/5/2003 | 8908 VIOXX 25 MG (1 X 20) | N7740 |
| JASON | T. | 10118604 | 20337 | 6/6/2001 | 6094 VIOXX 12.5 MG (1 X 4) | N7747 |
| JASON | T. | 10118604 | 20337 | 6/6/2001 | 8105 VIOXX 25 MG (1 X 4) | 84418 |
| JASON | T. | 10118604 | 20337 | 6/6/2001 | 8314 VIOXX 50 MG (1 X 2) | 84089 |
| CORAL | F. | 10027172 | 306060287 | 6/6/2003 | 8897 VIOXX 12.5 MG (1 X 20) | 84451 |
| CORAL | F. | 10027172 | 306060287 | 6/6/2003 | 8908 VIOXX 25 MG (1 X 20) | |
| CORAL | F. | 10027172 | 306060287 | 6/6/2003 | 8919 VIOXX 50 MG (1 X 20) | |
| LORI | T. | 10027172 | 22042 | 6/7/2001 | 8116 VIOXX 12.5 MG (1 X 30) | |
| DAVID | D. | 10093831 | 22042 | 6/7/2001 | 6116 VIOXX 12.5 MG (1 X 30) | |
| HENRY | C. | 10093831 | 20626 | 6/8/2000 | 6094 VIOXX 12.5 MG (1 X 4) | |
| DAVID | D. | 10043933 | 21214 | 6/8/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| MELISSA | SANTIAGO | 10065256 | 12083 | 6/10/1999 | 8116 VIOXX 12.5 MG (1 X 30) | J4501 |
| KATHERINE | H. | 10149124 | 406111078 | 6/11/2004 | 6908 VIOXX 25 MG (1 X 20) | P7096 |
| KATHERINE | H. | 10149124 | 406111078 | 6/11/2004 | 7269 VIOXX 50 MG (1 X 20) | P7311 |
| SCOTT | WILSON | 10107292 | 20949 | 6/12/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L44L1 |
| DAVID | WILSON | 10107292 | 20949 | 6/12/2001 | 6105 VIOXX 25 MG (1 X 20) | L4O94 |
| DAVID | D. | 10079811 | 22522 | 6/15/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L44S1 |
| HENRY | C. | 10079811 | 21409 | 6/21/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L4412 |
| HENRY | C. | 10043933 | 21409 | 6/21/2001 | 6105 VIOXX 25 MG (1 X 4) | L4094 |
| DAVID | D. | 10079811 | 21239 | 6/22/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| MELISSA | SANTIAGO | 10065256 | 21216 | 6/22/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | 10027172 | 306230337 | 6/23/2003 | 6897 VIOXX 12.5 MG (1 X 20) | N7741 |
| CORAL | F. | 10027172 | 306230337 | 6/23/2003 | 6908 VIOXX 25 MG (1 X 20) | N7765 |
| CORAL | F. | 10027172 | 306230337 | 6/23/2003 | 6919 VIOXX 50 MG (1 X 20) | N7749 |
| CORAL | F. | 10027172 | 45802 | 6/24/2002 | 6094 VIOXX 12.5 MG (1 X 4) | M6638 |
| CORAL | F. | 10027172 | 45802 | 6/24/2002 | 6589 VIOXX 25 MG (1 X 4) | M6645 |
| CORAL | F. | 10027172 | 45802 | 6/24/2002 | 6578 VIOXX 25 MG (1 X 2) | M6631 |
| CORAL | F. | 10027172 | 20389 | 6/25/1999 | 6094 VIOXX 12.5 MG (1 X 4) | J8024 |
| CORAL | F. | 10027172 | 20389 | 6/25/1999 | 6105 VIOXX 25 MG (1 X 4) | L4454 |
| CORAL | F. | 10027172 | 23228 | 6/25/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L4412 |
| CORAL | F. | 10027172 | 23228 | 6/25/2001 | 6314 VIOXX 50 MG (1 X 2) | L4094 |
| KATHERINE | H. | 10149124 | 406251145 | 6/25/2004 | 6908 VIOXX 25 MG (1 X 20) | P7096 |

MRK-MPF0850027

| LEGAL_ID | Case_Name | Cust_File | Rep | Call_Date | Customer | Note_Type |
|---|---|---|---|---|---|---|
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 5/1/2000 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 6/9/2000 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 8/18/2000 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | HARPER, CORAL | 11/22/2000 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | HARPER, CORAL | 12/1/2000 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | HARPER, CORAL | 1/30/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | HARPER, CORAL | 1/30/2002 | STEWART, JEFF | Program Notes |
| 514924 | May, Michael D. | Jeff L. Stewart | SANTIAGO, MELISSA | 2/19/1999 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | SANTIAGO, MELISSA | 7/20/1999 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 10/25/2001 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 1/18/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 6/24/2002 | STEWART, JEFF | Call Notes |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 8/6/2002 | STEWART, JEFF | Call Notes |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 10/3/2002 | STEWART, JEFF | Call Notes |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 10/21/2002 | STEWART, JEFF | Call Notes |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 6/21/1999 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 4/23/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 6/5/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 6/18/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 1/14/2000 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 2/23/2000 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 4/25/2000 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 4/25/2000 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 5/18/2000 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 6/29/2000 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 9/21/2000 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 9/21/2000 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 1/25/2001 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 10/30/2001 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 4/9/2002 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | BARTLETT, SCOTT | 4/15/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | BARTLETT, SCOTT | 8/20/2002 | STEWART, JEFF | Call Notes |

| | | | | |
|---|---|---|---|---|
| 514924 | STEWART, JEFF | 11/13/2002 SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | STEWART, JEFF | 10/22/2002 SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | STEWART, JEFF | 9/3/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 8/20/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 8/6/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 7/9/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 6/25/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 6/11/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 5/14/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 4/30/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 4/16/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 4/2/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 3/19/2004 HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 1/14/2000 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 9/21/2000 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 6/29/2000 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 4/25/2000 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 2/23/2000 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 10/30/2001 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 9/5/2001 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 7/9/2001 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 6/19/2001 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 5/9/2001 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 4/17/2001 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 3/5/2001 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 1/25/2001 LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 12/5/2003 BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 11/5/2003 BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 10/15/2003 BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 9/3/2003 BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 6/30/2003 BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 6/11/2003 BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 6/11/2003 BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 5/19/2003 BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 11/25/2002 BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |

MPF - Proprietary

Confidential - Subject To Protective Order

MRK-MPF0850032

| | | Date | Name | Name | ID |
|---|---|---|---|---|---|
| STEWART, JEFF | 514924 | 12/1/2003 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| STEWART, JEFF | 514924 | 11/10/2003 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| STEWART, JEFF | 514924 | 10/20/2003 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| STEWART, JEFF | 514924 | 9/10/2003 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| STEWART, JEFF | 514924 | 7/28/2003 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| STEWART, JEFF | 514924 | 4/16/2002 | PHARR, JERRY | PHARR, JERRY | 10122342 |
| STEWART, JEFF | 514924 | 3/19/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| STEWART, JEFF | 514924 | 5/26/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| STEWART, JEFF | 514924 | 4/7/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| STEWART, JEFF | 514924 | 9/20/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| STEWART, JEFF | 514924 | 7/2/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10119078 |
| STEWART, JEFF | 514924 | 1/5/2004 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 12/8/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 11/24/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 10/15/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 8/25/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 8/6/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 6/24/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 1/18/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 10/25/2001 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 7/30/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 7/1/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 4/14/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 1/23/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 12/20/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 11/22/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 10/21/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 514924 | 10/3/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |

MPF - Proprietary

Confidential - Subject To Protective Order

Sheet1

| WIN_NO | EMPLY_CURR_NAME | ADDR | CITY | ST_ZIP | ADDR_EFF_DT | HOME_PHONE |
|---|---|---|---|---|---|---|
| 10149124 | Holmes,Katherine H. | 3132 Woodhaven Drive | Birmingham | AL 35243 | 2/28/2005 | 205-967-1830 |
| 10147283 | Isiminger,Theresa | 1401 Maldonado Dr. | Pensacola Beach | FL 32561 | 4/4/2005 | 850-934-3147 |
| 10143691 | Houston,James | 2236 Summit Place | Birmingham | AL 35243 | 1/1/2003 | 2059687609 |
| 10122342 | PHARR,JERRY P | 2045 Lee Road #137, Lot #22 | Auburn | AL 36832 | 6/14/2001 | 334-821-1525 |
| 10119078 | Henderson III,Charles | 110 Riverside Walk | Sharpsburg | GA 30277 | 5/31/2001 | |
| 10111837 | Mcglothan-walker,Natasha J | 3122 Highland Lakes Road | Birmingham | AL 35242 | 1/19/2005 | 205-408-6906 |
| 10107292 | BARTLETT,SCOTT WILSON | 260 Brookstone Crest | Newnan | GA 30265 | 6/19/2000 | 770-251-8860 |
| 10093831 | Lovett,Lori T | 6 Waverly Circle | Newnan | GA 30263 | 10/31/2000 | 770-683-7883 |
| 10087447 | WALLS,RANDY | 619 Lakewood Dr | Lagrange | GA 30240 | 3/29/1999 | 706-882-4458 |
| 10079811 | Sparkman,David D | 201 Copperplate Lane | Peachtree City | GA 30269 | 2/22/1999 | 770-632-0493 |
| 10065256 | Bauer,Melissa Santiago | 7 Tuckahoe Path | Sharpsburg | GA 30277 | 3/26/2004 | 770-683-4993 |
| 10043933 | Mitcham III,Henry C | 2784 Chipley Highway | Warm Springs | GA 31830 | 11/7/2004 | 706-663-9574 |
| 10027172 | Harper,Coral F | 330 Brookstone Crest | Newnan | GA 30265 | 9/1/1996 | 770-253-5508 |

Confidential - Subject To Protective Order

MRK-MPF0850036

| | | | | | | |
|---|---|---|---|---|---|---|
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45438 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45438 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45438 |
| WOODLAND | AL | 36280 | MITCHAM | HENRY | C | 10043933 | 21592 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 403190627 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21445 |
| WOODLAND | AL | 36280 | HARPER | CORAL | J | 10027172 | 21445 |
| WOODLAND | AL | 36280 | MCGLOTHAN WALKER | NATASHA | J | 10111837 | 403241284 |
| WOODLAND | AL | 36280 | MCGLOTHAN WALKER | NATASHA | H. | 10111837 | 403241284 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | F. | 10149124 | 404020699 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45544 |
| WOODLAND | AL | 36280 | HARPER | CORAL | W. | 10027172 | 45544 |
| WOODLAND | AL | 36280 | HOUSTON | JAMES | J | 10143691 | 404071556 |
| WOODLAND | AL | 36280 | MCGLOTHAN WALKER | NATASHA | | 10111837 | 404071349 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 45502 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21556 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21556 |
| WOODLAND | AL | 36280 | HENDERSON | CHARLES | NMN | 10119078 | 304140006 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45429 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45429 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 404160783 |
| WOODLAND | AL | 36280 | LOVETT | LORI | T. | 10093831 | 21834 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22984 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22984 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 22365 |
| WOODLAND | AL | 36280 | LOVETT | LORI | T. | 10093831 | 20541 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 404300848 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 404300848 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21106 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21106 |
| WOODLAND | AL | 36280 | LOVETT | LORI | T. | 10093831 | 45595 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21933 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 23062 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 405140942 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 405140942 |

Confidential - Subject To Protective Order

MRK-MPF0850044

| | | | | | |
|---|---|---|---|---|---|
| WOODLAND AL | 36280 HARPER | CORAL | F. | 10027172 | 305160234 |
| WOODLAND AL | 36280 HARPER | CORAL | F. | 10027172 | 21701 |
| WOODLAND AL | 36280 HARPER | CORAL | F. | 10027172 | 21701 |
| WOODLAND AL | 36280 BARTLETT | SCOTT | WILSON | 10107292 | 305190093 |
| WOODLAND AL | 36280 BARTLETT | SCOTT | WILSON | 10107292 | 305190093 |
| WOODLAND AL | 36280 HOUSTON | JAMES | W. | 10143691 | 405261797 |
| WOODLAND AL | 36280 SPARKMAN | DAVID | D | 10079811 | 22476 |
| WOODLAND AL | 36280 SPARKMAN | DAVID | D | 10079811 | 22476 |
| WOODLAND AL | 36280 HARPER | CORAL | F. | 10027172 | 45726 |
| WOODLAND AL | 36280 SPARKMAN | DAVID | D | 10079811 | 45678 |
| WOODLAND AL | 36280 SPARKMAN | DAVID | D | 10079811 | 45678 |
| WOODLAND AL | 36280 HARPER | CORAL | F. | 10027172 | 45726 |
| WOODLAND AL | 36280 HARPER | CORAL | F. | 10027172 | 306060289 |
| WOODLAND AL | 36280 HARPER | CORAL | F. | 10027172 | 306060289 |
| WOODLAND AL | 36280 BARTLETT | SCOTT | WILSON | 10107292 | 20931 |
| WOODLAND AL | 36280 BARTLETT | SCOTT | WILSON | 10107292 | 20931 |
| WOODLAND AL | 36280 SPARKMAN | DAVID | D | 10079811 | 21219 |
| WOODLAND AL | 36280 SPARKMAN | DAVID | D | 10079811 | 21219 |
| WOODLAND AL | 36280 SPARKMAN | DAVID | D | 10079811 | 21219 |
| WOODLAND AL | 36280 HOLMES | KATHERINE | H. | 10149124 | 406111082 |
| WOODLAND AL | 36280 HOLMES | KATHERINE | H. | 10149124 | 406111082 |
| WOODLAND AL | 36280 HOLMES | KATHERINE | H. | 10149124 | 406111082 |
| WOODLAND AL | 36280 HARPER | CORAL | F. | 10027172 | 20348 |
| WOODLAND AL | 36280 LOVETT | LORI | T. | 10093831 | 22076 |
| WOODLAND AL | 36280 SPARKMAN | DAVID | D | 10079811 | 20166 |
| WOODLAND AL | 36280 HARPER | CORAL | F. | 10027172 | 21833 |
| WOODLAND AL | 36280 HARPER | CORAL | F. | 10027172 | 21833 |
| WOODLAND AL | 36280 BARTLETT | SCOTT | WILSON | 10107292 | 45668 |
| WOODLAND AL | 36280 BARTLETT | SCOTT | WILSON | 10107292 | 45668 |
| WOODLAND AL | 36280 BARTLETT | SCOTT | WILSON | 10107292 | 45668 |
| WOODLAND AL | 36280 | DSI | | VNDR1006 | 1932867 |
| WOODLAND AL | 36280 | DSI | | VNDR1006 | 1932867 |
| WOODLAND AL | 36280 HOLMES | KATHERINE | H. | 10149124 | 406251146 |
| WOODLAND AL | 36280 BARTLETT | SCOTT | WILSON | 10107292 | 21004 |
| WOODLAND AL | 36280 BARTLETT | SCOTT | WILSON | 10107292 | 21004 |

Confidential - Subject To Protective Order

MRK-MPF0850048

| City | ST | Zip | Last Name | First Name | MI | ID1 | ID2 |
|---|---|---|---|---|---|---|---|
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 306300176 |
| WOODLAND | AL | 36280 | HOUSTON | JAMES | W. | 10143691 | 407021946 |
| WOODLAND | AL | 36280 | LOVETT | LORI | T. | 10093831 | 22151 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 407091218 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 407091218 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45970 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45970 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21923 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21923 |
| WOODLAND | AL | 36280 | MITCHAM | HENRY | C | 10043933 | 20070 |
| WOODLAND | AL | 36280 | MITCHAM | HENRY | C | 10027172 | 20070 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10147283 | 20531 |
| WOODLAND | AL | 36280 | ISIMINGER | THERESA | K | 10147283 | 307280090 |
| WOODLAND | AL | 36280 | ISIMINGER | THERESA | X | 10147283 | 307280090 |
| WOODLAND | AL | 36280 | HENDERSON | CHARLES | K | 10107292 | 307300271 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | NMN | 10119078 | 45768 |
| WOODLAND | AL | 36280 | HENDERSON | CHARLES | NMN | 10119078 | 45648 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 408061309 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 22671 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 22671 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22009 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 23402 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21418 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21418 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45823 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 408201377 |
| WOODLAND | AL | 36280 | MITCHAM | HENRY | C | 10043933 | 20763 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 46489 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 46489 |
| WOODLAND | AL | 36280 | LOVETT | LORI | T. | 10093831 | 22358 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 20715 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 20715 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22116 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22116 |

Confidential - Subject To Protective Order

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22116 |
| WOODLAND | AL | 36280 | ISIMINGER | THERESA | K | 10147283 | 309100218 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 23483 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 23483 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 46248 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 46248 |
| WOODLAND | AL | 36280 | HOUSTON | JAMES | W. | 10143691 | 409202273 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22172 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22172 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22172 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 46139 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21548 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 20807 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 20807 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45964 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45964 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45964 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 46184 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 310100725 |
| WOODLAND | AL | 36280 | HENDERSON | CHARLES | NMN | 10119078 | 310150468 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 310150463 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21608 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21608 |
| WOODLAND | AL | 36280 | HENDERSON | CHARLES | NMN | 10119078 | 45833 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 20892 |
| WOODLAND | AL | 36280 | HENDERSON | CHARLES | NMN | 10119078 | 20515 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 20490 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 20490 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 46064 |
| WOODLAND | AL | 36280 | ISIMINGER | THERESA | K | 10147283 | 311100458 |
| WOODLAND | AL | 36280 | ISIMINGER | THERESA | K | 10147283 | 311100458 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 20996 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 20996 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 46452 |

Confidential - Subject To Protective Order

MRK-MPF0850056

| | | | | |
|---|---|---|---|---|
| 10043933 | MITCHAM, HENRY | 10/6/1999 MITCHAM, HENRY | POWERS, RUNAS | 509364 |
| 10043933 | MITCHAM, HENRY | 8/5/1999 MITCHAM, HENRY | POWERS, RUNAS | 509364 |
| 10043933 | MITCHAM, HENRY | 10/8/2003 MITCHAM, HENRY | SMITH, GEORGE | 509365 |
| 10043933 | MITCHAM, HENRY | 9/16/2003 MITCHAM, HENRY | SMITH, GEORGE | 509365 |
| 10043933 | MITCHAM, HENRY | 8/6/2003 MITCHAM, HENRY | SMITH, GEORGE | 509365 |
| 10043933 | MITCHAM, HENRY | 6/5/2003 MITCHAM, HENRY | SMITH, GEORGE | 509365 |
| 10043933 | MITCHAM, HENRY | 4/22/2003 MITCHAM, HENRY | SMITH, GEORGE | 509365 |
| 10043933 | MITCHAM, HENRY | 7/9/1999 MITCHAM, HENRY | STEWART, JEFF | 509366 |
| 10043933 | MITCHAM, HENRY | 3/29/2001 MITCHAM, HENRY | SMITH, GEORGE | 509365 |
| 10043933 | MITCHAM, HENRY | 1/25/2001 MITCHAM, HENRY | SMITH, GEORGE | 509365 |
| 10153969 | MORLEY, DANIEL | 9/23/2004 MORLEY, DANIEL | POWERS, RUNAS | 509364 |
| 10153969 | MORLEY, DANIEL | 9/9/2004 MORLEY, DANIEL | POWERS, RUNAS | 509364 |
| 10153969 | MORLEY, DANIEL | 8/26/2004 MORLEY, DANIEL | POWERS, RUNAS | 509364 |
| 10147283 | ISIMINGER, THERESA | 2/11/2004 ISIMINGER, THERESA | POWERS, RUNAS | 509364 |
| 10147283 | ISIMINGER, THERESA | 1/20/2004 ISIMINGER, THERESA | POWERS, RUNAS | 509364 |
| 10147283 | ISIMINGER, THERESA | 12/8/2003 ISIMINGER, THERESA | POWERS, RUNAS | 509364 |
| 10147283 | ISIMINGER, THERESA | 11/20/2003 ISIMINGER, THERESA | POWERS, RUNAS | 509364 |
| 10147283 | ISIMINGER, THERESA | 10/8/2003 ISIMINGER, THERESA | POWERS, RUNAS | 509364 |
| 10147283 | ISIMINGER, THERESA | 9/18/2003 ISIMINGER, THERESA | POWERS, RUNAS | 509364 |
| 10147283 | ISIMINGER, THERESA | 8/28/2003 ISIMINGER, THERESA | POWERS, RUNAS | 509364 |
| 10147283 | ISIMINGER, THERESA | 9/30/2003 ISIMINGER, THERESA | SMITH, GEORGE | 509365 |
| 10147283 | ISIMINGER, THERESA | 7/28/2003 ISIMINGER, THERESA | SMITH, GEORGE | 509365 |
| 101122342 | PHARR, JERRY | 6/19/2002 PHARR, JERRY | SMITH, GEORGE | 509365 |
| 101122342 | PHARR, JERRY | 5/8/2002 PHARR, JERRY | SMITH, GEORGE | 509365 |
| 101122342 | PHARR, JERRY | 3/26/2002 PHARR, JERRY | SMITH, GEORGE | 509365 |
| 101122342 | PHARR, JERRY | 3/5/2002 PHARR, JERRY | SMITH, GEORGE | 509365 |
| 101122342 | PHARR, JERRY | 2/12/2002 PHARR, JERRY | SMITH, GEORGE | 509365 |
| 101122342 | PHARR, JERRY | 11/26/2001 PHARR, JERRY | SMITH, GEORGE | 509365 |
| 101122342 | PHARR, JERRY | 10/15/2001 PHARR, JERRY | SMITH, GEORGE | 509365 |
| 101122342 | PHARR, JERRY | 9/21/2001 PHARR, JERRY | SMITH, GEORGE | 509365 |
| 101122342 | PHARR, JERRY | 8/21/2001 PHARR, JERRY | SMITH, GEORGE | 509365 |
| 10080454 | WU, YING | 6/8/1999 WU, YING | POWERS, RUNAS | 509364 |
| 10112643 | KINDT, MICHAEL | 5/11/2001 KINDT, MICHAEL | POWERS, RUNAS | 509364 |
| 10085299 | SIMPSON, SLOAN | 9/10/2003 SIMPSON, SLOAN | POWERS, RUNAS | 509364 |
| 10085299 | SIMPSON, SLOAN | 8/20/2003 SIMPSON, SLOAN | POWERS, RUNAS | 509364 |

REDACTED

Confidential - Subject To Protective Order

MRK-MPF0589436

| 509364 | POWERS, RUNAS | 7/30/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
|---|---|---|---|---|
| 509364 | POWERS, RUNAS | 7/9/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 6/25/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 5/14/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 4/23/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 2/25/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 11/7/2002 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 9/25/2002 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509365 | SMITH, GEORGE | 2/6/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509365 | SMITH, GEORGE | 8/19/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509365 | SMITH, GEORGE | 10/22/2001 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509365 | SMITH, GEORGE | 8/3/2001 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509365 | SMITH, GEORGE | 6/21/2001 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509365 | SMITH, GEORGE | 3/10/2001 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509365 | SMITH, GEORGE | 2/13/2001 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 8/5/2004 PATIL, PRACHI | PATIL, PRACHI | 10146724 |
| 509364 | POWERS, RUNAS | 11/6/2003 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 9/4/2003 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 8/14/2003 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 6/9/2003 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 1/24/2002 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 11/28/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 10/3/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509365 | SMITH, GEORGE | 7/13/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509365 | SMITH, GEORGE | 6/21/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509365 | SMITH, GEORGE | 5/10/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 8/6/2003 ISIMINGER, THERESA | ISIMINGER, THERESA | 101447283 |
| 509364 | POWERS, RUNAS | 10/7/2002 PHARR, JERRY | PHARR, JERRY | 10122342 |
| 509364 | POWERS, RUNAS | 8/7/2002 PHARR, JERRY | PHARR, JERRY | 10122342 |
| 509364 | POWERS, RUNAS | 6/26/2002 PHARR, JERRY | PHARR, JERRY | 10122342 |
| 509364 | POWERS, RUNAS | 4/26/2002 PHARR, JERRY | PHARR, JERRY | 10122342 |
| 509364 | POWERS, RUNAS | 3/13/2002 PHARR, JERRY | PHARR, JERRY | 10122342 |
| 509364 | POWERS, RUNAS | 3/1/2002 PHARR, JERRY | PHARR, JERRY | 10122342 |
| 509364 | POWERS, RUNAS | 11/2/2001 PHARR, JERRY | PHARR, JERRY | 10122342 |
| 509364 | POWERS, RUNAS | 10/2/2001 PHARR, JERRY | PHARR, JERRY | 10122342 |

REDACTED

Confidential - Subject To Protective Order

| | | | | |
|---|---|---|---|---|
| 509364 | POWERS, RUNAS | 9/5/2001 PHARR, JERRY | PHARR, JERRY | 10122342 |
| 509364 | POWERS, RUNAS | 8/9/2001 PHARR, JERRY | PHARR, JERRY | 10122342 |
| 509365 | SMITH, GEORGE | 2/2/2004 ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 509364 | POWERS, RUNAS | 4/24/2001 KINDT, MICHAEL | KINDT, MICHAEL | 10112643 |
| 509364 | POWERS, RUNAS | 2/28/2001 KINDT, MICHAEL | KINDT, MICHAEL | 10112643 |
| 509364 | POWERS, RUNAS | 12/20/2000 KINDT, MICHAEL | KINDT, MICHAEL | 10112643 |
| 509364 | POWERS, RUNAS | 3/24/2000 WU, YING | WU, YING | 10080454 |
| 509364 | POWERS, RUNAS | 11/3/1999 WU, YING | WU, YING | 10080454 |
| 509364 | POWERS, RUNAS | 10/28/1999 WU, YING | WU, YING | 10080454 |
| 509364 | POWERS, RUNAS | 10/11/1999 WU, YING | WU, YING | 10080454 |
| 509364 | POWERS, RUNAS | 8/9/1999 WU, YING | WU, YING | 10080454 |
| 509365 | SMITH, GEORGE | 11/7/2002 DELK, JASON | DELK, JASON | 10118604 |
| 509364 | POWERS, RUNAS | 12/10/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 11/19/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 11/5/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 10/22/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 9/24/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 1/30/2003 SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| 509364 | POWERS, RUNAS | 10/23/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 10/4/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 9/6/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 8/16/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 6/21/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 5/7/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 4/22/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 3/25/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 3/7/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 2/12/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 10/12/2001 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 9/13/2001 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 8/13/2001 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 6/27/2001 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509366 | STEWART, JEFF | 10/21/2001 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509366 | STEWART, JEFF | 10/3/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509365 | SMITH, GEORGE | 1/25/2002 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |

REDACTED

Confidential - Subject To Protective Order

MRK-MPF0589438

| | | | | | |
|---|---|---|---|---|---|
| 10119078 | HENDERSON, CHARLES | 12/21/2001 HENDERSON, CHARLES | SMITH, GEORGE | | 509365 |
| 10119078 | HENDERSON, CHARLES | 12/6/2001 HENDERSON, CHARLES | SMITH, GEORGE | | 509365 |
| 10119078 | HENDERSON, CHARLES | 10/25/2001 HENDERSON, CHARLES | SMITH, GEORGE | | 509365 |
| 10119078 | HENDERSON, CHARLES | 9/24/2001 HENDERSON, CHARLES | SMITH, GEORGE | | 509365 |
| 10119078 | HENDERSON, CHARLES | 8/29/2001 HENDERSON, CHARLES | SMITH, GEORGE | | 509365 |
| 10119078 | HENDERSON, CHARLES | 7/31/2001 HENDERSON, CHARLES | SMITH, GEORGE | | 509365 |
| 10119078 | HENDERSON, CHARLES | 6/29/2001 HENDERSON, CHARLES | SMITH, GEORGE | | 509365 |
| 10119078 | HENDERSON, CHARLES | 6/15/2001 HENDERSON, CHARLES | SMITH, GEORGE | | 509366 |
| 10119078 | HENDERSON, CHARLES | 1/5/2004 HENDERSON, CHARLES | STEWART, JEFF | | 509366 |
| 10119078 | HENDERSON, CHARLES | 12/8/2003 HENDERSON, CHARLES | STEWART, JEFF | | 509366 |
| 10119078 | HENDERSON, CHARLES | 11/24/2003 HENDERSON, CHARLES | STEWART, JEFF | | 509366 |
| 10119078 | HENDERSON, CHARLES | 10/15/2003 HENDERSON, CHARLES | STEWART, JEFF | | 509366 |
| 10119078 | HENDERSON, CHARLES | 8/25/2003 HENDERSON, CHARLES | STEWART, JEFF | | 509365 |
| 10122342 | PHARR, JERRY | 7/11/2001 PHARR, JERRY | SMITH, GEORGE | | 509365 |
| 10122342 | PHARR, JERRY | 7/6/2001 PHARR, JERRY | SMITH, GEORGE | | 509366 |
| 10147283 | ISIMINGER, THERESA | 2/2/2004 ISIMINGER, THERESA | STEWART, JEFF | | 509366 |
| 10143691 | HOUSTON, JAMES | 7/2/2004 HOUSTON, JAMES | SMITH, GEORGE | | 509365 |
| 10143691 | HOUSTON, JAMES | 3/19/2004 HOUSTON, JAMES | STEWART, JEFF | | 509366 |
| 10143691 | HOUSTON, JAMES | 5/26/2004 HOUSTON, JAMES | STEWART, JEFF | | 509366 |
| 10143691 | HOUSTON, JAMES | 4/7/2004 HOUSTON, JAMES | STEWART, JEFF | | 509366 |
| 10143691 | HOUSTON, JAMES | 9/20/2004 HOUSTON, JAMES | STEWART, JEFF | | 509366 |
| 10143691 | HOUSTON, JAMES | 7/2/2004 HOUSTON, JAMES | STEWART, JEFF | | 509366 |
| 10134774 | MELTON, JULIE | 10/8/2003 MELTON, JULIE | SMITH, GEORGE | | 509365 |
| 10134774 | MELTON, JULIE | 6/5/2003 HODGES, JULIE | SMITH, GEORGE | | 509365 |
| 10134774 | MELTON, JULIE | 4/22/2003 HODGES, JULIE | SMITH, GEORGE | | 509365 |
| 10080454 | WU, YING | 6/4/1999 WU, YING | POWERS, RUNAS | | 509364 |
| 10080454 | WU, YING | 8/2/1999 WU, YING | POWERS, RUNAS | | 509364 |
| 10080454 | WU, YING | 7/19/1999 WU, YING | POWERS, RUNAS | | 509364 |
| 10080454 | WU, YING | 7/22/1999 WU, YING | POWERS, RUNAS | | 509364 |
| 10085299 | SIMPSON, SLOAN | 9/4/2002 SIMPSON, SLOAN | POWERS, RUNAS | | 509364 |
| 10085299 | SIMPSON, SLOAN | 8/13/2002 SIMPSON, SLOAN | POWERS, RUNAS | | 509364 |
| 10085299 | SIMPSON, SLOAN | 7/9/2002 SIMPSON, SLOAN | POWERS, RUNAS | | 509364 |
| 10085299 | SIMPSON, SLOAN | 6/19/2002 SIMPSON, SLOAN | POWERS, RUNAS | | 509364 |
| 10085299 | SIMPSON, SLOAN | 5/29/2002 SIMPSON, SLOAN | POWERS, RUNAS | | 509364 |
| 10085299 | SIMPSON, SLOAN | 4/9/2002 SIMPSON, SLOAN | POWERS, RUNAS | | 509364 |

REDACTED

Confidential - Subject To Protective Order

MRK-MPF0589439

| | | | | |
|---|---|---|---|---|
| 509364 | POWERS, RUNAS | 10/3/2003 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 9/10/2003 HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 509364 | POWERS, RUNAS | 6/23/1999 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 6/2/1999 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509365 | SMITH, GEORGE | 1/9/2004 BAUER, MELISSA | BAUER, MELISSA | 10065256 |
| 509365 | SMITH, GEORGE | 12/16/2003 BAUER, MELISSA | BAUER, MELISSA | 10065256 |
| 509365 | SMITH, GEORGE | 6/10/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509365 | SMITH, GEORGE | 3/17/2003 SANTIAGO, MELISSA | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 8/8/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 6/4/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 4/26/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 3/15/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 11/30/2000 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 9/27/2000 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509364 | POWERS, RUNAS | 9/8/2000 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509366 | STEWART, JEFF | 6/22/2000 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509365 | STEWART, JEFF | 7/20/1999 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509366 | SMITH, GEORGE | 6/27/2000 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509365 | STEWART, JEFF | 6/8/2000 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509366 | STEWART, JEFF | 3/17/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509366 | SMITH, GEORGE | 8/23/2000 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509365 | SMITH, GEORGE | 1/30/2000 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509365 | SMITH, GEORGE | 11/27/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509365 | SMITH, GEORGE | 8/24/2001 MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 509365 | SMITH, GEORGE | 1/15/2004 ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 509366 | SMITH, GEORGE | 12/1/2003 ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 509366 | STEWART, JEFF | 11/10/2003 ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 509366 | STEWART, JEFF | 10/20/2003 ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 509366 | STEWART, JEFF | 9/10/2003 ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 509366 | STEWART, JEFF | 7/28/2003 ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 509366 | STEWART, JEFF | 4/16/2002 PHARR, JERRY | PHARR, JERRY | 10122342 |
| 509365 | SMITH, GEORGE | 3/16/2004 HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| 509365 | SMITH, GEORGE | 4/27/2004 HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| 509365 | SMITH, GEORGE | 3/30/2004 HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |

REDACTED

Confidential - Subject To Protective Order

MRK-MPF0589440

| | | | |
|---|---|---|---|
| SMITH, GEORGE | 10/22/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| SMITH, GEORGE | 8/9/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| SMITH, GEORGE | 7/19/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| POWERS, RUNAS | 1/10/2003 | SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| POWERS, RUNAS | 12/18/2002 | SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| POWERS, RUNAS | 11/20/2002 | SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| POWERS, RUNAS | 10/17/2001 | SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| POWERS, RUNAS | 9/19/2001 | SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| POWERS, RUNAS | 3/14/2002 | SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| POWERS, RUNAS | 2/13/2002 | SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| POWERS, RUNAS | 1/22/2002 | SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| POWERS, RUNAS | 12/5/2001 | SIMPSON, SLOAN | SIMPSON, SLOAN | 10085299 |
| POWERS, RUNAS | 6/5/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| POWERS, RUNAS | 3/11/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| POWERS, RUNAS | 2/13/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| POWERS, RUNAS | 1/2/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| POWERS, RUNAS | 12/3/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| POWERS, RUNAS | 6/14/2001 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| SMITH, GEORGE | 12/23/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| SMITH, GEORGE | 9/27/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| SMITH, GEORGE | 9/17/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| SMITH, GEORGE | 7/3/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| SMITH, GEORGE | 3/22/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 6/24/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 1/18/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 10/25/2001 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 7/30/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 7/1/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 4/14/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 1/23/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 12/20/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 11/22/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| STEWART, JEFF | 8/6/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |

| |
|---|
| 509365 |
| 509365 |
| 509365 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509364 |
| 509365 |
| 509365 |
| 509365 |
| 509365 |
| 509365 |
| 509366 |
| 509366 |
| 509366 |
| 509366 |
| 509366 |
| 509366 |
| 509366 |
| 509366 |
| 509366 |
| 509366 |

REDACTED

Confidential - Subject To Protective Order

MRK-MPF0589441

| Address | City | State | ZIP | Name |
|---|---|---|---|---|
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | MITCHAM |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HOLMES |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | MCGLOTHAN WALKER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | MCGLOTHAN WALKER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HOLMES |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HOUSTON |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | MCGLOTHAN WALKER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HENDERSON |

Confidential - Subject To Protective Order

| Address | City | State | ZIP | Name |
|---|---|---|---|---|
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | BARTLETT |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HOLMES |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | LOVETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | LOVETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | LOVETT |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HOLMES |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HOLMES |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | LOVETT |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HARPER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HOLMES |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HOLMES |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | BARTLETT |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | BARTLETT |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | HOUSTON |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | HARPER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 | BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 | SPARKMAN |

Confidential - Subject To Protective Order

| Address | City | State | Code |
|---|---|---|---|
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 SPARKMAN |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 HOLMES |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 HOLMES |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 HOLMES |
| WOODLAND CLINIC | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 LOVETT |
| WOODLAND CLINIC | WOODLAND | AL | 36280 SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 BARTLETT |
| 76 COUNTY RD | WOODLAND | AL | 36280 |
| 76 COUNTY RD | WOODLAND | AL | 36280 |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 HOLMES |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 BARTLETT |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 BARTLETT |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 HOUSTON |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 LOVETT |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 HOLMES |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 HOLMES |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC | WOODLAND | AL | 36280 MITCHAM |
| WOODLAND CLINIC | WOODLAND | AL | 36280 MITCHAM |
| WOODLAND CLINIC | WOODLAND | AL | 36280 HARPER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 ISIMINGER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 ISIMINGER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 ISIMINGER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HENDERSON |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HENDERSON |

Confidential - Subject To Protective Order

| Address | City | State | ZIP / Name |
|---|---|---|---|
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 HOLMES |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 SPARKMAN |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HOLMES |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 MITCHAM |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 BARTLETT |
| WOODLAND CLINIC | WOODLAND | AL | 36280 LOVETT |
| WOODLAND CLINIC | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 78 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 ISIMINGER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| 76 COUNTY ROAD #64; STE 3 WOODLAND RURAL HEALTH CLINIC | WOODLAND | AL | 36280 HOUSTON |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 SPARKMAN |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 SPARKMAN |
| WOODLAND CLINIC | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC | WOODLAND | AL | 36280 HARPER |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 BARTLETT |
| WOODLAND CLINIC; POBOX186 76 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 BARTLETT |
| WOODLAND CLINIC; POBOX186 78 COUNTY ROAD #64; STE 3 | WOODLAND | AL | 36280 BARTLETT |

Confidential - Subject To Protective Order

| | | | | |
|---|---|---|---|---|
| 509366 | STEWART, JEFF | 3/13/2001 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 2/20/2001 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 12/20/2000 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 12/11/2000 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 11/22/2000 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 1/14/2000 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 12/17/1999 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 11/12/1999 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 10/22/1999 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 10/1/1999 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 10/1/1999 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 9/8/1999 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 7/28/1999 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509366 | STEWART, JEFF | 6/15/1999 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509365 | SMITH, GEORGE | 5/4/2004 MCGLOTHAN WALKER, NATASHA | MCGLOTHAN WALKER, NATASHA | 10111837 |
| | STEWART, JEFF | 3/24/2004 MCGLOTHAN WALKER, NATASHA | MCGLOTHAN WALKER, NATASHA | 10111837 |
| REDACTED | POWERS, RUNAS | 6/19/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| | POWERS, RUNAS | 5/8/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| | POWERS, RUNAS | 4/17/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| | POWERS, RUNAS | 3/26/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| | POWERS, RUNAS | 2/14/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| | POWERS, RUNAS | 2/12/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| | POWERS, RUNAS | 12/12/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 9/4/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 7/10/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 6/27/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 6/12/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 5/16/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 4/3/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 10/6/2000 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509364 | POWERS, RUNAS | 9/14/2000 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509364 | POWERS, RUNAS | 8/24/2000 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509364 | POWERS, RUNAS | 8/11/2000 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509364 | POWERS, RUNAS | 7/25/2000 HARPER, CORAL | HARPER, CORAL | 10027172 |
| 509364 | POWERS, RUNAS | 6/28/2000 HARPER, CORAL | HARPER, CORAL | 10027172 |

Confidential - Subject To Protective Order

MRK-MPF0589432

| ID | Name | Date / Name | Name | Number |
|---|---|---|---|---|
| 509366 | STEWART, JEFF | 6/25/2002 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 6/5/2002 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 4/4/2002 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 3/13/2002 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 2/22/2002 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 1/30/2002 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 10/20/2000 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 9/26/2000 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 9/8/2000 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 8/10/2000 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 7/18/2000 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 6/23/2000 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 5/17/2000 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509365 | STEWART, JEFF | 4/10/2000 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 3/20/2000 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 2/2/2000 HARPER, CORAL | HARPER, CORAL | 100271172 |
| 509366 | STEWART, JEFF | 4/7/2004 MCGLOTHAN WALKER, NATASHA | MCGLOTHAN WALKER, NATASHA | 10111837 |
| 509364 | POWERS, RUNAS | 2/11/2004 BAUER, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 2/4/2004 BAUER, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 1/12/2004 BAUER, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 12/22/2003 BAUER, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 11/13/2003 BAUER, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 10/2/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 9/11/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 9/4/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 8/14/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 7/28/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 7/8/2003 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 3/14/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 2/20/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 2/1/2002 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 12/5/2001 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 10/12/2001 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 5/14/2001 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 509364 | POWERS, RUNAS | 2/21/2001 SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |

REDACTED

Confidential - Subject To Protective Order

MRK-MPF0589434

| ID | Name | Date | Name | ID |
|---|---|---|---|---|
| 509364 | POWERS, RUNAS | 8/9/2000 | SPARKMAN, DAVID | 10079811 |
| 509364 | POWERS, RUNAS | 7/19/2000 | SPARKMAN, DAVID | 10079811 |
| 509364 | POWERS, RUNAS | 6/28/2000 | SPARKMAN, DAVID | 10079811 |
| 509364 | POWERS, RUNAS | 4/3/2000 | SPARKMAN, DAVID | 10079811 |
| 509364 | POWERS, RUNAS | 1/31/2000 | SPARKMAN, DAVID | 10079811 |
| 509364 | POWERS, RUNAS | 1/11/2000 | SPARKMAN, DAVID | |
| 509366 | STEWART, JEFF | 9/3/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 8/20/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 8/6/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 7/9/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 6/25/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 6/11/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 5/14/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 4/30/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 4/16/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 4/2/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 3/19/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 9/3/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 8/20/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 8/6/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 7/23/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 7/9/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 6/25/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 6/11/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 5/28/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 5/14/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 4/30/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 4/16/2004 | HOLMES, KATHERINE | 10149124 |
| 509365 | SMITH, GEORGE | 4/2/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 3/19/2004 | HOLMES, KATHERINE | 10149124 |
| 509366 | STEWART, JEFF | 1/14/2000 | LOVETT, LORI | 10093831 |
| 509366 | STEWART, JEFF | 4/25/2000 | LOVETT, LORI | 10093831 |
| 509366 | STEWART, JEFF | 2/23/2000 | LOVETT, LORI | 10093831 |
| 509366 | STEWART, JEFF | 3/5/2001 | LOVETT, LORI | 10093831 |
| | | 1/25/2001 | LOVETT, LORI | 10093831 |

REDACTED

Confidential - Subject To Protective Order

MRK-MPF0589425

| First Name | MI | Date | Drug | Rx No. | Member ID | Code |
|---|---|---|---|---|---|---|
| DAVID | D | 1/21/2000 | 6094 VIOXX 12.5 MG (1 X 4) | 20707 | 10079811 | L4385 |
| CORAL | F. | 1/30/2002 | 6578 VIOXX 25 MG (1 X 4) | 45301 | 10027172 | L7839 |
| CORAL | F. | 1/30/2002 | 6589 VIOXX 50 MG (1 X 2) | 45301 | 10027172 | M6181 |
| CORAL | F. | 1/31/2003 | 6776 VIOXX 12.5 MG (1 X 2) | 46735 | 10027172 | M63374 |
| CORAL | F. | 1/31/2003 | 6787 VIOXX 25 MG (1 X 2) | 46735 | 10027172 | M6181 |
| DAVID | D | 2/2/2000 | 6105 VIOXX 25 MG (1 X 4) | 21214 | 10079811 | M63374 |
| DAVID | D | 2/7/2003 | 6776 VIOXX 12.5 MG (1 X 2) | 46556 | 10079811 | N7137 |
| DAVID | D | 2/7/2003 | 6787 VIOXX 25 MG (1 X 2) | 46556 | 10079811 | L4468 |
| DAVID | D | 2/11/2004 | 6908 VIOXX 25 MG (1 X 20) | 402111085 | 10079811 | L7793 |
| DAVID | D | 2/14/2002 | 6094 VIOXX 12.5 MG (1 X 4) | 45315 | 10079811 | K7357 |
| DAVID | D | 2/14/2002 | 6578 VIOXX 25 MG (1 X 4) | 45315 | 10079811 | K736Z |
| CORAL | F. | 2/20/2001 | 6094 VIOXX 12.5 MG (1 X 4) | 22778 | 10027172 | L7793 |
| CORAL | F. | 2/20/2001 | 6105 VIOXX 25 MG (1 X 4) | 22778 | 10027172 | M6776 |
| CORAL | F. | 2/22/2002 | 6578 VIOXX 25 MG (1 X 4) | 45393 | 10027172 | M6778 |
| SCOTT | WILSON | 3/11/2002 | 6094 VIOXX 12.5 MG (1 X 4) | 45331 | 10107292 | L7795 |
| SCOTT | WILSON | 3/11/2002 | 6578 VIOXX 25 MG (1 X 4) | 45331 | 10107292 | L4468 |
| SCOTT | WILSON | 3/11/2002 | 6589 VIOXX 50 MG (1 X 2) | 45331 | 10107292 | M6778 |
| CORAL | F. | 3/13/2002 | 6094 VIOXX 12.5 MG (1 X 4) | 45438 | 10027172 | L7795 |
| CORAL | F. | 3/13/2002 | 6578 VIOXX 25 MG (1 X 4) | 45438 | 10027172 | L4554 |
| CORAL | F. | 3/13/2002 | 6589 VIOXX 50 MG (1 X 2) | 45438 | 10027172 | P7169 |
| HENRY | C | 3/17/2001 | 6105 VIOXX 25 MG (1 X 4) | 21592 | 10043933 | P7177 |
| KATHERINE | H | 3/19/2004 | 6908 VIOXX 25 MG (1 X 20) | 403190627 | 10149124 | P7169 |
| CORAL | F. | 3/20/2000 | 6094 VIOXX 12.5 MG (1 X 4) | 21445 | 10027172 | P7169 |
| CORAL | F. | 3/20/2000 | 6105 VIOXX 25 MG (1 X 4) | 21445 | 10027172 | M6776 |
| NATASHA | J | 3/24/2004 | 7266 VIOXX 12.5 MG (1 X 20) | 403241284 | 10111837 | P7198 |
| NATASHA | J | 3/24/2004 | 6908 VIOXX 25 MG (1 X 20) | 403241284 | 10111837 | P7169 |
| KATHERINE | H. | 4/2/2004 | 6094 VIOXX 12.5 MG (1 X 4) | 404020699 | 10149124 | M6758 |
| CORAL | F. | 4/4/2002 | 6094 VIOXX 12.5 MG (1 X 4) | 45544 | 10027172 | |
| CORAL | F. | 4/4/2002 | 6578 VIOXX 25 MG (1 X 4) | 45544 | 10027172 | |
| JAMES | W. | 4/7/2004 | 7266 VIOXX 12.5 MG (1 X 20) | 404071556 | 10143691 | |
| NATASHA | J | 4/7/2004 | 6908 VIOXX 25 MG (1 X 20) | 404071349 | 10111837 | |
| DAVID | D | 4/9/2002 | 6578 VIOXX 25 MG (1 X 4) | 45502 | 10079811 | |
| CORAL | F. | 4/10/2000 | 6094 VIOXX 12.5 MG (1 X 4) | 21556 | 10027172 | |
| CORAL | F. | 4/10/2000 | 6105 VIOXX 25 MG (1 X 4) | 21556 | 10027172 | |
| CHARLES | NMN | 4/14/2003 | 6787 VIOXX 25 MG (1 X 2) | 304140006 | 10119078 | N7840 |

Confidential - Subject To Protective Order

| First | Last | Init | ID | Ref | Date | Description | Code |
|---|---|---|---|---|---|---|---|
| SCOTT | WILSON | | 10107292 | 45429 | 4/15/2002 | 6094 VIOXX 12.5 MG (1 X 4) | M6662 |
| SCOTT | WILSON | | 10107292 | 45429 | 4/15/2002 | 6578 VIOXX 25 MG (1 X 4) | M6758 |
| KATHERINE | | H. | 10149124 | 404160783 | 4/16/2004 | 6908 VIOXX 25 MG (1 X 20) | P7155 |
| LORI | | T. | 10093831 | 21834 | 4/17/2001 | 6105 VIOXX 25 MG (1 X 4) | L4009 |
| CORAL | | F. | 10027172 | 22984 | 4/18/2001 | 6094 VIOXX 12.5 MG (1 X 4) | K7410 |
| DAVID | | D. | 10079811 | 22984 | 4/18/2001 | 6105 VIOXX 25 MG (1 X 4) | K6711 |
| LORI | | T. | 10093831 | 22365 | 4/24/2001 | 6314 VIOXX 50 MG (1 X 2) | L4410 |
| KATHERINE | | H. | 10149124 | 20541 | 4/25/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| KATHERINE | | H. | 10149124 | 404300848 | 4/30/2004 | 7266 VIOXX 12.5 MG (1 X 20) | P7130 |
| DAVID | | D. | 10079811 | 404300848 | 4/30/2004 | 6908 VIOXX 25 MG (1 X 20) | P7155 |
| DAVID | | D. | 10079811 | 21106 | 5/1/2000 | 6094 VIOXX 12.5 MG (1 X 4) | |
| DAVID | | D. | 10079811 | 21106 | 5/1/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| LORI | | I. | 10079811 | 45595 | 5/8/2002 | 6578 VIOXX 25 MG (1 X 4) | M6628 |
| CORAL | | F. | 10093831 | 21933 | 5/9/2001 | 6105 VIOXX 25 MG (1 X 4) | L4052 |
| KATHERINE | | H. | 10027172 | 23062 | 5/10/2001 | 6105 VIOXX 25 MG (1 X 4) | L4052 |
| KATHERINE | | H. | 10149124 | 405140942 | 5/14/2004 | 6908 VIOXX 25 MG (1 X 20) | N7134 |
| CORAL | | H. | 10149124 | 405140942 | 5/14/2004 | 7269 VIOXX 50 MG (1 X 20) | P7119 |
| CORAL | | F. | 10027172 | 3051602341 | 5/16/2003 | 6908 VIOXX 25 MG (1 X 20) | N7746 |
| CORAL | | F. | 10027172 | 21701 | 5/17/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | | F. | 10027172 | 21701 | 5/17/2000 | 6314 VIOXX 50 MG (1 X 2) | |
| SCOTT | WILSON | | 10107292 | 305190093 | 5/19/2003 | 6116 VIOXX 12.5 MG (1 X 30) | M2095 |
| SCOTT | WILSON | | 10107292 | 305190093 | 5/19/2003 | 6908 VIOXX 25 MG (1 X 20) | N7746 |
| JAMES | | W. | 10143691 | 405261797 | 5/26/2004 | 6908 VIOXX 25 MG (1 X 20) | P7134 |
| DAVID | | D. | 10079811 | 22476 | 6/4/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L4455 |
| DAVID | | D. | 10079811 | 22476 | 6/4/2001 | 6105 VIOXX 25 MG (1 X 4) | L4D94 |
| CORAL | | F. | 10027172 | 45726 | 6/5/2002 | 6094 VIOXX 12.5 MG (1 X 4) | M6626 |
| DAVID | | D. | 10079811 | 45678 | 6/5/2002 | 6094 VIOXX 12.5 MG (1 X 4) | M6638 |
| DAVID | | D. | 10079811 | 45678 | 6/5/2002 | 6578 VIOXX 25 MG (1 X 4) | M6645 |
| CORAL | | F. | 10027172 | 45726 | 6/5/2002 | 6578 VIOXX 25 MG (1 X 4) | M6645 |
| CORAL | | F. | 10027172 | 306060289 | 6/6/2003 | 6897 VIOXX 12.5 MG (1 X 20) | N7741 |
| CORAL | | F. | 10027172 | 306060289 | 6/6/2003 | 6908 VIOXX 25 MG (1 X 20) | N7765 |
| SCOTT | WILSON | | 10107292 | 20931 | 6/7/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L4412 |
| SCOTT | WILSON | | 10107292 | 20931 | 6/7/2001 | 6105 VIOXX 25 MG (1 X 4) | L4094 |
| DAVID | | D. | 10079811 | 21219 | 6/9/2000 | 6094 VIOXX 12.5 MG (1 X 4) | |
| DAVID | | D. | 10079811 | 21219 | 6/9/2000 | 6105 VIOXX 25 MG (1 X 4) | |

Confidential - Subject To Protective Order

| First Name | Initial / Last | ID | No. | Date | Product | Code |
|---|---|---|---|---|---|---|
| DAVID | D | 10079811 | 21219 | 6/9/2000 | 6314 VIOXX 50 MG (1 X 2) | P7095 |
| KATHERINE | H | 10149124 | 406111082 | 6/11/2004 | 7266 VIOXX 12.5 MG (1 X 20) | P7096 |
| KATHERINE | H | 10149124 | 406111082 | 6/11/2004 | 6908 VIOXX 25 MG (1 X 20) | P7111 |
| KATHERINE | F | 10149124 | 406111082 | 6/11/2004 | 7269 VIOXX 50 MG (1 X 20) | J8321 |
| CORAL | T | 10027172 | 20348 | 6/18/1999 | 6094 VIOXX 12.5 MG (1 X 4) | L4094 |
| LORI | D | 10093831 | 22076 | 6/19/2001 | 6105 VIOXX 25 MG (1 X 4) | J8322 |
| DAVID | F | 10079811 | 20166 | 6/21/1999 | 6094 VIOXX 12.5 MG (1 X 4) | |
| CORAL | F | 10027172 | 21833 | 6/23/2000 | 6094 VIOXX 12.5 MG (1 X 4) | |
| CORAL | F | 10027172 | 21833 | 6/23/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| SCOTT | WILSON | 10107292 | 45668 | 6/24/2002 | 6094 VIOXX 12.5 MG (1 X 4) | M6638 |
| SCOTT | WILSON | 10107292 | 45668 | 6/24/2002 | 6578 VIOXX 25 MG (1 X 4) | M6645 |
| SCOTT | WILSON | 10107292 | 45668 | 6/24/2002 | 6589 VIOXX 50 MG (1 X 2) | M6631 |
| DSI | | VNDR1006 | 1932867 | 6/25/2003 | 6116 VIOXX 12.5 MG (1 X 30) | M8218 |
| DGI | | VNDR1006 | 1932867 | 6/25/2003 | 6600 VIOXX 25 MG (1 X 30) | N2433 |
| KATHERINE | H | 10149124 | 406251146 | 6/25/2004 | 6908 VIOXX 25 MG (1 X 20) | P7096 |
| SCOTT | WILSON | 10107292 | 21004 | 6/29/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L4411 |
| SCOTT | WILSON | 10107292 | 21004 | 6/29/2001 | 6105 VIOXX 25 MG (1 X 4) | L4417 |
| JAMES | W | 10143691 | 306300176 | 6/30/2003 | 6897 VIOXX 12.5 MG (1 X 20) | N8063 |
| LORI | T | 10093831 | 22151 | 7/9/2001 | 6105 VIOXX 25 MG (1 X 4) | P7156 |
| KATHERINE | H | 10149124 | 407091218 | 7/9/2004 | 7266 VIOXX 12.5 MG (1 X 20) | L4417 |
| KATHERINE | H | 10149124 | 407091218 | 7/9/2004 | 7269 VIOXX 50 MG (1 X 20) | P7060 |
| CORAL | F | 10027172 | 45970 | 7/16/2002 | 6787 VIOXX 25 MG (1 X 2) | P7067 |
| CORAL | F | 10027172 | 45970 | 7/16/2002 | 6589 VIOXX 50 MG (1 X 2) | M6608 |
| CORAL | F | 10027172 | 21923 | 7/18/2000 | 6105 VIOXX 25 MG (1 X 4) | M6636 |
| HENRY | C | 10043933 | 20070 | 7/18/2000 | 6314 VIOXX 50 MG (1 X 2) | |
| HENRY | C | 10043933 | 20070 | 7/20/1999 | 6094 VIOXX 12.5 MG (1 X 4) | |
| CORAL | F | 10027172 | 20531 | 7/20/1999 | 6105 VIOXX 25 MG (1 X 4) | |
| THERESA | K | 10147283 | 307280090 | 7/28/1999 | 6094 VIOXX 12.5 MG (1 X 4) | J8322 |
| THERESA | K | 10147283 | 307280090 | 7/28/2003 | 6897 VIOXX 12.5 MG (1 X 20) | J8033 |
| THERESA | K | 10147283 | 307280090 | 7/28/2003 | 6908 VIOXX 25 MG (1 X 20) | J8027 |
| CHARLES | NMN | 10119078 | 307300271 | 7/28/2003 | 6919 VIOXX 50 MG (1 X 20) | N7741 |
| SCOTT | WILSON | 10107292 | 45768 | 7/30/2003 | 6908 VIOXX 25 MG (1 X 20) | N7558 |
| CHARLES | NMN | 10119078 | 45648 | 8/6/2000 | 6776 VIOXX 12.5 MG (1 X 20) | N7768 |
| | | | | 8/6/2002 | 6787 VIOXX 25 MG (1 X 2) | N7554 |
| | | | | | | M6643 |
| | | | | | | M6611 |

Confidential - Subject To Protective Order

MRK-MPF0589586

| First Name | | Last Name | Acct 1 | Acct 2 | Date | Product | Code |
|---|---|---|---|---|---|---|---|
| KATHERINE | H. | | 10149124 | 408061309 | 8/6/2004 | 7266 VIOXX 12.5 MG (1 X 20) | P7130 |
| DAVID | D. | | 10079811 | 22671 | 8/9/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L4467 |
| DAVID | D. | | 10079811 | 22671 | 8/9/2001 | 6105 VIOXX 25 MG (1 X 4) | L4501 |
| CORAL | F. | | 10027172 | 22009 | 8/10/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 23402 | 8/16/2001 | 6105 VIOXX 25 MG (1 X 4) | L4501 |
| DAVID | D. | | 10079811 | 21418 | 8/18/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| DAVID | D. | | 10079811 | 21418 | 8/18/2000 | 6314 VIOXX 50 MG (1 X 4) | |
| SCOTT | | WILSON | 10107292 | 45823 | 8/20/2002 | 6787 VIOXX 25 MG (1 X 2) | M6649 |
| KATHERINE | H. | | 10149124 | 408201377 | 8/20/2004 | 7269 VIOXX 50 MG (1 X 20) | P7131 |
| HENRY | C. | | 10043933 | 20763 | 8/23/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| SCOTT | | WILSON | 10107292 | 46489 | 9/3/2003 | 6897 VIOXX 12.5 MG (1 X 20) | N7752 |
| SCOTT | | WILSON | 10107292 | 46489 | 9/3/2003 | 6908 VIOXX 25 MG (1 X 20) | N7562 |
| LORI | T. | | 10093831 | 22358 | 9/5/2001 | 6105 VIOXX 25 MG (1 X 4) | L4524 |
| CORAL | F. | | 10027172 | 20715 | 9/8/1999 | 6094 VIOXX 12.5 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 20715 | 9/8/1999 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 22116 | 9/8/2000 | 6094 VIOXX 12.5 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 22116 | 9/8/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| THERESA | K. | | 10147283 | 309100218 | 9/8/2000 | 6314 VIOXX 50 MG (1 X 2) | N7563 |
| CORAL | F. | | 10027172 | | 9/10/2003 | 6908 VIOXX 25 MG (1 X 20) | |
| CORAL | F. | | 10027172 | 23483 | 9/12/2001 | 6094 VIOXX 12.5 MG (1 X 4) | L4518 |
| CORAL | F. | | 10027172 | 23483 | 9/12/2001 | 6105 VIOXX 25 MG (1 X 4) | L4524 |
| CORAL | F. | | 10027172 | 46248 | 9/19/2002 | 6776 VIOXX 12.5 MG (1 X 2) | M6604 |
| CORAL | F. | | 10027172 | 46248 | 9/19/2002 | 6787 VIOXX 25 MG (1 X 2) | M6273 |
| CORAL | F. | | 10027172 | 46248 | 9/19/2002 | 6589 VIOXX 50 MG (1 X 2) | M6617 |
| JAMES | W. | | 10143691 | 409202273 | 9/20/2004 | 7266 VIOXX 12.5 MG (1 X 20) | P7033 |
| CORAL | F. | | 10027172 | 22172 | 9/26/2000 | 6094 VIOXX 12.5 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 22172 | 9/26/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 22172 | 9/26/2000 | 6314 VIOXX 50 MG (1 X 2) | |
| DAVID | D. | | 10079811 | 46139 | 9/26/2002 | 6776 VIOXX 12.5 MG (1 X 2) | M6254 |
| DAVID | D. | | 10079811 | 21548 | 9/27/2000 | 6105 VIOXX 25 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 20807 | 10/1/1999 | 6094 VIOXX 12.5 MG (1 X 4) | |
| CORAL | F. | | 10027172 | 20807 | 10/1/1999 | 6105 VIOXX 25 MG (1 X 4) | |
| SCOTT | | WILSON | 10107292 | 45964 | 10/2/2002 | 6776 VIOXX 12.5 MG (1 X 2) | M6643 |
| SCOTT | | WILSON | 10107292 | 45964 | 10/2/2002 | 6787 VIOXX 25 MG (1 X 2) | M6273 |
| SCOTT | | WILSON | 10107292 | 45964 | 10/2/2002 | 6589 VIOXX 50 MG (1 X 2) | M6619 |

Confidential - Subject To Protective Order

| Contact Type | Detailed Contact Type | Last Name | First Name | Middle Name | Title | Suffix | Degree | MedEd # | AOA # | Addr Line 1 |
|---|---|---|---|---|---|---|---|---|---|---|
| Employee | Field Employee | Holmes | Katherine | H | Ms. | | | | | 3132 Woodhaven Dr. |
| Employee | Field Employee | Holmes | Katherine | H | Ms. | | | | | Private Mini Storage |
| Health Care Professional | Physician | Smith | George | Cicero | | | | | | 400 E 10th St |
| Health Care Professional | Physician | Smith | George | Cicero | | | | | | 83745 Highway 9 |

REDACTED

Confidential - Subject To Protective Order

MRK-MPF0589629

Confidential - Subject To Protective Order

MRK-SMPFA0023369

| LEGAL_ID | Case_Name | Cust_File | Rep | Call_Date | Customer | Note_Type |
|---|---|---|---|---|---|---|
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 5/1/2000 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 6/9/2000 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 8/18/2000 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | HARPER, CORAL | 11/22/2000 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | HARPER, CORAL | 1/21/2000 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | HARPER, CORAL | 1/30/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | HARPER, CORAL | 1/30/2002 | STEWART, JEFF | Program Notes |
| 514924 | May, Michael D. | Jeff L. Stewart | HARPER, CORAL | 2/19/1999 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | SANTIAGO, MELISSA | 7/20/1999 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 10/25/2001 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 1/18/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 6/24/2002 | STEWART, JEFF | Call Notes |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 8/6/2002 | STEWART, JEFF | Call Notes |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 10/3/2002 | STEWART, JEFF | Call Notes |
| 514924 | May, Michael D. | Jeff L. Stewart | HENDERSON, CHARLES | 10/21/2002 | STEWART, JEFF | Call Notes |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 6/21/1999 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 4/23/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 6/5/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | SPARKMAN, DAVID | 6/18/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 1/14/2000 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 2/23/2000 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 4/25/2000 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 4/25/2000 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 5/18/2000 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 6/29/2000 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 9/21/2000 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 9/21/2000 | STEWART, JEFF | Next Call Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 1/25/2001 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 10/30/2001 | STEWART, JEFF | Strategy |
| 514924 | May, Michael D. | Jeff L. Stewart | LOVETT, LORI | 4/9/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | BARTLETT, SCOTT | 4/15/2002 | STEWART, JEFF | Accomplishments |
| 514924 | May, Michael D. | Jeff L. Stewart | BARTLETT, SCOTT | 8/20/2002 | STEWART, JEFF | Call Notes |

MRK-SMPFA0023370

Confidential - Subject To Protective Order

Note_Text

Lunch. Covered [Redacted-OP]. Vioxx.

Invite to FLA program, and Gary Evans on the 21st.

Show cost advantage with coupons.

Has seen some problems with hypertension/renal creatine levels rising with 25mg VX; provided with Merck info and sent PIR on the issues.    Follow-up.

L&L

14 people (nurses, staff, rep)

Introduce myself, [Redacted-OP]

MD hasn't heard any feed back from patients regarding vioxx. [Redacted-OP]

v - oxicodone data, safety in the elderly, safety in the elderly. GI safety    [Redacted-OP].

Percocet data, Tripple power, [Redacted-OP].

Vioxx label, [Redacted-OP]

Vigor Trial, [Redacted-OP].

Saftey and efficacy of the 12.5mg.

Blunting Bextra, [Redacted-OP]

Says he has put several patients on Vioxx but no feedback yet.

Lunch.   Vioxx new label changes.

Vioxx 12.5.

Vioxx vs Bextra.

[Redacted-OP] Vioxx- success stories

[Redacted-OP]Vioxx- MD stated that he preferred vioxxover C and hasn't used any Celebrex in a while

[Redacted-OP]- efficacy Vioxx- efficacy over C and price over branded NSAIDS [Redacted-OP]

[Redacted-OP]Vioxx- efficacy over C and price over branded NSAIDS [Redacted-OP]

[Redacted-OP]- efficacy Vioxx- efficacy over C and price over branded NSAIDS [Redacted-OP]

Vioxx- GI outcome date [Redacted-OP]

Vioxx- GI outcome date [Redacted-OP]

[Redacted-OP] Vioxx - positive dose response and QD simplicity [Redacted-OP]

[Redacted-OP] Vioxx - positive dose response and QD simplicity [Redacted-OP]

[Redacted-OP]  Vioxx- new data

[Redacted-OP] discussed PAP program

Discussed the new additions to the Vioxx P.I.

Signed up MD on efficacy program

MRK-SMPFA0023371

Confidential - Subject To Protective Order

| | | | |
|---|---|---|---|
| 514924 May, Michael D. | Jeff L. Stewart HARPER, CORAL | 6/18/1999 STEWART, JEFF | Accomplishments |
| 514924 May, Michael D | Jeff L. Stewart HARPER, CORAL | 10/1/1999 STEWART, JEFF | Accomplishments Forward |
| 514924 May, Michael D. | Jeff L. Stewart HARPER, CORAL | 2/2/2000 STEWART, JEFF | Accomplishments |
| 514924 May, Michael D. | Jeff L. Stewart HARPER, CORAL | 10/20/2000 STEWART, JEFF | Accomplishments |

MRK-SMPFA0023372

Confidential - Subject To Protective Order

Shared Vioxx information and samples. Dr had attended a Pfizer program the day before. Damage control may be needed. Lunch & learn with this office on all specialty products. Information was well received and there was some questions on Vioxx. Lunch & learn(Central Std Time). Physicians were detailed briefly on Vioxx and [Redacted-OPI] (given stethescopes). [Redacted-OPI]. gave an invitation to Sebba program

MRK-SMPFA0023373

Confidential - Subject To Protective Order

| LEGAL_ID | MPF - Proprietary | CUSTOMER | CALL_DT | REP | CURR_REP_NAME | WIN |
|---|---|---|---|---|---|---|
| 514924 | | STEWART, JEFF | 6/21/1999 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 11/30/2000 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 10/20/2000 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 9/27/2000 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 8/18/2000 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 6/9/2000 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 5/12/2000 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 1/21/2000 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 10/27/1999 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 10/8/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 9/26/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 8/15/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 9/10/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 6/18/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 6/5/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 4/23/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 4/9/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 5/8/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 3/8/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 2/14/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 11/12/2001 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 8/9/2001 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 6/4/2001 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 4/24/2001 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 3/5/2001 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 1/30/2004 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 12/17/2003 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 11/14/2003 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 10/23/2003 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 9/11/2003 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 8/21/2003 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 5/28/2003 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 5/8/2003 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | | STEWART, JEFF | 2/7/2003 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |

MRK-SMPFA0023374

Confidential - Subject To Protective Order

| | [IJPF - Proprietary] | | | | |
|---|---|---|---|---|---|
| 514924 | STEWART, JEFF | 11/13/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | STEWART, JEFF | 10/22/2002 | SPARKMAN, DAVID | SPARKMAN, DAVID | 10079811 |
| 514924 | STEWART, JEFF | 9/3/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 8/20/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 8/6/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 7/9/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 6/25/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 6/11/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 5/14/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 4/30/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 4/16/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 4/2/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 3/19/2004 | HOLMES, KATHERINE | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 1/14/2004 | LOVETT, LORI | HOLMES, KATHERINE | 10149124 |
| 514924 | STEWART, JEFF | 9/21/2000 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 6/29/2000 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 4/25/2000 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 2/23/2000 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 10/30/2001 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 9/5/2001 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 7/9/2001 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 6/19/2001 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 5/9/2001 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 4/17/2001 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 3/5/2001 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 1/25/2001 | LOVETT, LORI | LOVETT, LORI | 10093831 |
| 514924 | STEWART, JEFF | 12/5/2003 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 11/5/2003 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 10/15/2003 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 9/3/2003 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 6/30/2003 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 6/11/2003 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 6/11/2003 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 5/19/2003 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 11/25/2002 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |

MRK-SMPFA0023375                                           Confidential - Subject To Protective Order

| | | | MPF - Proprietary | | |
|---|---|---|---|---|---|
| 514924 | STEWART, JEFF | 10/30/2002 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 10/2/2002 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 8/20/2002 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 8/6/2002 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 6/24/2002 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 4/15/2002 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 3/11/2002 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 1/7/2002 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 12/11/2001 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 6/29/2001 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 6/7/2001 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 5/14/2001 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 1/9/2001 | BARTLETT, SCOTT | BARTLETT, SCOTT | 10107292 |
| 514924 | STEWART, JEFF | 10/11/1999 | WALLS, RANDY | WALLS, RANDY | 10107292 |
| 514924 | STEWART, JEFF | 8/4/1999 | WALLS, RANDY | WALLS, RANDY | 10087447 |
| 514924 | STEWART, JEFF | 7/15/1999 | WALLS, RANDY | WALLS, RANDY | 10087447 |
| 514924 | STEWART, JEFF | 2/11/2004 | HARPER, CORAL | HARPER, CORAL | 10087447 |
| 514924 | STEWART, JEFF | 10/10/2003 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 6/6/2003 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 5/16/2003 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 1/31/2003 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 11/13/2002 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 9/19/2002 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 7/16/2002 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 6/25/2002 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 6/5/2002 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 4/4/2002 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 7/28/1999 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 6/18/1999 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 3/13/2002 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 2/22/2002 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 1/30/2002 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 1/7/2002 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 10/8/2001 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 9/12/2001 | HARPER, CORAL | HARPER, CORAL | 10027172 |

Confidential - Subject To Protective Order

MRK-SMPFA0023376

MPF - Proprietary

| | | | | | |
|---|---|---|---|---|---|
| 514924 | STEWART, JEFF | 8/15/2001 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 7/12/2001 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 5/10/2001 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 4/18/2001 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 3/13/2001 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 2/20/2001 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 12/20/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 12/1/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 11/22/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 10/20/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 9/26/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 9/8/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 8/10/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 7/18/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 6/23/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 5/17/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 4/10/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 3/20/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 2/2/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 1/14/2000 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 12/17/1999 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 11/12/1999 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 10/22/1999 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 10/1/1999 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 10/1/1999 | HARPER, CORAL | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 9/8/1999 | HARPER, CORAL | MCGLOTHAN WALKER, NATASHA | 10111837 |
| 514924 | STEWART, JEFF | 3/24/2004 | MCGLOTHAN WALKER, NATASHA | HARPER, CORAL | 10027172 |
| 514924 | STEWART, JEFF | 4/7/2004 | MCGLOTHAN WALKER, NATASHA | MCGLOTHAN WALKER, NATASHA | 10111837 |
| 514924 | STEWART, JEFF | 7/20/1999 | SANTIAGO, MELISSA | BAUER, MELISSA | 10065256 |
| 514924 | STEWART, JEFF | 3/17/2001 | MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 514924 | STEWART, JEFF | 8/23/2000 | MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 514924 | STEWART, JEFF | 6/22/2000 | MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 514924 | STEWART, JEFF | 7/20/1999 | MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 514924 | STEWART, JEFF | 7/9/1999 | MITCHAM, HENRY | MITCHAM, HENRY | 10043933 |
| 514924 | STEWART, JEFF | 2/2/2004 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |

MRK-SMPFA002337

Confidential - Subject To Protective Order

| | | MPF - Proprietary | | | |
|---|---|---|---|---|---|
| 514924 | | STEWART, JEFF | 12/1/2003 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 514924 | | STEWART, JEFF | 11/10/2003 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 514924 | | STEWART, JEFF | 10/20/2003 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 514924 | | STEWART, JEFF | 9/10/2003 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 514924 | | STEWART, JEFF | 7/28/2003 | ISIMINGER, THERESA | ISIMINGER, THERESA | 10147283 |
| 514924 | | STEWART, JEFF | 4/16/2002 | PHARR, JERRY | PHARR, JERRY | 10122342 |
| 514924 | | STEWART, JEFF | 3/19/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| 514924 | | STEWART, JEFF | 5/26/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| 514924 | | STEWART, JEFF | 4/7/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| 514924 | | STEWART, JEFF | 9/20/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| 514924 | | STEWART, JEFF | 7/2/2004 | HOUSTON, JAMES | HOUSTON, JAMES | 10143691 |
| 514924 | | STEWART, JEFF | 1/5/2004 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 12/8/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 11/24/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 10/15/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 8/25/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 8/6/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 6/24/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 1/18/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 10/25/2001 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 7/30/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 7/1/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 4/14/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 1/23/2003 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 12/20/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 11/22/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 10/21/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |
| 514924 | | STEWART, JEFF | 10/3/2002 | HENDERSON, CHARLES | HENDERSON, CHARLES | 10119078 |

MRK-SMPFA0023378

Confidential - Subject To Protective Order

| WIN_NO | EMPLY_CURR_NAME | ADDR | CITY | ST_ZIP | ADDR_EFF_DT | HOME_PHONE |
|---|---|---|---|---|---|---|
| 10149124 | Holmes,Katherine H. | 3132 Woodhaven Drive | Birmingham | AL 35243 | 2/28/2005 | 205-967-1830 |
| 10147283 | Isiminger,Theresa | 1401 Maldonado Dr. | Pensacola Beach | FL 32561 | 4/4/2005 | 850-934-3147 |
| 10143691 | Houston,James | 2236 Summit Place | Birmingham | AL 35243 | 1/1/2003 | 2059687609 |
| 10122342 | PHARR,JERRY P | 2045 Lee Road #137, Lot #22 | Auburn | AL 36832 | 6/14/2001 | 334-821-1525 |
| 10119078 | Henderson III,Charles | 110 Riverside Walk | Sharpsburg | GA 30277 | 5/31/2001 | |
| 10111837 | Mcglothan-walker,Natasha J | 3122 Highland Lakes Road | Birmingham | AL 35242 | 1/19/2005 | 205-408-6906 |
| 10107292 | BARTLETT,SCOTT WILSON | 260 Brookstone Crest | Newnan | GA 30265 | 6/19/2000 | 770-251-6860 |
| 10093831 | Lovett,Lori T | 6 Waverly Circle | Newnan | GA 30263 | 10/31/2000 | 770-683-7883 |
| 10087447 | WALLS,RANDY | 619 Lakewood Dr | Lagrange | GA 30240 | 3/29/1998 | 706-882-4458 |
| 10079811 | Sparkman,David D | 201 Copperplate Lane | Peachtree City | GA 30269 | 2/22/1999 | 770-632-0493 |
| 10065256 | Bauer,Melissa Santiago | 7 Tuckaloe Path | Sharpsburg | GA 30277 | 3/26/2004 | 770-683-4993 |
| 10043933 | Mitcham III,Henry C | 2784 Chipley Highway | Warm Springs | GA 31830 | 11/7/2004 | 706-663-9574 |
| 10027172 | Harper,Coral F | 330 Brookstone Crest | Newnan | GA 30265 | 9/1/1998 | 770-253-5508 |

MRK-SMPFA0023379

Confidential - Subject To Protective Order

| STATUS | EMP_IND | TERM_DT |
|--------|---------|---------|
| Active | Employee | |
| Active | Employee | |
| Active | Employee | |
| Active | Employee | |
| Terminated | Employee | 2/14/2003 |
| Active | Employee | |
| Active | Employee | |
| Terminated | Employee | 2/7/2004 |
| Terminated | Employee | 1/22/2005 |
| Terminated | Employee | 2/24/2000 |
| Active | Employee | |
| Active | Employee | |
| Active | Employee | |
| Active | Employee | |

Sheet1

MRK-SMPFA0023386

Confidential - Subject To Protective Order

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45438 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45438 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45438 |
| WOODLAND | AL | 36280 | MITCHAM | HENRY | F. | 10027172 | 21592 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | C. | 10043933 | 403190627 |
| WOODLAND | AL | 36280 | HARPER | CORAL | H. | 10149124 | 21445 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21445 |
| WOODLAND | AL | 36280 | MCGLOTHAN WALKER | NATASHA | J. | 10027172 | 403241284 |
| WOODLAND | AL | 36280 | HOLMES | LORI | J. | 10111837 | 403241284 |
| WOODLAND | AL | 36280 | MCGLOTHAN WALKER | NATASHA | J. | 10111837 | 403241284 |
| WOODLAND | AL | 36280 | HARPER | KATHERINE | H. | 10149124 | 404020699 |
| WOODLAND | AL | 36280 | HOLMES | CORAL | F. | 10027172 | 45544 |
| WOODLAND | AL | 36280 | HOUSTON | JAMES | W. | 10027172 | 45544 |
| WOODLAND | AL | 36280 | MCGLOTHAN WALKER | NATASHA | | 10143691 | 404071556 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D. | 10111837 | 404071349 |
| WOODLAND | AL | 36280 | HARPER | CORAL | J. | 10079811 | 45502 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21556 |
| WOODLAND | AL | 36280 | HENDERSON | CHARLES | NMN | 10119078 | 21556 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 304140006 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45429 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 45429 |
| WOODLAND | AL | 36280 | LOVETT | LORI | T. | 10107292 | 404160783 |
| WOODLAND | AL | 36280 | LOVETT | CORAL | T. | 10149124 | 21834 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22984 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | | 10227172 | 22064 |
| WOODLAND | AL | 36280 | LOVETT | LORI | D | 10079811 | 22365 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10093831 | 20541 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10149124 | 20541 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10149124 | 404300848 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10079811 | 404300848 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21106 |
| WOODLAND | AL | 36280 | SPARKMAN | LORI | | 10079811 | 21106 |
| WOODLAND | AL | 36280 | LOVETT | DAVID | | 10093831 | 45595 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21933 |
| WOODLAND | AL | 36280 | HARPER | KATHERINE | H. | 10149124 | 23062 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 405140942 |

MRK-SMPFA0023390

Confidential - Subject To Protective Order

| City | State | Zip | Last | First | MI | Number | Number |
|---|---|---|---|---|---|---|---|
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 305160234 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21701 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21701 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 305190093 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 305190093 |
| WOODLAND | AL | 36280 | HOUSTON | JAMES | W. | 10143691 | 405261797 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 22476 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 22476 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45726 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45726 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 45678 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 45678 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45726 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45726 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 306060289 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 306060289 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 20931 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 20931 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21219 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21219 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 406111082 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 406111082 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 306060289 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45726 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45678 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 20931 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 20931 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 21219 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 21219 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 406111082 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 406111082 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 306060289 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 406111082 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 406111082 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 20348 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22076 |
| WOODLAND | AL | 36280 | LOVETT | LORI | T. | 10993331 | 20166 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 21833 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21833 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21219 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45668 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45668 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45668 |
| | | 36280 | DSI | | | VNDR1006 | 1932867 |
| | | 36280 | DSI | | | VNDR1006 | 1932867 |
| | | 36280 | HOLMES | KATHERINE | H. | 10149124 | 406251146 |
| | | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 21004 |
| | | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 21004 |

MRK-SMPFA0023394

Confidential - Subject To Protective Order

| | | | | | | |
|---|---|---|---|---|---|---|
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 101107292 | 30630176 |
| WOODLAND | AL | 36280 | HOUSTON | JAMES | W. | 10143691 | 407021946 |
| WOODLAND | AL | 36280 | LOVETT | LORI | T. | 10093831 | 22151 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 407091218 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H. | 10149124 | 407091218 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45970 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 45970 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21923 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 21923 |
| WOODLAND | AL | 36280 | MITCHAM | CORAL | C. | 10043933 | 20070 |
| WOODLAND | AL | 36280 | MITCHAM | HENRY | C. | 10043933 | 20070 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 20531 |
| WOODLAND | AL | 36280 | ISIMINGER | THERESA | K. | 10147283 | 3072280090 |
| WOODLAND | AL | 36280 | ISIMINGER | THERESA | K. | 10147283 | 3072280090 |
| WOODLAND | AL | 36280 | ISIMINGER | THERESA | K. | 10147283 | 3072280090 |
| WOODLAND | AL | 36280 | HENDERSON | CHARLES | NMN | 10119078 | 307300271 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45768 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | NMN | 10149124 | 45648 |
| WOODLAND | AL | 36280 | HENDERSON | CHARLES | H. | 10119078 | 408061309 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 22671 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 22671 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 22009 |
| WOODLAND | AL | 36280 | HARPER | CORAL | F. | 10027172 | 23402 |
| WOODLAND | AL | 36280 | SPARKMAN | DAVID | D | 10079811 | 23410 |
| WOODLAND | AL | 36280 | SPARKMAN | SCOTT | D | 10079811 | 21418 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45823 |
| WOODLAND | AL | 36280 | HOLMES | KATHERINE | H | 10149124 | 408201377 |
| WOODLAND | AL | 36280 | MITCHAM | HENRY | C | 10043933 | 20763 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 46489 |
| WOODLAND | AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 46489 |
| WOODLAND | AL | 36280 | LOVETT | LORI | T | 10093831 | 22358 |
| WOODLAND | AL | 36280 | HARPER | CORAL | | 10027172 | 20715 |
| WOODLAND | AL | 36280 | HARPER | CORAL | | 10027172 | 20715 |
| WOODLAND | AL | 36280 | HARPER | CORAL | | 10027172 | 20715 |
| WOODLAND | AL | 36280 | HARPER | CORAL | | 10027172 | 22116 |
| WOODLAND | AL | 36280 | HARPER | CORAL | | 10027172 | 22116 |

MRK-SMPFA0023398

Confidential - Subject To Protective Order

| | | | | | | |
|---|---|---|---|---|---|---|
| WOODLAND AL | 36280 | HARPER | CORAL | | 10027172 | 22116 |
| WOODLAND AL | 36280 | ISIMINGER | THERESA | F. | 10147283 | 309100218 |
| WOODLAND AL | 36280 | HARPER | CORAL | K | 10027172 | 23483 |
| WOODLAND AL | 36280 | HARPER | CORAL | | 10027172 | 46248 |
| WOODLAND AL | 36280 | HARPER | CORAL | F. | 10027172 | 46248 |
| WOODLAND AL | 36280 | HARPER | CORAL | F. | 10027172 | 46248 |
| WOODLAND AL | 36280 | HARPER | CORAL | F. | 10027172 | 46248 |
| WOODLAND AL | 36280 | HOUSTON | JAMES | W. | 10143691 | 409202273 |
| WOODLAND AL | 36280 | HARPER | CORAL | | 10027172 | 22172 |
| WOODLAND AL | 36280 | HARPER | CORAL | | 10027172 | 22172 |
| WOODLAND AL | 36280 | SPARKMAN | DAVID | D | 10799811 | 46139 |
| WOODLAND AL | 36280 | HARPER | CORAL | D | 10027172 | 21548 |
| WOODLAND AL | 36280 | SPARKMAN | DAVID | | 10799811 | 20807 |
| WOODLAND AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45964 |
| WOODLAND AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45964 |
| WOODLAND AL | 36280 | HARPER | CORAL | F. | 10027172 | 20807 |
| WOODLAND AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 45964 |
| WOODLAND AL | 36280 | SPARKMAN | DAVID | | 10799811 | 46184 |
| WOODLAND AL | 36280 | HARPER | CORAL | D | 10027172 | 45964 |
| WOODLAND AL | 36280 | HENDERSON | CHARLES | F. | 10027172 | 310100725 |
| WOODLAND AL | 36280 | BARTLETT | SCOTT | NMN | 10119078 | 310150468 |
| WOODLAND AL | 36280 | SPARKMAN | DAVID | WILSON | 10107292 | 310150463 |
| WOODLAND AL | 36280 | SPARKMAN | DAVID | D | 10799811 | 21608 |
| WOODLAND AL | 36280 | HENDERSON | CHARLES | | 10270811 | 21600 |
| WOODLAND AL | 36280 | HENDERSON | CHARLES | NMN | 10119078 | 21600 |
| WOODLAND AL | 36280 | HARPER | CORAL | F. | 10027172 | 45833 |
| WOODLAND AL | 36280 | HENDERSON | CHARLES | NMN | 10119078 | 20892 |
| WOODLAND AL | 36280 | SPARKMAN | DAVID | D | 10799811 | 20515 |
| WOODLAND AL | 36280 | SPARKMAN | DAVID | D | 10799811 | 20490 |
| WOODLAND AL | 36280 | BARTLETT | SCOTT | WILSON | 10107292 | 20490 |
| WOODLAND AL | 36280 | ISIMINGER | THERESA | K | 10147283 | 46064 |
| WOODLAND AL | 36280 | ISIMINGER | THERESA | | 10147283 | 311100458 |
| WOODLAND AL | 36280 | HARPER | CORAL | | 10027172 | 311100458 |
| WOODLAND AL | 36280 | HARPER | CORAL | | 10027172 | 20996 |
| WOODLAND AL | 36280 | HARPER | CORAL | | 10027172 | 20996 |
| WOODLAND AL | 36280 | HARPER | CORAL | | 10027172 | 46452 |

MRK-SMPFA0023404

| CUSTOMER | PGM_START_DT | PGM_END_DT | REP | PGM_TYPE | TALK_TITLE | TOPIC |
|---|---|---|---|---|---|---|
| STEWART, JEFF | 2/2/2000 | 12/31/9999 | HARPER, CORAL | Lunch and Learn | | Management of Osteoarthritis |
| STEWART, JEFF | 8/6/2002 | 8/6/2002 | HENDERSON, CHARLES | Rep. Facilitated Mtg | | |
| STEWART, JEFF | 11/13/2002 | 11/13/2002 | SPARKMAN, DAVID | Rep. Facilitated Mtg | | |
| STEWART, JEFF | 11/22/2002 | 11/22/2002 | HENDERSON, CHARLES | Rep. Facilitated Mtg | | |
| STEWART, JEFF | 2/7/2003 | 2/7/2003 | SPARKMAN, DAVID | Rep. Facilitated Mtg | | |
| STEWART, JEFF | 7/30/2003 | 7/30/2003 | HENDERSON, CHARLES | Rep. Facilitated Mtg | | |
| STEWART, JEFF | 10/15/2003 | 10/15/2003 | HENDERSON, CHARLES | Rep. Facilitated Mtg | | |
| STEWART, JEFF | 11/14/2003 | 11/14/2003 | SPARKMAN, DAVID | Rep. Facilitated Mtg | | |
| STEWART, JEFF | 1/30/2004 | 1/30/2004 | SPARKMAN, DAVID | Rep. Facilitated Mtg | | |

MRK-SMPFA0023405

| SPKR not available | ADDR_1 | ADDR_2 | CITY | STATE_CD | ZIP_CD |
|---|---|---|---|---|---|
| | | | WOODLAND | AL | 36280 |